UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NAVIDEA BIOPHARMACEUTICALS, INC.,

                    Plaintiff,

        v.

MICHAEL M. GOLDBERG,,

                    Defendants.

Case No.:  1:19-cv-01578

**FIRST AMENDED COMPLAINT**

        Plaintiff Navidea Biopharmaceuticals, Inc. ("Navidea" or "Plaintiff"), files this Complaint against Defendant Dr. Michael M. Goldberg ("Goldberg" or "Defendant") for breach of contract, breach of the covenant of good faith and fair dealing, to obtain a declaratory judgment, and for breach of fiduciary duty.

## THE PARTIES

        1.      Plaintiff Navidea is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Ohio.  Plaintiff is a publicly-traded corporation listed on the New York Stock Exchange American ("NYSE").

        2.      Non-Party Macrophage Therapeutics, Inc. ("Macrophage") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Ohio.

        3.      Upon information and belief, Defendant Goldberg is a former employee of Macrophage and Navidea and is a resident of New Jersey.  Also, Goldberg was a member of Navidea's board of directors from November 2013 until August 14, 2018.  At certain times, he also served as the CEO of Navidea, the CEO of Macrophage, and a director of Macrophage.

**NATURE OF THE ACTION**

4.      This is a civil action for breach of contract, breach of the covenant of good faith and fair dealing, to obtain a declaratory judgment, and for breach of fiduciary duty.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because this is a civil action involving citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs. Navidea is a citizen of Delaware and Ohio; the Defendant is a citizen of New Jersey.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) and because a substantial part of the events or omissions giving rise to the claim occurred in this county and personal jurisdiction over Goldberg exists in this county.

7.      Personal jurisdiction over Goldberg exists because (a) Goldberg entered into the August 14, 2018 Agreement (the "August Agreement") in which he agreed that any action brought to enforce the terms of this Agreement shall be brought exclusively in the federal and state courts located in New York, New York, and (b) Goldberg regularly transacts business within New York.

**BACKGROUND**

**B.      Goldberg's Separation From Navidea**

8.      Navidea is a leader in precision medicine with immuno-targeted products designed to help identify the sites and pathways of undetected disease and enable better diagnostic accuracy, clinical decision-making, targeted treatment and, ultimately, patient care.

9.      Navidea focuses on the development of innovative immunodiagnostic agents and immunotherapeutics that can and will make a difference for individuals, as well as their families,

physicians and care givers, touched by devastating conditions like cancer, autoimmune, infectious and inflammatory diseases.

10.     Macrophage is a subsidiary of Navidea and is seeking to develop treatments for cancer, cardiovascular, autoimmune, antiviral and brain diseases through use of the Manocept platform, a patented delivery system targeting CD206 on activated macrophages.

11.     Navidea owns approximately 99.8% of Macrophage with Goldberg and Platinum-Montaur (defined below) holding the remaining 0.2% through preferred shares of stock.

12.     On or about August, 14, 2018, Navidea, Macrophage, and Goldberg entered into the August Agreement with the intent of entering into one or more additional definitive agreements (the "Transaction Documents") to provide for the separation of Goldberg from Navidea and the establishment of the parties rights and obligations with respect to the ownership, management and continued operations of Macrophage.

13.     To date, no Transaction Documents have been entered into between Navidea, Goldberg and Macrophage.

14.     As described in more detail below, the parties have not entered into the Transaction Documents because Goldberg initially refused to execute (or even negotiate) proposed transaction documents provided to him and then sought to renegotiate the terms of the August Agreement which Navidea refused to do.  Thereafter, Goldberg made certain claims and undertook certain actions which Navidea considered breaches of the August Agreement at best, and at worst, actions undertaken by Goldberg to frustrate the terms of the August Agreement.

15.     Thereafter, Goldberg engaged in other materially disturbing conduct that is the subject of a separate action by Macrophage against Goldberg in the Delaware Chancery Court: *Macrophage Therapeutics, Inc v. Michael M. Goldberg M.D.* (C.A. No. 2019-0137-JRS).  The

conduct challenged in that action includes Goldberg's unauthorized transfer of all or substantially all of Macrophage's assets, including rights under a license agreement with Navidea, to an entity formed and controlled by Goldberg.

**C.    The August Agreement**

16.    Because the August Agreement was entered into to expedite the separation of Goldberg from Navidea, the August Agreement expressly provides that "any failure to execute the Transaction Documents shall not render the provisions of [the August Agreement] invalid." (a true and correct copy of the August Agreement is annexed hereto as Exhibit A).

