# EXHIBIT 2

**UNITED STATES  DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In the Matter of: | § § § | |
| NAVIDEA BIOPHARMACEUTICALS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 1:19-cv-01578-VEC |
| MICHAEL M. GOLDBERG, M.D., | § § § | |
| Defendant. | § § § | |

**EXPERT REPORT**
**SEPTEMBER 30, 2021**

_____

_____

**TERRY L. ORR**



HKA Global, Inc.
1717 Main Street, Suite 3075
Dallas, TX 75201

Expert Report of Terry L. Orr

## CONTENTS

I.  **Introduction & Qualifications**....................................................................................**1**

A. Scope of Assignment ...............................................................................................1

II.  **Case Background**..............................................................................................................**2**

A. August 14th Agreement ............................................................................................3

B. Restrictions Imposed by Regulation D and Rule 144 for Transfers to Affiliates......................4

C. Restrictions Imposed by Legends Placed on Navidea Shares ...............................................8

D. Differences in Restrictions Imposed by Reg D and Legends Placed on Navidea Shares ....10

E. Reverse Stock Splits .................................................................................................13

III.  **Navidea Analysis**..........................................................................................................**16**

A. 722,726 Navidea Shares Issued to Dr. Goldberg Were Not Issued Under Regulation D .....16

B. The Remaining Navidea Shares Issued to Dr. Goldberg Contained Restrictive Legends Not Authorized or Required by Regulation D ...................................................................16

C. Financial Damages Suffered by Goldberg ...............................................................16

IV. **Summary of Navidea Opinions**.................................................................................**23**

V.  **MT Analysis**...................................................................................................................**24**

VI. **Summary of MT Opinions**.........................................................................................**25**



Expert Report of Terry L. Orr

## LIST OF APPENDICES & ATTACHMENTS

1.  Appendix 1 – Curriculum Vitae and Testimony Listing of Terry L. Orr

2.  Appendix 2 – Documents Considered

## LIST OF FIGURES & TABLES

Table 1: Navidea Shares ......................................................................................21
Table 2: Calculation of Transfer Values ...............................................................22
Table 3: Range of Shares Value............................................................................22

Chart 1: Navidea's Share Pricing and Volume......................................................23



Expert Report of Terry L. Orr

## I.    Introduction & Qualifications

HKA Inc. ("HKA") is a business and litigation consulting firm that provides services to corporations and counsel with offices worldwide.  HKA professionals include Certified Public Accountants, Certified Fraud Examiners, Project Management Professionals, Professional Engineers, and other financial and accounting personnel who provide dispute resolution and other consulting services to corporations and the legal profession.

I am a Partner with HKA in the Dallas office of the Forensic Accounting and Commercial Damages practice. I am a Certified Public Accountant licensed in the State of Texas with over 35 years of experience in the field of public accounting. I am a member of the American Institute of Certified Public Accountants ("AICPA"). I am also a Chartered Global Management Accountant ("CGMA"), a Certified Internal Controls Auditor ("CICA"), a Certified Construction Auditor ("CCA") and I am a member of the AICPA's Forensic & Valuation Services Section (FVS Section). My educational background includes a Bachelor of Science in Accountancy and Business Administration from Brigham Young University. I spent the first 27 years of my career conducting audits and reviews for companies in a variety of industries, including public and Regulation D filings. Subsequently, I have focused on providing litigation consulting services in forensic accounting matters, corporate investigations, fraud examinations, and damage computations. I have also provided expert witness testimony for depositions, trials, and arbitrations, and have assisted legal counsel in mediation settlements. Further detail about my qualifications, including my curriculum vitae, can be found in Appendix 1[1] attached to this report.

### A.  Scope of Assignment

HKA has been retained by Gregory Zimmer, Esq. ("Counsel") on behalf of his client, Michael M. Goldberg, M.D. ("Dr. Goldberg" or "Goldberg"), to do the following as it relates to Navidea Biopharmaceuticals, Inc's ("Navidea") and Macrophage Therapeutics, Inc.'s ("MT") breach of the August 14th Agreement [2] with Dr. Goldberg.

1.  Educate finder of fact with respect to attributes of shares issued pursuant to Reg D.

2.  To opine on whether the Navidea shares purportedly issued to Dr. Goldberg were issued consistent with those standards.

---

[1] Appendix 1 – Curriculum Vitae and Testimony Listing of Terry L. Orr.

[2] August 14, 2018, Agreement.



Expert Report of Terry L. Orr

3.  Evaluate the damages sustained by Dr. Goldberg resulting from the breach.

The Orr Expert Report was prepared by me with the support of other personnel of HKA. HKA is being compensated for the services of its personnel on an hourly basis. The hourly rates for personnel working on this engagement range from $160-$650 per hour.[3] HKA's compensation is not contingent on my findings or on the outcome of this case.

My opinions are based upon my experience as well as the information obtained through my own research, information available in case documents, information provided by Counsel and interviews with Dr. Goldberg. My opinions are expressed to reasonable professional certainty. The documents I considered thus far in this matter include the information and data detailed in Appendix 2.[4] If I am asked to testify, I may illustrate my testimony with demonstration aids such as graphs, charts and/or slides based on information contained in those materials and this Report.

This Report has been prepared in connection with the litigation matter referenced on the cover page hereof. This Report is to be used solely for the purpose of the subject litigation and is not to be used or relied upon for any other purpose without the express written consent of HKA.

While my testimony may involve references to valuation reports, accounting records, financial statements, and other documents, the analysis is not an audit or review within the meaning of generally accepted auditing standards ("GAAS") of such reports, financial statements, and records.

If new information is provided to me, including but not limited to opposing expert reports and analyses, I reserve the right to address matter contained in such reports and/or analysis and to amend and/or update this report and any opinions or conclusions contained herein.

## II.  Case Background

Navidea is a leader in precision medicine with immuno-targeted products designed to help identify the sites and pathways of undetected disease and enable better diagnostic accuracy, clinical decision-making, targeted treatment, and, ultimately, patient care.[5] Navidea is a publicly-

---

[3] My rate for deposition/trial testimony will be $650 per hour.

[4] Appendix 2 – Documents Considered.

[5] First Amended Complaint, paragraph 8.



Expert Report of Terry L. Orr

traded corporation listed on the New York Stock Exchange American ("NYSE"), organized and existing under the laws of the state of Delaware with its principal place of business in Ohio.[6]

MT is subsidiary of Navidea formed to develop treatments for cancer, cardiovascular, autoimmune, antiviral and brain diseases through use of the Manocept platform, a patented delivery system targeting CD206 on activated macrophages.[7] At this time, Navidea owns approximately 99.8% of MT.[8] The remaining 0.2% is owned by Dr. Goldberg and Platinum-Montaur Life Sciences, LLC ("Platinum-Montaur")[9] through convertible preferred stocks, of which Dr. Goldberg owned 40% and Platinum-Montaur owned 60%[10].  MT is a corporation organized and existing under the laws of the state of Delaware.[11]

Dr. Goldberg is a former employee of Navidea and MT. He was a member of Navidea's board of directors from November 2013 until August 14, 2018. At certain times, he also served as the CEO of Navidea, the CEO of MT, and a director of MT. Dr. Goldberg is a resident of New Jersey. [12]

### A.  August 14th Agreement

On August 14, 2018, Navidea, MT and Dr. Goldberg entered into an Agreement, hereinafter referred to as the "August 14th Agreement"[13], to provide for Dr. Goldberg's resignation from Navidea as Director and CEO, affect a separation of MT from Navidea and establish the parties' rights and obligations with respect to the ownership, management and continued operations of MT[14].

