# EXHIBIT 3

1          UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF NEW YORK

2

   IN RE:  NAVIDEA          §

3  BIOPHARMACEUTICALS       §

   LITIGATION               §     Case No. 1:19-cv-01578-VEC

4                           §     ECF

5

6

7

              ----------------------------------

8                   ORAL DEPOSITION OF

9                     TERRY LEE ORR

10                   NOVEMBER 16, 2021

              ----------------------------------

11

12

13

14

15             ORAL DEPOSITION OF TERRY LEE ORR,

16   produced as a witness at the instance of the PLAINTIFF

17   NAVIDEA BIOPHARMACEUTICALS AND MACROPHAGE THERAPEUTICS,

18   INC., and duly sworn, was taken in the above-styled and

19   numbered cause on the 16th day of November, 2021, from

20   9:56 a.m. to 2:35 p.m., before TINA TERRELL BURNEY, CSR

21   in and for the State of Texas, reported by machine

22   shorthand, at the offices of Veritext Legal Solutions,

23   600 North Pearl, Suite 2230, Dallas, Texas 75201,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.

Page 2

1          A P P E A R A N C E S
2   FOR THE PLAINTIFF NAVIDEA BIOPHARMACEUTICALS AND
    MACROPHAGE THERAPEUTICS, INC.:
3
       Mr. Barry M. Kazan
4   MINTZ & GOLD LLP
       600 Third Avenue, 25th Floor
5   New York, New York  10016
       212.696.4848  Fax 212.696.1231
6   kazan@mintzandgold.com
7
    FOR THE DEFENDANT MICHAEL M. GOLDBERG, M.D.:
8
       Mr. Gregory Zimmer
9   ATTORNEY AT LAW
       360 Lexington Avenue, Suite 1502
10  New York,New York  10017
       914.402.5683  Fax 914.402.5683
11  gzimmer@gzimmerlegal.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2                      PAGE
3   Appearances.....................................  2
4   WITNESS:  TERRY LEE ORR
5   Examination by Mr. Kazan......................  4
6   Signature and Changes......................... 130
7   Reporter's Certificate........................ 132
8
9
10
11
12          EXHIBITS
13      DESCRIPTION              PAGE
14  Exhibit 1  Expert Report  9/30/21............  4
15  Exhibit 2  Employment Record.................  7
16  Exhibit 3  August 14th, 2018 Agreement....... 46
17  Exhibit 4  Article from Investor Publications. 54
18
19
20
21
22
23
24
25

Page 4

1        (Exhibits 1 - 3 marked.)
2          TERRY LEE ORR,
3   having been first duly sworn, testified as follows:
4          EXAMINATION
5      Q.  Can you please state your name and address for
6   the record.
7      A.  Yes.  The full name is Terry Lee Orr.  The
8   address is -- we're all working out of our homes now, so
9   1715 Weeping Willow Way, Southlake, Texas 76092.
10     Q.  And you've had your deposition taken before?
11     A.  Yes.
12     Q.  So the only thing I want to emphasize is that
13  as I ask you questions, if you don't understand the
14  question, just please tell me that; otherwise, people
15  reading this will assume that you've understood the
16  question and you're answering the question that I've
17  asked.  Is that acceptable?
18     A.  Yes.
19     Q.  And obviously for the court reporter's
20  benefit, we should not talk over each.  Provide verbal
21  answers and verbal statements so that she doesn't get
22  mad at me, if that's acceptable to you.
23     A.  Yes, that's fine.
24     Q.  I've premarked Orr Number 1, which is titled
25  "Expert Report, September 30, 2021."  And I'd ask that

Page 5

1   you take a look at the document and let me know when
2   you're finished reviewing it.
3      A.  Okay.
4      Q.  And do you recognize that document?
5      A.  Yes, I do.
6      Q.  And that's your signature on the front?
7      A.  Yes, it is.
8      Q.  And this is the expert report you prepared in
9   connection with the matter Navidea Biopharmaceuticals,
10  Inc. versus Dr. Michael M. Goldberg, correct?
11     A.  Yes.
12     Q.  And is this your complete report as of today?
13     A.  It is -- there may be, you know, additional
14  information I'm asked to provide or opinions I'm asked
15  to render, but for my initial report that I filed, you
16  know, I addressed what I was asked to address.
17     Q.  And are you currently planning on making any
18  changes to this report?
19     A.  Currently there are a few typos and things in
20  here as I read through it I noticed, but I'm not going
21  to amend this report for that, those typos.
22     Q.  Okay.  Other than typos, do you plan on making
23  any changes to this report?
24     A.  Not at this time.
25     Q.  Have you reviewed the report of William

2 (Pages 2 - 5)

Page 6

1  Murray, which was issued in rebuttal?
2      A.  No.
3      Q.  Now, in terms of what we'll be talking about
4  today, let's agree on some terms.  Navidea
5  Biopharmaceuticals, you're familiar with that entity?
6      A.  Yes.
7      Q.  And we'll refer to that as Navidea, and we'll
8  understand we are talking about Navidea
9  Biopharmaceuticals, Inc., correct?
10     A.  Yes.
11     Q.  And Macrophage Therapeutics, Inc., you're
12  familiar with that entity?
13     A.  I am.
14     Q.  And if we refer to Macrophage or MT, that will
15  mean Macrophage Therapeutics, Inc. today.  Is that okay?
16     A.  Yes.
17     Q.  When did you first start doing valuation work?
18     A.  I guess, as an audit partner, you address many
19  valuation issues in auditing financial statements, you
20  know, the carrying value of intangibles, you know,
21  different markup value of items in financial statements.
22  So I would say that's been -- I've been involved in
23  making valuation assessments throughout my career.
24         And then once I got out of public
25  accounting and started doing advisory work, you know,

Page 7

1  and testifying in damage cases, then I would make
2  valuations in those as well.
3      Q.  Why don't we go ahead -- we've marked as Orr 2
4  a document that you've been kind enough to bring today.
5  Can you tell me what Orr 2 is?
6      A.  Yes.  It's my employment history or record.
7      Q.  And is this part of your CV?
8      A.  It is -- it was not part of what I attached to
9  this report, and that's how come I brought it.  But at
10  times I do put this in as an attachment to my CV.
11     Q.  Because it does say Page 4 of 4 on the bottom,
12  correct?
13     A.  Yes, it does.
14     Q.  And your CV that was attached to your report
15  ends at Page 3 of 4, correct?
16     A.  It does.
17     Q.  And so is this Page 4 that would have been
18  attached to your CV had you attached it?
19     A.  Yes, it is.
20     Q.  On Exhibit 2, can you tell me which of these
21  were companies that you did audit work?
22     A.  All of the ones up through BDO.  So the bottom
23  four are all public accounting firms, and I was in audit
24  in all of those firms.
25     Q.  And then what was your role at FTI Consulting?

Page 8

1      A.  I was senior managing director, head of the
2  forensic practice in Dallas.
3      Q.  And what generally were your responsibilities
4  at FTI Consulting?
5      A.  Well, I led the practice in -- the forensic
6  practice here in Dallas, which entailed conducting
7  investigations of fraud, waste and abuse cases, and
8  doing expert testimony work predominantly in damage
9  calculations, lost profits, contract disputes.
10     Q.  Do you know if any of the engagements -- did
11  any of the engagements at FTI Consulting involve valuing
12  shares in publicly traded companies?
13     A.  At this time I can't think of -- there maybe
14  were cases, but I can't think of a specific case.
15     Q.  So possibly, but you can't recall at this
16  moment?
17     A.  I'm not remembering a specific case.
18     Q.  What was your role at Ryan Forensic?
19     A.  I was senior managing director at Ryan in
20  their emerging forensic practice.
21     Q.  And what was the nature of your
22  responsibilities there?
23     A.  The same, fraud, waste and abuse, and I did
24  expert testimony.
25     Q.  Did you do any valuation of shares in publicly

Page 9

1  traded companies at Ryan Forensic?
2      A.  Probably not at Ryan.  As I reflect back on
3  the cases there, I would think not.
4      Q.  And what did you do at Grant Thornton?
5      A.  Same thing.  And I led the forensic practice
6  at Grant Thornton here in Dallas.
7      Q.  And did you do any work involving the
8  valuation of publicly traded shares at Grant Thornton?
9      A.  I'm trying to think if the companies that I
10  did valuations on were public or private.  I'm trying to
11  remember.  As we get more current, I'll remember the
12  cases more specifically.
13         There were some cases at Grant where the
14  companies we were dealing with were public, and there
15  was valuation work involved of those companies -- in
16  those companies.  I can't remember if it was
17  specifically on -- it involved some acquisition targets
18  and so...  But I can't remember if the targets were
19  public or if the company I was dealing with was public.
20         But, yeah, at Grant there was valuation
21  of either public or private shares of stock.
22     Q.  When you say there was valuation of public or
23  private shares of stocks, are you talking about the per
24  share price, or are you talking about valuing the
25  company as a whole?

3 (Pages 6 - 9)

Page 10

1     A.   It would be valuing the -- in these cases, it
2   was valuing the company, but the impact would be after
3   an acquisition, you know, what that -- if there would be
4   impact on the share price of the public companies.  But
5   it was probably more associated with the acquisition
6   targets.
7     Q.   Meaning valuing the acquisition target as to
8   how much it was worth?
9     A.   Yes.
10    Q.   Any others that come to mind with respect to
11  the question that I asked?
12    A.   No.  There's one predominant one that I
13  remember, but I don't remember, you know, valuing
14  specifically public company shares.
15    Q.   What was your role at Kroll?
16    A.   Kroll, same role through all of them.  It
17  was I led the Dallas practice in their forensic
18  practice, fraud, waste and abuse.
19    Q.   And did you do any valuation of shares in
20  publicly trade companies at Kroll?
21    A.   All of the companies were private that I dealt
22  with at Kroll.
23    Q.   And what's your role at HKA?
24    A.   I'm a partner at HKA in their forensic
25  practice doing fraud, waste and abuse investigations and

Page 11

1   expert testimony work.
2     Q.   And why did you leave BDO to go to FTI
3   Consulting?
4     A.   I got out of public accounting, primarily with
5   the change in Sarbanes-Oxley.  I enjoyed more of the
6   consulting work that I was doing with my audit clients.
7   When I no longer could do consulting work since
8   Sarbanes-Oxley prohibited that, I wanted to get more
9   into a consulting role.
10    Q.   And why did you leave FTI to go to Ryan
11  Forensic?
12    A.   It was an FTI decision.  I didn't leave them.
13  They had a big RIF.  I was in the process of developing
14  a new product for them.  And basically they had made the
15  decision that anyone that was below a certain revenue
16  generation was going to be let go.
17          I was told I was protected because I was
18  developing a new software package for FTI, and
19  ultimately that was not the case.
20    Q.   Did that software package involve valuation of
21  shares in publicly traded companies?
22    A.   No, it did not.
23    Q.   Why did you leave Ryan Forensic to go to Grant
24  Thornton?
25    A.   Just a better opportunity.  That was -- Ryan

Page 12

1   was a startup forensic practice.  It just was not
2   dealing with the things that I wanted to deal with.
3     Q.   And what about for Grant Thornton to Kroll,
4   why did you leave Grant Thornton?
5     A.   Grant went through a period of financial
6   troubles at Grant, and they cut back on their forensic
7   practices across the country.  So they shut down a lot
8   of them.  They shut down their practice here in Dallas.
9     Q.   And why did you leave Kroll?
10    A.   Kroll, I was brought in to expand the Texas
11  market.  I was the only person in Dallas working at
12  Kroll, and there was -- they brought in one partner in
13  Houston as well.
14          And there was a change in leadership at
15  Kroll, and they decided they didn't want to expand more
16  aggressively in those markets, and it didn't make sense
17  to have one partner in Dallas and one partner in Houston
18  if they weren't going to hire the additional staff to
19  support them.
20    Q.   Okay.  And at HKA, have you done valuation of
21  shares in publicly traded companies?
22    A.   I think this would be the first at HKA.
23    Q.   What formal valuation training have you
24  received?
25    A.   As a CPA audit partner for the extended period

Page 13

1   of time that I was, roughly, you know, more than 20
2   years, a lot of valuation work as a CPA of public
3   companies and their activities, not only on line items
4   for intangibles, but, you know, share values and
5   pollution issues in share prices, stock prices.
6          So as a CPA, there are specific guidances
7   for CPAs in doing that type of work, which is, you know,
8   work that I studied and work that I did in valuing --
9   doing valuation work.  Then I'm also -- as you'll notice
10  on my CV, I'm also a member of the AICPA forensic and
11  valuation services section.
12    Q.   Have you become a member of that section?
13    A.   There's tests and continued licensing.
14    Q.   How often do you get licensed?
15    A.   You're licensed once, and then you have to
16  pay -- like most of these, you have to pay an annual
17  fee.
18    Q.   And how often do you have to test?
19    A.   Just initial.
20    Q.   Just initial?
21    A.   Yeah.
22    Q.   When did you take that test?
23    A.   In that case I didn't need to take that test.
24  As a CPA, for the experience that I had, I was able to
25  obtain that without testing.

4 (Pages 10 - 13)

Page 14

1    Q.  So you just applied and --
2    A.  Your CPA is -- it's part of the AICPA.  Now,
3  today, it is something that you test for.
4    Q.  But you have never taken that test?
5    A.  No.
6    Q.  And is there continuing professional credits
7  you have to obtain in valuation to maintain your
8  membership in the section?
9    A.  It's maintained through -- I do take valuation
10  continuing training, but it's part of the AICPA
11  licensing that I'm required to maintain, 40 hours a
12  year.
13    Q.  In valuation or in maintaining your AICPA
14  membership?
15    A.  To maintain my AICPA membership.
16    Q.  So there's nothing specific -- is it correct
17  that there's nothing specific to maintaining it at this
18  point other than paying the membership fee every year?
19    A.  Well, and maintaining some level of continuing
20  education.  So there's -- you know, there's -- you have
21  some latitude in what that education process is, but it
22  has to be AICPA approved courses.
23          So it could be under auditing.  It could
24  be under valuation.  It could be under, you know, other
25  kinds of qualifying testing -- or continuing ed, excuse

Page 15

1  me.
2    Q.  Okay.  But that 40 hours is to maintain your
3  AICPA certification.  It's not specific to valuation?
4    A.  Not specific to valuation.
5    Q.  The valuation, you can be a member as long as
6  your AICPA certification is current, correct?
7    A.  That's correct.
8    Q.  So you don't have to do valuation work to
9  maintain your -- I forget the language that you used
10  here.
11        MR. ZIMMER:  Objection.
12    Q.  I'll withdraw the question and just rephrase
13  it here.
14        So to maintain your membership in AICPA's
15  forensic and valuation services section, you only have
16  to maintain your membership in the AICPA and pay a
17  separate membership fee for the section?
18        MR. ZIMMER:  Objection.
19    A.  That is correct.
20    Q.  And do you hold any certifications in
21  valuation?
22    A.  Other than that, no.
23    Q.  And you're aware that there are certain
24  valuation professions that you can be certified,
25  correct?

Page 16

1    A.  I am.
2    Q.  And you're not certified in those?
3    A.  No.
4    Q.  A double negative there.  It's correct that
5  you're not certified in those?
6    A.  That is correct.  I'm not certified in those.
7    Q.  Have you published in the area of valuation?
8    A.  No.
9    Q.  Have you written any articles?
10    A.  No.
11    Q.  Taught any classes?
12    A.  No.
13    Q.  Edited any journals that deal with valuation?
14    A.  No.
15    Q.  Okay.  Thank you.
16        Let's take a look at your report, which
17  is Exhibit 1.  So who worked with you at HKA in
18  preparing this report?
19    A.  I had two staff people that worked with me.
20  Sam -- Samantha, I believe her name is Fargot.
21  F-a-r-g-o-t, I believe.  And Tina.  And her name is --
22  her last name is Asian, and I don't know how to
23  pronounce it.
24    Q.  Do you know how to spell it?
25    A.  No.  I could look and see, but off the top of

Page 17

1  my head, I don't know how to spell it.
2    Q.  Okay.  For your convenience, I'll just refer
3  to them as Samantha and Tina.
4    A.  Yes.
5    Q.  What's Samantha's role at HKA?
6    A.  I believe she's a director.
7    Q.  And what are her qualifications?
8    A.  I would have to go look to see.  I don't know
9  offhand what they are specifically.
10    Q.  And what is Tina's role at HKA?
11    A.  She's a -- so Samantha, Sam, is a director.  I
12  said director.  I believe Tina is a manager.  So a
13  manager -- a director is higher than a manager, so she's
14  underneath Samantha.
15    Q.  And what did Samantha do for you in connection
16  with this report?
17    A.  A lot of what she did was helped with the
18  pagination, helped with just putting the report together
19  from that standpoint, doing the research and things of
20  that nature.
21    Q.  What sort of research did she do?
22    A.  Share value, tables that we have in here,
23  running calculations on stock prices, putting -- putting
24  a lot of the tables together.  That was stuff she did.
25    Q.  Do you consider that work to have been

5 (Pages 14 - 17)

Page 18

1 substantive towards your opinions?
2    A.  Well, it was work that I supervised, so I
3 believe everything in my report is substantive.  But on
4 the opinions that I rendered, you know, it was --
5 especially like on stock tables and stuff like that,
6 it's part of my opinions.
7    Q.  And what did Tina do for you on this report?
8    A.  I'm sorry, I thought Tina --
9    Q.  Oh, that was Tina?
10    A.  Yeah, that was Tina.  I'm sorry.
11 I think I said Samantha, but if I said Tina,
12 the record will reflect it.  But for clarification, the
13 person you were discussing was Tina?
14    A.  Yes.
15    Q.  Okay.  So now let's talk about what Samantha
16 did on the report.
17    A.  Samantha would play the higher role in this,
18 helped in in putting the report together.
19    Q.  How did she assist in putting the report
20 together?
21    A.  Most of it I would -- in this case, most of it
22 I wrote, but she would have done a review of that.  And
23 then there was a second partner review of this report as
24 well.
25    Q.  Who was that second partner?

Page 19

1    A.  David Duffus.
2    Q.  Can you spell his last name, please?
3    A.  I think it's D-u-f-f-u-s, I believe.
4    Q.  And what's the role of the second -- what was
5 his role as a second partner reviewer?
6    A.  To look at the technical aspects of it.  He is
7 certified in valuation, and he looked through anything
8 specifically on that part just to make sure that he was
9 comfortable that it was correct.
10    Q.  And how much have you charged Dr. Goldberg for
11 the report to date?
12    A.  It's an estimate.  I believe it's about
13 35,000.
14    Q.  And have you been paid the 35,000?
15    A.  Not yet.
16    Q.  How much have you been paid?
17    A.  There was a retainer, I believe, of ten, so it
18 could be applied.  But the terms of our engagement
19 letter is that the ten would be applied to the last
20 invoice.  But I've received that ten.
21    Q.  And on Page 1 it says, "Scope  of Assignment."
22 It says, "HKA has been retained by Gregory Zimmer,
23 Esquire, counsel on behalf of his client, Michael M.
24 Goldberg, M.D. (Dr. Goldberg or Goldberg) to do the
25 following as it relates to Navidea Pharmaceuticals,

Page 20

1 Inc.'s, (Navidea) and Macrophage Therapeutics, Inc.'s
2 (MT) breach of the August 14th agreement with
3 Dr. Goldberg."
4        Is that an accurate description of what
5 you were retained to do?
6    A.  I think the real description of what I was
7 retained to do is in Points 1, 2 and 3 below.  That's an
8 introductory paragraph with specificity of what I was
9 asked to do are on the following points.
10    Q.  So you were asked to educate the finder of
11 fact with respect to attributes of shares issued
12 pursuant to Reg D, correct?
13    A.  Yes.
14    Q.  And your report you believe does that?
15    A.  That was my attempt to do so, yes.
16    Q.  And you issued -- so that's educating,
17 correct?
18    A.  Yes.
19    Q.  So that's not rendering an opinion, correct?
20    A.  That is correct.
21    Q.  I have obviously read your report, but what
22 did you use to educate the finder of fact about Reg D?
23    A.  I talked about what Reg Ds are, some
24 background on Reg Ds, what the rules are with regard to
25 Section 506, 504.  Those are specific sections of Reg D

Page 21

1 that I thought were applicable.  And then I addressed
2 the issues related to -- or information around the
3 requirements under Rule 144.
4    Q.  The next statement you said was, "to opine on
5 whether the Navidea shares purportedly issued to
6 Dr. Goldberg were issued consistent with those
7 standards."
8    A.  Yes.
9    Q.  And that's an opinion you've rendered,
10 correct?
11    A.  Yes.
12    Q.  And your opinion is that the shares were not
13 issued to Dr. Goldberg consistent with the standards of
14 Reg D, correct?
15    A.  I think you've simplified it.  The opinion is
16 that the legends specifically in the shares issued under
17 the requirements to issue shares under Reg D did not
18 require certain legends that were in there.  Reg D did
19 not require certain of those legends to be there.
20        So by Reg D not requiring, it was not
21 issued in accordance to the requirements of Reg D.
22    Q.  Does Reg D require restrictions be placed onto
23 shares?
24    A.  Typically you're going to have a restriction,
25 I think, pretty broadly -- assume that you would -- in

6 (Pages 18 - 21)

Page 22

1 that Reg D is a private offering, and you're getting
2 public shares. They're not tradable. They can't be
3 immediately traded publicly. So you typically are
4 always going to have that restriction on there.
5         That would be notification to anyone
6 looking at those shares that they cannot be publicly
7 traded.
8     Q. But does Reg D contain a requirement that
9 there be a restrictive legend placed on a share?
10    A. Yes.
11    Q. It does?
12    A. Yes. Because they are not publicly tradable.
13 I'd say generally. I mean, there may be some
14 exceptions, but generally it's going to require that.
15    Q. And is there specific language in the
16 regulation that you're relying on for that opinion?
17        MR. ZIMMER: Objection.
18    A. The concept, and I put it in my report, that
19 shares issued under Reg D have not gone through a public
20 filing and, therefore, are not publicly tradable. That
21 is a restriction limitation of Reg D that needs to be
22 noted on those shares.
23    Q. And is there specific language in Reg D that
24 says that?
25    A. I don't have all of it in front of me, but I

Page 23

1 will look at my report, and I believe I addressed that.
2        So if you'll look on Page 5 at the bottom
3 last paragraph it says, "Purchasers of securities
4 offered pursuant to Rule 506" -- which is Reg D --
5 "receive restricted securities," meaning the securities
6 cannot be sold for at least six months or a year without
7 registering them. And then I give the reference from
8 where that language was obtained.
9    Q. But as you're sitting here today, you don't
10 know specifically what that language is, correct?
11    A. I can't quote it verbatim.
12    Q. And is registering a security the same as
13 removing a restriction on a security?
14        MR. ZIMMER: Objection.
15    A. Would you repeat that question again?
16    Q. You pointed to Page 5 as to the question, and
17 you cited to me language that says they can't be sold
18 without registering them.
19    A. Yes.
20    Q. And I've been asking you whether Reg D
21 requires that a restrictive legend be placed on a share.
22    A. Yes.
23    Q. And you've said you're relying on this
24 language for that.
25    A. Yes.

Page 24

1    Q. So is registering a share different than
2 removing a restriction on the share, or is it the same?
3        MR. ZIMMER: Objection.
4    A. To have the restriction removed, you have to
5 notify the company whose shares you're holding that
6 you've either met the requirement that you've held it
7 the required period of time, and, therefore, those
8 shares will be registered. And so by removing the
9 legends, they will register those shares, or those
10 shares have become part of -- included in part of a
11 public registration.
12    Q. But they can be included in public
13 registration even if they have never had a restrictive
14 legend on them, correct?
15        MR. ZIMMER: Objection. Is any of this
16 discussed in the report, Barry? This is outside the
17 scope of what we're here for today, right? We're here
18 to ask about the report. No?
19        MR. KAZAN: In the report -- Greg, you
20 know how we feel about lawyer conversations in these,
21 but that's what I'm trying to understand.
22    Q. In the report you suggest there are issues
23 with the restrictive legends placed on the stock. My
24 question is where in Reg D does it dictate what can or
25 cannot be in a restrictive legend on a stock?

Page 25

1        MR. ZIMMER: Objection.
2    A. And I have pointed that language out to you,
3 so then had a follow-up question. And I don't think
4 we're going back to the same question I already
5 answered, are we?
6    Q. Well, the language you've pointed out to me
7 talks about registering a stock.
8    A. Right.
9    Q. The question I have is -- and you're saying
10 that the stocks have to be registered under Rule 506.
11 That's what's in your report, correct?
12    A. Correct.
13    Q. The question I have is where in 504 or 506 Reg
14 D does it say there needs to be a restrictive legend on
15 a stock subject to Reg D?
16        MR. ZIMMER: Objection.
17    A. So let me re-read what's in my report again.
18 "Purchasers of securities offered pursuant to Rule 506
19 of Reg D receive restricted securities." That
20 restricted security is the legend that says these cannot
21 be traded unless they are held for six months under 144,
22 Rule 144, or they have been included as part of a public
23 registration.
24    Q. So you're relying on the language that says
25 it's a restricted security and saying that means there

7 (Pages 22 - 25)

Page 26

1   must be a physical restriction placed on the stock?
2          MR. ZIMMER: Objection.
3      A.  It is a restricted security, and you have to
4   notify users -- or holders and potential users, you
5   know, if those shares were traded that there is a
6   restriction.  And then those restrictions under 506 and
7   144 are that they have to be held a certain period of
8   time.
9          In this case, 144, through what I've
10  studied of the case, it would have been six months, or
11  they have to be part -- and then you have to notify the
12  company to have those legends removed so they can
13  incorporate those shares into their issued shares,
14  reported shares, or they have to be included in a public
15  registration.
16         Those are the two requirements to get
17  that legend removed saying that those shares are now
18  tradable to the public.
19     Q.  To get the legends removed --
20     A.  I said to get that legend removed, which is on
21  Reg D shares.
22     Q.  In order to get a legend -- so is there
23  anything else that you can point to that says there's a
24  requirement to put a restrictive legend on a security
25  subject to Reg D or Rule 144?

Page 27

1          MR. ZIMMER: Objection.
2      A.  I think that's what's in my report, and you
3   know, I'm going to go with what I used in there.  I
4   could do additional research and see if there are
5   additional references.
6          But what you are doing is you have
7   shares that were issued under Reg D, a private offering,
8   a private issuing, not a public offering, and you cannot
9   trade them, therefore, publicly.  And because you cannot
10  trade them publicly, a legend is put on to notify the
11  holder and potential users of those shares that those
12  shares are not publicly tradable until that legend is
13  removed.
14     Q.  You've said that.  What I'm asking is what's
15  the source for the requirement to put a restrictive
16  legend on the security?
17         MR. ZIMMER: Objection.
18     A.  And I've gone back to the same answer that I
19  have given you before in my Footnote Reference 22 -- or,
20  excuse me, yes, 22, which goes back to Footnote 19.
21     Q.  On the top of Page 2, it says in part of the
22  scope of your assignment, "Evaluate the damages
23  sustained by Dr. Goldberg resulting from the breach."
24         Do you see that?
25     A.  Yes.

