# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**NAVIDEA BIOPHARMACEUTICALS, INC**
**V.**
**MICHAEL M. GOLDBERG, M.D.**

**CIVIL ACTION NO. 1:19-cv-01578-VEC**

**EXPERT REBUTTAL REPORT**
**OF**
**WILLIAM F. MURRAY, ASA, CPA/ABV, CFF**

Management Planning, Inc. ("MPI") was engaged by the law firm of Mintz & Gold LLP to provide expert services for Plaintiff Navidea Biopharmaceuticals, Inc. ("Navidea") and Third-Party Defendant Macrophage Therapeutics, Inc. ("Macrophage" or "MT") in the above captioned matter. MPI was asked to provide an analysis of and rebuttal to the Expert Report by Terry L. Orr, dated September 30, 2021 ("Orr Expert Report").[1]

This Rebuttal Report does not consider the merits of the claims or any counterclaims in this matter. Such consideration is beyond the scope of our retention as experts in this case. In addition, this Rebuttal Report is limited to the analysis and rebuttal of the Expert Report by Terry L. Orr. This Rebuttal Report does not address any other damage claims asserted in this matter.

## Qualifications

I am a Managing Director in the consulting firm Management Planning, Inc. My office is located in Westport, Connecticut. I am a Certified Public Accountant (CPA) licensed in the State of Connecticut, Accredited in Business Valuation (ABV) and Certified in Financial Forensics (CFF) by the American Institute of Certified Public Accountants and an Accredited Senior Appraiser (ASA) by the American Society of Appraisers. A copy of my curriculum vitae is included in this report as Addendum A.

---

[1] Expert Report by Terry L. Orr of HKA Global, Inc, dated September 30, 2021.

**Expert Rebuttal Report of William F. Murray**

**Other Matters**

Rate of Compensation – I am being compensated in this matter at my standard rate of $600 per hour, plus reimbursement of any direct expenses incurred. Our professionals working on this matter are compensated at the following rates:

$450.00 - $600.00 per hour – Senior partners and Managing Directors
$300.00 - $375.00 per hour – Senior professional staff
$175.00 - $250.00 per hour – Research analysts and other support staff

Conflicts – To the best of my knowledge and belief, neither I nor any partner or employee of MPI have had any professional, business, or personal dealings or relationship with the parties in this case prior to our engagement in this matter in the past three years.

Right to Amend Report – I reserve the right to amend this report if additional information comes to my attention or is presented to me that might further support, supplement, or otherwise change any facts or opinions expressed herein.

Exhibits and Summaries – The exhibits that I intend to use in connection with my testimony may include the exhibits cited in this report and any other exhibits that may be relied upon by Mr. Orr. I may also rely upon and use demonstrative exhibits and summaries that have yet to be prepared. I may also use a variety of other materials to summarize and support my opinions and testimony. These may include such things as equipment, models, studies, photographs, videos, animations, charts, drawings, or other demonstrative materials.

Documents Considered – In connection with the preparation of this report, the documents considered are listed in Addendum B.

**Expert Rebuttal Report of William F. Murray**

<u>**SUMMARY OF OPINIONS**</u>

Based upon my review of the materials described above and my knowledge and experience, it is my opinion that:

1. Mr. Orr speculates that Dr. Goldberg would hold his shares well after he was able to sell and time the market with precision by selling during the period when the stock traded at its highest level;

2. Mr. Orr failed to consider the thinly traded nature of Navidea's stock;

3. Mr. Orr claims that Dr. Goldberg suffered damages related to stock of Macrophage but does not provide any quantification of damages or valuation analysis to support his claim;

4. Mr. Orr fails to consider the fact that Dr. Goldberg claims that all shares should have been issued as of August 14, 2018; and

5. Mr. Orr fails to consider the value of the shares as of today as an offset to damages.

Mr. Orr also discusses restrictions on transfer imposed by operation of Rule 144 and Regulation D of the Securities Act of 1933 related to transfers by affiliates.[2]  Mr. Orr concludes that certain legends placed on the subject Navidea shares of stock are neither "authorized" nor "required" by Rule 144 and/or Regulation D.[3]  Such conclusion requires a legal opinion, which is beyond my area of expertise.

<u>**Background**</u>

I understand that the parties entered into an agreement dated August 14, 2018[4] (the "August 14th Agreement") whereby on a specified Closing Date (as defined in the August 14th Agreement): (1) Navidea would issue Michael M. Goldberg, MD. ("Dr. Goldberg") 23.5 million shares of Navidea common stock (18.5 million currently, and 5 million on January 2, 2019); (2) 10.0 million of these shares would be deposited into an escrow account and held as such for up to 18 months, and (3) Macrophage would issue Dr. Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT.

---

[2] Orr Expert Report, pp. 4-8.
[3] Orr Expert Report, p. 10.
[4] August 14th Agreement, effective August 14, 2018.