17.    The August Agreement incorporates the following agreements:

- Navidea Shares.  Goldberg would be issued 23.5 million shares of common stock of Navidea.  18.5 million shares to be issued upon consummation of the transaction, and five million shares to be issued on January 2, 2019.

- Share Escrow.  10 million of the shares of common stock to be issued to Goldberg would be held in escrow to settle any disputes that may arise between Navidea and Goldberg related to certain debt obligations alleged to be owed to Goldberg and for which a third party, Platinum-Montaur Life Sciences, LLC, has made a competing claim.

- Severance.    Goldberg will also be entitled to an aggregate of $978,000 as severance, payable in equal installments over 24 months beginning on August 31, 2018.

- COBRA. Navidea will also pay the costs to continue Goldberg's existing health coverage for a period of 16 months, by paying the amounts required under COBRA to maintain such coverage.

- Waiver.  Goldberg waived all rights to collect any debt (including, without limitation, interest) owed by Navidea, and releases each of Navidea and Macrophage from any and all claims that currently exist or arise, including but not limited to claims for any compensation, vacation pay, severance, bonus, options, warrants or any debt obligations.  The August Agreement specifically did not waive Goldberg's claims to an additional five million so-called "Phantom Shares" of Navidea stock; however, Goldberg's entitlement to the Phantom Shares expired by virtue of his cessation of employment at Navidea.

- Lock-up.  The August Agreement provides that after the award and the placement of the Navidea shares with members of Goldberg's family, neither Goldberg nor such family members will transfer any of Navidea shares for six months without the prior written consent of Navidea.

- <u>MT Super Voting Shares</u>.   The August Agreement further provides that Macrophage would issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of Macrophage.  The August Agreement further provides that the holders of MT Super Voting Common Stock shall be entitled to notice of any stockholders' meeting and to vote as a single class with holders of the Common Stock upon any matter submitted to the stockholders for a vote and that each holder of MT Super Voting Common Stock shall have 20 votes for each full share of MT Common Stock into which the shares of MT Super Voting Common Stock would be convertible on the record date for the matter to be voted on.  The August Agreement provides that until such time as Macrophage shall have obtained aggregate gross proceeds of $10 million in one or more financings, the vote or written consent of Navidea shall be required to issue to Goldberg or any of his affiliates any equity or rights to purchase equity.

- <u>Observer</u>.   The August Agreement provides that Navidea would be entitled to appoint one observer to the Macrophage Board of Directors, who would receive all notices of board meetings, written consents and board materials in advance of such meetings.

- <u>Credit Line</u>.   The August Agreement provides that for a period of six months, Navidea will provide a line of credit to Macrophage for the salary and benefits of Joel Kaufman, the expense of Nai Fang Wang, the expense of Jeffrey Arnold and MedChem, the remaining payment due and owing to the Salzman Group, the payment to Smart Assays, and other working capital items not to exceed $750,000 in the aggregate.

- <u>MT Preferred Stock</u>.   The August Agreement provides that Macrophage will redeem all shares of Goldberg's Macrophage preferred stock and any warrants or other equity rights held by Goldberg in Macrophage for no additional consideration other than Goldberg's rights under the August Agreement.

- <u>Transaction Documents</u>.   The August Agreement provides that the Transaction Documents shall contain other terms, conditions, representations and warranties of Navidea, MT and Goldberg customary for transactions of the type set forth in this Agreement, that counsel to Navidea's Special Committee, will prepare the initial drafts of the Transaction Documents, and that upon execution, the terms of such Transaction Documents shall supersede the terms set forth in the August Agreement.   The August Agreement provides that any subsequent failure to execute the Transaction Documents shall not render the provisions of the August Agreement invalid.

- <u>Severability</u>.   The August Agreement provides that if any part of the August Agreement is found invalid or unenforceable pursuant to judicial decree or decision, the remainder shall remain valid and enforceable according to its terms.

**D.**     **Partial Performance of the August Agreement**

18.     Goldberg and Navidea each have partially performed their obligations under the August Agreement.

19.     On August 14, 2018, Goldberg resigned as the Chief Executive Officer and President, and from the board of directors, of Navidea.

20.     On August 14, 2018, Goldberg waived his rights to collect on the Platinum Debt (defined below).

21.     On August 14, 2018, Goldberg released certain claims against Navidea and Macrophage but neither Navidea nor Macrophage released claims against Goldberg.

22.     Beginning on August 14, 2018, Navidea extended credit to Macrophage in an amount not to exceed $750,000 and paid directly all of the expenses of Macrophage incurred through February 14, 2019 that were required to be paid under the August Agreement.