The August 14th Agreement required Navidea to, "…issue to Goldberg 23.5 million shares of Navidea common stock (the "Shares"), 18.5 million currently, and 5 million on January 2nd,

---

[6] First Amended Complaint, paragraph 1.

[7] First Amended Complaint, paragraph 10.

[8] First Amended Complaint, paragraph 11.

[9] Platinum-Montaur was the result of a collaboration between Dr. Goldberg and three hedge funds: Platinum Partners Value Arbitrage Fund LP, Platinum Partners Liquid Opportunity Master Fund L.P. and Platinum Opportunity Management (NY) LLC. First Amended Complaint, paragraph 33.

[10] From discussions with counsel and Dr. Goldberg.

[11] First Amended Complaint, paragraph 2.

[12] First Amended Complaint, paragraph 3.

[13] August 14, 2018, Agreement.

[14] First Amended Complaint, paragraph 12.



Expert Report of Terry L. Orr

2019.  The Shares will be issued under Regulation D of the Securities Act of 1933."[15]  The August 14th Agreement requires MT to "issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT,"[16] which provided him with a 5.0% equity interest in MT and voting control of MT.

## B.  Restrictions Imposed by Regulation D and Rule 144 for Transfers to Affiliates

### 1.  Regulation D ("Reg D")

Under the federal securities laws, any offer or sale of a security must either be registered with the Security Exchange Commission ("SEC") or meet an exemption. Regulation D under the Securities Act provides a number of exemptions from the registration requirements, allowing some companies to offer and sell their securities without having to register the offering with the SEC.[17]

Rule 504 of Regulation D provides an exemption from the registration requirements of the federal securities laws for some companies when they offer and sell up to $10,000,000 of their securities in a 12-month period.  Except in limited circumstances, purchasers of securities offered pursuant to Rule 504 receive "restricted securities", meaning that the securities cannot be sold for at least six months or a year without registering them.[18]

Rule 506 of Regulation D provides two distinct exemptions from registration for companies when they offer and sell securities.[19]

Under Rule 506(b), a "safe harbor" under Section 4(a)(2) of the Securities Act, a company can be assured it is within the Section 4(a)(2) exemption by satisfying certain requirements, including the following:[20]

- The company cannot use general solicitation or advertising to market the securities.

---

[15] August 14, 2018, Agreement, Navidea Shares.

[16] August 14, 2018, Agreement, MT Super Voting Shares.

[17] 17 CFR §230.501 et seq.

[18] 17 CFR §230.504 et seq.

[19] 17 CFR §230.506 et seq.

[20] Id.



Expert Report of Terry L. Orr

- The company may sell its securities to an unlimited number of accredited investors and up to 35 other purchasers. All non-accredited investors, either alone or with a purchaser representative, must be sophisticated—that is, they must have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of the prospective investment.

- Companies must decide what information to give to accredited investors, so long as it does not violate the antifraud prohibitions of the federal securities laws. This means that any information a company provides to investors must be free from false or misleading statements. Similarly, a company should not exclude any information if the omission makes what is provided to investors false or misleading. Companies must give non-accredited investors disclosure documents that are generally the same as those used in Regulation A or registered offerings, including financial statements, which in some cases may need to be certified or audited by an accountant. If a company provides information to accredited investors, it must make this information available to non-accredited investors as well.

- The company must be available to answer questions by prospective purchasers.

Under Rule 506(c), a company can broadly solicit and generally advertise the offering and still be deemed to be in compliance with the exemption's requirements if:[21]

- The investors in the offering are all accredited investors; and

- The company takes reasonable steps to verify that the investors are accredited investors, which could include reviewing documentation, such as W-2s, tax returns, bank and brokerage statements, credit reports and the like.

Purchasers of securities offered pursuant to Rule 506 receive restricted securities, meaning that the securities cannot be sold for at least six months or a year without registering them.[22]

---

[21] Id.

[22] Id.



## 2. Rule 144

Rule 144 is a regulation enforced by the SEC that sets the conditions under which restricted, unregistered, and control securities can be sold or resold. Rule 144 provides an exemption from registration requirements to sell the securities through public markets if a number of specific conditions are met.[23]

Restricted securities are securities acquired in unregistered, private sales from the issuing company or from an affiliate of the issuer. Investors typically receive restricted securities through private placement offerings, Regulation D offerings, employee stock benefits plans, as compensation for professional services, or in exchange for providing seed money or start-up capital to the company. Rule 144(a)(3) identifies what sales produce restricted securities.[24]

If one wants to sell restricted or control securities to the public, one must meet the applicable conditions set forth in Rule 144. The rule is not the exclusive means for selling restricted or control securities but provides a "safe harbor" exemption to sellers. The rule's five conditions are summarized as follows:[25]

1. **Holding Period.** Before restricted securities can be sold in the marketplace, one must hold them for a certain period of time. If the company that issued the securities is a "reporting company" in that it is subject to the reporting requirements of the Securities and Exchange Act of 1934, then one must hold the securities for at least six months. If the issuer of the securities is not subject to the reporting requirements, then you must hold the securities for at least one year.

2. **Current Public Information.** There must be adequate concurrent information about the issuing company publicly available before the sale can be made. For reporting companies, this generally means that the companies have complied with the periodic reporting requirements of the Securities Exchange Act of 1934. For non-reporting companies, this means that certain company information,

---

[23] 17 CFR § 230.144

[24] 17 CFR § 230.144

[25] Id.



including information regarding the nature of its business, the identity of its officers and directors, and its financial statements, is publicly available.

3. **Trading Volume Formula**.  If one is an affiliate, the number of equity securities one may sell during any three-month period cannot exceed the greater of 1% of the outstanding shares of the same class being sold, or if the class is listed on a stock exchange, the greater of 1% or the average reported weekly trading volume during the four weeks preceding the filing of a notice of sale on Form 144.  Over-the -counter stocks, including those quoted on the OTC Bulletin Board and the Pink Sheets, can only be sold using the 1% measurement.

4. **Ordinary Brokerage Transactions.**  If one is an affiliate, the sales must be handled in all respects as routine trading transactions, and brokers may not receive more than a normal commission.  Neither the seller nor the broker can solicit orders to buy the securities.

5. **Filing a Notice of Proposed Sale with the SEC.**  If one is an affiliate, one must file a notice with the SEC on Form 144 if the sale involves more than 5,000 shares or the aggregate dollar amount is greater than $50,000 in any three-month period.

If one is not (and has not been for at least three months) an affiliate of the company issuing the securities and has held the restricted securities for at least one year, one can sell the securities without regard to the conditions in Rule 144 discussed above.  If the issuer of the securities is subject to the Exchange Act reporting requirements and one has held the securities for at least six months but less than one year, one may sell the securities if one satisfies the current public information condition.

If one acquires restricted securities, they almost always will receive a certificate stamped with a "restrictive" legend.  The legend indicates that the securities may not be resold in the marketplace unless they are registered with the SEC or are exempt from the registration requirements.