Page 28

1      Q.  What is the breach you're referring to here?
2      A.  But for -- it's kind of a but for argument.  I
3   believe you're probably familiar with that.  But for
4   receiving the shares, what damages were received by not
5   receiving those shares.  I'm not digging into depths
6   into the agreement, but if there was a breach, if there
7   was a -- that he did not have access to the shares and
8   use of the shares, what would have been the damages for
9   not having the access to those shares?
10     Q.  Have you made an opinion that Navidea breached
11  the August 14th agreement?
12         MR. ZIMMER: Objection.
13     A.  No.
14     Q.  Have you made an opinion that Macrophage
15  Therapeutics breached the August 14th agreement?
16     A.  Yes.
17     Q.  Is it because those are legal conclusions that
18  you're not qualified to make?
19         MR. ZIMMER: Objection.  It's not in his
20  report, so why does he have to explain why he didn't
21  include something in his report?
22         MR. KAZAN: The word breach is not in his
23  report?
24         MR. ZIMMER: He gives specific opinions.
25  They are numbered, they are well supported, and none of

Page 29

1   them have anything to do with breach.  They have to do
2   with damages in two specific language items.  There is
3   nothing in there about a breach.
4      Q.  What's your understanding of what the breach
5   is that you're trying to value damages for?
6          MR. ZIMMER: Objection.
7      A.  I described it as a but for, but for not
8   receiving the shares.
9      Q.  So if I ask -- forget it.  I'm not going to
10  say so if.
11         How did Navidea breach the August 14th
12  agreement?
13         MR. ZIMMER: Objection.
14     A.  I think there's an assumption here.  I'm not
15  making -- I'm not rendering an opinion as to whether it
16  was breached.  You asked how they breached it.  I'm not
17  addressing how they breached it.  I'm addressing it
18  assuming there was a breach, a but for, the shares were
19  not received, what would have been the damage?
20     Q.  And it references that you -- that your
21  opinions are expressed to reasonable professional
22  certainty, correct?
23     A.  Yes.
24     Q.  Sorry, this is what I was looking for.
25         It says your opinions are based upon your

8 (Pages 26 - 29)

Page 30

1 experience, "as well as the information obtained through
2 my own research." What was your own research that you
3 did?
4 A. I drafted this report. So going back and
5 researching additionally what the requirements were of a
6 Reg D and 144, refamiliarizing myself with those would
7 be, I guess, the research that was performed, looking at
8 share values.
9 We're talking about a public company,
10 what the trading volumes were, what the share values
11 were from the time of the agreement to the time that I
12 wrote this report.
13 Q. Are there sources you looked at that aren't
14 cited in this report?
15 A. Not that I'm aware of. It would be an
16 oversight if there are.
17 Q. I'm sorry?
18 A. It would have been an oversight if there is.
19 Q. And it says, "Information available in case
20 documents." What does that refer to?
21 A. So I did get copies of depositions, filings
22 that were related to the case, the initial complaints,
23 and, you know, that's what I would call case documents.
24 Q. Information provided by counsel, what
25 information --

Page 31

1 A. So case would probably be filings related to
2 the case. Information provided by counsel would have
3 been the depositions that I received.
4 Q. Any other information provided by counsel?
5 A. I'd have to go through the list, but if it
6 wasn't public information, then it's probably something
7 I received from counsel. You can see all of the Bates
8 numbers on the documents that I used. Those would have
9 been received from counsel.
10 It's in my appendix too, the very last
11 page of the report.
12 Q. And it also says, "Interviewing with
13 Dr. Goldberg." What information did you receive from
14 Dr. Goldberg?
15 A. Certainly some background information on the
16 case. I talked with him about his -- a little bit about
17 his financial capabilities and in holding the shares,
18 was -- you know, financially was he able to hold the
19 shares through a period of time? Did he need money to
20 convert the shares since they were convertible, roles
21 that he had played in the company and at Macrophage --
22 or, yes. I'm trying to think. I think that's kind of a
23 general summation, discussions about the case.
24 Q. What did Dr. Goldberg tell you that you relied
25 upon in preparing your opinions that are contained in

Page 32

1 this report?
2 A. Specifically his financial capabilities, that
3 he financially did not need to convert the shares
4 immediately, and he had the financial wherewithal to
5 hold the shares. He wasn't dependent on the conversion
6 of that to feed his family, so to speak. His experience
7 in trading shares as an investor in roles that he had
8 held.
9 He was with an investment firm, the
10 activity that they were involved in, trying to get a
11 sense of his awareness of how the markets worked, his
12 experience levels as an investor, things of that nature.
13 Q. Did he provide you any documents that
14 demonstrated his traits you've described he told you
15 about?
16 MR. ZIMMER: Objection.
17 A. He indicated that there was -- he had been
18 involved in a number of successful endeavors in
19 biopharmaceuticals, that those investments had rewarded
20 him well. We talked about some of those companies that
21 he had worked with that had gone public that he had --
22 he was the beneficiary of. Really, his knowledge and
23 expertise.
24 Actually we went -- as I sit here now, we
25 went through some of his background training as a -- he

Page 33

1 became a doctor and then went back and got his MBA and
2 really focused on, you know, medical biopharmaceutical
3 types of companies, investments, things of that nature,
4 his role in private equity firms and roles in private
5 equity firms.
6 So, you know, if I had my notes in front
7 of me, I maybe could add to it, but it was of that
8 nature.
9 Q. Did he provide you information regarding his
10 trading in the markets?
11 A. No. I would say based on discussions with
12 him, it was apparent he was familiar with the markets,
13 had a good working knowledge of them, had roles as a
14 CEO, officer of public companies that would have
15 provided him background in how the markets worked.
16 Q. But he didn't provide you any documents or
17 information saying, "I made 15 to 20 percent on my
18 holdings every year because I trade stock in the
19 market"?
20 MR. ZIMMER: Objection.
21 A. No, he did not.
22 Q. Anything similar to that?
23 MR. ZIMMER: Objection, form.
24 A. He talked about companies that he had invested
25 in and had done well in but not to the specificity that

9 (Pages 30 - 33)

Page 34

1  you have mentioned.
2      Q.  Those investments were effectively private
3  investments that he was with either funds or private
4  equity firms, correct?
5          MR. ZIMMER:  Objection.
6      A.  They were.  And roles, I believe -- again, I
7  don't have my notes in front of me, but I believe he had
8  been an officer in some of those companies as well.
9      Q.  Turning to Page 3, you said -- I'm looking at
10 the first full paragraph.  The second sentence says, "At
11 this time Navidea owns approximately 99.8 percent of MT.
12 The remaining two percent is owned by Dr. Goldberg and
13 Platinum-Montaur Life Sciences through convertible
14 preferred stocks, of which Dr. Goldberg owned 40 percent
15 and Platinum-Montaur owned 60 percent."
16         Do you see that?
17     A.  Yes.
18     Q.  And you cite the first amended complaint for
19 that information, correct?
20     A.  You have the footnote references there.  All
21 of that was -- Footnote 6, 7 and 8 are to the complaint.
22 Footnote 9 regarding Platinum-Montaur, there is a
23 reference to that, and I think you took it down through
24 Footnote 10, which was from discussions with counsel and
25 Dr. Goldberg.

Page 35

1      Q.  Okay.  Did you take the allegations in the
2  first amended complaint to be true that are listed
3  there?
4          MR. ZIMMER:  Objection.
5      A.  You'll have to refresh my memory on what the
6  first -- what you're referring to.
7      Q.  You've cited to various paragraphs in the
8  first amended complaint as the basis for your recitation
9  of the background, correct?
10     A.  Yes.
11     Q.  So did you do anything to verify that what was
12 said in the first amended complaint was accurate?
13         MR. ZIMMER:  Objection.
14         That's your document, Barry.  That's
15 Macrophage's and Navidea's allegations in a lawsuit.
16 What would he do to verify their own statements to the
17 court?
18     A.  So the answer is no.  I took that information
19 in that document.
20     Q.  Did you ask Dr. Goldberg as to whether he
21 agreed with these statements?
22     A.  No.  That wasn't our topic of discussion.
23     Q.  If he denied these allegations, would that
24 impact your opinion in any way?
25     A.  It wasn't -- that's not what I was asked to

Page 36

1  assess.  I was given an assignment to educate the finder
2  of fact about Reg D, opine on the shares purportedly
3  issued to Dr. Goldberg under Reg D, and evaluate
4  damages, and assuming there was a breach, what those
5  damages would be.
6      Q.  But in order to -- let's use Macrophage.  In
7  order to understand valuing damages of Macrophage, you
8  have to understand the ownership structure, correct?
9      A.  The valuation -- I would say typically, yes,
10 that there would be some requirement to understand the
11 structure of it, who owned it, what the ownership
12 percentages were.  It was a subsidiary, and to do an
13 extensive valuation of Macrophage would have been an
14 extensive assignment.  I did not do that, as you can see
15 from my report.  What I did do was, by reading through
16 information in the depositions regarding -- I was trying
17 to think if there was more information or if it was just
18 the depositions, but regarding the potential investors
19 into Macrophage and realizing that fair value on a
20 private, you know, subsidiary of a public company could
21 be assessed by the standard of a willing buyer, willing
22 seller or willing investor to make an investment for a
23 certain percentage would give you a valuation of that
24 company without doing an extensive analysis of the value
25 of that company.

Page 37

1          And so taking that information and the
2  testimony of the then CEO and I believe CFO at the same
3  time officer, that filings that they had made or reports
4  they had made to the SEC that they had potential
5  buyers -- investors, not buyers but investors into
6  Macrophage for $25,000,000 established a willing buyer,
7  a willing investor, a willing seller, established value
8  that I used as an estimate of the value of Macrophage.
9      Q.  But that estimate is based on what the
10 ownership structure of Macrophage was, correct?
11         MR. ZIMMER:  Objection.
12     A.  I didn't know how much the potential investors
13 into Macrophage were going to receive for the
14 $25,000,000 investment.  So I made some assumptions in
15 range, developed a range.  If they were not buying it at
16 100 percent, which would be a sale, and it was going to
17 continue to be a subsidiary of a public company, then
18 the public company would have to have a controlling
19 interest, not necessarily in shares, but control the
20 decisions that were made in Macrophage to be
21 consolidated into Navidea, that it was less than 100
22 percent.  And for Macrophage -- or Navidea to continue
23 to have that control where Macrophage was consolidated
24 had to be somewhat less than 50 percent.
25         So I didn't have the exact structure, but

Page 38

1 I made assumptions based on what was being reported to
2 the SEC about potential investors into Macrophage.
3     Q.   Have you ever seen the agreement that governs
4 the preferred shares of Macrophage?
5     A.   I have not.
6     Q.   Would that be relevant to expressing an
7 opinion on the value of Macrophage?
8     A.   Again, I didn't express an opinion.  I did a
9 valuation to valuate the damages.  So I valuated a way
10 of assessing those, the value of Macrophage.  And I used
11 market information that there was an investor willing --
12 or investors willing to invest $25,000,000 into
13 Macrophage, that they would have done the study of
14 preferred shares, common shares, whatever was in that
15 company to assess a value of the company based on the
16 interest that they were willing to receive from their
17 $25,000,000 investment.
18     Q.   Going back to my question:  Would it have been
19 relevant to your opinion to see the agreement that
20 governed the preferred shares between Dr. Goldberg,
21 Platinum and the Navidea?
22          MR. ZIMMER:  Objection, asked and
23 answered.
24          MR. KAZAN:  I don't think it was
25 answered.

Page 39

1          MR. ZIMMER:  You didn't like the answer,
2 but he gave you a five-minute answer, and it spoke
3 directly to the question.
4          MR. KAZAN:  Craig, are you going to talk
5 the entire deposition?  I mean, seriously.
6          MR. ZIMMER:  I have talked for about 40
7 seconds out of the last hour, and I'm making a valid
8 objection.  So proceed as you wish.
9     Q.   Would it have been relevant to see the share
10 purchase agreement between Navidea, Macrophage -- I'm
11 sorry, Dr. Goldberg and Platinum-Montaur in expressing
12 your opinion?
13          MR. ZIMMER:  Objection.
14     A.   So I'm going to answer it very directly.
15     Q.   Can you answer it with a yes or no?
16     A.   Yes.  That's what I was going to say, yes or
17 no.  I'll give you a very direct answer.  And the answer
18 was no, but it was based on the way I approached it
19 because of -- that's what I was attempting to explain.
20          I approached it from the standpoint that
21 investors willing to put $25,000,000 into Macrophage had
22 done their analysis and knew what they were getting for
23 that, and so that 25,000,000, whatever their interest
24 they were receiving, established a value of Macrophage.
25     Q.   So you assumed that that 25,000,000 had

Page 40

1 already been subject to due diligence and that those
2 potential investors had reviewed all the documents?
3          MR. ZIMMER:  Objection.
4     A.   Based on -- yes.  Based on the -- what I read
5 in Jed's -- I can't remember his last name.
6     Q.   Latkin.
7     A.   Yes, Latkin.  Testimony and filings he made
8 with the SEC, it seemed that those investments were
9 imminent, that they had been -- at the point of letter
10 of intent, that we have investors that were willing to
11 put 25,000,000 in.  I didn't know the interest they were
12 receiving for that 25,000,000, but it sounded like that
13 process had progressed to the point where it was being
14 disclosed to the SEC as probable, as a high probability
15 so...
16     Q.   But you don't know what the value of
17 Macrophage would have been based on those investments,
18 correct?
19          MR. ZIMMER:  Objection.
20     A.   Not without knowing what their percentage was.
21 I didn't know what they were getting as a percentage
22 of -- what they were getting for their 25,000,000.  So I
23 made some assumptions that, since it wasn't a sale and
24 that Navidea continued to be the parent, that they
25 controlled the subsidiary.  They had control of the

Page 41

1 subsidiary.
2          So these shareholders weren't -- it
3 wasn't a sale of 100 percent, so it had to be less than
4 50 percent for Navidea to continue being the majority
5 shareholder.  That was kind of the benchmarks that I
6 used for coming up with a valuation of Macrophage.
7     Q.   But you didn't say Navidea had to remain a
8 majority shareholder, correct?
9     A.   To be consolidated, they had to maintain
10 control of that subsidiary for that subsidiary to be
11 consolidated.
12     Q.   Right.  But that doesn't mean that they had to
13 be majority shareholder to maintain control.  You said
14 it could be by other means, correct?
15     A.   It can be.
16     Q.   Could it be by super voting shares perhaps?
17     A.   It could be by super voting shares.  That
18 information I didn't have.  I tried to make some
19 assumptions, and I did state in my report it would be
20 controlled by either majority or, as you've pointed out,
21 some other means of control.
22     Q.   In fact, your opinion on Macrophage is on Page
23 25, right, the opinion that you're rendering?
24     A.   Like I said, it's what I was rendering.  I
25 think I called it a valuation.  So let me get to Page

11 (Pages 38 - 41)

Page 42

1   25. Can you point out specifically what you're
2   referring to?
3       Q.   Yes. It's Summary of MT Opinions. Do you see
4   that?
5       A.   Oh, okay.
6       Q.   Your opinion is, "Dr. Goldberg was damaged by
7   Navidea's failure to issue the MT super voting shares to
8   Dr. Goldberg."
9           Is that the sum total of your opinion
10  regarding the damages that Dr. Goldberg suffered as a
11  result of Navidea's failure to issue the MT super voting
12  shares?
13      A.   Yes. That's all that's written there.
14      Q.   Was that the best you could do to a reasonable
15  professional certainty?
16          MR. ZIMMER: Objection.
17      A.   Well, I demonstrated already that through
18  potential investors coming in and making an investment
19  of 25,000,000 into the company, that there was value in
20  the company. I indicated in my report that super voting
21  shares have a higher value than common shares, regular
22  shares.
23          So if there was a value in Macrophage
24  and Mr. Goldberg did not receive shares, common or super
25  voting, that he was going to be damaged. And if they

Page 43

1   were super voting, they have more value than common
2   shares.
3           So there's value in Macrophage, he didn't
4   get the shares issued to him, and so there was damage to
5   him.
6       Q.   How much?
7       A.   I don't know exactly how much. I didn't
8   render an opinion -- I didn't do a full analysis of the
9   value of Macrophage. I just showed in my report that
10  there was value in Macrophage based on the reports to
11  the SEC that new investors were coming in with new
12  money, $25,000,000, to invest in Macrophage. That shows
13  that there's value in Macrophage.
14      Q.   Did those investments ever occur?
15      A.   To my knowledge, no, they never did.
16      Q.   Does that impact your opinion at all?
17      A.   Well, value was -- at that time many things
18  happened after that. But at that point in time when
19  these events were going on, I believe there was value.
20  And my opinion is, if there was value, then he was
21  damaged by not getting shares.
22          So it didn't impact my opinion that he
23  was damaged, and I didn't say what the amount of damage
24  was, that there was damage.
25      Q.   Because you did not have enough information to

Page 44

1   assign a value to the damage, correct?
2           MR. ZIMMER: Objection.
3       A.   Not enough information to assign a specific
4   value, but the fact that shareholders -- new
5   shareholders were willing to invest $25,000,000
6   indicates that there is value. At that point in time
7   there was perceived value in Macrophage.
8       Q.   How do you quantify the damage to Dr. Goldberg
9   for not receiving the MT super voting shares?
10          MR. ZIMMER: Objection.
11      A.   No.
12      Q.   No. I said how do you do it.
13      A.   Oh, how would you do it?
14      Q.   Yes.
15      A.   At that point in time if it were done, that
16  would be a very extensive analysis because they didn't
17  have extensive sales. You would have to study their
18  technology, competitors in that market for that
19  technology, timing on what that technology or IP -- the
20  timing it would take to get that to marketability to
21  producing revenues. I mean, it would be an extensive
22  study.
23      Q.   Which you did not do?
24      A.   I did not do.
25      Q.   And, therefore, you can't assign a number to

Page 45

1   the amount of damages that Dr. Goldberg suffered as a
2   result of not receiving the MT voting shares, right?
3           MR. ZIMMER: Objection.
4       A.   I think I've answered that. I did not assign
5   a specific number, no. I did enough work to indicate
6   that there was value at that point in time in Macrophage
7   based on the outline that I've already -- testimony I
8   have already given in that because there was value and
9   he did not get the shares that he was promised -- or I
10  don't even want to get into any kind of legal rendition
11  of whether he was promised or not.
12          I assumed he was to receive and that by
13  not receiving those, there was damage to him.
14      Q.   But you don't have a number for those damages,
15  correct?
16          MR. ZIMMER: Objection. Asked and
17  answered twice or three times.
18      A.   No.
19      Q.   Let me have you look at Page 3 of your report,
20  please. You quote from the August 14th, 2018 agreement,
21  correct?
22      A.   Where?
23      Q.   At the very bottom, the last sentence on the
24  page.
25      A.   "The August 14th agreement required Navidea

12 (Pages 42 - 45)

Page 46

1  to..."
2      Q.  Yes.
3      A.  Okay.
4      Q.  So you quoted from the August 14th agreement,
5  correct?
6      A.  Yes.
7      Q.  May I show you what's been marked as Exhibit
8  3?
9      A.  Thank you.
10     Q.  And that's the August 14th agreement that you
11  referred to?
12     A.  Yes.
13     Q.  Is there a reason that you didn't quote the
14  first sentence?
15         MR. ZIMMER:  Objection.
16     A.  So the sentence you're referring to is, "This
17  agreement is dated effective" --
18     Q.  No, the beginning on Page 3.  I apologize for
19  interrupting there, but I just wanted to jump to the
20  point.
21     A.  That was the first sentence, though, was it
22  not?
23     Q.  It says, "Navidea's shares on the date of the
24  consummation of the transaction, such date the closing
25  date, Navidea will issue to Goldberg 23 and a half

Page 47

1  million shares of Navidea common stock."
2         Do you see that?
3      A.  Yes.
4      Q.  Is it relevant to your analysis what the
5  closing date was?
6      A.  So the closing date is a defined term there,
7  as I read through this agreement.  I'm not trying to be
8  the lawyer, but as a layman reading through this, the
9  closing date appears to be a defined term that was
10  driven on certain actions occurring.
11         I looked at those actions and put them on
12  a timeline, and not all of those dates -- not all of the
13  actions required to meet the closing were addressed when
14  the shares were ultimately issued to Dr. Goldberg.  So I
15  used the date on which the shares were issued for my
16  analysis.
17     Q.  So the fact that there's a closing date
18  reference by which date the shares should be issued is
19  not part of your analysis?
20         MR. ZIMMER:  Objection.
21     A.  Repeat the question again.
22         MR. KAZAN:  Can you read it back, please?
23         (Record read.)
24     A.  So the confusion was in the question after I
25  had stated that I looked at events -- I had looked at

Page 48

1  events that were supposed to occur before the closing
2  date, and many of those events had -- some of those
3  events hadn't occurred when the shares were actually
4  issued.
5         So I discontinued using the closing date
6  in my analysis as the date of share issuance and used
7  one of the events of the closing date, the actual
8  issuance of the shares, as the date for measuring when
9  the closing date or the shares should be issued.
10     Q.  Didn't you earlier say that the damages is the
11  failure to deliver the shares to Dr. Goldberg?
12     A.  Those were the Macrophage super voting, and I
13  understand that those -- that was the topic we were
14  talking on when I made that statement, I believe.  And I
15  believe those shares have never been issued, the super
16  voting shares of Macrophage.
17     Q.  When we talked about the damage to
18  Dr. Goldberg on Page 2 of your report, didn't you say
19  you assumed a breach and that was the failure to deliver
20  Dr. Goldberg the shares?
21         MR. ZIMMER:  Objection.  Don't answer.
22  The record will reflect what you said.  You're not going
23  to go back and tell him what you said earlier.
24         If you want to ask him a question about
25  what he's thinking or what he did, you can ask, but

Page 49

1  don't ask him to memorize what was stated on the record
2  and repeat it back to you.  That's not a fair question.
3      Q.  Isn't it correct that the damages you're
4  analyzing are damages for failure to deliver Navidea
5  shares to Dr. Goldberg?
6      A.  Part of the damages -- so there's two
7  companies.  So we've got Macrophage and super voting
8  shares.  And maybe the confusion on my part was that you
9  went to the back of my report talking about Macrophage.
10  Those shares, I don't believe, were ever issued.
11         But shares were issued in Navidea, and I
12  believe all of those shares -- I'm trying to think it
13  through.  I believe all of the Navidea shares were
14  issued.
15     Q.  So what damages are you evaluating with
16  respect to the Navidea shares?
17         MR. ZIMMER:  Objection.
18     A.  The Navidea shares were issued, but there are
19  restrictions on those shares that prevent them from
20  being usable beyond the normal restrictions of a Reg D.
21  As we talked about Reg D, they're not tradable publicly
22  until you've held them for at least six months.  Then
23  you have to register them.  You know, you have to let
24  the company know that you're going to trade them.  They
25  have to incorporate that into their filings.  They have

13 (Pages 46 - 49)

Page 50

to include them in a public filing.

So besides that restriction, there were other restrictions on there that made the shares nontradable unless those legends were removed. And so while the shares were issued, they are not usable to anyone until those legends are removed.

Q. So is this damage the failure to issue the Navidea shares or the failure to remove the restrictions on the Navidea shares?

A. I would say that the damage was -- and you see this in my report on the timeline that I used -- is restricting the use of those shares beyond the requirements of Reg D, which we've talked about, and 144.

Q. Going back to the MT stock for a minute, super voting stock, who was responsible to issue that?

MR. ZIMMER: Objection.

A. I don't know that I know based on reading this agreement. If you'll give me a minute and let me read the agreement and see if --

MR. ZIMMER: Well, I'm not going to let you give an opinion on the agreement. You didn't give opinions on the agreement when you were penning it, and I'm not going to let you opine on legal conclusions and contract language.

Page 51

We're here to discuss his report, his credentials, you know. We're not here to have him give you his opinion on documents and things that he hasn't even mentioned in report. I'm not going to let him answer the question.

MR. KAZAN: You're going to instruct the witness not to answer?

MR. ZIMMER: Repeat your question. You want him to interpret this agreement for you? I'm not going to allow him to do that.

Q. Who was supposed to issue the MT super voting stocks?

MR. ZIMMER: I'm going to instruct you not to answer that question.

Q. Are you going to abide by Mr. Zimmer's instructions?

A. I am.

Q. Okay. Fair enough.

Did you know Dr. Goldberg was the CEO of Macrophage Therapeutics from August 14th, 2018 to February 20th, 2019?

MR. ZIMMER: Objection.

A. I did know that he was the CEO for -- he was the CEO of Navidea, and part of the agreement was, as I read it, is that he would leave that position to become

Page 52

CEO of Macrophage.

Q. Well, you spoke to Dr. Goldberg. Did you speak to him about his role as the CEO of Macrophage?

A. I'm not sure if I had that specific discussion or talked about what he did in that role at Macrophage. I know he was the CEO. I don't -- I'm just reflecting back on my discussion with him. I don't believe we talked extensively more than he was the CEO about Macrophage.

We talked about the product of Macrophage. We talked about, you know, its potential, but not beyond that.

Q. And you don't know why the MT super voting stock was not issued, correct?

MR. ZIMMER: Objection.

A. I do not know. That was not part of my assignment.

Q. Who is held liable if the exemptions in Reg D are not followed or not satisfied?

MR. ZIMMER: Objection.

A. Rephrase your question. Would the issuer of the shares be liable? Was that your question?

Q. Well, my question was broader as to who is liable for a violation or a failure to satisfy the exemptions in Reg D.

Page 53

A. The issuer of the shares would be the primary -- again, this is a little bit of a legal question. But, you know, from my reading of the regulations, I think the issuer would be held liable.

Q. On Page 6 and 7, you have these statements in here about Rule 144.

A. Yes.

Q. Did you write this language?

A. Some of it maybe was lifted out of regulations. I don't know. Something I was reading. Let me see if there's a footnote.

MR. ZIMMER: Objection. Are you asking if he created the words or if he copied and pasted versus typing?

MR. KAZAN: Greg, are you going to instruct him not to answer again? Because I think my question was did you write it.

MR. ZIMMER: As in transcribe?

MR. KAZAN: Greg, you're not answering my questions. Mr. Orr is.

Q. Mr. Orr, did you write --

MR. ZIMMER: I'm making an objection. I'm asking you to clarify the question. I didn't understand it.

Q. Do you understand what I'm asking you when I

Page 54

1  said did you write the language that's in your report?
2       MR. ZIMMER: Objection.
3       A.  It was language that I put in the report.  I
4  may have gotten that language from some other source.
5       Q.  Okay.  But you didn't cite to another source,
6  did you?
7       A.  Well, Footnote 25 is referring to those
8  sources that relate to that language.
9       MR. KAZAN:  Can we mark that as Exhibit
10  4?
11       (Exhibit 4 marked.)
12       A.  Okay.
13       Q.  Have you ever seen that document before,
14  Mr. Orr?
15       A.  I have.
16       Q.  What is that?
17       A.  It's a summary of 144 written by Investor
18  Publications.
19       Q.  And is this what you used to put the language
20  into your report?
21       A.  Obviously, yes.
22       Q.  Do you remember doing it?
23       A.  Well, I wrote it, so I can't deny putting it
24  in.
25       Q.  Okay.  And you got this language from this SEC

Page 55

1  publication, correct?
2       A.  Yes.
3       Q.  Did you do independent research or did you
4  just take what the SEC said and put it into your report?
5       MR. ZIMMER: Objection.
6       A.  No.  I read through the literature.  I
7  actually read through this and the literature and
8  compared it to make sure I was comfortable with it.
9       Q.  What literature are you referring to?
10       A.  The -- not literature, but the regulations,
11  excuse me.
12       Q.  On Page 7 it says, "If one acquires restricted
13  securities" -- I'm looking at the second full paragraph
14  from the bottom on Page 7 of your report.
15       A.  Yes.
16       Q.  It says, "If one acquires restricted
17  securities, they almost always will receive a
18  certificate stamped with a restrictive legend."
19       A.  Yes.
20       Q.  It says almost always.  Does that refresh your
21  recollection as to whether a restricted legend is
22  required to be on a restrictive security?
23       MR. ZIMMER: Objection.
24       A.  I'm not aware of an example right now that I
25  can think of where it would -- where you would not have

Page 56

1  a restriction when you are dealing with a private
2  offering that was to be issued in a public filing -- or
3  excuse me.  Can I strike that?
4       Where you would have a private issuance
5  of shares of a public company.  Now, an example might be
6  if you were a control person within the company, which I
7  made specific reference that Dr. Goldberg wasn't because
8  he was no longer with Navidea.  There are some
9  exemptions that make it so you -- exemptions that you
10  are not restricted in trading those shares.  That would
11  be the reasons why you would say almost always.
12       But in this situation where you're
13  dealing with someone that's not a control person in the
14  public company, the issuing company, not an employee of
15  that company when they received those shares -- I put
16  that exception in for the reasons I told you, but right
17  now I can't think of an exemption why you wouldn't have
18  those in there where you were outside the company.
19       If you're inside the company and a
20  control person, you could get shares without a legend.
21       Q.  But they'd still be subject to the
22  restriction?
23       A.  There's actually situations where within the
24  company, as a control person within a company, you can
25  get them.  You just have to -- you don't have the

Page 57

1  restrictions on your legends, but you have to register
2  them with the SEC if you trade over certain volumes.
3  And you see that under 144 disclosures in public
4  companies, of officers of public companies.
5       Q.  Let's turn to Page 8 of your report, please.
6       A.  Okay.
7       Q.  You refer to restrictions imposed by legends
8  placed on Navidea shares.  Do you see where I am?
9       A.  C?
10       Q.  Do you see where I am?
11       A.  Then I said C.
12       Q.  Yes.  Correct.
13       A.  Yes.
14       Q.  So it has an issuance of 12,777,274 shares.
15  Do you see that?
16       A.  Yes.
17       Q.  Do you know why that amount of shares were
18  issued?
19       A.  I asked that question.  When the agreement has
20  certain share quantities that are supposed to be issued,
21  why wasn't the agreement followed.  I was told that --
22  and I did not research it, but I was told that Navidea
23  was restricted from issuing the number of shares in the
24  agreement based on their trading volumes and SEC
25  restrictions on the number of shares that they could

15 (Pages 54 - 57)

Page 58

1 issue at that time. And that 12,000,000, I'm assuming
2 based on what I was told, the 12,000,000 was under that
3 restrictive volume.
4        And that's how come also why the 722 in 2
5 on my report on Page 9 was registered on Form S-8 and
6 not Reg D.
7    Q.   You said you asked and you were told. Who did
8 you ask?
9    A.   I asked counsel, and it maybe was in the
10 discussion. I can't remember if Dr. Goldberg was
11 involved, but I did ask counsel why this was not
12 followed, and that was his understanding.
13   Q.   And when you say counsel, are you referring to
14 Mr. Zimmer?
15   A.   Yes.
16   Q.   And do you know why the 722,726 shares were
17 issued under S-8?
18   A.   I'm not trying to be cute, but I tried to
19 address --
20   Q.   All three?
21   A.   Yes, all of it at one time. The answer was
22 there was limitation on what could be issued. And I
23 don't know that they were SEC limitations. I maybe said
24 SEC, but the New York Stock Exchange, I think that was
25 the limiting factor. I'm not sure if it was the SEC or

Page 59

1 the New York Stock Exchange.
2        But there's a limit on the number of
3 shares they were able to issue, and so that is why they
4 issued the Form S-8 shares.
5    Q.   On Page 10, you cite to the restrictive
6 legend. And I'm looking at the part right above Letter
7 D. It states, "The securities represented by this
8 certificate are subject to an escrow agreement and no
9 sale, loan, hypothecation, pledge, grant of any option
10 for the purchase of or other disposal of or any such
11 securities may be made except following their release
12 from escrow in accordance with the terms of such escrow
13 agreement."
14        Do you know what the escrow agreement
15 reference is to? Do you know what the escrow agreement
16 that is referenced here is?
17        MR. ZIMMER: Objection, form.
18   A.   I believe by reading the agreement that you
19 gave me in Exhibit 3, there is share escrow, and my
20 understanding is it was related -- this legend related
21 to that in the agreement, the share escrow portion of
22 the agreement.
23   Q.   Do you know whether an escrow agreement was
24 ever entered into?
25        MR. ZIMMER: Objection.