**Expert Rebuttal Report of William F. Murray**

I also understand that certain provisions of the August 14th Agreement were never consummated.[5] I am advised that 13.5 million shares of Navidea were issued to Dr. Goldberg on November 22, 2018, and an additional 5 million shares were issued on November 22, 2018, and held in escrow.[6] I am advised that Dr. Goldberg claims that all shares should have been issued as of August 14, 2018.[7]  I am also advised that the 5 million shares to be issued on January 2, 2019 were never issued.[8]

Navidea shares are traded on the New York Stock Exchange under the ticker symbol NAVB.  The August 14th Agreement indicates that upon the Closing Date, the Navidea shares would be issued subject to Regulation D of the Securities Act of 1933.[9]  I am advised that Navidea shares were considered restricted stock that could not be traded for six months and contained restriction language in the legend.[10]  I am advised that the legend was never cleared on the issued shares.[11]

On April 26, 2019, Navidea executed a 1 to 20 reverse stock split.[12]  As a result, the 13.5 million shares would be reduced to 675,000 shares and the 5 million share blocks would be reduced to 250,000 shares each.

**Mr. Orr's Report**

In his report, Mr. Orr: (1) calculates damages related to Dr. Goldberg's failure to receive Navidea shares ($5,675,250)[13] and (2) concludes that Dr. Goldberg was "damaged by Navidea's failure to issue the MT Super Voting Shares to Dr. Goldberg."[14]   However, Mr. Orr fails to provide a quantification of damages related to the MT Super Voting Shares.

---

[5] First Amended Complaint in *Navidea Biopharmaceuticals, Inc. v. Michael M. Goldberg*, ¶¶ 12-14, 94-95, 105, 109; Deposition of Jed Latkin, dated September 8, 2020 ("Latkin Dep.") at 262:23-25.
[6] Latkin Dep. at 119:18, 121:18, 256:7-8; 262:10-25; 263:8-9.
[7] *See* MT-DEL00022658-MT-DEL00022659 (e-mail from Dr. Goldberg to William Mower, dated November 1, 2018, attaching MG Plan Phantom Shares.xlsx).
[8] Latkin Dep. at 119:12-19, 121:19, 222:9-13.
[9] August 14th Agreement, effective August 14, 2018.
[10] *See* MT-DEL00071429-MT-DEL00071431 (Navidea Share Issuance Instruction Letter, dated November 20, 2018); Orr Expert Report, pp. 10, 18.
[11] Deposition of Jed Latkin, dated October 26, 2020 at 132:8-10; Orr Expert Report, p. 16.
[12] Navidea Biopharmaceuticals, Inc. Form 8-K dated April 26, 2019
[13] Orr Expert Report, p. 24.
[14] *Id.* at 25.

**Expert Rebuttal Report of William F. Murray**

In his analysis of the Navidea shares, Mr. Orr calculates damages under the various assumptions listed below:[15]

1. Shares are sold at the "earliest" opportunity, including 675,000 shares sold on May 21, 2019, 250,000 sold on May 15, 2020, and 250,000 are sold on June 25, 2020 ($2.2 million);

2. Shares are sold at the "highest stock price" ($5,816,250); and

3. Shares are sold on September 28, 2021 ($1.9 million).

Mr. Orr concludes that Dr. Goldberg would have sold his shares during a period when the shares reached their highest share price, between July 20, 2020 and August 7, 2020.[16]  As a result, Mr. Orr concludes on damages of $5,675,250 related to the Navidea shares.[17]

Mr. Orr does not provide any formal valuation analysis related to MT.  Mr. Orr cites two potential investments in MT that I am advised never came to fruition, including (1) one for a $10 million investment and (2) one for a $15 million investment in MT.[18]  The specifics of these potential investments are unknown.  Ultimately, Mr. Orr does not provide any opinion of value for the MT shares.

<u>**Analysis of the Mr. Orr's Report**</u>

It is my opinion that Mr. Orr's damages calculations as delineated in his report do not possess reasonable certainty for the following reasons further discussed in detail below:

1. **Mr. Orr speculates that Dr. Goldberg would hold his shares well after he was able to sell and time the market with precision by selling during the period when the stock traded at its highest level.**

In his report, Mr. Orr concludes that Dr. Goldberg would sell his shares

> "between July 20, 2020 and August 7, 2020, [when] shares reached a high price of $4.95 and a low price of $4.70. A savvy investor would have expected the share price to increase and sustain at a higher price after an announcement that triggers

---

[15] *Id.* at 21-22.
[16] *Id.* at 23.
[17] *Id.*
[18] *Id.* at 24-25.

**Expert Rebuttal Report of William F. Murray**

that volume increase; therefore, it is reasonable to assume Dr. Goldberg could have taken advantage of this higher share price and sold his shares for the higher end of the range of damages."[19]

This is highly speculative since Mr. Orr assumes that the "earliest" opportunity to sell shares occurs as follows: (1) 675,000 shares can be sold on May 21, 2019; (2) 250,000 can be sold on May 15, 2020; and (3) 250,000 can be sold on June 25, 2020.[20]   Moreover, Mr. Orr assumes that Dr. Goldberg would achieve near perfect market timing, having the foresight to hold his stock from May 25, 2019 for over a year and promptly selling the 500,000 shares of stock he assumes would be eligible for sale in May and June 2020 just a month later.  Mr. Orr does not cite to any support for his conclusion regarding the timing of sales and I am unaware of any empirical data or professional literature that suggests any person, much less Dr. Goldberg, can perfectly time the market to realize the maximum gains on publicly traded shares.