23.     On August 31, 2018, Navidea advanced to Goldberg the costs to continue Goldberg's existing health coverage for a period of 16 months from August 14, 2018.

24.     Commencing on August 31, 2018, Navidea has been paying the severance obligations under the August Agreement on a monthly basis.  Goldberg has been paid severance in the amount of $346,375 through April 30, 2019.

25.     In September 2018, Navidea's proposed issuance of 23.5 million shares to Goldberg under the August Agreement was presented to the NYSE for review.

26.     The NYSE took the position that all equity granted to Goldberg at other than fair market value on the date of the issuance would constitute equity compensation, including equity granted in lieu of debt forgiveness because the value of the shares to be issued exceeded the amount of the debt being retired.

27.     In addition, the NYSE indicated that any shares issued to Goldberg in lieu of his 2017 and 2018 bonus would be deemed equity compensation unless they were issued at fair market value on the date of the issuance, or issued under a stockholder approved plan.

28.     The NYSE guidance limited the ability of Navidea to comply with Goldberg's subsequent demands as to how he wanted his shares issued under the August Agreement without putting Navidea's stock exchange listing in jeopardy.

29.     In response, Navidea offered Goldberg a cash payment in exchange for debt forgiveness in excess of the amount permitted by the NYSE to be issued in shares. Navidea offered each of the foregoing alternatives to Goldberg to the extent permissible under the NYSE rules (including combinations of the foregoing), but Goldberg rejected both, citing personal reasons, including tax planning.

30.     On November 22, 2018, after Goldberg refused to sign the lock-up agreements, seek shareholder approval, or give instructions to which family members the shares should be issued, Navidea directed the transfer agent to issue 18.5 million shares due under the August Agreement.

31.     On or about November 22, 2018, Goldberg was provided with 13.5 million shares and the remaining five million shares have been held by Navidea pursuant to the escrow provision in the August Agreement.

32.     While Navidea has not yet issued the additional five million shares due on January 2, 2019 (which still would require stockholder approval or be issued under an equity plan), those additional five million shares would be required to be held in escrow under the August Agreement.

E.     **Platinum-Montaur Life Sciences LLC**

33.     Prior to becoming CEO of Navidea, Goldberg was affiliated with an entity called Platinum-Montaur Life Sciences, LLC ("Platinum-Montaur").  Platinum-Montaur was the result of a collaboration between Goldberg and three hedge funds: Platinum Partners Value Arbitrage Fund LP, Platinum Partners Liquid Opportunity Master Fund L.P. and Platinum Opportunity Management (NY) LLC (collectively "Platinum Funds").  The Platinum Funds are now insolvent, in receivership, and several of their principals are the subject of criminal proceedings.

34.     Platinum-Montaur, Navidea and Goldberg are parties to that certain Securities Purchase Agreement, dated as of March 1, 2015, between Platinum-Montaur and Macrophage (the "SPA"), which restricts Macrophage from issuing additional shares below a certain value absent Platinum-Montaur's consent.

35.     The issuance of the MT Super Voting Common Stock could not be accomplished under the SPA without either obtaining Platinum-Montaur's consent or without diluting's Platinum-Montaur's interests in Macrophage.

36.     Platinum-Montaur is also currently in receivership and the 99% member of Platinum-Montaur is in liquidation in the Cayman Islands.

37.     On or about November 2, 2017, Platinum-Montaur sued Navidea seeking to recover amounts that Platinum-Montaur contends are due to it (the "Platinum Debt").  *See Platinum-Montaur Life Sciences LLC, v. Navidea Biopharmaceuticals, Inc.*, Civ. Act. No. 17-cv-9591 (VEC) (HBP) (the "Platinum Lawsuit").

38.     Goldberg has made a competing claim to the Platinum Debt.

39.     The August Agreement resolved Goldberg's claim by Navidea agreeing to issue him Navidea shares as compensation for Goldberg's asserted interest in the Platinum Debt, but

holding 10 million shares in escrow as security in the event that Navidea is required to pay Platinum-Montaur for all or a portion of the Platinum Debt.

40. On October 31, 2018, the Southern District of New York dismissed the Platinum Lawsuit for lack of standing.  Platinum-Montaur took an appeal of the dismissal.

41. On or about December 30, 2018, Navidea discovered that Platinum-Montaur had sued Goldberg individually, alleging that he had misappropriated certain warrants from Platinum-Montaur pursuant to which Goldberg acquired 5.4 million shares in Navidea back in January 2017 (the "Warrants Litigation").  *See Platinum Partners Value Arbitrage Fund L.P. v. Goldberg*, Adv. Proc. No. 1:18-ap-1650 (S.D.N.Y. Bankr.).