Even if one has met the conditions of Rule 144, restricted securities cannot be sold to the public until any legends are removed from the certificates.  Only a transfer agent can remove a restrictive legend.  But the transfer agent won't remove the legend unless they've obtained the consent of the issuer – usually in the form of an opinion letter from



Expert Report of Terry L. Orr

the issuer's counsel – that the restrictive legend can be removed.  Unless this happens, the transfer agent doesn't have the authority to remove the legend and permit execution of the trade in the marketplace.

**C. Restrictions Imposed by Legends Placed on Navidea Shares**

Navidea instructed its transfer agent to put the following legends on the Navidea shares to be issued to Dr. Goldberg in a letter dated November 20, 2018.[26]

1. 12,777,274 shares, bearing the following legends in larger or other contrasting type or color:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO THE EXEMPTION FROM REGISTRATIOIN PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL, IF THE ISSUER SO REQUESTS), OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP AGREEMENT, DATED AUGUST 14, 2018 (THE "AGREEMENT") THAT RESTRICTS THE TRANSFER OF THESE SECURITIES UNTIL THE EXPIRATION OF SIX MONTHS FOLLOWING THE CLOSING DATE (AS DEFINED IN THE AGREEMENT) (SUCH PERIOD THE "LOCK-UP PERIOD"). COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY.  HOLDER HEREBY AGREES NOT TO SELL, MAKE ANY SHORT SALE OF, LOAN, HYPOTHECATE, PLEDGE, GRANT ANY OPTION FOR THE PURCHASE OF,

---

[26] Navidea Share Issuance Instruction Letter, dated November 20, 2018.



OR OTHERWISE DISPOSE OF ANY SECURITIES UNTIL THE EXPIRATION
OF THE LOCKUP PERIOD.


2.  722,726 shares, registered on Form S-8, bearing the following legend in larger or
    other contrasting type or color:

    THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO
    A LOCK-UP AGREEMENT, DATED AUGUST 14, 2018 (THE "AGREEMENT")
    THAT RESTRICTS THE TRANSFER OF THESE SECURITIES UNTIL THE
    EXPIRATION OF SIX MONTHS FOLLOWING THE CLOSING DATE (AS
    DEFINED IN THE AGREEMENT) (SUCH PERIOD THE "LOCK-UP PERIOD").
    COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN
    REQUEST OF THE SECRETARY OF THE COMPANY.  HOLDER HEREBY
    AGREES NOT TO SELL, MAKE ANY SHORT SALE OF, LOAN,
    HYPOTHECATE, PLEDGE, GRANT ANY OPTION FOR THE PURCHASE OF,
    OR OTHERWISE DISPOSE OF ANY SECURITIES UNTIL THE EXPIRATION
    OF THE LOCKUP PERIOD.


3.  5,000,000 shares, bearing the following legends in large or other contrasting type
    or color:

    THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN
    REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE
    "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE.  THE
    SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR
    OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO THE EXEMPTION
    FROM REGISTRATIOIN PROVIDED BY RULE 144 UNDER THE SECURITIES
    ACT (IF AVAILABLE) OR ANOTHER EXEMPTION FROM THE REGISTRATION
    REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN
    OPINION OF COUNSEL, IF THE ISSUER SO REQUESTS), OR (2) PURSUANT
    TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES
    ACT.



THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP AGREEMENT, DATED AUGUST 14, 2018 (THE "AGREEMENT") THAT RESTRICTS THE TRANSFER OF THESE SECURITIES UNTIL THE EXPIRATION OF SIX MONTHS FOLLOWING THE CLOSING DATE (AS DEFINED IN THE AGREEMENT) (SUCH PERIOD THE "LOCK-UP PERIOD"). COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY.  HOLDER HEREBY AGREES NOT TO SELL, MAKE ANY SHORT SALE OF, LOAN, HYPOTHECATE, PLEDGE, GRANT ANY OPTION FOR THE PURCHASE OF, OR OTHERWISE DISPOSE OF ANY SECURITIES UNTIL THE EXPIRATION OF THE LOCKUP PERIOD.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN ESCROW AGREEMENT AND NO SALE, LOAN, HYPOTHECATION, PLEDGE, GRANT OF ANY OPTION FOR THE PURCHASE OF, OR OTHER DISPOSAL OF ANY SUCH SECURITIES MAY BE MADE EXCEPT FOLLOWING THEIR RELEASE FROM EXCROW IN ACCORDANCE WITH THE TERMS OF SUCH ESCROW AGREEMENT.

### D. Differences in Restrictions Imposed by Reg D and Legends Placed on Navidea Shares

The August 14th Agreement provides that Dr. Goldberg ".... resigns as an officer and director of Navidea and any other subsidiary of Navidea other than MT on the date of execution of this Agreement."[27] Therefore, Dr. Goldberg does not qualify as a control person of Navidea. Any Navidea shares issued to him would be considered restricted securities and subject to a six-month holding period under Regulation D and Rule 144.

Restrictive securities are almost always issued with a "restrictive" legend.  Such a legend indicates that the securities may not be resold in the marketplace unless they are registered with the SEC or are exempt from the registration requirements.

---

[27] August 14, 2018, Agreement, Resignation.



Expert Report of Terry L. Orr

The following portion of the Navidea Share legend is in accordance with typical Reg D restricted securities legends:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO THE EXEMPTION FROM REGISTRATIOIN PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL, IF THE ISSUER SO REQUESTS), OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT.[28]

The remaining portion of the Navidea Share legend is not authorized or required Reg D. In addition, the restrictive legend regarding a "Lockup Agreement" states that Dr. Goldberg may not "sell, make any short sale of, loan, hypothecate, pledge, grant any option for the purchase of or otherwise dispose of any securities until the expiration of the lockup period." The additional legends provide:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP AGREEMENT, DATED AUGUST 14, 2018 (THE "AGREEMENT") THAT RESTRICTS THE TRANSFER OF THESE SECURITIES UNTIL THE EXPIRATION OF SIX MONTHS FOLLOWING THE CLOSING DATE (AS DEFINED IN THE AGREEMENT) (SUCH PERIOD THE "LOCK-UP PERIOD"). COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY.  HOLDER HEREBY AGREES NOT TO SELL, MAKE ANY SHORT SALE OF, LOAN, HYPOTHECATE, PLEADE, GRANT ANY OPTION FOR THE PURCHASE OF,

---

[28] Navidea Share Issuance Instruction Letter, dated November 20, 2018.



OR OTHERWISE DISPOSE OF ANY SECURITIES UNTIL THE EXPIRATION OF THE LOCKUP PERIOD.[29]

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN ESCROW AGREEMENT AND NO SALE, LOAN, HYPOTHECATION, PLEDGE, GRANT OF ANY OPTION FOR THE PURCHASE OF, OR OTHER DISPOSAL OF ANY SUCH SECURITIES MAY BE MADE EXCEPT FOLLOWING THEIR RELEASE FROM ESCROW IN ACCORDANCE WITH THE TERMS OF SUCH ESCROW AGREEMENT.[30]

However, the lockup provision contained in the August 14th Agreement provides only that "After the award and placement of the Shares with members of Goldberg's family, neither Goldberg nor such family members will transfer any of the Shares for six months after the Closing Date without the written consent of Navidea."[31] The language of the legend differs from the lock-up language contained in the August 14th Agreement and are not authorized or required by Regulation D.