Page 60

1    A.   It wasn't part of my assignment, and I do not
2 know.
3    Q.   Whether an escrow agreement was entered into,
4 is that relevant to your calculation of damages?
5    A.   I don't know if the escrow agreement was -- I
6 don't know if it was signed. I don't know -- I don't
7 know if -- my understanding is it's this agreement.
8 There are some disputes about this agreement.
9        So, please, I'm sorry, ask your question
10 again. I think I got off on the wrong trail.
11        MR. KAZAN: Can you re-read the question,
12 please?
13        (Record read.)
14   A.   I assumed that if this agreement were followed
15 in which the escrow portion exists in the agreement,
16 that there would be an 18-month delay on when it
17 would -- on when the shares could be tradable. And I
18 used that in my calculations of when -- as I read this
19 agreement, what the timing would be when Dr. Goldberg
20 would be able to go into the market and trade those
21 shares, assuming that the 18-month -- it's if certain
22 things happened or 18 months later, so assuming it was
23 the 18 months later. You would have to wait 18 months
24 to trade shares under the escrow agreement.
25        So the answer is, yes, it played a factor

Page 61

1 in my calculation because it limited when he would -- in
2 my calculation, when he would be able to trade the
3 shares.
4    Q.   And you're timing that 18 months on when the
5 shares were issued to him, correct?
6    A.   Yes. November 22nd, I believe.
7    Q.   On Page 11, on the second half of the
8 document, the sentence starts, "The remaining portion of
9 the Navidea share legend is not authorized or required
10 Reg D."
11        Do you see that? I'm assuming that's one
12 of your typos.
13   A.   The alleged typos that I mentioned, no.
14   Q.   It's not one of your typos or it is?
15   A.   No, it's not.
16   Q.   It says, "is not authorized or required Reg
17 D."
18   A.   Oh, yes. There's supposed to be required by.
19 There is supposed to be a by in there. I apologize. I
20 see what you're referring to now.
21   Q.   When you say authorized, that it was not
22 authorized, what do you mean by that?
23   A.   Similar to required. You're not -- it's
24 not -- it's not an authorized portion. It's not that
25 you couldn't put them in. It's not an acquired portion

16 (Pages 58 - 61)

Page 62

1 of Reg D. You can put all kinds of legends in there,
2 but it is a legend specifically required by Reg D.
3         And the authorized/required is trying to
4 say authorized by Reg D language. Required by --
5 authorized by Reg D language or required by Reg D
6 language. It may be a poor term, but that was the
7 thinking.
8    Q.   So you're not saying that Reg D prohibited
9 Navidea from putting this legend on?
10   A.   No, no. Absolutely not.
11   Q.   On Page 12 of your report, there is a
12 reference to a lockup provision. Do you see that?
13   A.   At the top I think is where you're referring?
14   Q.   It's the first nonquoted paragraph, I guess.
15   A.   Yes.
16   Q.   It says, "The lockup provision contained in
17 the August 14th agreement."
18         What does that refer to?
19   A.   I know if I show you -- you can't see it, but
20 on the agreement there is a section called lockup.
21 That's what I was referring to, in the escrow -- or the
22 lockup provisions of the agreement.
23   Q.   It says -- and you've written, "However, the
24 lockup provision contained in the August 14th agreement
25 provides only that 'After the award and placement of the

Page 63

1 shares with members of Goldberg's family, neither
2 Goldberg nor such family members will transfer any of
3 the shares for six months after the closing date without
4 the written consent of Navidea.'"
5    A.   Yes.
6    Q.   And what is the reference to issuing --
7 is your understanding of the placement of shares with
8 Goldberg's family to refer to?
9         MR. ZIMMER: Objection.
10   A.   Nothing more than what I read in the
11 agreement. It was -- it's the exact -- I'm just
12 double-checking. It's the exact language that was in
13 the agreement.
14   Q.   Would your analysis of Dr. Goldberg's damages
15 change if shares were not issued to him directly but
16 were issued to his children?
17   A.   In my analysis it would not have changed my
18 analysis of any damages because it appears that
19 Goldberg's family -- I guess if it was issued to his
20 family -- again, I'm not trying to be a lawyer, but if
21 it's issued to his family, it's in my analysis one and
22 the same as being issued to him.
23   Q.   So it wouldn't make a difference to you if
24 they were issued to his family members?
25   A.   It wouldn't, no.

Page 64

1    Q.   Is it because you're making an assumption that
2 his family members would follow the same trading
3 patterns that he was if permitted to freely trade
4 Navidea stock?
5    A.   It says -- it's confusing the way it's written
6 for me. It says with members of Goldberg's family,
7 "neither Goldberg nor such family members." So it
8 includes him in there as though they are one unit.
9 Goldberg nor family, and I treated them as one.
10   Q.   Were you aware that Dr. Goldberg wanted the 23
11 and a half million shares to be partially distributed to
12 his family members and not to him directly?
13         MR. ZIMMER: Objection.
14   A.   I was not aware of that, other than, you know,
15 I could assume that there was some discussion that
16 family members were going to get some shares based on
17 this. But details beyond that, I don't have any
18 additional details.
19   Q.   And if family members received the shares,
20 your damage analysis would not change?
21         MR. ZIMMER: Objection.
22   A.   I don't know if it would have changed. Going
23 down that thought process, I would have wanted to
24 interview them just as I had done Dr. Goldberg.
25   Q.   So can you state with a reasonable degree of

Page 65

1 certainty that your analysis wouldn't change if the
2 shares were issued directly to Dr. Goldberg's family
3 members?
4         MR. ZIMMER: Objection.
5    A.   I think I answered that question. I think
6 you're just trying to clarify my answer. What I said is
7 before I would render opinions that my -- before I would
8 say whether my opinion would change or not, I would want
9 to do more work if in fact it was -- if the shares were
10 to be issued to family, interviewing them. Those
11 interviews would determine whether my estimations of
12 damages would have changed or not.
13         My assumption in this is Dr. Goldberg is
14 making the decision on those shares, and it's like I
15 said, I wasn't sure if it came to Dr. Goldberg and then
16 he issued them to the kids or if it was directly issued
17 to him. So it would take some -- potentially take some
18 additional inquiry and understanding of if he held them
19 and then transferred them to his family or if they were
20 directly transferred, you know, issued to the family.
21         My understanding is that all of the
22 shares were issued to Dr. Goldberg on 11/22, except
23 those that would have been -- now I'm questioning that
24 statement. I'd have to look -- I think all of the
25 shares were issued, as we talked about, to Dr. Goldberg.

17 (Pages 62 - 65)

Page 66

1 I'd just need to go back and check my notes.
2 Q. Yes. That's consistent with your report.
3 A. Yeah.
4 Q. You would need -- if the shares were to be
5 issued directly in the name of Dr. Goldberg's children,
6 you would need to do additional work to assess the
7 damages in this case, correct?
8 A. Well, is that a hypothetical? Because now I'm
9 trying to remember if in fact all of the shares were
10 issued to Dr. Goldberg and he received them all that
11 were be to issued. Then you're asking a hypothetical?
12 Q. Yes. It's a hypothetical in that there's a
13 reference to his family members receiving shares. So
14 there's an agreement. I understand you're not
15 interpreting the agreement, but I also understand that
16 you're assessing damages resulting from a breach of the
17 agreement that you have assumed.
18 MR. ZIMMER: If your opinion was not
19 based on an assumption, then that's a hypothetical
20 question, and he's not here to answer hypotheticals.
21 Objection.
22 A. Let me try to answer the question. I'm not
23 trying to be evasive.
24 One, my understanding is all the shares
25 were issued to Dr. Goldberg, so that kind of makes this

Page 67

1 a hypothetical. Two, if he controls the shares, they
2 were issued directly to him and not to his children,
3 then he controls when he would transfer them to his
4 children. He would have that control.
5 My analysis was done that he had control,
6 and at this point in time, there is nothing to transfer.
7 So when those shares -- if he had those shares and
8 controlled those shares, then the damages are on his
9 control, and I have no idea when he would pass those on
10 to the kids.
11 Q. On Page 13, let me ask you a question.
12 Dr. Goldberg was issued ultimately 13 and a half million
13 shares, correct?
14 MR. ZIMMER: Objection.
15 A. What he was issued and what the agreement says
16 are different. We already talked about that, the
17 differences in the numbers of shares and the tranches of
18 those. The initial tranche as per the agreement was 13
19 and a half million. That is correct. What he actually
20 received was the 12,777,274.
21 So the way you asked the question, I'm
22 not sure what you are asking about. What he received or
23 should have received under the agreement or what he
24 received -- actually received in shares.
25 Q. I'm asking what he actually received in

Page 68

1 shares.
2 A. He actually received -- rather than me just
3 regurgitating it, it's on Page 8, 9 and 9. Those are
4 the shares that he actually received. So 12,777,274,
5 722, 726, not Reg D but Form S-8 shares, and then
6 5,000,000 shares that were, I believe, the lockup or --
7 the lockup shares, yeah.
8 Q. Do you know what. So that adds up to 18 and a
9 half million.
10 A. Does it? Okay. I apologize then. I know I
11 had it in my workpapers, but I couldn't remember if it
12 added up to 18, and that's what you're asking about,
13 that 18. Okay.
14 Q. Do you know what percentage of Navidea stock
15 18 and a half million shares is equal to?
16 A. I don't have the exact number. I know it's a
17 significant number of shares, a significant percentage.
18 I don't remember what the number was, but it's
19 significant.
20 Q. Did the percentage trigger any other
21 restrictions on Dr. Goldberg by holding that many shares
22 of a publicly traded company?
23 MR. ZIMMER: Objection. Are you asking
24 him for a legal opinion?
25 Don't give a legal opinion. If you

Page 69

1 didn't study it and you didn't opine on it, then it's
2 not a subject for today.
3 A. So ask your question again.
4 Q. Do you know if Dr. Goldberg's holding 18 and a
5 half million shares of Navidea stock imposed additional
6 restrictions on his ability to transfer them?
7 MR. ZIMMER: Objection.
8 A. I didn't look at that, and I didn't look at
9 what the share volumes were at the times when he would
10 actually have been able to trade them.
11 Q. You didn't look at the share volumes?
12 A. Well, I looked at share volumes, but not the
13 fluctuation of his percentages because at certain points
14 in time, share volumes go up and down. I mean, shares
15 are traded. So I didn't -- while I looked at share
16 volumes, I didn't do it in correlation to what his
17 shares would be and didn't look at any additional
18 restrictions. I wasn't asked to do that.
19 Q. If there were further restrictions on his
20 stock, would that lower the value of the damage number
21 you came up with?
22 MR. ZIMMER: Objection.
23 A. It's a speculative response to your question.
24 I mean, I don't know based on what levels he could trade
25 under those restrictions because there's percentages,

18 (Pages 66 - 69)

Page 70

1 and so where those percentages would be, you know, where
2 his block would be.
3          So I don't know if he could have timed
4 those within the same trading blocks that I outlined or
5 not.
6     Q.   So you assume there were no other restrictions
7 other than the restrictive legends?
8     A.   Yes.  That is -- you can read that from my
9 opinion.  I didn't break it up and address any of those
10 additional restrictions or my opinion in my report.
11    Q.   Page 13, right above E says "This legend is
12 not authorized or required for Form S-8 or shares issued
13 in accordance with Form S-8 or shares issued under
14 Regulation D, and the language of the legend differs
15 from the lockup language contained in the August 14th
16 agreement and is not authorized or required by Reg D."
17         Again, when you say authorized here, are
18 you saying that these legends were prohibited by S-8?
19    A.   No.
20    Q.   What did you mean by that the legend is not
21 authorized by Form S-8?
22    A.   I think I answered that, so I'll try to make
23 my answer consistent, but --
24    Q.   I was going to say, if it's same explanation
25 that you gave for Reg D, you can say that.

Page 71

1     A.   It is the same.
2     Q.   So it's not that it was prohibited, but it's
3 not required, correct?
4         MR. ZIMMER:  Objection.  You're asking
5 him to rely on prior testimony, so he has no need to
6 recharacterize it and it won't change what he said
7 earlier.
8         MR. KAZAN:  Fine.
9     Q.   You know what, Mr. Zimmer thinks that you need
10 to explain --
11        MR. ZIMMER:  No.  The way you're
12 approaching it --
13        MR. KAZAN:  Mr. Zimmer, stop.  It's my
14 deposition.  Mr. Zimmer --
15        MR. ZIMMER:  I'm going to make a
16 statement on the record before or after your question.
17        MR. KAZAN:  Mr. Zimmer, it's my
18 deposition.
19    Q.   Mr. Orr --
20    A.   Can I use the restroom?
21    Q.   After you answer this question.
22        Mr. Orr, what do you mean by the legend
23 is not authorized or required by Form S-8?
24    A.   Again, where I was starting to go with the
25 answer is exactly what I had said before.  It's not

Page 72

1 prohibited.  Authorized means in the canon of
2 regulations, is it indicated that it should be -- you
3 know, is it required?  Is it authorized?  It's not
4 prohibited, but it's not something that you would have
5 to put in.
6     Q.   Thank you.
7         And, yes, you may use the  restroom.
8         (Lunch recess.)
9     Q.   Mr. Orr, let's turn to Page 23 of your report.
10 I want to go to the summary of the Navidea opinions that
11 you have down there.  Are you with me there?
12    A.   Yes.
13    Q.   All right.  We've talked about your discussion
14 regarding the restrictions relative to Reg D.  But in
15 opinion A, you state that the legends were not
16 authorized by the terms of the August 14th agreement.
17 Do you see that?
18    A.   I see it, yes.
19    Q.   Is that a legal opinion?
20    A.   I was not attempting to render a legal
21 opinion.  What I was attempting to say is that the terms
22 of the August 14th agreement are that Mr. Goldberg would
23 receive shares issued in accordance with Reg D.  It's
24 more of a statement of fact that the legends on the
25 shares that were issued were more extensive than what

Page 73

1 were required by Reg D.
2         That's all that I'm attempting to say.
3 And, therefore, because of that, they're not in
4 accordance with the agreement in that shares would be
5 issued in accordance with Reg D.
6     Q.   Well, what I'm trying to determine -- let me
7 just rephrase that.
8         Are you interpreting the August 14th
9 agreement when you come up with your conclusions?
10    A.   I'm interpreting one small aspect of the
11 agreement, and that is that the legends on the shares
12 that were issued were more extensive than what were
13 required by Reg D and, therefore, were different than
14 saying the shares were issued in accordance with Reg D.
15    Q.   So your opinion is that Navidea had an
16 obligation to issue 23 and a half million shares to
17 Dr. Goldberg in accordance with Reg D?
18        MR. ZIMMER:  Objection.  Are you talking
19 about what's in the report or some opinion he has
20 outside the report?
21    Q.   Can you answer my question?
22    A.   Yeah, I'm reading the agreement, and here's
23 what I'm attempting to address and this is all.  Navidea
24 will issue 23 and a half million shares of Navidea
25 common stock, and then, you know, it breaks it down into

19 (Pages 70 - 73)

Page 74

1 two tranches. The shares will be issued under Reg D of
2 the Securities Act of 1933.
3     Q.  When was Navidea to issue those shares?
4         MR. ZIMMER:  Objection, form.
5     A.  I'm not making an interpretation when any of
6 that -- I'm just saying -- what I was attempting to say
7 here is that it's that portion only, the reg -- issued
8 under Reg D, that the legends that are on the shares
9 were more extensive than were required by Reg D.  That's
10 all I'm trying to say.
11    Q.  It is clear that your opinion is that the
12 restrictive legends are not required under Reg D.
13    A.  Yes.  That's all I'm --
14    Q.  But we've had a back-and-forth today over to
15 what extent you're interpreting the obligations of
16 Navidea under the August 14th agreement, and I'm trying
17 to determine if you're making that opinion.
18    A.  No, I'm not making the opinion of their
19 obligation to pay or when they pay.  I'm just -- my
20 opinion is intended to be that it was not issued under
21 the requirements.  As we've discussed the requirements
22 of Reg D, that the additional legends were not required
23 by Reg D.  That's all I'm attempting to say here.
24    Q.  But would you agree that you have the
25 requisite expertise to determine whether the shares were

Page 75

1 issued -- whether the lockup legend was authorized by
2 the terms of the August 14th agreement?
3         MR. ZIMMER:  Objection.
4     A.  Again, the only thing there, it's the same
5 concept in B as in A, that the additional legends make
6 it so it's not in accordance with the requirements of
7 Reg D.
8     Q.  Understood.  But you keep -- you reference the
9 August 14th agreement.  Are you interpreting the August
10 14th agreement?
11        MR. ZIMMER:  Objection.
12    A.  I am not attempting to make a legal
13 interpretation of the agreement.  I told you a couple of
14 times what I intended.  Now, maybe the criticism is that
15 I didn't word it well, but my intention is to -- as you
16 read through my report, it supports this conclusion, is
17 that the shares that were issued had additional legends
18 that were not required by Reg D.  That is all I am
19 trying to interpret of the agreement.
20    Q.  So you're not interpreting what the agreement
21 required with respect to the lockup provision or the
22 escrow?
23    A.  No.
24    Q.  Or the restriction that was ultimately placed?
25    A.  No --

Page 76

1         MR. ZIMMER:  Objection.
2     A.  -- only the basic restrictions of Reg D.
3     Q.  And in B, which I think you might have
4 actually referenced in talking to me, I'm not sure, but
5 let me just clean the table so we can ask the question.
6     A.  Okay.
7     Q.  It says, "Navidea failed to issue shares due
8 to Dr. Goldberg on January 2nd, 2019 under the terms of
9 the August 14th agreement."
10        Is that an opinion as to what Navidea's
11 obligations were under the August 14th agreement?
12    A.  No.  Again, what I'm trying to do is the same
13 as I did up above under Reg D, that those were -- that
14 those were not issued in accordance with Reg D
15 requirements, that they had additional legends on them.
16    Q.  So you're not opining as to whether Navidea
17 had an obligation to issue shares to Dr. Goldberg under
18 the terms of the August 14th agreement on January 2nd,
19 2019?
20    A.  I don't know if the terms of that agreement
21 were met or not.  That was not my scope of my work.  So,
22 no, I was not attempting to do that.
23    Q.  So do you think D is still an accurate
24 statement of the opinion that you're trying to
25 represent?

Page 77

1     A.  When you read through my report and I talk
2 about the differences between Reg D requirements and the
3 additional legends, I think it supports what I'm
4 attempting to say.  And that is he did not get shares
5 issued on January 2nd limited to the restrictions
6 only -- only limited to the restrictions required by Reg
7 D.
8     Q.  Independent of the August 14th agreement then?
9     A.  Yeah, I'm not -- I don't know if they were
10 issued -- the August 14th agreement says that they will
11 be issued under Regulation D of the Securities Act.  I'm
12 saying that Reg D -- the issuance of shares under that
13 has one restriction.  These are nontradable to the
14 public.  That's the only requirement that it has.
15        Those shares both -- well, all of the
16 shares that were issued had additional restrictions, and
17 that's all I'm attempting to say.
18    Q.  So you're not trying to opine on anybody's
19 obligation under the August 14th agreement, correct?
20    A.  No.  To me, it's -- certain shares were
21 supposed to be issued in a certain manner.  All I'm
22 saying is they were not issued in that manner.
23    Q.  But you're assuming there was an obligation to
24 issue shares in that manner?
25        MR. ZIMMER:  Objection.

20 (Pages 74 - 77)

Page 78

1    A.  I'm not assuming it.  It says that they
2  will -- I've read you the line now a couple of times.
3  Navidea shares, the last sentence is what I am focused
4  on.  "Shares will be issued under Reg D of the
5  Securities Act."
6         I'm saying the Securities Act has one
7  specific limitation that should have been on the shares,
8  on the legends.  There were additional legends.  Those
9  are in addition to the requirement of Reg D.
10   Q.  But you're ignoring the first part of the
11  sentence there that says upon a closing date.
12        MR. ZIMMER:  Objection.
13   A.  No.  The shares will be issued under Reg D.
14  It doesn't say upon a closing date.  I've read you the
15  sentence several times.  I mean, you've got to go down
16  in other places on closing date.
17        I'm not trying to talk about the closing
18  date.  I'm just saying shares will be issued under Reg
19  D, the last sentence under Navidea shares.
20   Q.  So what you're saying is the shares will be
21  issued under Reg D of the Securities Act.  That's the
22  statement you are trying to opine about here?
23   A.  Yes.
24   Q.  Okay.  And even though shares is defined as
25  being issued on the date of the closing date, you don't

Page 79

1  think that's relevant to your opinion?
2    A.  I'm not trying to interpret when the closing
3  date was.  I think we discussed I used a closing date
4  of -- or when the shares were issued, when they were
5  actually issued of November 22nd.  The closing date is
6  defined in here, and it says that those shares aren't
7  going to be even issued until all the terms supporting
8  the definition of closing date are met.  As far as I
9  know, some of those terms weren't met, yet the shares
10  were issued.
11        So I'm not trying to opine on any of
12  that.  I'm just trying to say the shares that were
13  issued, whether they were issued in accordance with this
14  agreement or other aspects of this agreement, timing on
15  the closing date, things of that nature, I'm just saying
16  they were not issued in accordance with Reg D
17  requirements.
18   Q.  Would a more accurate statement of B be
19  Navidea failed to issue shares to Dr. Goldberg on
20  January 2nd, 2019 in accordance with Regulation D of the
21  Securities Act?
22        MR. ZIMMER:  Objection.
23   A.  That would be more accurate as what I was
24  opining on, yes.
25   Q.  Thank you.

Page 80

1         If you could go to C, it says, "When
2  agreement" -- sorry.  "When agreement was executed,
3  Navidea intended to initiate reverse split of stock."
4         Is that an opinion?
5    A.  No.  It's really a statement of fact, in
6  talking to Dr. Goldberg and testimony of -- or in the
7  deposition of Latkin, that it was known beforehand --
8  before this agreement that a potential stock split was
9  anticipated.
10   Q.  Have you formed an opinion as to whether the
11  23 and a half million shares were subject to the stock
12  split or not?
13        MR. ZIMMER:  Objection.
14   A.  No.  In my analysis, I don't say -- in fact,
15  my damages says if it's determined that it's pre-split
16  shares, then this is how you do it.  If it's determined
17  that it's post-split shares, this is how I do it.
18        So I'm not forming an opinion on which
19  way it should be.  I just said, "Whichever way it is,
20  here's what the damages will be."
21   Q.  Is the delta between the damages pre and
22  post-split simply multiplying your numbers by 20?
23        MR. ZIMMER:  Objection.
24   A.  It's not exactly that way.  In the post-split
25  shares, you have market values.  And so if you said the

Page 81

1  shares should have been issued on this date or over this
2  range or in this time period, you have data on a
3  post-split share value, and you can use that data to
4  determine the value or the damages.
5         If you do pre-split, then there is no
6  data, and so then I outlined a way to calculate what the
7  damages would have been on pre-split shares.  Because
8  you put that many additional shares into the market,
9  it's going to change the value of the per share values.
10        MR. ZIMMER:  Can we go off the record for
11  one second?
12        MR. KAZAN:  Well, I'd like him to finish
13  his answer.
14        MR. ZIMMER:  Were you not finished?  I
15  apologize.  I thought you were finished.
16        THE WITNESS:  No, I was.  I was done.
17        MR. KAZAN:  Okay.
18        (Discussion off the record.)
19   Q.  You assigned a range of damage numbers based
20  on the timing of transferability of the stock, correct?
21        Actually let me rephrase.  You assigned
22  certain ranges of numbers to Dr. Goldberg's damages
23  related to Navidea stock based on dates that he would
24  have sold that stock, correct?
25   A.  Yes.

21 (Pages 78 - 81)

Page 82

1    Q.   And you used the post-split numbers to do
2  that, correct?
3    A.   Yes.
4    Q.   You did not make any effort to calculate it on
5  a pre-split basis, correct?
6    A.   That is correct.
7    Q.   And there's not a simple mathematical formula
8  that you would apply on the pre-split shares?
9    A.   I identified how I would calculate the damages
10  on pre-split.  So if -- let me define pre-split in my
11  mind.  Pre-split is if it was determined by the court
12  that Dr. Goldberg was supposed to get 23 and a half
13  million shares today, how would you value the damages
14  because putting that many shares into the market will
15  change the marketplace?
16        So I outlined a -- you know, they
17  couldn't issue that many after the post-split anyway.
18  So I identified how you would come up with the damage
19  valuation of adding that many more shares into it.
20    Q.   Okay.  So you have not -- actually let's go to
21  Page 15 of your report, if we could.
22    A.   Okay.
23    Q.   You have written here at the bottom of the
24  page, "It would be expected that an issuer contemplating
25  effecting a reverse stock split would include such

Page 83

1  language in any contract referencing a specific number
2  of shares for clarification purposes."
3        What's the basis of that statement?
4    A.   My experience of transactions in which -- you
5  know, transactional disclosures.  If there's going to be
6  anticipated future transactions where there's a
7  transaction with a fixed number of shares -- let me
8  rephrase.
9        If there's a transaction with a fixed
10  number of shares, it's pretty common to see that there's
11  language in the agreement that specifies if there is a
12  reverse split or a diluted or a creative kind of
13  activity, that those shares will be adjusted for those
14  activities.  That's very common in my opinion from my
15  experiences because you're talking about receiving a set
16  number of shares.
17    Q.   Have you made a determination as to whether
18  the 23 and a half million shares discussed in the August
19  14th agreement were to be treated on a pre-split basis
20  or a post-split basis?
21        MR. ZIMMER:  Objection.
22    A.   I have not.  That's going to be a legal
23  opinion.  I just identified what the damage -- how you
24  would calculate damage, what the damages would be based
25  on what the courts decide.

Page 84

1    Q.   Okay.  Let's go to Page 16 of your report.
2  Under the financial damages suffered by Dr. Goldberg you
3  state, "I have been asked by counsel to provide a
4  methodology for calculating the damages to Dr. Goldberg
5  if the court enters a judgment that he is entitled to
6  the value of 23 and a half million post-split shares
7  because Navidea has not yet issued those shares in
8  accordance with the August 14th agreement and under
9  Regulation D of the Securities Act of 1933."
10        That's what you wrote, right?
11    A.   Yes.
12    Q.   Does this methodology have a name?
13    A.   No, other than what I gave it, a methodology
14  to value shares at a pre-split basis.
15    Q.   And have you written about this methodology
16  anywhere?
17    A.   No.
18    Q.   Have you read about this methodology anywhere?
19    A.   No.
20    Q.   Has it been peer reviewed by anybody?
21    A.   Yes.
22    Q.   Who has it been peer reviewed by?
23    A.   David Duffus.
24    Q.   When you say David Duffus peer reviewed it,
25  you mean he read your report?

Page 85

1    A.   He read through the second part of the review,
2  yes.
3    Q.   Other than David Duffus, has it been peer
4  reviewed?
5    A.   No.
6    Q.   Has this methodology been used by you before?
7    A.   No.
8    Q.   So other than the methodology that you've
9  described here, there's no place to read about this as
10  being an accepted methodology for valuation of pre-split
11  shares?
12    A.   No, not -- no.  I don't think this issue would
13  be very common, but, you know, the answer is no.
14    Q.   And you did not -- you did not actually apply
15  this methodology to the facts of this case, correct?
16    A.   The shares have never been issued so you
17  couldn't apply it.
18    Q.   Well, you could pick a date, couldn't you?
19    A.   A hypothetical and say assuming that they had
20  been issued on this date, this is how it would -- you
21  could, but it would all be hypothetical.  This was a
22  methodology for valuing the damages if in a judgment --
23  if a judge or a court ruled that Dr. Goldberg was
24  entitled to 23 and a half million shares today.
25    Q.   And so in Step 1 you said, "The market cap of

22 (Pages 82 - 85)

1 a company is equivalent to the market value of the
2 company's outstanding shares," correct?
3    A.  Yes.
4    Q.  So you effectively -- your model is that on
5 day one, you have the market cap of Navidea, correct?
6    A.  The company is worth number of shares times
7 share value.  That's the market value.
8    Q.  On Day 2 a judgment is entered?
9    A.  Yes.
10    Q.  I'm following your methodology, right?
11    A.  Yes.
12    Q.  So your methodology says on Day 2, a judgment
13 is entered.  You then -- because you want to start from
14 the market cap on Day 1, you're not going to look at Day
15 2 because your concern is that Day 2 the market will be
16 distorted by the entry of the judgment?
17    A.  If you put that many additional shares in,
18 yes, it would distort the...
19    Q.  So you said you would add in the additional
20 shares?
21    A.  Yes.
22    Q.  So whatever the outstanding shares were on Day
23 1, you would add 23 and a half million to that?
24    A.  That is correct.
25    Q.  And that gives you a new market cap?