## 2.  Mr. Orr fails to consider the fact that Dr. Goldberg claims that all shares should have been issued as of August 14, 2018.

I am advised that Dr. Goldberg claims that all shares should have been issued as of August 14, 2018.[21]   Under this assumption, 13,500,000[22] shares would be available for sale on February 14, 2019 and 500,000[23] shares would be available for sale on February 14, 2020.

As a result, the shares would have traded as follows:

| Sale Date | **2/14/2019** | **2/14/2020** | |
|---|---|---|---|
| Number of Shares | 13,500,000 | 500,000 | |
| Price per share | 0.18 | 1.18 | |
| Market Value | 2,408,400 | 590,000 | 2,998,400 |

---

[19] *Id.* at 23.
[20] *Id.* at 21.
[21] *See* MT-DEL00022658-MT-DEL00022659 (e-mail from Dr. Goldberg to William Mower, dated November 1, 2018, attaching MG Plan Phantom Shares.xlsx).
[22] Number of shares prior to the reverse stock split that occurred on April 26, 2019.
[23] Number of shares after the reverse stock split. This assumes an 18-month escrow period.

# Expert Rebuttal Report of William F. Murray

Adjustment for Blockage

The term "blockage" is used to recognize that in some instances a large block of stock cannot be liquidated as quickly as a smaller block without causing a material impact on the trading price of the stock. A blockage discount is applicable where the subject block of stock is of a size that would be difficult to sell in the normal course of trading without causing material impact.

Navidea stock was very thinly traded on both February 14, 2019 and February 14, 2020. In addition, the subject interest represents a large portion of the outstanding shares traded:

| Trading Day | **2/14/2019** | **2/14/2020** |
|---|---|---|
| Total number of shares outstanding (traded) | 10,014,540 | 19,219,960 |
| Subject Interest | 13,500,000 | 500,000 |
| Percent of total shares | 134.8% | 2.6% |

A blockage discount should be applied since the sale of this amount of stock into the public market on the assumed trading dates would clearly be difficult, if not impractical. If enacted, a sale would almost certainly result in significant downward pressure on the price due to the sudden excess supply of Navidea common stock. These impacts are illustrated in the models described below.

I consider a private placement to determine the impact of blockage on the Navidea shares.

From time to time, shares in public corporations are sold in private transactions (*i.e.*, private placements), but are subject to trading restrictions. These private transactions enable one to compare the prices of shares that may not be immediately traded in the public markets (i.e., the restricted shares) with the prices of otherwise identical shares in the same company that may be immediately traded in the established public market. These transactions in restricted shares provide useful guidance as to the diminution in value arising from lack of liquidity.

**Expert Rebuttal Report of William F. Murray**

MPI developed a multiple regression model (the "MPI Restricted Stock Study")[24] based on private placements of restricted stock. The underpinning tenet of the MPI Restricted Stock Study is that one may model the observed private placement prices as a function of a number of statistically significant factors (or explanatory variables). These statistically significant factors are then be applied to client-specific data in a multiple regression analysis to predict a baseline discount that would be observed for a hypothetical private placement involving the subject shares. The MPI Restricted Stock Study is a generally accepted methodology used to value restricted stock.

Calculating the predicted discounts using the **MPI Restricted Stock Study** is a relatively straightforward multi-step process. The variables are defined below:

Blockage for February 14, 2019

- The estimated volatility is 82.2%, or the median volatility of a representative the one-year average volatility of Navidea stock;

- The twelve-month change in the S&P 500 was +1.7% as of February 14, 2019;

- The yield on the 30-year Treasury was normalized to 3.0%;

- The estimated market capitalization was $32.0 million;

- The holding period was 50.0 quarters;

- The assumed closing price was $7.50, or the average closing price in the dataset; and

- For registration status (a dummy variable), we assigned a value of 1 to represent their unregistered status.

Blockage for February 14, 2020

- The estimated volatility is 92.5%, or the median volatility of a representative the five-year average volatility of Navidea stock;

- The twelve-month change in the S&P 500 was +23.1% as of February 14, 2020;

- The yield on the 30-year Treasury was normalized to 3.0%;

---

[24] Ezra Angrist, Harry Curtis, III, Daniel Kerrigan, (2011) Regression Analysis and Discounts for Lack of Marketability. Business Valuation Review: Spring 2011, Vol. 30, No. 1, pp. 36-48.

**Expert Rebuttal Report of William F. Murray**

- The estimated market capitalization was $21.0 million;

- The holding period was 12.0 quarters;

- The assumed closing price was $7.50, or the average closing price in the dataset; and

- For registration status (a dummy variable), we assigned a value of 1 to represent their unregistered status.