42. Prior to executing the August Agreement, Goldberg had informed Navidea that Platinum's claim to the warrants was a "dead issue" in that Platinum was not pursuing those claims against Goldberg any further.  However, it turns out this representation was false in that the Warrants Litigation was filed on October 5, 2018.

43. On February 8, 2019, Goldberg filed an answer in the Warrants Litigation and that case remains pending.

**F.    Goldberg's Breaches of the August Agreement**

44. As of August 14, 2018, the parties anticipated that Goldberg would remain engaged in Navidea's subsidiary, Macrophage.

45. As of August 14, 2018, Goldberg agreed to focus his energy full time on creating value at Macrophage for Macrophage's shareholders.

46. Goldberg has refused to engage in activities necessary for the success of Macrophage because he views resolution of his demands for his additional compensation under the August Agreement as a precondition to undertaking such actions.

47.     On September 7, 2018, Navidea sent drafts of documents to Goldberg and Macrophage to memorialize and consummate the transaction (the "Draft Documents").

48.     That same day, Goldberg refused to review the Draft Documents.

49.     Specifically, Goldberg stated that he would not review the documents because: (1) there was no agreement regarding the preferred stock sale from Macrophage to Navidea; and (2) there was no agreement for the $750,000 to be treated as debt (even though the August Agreement expressly provided otherwise).

50.     Moreover, on or about September 13, 2018, he requested that Macrophage's attorneys undertake actions designed to further Goldberg's own interests (i.e., the issuance of Navidea stock), by stating that Goldberg's "key interest is to get the 6-month holding period running as soon as possible" and directed Macrophage's attorneys to undertake personal work for Goldberg by calling Navidea's counsel "to get him to issue the shares ASAP to start the 6-month holding period running …"

51.     Thus, Goldberg refused to negotiate or comment on any Draft Documents that did not address his stock issuances.

52.     Moreover, because of the NYSE guidance restricting certain actions by Navidea, Goldberg demanded more shares or cash than what he had previously agreed to accept in the August Agreement.

53.     During the course of these discussions, Goldberg made numerous demands to change the terms of the August Agreement and made improper demands upon Navidea to try and circumvent the NYSE guidance.

54.     For example, Goldberg offered to sell unspecified intellectual property to Navidea (which already belonged to Navidea because Goldberg was required under various agreements to

transfer any intellectual property to Navidea). This "offer" was inconsistent with Goldberg's prior agreements regarding the ownership of intellectual property.

55.     Specifically, Goldberg had executed a Proprietary Information Agreement with Navidea, in which he agreed that "all ideas, concepts, discoveries, inventions, mask works, improvements and developments, whether process, product apparatus or design of whatever kind which Navidea considers relate to … its business or those of its affiliates, which I may make, conceive or acquire during the period of my employment by Navidea, shall belong to Navidea." Annexed hereto as Exhibit B is a true and correct copy of the Proprietary Information Agreement.

56.     Nonetheless, after signing the August Agreement Goldberg asserted repeatedly that he personally owned unspecified intellectual property that was critical to Macrophage's success going forward. Goldberg has consistently refused to identify what Macrophage intellectual property he allegedly owns.

57.     Similarly, Goldberg demanded that Navidea restate the amount of the Platinum Debt notwithstanding the fact that the Platinum Debt had been quantified as a specific number in numerous filings during the time in which he was CEO of Navidea.

58.     Similarly, in October 2018 and unknown to Navidea, Goldberg was seeking the assistance of Macrophage's attorneys to frustrate Navidea's interests in Macrophage. Specifically Goldberg wrote:

> I am not very concerned with the potential for new investors being put off re the actions that are (sic) taking during this split from Navidea (as long as they are 100% ethical) because I actually am not looking to bring investors into MT, but into its subsidiaries (yet to be formed – we need to move on that ASAP). Any investor that we accept into MT has to appreciate the many changes we will need to make to MT post Navidea split and this will not be an issue since if it is we will not let them in in any event … It is also critical that Navidea remains as distant from MT control as possible. ***Should Navidea not agree to exchange prior***

*investments in MT in return for preferred stock so that they can vote to change the financing restrictions on MT then give up the preferred as I committed to do then we need another solution.*" (Emphasis added).

59.     Of course, Goldberg's other solution was designed to frustrate Navidea's

interests.  As Goldberg wrote on October 14, 2018:

> "We have no restrictions so we can do anything that makes sense.  ***The plan is to ONLY dilute Navidea so it will not be an issue with respect to new investors***. Currently Navidea owns 95% of the equity which is artificial so the objective will be get that better aligned with what is standard given [Navidea has] no technology and minimal financial investment in MT.  Best we discuss the cap structure by phone as there is a lot of history that we have the freedom to correct under the new arrangement." (emphasis added).