In addition, while the August 14th Agreement requires that all shares, "…be issued under Regulation D of the Securities Act of 1933,"[32] Navidea issued 722,726 shares of registered shares on Form S-8, not under Regulation D.[33]

### 1. Form S-8

Registration of securities on Form S-8 ("Form S-8") is a short-form registration statement under the Securities Act of 1933, providing significant benefits to small issuers. Form S-8 is available to register securities offered to employees and consultants under benefit plans under limited circumstances. Because a registration statement on Form S-8 is effective upon filing it offers benefits to SEC reporting companies, most significantly that an S-8 registration statement becomes effective upon

---

[29] Id.

[30] Id.

[31] August 14th Agreement.

[32] August 14, 2018, Agreement, Navidea Shares.

[33] Navidea Share Issuance Instruction Letter, dated November 20, 2018.



filing and the shares registered may be issued without a restrictive legend.[34] According to the Navidea Share Issuance Instruction Letter, dated November 20, 2018, 722,726 of the shares issued were registered on Form S-8.[35]  Further, these shares contain the following legend:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP AGREEMENT, DATED AUGUST 14, 2018 (THE "AGREEMENT") THAT RESTRICTS THE TRANSFER OF THESE SECURITIES UNTIL THE EXPIRATION OF SIX MONTHS FOLLOWING THE CLOSING DATE (AS DEFINED IN THE AGREEMENT) (SUCH PERIOD THE "LOCK-UP PERIOD"). COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY.  HOLDER HEREBY AGREES NOT TO SELL, MAKE ANY SHORT SALE OF, LOAN, HYPOTHECATE, PLEDGE, GRANT ANY OPTION FOR THE PURCHASE OF, OR OTHERWISE DISPOSE OF ANY SECURITIES UNTIL THE EXPIRATION OF THE LOCKUP PERIOD.[36]

This legend is not authorized or required for Form S-8 or shares issued in accordance with Form S-8 (or shares issued under Regulation D) and the language of the legend differs from the lock-up language contained in the August 14th Agreement and are not authorized or required by Regulation D.

### E.  Reverse Stock Splits

On April 26, 2019, Navidea executed a 1 to 20 reverse stock split.[37]  A reverse stock split is a reduction in the number of existing shares of stock held by shareholders into fewer,

---

[34] 17 CFR § 230.428.

[35] See MT-DEL00071430.

[36] Id.

[37] Navidea Biopharmaceuticals, Inc. Form 8-K dated April 26, 2019, which states, "…on April 18, 2019, the Board of Directors of Navidea Biopharmaceuticals, Inc. ("*Navidea*" or the "*Company*") approved a one-for-twenty reverse stock split of its issued and outstanding shares of common stock (the "*Reverse Split*")."



Expert Report of Terry L. Orr

proportionally more valuable shares.  In this case reducing 20 shares into 1 share.  A reverse stock split does not directly impact a company's value.

To illustrate this, if Company X has one million shares outstanding and each share outstanding is valued at $1, then the total market value of the company is $1 million (i.e., 1,000,000 x $1 = $1,000,000). If Company X announces a 1 to 20 reverse stock split, the number of shares outstanding is reduced to 50,000 shares, and each share outstanding increases to $20. The total market value is unchanged at $1 million (i.e., 50,000 x $20 = $1,000,000).

There are several reasons why a company may decide to execute a reverse stock split and reduce its number of outstanding shares in the market.

- Prevent being delisted from an exchange.  If a stock price falls below $1, it is at risk of being delisted from the stock exchange that have minimum share price rules.  Being listed on a major exchange is important for attracting equity investors and, in some cases, the only way to prevent delisting is to increase share price by engaging in reverse stock splits.[38]

- Boost the company's image if the stock price has dropped dramatically.  If the stock is trading in the single digits, it is likely to be viewed as a risky investment, particularly if the price is near $1 or considered a penny stock by investors. There is a negative stigma attached to penny stocks traded only over the counter (OTC), and sometimes the quickest method to escape this association and protect a company's market image is to engineer a reverse stock split.

- Draw more attention from analysts and influential investors.  Higher priced stocks are more likely to pop up on the radars of big institutional investors and mutual funds, many of which have policies against taking positions in a stock whose price is below a minimum value.

At the time the August 14th Agreement was negotiated and executed Navidea intended to effect a reverse stock split in order to address delisting concerns raised by the New York

---

[38] I note that Navidea received a letter from NYSE Regulation on August 14, 2018, regarding, "the Company's noncompliance with certain listing standards…"  Navidea responded in a letter, dated September 14, 2018, with a "Plan to Regain Compliance with Continued Listing Standards." See MT-DEL00071233.



Expert Report of Terry L. Orr

Stock Exchange (American) (the "NYSE"), the exchange on which Navidea trades. Navidea's Chief Financial Officer, Jed Latkin, who signed the August Agreement on behalf of Navidea in that capacity, testified that at the time the August 14th Agreement was executed there was an urgency at Navidea to receive shareholder approval for a reverse stock split to address the NYSE's concerns.[39]

The August 14th Agreement specifies Dr. Goldberg is to receive "23.5 million shares of Navidea common stock".[40]  The August 14th Agreement does not contain language common for addressing the potential of a stock split or divide.  Examples of such language is as follows:[41]

- The parties acknowledge and agree that all share related numbers in this agreement shall be adjusted to take into account any stock split effected with respect to the shares.

- Wherever in this agreement there is a reference to a specific number of shares of stock of the company that upon the occurrence of a subdivision, combination or stock dividend of such stock, the specific number of shares so referenced in this agreement shall automatically be proportionally adjusted to reflect the effect on the outstanding shares of such class or series of stock by such subdivision, combination, or stock dividend.

It would be expected that an issuer contemplating effecting a reverse stock split would include such language in any contract referencing a specific number of shares for clarification purposes.

---

[39] Deposition of Jed Latkin, dated September 30, 2020, at 333:10-12 in which he states, "in my mind, at that time, the reverse split was very, very important."

[40] August 14, 2018, Agreement, Navidea Shares.

[41] https://www.lawinsider.com/clause/adjustments-for-stock-splits



Expert Report of Terry L. Orr

III.   **Navidea Analysis**

A.  **722,726 Navidea Shares Issued to Dr. Goldberg Were Not Issued Under Regulation D**

As set forth above, 772,726 shares of Navidea stock issued to Dr. Goldberg pursuant to the August 14th Agreement were registered shares and were not issued under Regulation D.  In addition, shares contained restrictive legends not authorized or required by Regulation D which rendered the shares unsalable unless and until Navidea unilaterally authorized its transfer agent to remove the legends, which Navidea refused to do.[42]

B.  **The Remaining Navidea Shares Issued to Dr. Goldberg Contained Restrictive Legends Not Authorized or Required by Regulation D**

As set forth above, the remaining shares issued to Dr. Goldberg contained restrictive legends not authorized or required by Regulation D which rendered the shares unsalable unless and until Navidea unilaterally authorized its transfer agent to remove the legends, which Navidea refused to do.[43]

C.  **Financial Damages Suffered by Dr. Goldberg**

1.  **Damages Based on 23.5 Million Shares Without Adjustment for the Reverse Split**

I have been asked by counsel to provide a methodology for calculating the damages to Dr. Goldberg if the Court enters a Judgment that he is entitled to the value of 23.5 million post-split shares because Navidea has not yet issued those shared in accordance with the August 14th Agreement and under Regulation D of the Securities Act of 1933.