1    A.  That gives you the number of shares and then
2 you divide that number into the previously existing
3 market cap, and that gives you a valuation for those
4 shares on Day 2 that Dr. Goldberg would have received.
5    Q.  And is your assumption that that would cause a
6 stock drop?
7    A.  I was measuring a way to calculate damages,
8 not that those shares would be issued because there
9 would be -- there could be a significant impact on the
10 market value by dropping 23 and a half million shares
11 into the market.
12    Q.  But you said you were developing a new per
13 share price?
14    A.  To come up with damages to -- what the damages
15 would be for not getting 23 and a half million.  I'm not
16 suggesting that he's actually issued those shares.  I'm
17 just saying the value of those 23 and a half million
18 shares today, whenever that would happen, is -- you
19 know, the company is only worth so much.  It's the
20 market cap of the company.
21        So his percentage of that company
22 increases.  He gets a bigger slice of the value of the
23 company, not that the value of the company would change.
24    Q.  And would that take into account any
25 additional restrictions that might be imposed because he

1 now owns a bigger percentage of the company?
2    A.  It does not.  I was not attempting to say,
3 "Here would be the effect of issuing 23 and a half
4 million shares," because there could be restrictions.
5 Maybe you couldn't issue 23 and a half million.  And
6 putting that many additional shares -- the company may
7 not be able to issue that many shares, first of all.
8        Putting that many more shares into the
9 market would -- potentially could be catastrophic.  I'm
10 just trying to measure what the value of those shares
11 would be of ownership of those shares, how that would
12 change his slice, his apportionment of the value of the
13 company as a whole just to come up with damages to him,
14 not that he issues the shares.
15    Q.  How are you using damages in that context?
16    A.  But for kind of -- if the market would have
17 time to absorb those shares, but for not having those
18 shares, he would have had a greater ownership of the
19 company.  I'm just saying the company value stays
20 static.  His percentage of ownership of the company
21 increases, would have increased as a result of that,
22 and, therefore, that's the value of what he should have
23 received but for not receiving those shares.  I never
24 anticipated he would actually receive those shares.
25    Q.  So is your model ultimately saying if the

1 judge were to offer something, he owns five percent of
2 the company before judgment and now he owns ten percent
3 of the company after judgment?  And so, therefore, his
4 damages, as you've referred to them, is the delta
5 between the ten percent ownership and the five percent
6 ownership?
7        MR. ZIMMER:  Objection.
8    A.  Yes.
9    Q.  But you've -- and that's not tied to any
10 actual transactions?
11    A.  That is correct.
12    Q.  And why is this not mere speculation that this
13 works?
14    A.  I was asked to calculate what the damages
15 would be to Dr. Goldberg if on a -- if the court said,
16 "You should have received 23,000,000, but we can't issue
17 it," what would the damages to Goldberg be for not
18 receiving those shares?  Because of restrictions and the
19 impact it would have on the market to drop those in, it
20 was a way of calculating his increased ownership of a
21 company that has a fixed value.
22        The value of the company should be the
23 value of the company, not the value of the company based
24 on the number of shares.  So the value of the company is
25 static, his ownership percentage would be changed, and

23 (Pages 86 - 89)

Page 90

what would that value be under that new ownership?
He didn't receive that value, he doesn't have that value, so that would be the damages.
Q. And is that different than simply saying on Day 1 the stock price was trading at $1.50 and so 23 and a half million shares on Day 2 times $1.50 is its damages?
A. It's a little different because those shares -- I'm measuring the damage as though the shares had not been issued. Because it is a -- the shares were issued, but the legends make them nonusable. So were the shares really issued to where he could take advantage of them and convert it to a value because they're nonusable with the legends in there, the additional legends.
So if in the future those legends are removed and it's determined he should have received $23,000,000, what would have been the share price at that point in time? I don't know. There could be all kinds of market factors that would have changed it.
So I'm just saying a way to determine what the value of the company would have been, at that future date if the court determined he should have received 23,000,000, at that point in time it would have been traded -- it would have been valued on the market

Page 91

at that date, not back historically on August 14th.
Q. And is there any documents, treatises, papers that you relied on in creating this model?
A. No. My experience.
Q. But you have never done it before?
A. No. I have never run into this -- it's kind of a hypothetical. How would you calculate the damages? This is how I would think would be a fair calculation on some future date if it's determined that he has a greater ownership percentage than -- or ownership percentage of the company at that date, how would I calculate that damage?
Q. Okay. Let's look at the 23 and a half million adjusted for the split, which is at the end of Page 17.
A. Okay.
Q. You start this analysis -- you recite, "The August 14th agreement provides on the date of consummation of the transaction (such date, the closing date), Navidea will issue to Goldberg 23 and a half million shares of Navidea common stock, 18 and a half million currently and 5,000,000 on January 2nd, 2019, and the shares will be issued under Reg D of the Securities Act."
You've told me that the closing date is not relevant to your analysis, correct?

Page 92

A. The closing date, I couldn't measure it based on -- the closing date specifies that certain things must happen. Some of those things happened and some of them didn't, and they issued shares, which was not supposed to happen until the terms of the closing date had been satisfied. So I used as the closing date the date the shares were issued, November 22nd.
It clearly didn't follow -- the shares weren't issued under the terms of when -- under the terms of the closing date.
Q. You're not -- you haven't issued an opinion of what you think the closing date is under the August 14th agreement?
A. No.
Q. Correct?
A. Correct, I have not. I have not issued an opinion on that. I'm sorry.
Q. The last sentence says, "On November 22nd, 2018, Navidea purportedly issued 18 and a half million shares to Dr. Goldberg."
Is there a reason you're saying purportedly?
A. There are probably two reasons for that in my mind. I don't want -- maybe three. One, I'm not trying to render a legal opinion so I don't want to say that it

Page 93

did issue. I mean, it issued them, but they had restrictions, and so there's some question about whether they've been issued or not.
I just went with the date that -- I'm not trying to render a legal opinion, just the date the shares were sent to Dr. Goldberg. They're not tradable at this point because of the legends. I'm not trying to deal with any of those. I'm not trying to deal with arguments over the agreement, whether the shares have been issued or all the terms of the agreement have been met. That's why I put the purported in there.
Q. Okay. And in effect, you're assuming that the shares are issued on November 22nd and will be freely tradable after six months?
MR. ZIMMER: Objection.
A. Yes, six months if it was just -- well, let me back up. There are tranches of shares, so I said yes maybe too quickly. There were those that were issued on November 22nd. Then you had shares that were to be issued on January 2nd.
And I'm trying to address those when he could have traded. So you have the six months under Reg D 144, but there is also a lockup period of 18 months. So you have six months and 18 months of overlay, so there's another year, 12 months added onto when he could

1 trade the shares.
2         So six months under 144, 18 months under
3 the lockup puts it out, you know, 18 months when the
4 shares could actually be traded.
5     Q.  And those are only for shares that would be
6 subject to the escrow?
7     A.  That's correct.
8     Q.  And you don't run -- you run those periods --
9 let me start over.
10        You run the six-month and 18-month
11 periods concurrently?
12    A.  Yes.
13    Q.  Turning to Page 20, the paragraph after the
14 escrow legend, you wrote, "Dr. Goldberg's ability to
15 sell or otherwise dispose of the shares is left entirely
16 to Navidea's sole discretion because only Navidea can
17 authorize its transfer agent to remove the restrictive
18 legends."
19    A.  Yes.
20    Q.  That's always a true statement relative to a
21 restricted stock in an issuer, correct?
22    A.  It is.
23    Q.  You said, "This is neither authorized or
24 required by Regulation D and the August 14th agreement
25 contains no provision authorizing the placement of any

1 legends on the Navidea's shares."
2         That authorization and the required is
3 what we talked about before, correct?
4     A.  Yes.
5     Q.  Your statement about the August 14th
6 agreement, we discussed in connection with the summary
7 of your opinions the fact that you're not attempting to
8 interpret what's required under the August 14th
9 agreement, correct?
10    A.  That is correct.
11    Q.  And for clarification, nothing in Reg D or
12 Rule 144 -- let me rephrase.
13        The issuer always has to remove a legend
14 if there is a restrictive legend on the stock?
15        MR. ZIMMER:  Objection.
16    A.  The transfer agent actually removes the
17 legend, but the company tells the transfer agent to
18 remove it.  Under Reg D and 144, there are two
19 requirements.  Basically one is you have to hold it the
20 minimum time period, six months, which is -- you know,
21 it could be six months to a year.  Based on my
22 understanding of the facts, I felt like it was six
23 months, not a year.  But you have to hold it during the
24 holding period.  You can't trade them prior to the
25 restrictions.  The legend couldn't be removed prior to

1 that.
2         Then you have to report to the company
3 that you've held them for that six months and the
4 company would -- the reason you have to report it is
5 because they have to integrate those shares now as
6 tradable shares integrated in their disclosures.  That's
7 one.  Or, two, they're incorporated into a public
8 offering.  So one of those two things has to happen.
9         Those are both known factors.  People can
10 trade in shares that -- I mean, there's a value to
11 shares that have normal Reg D restrictions on it.  It's
12 a time issue.  It's putting them into the tradable
13 shares.  Those are kind of the two issues.
14        There are no -- so those shares, they
15 have value because those terms are preset.  When it
16 become -- and a company is not going to deny issuing
17 those shares if you've held it the six months.  I mean,
18 you've done your part.  They should be tradable under
19 Reg D at that point.
20        The additional legends they lock in
21 escrow, those are at the full discretion of the company,
22 Navidea.  They can hold those.  It's -- I can't say it
23 any differently.  It's at their full discretion.  It's
24 not regulated by you held it six months and then you
25 reported it into your tradable shares.  It's fully at

1 their discretion.
2         Because it's fully at their discretion,
3 no one knows when those shares might be usable and
4 there's no value to them.
5     Q.  So what's the value of a -- is there a
6 difference in value between a share containing what you
7 referred to solely as the Reg D restriction four months
8 after it was issued versus seven months after it was
9 issued, assuming that the issuer has not removed the
10 restriction?
11    A.  There is value because those are more
12 measured.  It's a time and reporting it by the issuing
13 company.  It shouldn't be as discretionary.  You know,
14 you've held it so they should incorporate it.  You have
15 plenty of time to incorporate it, you know, six months,
16 or they have included it in a public offering.
17        So those are known events.  You can look
18 at those events and say, "Well, I only have to hold it
19 another month and the stock -- you know, there's these
20 good things in the stock and I'm willing to take that
21 risk and hold it now another month so there's value to
22 those shares," not knowing when you might be able to use
23 those shares, the uncertainty.
24        You have no idea what the market
25 conditions will be.  There's little to no value with the

1  other restrictions that don't have time limitations,
2  measurement deadlines on them.  I think the answer was
3  yes, and I explained the answer.
4      Q.  But at the end of the six-month period, the
5  restriction is not automatically lifted.  The issuer
6  still has to tell the transfer agent to lift the
7  restriction?
8          MR. ZIMMER:  Objection.
9      A.  Yes, sir.
10     Q.  You have a statement on Page 20.  It's the
11  last sentence of the second to the last paragraph that
12  says, "Dr. Goldberg did not receive the benefit for
13  which he bargained and has suffered financial harm and
14  damage."
15          You wrote that, correct?
16     A.  Yes.
17     Q.  Is that a legal conclusion?
18          MR. ZIMMER:  Objection.
19     A.  Well, it's a conclusion of the benefit of the
20  bargain.  We, as consultants, are asked to do
21  measurements of damages based on the benefit of the
22  bargain.  So it's anticipated that you would have
23  tradable shares after a certain period, and if those
24  shares are not tradable at that period, you didn't get
25  the benefit of the bargain.

1          I'm just measuring -- I'm not trying to
2  render a legal opinion.  I'm just saying if that is the
3  case, if it was that those shares were supposed to have
4  been issued in accordance to Reg D and they could have
5  been tradable after six months or the overlying holding
6  period for the escrow and that wasn't and they aren't,
7  then there is damage because you don't have something
8  that you can use at that point in time.
9      Q.  So the benefit of the bargain that you're
10  referring to here is the idea that, assuming a date of
11  issuance and a period of restriction, when that period
12  of restriction expires, there is damage and financial
13  harm?
14     A.  If the shares haven't been issued, yes.
15     Q.  Issued or if the legends haven't been removed?
16     A.  The legends haven't been removed.  If they're
17  usable, exactly.
18     Q.  And then in this part of your report, Page 20
19  that we're on, you go through the exercise of assuming
20  that we're talking about -- or you're measuring damages
21  in connection with 1.175 million shares, correct?
22     A.  Yes.
23     Q.  So on Page 21, you say you're going to pick
24  three ranges, correct?
25          MR. ZIMMER:  Objection.

1      A.  What I did initially, I looked and said, "What
2  would be the high, what would be the low, and what would
3  it be if you traded at today's date," just giving a
4  sense of what that range would look like.
5          One could also say, "What was the average
6  of that time period," you know, weighted average of all
7  trades during that time period.
8          What I did is -- this was just kind of --
9  I'm not rendering an opinion that this is a fixed dollar
10  amount.  The way I worded it is I think I did a
11  valuation of it.
12          So if you look at the chart on Page 23,
13  you could take from the earliest point to what period
14  would you say at that point because it's still running.
15  The shares still aren't -- they have been issued, but
16  they're not usable, so when could they become usable.
17  It extends your average out indefinitely because you
18  don't know when it's going to be -- when the legends are
19  going to be removed, and you could actually value them
20  at that date, so high, low, today's date.
21          And then I looked at these trades.  I
22  looked at that trade chart, and there was 80 million
23  shares traded on January 9th -- or June 9th, excuse me,
24  around that time period on the scale if you'll look at
25  that chart.  It seemed to coincide with an earnings

1  release.  A lot of activity, a lot of shares were traded
2  and the stock price went up, and it stayed up for a
3  period of time.
4          And so I took the weighted average also
5  of that period of time based on that earnings release,
6  saying, "I can't really use the average because I don't
7  know when the end is, so I'll use lowest point, highest
8  point, today's date and then look and see if I'd had
9  shares that I could have used and traded at any point in
10  that."
11          And Dr. Goldberg is a pretty astute
12  trader.  He ran this company.  So my sense, my feeling
13  was -- my feeling was that if there was that much
14  activity, if you look at that chart, trading activity,
15  that certainly would draw an astute investor's
16  attention, and you would look at that trend.
17          And so I looked at that trend and said,
18  "Okay.  What would it be during that time period, if you
19  traded sometime in that time period?"  So those were my
20  measurement dates.
21     Q.  And are you calculating what you view to have
22  been what would be actual transactions?
23          MR. ZIMMER:  Objection.
24     A.  I'm not sure I understand the question.
25     Q.  So you said -- you picked a range, right?  You

Page 102

1  picked three points in time.
2      A.  Actually I picked four.
3      Q.  What was the fourth?
4      A.  The fourth was when the earnings release came
5  out, for about 30 days the stock stayed high and there
6  was a high level of activity, that if you would have had
7  access to the shares during that time, you didn't need
8  to trade the shares because you were not in want of
9  money at that point in time where you said, "I have to
10 have this money," and you were able to hold the shares.
11         If you had access at that time, a lot of
12 people -- quite a number of people took advantage of the
13 share activity at that point in time.  So I looked at
14 that significant level of activity and said, "That needs
15 to be considered as well."  So I used that measurement
16 date as well, four measurement dates.
17     Q.  And is there any -- how did you pick those
18 dates?
19     A.  Trying to give a range, high, low and today
20 when I wrote the report, and then was there a period in
21 between high, low and today that there was such level of
22 activity that it was unusual, abnormal?  And then I
23 picked that point.
24     Q.  Is this a methodology that's published
25 anywhere?

Page 103

1      A.  No.  It was -- you know, if there are -- if
2  you look at this graph, and that's the point -- there's
3  no other activity levels even close to that level of
4  activity.  So based on this earnings release, there was
5  a great deal of excitement in the market about the
6  shares, and the share value increased and held for a
7  30-day period.
8         Dr. Goldberg, being a former CEO of the
9  company, being very familiar with biopharmaceutical
10 shares, looking at that activity, I don't think it would
11 be that unreasonable to assume that that would have
12 caught his attention.  And if he had had tradable shares
13 at that point, he would have been able to understand, as
14 so many people did -- it's not like -- I mean, the
15 volume of trading is -- there's nothing in this time
16 period that compares to the volume of trading when the
17 earnings release came out.
18         So it was a big deal.  If he had shares
19 that he could trade, that would have been a time that he
20 would have known that the value of -- recognized the
21 value of the company at that point in time to make the
22 trade.
23     Q.  So your assumption is that Dr. Goldberg would
24 simply hold the shares until some event occurred in the
25 future where the stock popped significantly?

Page 104

1         MR. ZIMMER:  Objection.
2      A.  No.  What I'm saying is I don't know when he
3  would trade the shares.  I considered doing an average
4  of the shares, but I don't know when he would get the
5  shares.  So but for, you know, not having the shares
6  tradable, was there periods looking at between today's
7  date when those shares could have been tradable?  Was
8  there any periods in there -- other than low, high and
9  today's date, was there a period in there that seemed to
10 jump out and say -- you know, there's an event that if
11 you had the shares, you would attempt to take advantage
12 of it.
13         So that was that time period right after
14 the earnings release that I looked at and gave a
15 valuation.  So I'm giving a range of values.  But as
16 opposed to high, low and today's date, there was this
17 monumental event -- and I say monumental because the
18 volume of shares that were traded after that earnings
19 release, I used that date as well, the time period
20 around that date, and said, "In a range of damages, here
21 would be a range."
22         And if he had access to the shares, being
23 an astute investor, someone that, given his
24 qualifications, ran bio companies, was an investment
25 banker, if he had shares tradable at that point in time,

Page 105

1  he would have recognized with that earnings release, as
2  so many other people did, there was increased value of
3  the company.
4         Now, I'm not saying that he would have
5  traded necessarily exactly on that day, so I put a
6  30-day range around that and averaged that period.
7      Q.  Your opinion on these trades is based on your
8  assessment of Dr. Goldberg's skill as a trader?
9         MR. ZIMMER:  Objection.
10     A.  No.  I'm basing it on someone that is familiar
11 with the industry, watching what's going on in the bio
12 forma shares.  That's where he's made his money.
13 Looking at those earnings releases that so many people
14 looked at and it increased the value of the company,
15 that he would have been able, like so many other people
16 did, to look at that earnings release and say, "This
17 company is more valuable."  You know, there's been a
18 change.  There's been something happened here that has
19 increased the value of the company.
20     Q.  And what are you relying -- sorry, let me
21 rephrase.
22         Is there some treatise that you've looked
23 at that talks about the way people trade in publicly
24 traded companies?
25         MR. ZIMMER:  Objection.

27 (Pages 102 - 105)

Page 106

1    A.  No, because I'm not looking at all people.
2  I'm looking at someone that ran this company, could
3  interpret an earnings release.  He was the CEO.  He ran
4  numerous pharmaceutical companies.  He knew what was
5  going on in the industry.
6        If that many people in the market saw
7  that earnings release as a significant event to increase
8  the value of the company, he was as accomplished, and
9  particularly on this company, as so many other people
10 that invested in it, that it would have caught his
11 attention as well.
12    Q.  Under your methodology for the 1.175 shares --
13 1.75 million shares, he received 675,000 shares and can
14 trade them starting May 21st, 2019, correct?
15    A.  I have a table if you want to see that.
16    Q.  Yes, Page 21.
17    A.  I just want to make sure we're both on the
18 same -- oh, I did catch one other typo.  You probably
19 caught it too.  If you go into the tranches, Tranche 3
20 on the release date, in the verbiage, I don't have the
21 right date on the chart.  It's the wrong date.  It is 18
22 months from the January 2nd date, which I don't have
23 that exact date here.  I can find it -- oh, maybe it's
24 here in this verbiage.
25    Q.  It's on Page 21.  On Page 21 you say -- just

Page 107

1  so we're all on the same page.  Dr. Goldberg, under this
2  methodology that you're applying, gets 675,000 shares
3  freely tradable as of May 21st, 2019, correct?
4    A.  That is correct, yes.
5    Q.  Then he gets an additional 250,000 freely
6  tradable shares May 15th, 2020.
7    A.  Yes.
8    Q.  And then he gets another 250,000 June 25th,
9  2020?
10    A.  Yes, but the chart is wrong.
11    Q.  The chart is wrong, but the language in the
12 middle of that page?
13    A.  Right.  That's what I was looking for.  I was
14 trying to find the language.
15    Q.  And your methodology assumes that Dr. Goldberg
16 would have held 675,000 shares of Navidea for more than
17 a year before selling it, correct?
18        MR. ZIMMER:  Objection.
19    A.  Yes.  You know, that was the -- if you were to
20 pick a point, if you had an ability to trade in any of
21 those time periods from when it became usable through
22 today's date, there was this time period where there was
23 significant activity with the earnings release.  And I'm
24 saying that all of the dates that you could pick,
25 they're all -- you could argue, well, why would he pick

Page 108

1  the lowest date?  Why would he pick the highest date?
2  Why would he pick any of those dates?
3        There is a weighted assumption that an
4  event that big, if he had those shares to trade, he
5  would trade them during that time period.
6    Q.  If you look at your chart on 23, there is a
7  spike in volume in November of 2019, correct?
8    A.  Yes.
9    Q.  So under your theory, why wouldn't he sell his
10 shares at that spike?
11    A.  I don't know what drove that spike on that.  I
12 don't know if there was some -- I didn't investigate
13 that spike, but there was no change really in activity
14 at that point, in share value.
15        So I don't know if that was -- there was
16 some new money that came in, and I don't know when that
17 new money came in if shares were issued with that new
18 money and that was the spike.  But it wasn't tied to
19 like -- I don't believe tied to an earnings release or
20 something of that nature.
21    Q.  Now, does the volume of shares being traded
22 impact your analysis?
23    A.  Well, in this case, the volume actually
24 increased the value of the shares, so it was more
25 than -- it was volume based on some positive information

Page 109

1  because the volume started trading and going up and the
2  value of the shares started increased significantly.
3        So you might argue that there was a
4  correlation between volume, and if there's a high volume
5  of trade, maybe there's a reduction in value.  But in
6  this -- because you could argue that there's a high
7  volume because the stock is tanking.  In this case there
8  is a high volume because the stock is increasing.
9        There was a measured event when the
10 earnings release came out that drove the value of the
11 stock up for over 30 days, and then it remained at a
12 high thereafter for quite an extended period of time.
13    Q.  What was the earnings release?
14    A.  It was -- what did it say?  I don't understand
15 your question.
16    Q.  Yeah, you said there was an earnings release
17 that popped the stock.
18    A.  I don't know what drove it.  There was an
19 earnings release at that time.  I'm assuming that's what
20 drove the value up.  I didn't look at all the earnings
21 releases.  I didn't look to see what was disclosed at
22 that point in time that excited the market because it's
23 not stock I follow.
24        But when that earnings release came out,
25 the volumes went up and the stock price went up.

28 (Pages 106 - 109)

Page 110

1    Q.  Did Dr. Goldberg tell you he would have sold
2  during that time period?
3    A.  No.
4    Q.  You just assumed he would have?
5    A.  I gave you my rationale for why.  I did ask
6  him, "Are these shares that you could hold?  Did you
7  need the money," you know, get his thought processes
8  there.  His basic thought was the company was stagnant
9  during this time period like the share price shows, but
10  I didn't ask him if he would have traded when this new
11  news came out and the stock price went up.
12        I went through it as being an astute
13  trader, investor, ran the company as the CEO, was
14  involved in a private equity firm that invested in and
15  followed the biotech market, whatever it was in that
16  earnings release would have caught his attention.
17    Q.  Is your assumption?
18    A.  Is my assumption, that got so many other
19  people's attention.
20    Q.  Right.  But he has never told you --
21    A.  He never told me, no.
22    Q.  He's never told you that it caught his
23  attention, correct?
24    A.  No.
25    Q.  He didn't tell you that he would have sold on

Page 111

1  those dates, correct?
2    A.  No.  That is correct.  He didn't.
3    Q.  And you never gathered information from
4  Dr. Goldberg as to what his actual trading history was
5  in the stock of Navidea, correct?
6        MR. ZIMMER:  Objection.
7    A.  No.
8    Q.  Would that have been relevant to your
9  analysis?
10    A.  Well, I don't know what his -- I don't know --
11  I could have asked him for that.  I don't know if he
12  would have shared that information, that private
13  information -- you know, it's not public information,
14  that's when he's outside the company -- what he traded.
15        I don't know how -- if you had -- you
16  must have had subpoena power or something that you got
17  that information.  I don't have access to that
18  information, what he traded.
19    Q.  Well, you had access to Dr. Goldberg.
20    A.  I did.
21    Q.  You could have asked Dr. Goldberg, "How many
22  shares of Navidea have you owned over the past ten
23  years," correct?
24    A.  I could have.
25    Q.  And you could have said, "What made you decide

Page 112

1  to buy or sell," correct?
2        MR. ZIMMER:  Objection.
3    A.  Well, if he's an active trader -- I don't know
4  how active he was in trading.
5    Q.  And you didn't bother to find out, though,
6  correct?
7    A.  I did not ask him that question, what his
8  volumes were of any trades, if any.
9    Q.  When you pick your low point on -- you've
10  given us a range.  You picked a date that they were
11  first tradable, and then you picked the high point, and
12  you settle on that average.  But let's talk about the
13  low point for a minute.
14        So you're saying -- I just want to
15  understand this.  For the low point -- sorry.  It's not
16  the low point actually.  You talk about the earliest
17  possible date, correct?
18    A.  Yes.
19    Q.  And so you said transfer one, which would be
20  675,000 shares --
21    A.  Yes.
22    Q.  -- could be sold for $1.43 per share?
23    A.  Yes.
24    Q.  Do you know what the volume of shares traded
25  were on that day?

Page 113

1    A.  I do not, no.
2    Q.  Would that be relevant to your analysis?
3    A.  I'm looking at what potential damages were.  I
4  just looked at the share price on that date.  I was
5  trying to do a range, so it was the low.  It didn't
6  really change the low, whether there's a high volume or
7  not.  It would have been the low stock value.
8    Q.  Are you familiar with something called
9  blockage discounts?
10    A.  Yeah, large -- yes, large shares of stock that
11  you would trade.
12    Q.  Would drive down the price of a share?
13    A.  Would drive down, yes.
14    Q.  And did you apply that in this analysis?
15        MR. ZIMMER:  Objection.
16    A.  I did not.  You can see I didn't.
17    Q.  What was the reason you didn't?
18    A.  I was trying to just outline a range of what
19  potential damages could be because the stocks aren't
20  tradable.
21    Q.  But your damages are based on the idea that he
22  would trade them at a certain number I thought -- sorry.
23  Let me take out the "I thought."
24        Your damages model is based on his
25  ability to trade the shares, isn't it?

29 (Pages 110 - 113)

Page 114

1    A.   Yes.  And he never had that ability to trade
2  the shares.  So assuming he had that ability and he --
3  it's all assumptions.  So during this whole time period,
4  he never had the ability to trade his shares.
5    Q.   So, in effect, your damage model says you're
6  just assuming the share price times the volume of shares
7  that he could have traded and said, "That's his
8  damages"?
9    A.   Yes.  In essence, what I'm saying is that's
10 the value he could have gotten for those shares on that
11 day.  But I didn't look at volume trades.  I just said
12 the shares were at this value on that date.  The shares,
13 if they had been and could have been traded on that date
14 at that volume, this would have been the amount they
15 would have been worth.
16    Q.   Okay.  I want to be careful there for a minute
17 because I think you just said two different things.  You
18 said the volume that he could have traded on that date.
19         MR. ZIMMER:  Objection.  The record will
20 speak for itself what he said.
21    Q.   You're not adjusting -- you're taking as a
22 damage number -- let me rephrase.
23         Isn't your damage model simply stock
24 price times shares?
25         MR. ZIMMER:  Objection.

Page 115

1    A.   Yes.
2    Q.   You're not adjusting for what he could have
3  actually sold those shares for, correct?
4    A.   That is correct.
5    Q.   And when he entered into an agreement to get
6  restricted shares, he didn't know what he was going to
7  do with those shares in the future, correct?
8         MR. ZIMMER:  Objection.
9         How could he know that?
10    A.   I don't know.  I can't get in his head to know
11 what he would have done.  So I don't know when he would
12 have traded them.
13    Q.   But you have made the assumption on your
14 range.  You did get into his head, and you said he would
15 have traded on this date.
16         MR. ZIMMER:  Objection.
17    A.   If he had them, if they were available to him
18 at that point.  What I said was that event was so
19 significant that it would have drawn his attention.  It
20 was a more likely time period that he would have traded,
21 but he didn't have access to the shares at that point in
22 time.  And I did not measure that -- I think your
23 original question was that I considered volumes.
24         I just took the number of shares times
25 the stock price at that point in time as a range of

Page 116

1  damages.
2    Q.   Irrespective of whether he could have actually
3  traded the stock at that point due to a blockage issue?
4    A.   Yes.  But irrespective of the fact the legends
5  were still on it and he couldn't trade it anyway.  So I
6  was just trying to -- again, those shares times that
7  price gives you that value on that date of that stock
8  price.
9    Q.   And is there another example of this I can
10 look at --
11         MR. ZIMMER:  Objection.
12    Q.   -- where somebody has established a damage
13 range based on this theory that you put forth?
14         MR. ZIMMER:  Objection.
15    A.   They were going -- you would have to make
16 assumptions if you -- because the shares were not
17 tradable during this time period, so you had to make
18 some assumptions.  You could make an assumption, as I
19 said, high, low, average during the time period, but the
20 shares still aren't tradable.  So any assumption you
21 make is -- you're making assumptions, what-ifs.  What if
22 he now today could trade them?  Well, it would be then
23 the average from there until today's date.
24         But he never had the ability to trade the
25 shares.  So all I was saying is if he had the -- had had

Page 117

1  the ability to trade and he had traded on dates that
2  range the low, the high, the most current, and a
3  significant event had occurred.  Had that event not been
4  in there, you know, that significant event been in
5  there, I would have just gone high, low and current
6  date.  But it was so significant, it jumps out as an
7  additional measurement point.
8    Q.   There's no treatise you're aware of that
9  applies this model that you've come up with?
10    A.   No.
11         MR. ZIMMER:  Objection.
12    Q.   And there's no -- you have never published
13 this model, correct?
14         MR. ZIMMER:  Objection.
15    A.   No.
16    Q.   And it's not been peer reviewed other than
17 Mr. -- I've forgot his name already.  Other than the
18 person who works with you?
19         MR. ZIMMER:  Objection.
20    A.   Yes.
21    Q.   You're familiar with the concept of discount
22 for lack of marketability, correct?
23    A.   Yes.
24    Q.   No application of that theory to your report,
25 correct?