*Holding Period*

Holding period measures the time necessary to dribble out the subject interest in order to avoid a material impact on the price of the stock.

In our regression analysis, we observed classified each transaction into one of four time periods, each of which corresponds with changes to Rule 144 under the Securities Act of 1933 ("Rule 144"). Rule 144 defines restricted securities as "securities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering." The time periods are as follows:

| Time Period | Years | Commentary |
|---|---|---|
| Time Period 1 | Pre-1990 | Required a minimum holding period of three years. |
| Time Period 2 | 1990 to 1997 | Reduced holding period by allowing subsequent purchasers to "tack" onto the holding period of the previous owner. |
| Time Period 3 | 1997 to 2008 | Shortened the minimum holding period to two years. |
| Time Period 4 | 2008 | Shortened the minimum holding period (for non-affiliates) to six months. |

We match the holding period to the subject interest to the appropriate holding period in our restricted stock analysis.

We estimated the holding period of the subject interest using the average daily trading volume for the four trading weeks prior to February 14, 2019. We assumed that Dr. Goldberg could dribble out 15% of the daily trading volume without impacting the price.[25] As a result, the holding period was calculated as follows:

---

[25] Based on experience, I understand that 10% to 15% of the daily trading volume is considered the maximum level of trading activity to avoid a material negative impact on the trading price of a stock.

**Expert Rebuttal Report of William F. Murray**

| | | |
|---|---|---|
| Daily Trading Volume | 27,156 | 115,164 |
| 15% of Daily Trade | 4,073 | 17,275 |
| Number of Shares | 13,500,000 | 500,000 |
| Quarters to sell | 53.0 | 0.5 |
| Years to sell | 13.3 | 0.1 |

*Blockage Discount for February 14, 2019*

To get the predicted price, we multiplied the inputs by the coefficients in the model specified earlier, summed the result, and then exponentiated it.  The predicted discount is found by the following calculation:

| Variable | Base Value | Inputs (In Natural Logs where Needed) | Coefficients | Comments |
|---|---|---|---|---|
| Log Guideline Company Volatility | | | | |
| Median | 82.2% | (0.20) | (0.1255) | We default to the volatility of Navidea stock |
| 25th Percentile | 0.0% | | NA | |
| 75th Percentile | 0.0% | | NA | |
| Log Market Cap Time Period I | 32 | 3.48 | 0.0755 | We use Time Period I, as closely-held securities are most |
| Log Market Cap Time Period II | 0 | NA | NA | similar to pre-1990 restricted stock transactions with regard |
| Log Market Cap Time Period III | 0 | NA | NA | to the potential holding period. |
| Log Market Cap Time Period IV | 0 | NA | NA | |
| Log Risk Free Rate | 3.00 | 1.10 | 0.1438 | Normalized risk free rate. |
| S&P 500: 12-month Change | 1.7% | 1.7% | (0.1498) | |
| Price to Book Dummy I | 1 | 1 | 0.1048 | Is price to book ratio > 0.0 and <= to 1.25? |
| Price to Book Dummy II | 0 | 0 | NA | Is price to book ratio >= of 1.250001 or <= 3.00? |
| Log Closing Price | 7.50 | 2.01 | 0.9954 | Average price from the study's dataset |
| Log Quarters to Sell Under the 1% Limit Rule | 12.0 | 2.48 N/a | | We default to 12 quarters, which is the median quarters |
| | 50.0 | 3.91 | (0.0357) | to sell variable of the dataset. |
| | 100.0 | 4.61 | NA | |
| Registration Status | 1 | 1 | (0.0835) | 1 = Unregistered. |
| Time Period I Dummy | 1 | 1 | (0.6942) | Use the Time Period I dummy variable to reflect |
| Time Period II Dummy | 0 | 0 | NA | the longer holding period due to size of block |
| Time Period III Dummy | 0 | 0 | NA | |
| Intercept | 1 | 1 | (0.2068) | Assumed to be 1 (We have not forced the regression |
| | | | | through the origin, but rather used the intercept as given). |
| **Sumproduct of Coefficients and Inputs** | | | **1.4289** | |
| **Predicted Price** | | | **4.17** | |
| **Predicted Private Placement Discount** | | | **44.3%** | |

**Expert Rebuttal Report of William F. Murray**

*Blockage Discount for February 14, 2020*

To get the predicted price, we multiplied the inputs by the coefficients in the model specified earlier, summed the result, and then exponentiated it.  The predicted discount is found by the following calculation:

| Variable | Base Value | Inputs (In Natural Logs where Needed) | Coefficients | Comments |
|---|---|---|---|---|
| Log Guideline Company Volatility | | | | |
| Median | 92.5% | (0.08) | (0.1255) | We default to the volatility of Navidea Stock |
| 25th Percentile | 0.0% | | NA | |
| 75th Percentile | 0.0% | | NA | |
| Log Market Cap Time Period I | - | NA | NA | We use Time Period IV, which represents |
| Log Market Cap Time Period II | - | NA | NA | a restriction period of 6 months |
| Log Market Cap Time Period III | 0 | NA | NA | |
| Log Market Cap Time Period IV | 21 | 3.06 | (0.0207) | |
| Log Risk Free Rate | 3.00 | 1.10 | 0.1438 | Normalized risk free rate. |
| S&P 500: 12-month Change | 23.1% | 23.1% | (0.1498) | |
| Price to Book Dummy I | 1 | 1 | 0.1048 | Is price to book ratio > 0.0 and <= to 1.25? |
| Price to Book Dummy II | 0 | 0 | NA | Is price to book ratio >= of 1.250001 or <= 3.00? |
| Log Closing Price | 7.50 | 2.01 | 0.9954 | Average price from the study's dataset |
| | 12.0 | 2.48 | (0.0357) | We default to 12 quarters, which is the |
| Log Quarters to Sell Under the 1% Limit Rule | 50.0 | 3.91 | NA | median quarters to sell variable of the dataset. |
| | 100.0 | 4.61 | NA | |
| Registration Status | 1 | 1 | (0.0835) | 1 = Unregistered. |
| Time Period I Dummy | 0 | 0 | NA | |
| Time Period II Dummy | 0 | 0 | NA | |
| Time Period III Dummy | 0 | 0 | NA | |
| Intercept | 1 | 1 | (0.2068) | Assumed to be 1 (We have not forced the regression through the origin, but rather used the intercept as given). |
| **Sumproduct of Coefficients and Inputs** | | | **1.8013** | |
| **Predicted Price** | | | **6.06** | |
| **Predicted Private Placement Discount** | | | **19.2%** | |

The predictive model for February 14, 2020 assumes a six-month holding period.  As a result, I adjusted the result downward by 50% to reflect the difference between the model and the calculated holding period.

11

**Expert Rebuttal Report of William F. Murray**

---

<u>Value of the Shares</u>

We calculated the value of the shares as follows:

|  | 2/14/2019 | 2/14/2020 |  |
|---|---|---|---|
| Market Value | 2,408,400 | 590,000 |  |
| Blockage Discount | (1,068,011) | (56,738) | (1,124,749) |
| Value of Shares | $   1,340,389 | $    533,262 | $  1,873,651 |

### 3. Mr. Orr failed to consider the thinly traded nature of Navidea's stock.

Mr. Orr concludes that Dr. Goldberg would sell his shares at the height of the market, which is also a period that the stock traded at a very high volume.[26]  However, under his assumption that Dr. Goldberg would sell his shares at the "earliest" opportunity[27], Mr. Orr does not consider the size of the block of stock for sale compared to the thinly traded nature of the stock on May 21, 2019.

Assuming that Dr. Goldberg would be able to sell 675,000 shares on May 21, 2019, that number of shares represented 6.7 percent of the outstanding shares traded on the market.  Further, the average daily volume for the four weeks prior to that date was approximately 55,000 shares.  As a result, selling a block of 675,000 shares would depress the price of the stock.  To avoid such a price impact, the shares would need to be dribbled out over time.  Accordingly, the value of the shares on May 21, 2019 would need to be discounted to account for the time necessary to liquidate the large block of stock.  Mr. Orr failed to take this into consideration in his analysis.

---

[26] Orr Expert Report, p. 21.
[27] *Id.*

**Expert Rebuttal Report of William F. Murray**

---

On May 21, 2019, the subject interest represents a large portion of the outstanding shares traded:

|                                             | **5/21/2019** |
| ------------------------------------------- | ------------- |
| Total number of shares outstanding (traded) | 10,037,390    |
| Subject Interest                            | 675,000       |
| Percent of total shares                     | 6.7%          |

Under the assumption that Dr. Goldberg could dribble out 15% of the daily trading volume without impacting the price, the holding period was calculated as follows:

|                      | **5/21/2019** |
| -------------------- | ------------- |
| Daily Trading Volume | 54,631        |
| 15% of Daily Trade   | 8,195         |
| Number of Shares     | 675,000       |
| Quarters to sell     | 1.32          |
| Years to sell        | 0.33          |

   **4. Mr. Orr claims damages related to stock of Macrophage but does not provide any quantification of damages or valuation analysis to support his claim.**

There are three fundamental (generally accepted) approaches to valuing any business to a reasonable certainty; namely, (1) the asset approach, (2) the market approach, and (3) the income approach.

The asset approach involves the determination of the total asset value of a corporation or business and reducing that value by the amount of its outstanding liabilities.   An asset approach is

**Expert Rebuttal Report of William F. Murray**

appropriate for an asset holding company or an operating company that lacks profitability.  Mr. Orr does not apply the asset approach in his valuation of the MT shares.

The income approach involves projecting the future benefits of owning an asset (usually some measure of economic income such as cash flow, earnings or dividends) and translating those future benefits into value based upon the time value of money and the investment risks associated with ownership.  Mr. Orr does not apply the income approach in his valuation of MT shares.