60.     Later that month and still unknown to Navidea, Goldberg continued to confirm

that the problems consummating a transaction were not issues with Navidea, but rather his

personal goals and his issues with Platinum-Montaur.  On October 23, 2018, Goldberg wrote:

> "…I will leave that up to you *so long as MT does not find itself with Navidea having any future ability to govern MT's actions via their new Preferred position*.  Also, I don't want to have to be forced to pay back Platinum before a sale of the company."  (Emphasis added).

61.     Still unknown to Navidea, Goldberg was also seeking advice from Macrophage's

counsel as to how he could take additional control and economic benefits at the expense of other

shareholders:

> "What do you think about the board of MT voting to pay my current ongoing salary in preferred shares … I will have a salary of one share per month ($600,000 annual in a security that has a market value of 1/3 the nominal value … so as of October 14 I will have earned 3 shares.  Combined with my previous 5.6 shares I will have 8.6 shares and platinum will still have 8.4 shares.  We can then change the restrictions and get on with the rest of our agenda.  I will then also "give up" all economic interest in the preferred shares existing and new, as I committed to as part of the Navidea deal, except for the right to vote or prevent platinum from voting to change the terms of the preferred."

62.    On November 2, 2018,  Goldberg again refused to negotiate or enter into the transactions unless he received additional shares to which he was not entitled under the August Agreement.

63.    Later that same day, Goldberg contacted a member of the Navidea Board of Directors and stated:  "If [the Navidea CEO] is representing the board and if what he offered is the final offer that Navidea is making for its inability to honor its contract I need to know. Because if so I will hire litigators next week and take all other actions necessary to perfect my valid contractual claims. This will be a disaster for all involved and I will lose millions that Navidea may not be able [sic] makeup so it's not where I want to go but that is the only path I will be left with to protect my downside."

64.    On November 9, 2018, Goldberg continued to insist to Navidea's counsel that he needed additional compensation for the Platinum Debt and the purported delay in issuance of shares under the August Agreement.

65.    On November 12, 2018, Goldberg continued to place the issue of his Navidea share issuance, and his desire to deprive Navidea of its rights, as a precondition to fulfilling his commitment to focus his time creating value at Macrophage.

66.    Moreover, Goldberg has engaged in other erratic and improper conduct subsequent to entry into the August Agreement that has made clear his unfitness to effectively govern or lead Macrophage, including the conduct which is detailed in the Delaware Action. Accordingly, on February 20, 2019, the Macrophage Board of Directors voted to remove Goldberg as CEO of Macrophage.

67.    Based on the foregoing, Navidea has been deprived of the benefits of the bargain it struck with Goldberg in the August Agreement.

G.    **Goldberg's Breach of Fiduciary Duty**

68.    In addition to breaches of the August 14, 2018 agreement, Goldberg has breached his fiduciary duties owed to Navidea.

69.    On May 8, 2015, Navidea entered into a Term Loan Agreement with Capital Royalty Partners II (CRG) and its affiliates pursuant to which CRG agreed to loan Navidea up to $60,000,000.

70.    Macrophage was a subsidiary guarantor under the CRG Loan Agreement.

71.    The loan agreement required that CRG receive control agreements for all depository accounts controlled by either Navidea or Macrophage.  Further, Navidea was required to provide prompt written notice to CRG after a Responsible Navidea Officer first learned of any changes to Navidea's or Macrophage's deposit accounts.  Failure to provide written notice or control agreement was an Event of Default under the CRG loan agreement.  As CEO of Navidea, Goldberg was a Responsible Navidea Officer within the meaning of the CRG Loan Agreement.

72.    During 2015 a rift developed between Goldberg and other members of Navidea management and directors concerning the future direction of Navidea and who was authorized to withdraw funds from the Macrophage account.

73.    Although both Navidea's CEO and CFO were appointed officers of Macrophage, Goldberg claimed they were unauthorized to engage in any transactions with respect to Macrophage's U.S. Bank account.  Because they did deposit and withdraw funds from Macrophage's U.S. Bank account, Goldberg concluded this was an unacceptable affront to his authority.