The methodology to value the Shares at a pre-split basis, based on my experience, would include the following steps:

---

[42] Letter regarding Navidea Biopharmaceuticals, Inc. Shares Issued to Dr. Michael M. Goldberg, M.D., dated July 15, 2020.

[43] Id.



Expert Report of Terry L. Orr

1. The market capitalization ("market cap") of a company is equivalent to the market value of the company's outstanding shares. I would consider the market cap based on the closing price on the date before that judgement is rendered (because the entry of the judgment might affect the trading value of Navidea's shares once announced) and the outstanding shares of the company on that date.

2. I would then consider the total of number of outstanding shares. To the extent that they have not already been considered in the shares outstanding, I would add in the additional Shares that were to be issued to Dr. Goldberg under the Judgment. [44]

3. I would then divide the market cap on the date that judgement is rendered by the new outstanding shares to arrive at a price per new outstanding share.

4. Finally, I would multiply the price per new outstanding share by the Shares to be issued to Dr. Goldberg under the Judgment.

## 2. Damages based on 23.5 Million Shares Adjusted for the Reverse Split

If the Court considers the value of 23.5 million shares adjusted for the reverse split, there are multiple measurement dates to consider.

The August 14th Agreement provides, "***On the date of consummation of the Transaction (such date, the "Closing Date")***, Navidea will issue to Goldberg 23.5 million shares of Navidea common stock (the "Shares"), 18.5 million currently, and 5 million on January 2nd, 2019.  The Shares will be issued under Regulation D of the Securities Act of 1933."[45]

On **November 22, 2018,** Navidea purportedly issued 18.5 million shares to Dr. Goldberg.[46] In accordance with the August 14th Agreement, 13.5 million shares were to

---

[44] According to the Navidea Share Issuance Instruction Letter, dated November 20, 2018, 722,726 of the shares issued were registered on Form S-8, and therefore I would expect them to be already included in the shares outstanding on the date that judgement is rendered. See MT-DEL00071430.

[45] August 14, 2018, Agreement, Navidea Shares.

[46] First Amended Complaint, paragraph 31.



be issued directly to Dr. Goldberg, and 5 million shares to be deposited into an escrow account.[47]

In accordance with the August 14th Agreement and restrictions under Regulation D, the 13.5 million shares issued directly to Dr. Goldberg ("Transfer 1") are subject to a six-month holding period before they can be traded on the public market. Assuming a 30-day month, the shares could not be traded until six months after they were issued, or **May 21, 2019.**

The 5 million shares issued on November 22, 2018 and deposited into the escrow account ("Transfer 2") are also subject to a six-month holding period under Regulation D, as well as to an eighteen-month potential holding period under the August 14th Agreement.[48] To be conservative, I assume these shares could not be traded until eighteen months after they were issued, or **May 15, 2020.[49]**

According to the August 14th Agreement, an additional 5 million shares were to be issued on January 2, 2019 and deposited into an escrow account ("Transfer 3").[50] To date, these shares have not been issued.[51] Assuming these shares were issued on January 2, 2019, as stated in the August 14th Agreement, they were subject to a six-month holding period under Regulation D, as well as an eighteen-month potential holding period under the August 14th Agreement. To be conservative, I assume these shares could not be traded until eighteen months after they were issued, or **June 25, 2020.[52]**

To date, none of the issued shares can be traded on the public market due to the additional restrictive legends imposed by Navidea and not required or authorized by

---

[47] August 14, 2018, Agreement, Navidea Shares, Share Escrow.

[48] August 14, 2018, Agreement, Share Escrow.

[49] Assuming a 30-day month.

[50] August 14, 2018, Agreement, Navidea Shares, Share Escrow.

[51] First Amended Complaint, paragraph 32.

[52] Assuming a 30-day month.



Expert Report of Terry L. Orr

Regulation D, which allow Navidea to control when the non-Regulation D legends can be removed and the shares can be traded.[53]

The Lock-Up legend reads:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP AGREEMENT, DATED AUGUST 14, 2018 (THE "AGREEMENT") THAT RESTRICTS THE TRANSFER OF THESE SECURITIES UNTIL THE EXPIRATION OF SIX MONTHS FOLLOWING THE CLOSING DATE (AS DEFINED IN THE AGREEMENT) (SUCH PERIOD THE "LOCK-UP PERIOD").  COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY.  HOLDER HEREBY AGREES NOT TO SELL, MAKE ANY SHORT SALE OF, LOAN, HYPOTHECATE, PLEDGE, GRANT ANY OPTION FOR THE PURCHASE OF, OR OTHERWISE DISPOSE OF ANY SECURITIES UNTIL THE EXPIRATION OF THE LOCKUP PERIOD.[54]

The August 14th Agreement, under Lock-Up reads:

> After the award and the placement of the Shares with members of Goldberg's family, neither Goldberg nor such family members will transfer any of the Shares for six months after the Closing Date without the prior written consent of Navidea.[55]

The escrow legend reads:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN ESCROW AGREEMENT AND NO SALE, LOAN, HYPOTHECATION, PLEDGE, GRANT OF ANY OPTION FOR THE

---

[53] Letter regarding Navidea Biopharmaceuticals, Inc. Shares Issued to Dr. Michael M. Goldberg, M.D., dated July 15, 2020.

[54] Navidea Share Issuance Instruction Letter, dated November 20, 2018.

[55] August 14, 2018, Agreement, Lock-Up.



> PURCHASE OF, OR OTHER DISPOSAL OF ANY SUCH SECURITIES
> MAY BE MADE EXCEPT FOLLOWING THEIR RELEASE FROM
> ESCROW IN ACCORDANCE WITH THE TERMS OF SUCH ESCROW
> AGREEMENT.[56]

Dr. Goldberg's ability to sell or otherwise dispose of the shares is left entirely to Navidea's sole discretion because only Navidea can authorize its transfer agent to remove the restrictive legends.  This is neither authorized or required by Regulation D and the August 14th Agreement contains no provision authorizing the placement of any legends on the Navidea shares.  Moreover, Navidea has refused to remove the legends despite Dr. Goldberg's written demand that it do so.[57]

Because the shares that Navidea has issued to date were not issued in accordance with the August 14th Agreement and under Regulation D of the Securities Act of 1933, including by placing non-Regulation D legends on issued shares, making them non-tradable until Navidea unilaterally removes the legends, and because shares that were to be issued on January 2, 2019, per the August 14th Agreement, have not been issued; Dr. Goldberg did not receive the benefit for which he bargained and has suffered financial harm and damage.

On April 26, 2019, Navidea executed a 1 to 20 reverse stock split.[58] Assuming that Navidea had issued the Shares in accordance with the August 14th Agreement and Regulation D and assuming that the Shares would have been subject to the reverse stock split, then Dr. Goldberg's post-split shares would total 1,175,000, as summarized in the table below:

---

[56] Navidea Share Issuance Instruction Letter, dated November 20, 2018.

[57] Letter regarding Navidea Biopharmaceuticals, Inc. Shares Issued to Dr. Michael M. Goldberg, M.D., dated July 15, 2020.