30 (Pages 114 - 117)

Page 118

1    A.   That is correct.
2    Q.   You do agree that the phenomena exists that if
3  a significant block of stock in excess of the daily
4  trading volume were to be sold, it would likely drive
5  down the price, correct?
6         MR. ZIMMER:  Objection.
7    A.   I agree with that, yes.
8    Q.   On your chart on Page 23 you say, "I note
9  Navidea's share price remains relatively constant
10 between July 2020 and September 2021."
11        Is that your statement?
12   A.   I'm sorry?
13   Q.   It's the second sentence below your chart.
14 You wrote, "I note that Navidea's share price remains
15 relatively constant between July 2020 and September
16 2021."
17   A.   It's a small graph.  I mean, there's a
18 gradual -- I mean, there's a decline over that period,
19 but it's less volatile than prior periods, I guess.
20 But, yeah, that's what I wrote.  I wrote that in here.
21   Q.   Well, how do you define volatility in that
22 answer?
23   A.   I just looked at the chart, just noting
24 that -- you know, you can see the volatility of it
25 there.  I didn't do volatility measurements on it.  It's

Page 119

1  a visual looking at the chart.
2    Q.   But in July of 2020, the stock is trading at
3  four dollars a share, almost up to five dollars at one
4  point, correct?
5    A.   Yes.  That's when that earnings release came
6  out.
7    Q.   And by September 28th, 2021, the stock is
8  trading at $1.68 per share, correct?
9    A.   I don't have the exact measurement on that
10 date, but looking at the chart, that's not too far off.
11   Q.   If you would turn back to Page 21 where you
12 say, "If the shares had been issued in accordance with
13 the August 14th agreement and sold at the current stock
14 price on September 28th, 2021 for $1.68 per share."
15   A.   Okay.
16   Q.   So you would agree that it was selling at
17 $1.68 a share on that date, correct?
18   A.   Yes.
19   Q.   And so is it your testimony that $4.95 per
20 share and $1.68 a share is a relatively constant share
21 price?
22   A.   That's not a well stated statement.  I think
23 after that spike, it stayed relatively -- you know, as
24 more constant.  But, yeah, it is less volatile than
25 prior periods.

Page 120

1    Q.   But you didn't run a volatility analysis on
2  it?
3    A.   I did not.
4    Q.   So if the stock goes from three dollars down
5  to two dollars, it's losing a third of its value; is
6  that correct?
7    A.   That is correct.
8    Q.   Would that constitute relatively constant in
9  your mind?
10   A.   Well, I would say volatility, if it went from
11 two dollars to four dollars to 2.01 to four dollars,
12 that's high volatility, you know.  If it's going like
13 this, you're doing volatility of this point to this
14 point, but that volatility is more gradual.  It's not as
15 much a spike as certainly with volatility as earlier
16 periods where it was up to seven dollars a share going
17 to a dollar a share.
18   Q.   You've referred to Dr. Goldberg as a savvy
19 investor, correct?
20   A.   Well, I would say if you invest as a
21 private -- you know, in a private equity firm and you
22 have ownership in that, you're investing in public
23 companies' shares in the market, it makes you more savvy
24 than a lot of people.
25   Q.   Is a savvy investor a term of art?

Page 121

1    A.   No.
2    Q.   I'm not going to be able to find a savvy
3  investor model?
4    A.   No.
5    Q.   You use -- sorry, I need to restart.
6         On Page 24, you refer to a weighted
7  average calculation.  What is that?
8    A.   You take the share value and the number of
9  shares traded during that time period and weight that
10 through that time period.  So it's kind of like
11 averaging the number of shares and averaging the trading
12 value, but it's weighted.  So if you had higher trading
13 volumes, it's weighted.
14   Q.   And you did that calculation?
15   A.   Just for that time period, roughly that 30-day
16 time period where it was at a higher price.
17   Q.   That calculation though -- the actual
18 calculations are not in this report, correct?
19   A.   No, no.
20   Q.   Is there a reason you didn't include them in
21 the report?
22   A.   Actually the software that does weighted
23 average calculations, you put in the information and it
24 runs those calculations.  It's not -- you get kind of
25 the end results, but it doesn't give you how the sausage

31 (Pages 118 - 121)

Page 122

1  was made.  It doesn't give you the mathematical formulas
2  for it.
3      Q.  Are you familiar with a term called volume
4  weighted average price?
5      A.  It's very similar to what I did, yes.
6      Q.  How does it differ?
7      A.  I would say, as I understand it, there was no
8  difference because I weighted it based on volume and
9  pricing both in my weighted average.
10     Q.  Okay.  Now I'm confused because you said they
11  were different, but now you're saying they're not
12  different.
13     A.  Well, different terms.  You used a different
14  term than I use, but the methodologies for calculating
15  them are the same.  That's what I was referring to,
16  different terminology.
17     Q.  And why do you apply the value weighted --
18  well, can the terms be used interchangeably with you, or
19  should I stick to yours?
20     A.  You can use them interchangeably with me.
21     Q.  Why does someone use a volume weighted average
22  price?
23     A.  You have a beginning and an end, and so you're
24  looking at the weighted average.  And again I just left
25  the volume out, but I told you in my explanation of

Page 123

1  weighted average it considers the volume.
2          So you have a beginning and an ending, so
3  you can weight it during that time period and come up
4  with here's what the average is, the weighted averages
5  were in that time period.
6      Q.  And that's meant to address the fact --
7      A.  Fluctuations, up and downs, levels it out.
8      Q.  Well, the fact is that a closing price may not
9  be reflective of the true price during the day, correct?
10     A.  That's true.
11     Q.  So if someone bought a block of 100 shares at
12  ten dollars and it was the last trade, that would be the
13  closing price, correct?
14     A.  Yeah.
15     Q.  It wouldn't necessarily be a good reflection
16  of the stock price as a whole, correct?
17     A.  That is true.
18     Q.  And that's why you would apply some sort of
19  weighted average approach, correct?
20     A.  Yes.
21     Q.  And you believe you did that for that time
22  frame July 2020 to August 7, 2020?
23     A.  Yes.
24     Q.  On your CV you list numerous cases, deposition
25  testimony and trial and arbitration testimony.  Did any

Page 124

1  of these cases involve valuing restricted stock in a
2  publicly trade company?
3      A.  No.
4      Q.  Is there a case here that you think comes
5  close to that?
6      A.  Restricted stock of a public company?  Let me
7  go through them.  I don't think -- some of them dealt
8  with valuations, but not of restricted stock.  None of
9  those did.
10     Q.  Have you ever been excluded as an expert?
11     A.  No.
12     Q.  Have any portions of your testimony ever been
13  excluded by a court or tribunal?
14     A.  No.
15         MR. KAZAN:  Let's take five minutes.
16         MR. ZIMMER:  Sure.
17     Q.  Mr. Orr, can you turn to Page 24 of your
18  report.  So the last full paragraph begins with, "Fair
19  market value, the value between a willing buyer and a
20  willing seller is a useful metric in determining whether
21  an entity holds value."
22         You wrote that, correct?
23     A.  Uh-huh.
24     Q.  Verbal, please.
25     A.  Oh, yes.

Page 125

1      Q.  That's not the methodology that you're using
2  to value Dr. Goldberg's shares in Navidea, though,
3  correct?
4      A.  That is correct.  This is just for MT shares.
5      Q.  So the fair market value that you were trying
6  to establish for MT, was that based on valuing MT as a
7  whole or trying to value the five percent super voting
8  stock?
9          MR. ZIMMER:  Objection.
10     A.  It was an attempt to value MT as a whole
11  because outside investors were coming in with
12  $25,000,000.  What were they -- what ownership of MT
13  were they going to get for that investment?
14         That would give you, you know, a
15  valuation, a fair -- you know, a willing buyer, willing
16  seller valuation of MT at that time.
17     Q.  And the $25,000,000 number that you are using
18  is what you saw reflected in deposition testimony of Jed
19  Latkin, correct?
20         MR. ZIMMER:  Objection.
21     A.  Yes.
22     Q.  And emails with the New York Stock Exchange of
23  the listing requirements, correct?
24     A.  The discussions back and forth with the New
25  York Stock Exchange.

32 (Pages 122 - 125)

Page 126

1    Q.  But you never saw term sheets about that,
2  correct?
3    A.  I did not.  I will tell you I weighted it as
4  significant because those were supposed discussions back
5  and forth with the New York Stock Exchange, in which the
6  SEC has oversight on as well.  So if you're making those
7  kinds of representations to the exchanges, SEC is
8  watching that as well, then one would think those were
9  legit or legit investors, you know.
10    Q.  When you say legit investors, what is the
11  level of -- let me rephrase.
12        What's the degree of certainty you need
13  to have on an investment in order to value a company?
14        MR. ZIMMER:  Objection.
15    A.  The value of a company is the value at that
16  point in time.  If there are offers, as I described,
17  between a willing buyer and willing seller, they're in
18  the process of negotiating, they're making offers back
19  and forth to each other, especially an investment of
20  $25,000,000.  It's not like pulling five dollars out of
21  your back pocket.  Under the theory of fair market
22  value, it is determined by a willing buyer and a willing
23  seller, the level of confidence you have in that or that
24  you need to have in that is the level of seriousness, I
25  guess, between the willing buyer, willing seller.

Page 127

1        If it was a passive kind of, "Oh, yeah,
2  I'd make an investment in that," then you wouldn't be
3  able to have a very high level of confidence in that.
4  If it comes down to term sheets, things of that nature,
5  now you're having a much higher level of confidence in
6  that buyer's willingness and the seller's willingness to
7  sell at that price.
8        The fact that you're making
9  representations to the SEC, a government entity, and the
10  New York Stock Exchange, where to mislead them could be
11  criminal, I assumed that making those statements to
12  those entities, you are at a level of confidence
13  because -- a pretty high level of confidence.
14        Because if you are making false
15  statements or ones that aren't legitimate, then you
16  could be accused and prosecuted for, you know, trying to
17  manipulate the market, you know, through false
18  information.  Stock manipulation, you know, people go to
19  jail on that stuff all the time.
20        So the fact that they're talking about
21  it, they're having those discussions with the SEC, with
22  the New York Stock Exchange made me feel that we were at
23  a high level of confidence.
24    Q.  And is there any treatise or publication that
25  you can point me to that says that that is a substitute

Page 128

1  for comparable sales?
2        MR. ZIMMER:  Objection.
3    A.  No.  There's not going to be some treatise on
4  this.  If you're willing to go to jail for that
5  statement to a government entity that you're in
6  negotiations with someone for ownership in a company for
7  25,000,000, I mean, I'm looking at they know where to
8  find you.  If that's not true and you're misleading the
9  markets, you know, there is going to be serious
10  repercussions.
11        So there is no treatise.  I considered it
12  serious because the consequences of falsifying that
13  information, it being misleading or untrue, are
14  significant to the person making those false statements.
15    Q.  And why are you not characterizing it as
16  merely aspirational?
17        MR. ZIMMER:  Objection.
18    A.  This was specific in that there were two
19  investors for a specified amount that you're making a
20  representation to a government entity and the New York
21  Stock Exchange.  That sounds more than -- that sounds a
22  little more certain than aspirational as we are entering
23  into discussions with potential investors.  We're having
24  ongoing discussions, you know.
25        This is down to a specificity of who

Page 129

1  those investors are, a specificity of the amount of
2  those investments at a time that there's a lot of
3  scrutiny on the company.  The company is looking at
4  being delisted.  You know, they have a lot of issues
5  going on.  You do not want to make false statements at
6  that point in time.
7    Q.  But you did not in doing your analysis have
8  details as to what either that $10,000,000 would have
9  looked like or that $15,000,000 investment would have
10  looked like, correct?
11        MR. ZIMMER:  Objection.
12    A.  No.
13    Q.  And you don't know who the counterparties were
14  that they were discussing, correct?
15        MR. ZIMMER:  Objection.
16    A.  I do not.
17    Q.  Do you recall there being a reference by
18  Navidea telling NYSE that they had alternative plans if
19  those deals didn't go through?
20        MR. ZIMMER:  Objection.
21    A.  You know, when you said it, it seemed like,
22  yeah, I saw something like that, but I can't remember
23  the specificities of it.
24    Q.  Okay.
25        MR. KAZAN:  I don't believe I have any

33 (Pages 126 - 129)

Page 130

1  further questions at this time.
2          MR. ZIMMER:  Nothing from me.
3          (Deposition concluded at 2:35 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1  therefor;
2          _____ was not requested by the deponent
3  or a party before the completion of the deposition.
4          I further certify that I am neither
5  attorney or counsel for, nor related to or employed by,
6  any of the parties or attorneys to the action in which
7  this deposition was taken.  Further, I am not a relative
8  or employee of any attorney of record in this case, nor
9  am I financially interested in the outcome of the
10  action.
11          Subscribed and sworn to on this the
12  2nd day of December, 2021.
13
14          _____
           TINA TERRELL BURNEY, CSR No. 2908
15          Certified Shorthand Reporter
           in and for the State of Texas
16          Certification expires 10/31/23
           Veritext Legal Solutions
17          Firm Registration No. 571
           300 Throckmorton Street, Suite 1600
18          Fort Worth, Texas  76102
           817.654.4006  Fax 817.335.1203
19
20
21
22
23
24
25

Page 131

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
2
   IN RE:  NAVIDEA          §
3  BIOPHARMACEUTICALS     §
   LITIGATION          §     Case No. 1:19-cv-01578-VEC
4                      §     ECF Case
5  _____
6          REPORTER'S CERTIFICATION
7          ORAL DEPOSITION OF
8          TERRY LEE ORR
9          NOVEMBER 16, 2021
10  _____
11
12          I, Tina Terrell Burney, Certified
13  Shorthand Reporter in and for the State of Texas, hereby
14  certify to the following:
15          That the witness, TERRY LEE ORR, was duly
16  sworn by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19          I further certify that pursuant to FRCP
20  Rule 30(f)(1) that the signature of the deponent:
21          __xxx_____ was requested by the deponent
22  or a party before the completion of the deposition and
23  is to be returned within 30 days from date of receipt of
24  the transcript.  If returned, the attached Changes and
25  Signature Page contains any changes and the reasons

Page 133

1  Gregory Zimmer, Esq.
2  gzimmer@gzimmerlegal.com
3          December 2nd, 2021
4  RE:   Navidea Biopharmaceuticals   v. Goldberg
5      11/16/2021, Terry Lee Orr (#4894727)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy.  If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

34 (Pages 130 - 133)

Page 134

```
1  Navidea Biopharmaceuticals   v. Goldberg
2  Terry Lee Orr (#4894727)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Terry Lee Orr              Date
25
```

Page 135

```
1  Navidea Biopharmaceuticals   v. Goldberg
2  Terry Lee Orr (#4894727)
3          ACKNOWLEDGEMENT OF DEPONENT
4     I, Terry Lee Orr, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Terry Lee Orr              Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25
```

## &

**&**   2:4

## 0

**01578**   1:3 131:3

## 1

**1**   3:14 4:1,24
16:17 19:21 20:7
85:25 86:14,23
90:5 131:20
**1.175**   99:21 106:12
**1.43**   112:22
**1.50**   90:5,6
**1.68**   119:8,14,17
119:20
**1.75**   106:13
**10**   34:24 59:5
**10,000,000**   129:8
**10/31/23**   132:16
**100**   37:16,21 41:3
123:11
**10016**   2:5
**10017**   2:10
**11**   61:7
**11/16/2021**   133:5
**11/22**   65:22
**12**   62:11 93:25
**12,000,000**   58:1,2
**12,777,274**   57:14
67:20 68:4
**12737**   132:14
**13**   67:11,12,18
70:11
**130**   3:6
**132**   3:7
**144**   21:3 25:21,22
26:7,9,25 30:6
50:14 53:6 54:17
57:3 93:23 94:2
95:12,18

## 14th

**14th**   3:16 20:2
28:11,15 29:11
45:20,25 46:4,10
51:20 62:17,24
70:15 72:16,22
73:8 74:16 75:2,9
75:10 76:9,11,18
77:8,10,19 83:19
84:8 91:1,17
92:12 94:24 95:5
95:8 119:13
**15**   33:17 82:21
**15,000,000**   129:9
**1502**   2:9
**15th**   107:6
**16**   1:10 84:1 131:9
**1600**   132:17
**16th**   1:19
**17**   91:14
**1715**   4:9
**18**   60:16,21,22,23
60:23 61:4 68:8
68:12,13,15 69:4
91:20 92:19 93:23
93:24 94:2,3,10
106:21
**19**   27:20
**1933**   74:2 84:9
**1:19**   1:3 131:3

## 2

**2**   3:3,15 7:3,5,20
20:7 27:21 48:18
58:4 86:8,12,15,15
87:4 90:6
**2.01**   120:11
**20**   13:1 33:17
80:22 94:13 98:10
99:18 135:15
**2018**   3:16 45:20
51:20 92:19

## 2019

**2019**   51:21 76:8,19
79:20 91:21
106:14 107:3
108:7
**2020**   107:6,9
118:10,15 119:2
123:22,22
**2021**   1:10,19 4:25
118:10,16 119:7
119:14 131:9
132:12 133:3
**20th**   51:21
**21**   99:23 106:16,25
106:25 119:11
**212.696.1231**   2:5
**212.696.4848**   2:5
**21st**   106:14 107:3
**22**   27:19,20
**2230**   1:23
**22nd**   61:6 79:5
92:7,18 93:13,19
**23**   46:25 64:10
72:9 73:16,24
80:11 82:12 83:18
84:6 85:24 86:23
87:10,15,17 88:3,5
90:5 91:13,19
100:12 108:6
118:8
**23,000,000**   89:16
90:18,24
**24**   121:6 124:17
**25**   41:23 42:1 54:7
**25,000,000**   37:6,14
38:12,17 39:21,23
39:25 40:11,12,22
42:19 43:12 44:5
125:12,17 126:20
128:7
**250,000**   107:5,8

## 25th

**25th**   2:4 107:8
**28th**   119:7,14
**2908**   132:14
**2:35**   1:20 130:3
**2nd**   76:8,18 77:5
79:20 91:21 93:20
106:22 132:12
133:3

## 3

**3**   3:16 4:1 7:15
20:7 34:9 45:19
46:8,18 59:19
106:19
**30**   4:25 102:5
103:7 105:6
109:11 121:15
131:20,23 133:17
**300**   132:17
**35,000**   19:13,14
**360**   2:9

## 4

**4**   3:5,14,17 7:11,11
7:15,17 54:10,11
**4.95**   119:19
**40**   14:11 15:2
34:14 39:6
**46**   3:16
**4894727**   133:5
134:2 135:2

## 5

**5**   23:2,16
**5,000,000**   68:6
91:21
**50**   37:24 41:4
**504**   20:25 25:13
**506**   20:25 23:4
25:10,13,18 26:6
**54**   3:17
**571**   132:17

**6**

**6**  34:21 53:5
**60**  34:15
**600**  1:23 2:4
**675,000**  106:13
  107:2,16 112:20

**7**

**7**  3:15 34:21 53:5
  55:12,14 123:22
**722**  58:4 68:5
**722,726**  58:16
**726**  68:5
**75201**  1:23
**76092**  4:9
**76102**  132:18

**8**

**8**  34:21 57:5 58:5
  58:17 59:4 68:3,5
  70:12,13,18,21
  71:23
**80**  100:22
**817.335.1203**
  132:18
**817.654.4006**
  132:18

**9**

**9**  34:22 58:5 68:3
  68:3
**9/30/21**  3:14
**914.402.5683**  2:10
  2:10
**99.8**  34:11
**9:56**  1:20
**9th**  100:23,23

**a**

**a.m.**  1:20
**abide**  51:15
**ability**  69:6 94:14
  107:20 113:25

114:1,2,4 116:24
117:1
**able**  13:24 31:18
  59:3 60:20 61:2
  69:10 88:7 97:22
  102:10 103:13
  105:15 121:2
  127:3
**abnormal**  102:22
**absolutely**  62:10
**absorb**  88:17
**abuse**  8:7,23 10:18
  10:25
**acceptable**  4:17,22
**accepted**  85:10
**access**  28:7,9
  102:7,11 104:22
  111:17,19 115:21
**accomplished**
  106:8
**account**  87:24
**accounting**  6:25
  7:23 11:4
**accuracy**  133:9
**accurate**  20:4
  35:12 76:23 79:18
  79:23
**accused**  127:16
**acknowledgement**
  135:3
**acknowledgment**
  133:12
**acquired**  61:25
**acquires**  55:12,16
**acquisition**  9:17
  10:3,5,7
**act**  74:2 77:11
  78:5,6,21 79:21
  84:9 91:23
**action**  132:6,10

**actions**  47:10,11
  47:13
**active**  112:3,4
**activities**  13:3
  83:14
**activity**  32:10
  83:13 101:1,14,14
  102:6,13,14,22
  103:3,4,10 107:23
  108:13
**actual**  48:7 89:10
  101:22 111:4
  121:17
**add**  33:7 86:19,23
**added**  68:12 93:25
**adding**  82:19
**addition**  78:9
**additional**  5:13
  12:18 27:4,5
  64:18 65:18 66:6
  69:5,17 70:10
  74:22 75:5,17
  76:15 77:3,16
  78:8 81:8 86:17
  86:19 87:25 88:6
  90:15 96:20 107:5
  117:7
**additionally**  30:5
**additions**  135:6
**address**  4:5,8 5:16
  6:18 58:19 70:9
  73:23 93:21 123:6
**addressed**  5:16
  21:1 23:1 47:13
**addressing**  29:17
  29:17
**adds**  68:8
**adjusted**  83:13
  91:14
**adjusting**  114:21
  115:2

**advantage**  90:13
  102:12 104:11
**advisory**  6:25
**agent**  94:17 95:16
  95:17 98:6
**aggressively**  12:16
**agree**  6:4 74:24
  118:2,7 119:16
**agreed**  35:21
**agreement**  3:16
  20:2 28:6,11,15
  29:12 30:11 38:3
  38:19 39:10 45:20
  45:25 46:4,10,17
  47:7 50:19,20,22
  50:23 51:9,24
  57:19,21,24 59:8
  59:13,14,15,18,21
  59:22,23 60:3,5,7
  60:8,14,15,19,24
  62:17,20,22,24
  63:11,13 66:14,15
  66:17 67:15,18,23
  70:16 72:16,22
  73:4,9,11,22 74:16
  75:2,9,10,13,19,20
  76:9,11,18,20 77:8
  77:10,19 79:14,14
  80:2,2,8 83:11,19
  84:8 91:17 92:13
  93:9,10 94:24
  95:6,9 115:5
  119:13
**ahead**  7:3
**aicpa**  13:10 14:2
  14:10,13,15,22
  15:3,6,16
**aicpa's**  15:14
**allegations**  35:1
  35:15,23

alleged 61:13
allotted 133:20
allow 51:10
alternative 129:18
amend 5:21
amended 34:18
  35:2,8,12
amount 43:23
  45:1 57:17 100:10
  114:14 128:19
  129:1
analysis 36:24
  39:22 43:8 44:16
  47:4,16,19 48:6
  63:14,17,18,21
  64:20 65:1 67:5
  80:14 91:16,25
  108:22 111:9
  113:2,14 120:1
  129:7
analyzing 49:4
annual 13:16
answer 27:18
  35:18 39:1,2,14,15
  39:17,17 48:21
  51:5,7,14 53:16
  58:21 60:25 65:6
  66:20,22 70:23
  71:21,25 73:21
  81:13 85:13 98:2
  98:3 118:22
answered 25:5
  38:23,25 45:4,17
  65:5 70:22
answering 4:16
  53:19
answers 4:21
anticipated 80:9
  83:6 88:24 98:22
anybody 84:20

anybody's 77:18
anyway 82:17
  116:5
apologize 46:18
  61:19 68:10 81:15
apparent 33:12
appearances 3:3
appears 47:9
  63:18
appended 135:7
appendix 31:10
applicable 21:1
  133:8
application 117:24
applied 14:1 19:18
  19:19
applies 117:9
apply 82:8 85:14
  85:17 113:14
  122:17 123:18
applying 107:2
apportionment
  88:12
approach 123:19
approached 39:18
  39:20
approaching
  71:12
approved 14:22
approximately
  34:11
arbitration 123:25
area 16:7
argue 107:25
  109:3,6
argument 28:2
arguments 93:9
art 120:25
article 3:17
articles 16:9

asian 16:22
asked 4:17 5:14,14
  5:16 10:11 20:9
  20:10 29:16 35:25
  38:22 45:16 57:19
  58:7,9 67:21
  69:18 84:3 89:14
  98:20 111:11,21
asking 23:20
  27:14 53:12,23,25
  66:11 67:22,25
  68:12,23 71:4
aspect 73:10
aspects 19:6 79:14
aspirational
  128:16,22
assess 36:1 38:15
  66:6
assessed 36:21
assessing 38:10
  66:16
assessment 105:8
assessments 6:23
assign 44:1,3,25
  45:4
assigned 81:19,21
assignment 19:21
  27:22 36:1,14
  52:17 60:1
assist 18:19
assisted 18:18
associated 10:5
assume 4:15 21:25
  64:15 70:6 103:11
assumed 39:25
  45:12 48:19 60:14
  66:17 110:4
  127:11
assumes 107:15
assuming 29:18
  36:4 58:1 60:21

60:22 61:11 77:23
  78:1 85:19 93:12
  97:9 99:10,19
  109:19 114:2,6
assumption 29:14
  64:1 65:13 66:19
  87:5 103:23 108:3
  110:17,18 115:13
  116:18,20
assumptions 37:14
  38:1 40:23 41:19
  114:3 116:16,18
  116:21
astute 101:11,15
  104:23 110:12
attached 1:25 7:8
  7:14,18,18 131:24
  133:11
attachment 7:10
attempt 20:15
  104:11 125:10
attempting 39:19
  72:20,21 73:2,23
  74:6,23 75:12
  76:22 77:4,17
  88:2 95:7
attention 101:16
  103:12 106:11
  110:16,19,23
  115:19
attorney 2:9 132:5
  132:8 133:13
attorneys 132:6
attributes 20:11
audit 6:18 7:21,23
  11:6 12:25
auditing 6:19
  14:23
august 3:16 20:2
  28:11,15 29:11
  45:20,25 46:4,10

51:20 62:17,24
70:15 72:16,22
73:8 74:16 75:2,9
75:9 76:9,11,18
77:8,10,19 83:18
84:8 91:1,17
92:12 94:24 95:5
95:8 119:13
123:22
**authorization** 95:2
**authorize** 94:17
**authorized** 61:9
61:16,21,22,24
62:3,4,5 70:12,16
70:17,21 71:23
72:1,3,16 75:1
94:23
**authorizing** 94:25
**automatically**
98:5
**available** 30:19
115:17 133:6
**avenue** 2:4,9
**average** 100:5,6
100:17 101:4,6
104:3 112:12
116:19,23 121:7
121:23 122:4,9,21
122:24 123:1,4,19
**averaged** 105:6
**averages** 123:4
**averaging** 121:11
121:11
**award** 62:25
**aware** 15:23 30:15
55:24 64:10,14
117:8
**awareness** 32:11

**b**

**b** 75:5 76:3 79:18
**back** 9:2 12:6 25:4
27:18,20 30:4
33:1 38:18 47:22
48:23 49:2,9
50:15 52:7 66:1
74:14 91:1 93:17
119:11 125:24
126:4,18,21
**background** 20:24
31:15 32:25 33:15
35:9
**banker** 104:25
**bargain** 98:20,22
98:25 99:9
**bargained** 98:13
**barry** 2:3 24:16
35:14
**based** 29:25 33:11
37:9 38:1,15
39:18 40:4,4,17
43:10 45:7 50:18
57:24 58:2 64:16
66:19 69:24 81:19
81:23 83:24 89:23
92:1 95:21 98:21
101:5 103:4 105:7
108:25 113:21,24
116:13 122:8
125:6
**basic** 76:2 110:8
**basically** 11:14
95:19
**basing** 105:10
**basis** 35:8 82:5
83:3,19,20 84:14
**bates** 31:7
**bdo** 7:22 11:2
**beginning** 46:18
122:23 123:2

**begins** 124:18
**behalf** 19:23
**believe** 16:20,21
17:6,12 18:3 19:3
19:12,17 20:14
23:1 28:3 34:6,7
37:2 43:19 48:14
48:15 49:10,12,13
52:7 59:18 61:6
68:6 108:19
123:21 129:25
**benchmarks** 41:5
**beneficiary** 32:22
**benefit** 4:20 98:12
98:19,21,25 99:9
**best** 42:14
**better** 11:25
**beyond** 49:20
50:12 52:12 64:17
**big** 11:13 103:18
108:4
**bigger** 87:22 88:1
**bio** 104:24 105:11
**biopharmaceutical**
33:2 103:9
**biopharmaceutic...**
1:3,17 2:2 5:9 6:5
6:9 32:19 131:3
133:4 134:1 135:1
**biotech** 110:15
**bit** 31:16 53:2
**block** 70:2 118:3
123:11
**blockage** 113:9
116:3
**blocks** 70:4
**bother** 112:5
**bottom** 7:11,22
23:2 45:23 55:14
82:23

**bought** 123:11
**breach** 20:2 27:23
28:1,6,22 29:1,3,4
29:11,18 36:4
48:19 66:16
**breached** 28:10,15
29:16,16,17
**break** 70:9
**breaks** 73:25
**bring** 7:4
**broader** 52:23
**broadly** 21:25
**brought** 7:9 12:10
12:12
**burney** 1:20
131:12 132:14
**buy** 112:1
**buyer** 36:21 37:6
124:19 125:15
126:17,22,25
**buyer's** 127:6
**buyers** 37:5,5
**buying** 37:15