The market approach uses comparisons between companies in the same general industry and the subject business to provide valuation guidance.  Comparisons can be made using public companies (the market approach – guideline company method) or recently acquired entities (the market approach – guideline transaction method).  While Mr. Orr suggests that he is applying the market approach in his valuation of MT shares, he has insufficient data to do so.

Instead of applying a comprehensive analysis of value using any of the three approaches, Mr. Orr cites two potential investments in MT that never came to fruition: one for a $10 million investment and one for a $15 million investment.[28] The specifics of the amount of share of MT related to these deals were unknown.[29]  In order for this information to be useful for valuation purposes, the person valuing the enterprise would need to know (1) the ownership interest acquired, (2) the type of ownership acquired (e.g., common or preferred), (3) any preferential treatment associated with the acquired ownership interest, and (4) any other benefits associated with the ownership interest, such as board seats, super voting rights, options to purchase additional ownership, and/or conversion features.

Mr. Orr speculates about the ownership interest that was contemplated in these investments.[30] However, no such information was known.  Moreover, Mr. Orr also assumes that the potential investors would take a common stock interest in MT.[31]  However, it is more likely that a potential investor would take a preferred interest, which has priority over common stock ownership interest.

---

[28] *Id.* at 24-25.
[29] *Id.*
[30] *Id.*
[31] *Id.*

**Expert Rebuttal Report of William F. Murray**

In fact, Mr. Orr ignores the fact that the initial investment in MT was done through preferred shares.[32]

Mr. Orr did not provide any further valuation analysis.  Ultimately, Mr. Orr does not provide any opinion of value for the MT shares.

### 5.   Mr. Orr fails to consider the value of the shares as of today as an offset to damages.

Mr. Orr calculates the stock price as of September 28, 2021, which is close to the date of his report, at $1,974,000.[33]  However, Mr. Orr fails to consider that if the restrictions were lifted on that date, then Dr. Goldberg would have shares worth $1,974,000.

As a result, based on Dr. Goldberg's claim that his shares should have been issued on the date of the August 14th Agreement, Dr. Goldberg would have no damages.

November 15, 2021

William Murray

---

[32] *Id.* at 3.
[33] *Id.* at 21.

ADDENDUM A
WILLIAM F. MURRAY
CURRICULUM VITAE

---

## SUMMARY OF QUALIFICATIONS

William F. Murray is a Certified Public Accountant (CPA) licensed in the State of Connecticut, Accredited in Business Valuation (ABV) and Certified in Financial Forensics (CFF) by the American Institute of Certified Public Accountants and an Accredited Senior Appraiser (ASA) by the American Society of Appraisers. He has over 35 years of professional experience, including more than 20 years of experience in business valuation, economic damages and forensic matters. Mr. Murray has been accepted as an expert witness in various state and federal courts as well as tribunals. His expert witness testimony related to business valuation matters and lost profits/economic damages matters. He has served as an expert witness in breach of contract, intellectual property infringement, marital dissolution and dissenting shareholder appraisal rights/shareholder oppression litigation.

## PROFESSIONAL EXPERIENCE

- Management Planning, Inc., Managing Director, 2019 - present
- BlumShapiro (acquired by CliftonLarsonAllen), Litigation and Business Valuation Group, 2012-2019
- Anchin, Block & Anchin, LLP, Litigation Support, Forensic and Valuation Services, 2005 to 2012
- Willamette Management Associates, Litigation and Valuation Services, 2004 to 2005
- Centerprise Advisors (UHY Advisors), Senior Manager, Litigation and Valuation Services, 2002 to 2004
- Gerber Scientific, Inc. (acquired by Lectra), Internal Audit, Finance Manager, 1995 to 2002
- Echlin, Inc. (acquired by Dana Corporation), Senior IT Auditor, 1993 to 1995
- Aetna, Inc., Senior Auditor, 1989 to 1993
- Travelers Insurance Company, Inc., Senior Auditor, 1986 to 1989
- Coopers & Lybrand (merged into PriceWaterhouseCoopers), Staff, 1985 to 1986

## EDUCATION

- B.A. Economics and Accounting, Washington and Jefferson College, Washington, PA, 1985
- Post graduate training in business law at the University of Hartford
- Advanced training in computer science at Pennsylvania State University

## PROFESSIONAL DESIGNATIONS

- Certified Public Accountant, in Connecticut (1992 to present)
- American Institute of Certified Public Accountants Accreditation in Business Valuation (ABV)
- American Institute of Certified Public Accountants Certification in Financial Forensics (CFF)
- American Society of Appraisers Accredited Senior Appraiser (ASA)

## PROFESSIONAL MEMBERSHIPS

- American Society of Appraisers
  - Former Treasurer, Second Vice President and President of the New York City Chapter

- American Institute of Certified Public Accountants
- Estate Planning Council of Lower Fairfield County
- Estate and Business Planning Council of Hartford
- Association of Corporate Growth (ACG), Connecticut Chapter
- Connecticut Bar Association, Associate (Non-Attorney) Member
- Fairfield County Bar Association
- Exit Planning Exchange (XPX), Connecticut Chapter