74.    Accordingly, on December 1, 2015, Goldberg secretly, and without consulting with Navidea's legal counsel about potential legal implications under the CRG loan agreement,

caused to be opened a Wells Fargo account for Macrophage into which he and Platinum deposited $101,000 to fund certain operating expenses of Macrophage.  In doing so, Goldberg caused Navidea to be in breach of the CRG Loan Agreement, both because Goldberg failed to advise CRG of the existence of the account and because he failed to provide CRG with a control agreement on the account necessary to perfect CRG's first security interest in any Macrophage accounts.

75.    In January 2016, CRG invited Goldberg to a meeting where he was advised that CRG was extremely concerned with his relationship with Platinum and that it would be best for Goldberg to withdraw from the management of Navidea.  Goldberg rebuffed their suggestion but was on notice that CRG wanted him gone from Navidea.

76.    In 2016, Goldberg instigated major changes in Navidea's corporate governance that solidified his control over Navidea and Macrophage by causing any director or officer opposed to his agenda to be marginalized.  Goldberg achieved this by calling a board meeting on March 27, 2016 – (Easter Morning).  At this meeting four members of the Navidea Board voted to elect Goldberg as the Chairman of Navidea's Board of Directors and simultaneously Goldberg resigned as CEO of Macrophage.

77.    Goldberg then proceeded to form a standing Executive Committee having the unilateral power to make decisions without full Board Consent or approval, and consisting of four members: Michael Goldberg, Tony Fiorino, Marc Green and Eric Rowinsky.  At the meeting, Goldberg also reappointed himself to the Macrophage Board and replaced Navidea Directors Anton Guth and Rick Gonzalez (Navidea's CEO) with Dr. Greene and Rowinsky.

78.    Goldberg further restructured the Audit Committee and appointed himself its head.  Director Anton Guth then resigned on April 6, citing his objections to the changes in

Navidea's governing structure.  Then on April 7, 2016, the Navidea Board voted to terminate the employment of Navidea's CEO Rick Gonzalez.  Finally on April 28, 2016, Gordon Troup resigned his position from Navidea's Board of Directors stating that he "continued to be concerned with the direction, governance and control of the company."

79.     Gonzalez subsequently sued Navidea for compensation owed because he was terminated without cause.  Goldberg insisted that Gonalez had "resigned" and refused to allow Navidea to pay severance benefits.  Gonzalez commenced an arbitration against Navidea in Ohio, and the Arbitrator completely rejected Goldberg's version of events and found him not a credible witness.  In pertinent part, the Arbitrator's ruling included the following findings:

> Navidea had been in turmoil for some time.  It failed to meet targets for 2015, and was at risk of violating covenants with its lenders.  A Board "coup" happened on March 27 (Easter Sunday), 2016.  Two new members were seated.  The result was that Dr. Michael Goldberg was named Chair (by a 4-3 vote), and an executive committee was named, with full power to act for the Board (also by a 4-3 vote).  The four "yes" votes were named to the executive committee.

> The critical event in this case is a telephone conference between Dr. Goldberg (now Board chair), Dr. Eric Rowinsky (Board member), and Mr. Gonzalez on April 7, 2016.  Dr. Goldberg got right to the point.

> So, Rick, I just want to update you on something.  The Board met and we had a very significant discussion and reviewed things, and it was determined by the Board that, in the shareholder's best interests, that you be terminated as CEO for cause.

> In the rest of the call Dr. Goldberg made repeated references to the possibility that Mr. Gonzalez might wish to resign instead of being terminated, "the longer it takes you're going to lose the ability to say it is something other than what it is."

> That should have been the end of the story.  Any reasonable person would have understood that he was fired.  There is simply no other interpretation.

> Navidea continued to claim, in this arbitration, that Gonzalez had resigned, in which case he would get no money under the employment contract.

> In an answer to an admission request that quoted the exact language of the telephone call above, Navidea stated "Denied. He was told that it was in the best

interest of shareholders that the Company go in a new direction and that he is not the right guy to run the company for this transition."

Dr. Goldberg, in his deposition, denied that he used the quoted language.  But Mr. Gonzalez had recorded the conversation.  (Legally—as Ohio allows recording with the permission of one party.)  The tape was played and the transcript admitted in the hearing.

On the stand at the hearing, Dr. Goldberg still tried to deny the language or mitigate it.  The panel finds that in this, and in general, Dr. Goldberg was not a credible witness.

The "resignation" defense was the only one offered at the hearing.  It is feckless. The panel unanimously finds that Mr. Gonzalez was fired without cause on April 7, 2016.  A discussion of damages follows.