[58] Navidea Biopharmaceuticals, Inc. Form 8-K dated April 26, 2019, which states, "…on April 18, 2019, the Board of Directors of Navidea Biopharmaceuticals, Inc. ("*Navidea*" or the "*Company*") approved a one-for-twenty reverse stock split of its issued and outstanding shares of common stock (the "*Reverse Split*")."



Expert Report of Terry L. Orr

**Table 1: Navidea Shares**

| | Number of Shares | Post-Split Shares | Date Issued | Holding Period | Release Date |
|---|---|---|---|---|---|
| Transfer 1 | 13,500,000 | 675,000 | 11/22/2018 | 6 months | 5/21/2019 |
| Transfer 2 | 5,000,000 | 250,000 | 11/22/2018 | 18 months | 5/15/2020 |
| Transfer 3 | 5,000,000 | 250,000 | 1/2/2019 | 18 months | 5/15/2020 |
| | 23,500,000 | 1,175,000 | | | |

The value of the Shares can be calculated as share price of stock on the dates the Shares could be traded to the public (after regulatory restrictions) multiplied by the stipulated post-split shares. To calculate a range of damages, I considered the value of the post-split shares as if they had been sold at the earliest possible date ("Release Date"), the date of the highest stock price for which the Shares could have been sold, and the current date. The Release Dates are based on the issuance date of each transfer and the holding period. The date of the highest stock price for which the shares could have been sold on is August 3, 2020. The current date is as of September 28, 2021.

If the Shares had been issued in accordance with the August 14th Agreement and sold at the earliest possible date under the restrictions of the August 14th Agreement and Regulation D: Transfer 1 sold on May 21, 2019 for $1.43 per share, Transfer 2 sold on May 15, 2020 for $1.10 per share, and Transfer 3 sold on June 25, 2020 for $3.99 per share, the value of the Shares would be $2,237,750.

If the Shares had been issued in accordance with the August 14th Agreement and sold at the highest stock price for which the Shares could have been sold under the restrictions of the August 14th Agreement and Regulation D, or on August 3, 2020 for $4.95 per share, the value of the Shares would be $5,816,250.

If the Shares had been issued in accordance with the August 14th Agreement and sold at the current stock price, on September 28, 2021 for $1.68 per share, the value of the Shares would be $1,974,000.

To date, Navidea has refused to direct its transfer agent to remove the restrictive legends placed on the shares and therefore none of the 18.5 million shares issued on November 22, 2018 can be traded to the public.  The 5 million shares that were supposed to be issued on January 2, 2019, in accordance with the August 14th Agreement, were never



Expert Report of Terry L. Orr

issued. Therefore, Dr. Goldberg has suffered damages, ranging from $1,974,000, if he had received the Shares and sold them today, to $5,816,250, if he had sold the Shares at the high. The tables below summarize the range of the value of the Shares.

### Table 2: Calculation of Transfer Values[59]

| Value with Pre-Split Shares | 11/22/2018 | 1/2/2019 | High | Today |
|---|---|---|---|---|
| **6 Months After** | 5/21/2019 | 7/1/2019 | 8/3/2020 | 9/28/2021 |
| Stock Price | $ 1.43 | $ 0.63 | $ 4.95 | $ 1.68 |
| | | | | |
| Transfer 1 | $ 965,250 | NA | $ 3,341,250 | $ 1,134,000 |
| | | | | |
| **18 Months After** | 5/15/2020 | 6/25/2020 | | |
| Stock Price | $ 1.10 | $ 3.99 | | |
| | | | | |
| Transfer 2 | $ 275,000 | NA | $ 1,237,500 | $ 420,000 |
| Transfer 3 | NA | 997,500 | 1,237,500 | 420,000 |

### Table 3: Range of Shares Value

| Transfer | Post Split Shares | Sold at Earliest | Sold at High | Sold Today | Min | Max |
|---|---|---|---|---|---|---|
| 1 | 675,000 | $ 965,250 | $ 3,341,250 | $ 1,134,000 | $ 965,250 | $ 3,341,250 |
| 2 | 250,000 | 275,000 | 1,237,500 | 420,000 | 275,000 | 1,237,500 |
| 3 | 250,000 | 997,500 | 1,237,500 | 420,000 | 420,000 | 1,237,500 |
| | 1,175,000 | $ 2,237,750 | $ 5,816,250 | $ 1,974,000 | $ 1,974,000 | $ 5,816,250 |

---

[59] August 14, 2018, Agreement; CAPIQ (NYSEAM: NAVB)



Expert Report of Terry L. Orr

**Chart 1: Navidea's Share Pricing and Volume[60]**



The chart above illustrates Navidea's share price and volume between August 2018 and September 2021. I note that Navidea's share price remains relatively constant between July 2020 and September 2021. It is also higher than it was the year prior. This appears to be due the release of Navidea's Form 8-K, dated and filed May 21, 2020, which triggered a spike in volume. Specifically, between July 20, 2020 and August 7, 2020, shares reached a high of $4.95 and a low of $4.70.  A savvy investor would have expected share price to increase and sustain at a higher price after an announcement that triggers that volume increase, therefore it is reasonable to assume Dr. Goldberg could have taken advantage of this higher share price and sold his shares for the higher end of the range of damages presented above, resulting in a value of $5,675,250 (weighted average of $4.83 x 1,175,000 = $5,675,250).

## IV.    Summary of Navidea Opinions

A.  The escrow and lockup legend placed on the shares issued by Navidea under the August 14th Agreement are not authorized or required under Regulation D or authorized by the terms of the August 14th Agreement, and therefore the shares bearing those legends are not issued in accordance with Regulation D.

B.  Navidea failed to issue shares due to Dr. Goldberg on January 2, 2019, under the terms of the August 14th Agreement.

---

[60] Navidea Biopharmaceuticals, Inc. data pulled from Capital IQ.



C. When agreement was executed, Navidea intended to initiate reverse split of stock.[61]

D. Dr. Goldberg was damaged by not getting the Navidea shares issued as anticipated.

    a. He was damaged in an amount to be calculated using the above methodology if in a Judgment he is awarded the value of 23.5 million shares without adjustment for the reverse split.

    b. If he is awarded damages on the 23.5 million shares adjusted for the reverse split, the weighted average calculation above for the period between July 20, 2020 and August 7, 2020 indicates Dr. Goldberg was damaged in the amount of $5,675,250.

## V.   MT Analysis

The August 14th Agreement states that, "MT will issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5% of the outstanding shares of MT." This award of MT shares would give Dr. Goldberg a 5.0% equity ownership interest in MT.

According to key stakeholders, MT's value was going to be derived once it separated from Navidea and the grant to Dr. Goldberg of MT Super Voting Common Stock as provided for in the August 14th Agreement was the mechanism agreed to by Navidea, Macrophage and Dr. Goldberg to effect that separation.[62] MT's full value was never realized in this manner, as the MT Super Voting Common Stock was never issued to Dr. Goldberg.

Fair market value, the value between a willing buyer and a willing seller, is a useful metric in determining whether an entity holds value. During the implementation period after the August 14th Agreement, there were discussions about obtaining an investment in MT. In particular, in responding to a NYSE delisting notice, there Navidea represented that it was negotiating with two potential investors regarding a $25 million total investment in MT (one $10 million investment and one $15 million investment). These investments were to be exchanged for an unknown share of MT.[63] In my experience, if the $25 million was to be exchanged for 100% of

---

[61] Deposition of Jed Latkin, dated September 30, 2020 at 333:5-8 indicates that the reverse stock split was contemplated on August 13, 2018.