**c**

**c** 2:1 57:9,11 80:1
**calculate** 81:6
82:4,9 83:24 87:7
89:14 91:7,12
**calculating** 84:4
89:20 101:21
122:14
**calculation** 60:4
61:1,2 91:8 121:7
121:14,17
**calculations** 8:9
17:23 60:18
121:18,23,24
**call** 30:23
**called** 41:25 62:20
113:8 122:3

canon  72:1
cap  85:25 86:5,14
  86:25 87:3,20
capabilities  31:17
  32:2
career  6:23
careful  114:16
carrying  6:20
case  1:3 8:14,17
  11:19 13:23 18:21
  26:9,10 30:19,22
  30:23 31:1,2,16,23
  66:7 85:15 99:3
  108:23 109:7
  124:4 131:3,4
  132:8
cases  7:1 8:7,14
  9:3,12,13 10:1
  123:24 124:1
catastrophic  88:9
catch  106:18
caught  103:12
  106:10,19 110:16
  110:22
cause  1:19 87:5
ceo  33:14 37:2
  51:19,23,24 52:1,3
  52:6,8 103:8
  106:3 110:13
certain  11:15
  15:23 21:18,19
  26:7 36:23 47:10
  57:2,20 60:21
  69:13 77:20,21
  81:22 92:2 98:23
  113:22 128:22
certainly  31:15
  101:15 120:15
certainty  29:22
  42:15 65:1 126:12

certificate  3:7
  55:18 59:8
certification  15:3
  15:6 131:6 132:16
certifications
  15:20
certified  15:24
  16:2,5,6 19:7
  131:12 132:15
certify  131:14,19
  132:4
cfo  37:2
change  11:5 12:14
  63:15 64:20 65:1
  65:8 71:6 81:9
  82:15 87:23 88:12
  105:18 108:13
  113:6 134:4,7,10
  134:13,16,19
changed  63:17
  64:22 65:12 89:25
  90:20
changes  3:6 5:18
  5:23 131:24,25
  133:10 135:6
characterizing
  128:15
charged  19:10
chart  100:12,22,25
  101:14 106:21
  107:10,11 108:6
  118:8,13,23 119:1
  119:10
check  66:1
checking  63:12
children  63:16
  66:5 67:2,4
cite  34:18 54:5
  59:5
cited  23:17 30:14
  35:7

civil  1:24
clarification  18:12
  83:2 95:11
clarify  53:23 65:6
classes  16:11
clean  76:5
clear  74:11
clearly  92:8
client  19:23
clients  11:6
close  103:3 124:5
closing  46:24 47:5
  47:6,9,13,17 48:1
  48:5,7,9 63:3
  78:11,14,16,17,25
  79:2,3,5,8,15
  91:18,24 92:1,2,5
  92:6,10,12 123:8
  123:13
coincide  100:25
come  7:9 10:10
  58:4 73:9 82:18
  87:14 88:13 117:9
  123:3
comes  124:4 127:4
comfortable  19:9
  55:8
coming  41:6 42:18
  43:11 125:11
common  38:14
  42:21,24 43:1
  47:1 73:25 83:10
  83:14 85:13 91:20
companies  7:21
  8:12 9:1,9,14,15
  9:16 10:4,20,21
  11:21 12:21 13:3
  32:20 33:3,14,24
  34:8 49:7 57:4,4
  104:24 105:24
  106:4 120:23

company  9:19,25
  10:2,14 24:5
  26:12 30:9 31:21
  36:20,24,25 37:17
  37:18 38:15,15
  42:19,20 49:24
  56:5,6,14,14,15,18
  56:19,24,24 68:22
  86:1,6 87:19,20,21
  87:23,23 88:1,6,13
  88:19,19,20 89:2,3
  89:21,22,23,23,24
  90:22 91:11 95:17
  96:2,4,16,21 97:13
  101:12 103:9,21
  105:3,14,17,19
  106:2,8,9 110:8,13
  111:14 124:2,6
  126:13,15 128:6
  129:3,3
company's  86:2
comparable  128:1
compared  55:8
compares  103:16
competitors  44:18
complaint  34:18
  34:21 35:2,8,12
complaints  30:22
complete  5:12
  135:8
completed  133:17
completion  131:22
  132:3
concept  22:18
  75:5 117:21
concern  86:15
concluded  130:3
conclusion  75:16
  98:17,19
conclusions  28:17
  50:24 73:9

concurrently
  94:11
conditions  97:25
conducting  8:6
confidence  126:23
  127:3,5,12,13,23
confused  122:10
confusing  64:5
confusion  47:24
  49:8
connection  5:9
  17:15 95:6 99:21
consent  63:4
consequences
  128:12
consider  17:25
considered  102:15
  104:3 115:23
  128:11
considers  123:1
consistent  21:6,13
  66:2 70:23
consolidated
  37:21,23 41:9,11
constant  118:9,15
  119:20,24 120:8
constitute  120:8
consultants  98:20
consulting  7:25
  8:4,11 11:3,6,7,9
consummation
  46:24 91:18
contain  22:8
contained  31:25
  62:16,24 70:15
containing  97:6
contains  94:25
  131:25
contemplating
  82:24

context  88:15
continue  37:17,22
  41:4
continued  13:13
  40:24
continuing  14:6
  14:10,19,25
contract  8:9 50:25
  83:1
control  37:19,23
  40:25 41:10,13,21
  56:6,13,20,24 67:4
  67:5,9
controlled  40:25
  41:20 67:8
controlling  37:18
controls  67:1,3
convenience  17:2
conversations
  24:20
conversion  32:5
convert  31:20 32:3
  90:13
convertible  31:20
  34:13
copied  53:13
copies  30:21
  133:14
correct  5:10 6:9
  7:12,15 14:16
  15:6,7,19,25 16:4
  16:6 19:9 20:12
  20:17,19,20 21:10
  21:14 23:10 24:14
  25:11,12 29:22
  34:4,19 35:9 36:8
  37:10 40:18 41:8
  41:14 44:1 45:15
  45:21 46:5 49:3
  52:14 55:1 57:12
  61:5 66:7 67:13

67:19 71:3 77:19
81:20,24 82:2,5,6
85:15 86:2,5,24
89:11 91:25 92:15
92:16 94:7,21
95:3,9,10 98:15
99:21,24 106:14
107:3,4,17 108:7
110:23 111:1,2,5
111:23 112:1,6,17
115:3,4,7 117:13
117:22,25 118:1,5
119:4,8,17 120:6,7
120:19 121:18
123:9,13,16,19
124:22 125:3,4,19
125:23 126:2
129:10,14 135:8
corrections  135:6
correlation  69:16
  109:4
counsel  19:23
  30:24 31:2,4,7,9
  34:24 58:9,11,13
  84:3 132:5 133:14
counterparties
  129:13
country  12:7
couple  75:13 78:2
courses  14:22
court  1:1 4:19
  35:17 82:11 84:5
  85:23 89:15 90:23
  124:13 131:1
courts  83:25
cpa  12:25 13:2,6
  13:24 14:2
cpas  13:7
craig  39:4
created  53:13

creating  91:3
creative  83:12
credentials  51:2
credits  14:6
criminal  127:11
criticism  75:14
cs  133:15
csr  1:20 132:14
current  9:11 15:6
  117:2,5 119:13
currently  5:17,19
  91:21
cut  12:6
cute  58:18
cv  1:3 7:7,10,14,18
  13:10 123:24
  131:3

---

**d**

---

d  19:3 20:12,22,25
  21:14,17,18,20,21
  21:22 22:1,8,19,21
  22:23 23:4,20
  24:24 25:14,15,19
  26:21,25 27:7
  30:6 36:2,3 49:20
  49:21 50:13 52:18
  52:25 58:6 59:7
  61:10,17 62:1,2,4
  62:5,5,8 68:5
  70:14,16,25 72:14
  72:23 73:1,5,13,14
  73:17 74:1,8,9,12
  74:22,23 75:7,18
  76:2,13,14,23 77:2
  77:7,11,12 78:4,9
  78:13,19,21 79:16
  79:20 84:9 91:22
  93:23 94:24 95:11
  95:18 96:11,19
  97:7 99:4

**daily** 118:3
**dallas** 1:23 8:2,6
  9:6 10:17 12:8,11
  12:17
**damage** 7:1 8:8
  29:19 43:4,23,24
  44:1,8 45:13
  48:17 50:7,10
  64:20 69:20 81:19
  82:18 83:23,24
  90:9 91:12 98:14
  99:7,12 114:5,22
  114:23 116:12
**damaged** 42:6,25
  43:21,23
**damages** 27:22
  28:4,8 29:2,5 36:4
  36:5,7 38:9 42:10
  45:1,14 48:10
  49:3,4,6,15 60:4
  63:14,18 65:12
  66:7,16 67:8
  80:15,20,21 81:4,7
  81:22 82:9,13
  83:24 84:2,4
  85:22 87:7,14,14
  88:13,15 89:4,14
  89:17 90:3,7 91:7
  98:21 99:20
  104:20 113:3,19
  113:21,24 114:8
  116:1
**data** 81:2,3,6
**date** 19:11 46:23
  46:24,25 47:5,6,9
  47:15,17,18 48:2,5
  48:6,7,8,9 63:3
  78:11,14,16,18,25
  78:25 79:3,3,5,8
  79:15 81:1 85:18
  85:20 90:23 91:1

91:9,11,17,18,19
91:24 92:1,2,5,6,7
92:10,12 93:4,5
99:10 100:3,20,20
101:8 102:16
104:7,9,16,19,20
106:20,21,21,22
106:23 107:22
108:1,1 112:10,17
113:4 114:12,13
114:18 115:15
116:7,23 117:6
119:10,17 131:23
134:24 135:12
**dated** 46:17
**dates** 47:12 81:23
  101:20 102:16,18
  107:24 108:2
  111:1 117:1
**david** 19:1 84:23
  84:24 85:3
**day** 1:19 86:5,8,12
  86:14,14,15,22
  87:4 90:5,6 103:7
  105:5,6 112:25
  114:11 121:15
  123:9 132:12
  135:15
**days** 102:5 109:11
  131:23 133:17
**deadlines** 98:2
**deal** 12:2 16:13
  93:8,8 103:5,18
**dealing** 9:14,19
  12:2 56:1,13
**deals** 129:19
**dealt** 10:21 124:7
**december** 132:12
  133:3
**decide** 83:25
  111:25

**decided** 12:15
**decision** 11:12,15
  65:14
**decisions** 37:20
**declare** 135:4
**decline** 118:18
**deemed** 135:6
**defendant** 2:7
**define** 82:10
  118:21
**defined** 47:6,9
  78:24 79:6
**definition** 79:8
**degree** 64:25
  126:12
**delay** 60:16
**delisted** 129:4
**deliver** 48:11,19
  49:4
**delta** 80:21 89:4
**demonstrated**
  32:14 42:17
**denied** 35:23
**deny** 54:23 96:16
**dependent** 32:5
**deponent** 131:20
  131:21 132:2
  133:13 135:3
**deposing** 133:13
**deposition** 1:8,15
  4:10 39:5 71:14
  71:18 80:7 123:24
  125:18 130:3
  131:7,17,22 132:3
  132:7
**depositions** 30:21
  31:3 36:16,18
**depths** 28:5
**described** 29:7
  32:14 85:9 126:16

**description** 3:13
  20:4,6
**details** 64:17,18
  129:8
**determination**
  83:17
**determine** 65:11
  73:6 74:17,25
  81:4 90:21
**determined** 80:15
  80:16 82:11 90:17
  90:23 91:9 126:22
**determining**
  124:20
**developed** 37:15
**developing** 11:13
  11:18 87:12
**dictate** 24:24
**differ** 122:6
**difference** 63:23
  97:6 122:8
**differences** 67:17
  77:2
**different** 6:21 24:1
  67:16 73:13 90:4
  90:8 114:17
  122:11,12,13,13
  122:16
**differently** 96:23
**differs** 70:14
**digging** 28:5
**diligence** 40:1
**diluted** 83:12
**direct** 39:17
**directly** 39:3,14
  63:15 64:12 65:2
  65:16,20 66:5
  67:2
**director** 8:1,19
  17:6,11,12,13

**disclosed** 40:14
  109:21
**disclosures** 57:3
  83:5 96:6
**discontinued** 48:5
**discount** 117:21
**discounts** 113:9
**discretion** 94:16
  96:21,23 97:1,2
**discretionary**
  97:13
**discuss** 51:1
**discussed** 24:16
  74:21 79:3 83:18
  95:6
**discussing** 18:13
  129:14
**discussion** 35:22
  52:4,7 58:10
  64:15 72:13 81:18
**discussions** 31:23
  33:11 34:24
  125:24 126:4
  127:21 128:23,24
**disposal** 59:10
**dispose** 94:15
**disputes** 8:9 60:8
**distort** 86:18
**distorted** 86:16
**distributed** 64:11
**district** 1:1,1
  131:1,1
**divide** 87:2
**doctor** 33:1
**document** 5:1,4
  7:4 35:14,19
  54:13 61:8
**documents** 30:20
  30:23 31:8 32:13
  33:16 40:2 51:3
  91:2

**doing** 6:17,25 8:8
  10:25 11:6 13:7,9
  17:19 27:6 36:24
  54:22 104:3
  120:13 129:7
**dollar** 100:9
  120:17
**dollars** 119:3,3
  120:4,5,11,11,11
  120:16 123:12
  126:20
**double** 16:4 63:12
**downs** 123:7
**dr** 5:10 19:10,24
  20:3 21:6,13
  27:23 31:13,14,24
  34:12,14,25 35:20
  36:3 38:20 39:11
  42:6,8,10 44:8
  45:1 47:14 48:11
  48:18,20 49:5
  51:19 52:2 56:7
  58:10 60:19 63:14
  64:10,24 65:2,13
  65:15,22,25 66:5
  66:10,25 67:12
  68:21 69:4 73:17
  76:8,17 79:19
  80:6 81:22 82:12
  84:2,4 85:23 87:4
  89:15 92:20 93:6
  94:14 98:12
  101:11 103:8,23
  105:8 107:1,15
  110:1 111:4,19,21
  120:18 125:2
**drafted** 30:4
**draw** 101:15
**drawn** 115:19
**drive** 113:12,13
  118:4

**driven** 47:10
**drop** 87:6 89:19
**dropping** 87:10
**drove** 108:11
  109:10,18,20
**ds** 20:23,24
**due** 40:1 76:7
  116:3
**duffus** 19:1 84:23
  84:24 85:3
**duly** 1:18 4:3
  131:15

**e**

**e** 2:1,1 70:11 134:3
  134:3,3
**earlier** 48:10,23
  71:7 120:15
**earliest** 100:13
  112:16
**earnings** 100:25
  101:5 102:4 103:4
  103:17 104:14,18
  105:1,13,16 106:3
  106:7 107:23
  108:19 109:10,13
  109:16,19,20,24
  110:16 119:5
**ecf** 1:4 131:4
**ed** 14:25
**edited** 16:13
**educate** 20:10,22
  36:1
**educating** 20:16
**education** 14:20
  14:21
**effect** 88:3 93:12
  114:5
**effecting** 82:25
**effective** 46:17
**effectively** 34:2
  86:4

**effort** 82:4
**either** 9:21 24:6
  34:3 41:20 129:8
**emails** 125:22
**emerging** 8:20
**emphasize** 4:12
**employed** 132:5
**employee** 56:14
  132:8
**employment** 3:15
  7:6
**endeavors** 32:18
**ends** 7:15
**engagement** 19:18
**engagements** 8:10
  8:11
**enjoyed** 11:5
**entailed** 8:6
**entered** 59:24 60:3
  86:8,13 115:5
**entering** 128:22
**enters** 84:5
**entire** 39:5
**entirely** 94:15
**entities** 127:12
**entitled** 84:5 85:24
**entity** 6:5,12
  124:21 127:9
  128:5,20
**entry** 86:16
**equal** 68:15
**equity** 33:4,5 34:4
  110:14 120:21
**equivalent** 86:1
**errata** 133:11,13
  133:17
**erratas** 133:15
**escrow** 59:8,12,12
  59:14,15,19,21,23
  60:3,5,15,24 62:21
  75:22 94:6,14

96:21 99:6
**especially**  18:5
26:19
**esq**  133:1
**esquire**  19:23
**essence**  114:9
**establish**  125:6
**established**  37:6,7
39:24 116:12
**estimate**  19:12
37:8,9
**estimations**  65:11
**evaluate**  27:22
36:3
**evaluating**  49:15
**evasive**  66:23
**event**  103:24
104:10,17 106:7
108:4 109:9
115:18 117:3,3,4
**events**  43:19 47:25
48:1,2,3,7 97:17
97:18
**exact**  37:25 63:11
63:12 68:16
106:23 119:9
**exactly**  43:7 71:25
80:24 99:17 105:5
**examination**  3:5
4:4
**example**  55:24
56:5 116:9
**exception**  56:16
**exceptions**  22:14
**excess**  118:3
**exchange**  58:24
59:1 125:22,25
126:5 127:10,22
128:21
**exchanges**  126:7

**excited**  109:22
**excitement**  103:5
**excluded**  124:10
124:13
**excuse**  14:25
27:20 55:11 56:3
100:23
**executed**  80:2
**exemption**  56:17
**exemptions**  52:18
52:25 56:9,9
**exercise**  99:19
**exhibit**  3:14,15,16
3:17 7:20 16:17
46:7 54:9,11
59:19
**exhibits**  3:12 4:1
**existing**  87:2
**exists**  60:15 118:2
**expand**  12:10,15
**expected**  82:24
**experience**  13:24
30:1 32:6,12 83:4
91:4
**experiences**  83:15
**expert**  3:14 4:25
5:8 8:8,24 11:1
124:10
**expertise**  32:23
74:25
**expires**  99:12
132:16
**explain**  28:20
39:19 71:10
**explained**  98:3
**explanation**  70:24
122:25
**express**  38:8
**expressed**  29:21
**expressing**  38:6
39:11

**extended**  12:25
109:12
**extends**  100:17
**extensive**  36:13,14
36:24 44:16,17,21
72:25 73:12 74:9
**extensively**  52:8
**extent**  74:15

**f**

**f**  16:21 19:3,3
131:20
**fact**  20:11,22 36:2
41:22 44:4 47:17
65:9 66:9 72:24
80:5,14 95:7
116:4 123:6,8
127:8,20
**factor**  58:25 60:25
**factors**  90:20 96:9
**facts**  85:15 95:22
**failed**  76:7 79:19
**fails**  133:19
**failure**  42:7,11
48:11,19 49:4
50:7,8 52:24
**fair**  36:19 49:2
51:18 91:8 124:18
125:5,15 126:21
**false**  127:14,17
128:14 129:5
**falsifying**  128:12
**familiar**  6:5,12
28:3 33:12 103:9
105:10 113:8
117:21 122:3
**family**  32:6 63:1,2
63:8,19,20,21,24
64:2,6,7,9,12,16
64:19 65:2,10,19
65:20 66:13

**far**  79:8 119:10
**fargot**  16:20
**fax**  2:5,10 132:18
**february**  51:21
**federal**  1:24
**fee**  13:17 14:18
15:17
**feed**  32:6
**feel**  24:20 127:22
**feeling**  101:12,13
**felt**  95:22
**filed**  5:15
**filing**  22:20 50:1
56:2
**filings**  30:21 31:1
37:3 40:7 49:25
**financial**  6:19,21
12:5 31:17 32:2,4
84:2 98:13 99:12
**financially**  31:18
32:3 132:9
**find**  106:23 107:14
112:5 121:2 128:8
**finder**  20:10,22
36:1
**fine**  4:23 71:8
**finish**  81:12
**finished**  5:2 81:14
81:15
**firm**  32:9 110:14
120:21 132:17
**firms**  7:23,24 33:4
33:5 34:4
**first**  4:3 6:17
12:22 34:10,18
35:2,6,8,12 46:14
46:21 62:14 78:10
88:7 112:11
**five**  39:2 89:1,5
119:3 124:15
125:7 126:20

**fixed**  83:7,9 89:21
   100:9
**floor**  2:4
**fluctuation**  69:13
**fluctuations**  123:7
**focused**  33:2 78:3
**follow**  25:3 64:2
   92:8 109:23
**followed**  52:19
   57:21 58:12 60:14
   110:15
**following**  19:25
   20:9 59:11 86:10
   131:14
**follows**  4:3
**footnote**  27:19,20
   34:20,21,22,24
   53:11 54:7
**foregoing**  135:5
**forensic**  8:2,5,18
   8:20 9:1,5 10:17
   10:24 11:11,23
   12:1,6 13:10
   15:15
**forget**  15:9 29:9
**forgot**  117:17
**form**  33:23 58:5
   59:4,17 68:5
   70:12,13,21 71:23
   74:4
**forma**  105:12
**formal**  12:23
**formed**  80:10
**former**  103:8
**forming**  80:18
**formula**  82:7
**formulas**  122:1
**fort**  132:18
**forth**  74:14 116:13
   125:24 126:5,19

**four**  7:23 97:7
   102:2,16 119:3
   120:11,11
**fourth**  102:3,4
**frame**  123:22
**fraud**  8:7,23 10:18
   10:25
**frcp**  131:19
**freely**  64:3 93:13
   107:3,5
**front**  5:6 22:25
   33:6 34:7
**fti**  7:25 8:4,11 11:2
   11:10,12,18
**full**  4:7 34:10 43:8
   55:13 96:21,23
   124:18
**fully**  96:25 97:2
**funds**  34:3
**further**  69:19
   130:1 131:19
   132:4,7
**future**  83:6 90:16
   90:23 91:9 103:25
   115:7

**g**

**g**  16:21
**gathered**  111:3
**general**  31:23
**generally**  8:3
   22:13,14
**generation**  11:16
**getting**  22:1 39:22
   40:21,22 43:21
   87:15
**give**  23:7 36:23
   39:17 50:19,22,22
   51:2 68:25 102:19
   121:25 122:1
   125:14

**given**  27:19 36:1
   45:8 104:23
   112:10 131:17
   135:9
**gives**  28:24 86:25
   87:1,3 116:7
**giving**  100:3
   104:15
**go**  7:3 11:2,10,16
   11:23 17:8 27:3
   31:5 48:23 60:20
   66:1 69:14 71:24
   72:10 78:15 80:1
   81:10 82:20 84:1
   99:19 106:19
   124:7 127:18
   128:4 129:19
**goes**  27:20 120:4
**going**  5:20 11:16
   12:18 21:24 22:4
   22:14 25:4 27:3
   29:9 30:4 37:13
   37:16 38:18 39:4
   39:14,16 42:25
   43:19 48:22 49:24
   50:15,21,24 51:4,6
   51:10,13,15 53:15
   64:16,22 70:24
   71:15 79:7 81:9
   83:5,22 86:14
   96:16 99:23
   100:18,19 105:11
   106:5 109:1 115:6
   116:15 120:12,16
   121:2 125:13
   128:3,9 129:5
**gold**  2:4
**goldberg**  2:7 5:10
   19:10,24,24,24
   20:3 21:6,13
   27:23 31:13,14,24

34:12,14,25 35:20
   36:3 38:20 39:11
   42:6,8,10,24 44:8
   45:1 46:25 47:14
   48:11,18,20 49:5
   51:19 52:2 56:7
   58:10 60:19 63:2
   64:7,9,10,24 65:13
   65:15,22,25 66:10
   66:25 67:12 68:21
   72:22 73:17 76:8
   76:17 79:19 80:6
   82:12 84:2,4
   85:23 87:4 89:15
   89:17 91:19 92:20
   93:6 98:12 101:11
   103:8,23 107:1,15
   110:1 111:4,19,21
   120:18 133:4
   134:1 135:1
**goldberg's**  63:1,8
   63:14,19 64:6
   65:2 66:5 69:4
   81:22 94:14 105:8
   125:2
**good**  33:13 97:20
   123:15
**gotten**  54:4 114:10
**governed**  38:20
**government**  127:9
   128:5,20
**governs**  38:3
**gradual**  118:18
   120:14
**grant**  9:4,6,8,13
   9:20 11:23 12:3,4
   12:5,6 59:9
**graph**  103:2
   118:17
**great**  103:5

**greater** 88:18 91:10

**greg** 24:19 53:15 53:19

**gregory** 2:8 19:22 133:1

**guess** 6:18 30:7 62:14 63:19 118:19 126:25

**guidances** 13:6

**gzimmer** 2:11 133:2

**gzimmerlegal.com** 2:11 133:2

**h**

**h** 134:3

**half** 46:25 61:7 64:11 67:12,19 68:9,15 69:5 73:16,24 80:11 82:12 83:18 84:6 85:24 86:23 87:10 87:15,17 88:3,5 90:6 91:13,19,20 92:19

**happen** 87:18 92:3 92:5 96:8

**happened** 43:18 60:22 92:3 105:18

**harm** 98:13 99:13

**head** 8:1 17:1 115:10,14

**held** 24:6 25:21 26:7 32:8 49:22 52:18 53:4 65:18 96:3,17,24 97:14 103:6 107:16

**helped** 17:17,18 18:18

**hereto** 1:25 135:7

**high** 40:14 100:2 100:20 102:5,6,19 102:21 104:8,16 109:4,6,8,12 112:11 113:6 116:19 117:2,5 120:12 127:3,13 127:23

**higher** 17:13 18:17 42:21 121:12,16 127:5

**highest** 101:7 108:1

**hire** 12:18

**historically** 91:1

**history** 7:6 111:4

**hka** 10:23,24 12:20,22 16:17 17:5,10 19:22

**hold** 15:20 31:17 32:5 95:19,23 96:22 97:18,21 102:10 103:24 110:6

**holder** 27:11

**holders** 26:4

**holding** 24:5 31:17 68:21 69:4 95:24 99:5

**holdings** 33:18

**holds** 124:21

**homes** 4:8

**hour** 39:7

**hours** 14:11 15:2

**houston** 12:13,17

**huh** 124:23

**hypothecation** 59:9

**hypothetical** 66:8 66:11,12,19 67:1 85:19,21 91:7

**hypotheticals** 66:20

**i**

**idea** 67:9 97:24 99:10 113:21

**identified** 82:9,18 83:23

**ifs** 116:21

**ignoring** 78:10

**immediately** 22:3 32:4

**imminent** 40:9

**impact** 10:2,4 35:24 43:16,22 87:9 89:19 108:22

**imposed** 57:7 69:5 87:25

**inc.'s** 20:1,1

**include** 28:21 50:1 82:25 121:20

**included** 24:10,12 25:22 26:14 97:16

**includes** 64:8

**incorporate** 26:13 49:25 97:14,15

**incorporated** 96:7

**increase** 106:7

**increased** 88:21 89:20 103:6 105:2 105:14,19 108:24 109:2

**increases** 87:22 88:21

**increasing** 109:8

**indefinitely** 100:17

**independent** 55:3 77:8

**index** 3:1

**indicate** 45:5

**indicated** 32:17 42:20 72:2

**indicates** 44:6

**industry** 105:11 106:5

**information** 5:14 21:2 30:1,19,24,25 31:2,4,6,13,15 33:9,17 34:19 35:18 36:16,17 37:1 38:11 41:18 43:25 44:3 108:25 111:3,12,13,13,17 111:18 121:23 127:18 128:13

**initial** 5:15 13:19 13:20 30:22 67:18

**initially** 100:1

**initiate** 80:3

**inquiry** 65:18

**inside** 56:19

**instance** 1:16

**instruct** 51:6,13 53:16

**instructions** 51:16

**intangibles** 6:20 13:4

**integrate** 96:5

**integrated** 96:6

**intended** 74:20 75:14 80:3

**intent** 40:10

**intention** 75:15

**interchangeably** 122:18,20

**interest** 37:19 38:16 39:23 40:11

**interested** 132:9

**interpret** 51:9 75:19 79:2 95:8 106:3

**interpretation**
74:5 75:13
**interpreting** 66:15
73:8,10 74:15
75:9,20
**interrupting** 46:19
**interview** 64:24
**interviewing**
31:12 65:10
**interviews** 65:11
**introductory** 20:8
**invest** 38:12 43:12
44:5 120:20
**invested** 33:24
106:10 110:14
**investigate** 108:12
**investigations** 8:7
10:25
**investing** 120:22
**investment** 32:9
36:22 37:14 38:17
42:18 104:24
125:13 126:13,19
127:2 129:9
**investments** 32:19
33:3 34:2,3 40:8
40:17 43:14 129:2
**investor** 3:17 32:7
32:12 36:22 37:7
38:11 54:17
104:23 110:13
120:19,25 121:3
**investor's** 101:15
**investors** 36:18
37:5,5,12 38:2,12
39:21 40:2,10
42:18 43:11
125:11 126:9,10
128:19,23 129:1
**invoice** 19:20

**involve** 8:11 11:20
124:1
**involved** 6:22 9:15
9:17 32:10,18
58:11 110:14
**involving** 9:7
**ip** 44:19
**irrespective** 116:2
116:4
**issuance** 48:6,8
56:4 57:14 77:12
99:11
**issue** 21:17 42:7
42:11 46:25 50:7
50:16 51:11 58:1
59:3 73:16,24
74:3 76:7,17
77:24 79:19 82:17
85:12 88:5,7
89:16 91:19 93:1
96:12 116:3
**issued** 6:1 20:11
20:16 21:5,6,13,16
21:21 22:19 26:13
27:7 36:3 43:4
47:14,15,18 48:4,9
48:15 49:10,11,14
49:18 50:5 52:14
56:2 57:18,20
58:17,22 59:4
61:5 63:15,16,19
63:21,22,24 65:2
65:10,16,16,20,22
65:25 66:5,10,11
66:25 67:2,12,15
70:12,13 72:23,25
73:5,12,14 74:1,7
74:20 75:1,17
76:14 77:5,10,11
77:16,21,22 78:4
78:13,18,21,25