ADDENDUM A
WILLIAM F. MURRAY
CURRICULUM VITAE

---

## DEPOSITION TESTIMONY HISTORY

- MTM Transportation Inc. v. Board of Education of the Town of Newtown et al., Connecticut Superior Court, Danbury, Case No. DBD-CV-12-6010756-S. Provided expert analysis and deposition testimony, 2014.
- Greenspan v. Greenspan, Connecticut Superior Court, Bridgeport, FBT-FA16-6054669-S. Provided expert rebuttal analysis and deposition testimony, 2017.
- Iorio v. Iorio, Connecticut Superior Court, Stamford, FST-FA-15-6027047. Provided expert analysis and deposition testimony, 2017.
- Goodhue v. 3M Company et al., Massachusetts Superior Court, Middlesex, 16-2529. Provided deposition testimony, 2017.
- Dur-A-Flex, Inc. v. Dy et al., Connecticut Superior Court, Hartford, HHD-CV14-6049281-D, Provided expert analysis and deposition testimony, 2018.
- Grabe v. Hokin, Connecticut Superior Court, Stamford, FST-FA16-6028032S. Provided deposition testimony, 2018.
- PMG Land Associates, LP et al v. Welch-Rubin & Jacobs, LLC et al., Connecticut Superior Court, Milford, AAN-CV10-6002691-S. Provided deposition testimony, 2018.
- Greenspan v. Greenspan, Connecticut Superior Court, Bridgeport, FBT-FA16-6054669-S. Provided expert analysis and deposition testimony, 2018.
- Lewin v. Williams et al., Connecticut Superior Court, New Haven, NNH-CV17--6068210-S. Provided expert analysis and deposition testimony, 2018.
- Grabe v. Hokin, Connecticut Superior Court, Stamford, FST-FA16-6028032S. Provided expert analysis and deposition testimony, 2018.
- Automated Irrigation Controls, LLC, v. The Watt Stopper, Inc. and Legrand North America, Inc., The United States District Court, Southern District of New York, Civil Action No. 1:18-cv-02435. Provided expert analysis and deposition testimony, 2018.
- Hummock Island Shellfish v. Birchwood Country Club, Inc., Connecticut Superior Court, Stamford, FST-CV17- 6032344-S. Provided expert analysis and deposition testimony, 2019.
- Mohegan Lake Motors, Inc. v. Maoli et al., The United States District Court, Southern District of New York, Civil Action No. 7:16-cv-06717. Provided expert analysis and deposition testimony, 2019.
- Bruce Kirby, Inc., et al. v. Laserperformance (Europe) Limited, et al., The United States District Court, Connecticut, Civil Action No. 3:13-cv-00297-RNC. Provided expert analysis and deposition testimony, 2020.
- Fantis Foods, Inc. v. Letica Corporation, Superior Court of New Jersey Law Division: Bergen County, Docket No. BER-L-134-18, Provided expert analysis and deposition testimony, 2021.
- Fontana v. Fontana, Connecticut Superior Court, New Haven, NNH-FA19-6110219-S. Provided expert analysis and deposition testimony, 2021.

ADDENDUM A
WILLIAM F. MURRAY
CURRICULUM VITAE

---

**TRIAL AND HEARING TESTIMONY HISTORY**

- Antonucci v. Antonucci; Marital Dissolution; Connecticut Superior Court, Stamford/ Norwalk Judicial District, Case No. DN-FA11-4021429-S. Provided expert analysis and testimony at trial, 2014.
- MTM Transportation Inc. v. Board of Education of the Town of Newtown et al. Connecticut Superior Court, Danbury, Case No. DBD-CV-12-6010756-S. Provided expert analysis and testimony at trail, 2015.
- DiGennaro v. DiGennaro, Case No. FBT-FA16-6056616-S. Provided expert analysis and testimony at binding arbitration proceeding, 2018.
- Longbottom v. Longbottom, Connecticut Superior Court, Hartford, Case No. HHD-FA11-4058960-S, Provided expert testimony for Motion to Open Judgment, 2018.
- Greenspan v. Greenspan, Connecticut Superior Court, Bridgeport, FBT-FA16-6054669-S. Provided expert analysis and trial testimony, 2019.
- Grabe v. Hokin, Connecticut Superior Court, Stamford, FST-FA16-6028032S. Provided expert analysis and trial testimony, 2019.
- Billet v. Billet, Supreme Court, New York County, Manhattan, NY, Index No. 350090/13. Provided expert analysis and trial testimony, 2019.
- Clarke v Clarke, Connecticut Superior Court, Stamford, FST-FA17-6031321-S. Provided expert testimony for Motion to Obtain Expert Fees, 2019.
- Cohen v. Cohen, Connecticut Superior Court, Bridgeport, FBT-FA18-6079812-S. Provided expert testimony related to Defendant's income, 2019.
- Gowda v. Arrosoft Solutions, LLC et al., American Arbitration Association, Commercial Arbitration Action, Princeton, NJ, Provided expert analysis and hearing testimony, 2020
- Bruce Kirby, Inc., et al. v. Laserperformance (Europe) Limited, et al., The United States District Court, Connecticut, Civil Action No. 3:13-cv-00297-RNC. Provided expert analysis and trial testimony, 2020.
- Ludwig v. Ludwig, Case No. FBT-FA07-4022129-S. Provided expert analysis and testimony at binding arbitration proceeding, 2021.
- Dur-A-Flex, Inc. v. Dy et al., Connecticut Superior Court, Hartford, HHD-CV14-6049281-D, Provided expert analysis and testimony at trial, 2021.
- Lobsenz v. Lobsenz, Connecticut Superior Court, Bridgeport, FBT-FA19-6086736-S, Provided expert analysis and testimony at binding arbitration proceeding, 2021.