80.     Goldberg did not provide any advance notice to CRG of his Easter coup resulting in significant changes to Navidea's governance and management structure and consolidating his control of Navidea.  These changes predictably infuriated CRG, which already believed that the Platinum funds were part of a criminal enterprise and were highly concerned with Goldberg's close prior affiliation with Platinum and its founder, Mark Nordlicht. CRG's concerns were widely shared at the Navidea board level by Rick Gonzalez, Anton Guth, and Gordon Troup, all of whom were effectively banished as a result of the coup.

81.     By April 2016, when Goldberg orchestrated the "board coup", he was aware that CRG was extremely concerned with this relationship with Platinum and his role at Navidea. While the CRG Agreement did not give CRG the right to appoint officers or directors, it gave CRG enormous leverage over Navidea by allowing it to declare events of defaults, which could have catastrophic implications for Navidea.

82.     Goldberg's secret decision to open the Macrophage Wells Fargo account was a breach of the CRG Loan Agreement and gave CRG the leverage it needed to hold Navidea hostage with the threat of a lawsuit declaring an event of default and seeking to accelerate the balance of the CRG Loan.  Navidea ultimately discovered what Goldberg had done when the IRS

contacted it about the Macrophage account, and then communicated it to CRG.  Predictably, CRG maintained this was an event of default under the CRG Loan Agreement entitling it to accelerate the entire loan.

83.     After learning of the massive corporate restructuring orchestrated by Goldberg, CRG demanded that the existing management team be maintained and that Goldberg resign from Navidea as Chairman of the Board and CEO.

84.     Goldberg refused to resign and CRG commenced suit.

85.     CRG filed litigation against Navidea in state court in Texas, alleging that there had been numerous events of default under the loan agreement, including Goldberg's secret opening of the Wells Fargo Macrophage bank account without notification to CRG or provision of a control agreement on that account.

86.     The Texas district court concluded that there had been one or more events of defaults under the CRG loan agreement, entitling CRG to foreclose on the assets of Navidea which would result in destruction of the company. On February 8, 2017, the Texas district court entered summary judgment in favor of CRG concluding that one or more events of default had occurred and that CRG was entitled to accelerate the loan balance.  This threatened Navidea's ability to continue as a going concern because it did not have cash to pay off the loan balance and would permit CRG to foreclose on all of Navidea's assets.  Indeed, CRG began the process of scheduling a foreclosure sale of Navidea assets.

87.     CRG was able to parlay its declaration of default into the assertion of control over Navidea's key bank accounts, which it was able to do without court approval.  As a result, Navidea was starved for cash.  Its sole source of cash was payments received from its distribution partner Cardinal Health for the diagnostic drug Manocept.

88.     Cardinal Health was willing to remit payments to a new account opened by Navidea, but only on condition that Navidea extend the existing distribution agreement, whose terms were extremely unfavorable to Navidea by another two years.  Navidea had no choice but to accede to this request, which alone cost the company millions of dollars of lost revenue.

89.     Following the district court's grant of summary judgment to CRG, the only practical way for Navidea to survive was for it to sell the Manocept asset to Cardinal Health, even though it otherwise made no business sense for Navidea to sell Manocept in 2016, because sales were just beginning to grow and delaying the sale for several more years would have resulted in at least $50 million more than what Navidea could have sold it for in 2016.

90.     Unfortunately, because of the Texas court's summary judgment order, Navidea was forced to negotiate from a position of weakness and did not have the luxury of waiting to sell Manocept.

91.     Cardinal Heath agreed to purchase the Manocept asset, but on terms highly favorable to it and highly unfavorable to Navidea.   The forced sale of Manocept caused damage to Navidea in excess of $50 million.

## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

92.     Navidea repeats and reiterates the preceding allegations as if set forth fully herein.

93.     The August Agreement is a valid and binding contract.

94.     The August Agreement required, among other things, that Goldberg enter into Transaction Documents which contain "terms, conditions, representations and warranties of Navidea, Macrophage and Goldberg customary for transactions of the type set forth in [the August Agreement."

95.     Goldberg has refused to provide comments on the Draft Documents or enter into Transaction Documents.

96.     The August Agreement prevented Goldberg from issuing to himself or any affiliate any equity until Macrophage has obtained $10 million in one or more financings.

97.     Notwithstanding the fact that Macrophage has not obtained $10 million in financings, Goldberg has issued himself five percent ownership of a newly created subsidiary of Macrophage.

98.     Notwithstanding the fact that Navidea advanced Goldberg the costs to continue Goldberg's existing health coverage, Goldberg did not pay the amounts required thereby causing Navidea to request a waiver from its insurer which has resulted in damage to Navidea.

99.     Navidea at all times has either complied with its obligations under the August Agreement and has performed and was willing and able to perform all of its obligations thereunder that it was able to perform.