[62] Deposition of Michael Rice, dated September 14, 2020, at 48:2-12 in which he states, "it would seem to be an intelligent decision to drive value."

[63] MT-DEL00071233, which states, "…Macrophage Therapeutics, Inc., has been engaged in active discussions with several parties regarding potential equity investment in the subsidiary of up to $25 million."



Expert Report of Terry L. Orr

the company, this transaction would be referred to as a "sale" instead of an "investment." Therefore, this $25 million was to be exchanged for a share of MT that was less than 100%. Ultimately, there was no investment in MT, but these investment offers denote value according to the fair market value principal. Dr. Goldberg holds 5% of that value per the August 14th Agreement. Further, based on my experience, a super voting common stock is of greater value than typical common stock in the same company.

In representations made to the NYSE, Navidea indicated that after investments by potential investors, Navidea would continue to consolidate MT into their financial statements.[64]  In order to consolidate MT's operations into the Navidea financial statements, Navidea would have to retain control of MT either through stock ownership or by some other measure.  If it were through stock ownership, they would have to retain an ownership interest of more than 46.5%, as Dr. Goldberg and Platinum owned 7% of MT.  Under this analysis, they would have to sell investors less than 46.5% interest in MT.  Therefore, if the investors were receiving a 46% interest for $25 million, MT would be worth approximately $54.348 million and a standard 5% common share interest would be worth approximately $2.717 million.  This would be near the lowest value for Dr. Goldberg's common share interest. If investors received a 10% interest for $25 million, MT would be worth $250.0 million, and a standard 5% common share interest would be worth $12.5 million. As referenced above, a super voting common stock is of greater value than typical common stock in the same company. Because Dr. Goldberg was to be issued super voting common stock per the August 14th Agreement, his shares are of greater value than standard common shares.

## VI.   Summary of MT Opinions

A.  Dr. Goldberg was damaged by Navidea's failure to issue the MT Super Voting Shares to Dr. Goldberg.

---

[64] See MT-DEL00071235, which states, "Macrophage Therapeutics, Inc., has been engaged in active discussions with several parties regarding potential equity investment in the subsidiary of up to $25 million. Any such investment in the subsidiary would also increase Navidea's stockholders' equity on a consolidated basis…"



CURRICULUM VITAE
# TERRY L. ORR
## PARTNER

## QUALIFICATIONS

B.S., Accountancy and Business Administration, Brigham Young University
Certified Public Accountant
Chartered Global Management Accountant
Certified Internal Controls Auditor
Certified Construction Auditor

## MEMBERSHIPS

American Institute of Certified Public Accountants
Texas Society of Certified Public Accountants
AICPA's Forensic & Valuation Services Section

## PROFILE

**Terry Orr** is a highly respected authority in forensic accounting, with more than 25 years of experience as an auditor and audit partner in international public accounting firms, where he audited both public and private companies and was involved in IPO's and Reg.D offerings.  He has led complex global and domestic engagements for clients in diverse industries, including the construction, healthcare, hospitality and oil/gas sectors. Terry regularly works with private equity firms, public company boards, management and outside counsel, and his expertise and insight have proved essential in resolving a wide range of matters, including fraud detection, investigation, remediation and prevention; Foreign Corrupt Practices Act (FCPA) investigations; and litigated disputes.

Terry has significant experience assisting clients with the often-contentious issues arising in disputes, such as accounting misstatements and malpractice, civil and criminal fraud, breaches of contract and fiduciary duty, single business enterprise and alter ego, lost profits and lost value. He has delivered expert testimony on accounting, financial, economic, valuation and damage quantification issues in the context of commercial litigation. Notably, Terry has provided consulting services in both auditor defense and plaintiff matters and acts as a neutral accounting arbitrator.

## EXPERIENCE

Terry brings deep expertise in investigations, financial analysis and valuation, and strategic response to clients seeking to resolve and mitigate fraud risks, regulatory and compliance violations, and disputes and litigation matters.  His representative engagements include:

**Fraud and Whistleblower Claims, Various Locations**
Investigated fraud and whistle-blower claims in both publicly and privately-owned companies, including FCPA violations in the Middle East, Asia, Europe and South America, and advised on appropriate responses.

**Earning Investigation, Fortune 50 Company, Various Locations**
Investigated earnings management allegations of a Fortune 50 firm with operations in Asia, Europe, Eastern Europe and North and South America.

**Insurance Claims Investigation**
Investigated and quantified damages related to a public insurance company's destruction and manipulation of submitted claims.



CURRICULUM VITAE
TERRY L. ORR

**Misappropriation and Fraud Investigation, Oil and Gas Company**

Investigated allegations of asset misappropriation and fraudulent financial reporting by the CFO and head of purchasing for a large mid-stream oil/gas operating company. Identified several conflicts of interest in the selection of equipment suppliers and contractors, internal financial reporting irregularities, ethics code deficiencies and internal control weaknesses.

**Financial Institution Investigation**

Investigated and testified on real estate loan practices and valuations of a publicly traded financial institution.

**Breach-of-Contract Investigation**

Analyzed lost and shared profits in a multi-family real estate development project in a breach-of-contract investigation.

**Cost Overruns Investigation, High-Rise Office Building**

Conducted the investigation of substantial construction overruns on a large high-rise office construction project.

**Materials Sales Investigation**

Investigated and reported on fraud and theft involving schemes of vendor kickbacks and theft and resale of purchased materials.

**Healthcare System Reserves Investigation**

Investigated the intentional overstatement of reported revenues through the understatement of reserves in a five-hospital system.

**Healthcare Overbillings Investigation, Laboratory Services Provider**

On behalf of investors seeking to identify recoverable funds, investigated a network of bankrupt urology labs which had failed due to overbilling charges by the Centers for Medicare and Medicaid Services (CMS).

**Accounting and Consulting Services, Hospitality Industry Clients**

As an auditor, provided accounting and consulting services for private and publicly traded companies in the hotel, restaurant, gaming, golf course and marina industries, including taking many of these companies public. Advised issuers on public filings, secondary offerings, Reg. D filings, reverse mergers, stock splits and reverse stock splits.

**Restaurant Fraud Investigation, New Jersey**

Investigated restaurant fraud, developed improved internal controls and provided testimony before the New Jersey Gaming Control Board on findings.

**Casino Maintenance and Construction Department Investigation**

Led the investigation of a large casino's operations, construction and maintenance department.

**Savings and Loans Investigations**

Worked with the Resolution Trust Corporation (RTC) on investigations of failed savings and loans and pursuit of officers involved in the perpetration of illegal acts.

**IP Theft and Loss of Data Investigation**

Investigated and reported on IP theft and loss of data through cyber and phishing schemes.