79:4,5,7,10,13,13
79:16 81:1 84:7
85:16,20 87:8,16
90:10,11,12 91:22
92:4,7,9,11,16,19
93:1,3,10,13,18,20
97:8,9 99:4,14,15
100:15 108:17
119:12
**issuer** 52:21 53:1,4
82:24 94:21 95:13
97:9 98:5
**issues** 6:19 13:5
21:2 24:22 88:14
96:13 129:4
**issuing** 27:8 56:14
57:23 63:6 88:3
96:16 97:12
**items** 6:21 13:3
29:2

**j**

**jail** 127:19 128:4
**january** 76:8,18
77:5 79:20 91:21
93:20 100:23
106:22
**jed** 125:18
**jed's** 40:5
**journals** 16:13
**judge** 85:23 89:1
**judgment** 84:5
85:22 86:8,12,16
89:2,3
**july** 118:10,15
119:2 123:22
**jump** 46:19
104:10
**jumps** 117:6
**june** 100:23 107:8

**k**

**kazan** 2:3,6 3:5
24:19 28:22 38:24
39:4 47:22 51:6
53:15,19 54:9
60:11 71:8,13,17
81:12,17 124:15
129:25
**keep** 75:8
**kids** 65:16 67:10
**kind** 7:4 28:2
31:22 41:5 45:10
66:25 83:12 88:16
91:6 96:13 100:8
121:10,24 127:1
**kinds** 14:25 62:1
90:20 126:7
**knew** 39:22 106:4
**know** 5:1,13,16
6:20,20,25 8:10
10:3,13 13:1,4,7
14:20,24 16:22,24
17:1,8 18:4 23:10
24:20 26:5 27:3
30:23 31:18 33:2
33:6 36:20 37:12
40:11,16,21 43:7
49:23,24 50:18,18
51:2,19,23 52:6,11
52:13,16 53:3,10
57:17 58:16,23
59:14,15,23 60:2,5
60:6,6,7 62:19
64:14,22 65:20
68:8,10,14,16 69:4
69:24 70:1,3 71:9
72:3 73:25 76:20
77:9 79:9 82:16
83:5 85:13 87:19
90:19 94:3 95:20
97:13,15,19 100:6

100:18 101:7
103:1 104:2,4,5,10
105:17 107:19
108:11,12,15,16
109:18 110:7
111:10,10,11,13
111:15 112:3,24
115:6,9,10,10,11
117:4 118:24
119:23 120:12,21
125:14,15 126:9
127:16,17,18
128:7,9,24 129:4
129:13,21
**knowing** 40:20
97:22
**knowledge** 32:22
33:13 43:15
**known** 80:7 96:9
97:17 103:20
**knows** 97:3
**kroll** 10:15,16,20
10:22 12:3,9,10,12
12:15

**l**

**lack** 117:22
**language** 15:9
22:15,23 23:8,10
23:17,24 25:2,6,24
29:2 50:25 53:8
54:1,3,4,8,19,25
62:4,5,6 63:12
70:14,15 83:1,11
107:11,14
**large** 113:10,10
**latitude** 14:21
**latkin** 40:6,7 80:7
125:19
**law** 2:9
**lawsuit** 35:15

**lawyer** 24:20 47:8
63:20
**layman** 47:8
**leadership** 12:14
**leave** 11:2,10,12
11:23 12:4,9
51:25
**led** 8:5 9:5 10:17
**lee** 1:9,15 3:4 4:2,7
131:8,15 133:5
134:2,24 135:2,4
135:12
**left** 94:15 122:24
**legal** 1:22 28:17
45:10 50:24 53:2
68:24,25 72:19,20
75:12 83:22 92:25
93:5 98:17 99:2
132:16 133:23
**legend** 22:9 23:21
24:14,25 25:14,20
26:17,20,22,24
27:10,12,16 55:18
55:21 56:20 59:6
59:20 61:9 62:2,9
70:11,14,20 71:22
75:1 94:14 95:13
95:14,17,25
**legends** 21:16,18
21:19 24:9,23
26:12,19 50:4,6
57:1,7 62:1 70:7
70:18 72:15,24
73:11 74:8,12,22
75:5,17 76:15
77:3 78:8,8 90:11
90:14,15,16 93:7
94:18 95:1 96:20
99:15,16 100:18
116:4

**legit** 126:9,9,10
**legitimate** 127:15
**letter** 19:19 40:9
59:6
**level** 14:19 102:6
102:14,21 103:3
126:11,23,24
127:3,5,12,13,23
**levels** 32:12 69:24
103:3 123:7
**lexington** 2:9
**liable** 52:18,22,24
53:4
**licensed** 13:14,15
**licensing** 13:13
14:11
**life** 34:13
**lift** 98:6
**lifted** 53:9 98:5
**limit** 59:2
**limitation** 22:21
78:7
**limitations** 58:22
58:23 98:1
**limited** 61:1 77:5,6
**limiting** 58:25
**line** 13:3 78:2
134:4,7,10,13,16
134:19
**list** 31:5 123:24
**listed** 35:2
**listing** 125:23
**literature** 55:6,7,9
55:10
**litigation** 1:3
131:3
**little** 31:16 53:2
90:8 97:25 128:22
**llp** 2:4
**loan** 59:9

**lock** 96:20
**lockup** 62:12,16
62:20,22,24 68:6,7
70:15 75:1,21
93:23 94:3
**long** 15:5
**longer** 11:7 56:8
**look** 5:1 16:16,25
17:8 19:6 23:1,2
45:19 65:24 69:8
69:8,11,17 86:14
91:13 97:17 100:4
100:12,24 101:8
101:14,16 103:2
105:16 108:6
109:20,21 114:11
116:10
**looked** 19:7 30:13
47:11,25,25 69:12
69:15 100:1,21,22
101:17 102:13
104:14 105:14,22
113:4 118:23
129:9,10
**looking** 22:6 29:24
30:7 34:9 55:13
59:6 103:10 104:6
105:13 106:1,2
107:13 113:3
119:1,10 122:24
128:7 129:3
**losing** 120:5
**lost** 8:9
**lot** 12:7 13:2 17:17
17:24 101:1,1
102:11 120:24
129:2,4
**low** 100:2,20
102:19,21 104:8
104:16 112:9,13
112:15,16 113:5,6

113:7 116:19
117:2,5
**lower**   69:20
**lowest**   101:7 108:1
**lunch**   72:8

**m**

**m**   2:3,7 5:10 19:23
**m.d.**   2:7 19:24
**machine**   1:21
**macrophage**   1:17
2:2 6:11,14,15
20:1 28:14 31:21
36:6,7,13,19 37:6
37:8,10,13,20,22
37:23 38:2,4,7,10
38:13 39:10,21,24
40:17 41:6,22
42:23 43:3,9,10,12
43:13 44:7 45:6
48:12,16 49:7,9
51:20 52:1,3,5,9
52:11
**macrophage's**
35:15
**mad**   4:22
**maintain**   14:7,11
14:15 15:2,9,14,16
41:9,13
**maintained**   14:9
**maintaining**   14:13
14:17,19
**majority**   41:4,8,13
41:20
**making**   5:17,22
6:23 29:15 39:7
42:18 53:22 64:1
65:14 74:5,17,18
116:21 126:6,18
127:8,11,14
128:14,19

**manager**   17:12,13
17:13
**managing**   8:1,19
**manipulate**
127:17
**manipulation**
127:18
**manner**   77:21,22
77:24
**mark**   54:9
**marked**   4:1 7:3
46:7 54:11
**market**   12:11
33:19 38:11 44:18
60:20 80:25 81:8
82:14 85:25 86:1
86:5,7,14,15,25
87:3,10,11,20 88:9
88:16 89:19 90:20
90:25 97:24 103:5
106:6 109:22
110:15 120:23
124:19 125:5
126:21 127:17
**marketability**
44:20 117:22
**marketplace**
82:15
**markets**   12:16
32:11 33:10,12,15
128:9
**markup**   6:21
**mathematical**
82:7 122:1
**matter**   5:9
**mba**   33:1
**mean**   6:15 22:13
39:5 41:12 44:21
61:22 69:14,24
70:20 71:22 78:15
84:25 93:1 96:10

96:17 103:14
118:17,18 128:7
**meaning**   10:7 23:5
**means**   25:25 41:14
41:21 72:1
**meant**   123:6
**measure**   88:10
92:1 115:22
**measured**   97:12
109:9
**measurement**   98:2
101:20 102:15,16
117:7 119:9
**measurements**
98:21 118:25
**measuring**   48:8
87:7 90:9 99:1,20
**medical**   33:2
**meet**   47:13
**member**   13:10,12
15:5
**members**   63:1,2
63:24 64:2,6,7,12
64:16,19 65:3
66:13
**membership**   14:8
14:14,15,18 15:14
15:16,17
**memorize**   49:1
**memory**   35:5
**mentioned**   34:1
51:4 61:13
**mere**   89:12
**merely**   128:16
**met**   24:6 76:21
79:8,9 93:11
**methodologies**
122:14
**methodology**   84:4
84:12,13,15,18
85:6,8,10,15,22

86:10,12 102:24
106:12 107:2,15
125:1
**metric**   124:20
**michael**   2:7 5:10
19:23
**middle**   107:12
**million**   47:1 64:11
67:12,19 68:9,15
69:5 73:16,24
80:11 82:13 83:18
84:6 85:24 86:23
87:10,15,17 88:4,5
90:6 91:13,20,21
92:19 99:21
100:22 106:13
**mind**   10:10 82:11
92:24 120:9
**minimum**   95:20
**mintz**   2:4
**mintzandgold.co...**
2:6
**minute**   39:2 50:15
50:19 112:13
114:16
**minutes**   124:15
**mislead**   127:10
**misleading**   128:8
128:13
**model**   86:4 88:25
91:3 113:24 114:5
114:23 117:9,13
121:3
**moment**   8:16
**money**   31:19
43:12 102:9,10
105:12 108:16,17
108:18 110:7
**montaur**   34:13,15
34:22 39:11

**month** 60:16,21
94:10,10 97:19,21
98:4
**months** 23:6 25:21
26:10 49:22 60:22
60:23,23 61:4
63:3 93:14,16,22
93:23,24,24,25
94:2,2,3 95:20,21
95:23 96:3,17,24
97:7,8,15 99:5
106:22
**monumental**
104:17,17
**mt** 6:14 20:2 34:11
42:3,7,11 44:9
45:2 50:15 51:11
52:13 125:4,6,6,10
125:12,16
**multiplying** 80:22
**murray** 6:1

**n**

**n** 2:1
**name** 4:5,7 16:20
16:21,22 19:2
40:5 66:5 84:12
117:17
**nature** 8:21 17:20
32:12 33:3,8
79:15 108:20
127:4
**navidea** 1:2,17 2:2
5:9 6:4,7,8 19:25
20:1 21:5 28:10
29:11 34:11 37:21
37:22 38:21 39:10
40:24 41:4,7
45:25 46:25 47:1
49:4,11,13,16,18
50:8,9 51:24 56:8
57:8,22 61:9 62:9

63:4 64:4 68:14
69:5 72:10 73:15
73:23,24 74:3,16
76:7,16 78:3,19
79:19 80:3 81:23
84:7 86:5 91:19
91:20 92:19 94:16
96:22 107:16
111:5,22 125:2
129:18 131:2
133:4 134:1 135:1
**navidea's** 35:15
42:7,11 46:23
76:10 94:16 95:1
118:9,14
**necessarily** 37:19
105:5 123:15
**necessary** 135:6
**need** 13:23 31:19
32:3 66:1,4,6 71:5
71:9 102:7 110:7
121:5 126:12,24
**needs** 22:21 25:14
102:14
**negative** 16:4
**negotiating** 126:18
**negotiations** 128:6
**neither** 63:1 64:7
94:23 132:4
**never** 14:4 24:13
43:15 48:15 85:16
88:23 91:5,6
110:20,21,22
111:3 114:1,4
116:24 117:12
126:1
**new** 1:1 2:5,5,10
2:10 11:14,18
43:11,11 44:4
58:24 59:1 86:25
87:12 90:1 108:16

108:17,17 110:10
125:22,24 126:5
127:10,22 128:20
131:1
**news** 110:11
**nonquoted** 62:14
**nontradable** 50:4
77:13
**nonusable** 90:11
90:14
**normal** 49:20
96:11
**north** 1:23
**notary** 135:13,19
**note** 118:8,14
133:10
**noted** 22:22 135:7
**notes** 33:6 34:7
66:1
**notice** 13:9
**noticed** 5:20
**notification** 22:5
**notify** 24:5 26:4
26:11 27:10
**noting** 118:23
**november** 1:10,19
61:6 79:5 92:7,18
93:13,19 108:7
131:9
**number** 4:24
32:18 44:25 45:5
45:14 57:23,25
59:2 68:16,17,18
69:20 83:1,7,10,16
86:6 87:1,2 89:24
102:12 113:22
114:22 115:24
121:8,11 125:17
**numbered** 1:19
28:25

**numbers** 31:8
67:17 80:22 81:19
81:22 82:1
**numerous** 106:4
123:24
**nyse** 129:18

**o**

**o** 16:21
**objection** 15:11,18
22:17 23:14 24:3
24:15 25:1,16
26:2 27:1,17
28:12,19 29:6,13
32:16 33:20,23
34:5 35:4,13
37:11 38:22 39:8
39:13 40:3,19
42:16 44:2,10
45:3,16 46:15
47:20 48:21 49:17
50:17 51:22 52:15
52:20 53:12,22
54:2 55:5,23
59:17,25 63:9
64:13,21 65:4
66:21 67:14 68:23
69:7,22 71:4
73:18 74:4 75:3
75:11 76:1 77:25
78:12 79:22 80:13
80:23 83:21 89:7
93:15 95:15 98:8
98:18 99:25
101:23 104:1
105:9,25 107:18
111:6 112:2
113:15 114:19,25
115:8,16 116:11
116:14 117:11,14
117:19 118:6
125:9,20 126:14

128:2,17 129:11
129:15,20
**obligation** 73:16
74:19 76:17 77:19
77:23
**obligations** 74:15
76:11
**obtain** 13:25 14:7
**obtained** 23:8 30:1
**obviously** 4:19
20:21 54:21
**occur** 43:14 48:1
**occurred** 48:3
103:24 117:3
**occurring** 47:10
**offer** 89:1
**offered** 23:4 25:18
**offering** 22:1 27:7
27:8 56:2 96:8
97:16
**offers** 126:16,18
**offhand** 17:9
**officer** 33:14 34:8
37:3 131:16
**officers** 57:4
**offices** 1:22
**oh** 18:9 42:5 44:13
61:18 106:18,23
124:25 127:1
**okay** 5:3,22 6:15
12:20 15:2 16:15
17:2 18:15 35:1
42:5 46:3 51:18
54:5,12,25 57:6
68:10,13 76:6
78:24 81:17 82:20
82:22 84:1 91:13
91:15 93:12
101:18 114:16
119:15 122:10
129:24

**once** 6:24 13:15
**ones** 7:22 127:15
**ongoing** 128:24
**opine** 21:4 36:2
50:24 69:1 77:18
78:22 79:11
**opining** 76:16
79:24
**opinion** 20:19 21:9
21:12,15 22:16
28:10,14 29:15
35:24 38:7,8,19
39:12 41:22,23
42:6,9 43:8,16,20
43:22 50:22 51:3
65:8 66:18 68:24
68:25 70:9,10
72:15,19,21 73:15
73:19 74:11,17,18
74:20 76:10,24
79:1 80:4,10,18
83:14,23 92:11,17
92:25 93:5 99:2
100:9 105:7
**opinions** 5:14 18:1
18:4,6 28:24
29:21,25 31:25
42:3 50:23 65:7
72:10 95:7
**opportunity** 11:25
**opposed** 104:16
**option** 59:9
**oral** 1:8,15 131:7
131:16
**order** 26:22 36:6,7
126:13
**original** 115:23
**orr** 1:9,15 3:4 4:2
4:7,24 7:3,5 53:20
53:21 54:14 71:19
71:22 72:9 124:17

131:8,15 133:5
134:2,24 135:2,4
135:12
**outcome** 132:9
**outline** 45:7
113:18
**outlined** 70:4 81:6
82:16
**outside** 24:16
56:18 73:20
111:14 125:11
**outstanding** 86:2
86:22
**overlay** 93:24
**overlying** 99:5
**oversight** 30:16,18
126:6
**owned** 34:12,14
34:15 36:11
111:22
**ownership** 36:8,11
37:10 88:11,18,20
89:5,6,20,25 90:1
91:10,10 120:22
125:12 128:6
**owns** 34:11 88:1
89:1,2
**oxley** 11:5,8

|   p   |
|---|

**p** 2:1,1
**p.m.** 1:20 130:3
**package** 11:18,20
**page** 3:2,13 7:11
7:15,17 19:21
23:2,16 27:21
31:11 34:9 41:22
41:25 45:19,24
46:18 48:18 53:5
55:12,14 57:5
58:5 59:5 61:7
62:11 67:11 68:3

70:11 72:9 82:21
82:24 84:1 91:14
94:13 98:10 99:18
99:23 100:12
106:16,25,25
107:1,12 118:8
119:11 121:6
124:17 131:25
134:4,7,10,13,16
134:19
**pagination** 17:18
**paid** 19:14,16
**papers** 91:2
**paragraph** 20:8
23:3 34:10 55:13
62:14 94:13 98:11
124:18
**paragraphs** 35:7
**parent** 40:24
**part** 7:7,8 14:2,10
18:6 19:8 24:10
24:10 25:22 26:11
27:21 47:19 49:6
49:8 51:24 52:16
59:6 60:1 78:10
85:1 96:18 99:18
**partially** 64:11
**particularly** 106:9
**parties** 132:6
**partner** 6:18
10:24 12:12,17,17
12:25 18:23,25
19:5
**party** 131:22
132:3
**pass** 67:9
**passive** 127:1
**pasted** 53:13
**patterns** 64:3
**pay** 13:16,16
15:16 74:19,19

paying  14:18
pearl  1:23
peer  84:20,22,24
  85:3 117:16
penning  50:23
people  4:14 16:19
  96:9 102:12,12
  103:14 105:2,13
  105:15,23 106:1,6
  106:9 120:24
  127:18
people's  110:19
perceived  44:7
percent  33:17
  34:11,12,14,15
  37:16,22,24 41:3,4
  89:1,2,5,5 125:7
percentage  36:23
  40:20,21 68:14,17
  68:20 87:21 88:1
  88:20 89:25 91:10
  91:11
percentages  36:12
  69:13,25 70:1
performed  30:7
period  12:5,25
  24:7 26:7 31:19
  81:2 93:23 95:20
  95:24 98:4,23,24
  99:6,11,11 100:6,7
  100:13,24 101:3,5
  101:18,19 102:20
  103:7,16 104:9,13
  104:19 105:6
  107:22 108:5
  109:12 110:2,9
  114:3 115:20
  116:17,19 118:18
  121:9,10,15,16
  123:3,5

periods  94:8,11
  104:6,8 107:21
  118:19 119:25
  120:16
permitted  64:3
person  12:11
  18:13 56:6,13,20
  56:24 117:18
  128:14
pharmaceutical
  106:4
pharmaceuticals
  19:25
phenomena  118:2
physical  26:1
pick  85:18 99:23
  102:17 107:20,24
  107:25 108:1,2
  112:9
picked  101:25
  102:1,2,23 112:10
  112:11
place  85:9
placed  21:22 22:9
  23:21 24:23 26:1
  57:8 75:24
placement  62:25
  63:7 94:25
places  78:16
plaintiff  1:16 2:2
plan  5:22
planning  5:17
plans  129:18
platinum  34:13,15
  34:22 38:21 39:11
play  18:17
played  31:21
  60:25
please  4:5,14 19:2
  45:20 47:22 57:5
  60:9,12 124:24

pledge  59:9
plenty  97:15
pocket  126:21
point  14:18 26:23
  40:9,13 42:1
  43:18 44:6,15
  45:6 46:20 67:6
  90:19,24 93:7
  96:19 99:8 100:13
  100:14 101:7,8,9
  102:9,13,23 103:2
  103:13,21 104:25
  107:20 108:14
  109:22 112:9,11
  112:13,15,16
  115:18,21,25
  116:3 117:7 119:4
  120:13,14 126:16
  127:25 129:6
pointed  23:16 25:2
  25:6 41:20
points  20:7,9
  69:13 102:1
pollution  13:5
poor  62:6
popped  103:25
  109:17
portion  59:21
  60:15 61:8,24,25
  74:7
portions  124:12
position  51:25
positive  108:25
possible  112:17
possibly  8:15
post  80:17,22,24
  81:3 82:1,17
  83:20 84:6
potential  26:4
  27:11 36:18 37:4
  37:12 38:2 40:2

42:18 52:11 80:8
  113:3,19 128:23
potentially  65:17
  88:9
power  111:16
practice  8:2,5,6,20
  9:5 10:17,18,25
  12:1,8
practices  12:7
pre  80:15,21 81:5
  81:7 82:5,8,10,10
  82:11 83:19 84:14
  85:10
predominant
  10:12
predominantly
  8:8
preferred  34:14
  38:4,14,20
premarked  4:24
prepared  5:8
preparing  16:18
  31:25
preset  96:15
pretty  21:25 83:10
  101:11 127:13
prevent  49:19
previously  87:2
price  9:24 10:4
  87:13 90:5,18
  101:2 109:25
  110:9,11 113:4,12
  114:6,24 115:25
  116:7,8 118:5,9,14
  119:14,21 121:16
  122:4,22 123:8,9
  123:13,16 127:7
prices  13:5,5
  17:23
pricing  122:9

**primarily** 11:4
**primary** 53:2
**prior** 71:5 95:24
   95:25 118:19
   119:25
**private** 9:10,21,23
   10:21 22:1 27:7,8
   33:4,4 34:2,3
   36:20 56:1,4
   110:14 111:12
   120:21,21
**probability** 40:14
**probable** 40:14
**probably** 9:2 10:5
   28:3 31:1,6 92:23
   106:18
**procedure** 1:24
**proceed** 39:8
**process** 11:13
   14:21 40:13 64:23
   126:18
**processes** 110:7
**produced** 1:16
**producing** 44:21
**product** 11:14
   52:10
**professional** 14:6
   29:21 42:15
**professions** 15:24
**profits** 8:9
**progressed** 40:13
**prohibited** 11:8
   62:8 70:18 71:2
   72:1,4
**promised** 45:9,11
**pronounce** 16:23
**prosecuted** 127:16
**protected** 11:17
**provide** 4:20 5:14
   32:13 33:9,16
   84:3

**provided** 30:24
   31:2,4 33:15
**provides** 62:25
   91:17
**provision** 62:12,16
   62:24 75:21 94:25
**provisions** 1:25
   62:22
**public** 6:24 7:23
   9:10,14,19,19,21
   9:22 10:4,14 11:4
   13:2 22:2,19
   24:11,12 25:22
   26:14,18 27:8
   30:9 31:6 32:21
   33:14 36:20 37:17
   37:18 50:1 56:2,5
   56:14 57:3,4
   77:14 96:7 97:16
   111:13 120:22
   124:6 135:19
**publication** 55:1
   127:24
**publications** 3:17
   54:18
**publicly** 8:12,25
   9:8 10:20 11:21
   12:21 22:3,6,12,20
   27:9,10,12 49:21
   68:22 105:23
   124:2
**published** 16:7
   102:24 117:12
**pulling** 126:20
**purchase** 39:10
   59:10
**purchasers** 23:3
   25:18
**purported** 93:11
**purportedly** 21:5
   36:2 92:19,22

**purposes** 83:2
**pursuant** 1:24
   20:12 23:4 25:18
   131:19
**put** 7:10 22:18
   26:24 27:10,15
   39:21 40:11 47:11
   54:3,19 55:4
   56:15 61:25 62:1
   72:5 81:8 86:17
   93:11 105:5
   116:13 121:23
**puts** 94:3
**putting** 17:18,23
   17:23 18:18,19
   54:23 62:9 82:14
   88:6,8 96:12

**q**

**qualifications** 17:7
   104:24
**qualified** 28:18
**qualifying** 14:25
**quantify** 44:8
**quantities** 57:20
**question** 4:14,16
   4:16 10:11 15:12
   23:15,16 24:24
   25:3,4,9,13 38:18
   39:3 47:21,24
   48:24 49:2 51:5,8
   51:14 52:21,22,23
   53:3,17,23 57:19
   60:9,11 65:5
   66:20,22 67:11,21
   69:3,23 71:16,21
   73:21 76:5 93:2
   101:24 109:15
   112:7 115:23
**questioning** 65:23
**questions** 4:13
   53:20 130:1

**quickly** 93:18
**quite** 102:12
   109:12
**quote** 23:11 45:20
   46:13
**quoted** 46:4

**r**

**r** 2:1 16:21 134:3,3
**ran** 101:12 104:24
   106:2,3 110:13
**range** 37:15,15
   81:2,19 100:4
   101:25 102:19
   104:15,20,21
   105:6 112:10
   113:5,18 115:14
   115:25 116:13
   117:2
**ranges** 81:22
   99:24
**rationale** 110:5
**read** 5:20 20:21
   25:17 40:4 47:7
   47:22,23 50:19
   51:25 55:6,7
   60:11,13,18 63:10
   70:8 75:16 77:1
   78:2,14 84:18,25
   85:1,9 133:9
   135:5
**reading** 4:15
   36:15 47:8 50:18
   53:3,10 59:18
   73:22
**real** 20:6
**realizing** 36:19
**really** 32:22 33:2
   80:5 90:12 101:6
   108:13 113:6
**reason** 46:13
   92:21 96:4 113:17

**[reason - removed]**

121:20 133:11
134:6,9,12,15,18
134:21
**reasonable**  29:21
42:14 64:25
**reasons**  56:11,16
92:23 131:25
**rebuttal**  6:1
**recall**  8:15 129:17
**receipt**  131:23
133:18
**receive**  23:5 25:19
31:13 37:13 38:16
42:24 45:12 55:17
72:23 88:24 90:2
98:12
**received**  12:24
19:20 28:4 29:19
31:3,7,9 56:15
64:19 66:10 67:20
67:22,23,24,24,25
68:2,4 87:4 88:23
89:16 90:17,24
106:13
**receiving**  28:4,5
29:8 39:24 40:12
44:9 45:2,13
66:13 83:15 88:23
89:18
**recess**  72:8
**recharacterize**
71:6
**recitation**  35:8
**recite**  91:16
**recognize**  5:4
**recognized**  103:20
105:1
**recollection**  55:21
**record**  1:25 3:15
4:6 7:6 18:12
47:23 48:22 49:1

60:13 71:16 81:10
81:18 114:19
131:17 132:8
**reduction**  109:5
**refamiliarizing**
30:6
**refer**  6:7,14 17:2
30:20 57:7 62:18
63:8 121:6
**reference**  23:7
27:19 34:23 47:18
56:7 59:15 62:12
63:6 66:13 75:8
129:17
**referenced**  59:16
76:4 133:6
**references**  27:5
29:20 34:20
**referencing**  83:1
**referred**  46:11
89:4 97:7 120:18
**referring**  28:1
35:6 42:2 46:16
54:7 55:9 58:13
61:20 62:13,21
99:10 122:15
**reflect**  9:2 18:12
48:22
**reflected**  125:18
**reflecting**  52:6
**reflection**  123:15
**reflective**  123:9
**refresh**  35:5 55:20
**reg**  20:12,22,23,24
20:25 21:14,17,18
21:20,21,22 22:1,8
22:19,21,23 23:4
23:20 24:24 25:13
25:15,19 26:21,25
27:7 30:6 36:2,3
49:20,21 50:13

52:18,25 58:6
61:10,16 62:1,2,4
62:5,5,8 68:5
70:16,25 72:14,23
73:1,5,13,14,17
74:1,7,8,9,12,22
74:23 75:7,18
76:2,13,14 77:2,6
77:12 78:4,9,13,18
78:21 79:16 91:22
93:22 95:11,18
96:11,19 97:7
99:4
**regard**  20:24
**regarding**  33:9
34:22 36:16,18
42:10 72:14
**register**  24:9
49:23 57:1
**registered**  24:8
25:10 58:5
**registering**  23:7
23:12,18 24:1
25:7
**registration**  24:11
24:13 25:23 26:15
132:17
**regular**  42:21
**regulated**  96:24
**regulation**  22:16
70:14 77:11 79:20
84:9 94:24
**regulations**  53:4
53:10 55:10 72:2
**regurgitating**  68:3
**relate**  54:8
**related**  21:2 30:22
31:1 59:20,20
81:23 132:5
**relates**  19:25

**relative**  72:14
94:20 132:7
**relatively**  118:9,15
119:20,23 120:8
**release**  59:11
101:1,5 102:4
103:4,17 104:14
104:19 105:1,16
106:3,7,20 107:23
108:19 109:10,13
109:16,19,24
110:16 119:5
**releases**  105:13
109:21
**relevant**  38:6,19
39:9 47:4 60:4
79:1 91:25 111:8
113:2
**relied**  31:24 91:3
**rely**  71:5
**relying**  22:16
23:23 25:24
105:20
**remain**  41:7
**remained**  109:11
**remaining**  34:12
61:8
**remains**  118:9,14
**remember**  9:11,11
9:16,18 10:13,13
40:5 54:22 58:10
66:9 68:11,18
129:22
**remembering**  8:17
**remove**  50:8 94:17
95:13,18
**removed**  24:4
26:12,17,19,20
27:13 50:4,6
90:17 95:25 97:9
99:15,16 100:19

removes 95:16
removing 23:13
  24:2,8
render 5:15 43:8
  65:7 72:20 92:25
  93:5 99:2
rendered 18:4
  21:9
rendering 20:19
  29:15 41:23,24
  100:9
rendition 45:10
repeat 23:15 47:21
  49:2 51:8
repercussions
  128:10
rephrase 15:12
  52:21 73:7 81:21
  83:8 95:12 105:21
  114:22 126:11
report 3:14 4:25
  5:8,12,15,18,21,23
  5:25 7:9,14 16:16
  16:18 17:16,18
  18:3,7,16,18,19,23
  19:11 20:14,21
  22:18 23:1 24:16
  24:18,19,22 25:11
  25:17 27:2 28:20
  28:21,23 30:4,12
  30:14 31:11 32:1
  36:15 41:19 42:20
  43:9 45:19 48:18
  49:9 50:11 51:1,4
  54:1,3,20 55:4,14
  57:5 58:5 62:11
  66:2 70:10 72:9
  73:19,20 75:16
  77:1 82:21 84:1
  84:25 96:2,4
  99:18 102:20