ADDENDUM A
WILLIAM F. MURRAY
CURRICULUM VITAE

---

**ARTICLES AUTHORED OR CO-AUTHORED WITHIN THE PRECEDING TEN YEARS**

- "Current Issues in Electronic Discovery," co-authored with Rolland Goss, Willamette Management Associates Insights, Summer 2004
- *"Adjusting the Restricted Stock Transactions to Estimate Marketability Discounts," co-authored with* Martin Greene, CPA/ABV, ASA, Business Valuation Update September 2012

**BOOKS, EDITOR OR CONTRIBUTING AUTHOR WITHIN THE PRECEDING TEN YEARS**

- <u>Valuing Professional Practices and Licenses: A Guide For The Matrimonial Practitioner</u>, Fourth Edition, Wolters Kluwer, Editor from 2017 to present.
- <u>Valuation of Specific Assets in Divorce</u>, Aspen Publications, 2010 - 2019 Updates, Editor of Business Valuation Chapters, Updated various chapters.
- <u>Valuation Strategies in Divorce</u>, Aspen Publications, 2010 - 2017 Updates, Updated various valuation chapters.

**PRESENTATIONS**

- "Valuation of Undivided Interests," presentation to American Society of Appraisers New York Chapter, March 9, 2010.
- *"Adjusting the Restricted Stock Transactions to Estimate Marketability Discounts,"* presented at New York State Society of CPAs Business Valuation Society Business Valuation Conference, May 20, 2013.
- "Estate Planning Basics," presented at American Society of Appraisers NYC Chapter Meeting, January 2012.
- "Expert Accounting Services," presented at Quinnipiac University Law School, September 17, 2014.
- "Taxation in Divorce," presented at the AAML CT Chapter Semi-Annual Conference, April 15, 2016.
- "Financial Statements and the Attorney," presented at Murtha Cullina, April 20, 2017.
- "2018 Tax Cuts & Job Acts for Family Law," presented at the Fairfield County Bar Association, March 2018.
- "The New Tax Bill and Its Impact on Family Law," presented at the Connecticut Bar Association, Family Law Section, October 2018.
- "Valuation Pitfalls," presented to the Connecticut Bar Association, Litigation Section, March 2019.
- "Valuation Pitfalls," presented to Pullman and Comley, Litigation Department, April 2019

ADDENDUM A
WILLIAM F. MURRAY
CURRICULUM VITAE

---

- "Planning to Protect the Client and the Family Business before and During the Marriage," panel discussion presented at The Connecticut High Net Worth Conference: Wealth Preservation & Business Planning Forum, June 2019.
- "The Impact of the Covid-19 Crisis On Family Law Practice: Business Issues," presented at the Fairfield County Bar Association, April 2020.
- Review of Tax Court Cases & the Impact of the Pandemic on Valuations of Closely-Held Companies & Partnerships, presented to Fairfield County Bar Association, September 2020.
- Business Valuations: The Nitty Gritty, Wisconsin Chapter American Academy of Lawyers, March 2021.

ADDENDUM B
DOCUMENTS CONSIDERED

1. Expert Report by Terry L. Orr of HKA Global Inc., dated September 30, 2021.

2. Agreement as of August 14, 2018.

3. First Amended Complaint in *Navidea Biopharmaceuticals, Inc. v. Michael M. Goldberg*, dated April 26, 2019.

4. Navidea Biopharmaceuticals, Inc. Form 8-K, dated April 26, 2019.

5. Deposition of Jed Latkin, dated September 8, 2020.

6. Deposition of Jed Latkin, dated October 26, 2020.

7. MT-DEL00022658-MT-DEL00022659 (e-mail from Dr. Goldberg to William Mower, dated November 1, 2018, attaching MG Plan Phantom Shares.xlsx).

8. MT-DEL00022396-MT00022398 (e-mail from Dr. Goldberg to William Mower and Faith Charles, dated November 9, 2018).

9. MT-DEL00071429-MT-DEL00071431 (Navidea Share Issuance Instruction Letter, dated November 20, 2018).

10. Post-Trial Memorandum Opinion, dated June 23, 2021, in Delaware Chancery Court action titled *Macrophage Therapeutics, Inc. v. Michael M. Goldberg*, C.A. No. 2019-0137-JRS.