100.     Goldberg was capable of performing his obligations under the August Agreement but, instead, breached the August Agreement through his actions above.

101.    Navidea has suffered damages and will continue to suffer damages resulting from Goldberg's breaches in an amount to be determined at trial.

SECOND CAUSE OF ACTION
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

102.    Navidea repeats and reiterates the preceding allegations as if set forth fully herein.

103.    The August Agreement is governed by Delaware law.

104.    The covenant of good faith and fair dealing is implied in every contract governed by Delaware law.

105.    When entering into the August Agreement, it was the intention of the parties that Goldberg, Macrophage and Navidea would promptly enter into the Transaction Documents.

106.    When entering into the August Agreement, it was the intention of the parties that Goldberg would immediately start taking actions to advance the business of Macrophage.

107.    When entering into the August Agreement, it was the intention of the parties that Navidea would extend a credit line up to $750,000 and for a period of only six months.

108.    Navidea was reasonably justified in understanding that Goldberg would cooperate in fulfilling the terms of the August Agreement.

109.    In refusing to negotiate the Draft Documents and/or enter into the Transaction Documents, Goldberg has acted arbitrarily and unreasonably.

110.    As a result of Goldberg's actions, including the transferring of Macrophage's assets to the MT Subsidiary, Navidea has been deprived of the benefits of the bargain it struck with Goldberg and Macrophage.

111.    The foregoing misconduct by Goldberg constitutes a breach of the implied covenant of good faith and fair dealing.

112.     Navidea has suffered damages and will continue to suffer damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

113.     Navidea repeats and reiterates the preceding allegations as if set forth fully herein.

114.     This action involves the respective rights of Goldberg and Navidea under the August Agreement.

115.     A ripe controversy exists under the parties respective obligations under the August Agreement in light of: (1) Goldberg's issuance of equity to himself; (2) Goldberg's failure to enter into the Transaction Documents; (3) Goldberg's insistence that his personal interests be satisfied before causing Macrophage to comply with its obligations under the August Agreement; (4) Navidea was unable to issue stock in accordance with Goldberg's demands without endangering Navidea's listing with the NYSE.

116.     Plaintiff seeks a declaratory judgment that performance of certain of its obligations are excused by virtue of the above.

117.     Plaintiff seeks a declaratory judgment that it is entitled to terminate the August Agreement as result of Goldberg's actions.

### FOURTH CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

118.     Navidea repeats and reiterates the preceding allegations as if set forth fully herein.

119.     As a CEO and Board member of Navidea, Goldberg owed Navidea a fiduciary duty and duty of loyalty.

120.     Goldberg's actions in failing to advise Navidea's board members and management of his decision to open a secret Macrophage bank account in violation of the CRG

Loan Agreement and without bothering to consult with Navidea legal counsel was not in good faith and in violation of Goldberg's fiduciary obligations to Navidea.

121.    Further it caused Navidea to be in breach of the CRG Loan Agreement, ultimately resulting in CRG obtaining summary judgment in the Texas district court and forcing Navidea to have to sell Manocept prematurely

122.    Goldberg's breaches of fiduciary duty and duty of loyalty have caused Navidea damages in excess of $50 million.

**REQUESTED RELIEF**

WHEREFORE, Navidea demands judgment as follows:

(a)    That Goldberg breached the August Agreement;

(b)    That Goldberg's conduct warrants the imposition of compensatory and punitive damages;

(c)    A declaration regarding the remaining rights and obligations under the August Agreement;

(d)    A money judgment against Goldberg for breach of fiduciary duty and duty of loyalty in an amount to be proven at trial.

(e)    That Navidea be awarded its attorney fees and costs; and

(f)    That Navidea be awarded such other and further relief that this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a jury trial on all issues so triable.

Dated: New York, New York
       April 26, 2019

Respectfully submitted,

THOMPSON HINE LLP

By: /s/ Barry M. Kazan
     Barry M. Kazan
     Catherine R. Hartman
     335 Madison Avenue, 12th Floor
     New York, New York 10017-4611
     Tel. (212) 344-5680
     Fax (212) 344-6101
     Barry.Kazan@Thompsonhine.com
     Catherine.Hartman@Thompsonhine.com

     -and-

     Alain M. Baudry
     KUTAK ROCK LLP
     60 South Sixth Street, Suite 3400
     Minneapolis, MN 55042-4018
     T: (612) 334-5000 / F: (612) 334-5050
     alain.baudry@kutakrock.com

     *Attorneys for Plaintiff*
     *Navidea Biopharmaceuticals, Inc.*