## DEPOSITION TESTIMONY

Donna Hanna, on behalf and as next friend of Brooke Gabrielle Hanna and Jake Mason Hanna, minor children*, Plaintiffs v. Burt Hanna, individually and as Trustee of The Brook Gabrielle Hanna Trust dated January 4, 1999 and as Trustee of the Jake Mason Hanna Trust dated January 4, 1999, Defendant, Case No. CV 2006-1593-4 (In the Circuit Court of Washington County, Arkansas Civil Division) (November 2007)



US Special Opportunities Trust PLC and Renaissance US Growth Investment Trust PLC* Plaintiff v. Sanders Morris Harris, Inc., Defendant (In the District Court of Dallas County, Texas 193rd Judicial District No. 07-0437) (August 2008)

Balkrishna Shagrithaya*, Plaintiff v. Max Martin, Defendant, Case No. 07-15149 (In the District Court of Dallas County, Texas 162nd Judicial District) (April 2009)

Ridgewood Renewable Power LLC, et al., Ridgewood Energy Corporation, and Ridgewood Capital Management, LLC,* Plaintiff against Perelson Weiner LLP, Defendant, Consolidated Docket No.: BER-L-6092-06 (December 2009)

Vaisala, Inc.*, Claimant, v. Quixote Corporation, Quixote Transportation Safety, Inc., and Transafe Corporation, Respondents, Reference No. 77117 Y 00209 10 (In the American Arbitration Association Dallas, TX) (August 2011)

Synergy Barukh, Ltd.*, Plaintiff v. 3S Services, LLC, 3S Team, LLC, Team Systems, Inc., August Linnartz, Jr., Robert Fudge, Joey Fudge, Mickey Staton, and Philip Levin, Defendants, Case No. 2012-22223 (In the District Court of Harris County, Texas 11th Judicial District) (March 2016)

Project Boat Holdings, LLC, Plaintiff v. Bass Pro Group LLC*, Defendant, C.A. No. 12606-VCS (The Court of Chancery for the State of Delaware) (January 2018)

Bailey Tool & Manufacturing Company, Debtor; Bailey Tool & Manufacturing Company, Hunt Hinges, Inc. and Cafarelli Metals, Inc., Plaintiffs; v. Republic Business Credit, LLC*, Defendant and Counter-Plaintiff; v. Bailey Tool & Manufacturing Company, Hunt Hinges, Inc. and Cafarelli Metals, Inc., Counter-Defendant District Court Case No. 3:17-cv-02946-S (US Bankruptcy Court, Northern District of Texas) (October 2020)

## TRIAL/ARBITRATION TESTIMONY

Donna Hanna, on behalf of and as next friend of Brooke Gabrielle Hanna and Jake Mason Hanna, minor children*, Plaintiffs v. Burt Hanna, individually and as Trustee of The Brook Gabrielle Hanna Trust dated January 4, 1999 and as Trustee of the Jake Mason Hanna Trust dated January 4, 1999, Defendant, Case No. CV 2006-1593-4 (In the Circuit Court of Washington County, Arkansas Civil Division) (November 2007)

US Special Opportunities Trust PLC and Renaissance US Growth Investment Trust PLC* Plaintiff v. Sanders Morris Harris, Inc., Defendant (In the District Court of Dallas County, Texas 193rd Judicial District No. 07-04837) (August 2008)

Balkrishna Shagrithaya*, Plaintiff v. Max Martin, Defendant, Case No. 07-15149 (In the District Court of Dallas County, Texas 162nd Judicial District) (April 2009)

Vaisala, Inc.*, Claimant, v. Quixote Corporation, Quixote Transportation Safety, Inc., and Transafe Corporation, Respondents, Reference No. 77117 Y 00209 10 (In the American Arbitration Association Dallas, TX) (August 2011)

Synergy Barukh, Ltd.*, Plaintiff v. 3S Services, LLC, 3S Team, LLC, Team Systems, Inc., August Linnartz, Jr., Robert Fudge, Joey Fudge, Mickey Staton, and Philip Levin, Defendants, Case No. 2012-22223 (In the District Court of Harris County, Texas 11th Judicial District) (March 2016)

Project Boat Holdings, LLC, Plaintiff v. Bass Pro Group, LLC,* Defendant, C.A. No. 12606-VCS (The Court of Chancery for the State of Delaware) (June 2018)

Bailey Tool & Manufacturing Company, Debtor; Bailey Tool & Manufacturing Company, Hunt Hinges, Inc. and Cafarelli Metals, Inc., Plaintiffs; v. Republic Business Credit, LLC,* Defendant and Counter-Plaintiff; v. Bailey Tool & Manufacturing Company, Hunt Hinges, Inc. and Cafarelli Metals, Inc., Counter-Defendant, District Court Case No. 3:17-cv-02946-S (US Bankruptcy Court, Northern District of Texas) (June 2021)

Kenneth Boatman d/b/a Boatman Automotive, Plaintiff; v. Comcast of the South L.P. & Comcast of the South,* Defendant, C.A. No. 3:17-CV-0536 (United States District Court, Eastern District of Tennessee) (June 2021)



Navidea Biopharmaceuticals, Inc. v. Michael M. Goldberg, M.D.

Expert Report of Terry L. Orr

Documents Considered

Appendix 2

| File Name | Bates Number | Document Description |
|---|---|---|
| August 14th Agreement CLEAN.pdf | NA | Agreement dated August 14, 2018 |
| First Amended Complaint 2.pdf | NA | First Amended Complaint, filed April 26, 2019 |
| Letter to Kazan re stock 07-14-2020 | NA | Letter from N. Ari Weisbrot, Esq. to Barry Kazan, Esq. dated July 15, 2020 |
| Navidea Share Issuance Instruction Letter.pdf | MT-DEL00071429 - MT-DEL00071431 | Letter from Jed Latkin to Richard Viscovich dated November 20, 2018 |
| ClaudineBruckMD_LinkPDF.pdf | NA | Deposition of Claudine Bruck, M.D. on September 11, 2020 |
| JedLatkin_PDFTran.pdf | NA | Deposition of Jed Latkin on October 26, 2020 |
| JedLatkinV2_LinkPDF.pdf | NA | Continued Deposition of Jed Latkin on September 30, 2020 |
| MichaelRice_LinkPDF.pdf | NA | Deposition of Michael Rice on September 14, 2020 |
| WilliamMower_LinkPDF.pdf | NA | Deposition of William Mover on September 4, 2020 |
| NYSE1.pdf | MT-DEL00069151 - MT-DEL00069157 | Email from Deoclides Machado to Jed Latkin dated September 26, 2018 |
| NYSE2.pdf | MT-DEL00069397 - MT-DEL00069403 | Email from Deoclides Machado to Jed Latkin dated October 3, 2018 |
| NYSE3.pdf | MT-DEL00070091 - MT-DEL00070093 | Email from Erika Gibson to Jeffrey Smith dated October 26, 2018 |
| NYSE4.pdf | MT-DEL00070094 - MT-DEL00070110 | Email from Erika Gibson to Jeffrey Smith dated October 24, 2018 |
| NYSE5.pdf | MT-DEL00071233 - MT-DEL00071295 | Letter from Jed Latkin to Ms. Tanya Hoos dated September 14, 2018 |
| NYSE6.pdf | MT-DEL00073057 - MT-DEL00073060 | Email from Deoclides Machado to Jeffrey Smith dated January 18, 2019 |
| NYSE7.pdf | MT-DEL00073251 - MT-DEL00073252 | Email from Erika Gibson to Deoclides Machado dated October 3, 2018 |
| NYSE8.pdf | MT-DEL00073375 - MT-DEL00073391 | Email from Jeffrey Smith to Deoclides Machado dated October 24, 2018 |
| NYSE9.pdf | MT-DEL00073864 - MT-DEL00073874 | Email from Deoclides Machado to Jeffrey Smith dated October 3, 2018 |