117:24 121:18,21
  124:18
reported 1:21
  26:14 38:1 96:25
reporter 131:13
  132:15
reporter's 3:7
  4:19 131:6
reporting 97:12
reports 37:3 43:10
represent 76:25
representation
  128:20
representations
  126:7 127:9
represented 59:7
requested 131:21
  132:2
require 21:18,19
  21:22 22:14
required 14:11
  24:7 45:25 47:13
  55:22 61:9,16,18
  61:23 62:2,3,4,5
  70:12,16 71:3,23
  72:3 73:1,13 74:9
  74:12,22 75:18,21
  77:6 94:24 95:2,8
  135:13
requirement 22:8
  24:6 26:24 27:15
  36:10 77:14 78:9
requirements 21:3
  21:17,21 26:16
  30:5 50:13 74:21
  74:21 75:6 76:15
  77:2 79:17 95:19
  125:23
requires 23:21
requiring 21:20

requisite 74:25
research 17:19,21
  27:4 30:2,2,7 55:3
  57:22
researching 30:5
respect 10:10
  20:11 49:16 75:21
response 69:23
responsibilities
  8:3,22
responsible 50:16
restart 121:5
restricted 23:5
  25:19,20,25 26:3
  55:12,16,21 56:10
  57:23 94:21 115:6
  124:1,6,8
restricting 50:12
restriction 21:24
  22:4,21 23:13
  24:2,4 26:1,6 50:2
  56:1,22 75:24
  77:13 97:7,10
  98:5,7 99:11,12
restrictions 21:22
  26:6 49:19,20
  50:3,8 57:1,7,25
  68:21 69:6,18,19
  69:25 70:6,10
  72:14 76:2 77:5,6
  77:16 87:25 88:4
  89:18 93:2 95:25
  96:11 98:1
restrictive 22:9
  23:21 24:13,23,25
  25:14 26:24 27:15
  55:18,22 58:3
  59:5 70:7 74:12
  94:17 95:14
restroom 71:20
  72:7

result 42:11 45:2
  88:21
resulting 27:23
  66:16
results 121:25
retained 19:22
  20:5,7
retainer 19:17
return 133:13,17
returned 131:23
  131:24
revenue 11:15
revenues 44:21
reverse 80:3 82:25
  83:12
review 18:22,23
  85:1 133:7
reviewed 5:25
  40:2 84:20,22,24
  85:4 117:16
reviewer 19:5
reviewing 5:2
rewarded 32:19
rif 11:13
right 24:17 25:8
  41:12,23 45:2
  55:24 56:16 59:6
  70:11 72:13 84:10
  86:10 101:25
  104:13 106:21
  107:13 110:20
risk 97:21
role 7:25 8:18
  10:15,16,23 11:9
  17:5,10 18:17
  19:4,5 33:4 52:3,5
roles 31:20 32:7
  33:4,13 34:6
roughly 13:1
  121:15

**rule** 21:3 23:4
25:10,18,22 26:25
53:6 95:12 131:20
**ruled** 85:23
**rules** 1:24 20:24
**run** 91:6 94:8,8,10
120:1
**running** 17:23
100:14
**runs** 121:24
**ryan** 8:18,19 9:1,2
11:10,23,25

**s**

**s** 2:1 19:3 58:5,17
59:4 68:5 70:12
70:13,18,21 71:23
134:3
**sale** 37:16 40:23
41:3 59:9
**sales** 44:17 128:1
**sam** 16:20 17:11
**samantha** 16:20
17:3,11,14,15
18:11,15,17
**samantha's** 17:5
**sarbanes** 11:5,8
**satisfied** 52:19
92:6
**satisfy** 52:24
**sausage** 121:25
**savvy** 120:18,23
120:25 121:2
**saw** 106:6 125:18
126:1 129:22
**saying** 25:9,25
26:17 33:17 62:8
70:18 73:14 74:6
77:12,22 78:6,18
78:20 79:15 87:17
88:19,25 90:4,21
92:21 99:2 101:6

104:2 105:4
107:24 112:14
114:9 116:25
122:11
**says** 19:21,22
22:24 23:3,17
25:20,24 26:23
27:21 29:25 30:19
31:12 34:10 46:23
55:12,16,20 61:16
62:16,23 64:5,6
67:15 70:11 76:7
77:10 78:1,11
79:6 80:1,15
86:12 92:18 98:12
114:5 127:25
**scale** 100:24
**sciences** 34:13
**scope** 19:21 24:17
27:22 76:21
**scrutiny** 129:3
**sec** 37:4 38:2 40:8
40:14 43:11 54:25
55:4 57:2,24
58:23,24,25 126:6
126:7 127:9,21
**second** 18:23,25
19:4,5 34:10
55:13 61:7 81:11
85:1 98:11 118:13
**seconds** 39:7
**section** 13:11,12
14:8 15:15,17
20:25 62:20
**sections** 20:25
**securities** 23:3,5,5
25:18,19 55:13,17
59:7,11 74:2
77:11 78:5,6,21
79:21 84:9 91:23

**security** 23:12,13
25:20,25 26:3,24
27:16 55:22
**see** 16:25 17:8
27:4,24 31:7
34:16 36:14 38:19
39:9 42:3 47:2
50:10,20 53:11
57:3,8,10,15 61:11
61:20 62:12,19
72:17,18 83:10
101:8 106:15
109:21 113:16
118:24
**seen** 38:3 54:13
**sell** 94:15 108:9
112:1 127:7
**seller** 36:22 37:7
124:20 125:16
126:17,23,25
**seller's** 127:6
**selling** 107:17
119:16
**senior** 8:1,19
**sense** 12:16 32:11
100:4 101:12
**sent** 93:6 133:14
**sentence** 34:10
45:23 46:14,16,21
61:8 78:3,11,15,19
92:18 98:11
118:13
**separate** 15:17
**september** 4:25
118:10,15 119:7
119:14
**serious** 128:9,12
**seriously** 39:5
**seriousness** 126:24
**services** 13:11
15:15

**set** 83:15
**settle** 112:12
**seven** 97:8 120:16
**share** 9:24 10:4
13:4,5 17:22 22:9
23:21 24:1,2 30:8
30:10 39:9 48:6
57:20 59:19,21
61:9 69:9,11,12,14
69:15 81:3,9 86:7
87:13 90:18 97:6
102:13 103:6
108:14 110:9
112:22 113:4,12
114:6 118:9,14
119:3,8,14,17,20
119:20,20 120:16
120:17 121:8
**shared** 111:12
**shareholder** 41:5
41:8,13
**shareholders** 41:2
44:4,5
**shares** 8:12,25 9:8
9:21,23 10:14,19
11:21 12:21 20:11
21:5,12,16,17,23
22:2,6,19,22 24:5
24:8,9,10 26:5,13
26:13,14,17,21
27:7,11,12 28:4,5
28:7,8,9 29:8,18
31:17,19,20 32:3,5
32:7 36:2 37:19
38:4,14,14,20
41:16,17 42:7,12
42:21,21,22,24
43:2,4,21 44:9
45:2,9 46:23 47:1
47:14,15,18 48:3,8
48:9,11,15,16,20

49:5,8,10,11,12,13
49:16,18,19 50:3,5
50:8,9,12 52:22
53:1 56:5,10,15,20
57:8,14,17,23,25
58:16 59:3,4
60:17,21,24 61:3,5
63:1,3,7,15 64:11
64:16,19 65:2,9,14
65:22,25 66:4,9,13
66:24 67:1,7,7,8
67:13,17,24 68:1,4
68:5,6,7,15,17,21
69:5,14,17 70:12
70:13 72:23,25
73:4,11,14,16,24
74:1,3,8,25 75:17
76:7,17 77:4,12,15
77:16,20,24 78:3,4
78:7,13,18,19,20
78:24 79:4,6,9,12
79:19 80:11,16,17
80:25 81:1,7,8
82:8,13,14,19 83:2
83:7,10,13,16,18
84:6,7,14 85:11,16
85:24 86:2,6,17,20
86:22 87:1,4,8,10
87:16,18 88:4,6,7
88:8,10,11,14,17
88:18,23,24 89:18
89:24 90:6,9,9,10
90:12 91:20,22
92:4,7,8,20 93:6,9
93:13,17,19 94:1,4
94:5,15 95:1 96:5
96:6,10,11,13,14
96:17,25 97:3,22
97:23 98:23,24
99:3,14,21 100:15
100:23 101:1,9

102:7,8,10 103:6
103:10,12,18,24
104:3,4,5,5,7,11
104:18,22,25
105:12 106:12,13
106:13 107:2,6,16
108:4,10,17,21,24
109:2 110:6
111:22 112:20,24
113:10,25 114:2,4
114:6,10,12,12,24
115:3,6,7,21,24
116:6,16,20,25
119:12 120:23
121:9,11 123:11
125:2,4
**sheet** 133:11
**sheets** 126:1 127:4
**shorthand** 1:22
  131:13 132:15
**show** 46:7 62:19
**showed** 43:9
**shows** 43:12 110:9
**shut** 12:7,8
**sign** 133:12
**signature** 3:6 5:6
  131:20,25 132:14
**signed** 60:6 133:20
**significant** 68:17
  68:17,19 87:9
  102:14 106:7
  107:23 115:19
  117:3,4,6 118:3
  126:4 128:14
**significantly**
  103:25 109:2
**similar** 33:22
  61:23 122:5
**simple** 82:7
**simplified** 21:15

**simply** 80:22 90:4
  103:24 114:23
**sir** 98:9
**sit** 32:24
**sitting** 23:9
**situation** 56:12
**situations** 56:23
**six** 23:6 25:21
  26:10 49:22 63:3
  93:14,16,22,24
  94:2,10 95:20,21
  95:22 96:3,17,24
  97:15 98:4 99:5
**skill** 105:8
**slice** 87:22 88:12
**small** 73:10
  118:17
**software** 11:18,20
  121:22
**sold** 23:6,17 81:24
  110:1,25 112:22
  115:3 118:4
  119:13
**sole** 94:16
**solely** 97:7
**solutions** 1:22
  132:16 133:23
**somebody** 116:12
**somewhat** 37:24
**sorry** 18:8,10
  29:24 30:17 39:11
  60:9 80:2 92:17
  105:20 112:15
  113:22 118:12
  121:5
**sort** 17:21 123:18
**sounded** 40:12
**sounds** 128:21,21
**source** 27:15 54:4
  54:5

**sources** 30:13 54:8
**southern** 1:1
  131:1
**southlake** 4:9
**speak** 32:6 52:3
  114:20
**specific** 8:14,17
  13:6 14:16,17
  15:3,4 20:25
  22:15,23 28:24
  29:2 44:3 45:5
  52:4 56:7 78:7
  83:1 128:18
**specifically** 9:12
  9:17 10:14 17:9
  19:8 21:16 23:10
  32:2 42:1 62:2
**specificities**
  129:23
**specificity** 20:8
  33:25 128:25
  129:1
**specified** 128:19
**specifies** 83:11
  92:2
**speculation** 89:12
**speculative** 69:23
**spell** 16:24 17:1
  19:2
**spike** 108:7,10,11
  108:13,18 119:23
  120:15
**split** 80:3,8,12,15
  80:17,22,24 81:3,5
  81:7 82:1,5,8,10
  82:10,11,17,25
  83:12,19,20 84:6
  84:14 85:10 91:14
**spoke** 39:2 52:2
**staff** 12:18 16:19

| | | | t |
|---|---|---|---|

stagnant 110:8
stamped 55:18
standard 36:21
standards 21:7,13
standpoint 17:19
  39:20
start 6:17 86:13
  91:16 94:9
started 6:25 109:1
  109:2
starting 71:24
  106:14
starts 61:8
startup 12:1
state 1:21 4:5
  41:19 64:25 72:15
  84:3 131:13
  132:15
stated 1:25 47:25
  49:1 119:22
statement 21:4
  48:14 65:24 71:16
  72:24 76:24 78:22
  79:18 80:5 83:3
  94:20 95:5 98:10
  118:11 119:22
  128:5
statements 4:21
  6:19,21 35:16,21
  53:5 127:11,15
  128:14 129:5
states 1:1 59:7
  131:1
static 88:20 89:25
stayed 101:2 102:5
  119:23
stays 88:19
step 85:25
stick 122:19
stock 9:21 13:5
  17:23 18:5 24:23

24:25 25:7,15
26:1 33:18 47:1
50:15,16 52:14
58:24 59:1 64:4
68:14 69:5,20
73:25 80:3,8,11
81:20,23,24 82:25
87:6 90:5 91:20
94:21 95:14 97:19
97:20 101:2 102:5
103:25 109:7,8,11
109:17,23,25
110:11 111:5
113:7,10 114:23
115:25 116:3,7
118:3 119:2,7,13
120:4 123:16
124:1,6,8 125:8,22
125:25 126:5
127:10,18,22
128:21
stocks 9:23 25:10
34:14 51:12
113:19
stop 71:13
street 132:17
strike 56:3
structure 36:8,11
37:10,25
studied 13:8 26:10
study 38:13 44:17
44:22 69:1
stuff 17:24 18:5
127:19
styled 1:18
subject 25:15
26:25 40:1 56:21
59:8 69:2 80:11
94:6
subpoena 111:16

subscribed 132:11
135:14
subsidiary 36:12
36:20 37:17 40:25
41:1,10,10
substantive 18:1,3
substitute 127:25
successful 32:18
suffered 42:10
45:1 84:2 98:13
suggest 24:22
suggesting 87:16
suite 1:23 2:9
132:17
sum 42:9
summary 42:3
54:17 72:10 95:6
summation 31:23
super 41:16,17
42:7,11,20,24 43:1
44:9 48:12,15
49:7 50:15 51:11
52:13 125:7
supervised 18:2
support 12:19
supported 28:25
supporting 79:7
supports 75:16
77:3
supposed 48:1
51:11 57:20 61:18
61:19 77:21 82:12
92:5 99:3 126:4
sure 19:8 52:4
55:8 58:25 65:15
67:22 76:4 101:24
106:17 124:16
sustained 27:23
sworn 1:18 4:3
131:16 132:11
135:14

t 16:21 134:3,3
table 76:5 106:15
tables 17:22,24
18:5
take 5:1 13:22,23
14:9 16:16 35:1
44:20 55:4 65:17
65:17 87:24 90:12
97:20 100:13
104:11 113:23
121:8 124:15
taken 1:18 4:10
14:4 132:7
talk 4:20 18:15
39:4 77:1 78:17
112:12,16
talked 20:23 31:16
32:20 33:24 39:6
48:17 49:21 50:13
52:5,8,10,11 65:25
67:16 72:13 95:3
talking 6:3,8 9:23
9:24 30:9 48:14
49:9 73:18 76:4
80:6 83:15 99:20
127:20
talks 25:7 105:23
tanking 109:7
target 10:7
targets 9:17,18
10:6
taught 16:11
technical 19:6
technology 44:18
44:19,19
tell 4:14 7:5,20
31:24 48:23 98:6
110:1,25 126:3
telling 129:18

**tells** 95:17
**ten** 19:17,19,20
  89:2,5 111:22
  123:12
**term** 47:6,9 62:6
  120:25 122:3,14
  126:1 127:4
**terminology**
  122:16
**terms** 6:3,4 19:18
  59:12 72:16,21
  75:2 76:8,18,20
  79:7,9 92:5,9,10
  93:10 96:15
  122:13,18
**terrell** 1:20 131:12
  132:14
**terry** 1:9,15 3:4
  4:2,7 131:8,15
  133:5 134:2,24
  135:2,4,12
**test** 13:18,22,23
  14:3,4
**testified** 4:3
**testifying** 7:1
**testimony** 8:8,24
  11:1 37:2 40:7
  45:7 71:5 80:6
  119:19 123:25,25
  124:12 125:18
  131:17 133:9,18
  135:8
**testing** 13:25
  14:25
**tests** 13:13
**texas** 1:21,23 4:9
  12:10 131:13
  132:15,18
**thank** 16:15 46:9
  72:6 79:25

**theory** 108:9
  116:13 117:24
  126:21
**therapeutics** 1:17
  2:2 6:11,15 20:1
  28:15 51:20
**therefor** 132:1
**thing** 4:12 9:5 75:4
**things** 5:19 12:2
  17:19 32:12 33:3
  43:17 51:3 60:22
  79:15 92:2,3 96:8
  97:20 114:17
  127:4
**think** 8:13,14 9:3
  9:9 12:22 18:11
  19:3 20:6 21:15
  21:25 25:3 27:2
  29:14 31:22,22
  34:23 36:17 38:24
  41:25 45:4 49:12
  53:4,16 55:25
  56:17 58:24 60:10
  62:13 65:5,5,24
  70:22 76:3,23
  77:3 79:1,3 85:12
  91:8 92:12 98:2
  100:10 103:10
  114:17 115:22
  119:22 124:4,7
  126:8
**thinking** 48:25
  62:7
**thinks** 71:9
**third** 2:4 120:5
**thornton** 9:4,6,8
  11:24 12:3,4
**thought** 18:8 21:1
  64:23 81:15 110:7
  110:8 113:22,23

**three** 45:17 58:20
  92:24 99:24 102:1
  120:4
**throckmorton**
  132:17
**tied** 89:9 108:18
  108:19
**time** 5:24 8:13
  13:1 24:7 26:8
  30:11,11 31:19
  34:11 37:3 43:17
  43:18 44:6,15
  45:6 58:1,21 67:6
  69:14 81:2 88:17
  90:19,24 95:20
  96:12 97:12,15
  98:1 99:8 100:6,7
  100:24 101:3,5,18
  101:19 102:1,7,9
  102:11,13 103:15
  103:19,21 104:13
  104:19,25 107:21
  107:22 108:5
  109:12,19,22
  110:2,9 114:3
  115:20,22,25
  116:17,19 121:9
  121:10,15,16
  123:3,5,21 125:16
  126:16 127:19
  129:2,6 130:1
  133:19
**timed** 70:3
**timeframe** 133:8
**timeline** 47:12
  50:11
**times** 7:10 45:17
  69:9 75:14 78:2
  78:15 86:6 90:6
  114:6,24 115:24
  116:6

**timing** 44:19,20
  60:19 61:4 79:14
  81:20
**tina** 1:20 16:21
  17:3,12 18:7,8,9
  18:10,11,13
  131:12 132:14
**tina's** 17:10
**titled** 4:24
**today** 5:12 6:4,15
  7:4 14:3 23:9
  24:17 69:2 74:14
  82:13 85:24 87:18
  102:19,21 116:22
**today's** 100:3,20
  101:8 104:6,9,16
  107:22 116:23
**told** 11:17 32:14
  56:16 57:21,22
  58:2,7 75:13
  91:24 110:20,21
  110:22 122:25
**top** 16:25 27:21
  62:13
**topic** 35:22 48:13
**total** 42:9
**tradable** 22:2,12
  22:20 26:18 27:12
  49:21 60:17 93:6
  93:14 96:6,12,18
  96:25 98:23,24
  99:5 103:12 104:6
  104:7,25 107:3,6
  112:11 113:20
  116:17,20
**trade** 10:20 27:9
  27:10 33:18 49:24
  57:2 60:20,24
  61:2 64:3 69:10
  69:24 94:1 95:24
  96:10 100:22

102:8 103:19,22
104:3 105:23
106:14 107:20
108:4,5 109:5
113:11,22,25
114:1,4 116:5,22
116:24 117:1
123:12 124:2
**traded**   8:12 9:1,8
11:21 12:21 22:3
22:7 25:21 26:5
68:22 69:15 90:25
93:22 94:4 100:3
100:23 101:1,9,19
104:18 105:5,24
108:21 110:10
111:14,18 112:24
114:7,13,18
115:12,15,20
116:3 117:1 121:9
**trader**   101:12
105:8 110:13
112:3
**trades**   100:7,21
105:7 112:8
114:11
**trading**   30:10 32:7
33:10 56:10 57:24
64:2 70:4 90:5
101:14 103:15,16
109:1 111:4 112:4
118:4 119:2,8
121:11,12
**trail**   60:10
**training**   12:23
14:10 32:25
**traits**   32:14
**tranche**   67:18
106:19
**tranches**   67:17
74:1 93:17 106:19

**transaction**   46:24
83:7,9 91:18
**transactional**   83:5
**transactions**   83:4
83:6 89:10 101:22
**transcribe**   53:18
**transcript**   131:16
131:24 133:6,20
135:5,8
**transfer**   63:2 67:3
67:6 69:6 94:17
95:16,17 98:6
112:19
**transferability**
81:20
**transferred**   65:19
65:20
**treated**   64:9 83:19
**treatise**   105:22
117:8 127:24
128:3,11
**treatises**   91:2
**trend**   101:16,17
**trial**   123:25
**tribunal**   124:13
**tried**   41:18 58:18
**trigger**   68:20
**troubles**   12:6
**true**   35:2 94:20
123:9,10,17 128:8
131:17 135:8
**try**   66:22 70:22
**trying**   9:9,10
24:21 29:5 31:22
32:10 36:16 47:7
49:12 58:18 62:3
63:20 65:6 66:9
66:23 73:6 74:10
74:16 75:19 76:12
76:24 77:18 78:17
78:22 79:2,11,12

88:10 92:24 93:5
93:7,8,21 99:1
102:19 107:14
113:5,18 116:6
125:5,7 127:16
**turn**   57:5 72:9
119:11 124:17
**turning**   34:9 94:13
**twice**   45:17
**two**   16:19 26:16
29:2 34:12 49:6
67:1 74:1 92:23
95:18 96:7,8,13
114:17 120:5,11
128:18
**type**   13:7
**types**   33:3
**typically**   21:24
22:3 36:9
**typing**   53:14
**typo**   106:18
**typos**   5:19,21,22
61:12,13,14

**u**

**u**   19:3,3
**uh**   124:23
**ultimately**   11:19
47:14 67:12 75:24
88:25
**uncertainty**   97:23
**underneath**   17:14
**understand**   4:13
6:8 24:21 36:7,8
36:10 48:13 53:24
53:25 66:14,15
101:24 103:13
109:14 112:15
122:7
**understanding**
29:4 58:12 59:20
60:7 63:7 65:18

65:21 66:24 95:22
**understood**   4:15
75:8
**unit**   64:8
**united**   1:1 131:1
**unreasonable**
103:11
**untrue**   128:13
**unusual**   102:22
**usable**   49:20 50:5
97:3 99:17 100:16
100:16 107:21
**use**   20:22 28:8
36:6 50:12 71:20
72:7 81:3 97:22
99:8 101:6,7
121:5 122:14,20
122:21
**useful**   124:20
**users**   26:4,4 27:11

**v**

**v**   133:4 134:1
135:1
**valid**   39:7
**valuable**   105:17
**valuate**   38:9
**valuated**   38:9
**valuation**   6:17,19
6:23 8:25 9:8,15
9:20,22 10:19
11:20 12:20,23
13:2,9,11 14:7,9
14:13,24 15:3,4,5
15:8,15,21,24 16:7
16:13 19:7 36:9
36:13,23 38:9
41:6,25 82:19
85:10 87:3 100:11
104:15 125:15,16
**valuations**   7:2
9:10 124:8

**value** 6:20,21
17:22 29:5 36:19
36:24 37:7,8 38:7
38:10,15 39:24
40:16 42:19,21,23
43:1,3,9,10,13,17
43:19,20 44:1,4,6
44:7 45:6,8 69:20
81:3,4,9 82:13
84:6,14 86:1,7,7
87:10,22,23 88:10
88:12,19,22 89:21
89:22,23,23,24
90:1,2,3,13,22
96:10,15 97:4,5,6
97:11,21,25
100:19 103:6,20
103:21 105:2,14
105:19 106:8
108:14,24 109:2,5
109:10,20 113:7
114:10,12 116:7
120:5 121:8,12
122:17 124:19,19
124:21 125:2,5,7
125:10 126:13,15
126:15,22
**valued** 90:25
**values** 13:4 30:8
30:10 80:25 81:9
87:17 104:15
**valuing** 8:11 9:24
10:1,2,7,13 13:8
36:7 85:22 124:1
125:6
**various** 35:7
**vec** 1:3 131:3
**verbal** 4:20,21
124:24
**verbatim** 23:11

**verbiage** 106:20
106:24
**verify** 35:11,16
133:9
**veritext** 1:22
132:16 133:14,23
**veritext.com**
133:15
**versus** 5:10 53:14
97:8
**view** 101:21
**violation** 52:24
**visual** 119:1
**volatile** 118:19
119:24
**volatility** 118:21
118:24,25 120:1
120:10,12,13,14
120:15
**volume** 58:3
103:15,16 104:18
108:7,21,23,25
109:1,4,4,7,8
112:24 113:6
114:6,11,14,18
118:4 122:3,8,21
122:25 123:1
**volumes** 30:10
57:2,24 69:9,11,12
69:14,16 109:25
112:8 115:23
121:13
**voting** 41:16,17
42:7,11,20,25 43:1
44:9 45:2 48:12
48:16 49:7 50:16
51:11 52:13 125:7

**w**

**wait** 60:23
**want** 4:12 12:15
45:10 48:24 51:9

65:8 72:10 86:13
92:24,25 102:8
106:15,17 112:14
114:16 129:5
**wanted** 11:8 12:2
46:19 64:10,23
**waste** 8:7,23 10:18
10:25
**watching** 105:11
126:8
**way** 4:9 35:24
38:9 39:18 64:5
67:21 71:11 80:19
80:19,24 81:6
87:7 89:20 90:21
100:10 105:23
**we've** 7:3 49:7
50:13 72:13 74:14
74:21
**weeping** 4:9
**weight** 121:9
123:3
**weighted** 100:6
101:4 108:3 121:6
121:12,13,22
122:4,8,9,17,21,24
123:1,4,19 126:3
**went** 12:5 32:24
32:25 33:1 49:9
93:4 101:2 109:25
109:25 110:11,12
120:10
**wherewithal** 32:4
**whichever** 80:19
**william** 5:25
**willing** 36:21,21
36:22 37:6,7,7
38:11,12,16 39:21
40:10 44:5 97:20
124:19,20 125:15
125:15 126:17,17

126:22,22,25,25
128:4
**willingness** 127:6
127:6
**willow** 4:9
**wish** 39:8
**withdraw** 15:12
**witness** 1:16 3:4
51:7 81:16 131:15
131:18 133:8,10
133:12,19
**word** 28:22 75:15
**worded** 100:10
**words** 53:13
**work** 6:17,25 7:21
8:8 9:7,15 11:1,6
11:7 13:2,7,8,8,9
15:8 17:25 18:2
45:5 65:9 66:6
76:21
**worked** 16:17,19
32:11,21 33:15
**working** 4:8 12:11
33:13
**workpapers** 68:11
**works** 89:13
117:18
**worth** 10:8 86:6
87:19 114:15
132:18
**write** 53:8,17,21
54:1
**written** 16:9 42:13
54:17 62:23 63:4
64:5 82:23 84:15
**wrong** 60:10
106:21 107:10,11
**wrote** 18:22 30:12
54:23 84:10 94:14
98:15 102:20
118:14,20,20

| | |
|---|---|
| 124:22 | 71:4,9,11,13,14,15 |
| **x** | 71:17 73:18 74:4 |
| **xxx** 131:21 | 75:3,11 76:1 |
| **y** | 77:25 78:12 79:22 |
| **yeah** 9:20 13:21 | 80:13,23 81:10,14 |
| 18:10 66:3 68:7 | 83:21 89:7 93:15 |
| 73:22 77:9 109:16 | 95:15 98:8,18 |
| 113:10 118:20 | 99:25 101:23 |
| 119:24 123:14 | 104:1 105:9,25 |
| 127:1 129:22 | 107:18 111:6 |
| **year** 14:12,18 23:6 | 112:2 113:15 |
| 33:18 93:25 95:21 | 114:19,25 115:8 |
| 95:23 107:17 | 115:16 116:11,14 |
| **years** 13:2 111:23 | 117:11,14,19 |
| **york** 1:1 2:5,5,10 | 118:6 124:16 |
| 2:10 58:24 59:1 | 125:9,20 126:14 |
| 125:22,25 126:5 | 128:2,17 129:11 |
| 127:10,22 128:20 | 129:15,20 130:2 |
| 131:1 | 133:1 |
| **z** | **zimmer's** 51:15 |
| **zimmer** 2:8 15:11 | |
| 15:18 19:22 22:17 | |
| 23:14 24:3,15 | |
| 25:1,16 26:2 27:1 | |
| 27:17 28:12,19,24 | |
| 29:6,13 32:16 | |
| 33:20,23 34:5 | |
| 35:4,13 37:11 | |
| 38:22 39:1,6,13 | |
| 40:3,19 42:16 | |
| 44:2,10 45:3,16 | |
| 46:15 47:20 48:21 | |
| 49:17 50:17,21 | |
| 51:8,13,22 52:15 | |
| 52:20 53:12,18,22 | |
| 54:2 55:5,23 | |
| 58:14 59:17,25 | |
| 63:9 64:13,21 | |
| 65:4 66:18 67:14 | |
| 68:23 69:7,22 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.