**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
**William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021**

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTHERN NEW YORK
2

3  NAVIDEA BIOPHARMACEUTICALS, INC. CIVIL ACTION NO.

4                                    1:19-cv-01578-VEC

5      VS.

6

   MICHAEL M. GOLDBERG, M.D.          DECEMBER 6, 2021
7

8

9

10

11  DEPOSITION OF WILLIAM F. MURRAY, CPA/ABV/CFF, ASA

12

13

14

15

16

17  Reported by:   Wendy J. Leard
                   Registered Merit Reporter
18                 CSR # 39

19

20

21

22

23              HUSEBY GLOBAL LITIGATION

24                   huseby.com

25                 (860) 549-1850

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021                    Page 2

```
 1   APPEARANCES:

 2   Attorneys for the Plaintiff:

 3      MINTZ & GOLD LLP
           600 Third Avenue, 25th Floor
 4      New York, New York 10016
           (212) 696-4848
 5      kazan@mintzandgold.com
        BY: BARRY M. KAZAN, ESQUIRE
 6
     Attorneys for the Defendant:
 7
        ZIMMER LEGAL
 8         360 Lexington Avenue, Suite 1502
        New York, New York 10017
 9         (914) 402-5683
        gzimmer@gzimmerlegal.com
10      BY: GREGORY ZIMMER, ESQUIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2    ------------------------------------------------------

 3    WITNESS          WILLIAM F. MURRAY, CPA/ABV/CFF, ASA

 4    ------------------------------------------------------

 5    DIRECT EXAMINATION BY MR. ZIMMER                     5

 6    ------------------------------------------------------

 7    EXHIBIT             DESCRIPTION                   PAGE

 8    ------------------------------------------------------

 9    Defendant's Exhibit A, Expert Rebuttal Report
         of William F. Murray, ASA, CPA/AB, CFF           5
10

11

12              (The original exhibit was filed
                with the original transcript.)
13

14

15                    *  *  *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25
```

1              . . . Deposition of WILLIAM F. MURRAY,

2    CPA, ABV/CFF, ASA, taken on behalf of the

3    defendant in the hereinbefore entitled action,

4    pursuant to the Federal Rules of Civil Procedure,

5    before Wendy J. Leard, RMR, duly qualified Notary

6    Public in and for the State of Connecticut, held

7    at the offices of Halloran & Sage, 225 Asylum

8    Street, Hartford, Connecticut, commencing at

9    9:44 a.m., on Monday, December 6, 2021.

10

11              S T I P U L A T I O N S

12

13       It is hereby stipulated and agreed, by and

14   among counsel for the respective parties, that all

15   formalities in connection with the taking of this

16   deposition, including time, place, sufficiency of

17   notice and the authority of the officer before

18   whom it is being taken, may be and are hereby

19   waived.

20

21       It is further stipulated and agreed that

22   objections, other than as to form, are reserved to

23   the time of trial and that the reading and signing

24   of the deposition are hereby not waived.

25

1           It is further stipulated and agreed

2     that the proof of the qualifications of the notary

3     public before whom the deposition is being taken

4     is hereby waived.

5

6         (Defendant's Exhibit A was marked for

7           identification and is described in the index.)

8

9               WILLIAM F. MURRAY, CPA/ABV/CFF, ASA,

10    Deponent, having first been duly sworn, deposes

11    and states as follows:

12

13                    DIRECT EXAMINATION

14    BY MR. ZIMMER:

15      Q    Good morning, Mr. Murray.

16           My name is Greg Zimmer.  I represent

17    Dr. Michael Goldberg in this action.  I'll be

18    taking your deposition today.

19           I assume you've been deposed before?

20      A    A few times, yes.

21      Q    I actually see you've been deposed before.

22           So just a couple of ground rules.

23           Is there any reason you wouldn't be able

24    to understand the questions I ask today or give

25    answers accordingly?

1      A     No.

2      Q     Okay.  If, at any time, you don't

3   understand one of the questions, please ask me to

4   clarify.  I'll be happy to do it.  If not, it will

5   be assumed that you understood the question and

6   answered it accordingly.

7           If you can't hear a question, if you

8   mishear it -- if you think you misheard it, ask;

9   I'll be happy to repeat it.  Otherwise, it will be

10  assumed that you heard the question and answered

11  it accordingly.

12          That should do it.  We can deal with any

13  other rules as we go, but I'm sure you're pretty

14  much familiar with them.

15          If you need to take a break at any time,

16  that's fine.  I would just ask that you not take a

17  break while there is a question pending.

18     A     I understand.  Thank you.

19     Q     Okay.  I'm going to just ask you to hold

20  on to what's been premarked as Exhibit A.

21              MR. ZIMMER:  And here is a copy --

22              MR. KAZAN:  Thanks.

23              MR. ZIMMER:  -- for counsel.

24  BY MR. ZIMMER:

25     Q     It's turns out -- it looks like it's

1    missing the last two pages.  I don't intend to ask

2    anything about those pages.  I just want to make

3    sure the record is complete.

4          It's the last pages of the addenda.  So

5    the report is complete, and I'm going to ask you

6    about the report and possibly some of your prior

7    court appearances.

8    A    Okay.

9    Q    That portion of the exhibit is complete.

10         MR. KAZAN:  Off the record for a

11         second.

12         (A conversation was held off the record.)

13         MR. ZIMMER:  Back on the record.

14   BY MR. ZIMMER:

15   Q    Could you just give me a brief summary of

16   your educational background?

17   A    I have a bachelor of arts in accounting.

18   I took one graduate course in business law.

19   Q    Okay.  You made the right choice.

20   A    What do you mean?

21   Q    Going with the accounting.

22   A    I don't know about that.  I don't do

23   accounting anymore but . . .

24   Q    Okay.  How about your work history?

25   A    I started --

1    Q     Postgraduate, obviously.

2    A     Postgraduate, I started at a Big -- what

3  was then a Big 8 accounting firm.  From there I

4  went to an insurance company, another insurance

5  company, went to a manufacturer of auto parts, and

6  then from there I went to -- can I refresh my

7  memory?

8    Q     Sure, of course.

9    A     It's been a while.

10         I went to -- oh, Gerber Scientific, which

11  is here in the Hartford area.  After that, I went

12  to a company called Centerprise Advisors, which

13  became UHY Advisors, which was subsequently merged

14  to Markham.  And then, out of there, I went to

15  Willamette Management Associates and then went to

16  New York City to work for Anchin, Block & Anchin.

17         I left Anchin and went to BlumShapiro,

18  which is now CLA, I think.  I think they merged

19  with CliftonLarsonAllen last year.  And from

20  there, I went to Management Planning, Inc., where

21  I currently am.

22    Q     What kind of work were you doing at

23  Coopers & Lybrand?

24    A     At Coopers & Lybrand, I was a staff

25  accountant in audit.

1     Q     In audit?

2           And Travelers, it says, "Senior Auditor."

3           Did you only do audit work there?

4     A     At Travelers, I was part of the internal

5     audit team, and we mostly assisted with the

6     external audit.

7     Q     Okay.  At Aetna?

8     A     Aetna, I was internal audit also.  I did

9     more operational audits.

10    Q     Okay.  And Echlin?

11    A     Echlin was an automotive -- they actually

12    started -- I think they got bought out by Dana

13    automotive years ago.  They make after-market auto

14    parts, and I did IT audit for them.

15    Q     How does that differ from, you know,

16    financial auditing?

17    A     It's more looking at internal controls and

18    systems.  When I was at Aetna, part of the -- for

19    the last year I was there, I was on the special

20    projects team where we went out and looked at

21    building internal controls in the new systems,

22    because insurance companies tend to like to build

23    their own systems.

24    Q     Right.

25    A     So at that time they wanted to build

1    internal controls into the systems when they

2    developed it.

3         Q    And those were internal financial

4    controls?

5         A    Mainly, yes.

6         Q    Okay.  And was that the type of work you

7    were doing at Echlin?

8         A    At Echlin, I was looking at the internal

9    controls.  I was also looking at the IT system to

10   make sure they had controls around their IT

11   infrastructure.

12        Q    But, again, financial controls?

13        A    Financial and, you know, like, security

14   controls, change controls.  I mean, the whole IT

15   environment.

16        Q    Okay.  Not strictly focused on accounting

17   at that point?

18        A    That's correct.  Yes.

19        Q    Okay.  Gerber Scientific, what did you do?

20        A    Gerber Scientific, I went in as the IT

21   auditor, and I ended up doing special projects.

22   Most of my work there was special projects,

23   operational projects.

24             At one point, I became the controller of a

25   start-up subsidiary.  I ended up in accounting at

1   one point, and then I ended up in financial

2   reporting.

3       **Q    So you transitioned back into the**

4   **financial accounting through that -- in that job.**

5       **Is that right?**

6       **It sounds like you went in more**

7   **operationally, similar to what you were doing at**

8   **Echlin, and then ended up --**

9       A    I did a lot of things across the board at

10  Gerber.  I did a lot of operational stuff.  I did

11  a lot of accounting stuff.  I ended up in finance

12  reporting.

13      We ultimately ended up working on a

14  project team.  We had an SEC investigation at one

15  point when we were a public company, and I worked

16  on the team that worked with the outside

17  consultants.

18      That's kind of how I got into this

19  business.

20      **Q    Okay.  And Centerprise?**

21      A    Centerprise was -- since I worked at

22  Gerber, I did some M&A work at Gerber as well, so

23  I had that kind of background.  So that's kind of

24  where I got started in the litigation damage

25  support area, is Centerprise.

1    Q    Okay.  Do you remember whether you did

2    work on the valuation of public securities at

3    Centerprise?

4    A    I don't recall at Centerprise.  I know it

5    comes up on occasion.  It's come up a number of

6    times throughout my history, but I don't recall it

7    with specific firms.

8    Q    Okay.  Willamette Management?

9    A    Willamette is a boutique valuation firm.

10   That's all they do.  So I worked for a guy at

11   Centerprise.  He left and went to Willamette and

12   took me along with him.

13   Q    And that was in -- not a

14   litigation-related firm?  Was that more of a

15   business-related firm?

16   A    We did both business valuation and

17   litigation support, so we were -- I worked for a

18   guy who was an expert witness.

19   Q    Okay.  Any work on public securities

20   there?

21   A    Again, I don't recall that far back.

22   Q    Okay.  How about Anchin, Block?

23   A    Anchin, Block & Anchin is an accounting

24   firm based in New York City.  I worked in the

25   valuation litigation group.  I did business

 1   valuation, along with litigation support, there,

 2   so I worked for someone who was a testifying

 3   expert.

 4        Q    Okay.  Any publicly traded stock issues

 5   there?

 6        A    Yes.

 7        Q    Okay.  And then BlumShapiro?

 8        A    BlumShapiro is a public accounting firm

 9   based here in Connecticut.  I worked in New York.

10   I was commuting from Fairfield into New York, so

11   they caught me at a bad commute day.

12             And I -- at some point I ran the

13   litigation valuation group at BlumShapiro as a

14   partner.

15        Q    Okay.  Did you do public securities work

16   there?

17        A    There were also matters that involved

18   public securities at BlumShapiro.

19        Q    That you worked on?

20        A    Yes.

21        Q    Okay.  And then Management Planning, Inc.?

22        A    Management Planning, Inc., is a boutique

23   valuation litigation firm.

24        Q    Okay.  And what do you do there?  Is it

25   audits?

```
 1      A    I'm a managing director.  I'm basically
 2   the Connecticut office.  I do litigation and
 3   valuation for damage cases like this, divorce
 4   cases, shareholder disputes.  I do valuation work
 5   for shareholder disputes.  I do valuation work for
 6   trust estate matters.
 7      Q    Is it strictly litigation related?
 8      A    No.
 9      Q    Okay.  Do you think that your education
10   and work history qualify to you opine on the value
11   of publicly traded securities?
12      A    We've done it a lot.  It comes up a lot in
13   our practice, especially at Management Planning.
14      Q    Do you think your education and work
15   history qualifies to you opine on it?
16      A    Yes.
17      Q    Okay.  Are you offering any kind of an
18   opinion as to whether -- I'm going to refer to
19   "Mr. Orr" today and that's Terry Orr.  That's the
20   expert that's been engaged by Dr. Goldberg.
21           And you've reviewed his report, and your
22   report is actually -- you provided a report in
23   rebuttal to that report.
24           So when I speak about "your report," I'm
25   going to be talking about your rebuttal report.
```

1              Is that okay?

2      A      That's correct.

3      Q      Do you understand those terms?

4      A      I understand.  Thank you.

5      Q      So are you offering an opinion as to

6      whether Mr. Orr's background and education

7      qualifies him to offer the opinions in his report?

8              I understand that you take issue with, you

9      know, some of his methodology and some of his

10     conclusions and things like that, but are you

11     opining on the sufficiency of his education and

12     work history?

13                 MR. KAZAN:  Object to the form.

14                 THE WITNESS:  I have no opinion on

15             his background.

16     BY MR. ZIMMER:

17     Q      Okay.  First of all, I want to get down to

18     exactly what you're doing in the report.

19             Are you offering any opinion or rebuttal

20     regarding legends that were placed on shares of

21     Navidea Biopharmaceuticals, Inc., that were

22     purportedly issued to Dr. Golberg by Navidea?

23     A      No.

24     Q      Are you offering any opinion or rebuttal

25     regarding the use of antidilution provisions in

 1   contracts calling for the issuance of specific

 2   numbers of publicly traded shares?

 3      A    No.

 4      Q    Are you offering any opinion or rebuttal

 5   regarding the valuation of an award to Dr. Golberg

 6   of Navidea shares after it implemented a reverse

 7   stock split in 2019?

 8              MR. KAZAN:  Object to the form.

 9              THE WITNESS:  I'm only offering an

10          opinion based on Mr. Orr's methodology of

11          valuing those shares.  I have no comment

12          on anything else related to that.

13              MR. ZIMMER:  We'll come back to that.

14          We'll come back to that after we ask some

15          questions on the main opinion.

16   BY MR. ZIMMER:

17      Q    Okay.  In your report, you take issue with

18   Mr. Orr because -- this is a quote -- he "fails to

19   consider the fact that Dr. Golberg claims that all

20   shares should have been issued as of August 14,

21   2018."

22              How do you feel that affects his opinion?

23      A    He picks certain dates in his report, and

24   my opinion or my view is he should have --

25   Dr. Golberg indicated the shares should have been

1    issued on a certain date, which would have

2    triggered a time clock running.

3         So by choosing other dates, it doesn't

4    consider the fact that he -- Mr. Goldberg contends

5    that his shares should have been issued at the

6    date of the agreement.

7    Q    Are you offering an opinion that the

8    shares should have been issued on August 14, 2018,

9    under the parties' agreement?

10   A    No.

11   Q    You know, just by way of background,

12   Dr. Golberg, Navidea Biopharmaceuticals, Inc.,

13   which I'll refer to as "Navidea," and Macrophage

14   Therapeutics, Inc., which I'll refer to as

15   "Macrophage," entered into a three-party contract

16   as of August 14, 2018.

17        You're aware of that.  Right?

18   A    I'm aware that they entered into an

19   agreement.  Yes.

20   Q    Okay.  And I'm going to refer to that as

21   the "August 14 agreement."

22        Have you reviewed the agreement?

23   A    I have, yes.

24   Q    Okay.  So you're not offering an opinion

25   as to when Dr. Golberg should have been delivered

```
 1   shares under that agreement?

 2   A    No.

 3   Q    Okay.  Are you aware that the agreement

 4   provided for different time frames for different

 5   numbers of shares to be issued to Dr. Golberg?

 6   A    Yes.

 7   Q    Okay.  Did you see that the August 14

 8   agreement provides that the shares Dr. Golberg was

 9   to receive were to be issued pursuant to

10   Regulation D of the Securities Act of 1933?

11             MR. KAZAN:  Object to the form.

12             THE WITNESS:  I'd have to refer to

13        the agreement.  I do recall something

14        along those lines.

15   BY MR. ZIMMER:

16   Q    Are you offering an opinion as to whether

17   the shares issued to Dr. Golberg were issued in

18   conformity with Regulation D of the Securities Act

19   of 1933?

20   A    I am not.

21   Q    Are you familiar with Regulation D?

22   A    From a layman's point, but it's a legal

23   issue.

24   Q    Do you know whether Regulation D prohibits

25   immediate sale of securities issued to someone in
```

1    Dr. Golberg's position at the time he left

2    Navidea?  Are you aware that he was the CEO of

3    Navidea up until August 14, 2018?

4                   MR. KAZAN:  Object to the form.

5                   THE WITNESS:  That's what I recall.

6              But, again, the application of Regulation

7              D is a legal issue, and I have no opinion

8              on that.

9                   MR. ZIMMER:  Okay.

10   BY MR. ZIMMER:

11      Q    Did you see that there was a provision

12   prohibiting the sale of shares issued pursuant to

13   the August 14 agreement for six months after their

14   issuance?

15                  MR. KAZAN:  Object to the form.

16                  THE WITNESS:  I would have to look at

17             the agreement, but that's what I generally

18             recall.

19                  MR. ZIMMER:  Okay.

20   BY MR. ZIMMER:

21      Q    Did you incorporate that into your

22   opinions?

23      A    I incorporated that into my calculation.

24   Yes.

25      Q    Okay.  And how so?

```
 1      A    I took the date at which Mr. Goldberg

 2   assumed he should have his shares and we looked at

 3   six months later when he could trade those shares.

 4      Q    And you used August 14, 2018, as a

 5   starting point?

 6      A    Yes.

 7      Q    Are you aware that certain shares were not

 8   supposed to be issued until January 1, 2019?

 9              MR. KAZAN:  Object to form.

10              THE WITNESS:  Again, as I recall, I

11         took that into my analysis.

12              MR. ZIMMER:  Okay.

13   BY MR. ZIMMER:

14      Q    Are you aware that certain shares provided

15   for the August 14 agreement have never been

16   issued?

17      A    Yes.  I'm aware of that.

18      Q    Does your report provide an opinion on the

19   value of those shares?

20      A    We assumed they would have been issued

21   when they were supposed to be issued under the

22   agreement.

23      Q    Okay.  Do you know when they were supposed

24   to be issued?

25              MR. KAZAN:  Object to the form.
```

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 21 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 21

1              THE WITNESS:  I don't recall the

2         date.  I remember it's in the agreement,

3         and that's the date we used.  I don't

4         recall the exact date.

5              MR. ZIMMER:  Okay.

6   BY MR. ZIMMER:

7      **Q    But it didn't affect your opinion that**

8   **they were never, in fact, issued?**

9      A    No.

10     **Q    Okay.  Did you see that the August 14**

11  **agreement provides for 10 million shares to be**

12  **placed into an escrow account that would be**

13  **released under certain conditions set forth in the**

14  **agreement?**

15             MR. KAZAN:  Object to the form.

16             THE WITNESS:  Yes.  I do recall that.

17  BY MR. ZIMMER:

18     **Q    Did you take that into account in your**

19  **opinion?**

20     A    Yes.

21     **Q    How so?**

22     A    We assumed that those shares would have

23  been held for 18 months, in my opinion.

24     **Q    Are you aware that they still have not**

25  **been released from escrow?**

 1      A    I am aware of that, yes.

 2      Q    Okay.  Could Dr. Golberg sell shares

 3   before they were issued to him?

 4      A    I'm not sure I understand the question.

 5      Q    Well, I'm trying to understand why you

 6   used the August 14 date.

 7           Are you aware that shares -- certain

 8   shares were issued to Dr. Golberg in November of

 9   2018?

10      A    I am aware of that, yes.

11      Q    Are you aware that no shares were issued

12   to Dr. Golberg on August 14, 2018?

13      A    Yes.  I'm aware of that.

14      Q    So could he have sold the shares that had

15   not yet been issued to him between August 14 and

16   November of 2018?

17      A    I assume that his shares would have been

18   issued on August 14.

19      Q    Okay.  And what was the basis for the

20   assumption?

21      A    As I recall, he indicated that he thought

22   all of the shares should have been issued to him

23   on August 14.

24      Q    Okay.  Did you do any kind of research or

25   any -- have any conversations to determine whether

1   that was, in fact, the case?

2      A    What do you mean?  I don't understand the

3   question.

4      Q    I mean, do you agree with his proposition

5   that they should have been issued on the 14th of

6   August 2018?

7             MR. KAZAN:  Object to the form.

8             THE WITNESS:  I have no opinion on

9        that.

10            MR. ZIMMER:  Okay.

11   BY MR. ZIMMER:

12      Q    Did you know that the shares that were

13   issued in Dr. Golberg's name in November contained

14   restrictive legends?

15      A    I do recall that, yes.

16      Q    Okay.  Did you review the legends?

17      A    Only to the extent that Mr. Orr included

18   them in his report.  I didn't look at the actual

19   stock legends.

20      Q    Do you recall what the legends embodied?

21   What they said?

22      A    Not the exact verbiage, no.

23      Q    Well, do you remember -- do you recall the

24   implication of the legends?  What the restrictions

25   were that they placed on the sale of the stock?

1                    MR. KAZAN:  I object to the form.

2                    THE WITNESS:  Not specifically, no.

3                    MR. ZIMMER:  Okay.

4    BY MR. ZIMMER:

5        Q    Did you take that into account when you

6    did your valuation?

7        A    My valuation takes into account that, A,

8    there was a six-month holding period; and B, some

9    shares were held for up to 18 months.

10       Q    But it doesn't take into account that the

11   shares were issued with specific legends that

12   placed specific restrictions on the stock?

13       A    Again, I have no opinion on the legends of

14   the stock.

15       Q    Well, I understand you have no opinions on

16   the legends, because you said it, but your

17   analysis is an analysis of the impact -- well,

18   strike that.  We'll get to that.

19            Okay.  Do you know if the legends on the

20   shares that were issued in Dr. Golberg's name were

21   ever removed from the stock?

22       A    My understanding, they were not.

23       Q    Okay.  Did that affect your opinion in any

24   way?

25       A    No.

1     Q     Why not?

2     A     Because we assumed that, but for the

3     disagreement, the shares would have been issued on

4     August 14, and they would have run the course of

5     the -- whatever the agreement said.

6     Q     Okay.  Can you look at page 6 of your

7     report?

8     A     Sure.

9     Q     So you use two specific dates there.  What

10    do those dates represent?

11          I'm sorry.  I'm looking at the table at

12    the bottom of page 6, and there's -- there are two

13    dates listed on the row labeled "Sale Date."

14          What do those dates represent?

15    A     So the first date is six months after

16    August 14, and the other is one year later.  So

17    that would have been 18 months after.

18    Q     Okay.  And why did you pick those dates?

19    A     Because the initial block of shares would

20    have been held for six months, and then there were

21    shares in escrow that would have been held for

22    18 months, which would put them at the

23    February 14, 2020, date.

24    Q     Well, when you say "held," do you mean

25    they would have been restricted from sale or that

1    they would have only actually been held for that

2    period of time?

3        A    Again, my understanding is they were held

4    in escrow.  Whether they would have been

5    restricted for that period, I don't know.  I can't

6    answer that.

7        Q    But when you say they would have been held

8    for that time, what does that mean?  What happened

9    when that time expired, in your opinion?

10       A    My assumption is they would have been

11   available for sale at that period.

12       Q    Available for sale.

13            Is it your assumption they would have been

14   sold on those dates?

15       A    My assumption is they would -- they would

16   have been sold as soon as they were available for

17   sale.

18       Q    And what's that assumption based on?

19       A    It's just the first date it was available

20   for sale.

21       Q    That's the only basis?

22       A    That's the only basis, yes.

23       Q    Did you do any research or any review of

24   Dr. Golberg's trading history in Navidea shares?

25       A    No.

1      Q      Did you do any research or background into
2    Dr. Golberg's ownership of Navidea shares?
3      A      No.
4      Q      Did you interview Dr. Golberg at all to
5    try to determine what he might have done with the
6    shares?
7      A      No.
8      Q      Okay.  You just used the first date that
9    they could possibly be traded?
10     A      Correct.
11     Q      Okay.  What was the basis for that?
12     A      I assumed, when they were available, he
13   would have been able to sell them.
14     Q      Well, I understand that it's probably a
15   fair assumption when they were available, he would
16   have been able to trade them.
17            What is the basis for the assumption that,
18   as soon as they became available, he would have,
19   in fact, traded them?
20     A      I can't speculate to what he would have or
21   would not have done.
22     Q      Okay.  Do you know anything about
23   Dr. Golberg's financial condition?
24     A      No.
25     Q      Do you know if he had any need for funds

```
 1    that would have required him to sell the shares
 2    immediately?
 3      A    No.
 4      Q    Okay.  Do you know whether he held other
 5    shares of Navidea?
 6      A    I don't recall.
 7      Q    Okay.  Do you know whether he sold other
 8    shares of Navidea?
 9      A    I don't recall.
10      Q    You think you knew and you don't recall on
11    those last two questions, or you didn't -- well,
12    strike that.
13           Did you ever inquire whether Dr. Golberg
14    owned shares of Navidea other than the ones
15    relating to the August 14 agreement?
16      A    I don't recall.  I know I asked a question
17    of what his financial condition was.
18      Q    Okay.  And what did you get in response to
19    that?
20      A    As I recall, he had ample resources.  He
21    did not need the money.
22      Q    Okay.  Do you recall whether you asked
23    whether he owned other shares of Navidea, in
24    addition to the ones relating to the August 14
25    agreement?
```

```
 1     A     That, I don't recall.  I don't remember

 2   him owning other shares.

 3     Q     Did you ask?  Did you inquire whether he

 4   owned other shares?

 5     A     I don't recall if I asked or not.

 6     Q     Okay.  You don't think that would be

 7   important to know?

 8     A     No.

 9     Q     Okay.  And, again, are you aware of his

10   trading history in Navidea shares?

11     A     No.

12     Q     Okay.  You're aware that he was the CEO of

13   Navidea up until August 14, 2018?

14     A     Yes.

15     Q     And were you aware that he was a board

16   member of Navidea up until August 14, 2018?

17     A     Yes.

18     Q     Do you know of Dr. Golberg's educational

19   background?

20     A     No.

21     Q     Do you know of his employment background?

22     A     No.

23     Q     Do you know whether he is familiar with

24   the financial markets?

25     A     No.
```

1     Q     Do you know how closely he monitors

2   Navidea stock?

3     A     No.

4     Q     Do you know how closely he monitors

5   Navidea share prices?

6     A     No.

7     Q     Okay.  On page 7 of your report -- I'll

8   find the exact spot if you want, but I don't think

9   it's necessary -- you state, Navidea stock was

10   thinly traded in February of 2019 and February of

11   2020.

12           Can you define "thinly traded"?

13     A     It means that not a lot of shares traded

14   on a daily basis.

15     Q     Is there a formal definition of it?

16     A     I don't know if there's a formal

17   definition.  I think it's more of a generic term.

18     Q     Is there a threshold that you would

19   analyze to see whether a stock was thinly traded

20   or not?

21     A     I don't know if it would be a threshold or

22   it's more of a judgment call.

23     Q     So what was the basis for your statement

24   that the stock was thinly traded in February 2019

25   and February of 2020?

1    A    I looked at the daily trading volumes, and

2    they were very low.

3    **Q    Low relative to what?**

4    A    Relative to the number of shares

5    outstanding.

6    **Q    Okay.  And did you apply any kind of**

7    **formula to determine that they were thinly traded?**

8    A    No.

9    **Q    It was your judgment?**

10   A    My judgment.  Yes.

11   **Q    What was the judgment based on?**

12   A    Based on history -- my history of looking

13   at publicly traded stock.

14   **Q    What is that history?**

15   A    Well, I mean, in the valuation process --

16   and I've done hundreds of valuations, probably

17   thousands -- one thing you look at is public

18   companies, and you look at public companies in the

19   same industry.

20        And one of the things you eliminate from

21   your analysis is companies that do not trade

22   actively.  They're thinly traded.

23        It also comes up from time to time when

24   you have to value thinly traded stock, such as

25   this, where you have lock issues, where you have

 1   liquidity issues.

 2       Q     Do you know whether Dr. Golberg sold any

 3   Navidea stock in 2018?

 4       A     No.

 5       Q     Do you know whether Dr. Golberg sold any

 6   Navidea stock in 2019?

 7       A     No.

 8       Q     Okay.  Are you familiar with Navidea

 9   Biopharmaceuticals' business?

10       A     From a high level, generic level, yes.

11       Q     What's your understanding of the business?

12       A     They do -- I'd have to refresh my memory

13   from my report.

14       Q     Take your time.

15       A     I thought I included it in my report.

16           I know they do some kind of medical

17   technology.  I don't know the exact nature of it.

18   I don't recall the exact nature.

19       Q     Do you know if they manufacture anything?

20       A     I don't recall.

21       Q     Do you know if they sell anything?

22       A     I know they have medical technology, but I

23   don't recall how they generate their revenue.

24       Q     You don't know how they generate revenue?

25       A     I don't recall, off the top of my head,

1    no.

2        Q     Do you know for sure that they do generate

3    revenue?

4        A     My understanding is they do.  Yes.

5        Q     Okay.  Are you familiar with research and

6    development firms?

7        A     Yes.

8        Q     Do they typically generate a lot of

9    revenue?

10       A     Some do, yes.

11       Q     How do they do that?

12       A     Usually, they either -- they're either

13   doing research and they get funding and they sell

14   something, or they do research for other

15   companies.

16       Q     Do you know if Navidea does research for

17   other companies?

18       A     Not that I'm aware of.

19       Q     Okay.  And, again, you don't know whether

20   or not Navidea sells anything?

21       A     I don't recall, off the top of my head.

22       Q     Okay.  So you don't know whether Navidea

23   actually generate any revenue, do you?

24              MR. KAZAN:  Object to the form.

25              THE WITNESS:  Again, I don't recall.

1    BY MR. ZIMMER:

2        Q     Did you know at one time and you can't

3    remember?

4        A     Yes.  I knew at one time.

5        Q     Did you know when you wrote your report?

6        A     Yes.

7        Q     Was it important to the opinions in your

8    report?

9        A     In my report, I was looking strictly at

10   the stock price and when they could sell the

11   stock.

12       Q     Did you look at all how Navidea's business

13   history affected its stock price?

14       A     I know I looked at that at the time, but I

15   don't recall the answer.

16       Q     Was it relevant to your opinion?

17       A     No.

18       Q     So your opinion as to when someone might

19   have sold the stock did not take into account the

20   nature of Navidea's business or the way that its

21   business history had affected its share price over

22   time?

23                   MR. KAZAN:  Object to the form.

24                   THE WITNESS:  No.

25

```
 1   BY MR. ZIMMER:

 2       Q    No, it did not?

 3       A    No.

 4       Q    Okay.  Do you know whether announcements

 5   by Navidea about its development programs have

 6   affected its stock price throughout its history?

 7       A    As I recall, they did, yes.

 8       Q    And how did they affect the price?

 9       A    At some point, the price went up.

10       Q    Explain what you mean by "at some point."

11       A    As I recall, there was a period of time

12   when Navidea's stock was at its high point, and

13   Mr. Orr actually selected that period as part of

14   his damage.

15       Q    But are you saying that -- I'm asking if

16   you're aware of whether announcements about

17   Navidea's business, over time, affected its stock

18   price.

19            Are you talking about one specific point

20   in time?

21       A    At one specific time, but I am aware that

22   they had different announcements and it impacted

23   the price.  Yes.  I'm aware of that.

24       Q    Okay.  Have you researched what happens to

25   Navidea stock when it makes positive announcements
```

1    to the market about its development programs?

2    A    No.

3    Q    And, again, your opinion -- is it based on

4    the impact of Navidea's public announcements about

5    its development programs?

6    A    No.

7    Q    On its stock price?

8    A    No.

9    Q    Have you looked at any patterns in trading

10   volume for Navidea over time?

11   A    What do you mean?

12   Q    Well, have you -- in forming your

13   opinions, did you investigate any trends over

14   time -- over the history of Navidea's existence

15   with respect to its trading volume?

16   A    Yes.

17   Q    Okay.  And did that affect your opinion at

18   all?

19   A    We looked at trading history to determine

20   the extent of blockage in the market.

21   Q    When you say, "blockage," does that go

22   back to the thinly traded issue?

23   A    Well, at some point it's thinly traded,

24   but at some point it was not.

25        So in order to determine how much they can

1   trade at any point in time, you need to determine

2   how much is trading, so we have to look

3   historically at the trading volumes.

4      Q    And what time period did you look at?

5      A    We looked at it every -- at the different

6   periods Mr. Orr suggested they should trade and

7   the period when I suggested they should trade --

8   or could trade, I should say.

9      Q    Did you notice any trends in the trading

10  history?  I'm sorry.

11          Did you notice any trends in the trading

12  volume as it relates to the stock price?

13     A    Over time, the volume increased, yes.

14     Q    Okay.  And what about stock price?  Did

15  you notice any effect of trading volume on stock

16  price over time?

17     A    The stock price generally went up as

18  trading volume went up.

19     Q    Okay.  On page 7, you start to discuss

20  this concept of blockage.

21          Can you just give me a description of the

22  concept of blockage?

23     A    Certainly.  Blockage is when you have a

24  large block of stock or a large volume of shares

25  and the market trades at a lower volume.

1        So any time you have a large block of
2   shares, you're going to have to do something to
3   keep from impacting the stock price when you're
4   selling those shares.
5        Q    Any time.  Has there ever been a time in
6   the history of -- I guess we'll talk about the New
7   York Stock Exchange, where sales of large volumes
8   of shares has not affected the price?
9        A    That, I don't know.
10       Q    Okay.  Now, you say on page 7 that you'd
11  consider a private placement of publicly traded
12  shares to provide guidance on the reduction in
13  value resulting from a lack of liquidity.
14            Can you explain how a review of private
15  placement scenarios could instruct what would
16  happen to the publicly traded price of shares?
17       A    Sure.  We look -- somehow we need to find
18  public information on how trading restrictions
19  impact the price of stock.
20            So one of the things we look at are
21  private placements, and private placements are
22  private placements of restricted stock.  And we
23  use that data for a number of different purposes
24  in our firm.
25            So that gives us some market evidence of

1   what a lockup in the stock would be.

2      **Q    Do you assume that these shares would have**

3   **been sold while they were subject to a lockup?**

4      A    Well, restricted shares can be sold at a

5   private placement, is my understanding, and

6   they're sold -- they're sold while they have

7   restrictions.

8           So the shares are sold typically at a

9   discount to reflect the fact that there are

10  restrictions on the trading.

11     **Q    I thought you said that blockage relates**

12  **to selling large quantities of stock and its**

13  **effect on its share price.**

14     A    That's true.  It does.

15          So when you have a large quantity of

16  stock, you need to dribble that stock out into the

17  market over time.  So that time when it takes you

18  to dribble that stock out basically becomes a time

19  when you don't have access to your money.

20          So it's the same thing where you have a

21  restriction.  You can't trade all of your shares

22  today, so you have to dribble them out over time.

23          So what we do is we calculate what is that

24  time to basically divest that block of shares, and

25  that becomes -- we consider that a lockup.

1    Q    But the premise of your application of the

2    private placement information is that selling a

3    large quantity of shares will necessarily depress

4    the price of the stock?

5    A    I'm not sure I understand.  Can you repeat

6    that?  I'm sorry.

7                MR. ZIMMER:  Is it possible to read

8            it back?

9                THE COURT REPORTER:  Certainly.

10               (The last question was read

11               back by the court reporter.)

12               THE WITNESS:  No.  The premise of

13           using private placement data is to have

14           some sort of market evidence about the

15           impact of trading restrictions or, to put

16           it another way, a time to realize

17           liquidity from the share of stock.

18               So if you have a large block of

19           stock, you have to dribble it out.  That

20           takes time.  If you have a private

21           placement, there are restrictions on that

22           stock.  They have to wait for those

23           restrictions to end.

24    BY MR. ZIMMER:

25    Q    And that was my question.

1          What you just said is that, if you have a
2     large block of stock, you have to dribble it out
3     over time.
4          A    Correct.
5          Q    You made an assumption that any time a
6     large quantity of stock is sold, it depresses the
7     market price, and you were looking to use the
8     private placement information to inform what the
9     impact might be.
10               MR. KAZAN:   Object to the form.
11    BY MR. ZIMMER:
12         Q    Is that correct?
13         A    Yes.   We were using the private placement
14    data for some market evidence of what the
15    quantity -- or how to quantify that discount or
16    haircut that someone would take on that stock if
17    they had to trade it.
18         Q    But the starting point was an assumption
19    that there had to be some reduction in price.
20              Correct?
21         A    Yes.
22         Q    And you're just looking for something that
23    could help you quantify what you assume would be a
24    necessary reduction in the price.   Correct?
25         A    Correct.

1          MR. KAZAN:  Object to the form.

2          THE WITNESS:  I'm sorry.

3    BY MR. ZIMMER:

4    **Q    What made you choose this model, a private**

5    **placement model, to try to predict the effect of**

6    **high-volume sales on publicly traded shares?**

7    A    There's not a lot of market evidence out

8    there, so you can look at other big placements.

9    That data isn't as good as what we have here in

10   our private placement model.

11   **Q    But that data related to publicly traded**

12   **shares.  Right?  Public stock price?**

13   A    Yes.

14   **Q    So how could direct data about the public**

15   **price of shares be less relevant than information**

16   **about private placements that doesn't involve**

17   **publicly traded price of the stock?**

18   A    That's not true.  Private placements are

19   public -- they're public shares that are sold.

20   They just are restricted shares.  So those are

21   public shares.

22   **Q    But did you attempt to -- first of all,**

23   **did you develop your analysis for this assignment?**

24   A    What do you mean?

25   **Q    You refer to a specific methodology you**

```
 1    used, the MPI Restricted Stock Study, on page 8.
 2          Was that study conducted for purposes of
 3    this case?
 4    A    No.
 5    Q    This was kind of an off-the-shelf model
 6    that you had that you decided to use in this case?
 7    A    We use this model for -- every time we're
 8    trying to determine a lack of marketability.
 9    Q    Okay.  Are there other models out there?
10    A    Yes.
11    Q    Did you apply any of the other models in
12    this case?
13    A    No.
14    Q    Did you do any kind of observation on
15    actual trading volume of public shares and the
16    impact on stock price?
17    A    We looked at trading volumes -- we looked
18    at large blocks.  The problem is, there's not a
19    lot of them out there, so you don't have a lot of
20    data to go by.
21    Q    Okay.  But did that data yield the same
22    result as your study?
23    A    No.  They were much higher.
24    Q    What was much higher?
25    A    If you look at the actual trading of large
```

1   blocks of stock, it's much higher.

2       Q     What is much higher?

3       A     90 percent.

4       Q     No.  I don't understand.  What is much

5   higher?

6       A     If you look -- if you look at trading

7   transactions -- if you go back five or ten years

8   and you look at large blocks of stock, say, you

9   know, 90 percent or more of the company's

10  outstanding shares trading in a transaction, you

11  find the discount applied to that transaction is

12  about 90 percent.

13      Q     Why did you pick 90 percent of a company's

14  stock being traded in that example you just gave?

15      A     Because if you look at -- for example, in

16  the biggest volume of shares -- if we look at

17  page 7 of my report, on February 14, 2019, we were

18  talking about 13,500 shares, and outstanding

19  shares were only 10 million.

20      Q     13 million -- you're talking about 13 --

21      A     13,500,000.  The outstanding shares of the

22  company were only 10 million.  So that's a big

23  block of the stock.

24      Q     But if you're talking about February 14,

25  2019, that's after August 14, 2018.  Right?

1      A     That's six months later.

2      Q     So how could the total number of shares

3   outstanding be less than the number that's

4   outstanding and in Dr. Golberg's possession?

5            The market was aware of the August 14

6   agreement.  Correct?

7      A     My understanding is Dr. Golberg's shares

8   were not registered, so the 10 million is only

9   registered shares that are trading on the market.

10     Q     Okay.  So the 10 million number that

11  you're using here is the number of registered

12  shares?

13     A     Correct.

14     Q     Okay.  Are you aware that the August 14

15  agreement was announced publicly by Navidea?

16     A     I don't remember if I knew that.

17     Q     Are you aware that the issuance of

18  shares -- of 13 and a half million shares in

19  Dr. Golberg's name was publicly disclosed by

20  Navidea?

21               MR. KAZAN:  Object to the form.

22               THE WITNESS:  That's what I recall.

23       Yes.

24  BY MR. ZIMMER:

25     Q     Is there any reason why the market

1   wouldn't understand that there were, in fact, you

2   know, 10 -- you know, 23,514,540 shares that could

3   potentially be traded?

4       A    The market -- the actual trade -- the

5   actively traded shares was 10 million shares.

6       Q    I understand.  But if someone were looking

7   to seriously trade in Navidea shares and did any

8   kind of research on the company, they would easily

9   identify that, in addition to the 10 million-plus

10  registered shares, there were at least -- there

11  may have been others, but there were at least

12  13,500,000 shares in Dr. Golberg's name.

13          Wouldn't that information be priced into

14  the market already?

15          MR. KAZAN:  Object to the form.

16          THE WITNESS:  I can't speculate.  I

17          don't know.

18  BY MR. ZIMMER:

19      Q    You don't know?

20      A    I don't know.

21      Q    Okay.  Does the market ever price in

22  publicly disclosed information?

23      A    At times.

24          MR. KAZAN:  Object to the form.

25          THE WITNESS:  I'm sorry.  At times.

```
 1   BY MR. ZIMMER:

 2       Q    Isn't one of the premises of capitalism

 3   and public securities markets that information is

 4   incorporated efficiently into pricing?

 5       A    Theoretically, yes.

 6       Q    Okay.  Did you take that into account,

 7   that the market may have already priced in the

 8   fact that it was well aware that all of these

 9   shares were available for trading as of a certain

10   date?

11       A    No.

12       Q    You didn't.

13            Are you aware that the August 14 agreement

14   was actually disclosed in a publicly filed press

15   release by Navidea so that anyone could look at it

16   and understand -- or at least read when these

17   shares would become publicly available?

18       A    I don't recall.  I may have.  I don't

19   remember.

20       Q    Okay.  Did you take that into account when

21   you did your analysis?

22       A    No.

23       Q    Okay.  So does your firm have other

24   models, other than the MPI Restricted Stock Study?

25            Is that a proprietary model that it's
```

 1   developed?

 2      A    That's a proprietary model.  Yes.

 3      Q    Has it been peer reviewed?

 4      A    Yes.

 5      Q    Has it been peer reviewed for the purpose

 6   you used it for here; in other words, using

 7   private placements as a proxy for a large volume

 8   of trading into a publicly traded share?

 9      A    We've used this before, yes, for things

10   for the IRS.  Yes.

11      Q    Has it been peer reviewed for that

12   purpose?

13      A    I don't know the answer to that.

14      Q    Okay.  Do you know what purpose it was

15   peer reviewed for?

16           You know that it was peer reviewed.

17   Right?  You said that?

18      A    That's what I recall.  I'd have to

19   double-check that fact, though.

20      Q    So you're not positive it was peer

21   reviewed?

22      A    I'd have to check that fact.  I know it

23   was published in an article.

24      Q    Okay.  Can you check that and let me know?

25      A    I'll let you know.  Yes.

1    Q    Okay.  And also let me know whether it was

2    used in this way, to predict the public price of

3    shares.

4    A    Okay.

5    Q    Does low trading volume in a stock

6    necessarily indicate low demand for the stock?

7    A    I don't know the answer to that.

8    Q    Okay.  Is it possible that owners of

9    closely held stock don't often offer the stock for

10   sale rather than that nobody wants to buy it?

11            MR. KAZAN:  Object to the form.

12            THE WITNESS:  I'm not sure I

13        understand that question.

14   BY MR. ZIMMER:

15   Q    So if a -- do you know -- did you do any

16   research into how widely held the Navidea shares

17   are?

18   A    In terms of the 10 million outstanding?

19   Q    Yes.

20   A    No.

21   Q    Okay.  Do you have any idea whether those

22   shares are owned in large blocks?

23   A    That, I don't know.

24   Q    Do you know whether other nonregistered

25   shares of Navidea were sold in large blocks?

1      A      No.

2      Q      Were you aware that certain investors made

3   large purchases of Navidea shares between

4   August 14, 2018, and January of 2019?

5      A      Public shares?

6      Q      Restricted shares, I believe.

7      A      No.  I'm not aware of that.

8      Q      Okay.  Did you review all of Navidea's

9   public disclosures during the relevant time

10  period?

11     A      No.

12     Q      Did you review any of them?

13     A      Not that I recall.  Maybe very few.

14     Q      Okay.  So the question was, If you have a

15  stock with a low trading volume, is it possible

16  that people just don't want to sell the stock and

17  that's why it's not trading as opposed to no one

18  wants to buy it?

19             MR. KAZAN:  Object to the form.

20             THE WITNESS:  Again, I can't

21         speculate why a company would have low

22         trading volume.

23             MR. ZIMMER:  Okay.

24  BY MR. ZIMMER:

25     Q      But will you acknowledge that it's

1    possible that low volume might be explained by a

2    lack of supply as opposed to a lack of demand?

3                    MR. KAZAN:  Object to the form.

4                    THE WITNESS:  Again, it's possible.

5             I can't speculate.

6    BY MR. ZIMMER:

7        Q    You don't know?

8        A    I don't know.

9        Q    Did you do any research into that?

10       A    I don't know if there's any way to

11   research that.

12       Q    Okay.  Does your firm have any models that

13   would be able to analyze that?

14       A    No.

15       Q    Okay.  Did you consider trying to analyze

16   that?

17       A    No.

18       Q    Okay.  So how does -- first of all, do you

19   know the sample size for your -- I'll call it the

20   "MPI study," shorthand, and I'll be referring to

21   the MPI Restricted Stock Study that you referred

22   to by name in bold on page 8 of the report.

23            But I understand that's what you're

24   discussing throughout pages 7 and 8.  Correct?

25       A    Yes.

1     Q    So do you know the sample size for the MPI
2    study?  How many private placements it considered?
3     A    Not off the top of my head, but I can get
4    you that information.
5     Q    Okay.  Do you know what types of
6    restricted shares were involved in those private
7    placements?
8     A    What do you mean?
9     Q    In other words, what types of restrictions
10   were on the shares?
11    A    They were restrictions that were subject
12   to Rule 144.
13    Q    Any other restrictions?
14    A    No.
15    Q    Okay.  And that was for every share that
16   was part of these private placements?
17    A    Yes.
18    Q    Do you know the volume of shares relative
19   to the publicly registered shares in each one of
20   those private placements?
21    A    No.
22    Q    Were each one of the private placements
23   involving shares that were, in fact, publicly
24   traded?
25    A    Yes.

1    Q    Okay.  How did your methodology work?  I
2  mean, what is -- what are the steps in the process
3  of analyzing a private placement and then
4  determining how that would affect the public price
5  of the shares?
6    A    What do you mean?  For each stock in the
7  study or in general?
8    Q    The methodology for the study.
9         Did you help develop the MPI study?
10   A    No.
11   Q    Okay.  Do you understand how it works?
12   A    Yes.
13   Q    Can you explain it?
14   A    So, essentially, we look at a number of
15 restricted stock transactions.  From that
16 restricted stock, we look at -- they use a
17 multivariant regression analysis to determine
18 trends in that data.
19         And what our study does is, we take those
20 trends and apply a specific stock data to that
21 analysis via regression to determine what the
22 predicted -- basically, you look for a predicted
23 price against our median price of our study to
24 determine the discount.
25   Q    Median publicly traded price?

1      A    So what we do is we try to calculate the

2   median price at which a transact -- a replacement

3   transaction would occur based on the regression

4   analysis of our data points.

5      Q    But when you say, "median price," relative

6   to what?

7      A    If you look at the median price of our

8   entire study, and then we determine the specific

9   price.  So if we take our -- the data from a

10  specific company and apply it to our model, it

11  comes out with a price at which they predict would

12  be the price a transaction that particular company

13  would occur based on our model.  When you compare

14  that against the median price of our model, the

15  delta is -- determines the discount.

16     Q    Do you know whether Navidea was one of the

17  companies' shares that were included in your

18  review?

19     A    I do not.

20     Q    Did you do any kind of an analysis to

21  compare Navidea's trading history to the trading

22  history of the shares that were involved in the

23  study?

24     A    Yes.

25     Q    And how did they compare?

1     A     Well, if you look at -- I don't know about
2     the trade history basically, but volatility is one
3     of the --
4     **Q     Well, you said, "Yes."**
5     **Did you compare the trading history?**
6     A     Trading --
7     **Q     Because I asked you about trading history**
8     **only because you said yes, so --**
9     A     Trading history -- we looked at historical
10    trading history to determine the amount of time it
11    would take to dribble out the stock.
12    **Q     But did you look at Navidea's historical**
13    **publicly traded pricing information and compare**
14    **that to the companies whose shares were involved**
15    **in the private placements that are part of your**
16    **study?**
17    A     Only to the extent to calculate volatility
18    of Navidea stock.
19    **Q     Okay.  So you don't know if in the --**
20    **strike that.**
21    **Do you know whether any of the stocks that**
22    **were the subject of the private placements**
23    **incorporated into the MPI study were**
24    **biopharmaceutical companies?**
25    A     Not off the top of my head, no.

1     Q     Do you know whether any of the stocks that
2   were included in the private placements that were
3   part of the MPI study were research and
4   development companies?
5     A     Not off the top of my head, no.
6     Q     Do you know anything about the types of
7   companies that were involved in those private
8   placements?
9     A     It's been a long time since I've looked at
10  that study, so I can't -- I don't recall.
11    Q     How long?
12    A     When I first got the MPI, which was three
13  years ago.
14    Q     You didn't revisit in connection with this
15  report?
16    A     No.
17    Q     Okay.
18            THE WITNESS:  Can we take a
19            ten-minute break?
20            MR. ZIMMER:  Sure.  Absolutely.
21            (A recess was held off the record.)
22            MR. ZIMMER:  Back on the record.
23  BY MR. ZIMMER:
24    Q     So I'm going to skip around a little bit,
25  but on page 10, on page 11, you give pretty

1    detailed tables -- on page 10 and 11 of your

2    report, you give pretty detailed tables about the

3    blockage discount.  And on page 10, there's a

4    table in there that's "Blockage Discount for

5    February 14, 2019."

6              And what I'm trying to understand is -- I

7    mean, can you just explain, in layman's terms,

8    what it is you look at about the private

9    placements and how you use that to predict, you

10   know, outcomes in other contexts?

11   A     Sure.  So if you look on Table -- on

12   page 10, there's a table.  What we find, over

13   time, is that there's some drivers to price and

14   things that matter.  One of the biggest things is

15   volatility.

16             So if you see -- at the top, you'll see

17   Volatility, and it's really two things:

18   volatility and time to liquidate.  So those two

19   factors are the two biggest factors.

20   Q     Are you talk -- I apologize.

21             Are you talking about the table at the

22   top?  I'm happy to hear your explanation.

23             So you're referring to Table --

24   A     No, no, no, no.  At the bottom.  I'm

25   sorry.  So there's a table at the bottom.  If you

1   look, it says, "Log Guideline Company Volatility."

2        Q    **Where do you see that?**

3        A    At the very top.  It says, "Log Guideline

4   Company Volatility" at the top.

5        Q    **Yes.**

6        A    Median:  25th percentile, 75th percentile.

7             And then, below that, you'll see Time

8   Period.  So those two pieces are the biggest

9   driver of a discount.  So, essentially, that is

10  how volatile is the stock, and how long does it

11  take to trade that stock or get rid of that stock.

12       Q    **Okay.  So explain to me -- so now that I'm**

13  **with you, you have -- at the very top of that**

14  **chart, below the shaded area, you have Log**

15  **Guideline Company Volatility.**

16            **What does that mean?  Is that an**

17  **instruction to the user to log the volatility, or**

18  **what does "log guideline" mean?**

19       A    "Log" is a logarithm, so basically you put

20  everything in logarithm to do the calculations,

21  but if you look at this -- do you see the

22  82.2 percent?

23       Q    **Yes.**

24       A    That is the volatility of Navidea stock at

25  that time.

1    Q    Oh, at what time?  Over what time period?

2    A    At the -- we go back five years, but if

3    you look at as of February 14, 2019, if you take a

4    five-year median volatility, it's 82.2 percent.

5         So this stock has a very high volatility.

6    Q    Okay.  And what five-year period?

7         Are you talking about going back from the

8    date of your report or going back from February

9    14, 2019?

10   A    February 14, 2019.

11   Q    Going back five years?

12   A    Yes.

13   Q    Okay.  Do you know whether Navidea's

14   business changed over that time period?

15   A    Over the last previous five years?

16   Q    Yes.

17   A    I'm sure it did.

18   Q    Okay.  Did you look into that at all?

19   A    No.

20   Q    Did you do anything to determine whether

21   that historical volatility might have changed as a

22   result of business changes at the company?

23   A    We look at volatility usually one year,

24   five years.  We look at it over different periods

25   of time.

1      Q      Okay.

2      A      So what we found is the five year was

3   actually lower than the one year.

4      Q      Okay.  And you use five year?

5      A      We typically look back five years.

6      Q      Okay.  All right.  Now, when you say,

7   "Market Cap Time Period" -- well, explain this to

8   me:  So now you say -- in the Comments section, it

9   says, "We default to the volatility of Navidea

10  stock."  What does that indicate?

11     A      We used Navidea's stock volatility.

12     Q      Okay.  What else could you possibly use?

13     A      In our -- a lot of the work we do is

14  private companies.

15     Q      Okay.

16     A      So in private companies, you do not have a

17  stock price, so you have to look at the market in

18  general.  So typically what we'll do is we'll go

19  look at other companies in that market and use

20  that volatility.

21           But in this case, we have Navidea stock.

22  So we have their volatility, so we use that

23  volatility.

24     Q      So the private placements involved in the

25  MPI study are typically nonpublicly traded shares?

1     A    No.  They're publicly traded shares.  We

2  apply that data to nonpublicly traded companies.

3     Q    Oh, I see.  So if you were going to use

4  this in another context and that context involved

5  a nonpublicly traded company, you would use

6  some -- you wouldn't be able to use the actual

7  trading volatility?

8     A    That's correct.

9     Q    You'd use a proxy for that?

10     A    That's correct.

11     Q    But here you use the actual Navidea.

12  Okay.

13          Now, there is a listing for 25th

14  percentile, 75th percentile, and I see -- you

15  know, there's NA and 0 percent.  It doesn't seem

16  to be used here.

17          Why is that -- why it is there, and why

18  isn't it used?

19     A    We used the median because that's, you

20  know -- we typically always use the median.

21  Sometimes you use the 25 or 75 percentile, but in

22  this case, we just used the median because we used

23  the actual stock.

24     Q    Why would you use the 25th or 75th

25  percentile?

1    A    If you were doing a private company, you

2    would look at it versus the market, and you may

3    decide that, hey, it's lower than the market or

4    higher than the market.  Typically, we always use

5    the median.

6    **Q    Okay.  And then the Log Market Cap Time**

7    **Period, it says, "We use Time Period I, as**

8    **closely-held securities are most similar to**

9    **pre-1990 restricted transactions with regard to**

10   **the potential holding period."**

11          **What does that mean?**

12   A    So if you look at Rule 144 over time, the

13   holding period changed.  So we break it down into

14   four time periods:  Period I is pre-1990, which

15   was a two-year holding period plus a piggyback

16   provision.  So if you sold your stock --

17   restricted stock during the restriction period,

18   basically the clock would start over, so it could

19   be longer than the two-year restriction.

20          After 1990, that restriction went down to

21   two years.  They took away the piggyback

22   provision.

23          It was in '96, I think -- at some point

24   they made it a one-year provision.  And then, more

25   recently, they made it a six-month provision,

1   which is what it is currently.

2          So the six-month provision is Time Period

3   IV.  The one-year provision is Time Period III.

4   The two-year provision without a piggyback is Time

5   Period II.  And Period I is the provision where

6   it's two years, plus there's a -- there could be a

7   piggyback provision where, if you sell your stock,

8   there's additional time.

9      Q    Is this what's reflected on page 9 in the

10   table:  pre-1990, 1990 to 1997?

11      A    Exactly, yes.

12      Q    Some of those time frames are a little

13   different from what you said.

14      A    I should have referred to the chart.  I

15   apologize.

16      Q    Okay.  This says, "Use Time Period I,"

17   which is pre-1990, but obviously, we're talking

18   about shares that you're assuming were issued in

19   August of 2018.

20          Why would you use the pre-1990 time period

21   and -- well, let me just strike that because I

22   have a question I want to ask first.

23          Time Period IV in the chart -- it says

24   "2008."  The rest of them are, you know, time

25   periods.  Does Time Period IV actually cover 2008

1   onward?

2      A    Correct.  Yes.

3      Q    Okay.  So you're looking at shares that

4   were assumed to be issued in August of 2018.

5          Right?

6      A    Yes.

7      Q    So why would you use a pre-1990 time

8   period?  I don't understand -- first -- strike

9   that.

10         First, explain to me what the time period

11  refers to.  How is that relevant to the chart on

12  page 10?  Does that refer to the holding period,

13  the "time period"?

14     A    The time period is the holding -- we use

15  the time period to estimate a holding period.

16  So -- let me go back.

17         So the first thing we do is figure out, if

18  they dribbled out the stock, how long it would

19  take them to dribble it out to not impact the

20  price of the stock.  And, from that, we come up

21  with a number.

22         So, for example, in the first case, if you

23  look at the top of page 10, we assume it was going

24  to be 53 quarters to sell that block of stock if

25  we dribbled it out over time.

1    Q    But when you say it was going to be

2  53 quarters, do you assume that and then do

3  something with your model, or is your model

4  designed to come up with that number?

5    A    No.  We calculate that number and then put

6  that result into our model.

7    Q    So how do you get to the 53-quarter

8  number?  How do you assume -- you said you assume

9  that.  How do you arrive at that number?

10    A    So if we look at daily trading volume --

11  so at the top of page 10, you'll see it says,

12  "Daily Trading Volume 27,156."

13    Q    Right.

14    A    We assume you can trade 15 percent of the

15  daily trading volume at any point in time and not

16  impact the price.

17    Q    Okay.  But why wouldn't you be able to

18  trade 100 percent of the daily trading volume and

19  not impact the price if the price is based on the

20  sale of 100 percent of the shares sold on that

21  day?

22    A    What we're saying is if you put an

23  additional 100 percent of the shares in the

24  market, that would impact the price.

25    Q    So you're effectively saying 115 percent

 1   trading volume?

 2      A    You can do 115 percent trading volume on

 3   that day.  You can do 27,000 plus another 4,000

 4   shares and not impact the price.

 5      Q    And how did you come up with the

 6   15 percent?

 7      A    Our firm, based on what we do -- because

 8   we do a number of these studies for a number of

 9   purposes.  We talk to banks, people who are

10   trading, and we ask them, "What's your view?  How

11   much can you put in the market?"  And that's the

12   general consensus we found, is between 10 and

13   15 percent.

14      Q    You say "we."  You mean people that work

15   for MPI?

16      A    Yes.

17      Q    Okay.  So what was the process you used?

18   Did you poll people in the office?

19      A    I talked to a number of the people in the

20   office, I've talked to bankers myself, and I've

21   also talked to a number of the people in the

22   office, saying, "What's your experience?"

23           And they said, basically, "We talked to a

24   number people in the industry, and this is what we

25   found."

1     Q     And that was in connection with this
2  engagement, or that's a number you generally use?
3     A     That's a number we generally use.
4     Q     Okay.  Did you look at all at Navidea's
5  trading volume history versus its stock price
6  history to determine whether the 15 percent was
7  appropriate to apply to Navidea?
8     A     I did look at their trading history and
9  their stock price history, and I didn't see
10  anything that would make me disbelieve the
11  15 percent.
12     Q     What were you looking for to see that
13  might have led you to believe that the 15 percent
14  would not be appropriate?
15     A     I mean, 15 percent -- generally speaking,
16  15 percent is the number we use because we assume
17  that number will not impact the price.  So there
18  could be days when they trade more and it does
19  impact the price a little bit.  You just don't
20  know.  So we try to use a market -- a general
21  market guideline, which is the 15 percent.
22     Q     Is the general market guideline published
23  somewhere?
24     A     No.
25     Q     Did you use some kind of a study to arrive

```
 1   at it, or is it anecdotal input from different
 2   sources?
 3       A    It's just anecdotical input from various
 4   banks that we talked to.
 5       Q    Do you know if any of them were familiar
 6   with Navidea's trading history?
 7       A    No.
 8       Q    And, in fact, you didn't ask anyone,
 9   specifically for this engagement, about this.
10            Right?
11            You used the number that's an in-house
12   number that you use across the board?
13       A    It's a number we've derived over a number
14   of years of conversations with traders.
15       Q    But you use it across the board on your
16   engagements?
17       A    Yes.
18       Q    Okay.  And are all companies -- strike
19   that.
20            Is the impact of trading volume on share
21   price uniform across all publicly traded
22   companies?
23       A    No.
24       Q    Okay.  So in the chart on page 10 --
25   well, I will call the -- what do you want to call
```

```
 1   it?  Just so we're talking about the same thing.
 2         At the top, there's Daily Trading Volume,
 3   et cetera, and that looks like maybe a table?
 4    A    Let's call it "top" and "bottom."  That's
 5   easier.
 6    Q    Okay.  At the bottom -- the bottom table
 7   or chart, you know, you say, you know, sometimes
 8   you use 25th percentile; sometimes you use 75th
 9   percentile.
10         But in this case, Navidea was a publicly
11   traded company, so you could use its actual
12   volatility.  You didn't have to assume anything.
13         Right?
14    A    That's correct.  Yes.
15    Q    Okay.  And then, for the time period --
16   explain to me again why you think that a pre-1990
17   time period is most relevant to shares issued in
18   2018.
19    A    Certainly.  If you go look at the time
20   period -- that period of time, the market is when
21   shares had the largest lockup or the largest
22   period of time when they couldn't trade them.
23    Q    Right.
24    A    So right now, it's only six months.
25    Q    Right.
```

1     A    But these shares were locked up longer

2    than this.

3     Q    Which shares?

4     A    Well, we calculated -- for example, at the

5    top of page 10, we calculated 53 quarters to

6    dribble out the Navidea shares at that point in

7    time, which was -- I should have had a header on

8    this.  That's the February 14.

9          So as of February 14, to dribble out

10   13,500,000 shares, it would have taken them

11   53 quarters.

12    Q    Well, you assumed it would take them

13   53 quarters because you applied a 15 percent

14   number that you apply across the board to all of

15   your engagements at this time.  Right?

16    A    That's correct.  Yes.

17    Q    Regardless of the industry that the

18   company is in?

19    A    Correct.

20    Q    Regardless of the company's prior trading

21   history?

22    A    Correct.

23    Q    Okay.  How do you justify that?

24    A    That's the number -- that's the number

25   we've been using.  That's what we understand is

1   the threshold to not impact the stock price.

2       Q    But you're saying that, in every single

3   publicly traded company, if they traded

4   16 percent, it would decrease it, and if they only

5   traded 14 percent, it wouldn't?

6               MR. KAZAN:  Object to form.

7   BY MR. ZIMMER:

8       Q    What basis do you have to say that this

9   number is appropriate for every publicly traded

10  stock?

11      A    I mean, every publicly traded stock is

12  going to have its individual characteristics;

13  however, as a general rule, we use -- we use the

14  15 percent.  There's no way to know what it would

15  be otherwise.

16      Q    Well, you can argue that you should strike

17  the word "otherwise" from your statement,

18  but . . .

19              The 15 percent, to be clear, is not an

20  engagement-specific number.  Correct?

21      A    That's correct.

22              MR. KAZAN:  Object to the form.

23  BY MR. ZIMMER:

24      Q    And it's not a company-specific number.

25              Right?

1     A    Correct.

2     Q    And it's not investor-specific; in other

3  words, the person holding the shares and how they

4  might go about trading the shares.

5          Right?

6          It's not related to that?  Right?

7          It's not individualized to any person.

8          Right?

9     A    Not individualized to any person.  That's

10  correct.

11    Q    Okay.  And is it individualized to any

12  type of restrictions?

13    A    No.

14    Q    Okay.  And it's not based on any

15  methodology.  It's based on anecdotal inquiries to

16  certain people inside and outside of your firm.

17         Correct?

18              MR. KAZAN:  Object to form.

19              THE WITNESS:  It's based on inquiries

20         to trading people in the trading industry.

21  BY MR. ZIMMER:

22    Q    Do you know who?

23    A    I don't know.

24    Q    Is there a list somewhere?

25    A    Not that I'm aware of.  I don't know.

1     Q     Okay.  And do you know if those people

2   have experience in the biopharmaceutical area?

3     A     That, I don't know.

4     Q     Do you know whether they have experience

5   in trading a startup -- sorry, a research and

6   development company?

7     A     I don't know.

8     Q     Do you know anything about the people that

9   these numbers came from?

10    A     No.

11    Q     And did you talk to any of them yourself?

12    A     No.

13    Q     And how long has the 15 percent number

14  been used, to the best of your knowledge?

15    A     For years.  I don't know that.

16    Q     Five years?  Ten years?  Two years?

17    A     Probably at least five, maybe ten years.

18    Q     And is there any chance that the market

19  principles or, you know, trading concepts may have

20  changed over that period of time?

21          MR. KAZAN:  Object to the form.

22          THE WITNESS:  It's possible.

23  BY MR. ZIMMER:

24    Q     Do you know whether anything's been done

25  to update that number?

1    A    Not that I'm aware of, no.

2    Q    Okay.  So now, when you go down to the

3    table at the bottom of page 10, you said, you

4    know -- for example, for the volatility, there's a

5    median, there's a 25th percentile, there's a 75th

6    percentile.

7         Am I correct in my understanding that you

8    were saying that, for nonpublicly traded

9    companies, you might make an adjustment to the

10   25th percentile or the 75th percentile based on

11   the characteristics of the company?

12   A    That's correct.  Yes.

13   Q    Okay.  But because Navidea was a publicly

14   traded company, you went with the actual data

15   that's available -- right? -- on Navidea and went

16   with the median volatility for Navidea.  Correct?

17   A    That's correct.  Yes.

18   Q    Is there a reason why you didn't do the

19   same thing:  go back and calculate a number

20   different than the 15 percent you've been using

21   for the last ten years -- since you had actual

22   market data on Navidea -- for that purpose too?

23             MR. KAZAN:  Object to the form.

24             THE WITNESS:  No.

25

 1   BY MR. ZIMMER:

 2       Q     Could it have been done?

 3       A     I don't know.

 4       Q     Could you have at least asked people if

 5   they were familiar with Navidea or asked them to

 6   familiarize themselves with that and give you

 7   their opinion as to what the daily trading

 8   percentage that would affect stock price would be?

 9       A     We didn't -- we didn't look at that.  I

10   don't know if we could or not.

11       Q     You don't know whether you could have

12   asked traders to --

13       A     Asked traders?

14       Q     Well, you said you spoke to traders --

15   well, I'm not trying to put words in your mouth,

16   and it will be clear what you said.

17            My understanding of what you said was

18   that, at some point in time, possibly up to ten

19   years ago, people at your firm spoke to stock

20   traders to get their input to determine what the

21   percentage of daily trade in the top chart on

22   page 10 should be, and that number is intended to

23   represent the maximum additional volume of shares

24   that can be sold on any given day without

25   affect -- downwardly affecting stock price.

1            Is that correct?

2      A     That's correct.

3      Q     Did you go to any traders for purposes of

4  this engagement and ask them whether they were

5  familiar with Navidea or ask them to familiarize

6  themselves with Navidea and let you know if there

7  was a better estimate than the 15 percent?

8      A     No.

9      Q     Okay.  Now, if I understand correctly,

10  using that 15 percent number, you came up with

11  53 quarters to sell the 13,500,000-share block of

12  Navidea.  Correct?

13     A     Correct.

14     Q     And that, and that alone, is what leads

15  you to select Time Period I.  Right?

16           Because you're saying that, Our estimate

17  is that it would take a really long time, so

18  therefore, we look at the time period with the

19  longest restrictions.  Right?

20     A     Correct.

21     Q     Was there anything about the MPI study

22  that indicated that the pre-1990 would be

23  relevant, other than your assumption of 15 percent

24  that leads to a 53-quarter time period?

25     A     No.

1     Q     Okay.  So there's nothing about the

2  restrictions on the actual shares that were issued

3  in Dr. Golberg's name that led you to use Time

4  Period I?

5     A     No.

6     Q     And there was nothing about Navidea's

7  trading history that led you to use Time Period I?

8     A     No.

9     Q     Okay.  Is your study broken down by

10  these -- I see five time periods here in the chart

11  on the bottom of page 10 and only four in the

12  table on page 9 that talks about time periods.

13          I see Time Period 1, 2, 3, 4, and here I

14  see Time Periods Roman numeral I, Roman numeral

15  II, Roman numeral III -- oh, I'm sorry.  My

16  apologies.  There's four.  Strike that.

17          Is it the case -- I'm just trying to

18  understand -- that, using the MPI model, you can

19  segregate the time periods:  use only the Time

20  Period I information or use only the Time Period

21  II or Time Period III?

22     A     Yes.

23     Q     Is that how it works?

24     A     Yes.

25     Q     Are you able to use more than one time

1    period, or would you have to do that separately

2    and then blend the results?

3      A    You have to use one period at a time.

4      Q    Okay.  And this is really sort of like

5    a -- for lack of a better analogy, like a formula

6    in Excel or something.  Right?

7           You put certain inputs in and numbers come

8    out the back end.  Correct?

9      A    Yes.  Correct.

10     Q    Are you familiar with all of the different

11   calculations that are involved?

12     A    Yeah.  I have gone through the

13   calculations.  Yes.

14     Q    Okay.  Did you double-check -- at least

15   double-check the math on this one, so to say?

16          You checked every calculation in each one

17   of these tables to make sure that there was no

18   glitch in the system?

19     A    Our calculations were pretty much fixed,

20   so you can't really change the calculations.

21     Q    Okay.  But you understand what each and

22   every calculation is?

23     A    Yes.

24     Q    So the sole driver of the use of Time

25   Period I was your 15 percent assumption?

1     A     Correct.

2     Q     Okay.  And you never did an evaluation

3   using Time Period IV, which is actually the time

4   period in which the actual shares at issue here

5   were issued in Dr. Golberg's name.  Correct?

6     A     Not for February 14, 2019.

7     Q     Okay.  Why not?

8     A     Because we determined it would take

9   53 quarters to liquidate those shares at the end

10  of the restriction period.

11    Q     Okay.  Are the restrictions on shares in

12  the MPI study the driver of the daily trading

13  volume information, or is that completely

14  independent?

15    A     What do you mean?  The 15 percent?

16    Q     At the top of page 10, you do calculations

17  to determine how long it would take to sell

18  something.  Correct?

19    A     Correct.

20    Q     A block of shares.

21          In the MPI study, what drives the amount

22  of time it would take -- do you do the same

23  assumption every time you apply the MPI model, the

24  15 percent?

25    A     I'm not sure what you mean.

1      Q     I may not be sure either, but you're the

2   expert.

3           The private placement model, the MPI

4   study -- you said it involves both public and

5   privately traded companies?

6      A     The MPI study is only publicly traded

7   stocks.

8      Q     The private placements are only of

9   publicly traded stocks?

10     A     Correct.

11     Q     Okay.  Is the 15 percent of daily trade

12   volume assumption part of the MPI study?

13     A     No.

14     Q     It's not.  So what does the MPI study do?

15     A     The MPI study is -- what it does is, we

16   have to tell it what our time frame is, what our

17   lockup period is, and from that data, we can

18   determine the appropriate discount.

19     Q     So what you do is, you use the MPI study,

20   which is, to some extent, empirical, and it tells

21   you that shares that were locked up under the

22   pre-1990 regime -- this is the impact on price.

23           Right?

24     A     Correct.

25     Q     Or, you know, the post-2008, this is the

```
 1    impact on the stock.  Right?

 2       A    Correct.

 3       Q    But the input for the analysis has nothing

 4    to do with the MPI study.  Right?

 5            The input for the analysis is strictly the

 6    15 percent assumption.  Right?

 7       A    Correct.

 8       Q    And that's an across-the-board assumption

 9    for every single publicly traded share that your

10    company's looked at for the last ten years?

11       A    We use between 10 and 15 percent as a

12    general rule.  Yes.

13       Q    Okay.  So as far as arriving at the

14    15 percent, that's strictly based on discussions

15    with traders' internal decision that's made at

16    your firm.  Right?

17       A    Correct.

18       Q    Okay.  What are the -- explain to me how

19    you deal, then, with the variables.

20            I now understand that the volatility --

21    well, explain to me this:  If the MPI model deals

22    only with publicly traded shares, then why would

23    you ever use the 25th percentile as something --

24    in other words, why would you ever estimate

25    volatility in the MPI study if it deals only with
```

1    publicly traded shares?

2              Why wouldn't you always use the actual

3    volatility of the publicly traded stock?

4       A    Because when we're using this study, we're

5    not -- typically not valuing publicly traded

6    shares.  We're typically valuing privately traded

7    shares.

8       Q    Okay.

9       A    So at that point you do not have a

10   volatility number.

11      Q    So the data set that you used to perform

12   the MPI study were private placements of publicly

13   traded shares?

14      A    Correct.

15      Q    But the application of the MPI study is

16   typically to determine the impact on large-volume

17   trades on nonpublicly traded shares?

18      A    Or any trades on nonpublic shares.

19      Q    But typically used to value nonpublicly

20   traded shares?

21      A    Yes.

22      Q    So why did you use it to value publicly

23   traded shares here?

24      A    Because it's data generated from publicly

25   traded transactions.  This is a publicly traded

1   stock, and we know how long it would -- we know

2   the period of time it would take to sell.  We have

3   market evidence of what the discount would

4   potentially be.

5       Q    Well, you have market discount based

6   on -- strike that.

7            You have market information about

8   discounts that occurred on nonpublicly traded

9   shares?

10           Wait a minute.  Hold on.  Strike all that.

11           Why would you use a model, that's used by

12  you almost exclusively, to try to determine the

13  impact of trading volume on nonpublicly traded

14  shares or the time period it would take to sell

15  nonpublicly traded shares without impacting price?

16           Well -- and I apologize.  I'm trying to

17  learn this as I go.  So strike all that.

18           Is the purpose of the MPI model to

19  determine how much you could sell without

20  impacting the market or what the market impact

21  would be of a certain percentage of sale?

22      A    The MPI study -- let's back up.

23           So the bulk of our business is valuing

24  privately held companies.  And so that's why we

25  have this particular model, because we have market

1  evidence that tells us what the market does

2  over -- when there's a certain restriction period

3  or a period when you can't sell the stock.

4          So if you're a private company and you

5  want to sell your stock, you can't just go down

6  and sell it.  You have to go through a process to

7  do that.

8      Q    **Right.**

9      A    Part of it is dealing with brokers,

10  finding a buyer, and effectuating the sale.

11          The other part of it is, you've got to do

12  some other work upfront:  make it ready, you

13  know, clean up the books, et cetera, et cetera.

14          So we use this study to say, Okay.

15  There's a time period between when you want to

16  sell and when you can actually sell, and this

17  model gives us public data of what the impact of

18  that time period is.

19      **Q    But the time period in -- you're trying to**

20  **figure out what the impact is of the delay in, you**

21  **know, truing up the books and preparing it for**

22  **sale.  Is that what you're saying?**

23      A    I'm saying, from the day I want to sell

24  the business to the day I actually sell the

25  business, there's a time period.

1      Q      Right.

2      A      It's usually -- it could be a couple

3  years.  So I'm saying, I need to -- if I want to

4  sell my stock today or if I'm valuing it as of

5  today, I know I can't sell it in the public market

6  today.  It's going to take me time to sell this

7  company.

8      Q      But it's not going to take you time to

9  sell it because of concerns that sale of any

10  volume or any percentage of the company will

11  effect the market price.  Right?

12          There are practical considerations.  There

13  are operational things that need to be done.

14          Is that right?

15      A      In the case of a private company, that's

16  correct.

17      Q      Okay.  What is the Log Risk Fee Rate in

18  the table on the bottom of page 10?

19          What does that represent?

20      A      Where are you?

21      Q      Just below the Log Market Cap Time Period

22  entries, in that table at the bottom of page 10,

23  it says, in the variables, it's a "Log Risk Free

24  Rate."

25      A      Oh.

1      Q      What's a "log risk"?

2      A      That's the risk-free rate of a 30-year

3   treasury -- U.S. treasury rate, which we assume is

4   a 30-year treasury.

5      Q      Okay.  Does that rate fluctuate over time?

6      A      Yes.

7      Q      Okay.  And the one you used here was as of

8   February 14, 2019?

9      A      We normalize that to 3 percent because, if

10   you look at rates right now, they're very low.

11          So at that time, in February of '19, the

12   rates were really low.  So we basically normalize

13   it to 3 percent, which is basically the historical

14   long-term rate.

15      Q      Well, okay.  But why would you normalize

16   it and not use the actual rate?

17      A      Because the rate, at the time, was

18   extremely low.  And going forward, if you're

19   looking at going out 53 quarters, which is

20   13 years, that rate could change over time.  So

21   it's going to revert back.

22      Q      But has the rate been historically low

23   since in or about 2009?

24      A      It's been low since '09, and it's slightly

25   lower today than 3 percent.

```
 1      Q      Okay.

 2      A      It's about 2.8 percent.

 3      Q      And just about every day we hear news

 4    about the Federal Reserve, and that's what

 5    typically drives this.  Right?

 6           It's understood that the Federal Reserve

 7    is keeping that rate low.  Correct?

 8                  MR. KAZAN:  Object to the form.

 9                  THE WITNESS:  In the short term, yes.

10    BY MR. ZIMMER:

11      Q      Well, the short term, so far, has been

12    from 2009 to 2021.  Right?

13      A      That's correct.  It's been ten years.

14      Q      And it's been going down still.  Right?

15      A      It's actually gone up a bit.

16      Q      Well, I'm saying, it's still at

17    historically low rates, in your perspective.

18           Correct?

19      A      That's correct.  Yes.

20      Q      Okay.  Any inside knowledge, that I could

21    use to finally retire, about what the fed is

22    going to do with interest rates over the next 10

23    to 53 quarters?

24      A      You look like you have a long time to

25    retire.  No.  I wish I did because I'd retire.
```

1      Q     Okay.  So you really have -- so you're

2   using a rate -- a pre-2009 rate, because the rate

3   has been historically low for the last 12 years

4   and you have no information about whether it will

5   go up or not, but most of the news is that it's

6   unlikely that the fed is going to do anything to

7   precipitously raise rates in the short to medium

8   term.  Correct?

9            That's what they say at every quarterly

10  meeting.  Correct?

11               MR. KAZAN:  Object to the form.

12               THE WITNESS:  Again, that's the short

13          term.  We're looking at the long-term rate

14          and the long term -- over the long term,

15          things tends to revert back to the mean,

16          which is 3 percent.

17  BY MR. ZIMMER:

18     Q     Okay.  But you didn't take into account

19  the lower rate; you just used what you consider

20  the historical rate of 3.  Right?

21            You didn't adjust it for the 12 years it's

22  already been at about 1 percent.  It was at 0 at

23  one point, wasn't it?

24     A     I don't know if it was quite that low, but

25  it was --

1    Q    It was close to zero.

2    A    -- it was close.  In that range.

3    Q    You didn't account for that as part of

4    history?

5    A    No.

6    Q    The 12-year recent history isn't part of

7    the historical rates that you used to come up with

8    the 3 percent.  Right?

9    A    No.  We assume that it reverts to the

10   mean.

11   Q    Would a higher or lower percentage affect

12   the outcome of the model?

13   A    A lower rate would make the discount

14   higher.

15   Q    Okay.  Now, the next thing is S&P 500:

16   12-month change.

17        Is that just what it looks like?  Is that

18   the -- well, just me tell me what it is.

19   A    That's the actual change in the S&P 500 as

20   of February 14.

21   Q    The 12-month period -- what makes you use

22   a 12-month period there?  Do you know?

23   A    That's what our model looks at.  So, in

24   our model, we look at what date a stock price -- a

25   stock transaction occurred on a restricted stock

1   and look at the 12-month change at that point.

2        Q     Okay.  But you're using Time Period I,

3   which is, at minimum, a three-year holding period.

4        Right?

5        A     Yes.

6        Q     And you're looking at the 53-quarter

7   assumption.  Right?

8        A     Yes.

9        Q     So why use only a 12-month S&P rate

10  change?

11       A     Because that's what we calculate in our

12  model.  Like I said, we look at certain

13  attributes, and we look at, at that time when a

14  transaction occurred, what was the 12-month change

15  in the S&P market.

16       Q     So that's just something that's -- it's

17  done that way because it's done that way?  You

18  can't explain why?

19            Does it ever change -- strike that.

20            Does it ever -- does the -- well, let me

21  take a step back.

22            Does the risk-free rate -- has that ever

23  changed while you've been at MPI?  The assumption

24  that you used for that, the 3 percent?

25                 MR. KAZAN:  Object to the form.

```
 1                    THE WITNESS:  No.
 2    BY MR. ZIMMER:
 3        Q    To the best of your knowledge --
 4        A    We've always normalized at the 3 percent.
 5        Q    And the S&P, have you ever used anything
 6    other than a 12-month period?
 7        A    No.
 8        Q    Okay.
 9        A    That's the way the model calculates it.
10        Q    Well, I understand that's what's used.
11             How was it determined to use a 12-month
12    rate?
13        A    A 12-month period.
14        Q    The 12-month period.
15        A    That was determined when they did the
16    model.
17        Q    Okay.  And did you help create this model?
18        A    No.
19        Q    Okay.  Is this model ever reevaluated
20    internally, or is it just simply applied?
21        A    We update it from time to time.  I don't
22    recall when it was last updated.
23        Q    Okay.  Do you recall what was updated?
24        A    Usually just the underlying data.  The
25    methodology hasn't changed.
```

1    Q    Okay.  And what about these assumptions?

2    A    What do you mean?  Using a one year

3  versus --

4    Q    One year --

5    A    Yes.  That does not change.

6    Q    -- and the three?  Okay.

7         Now, Price to Book Dummy I, Price to Book

8  Dummy II, what does that refer to?

9    A    It looks at the value of the company

10  versus the book value of the stock.  So we assume

11  it's 1 for most companies, especially nonoperating

12  companies.

13    Q    Well, you assume it's 1?

14    A    Typically, yes.

15    Q    Now, what does Coefficients mean in the

16  header here?

17    A    Coefficients is just the statistical

18  calculation based on the log, which is the --

19  there's three columns:  Base Value, and then you

20  basically turn that into a log and then calculate

21  the coefficient of the log.

22    Q    Okay.  Why would -- you're saying that

23  this is intended to reflect the actual value.

24         What value?  Book value?  Market value?

25         You said it was intended to reflect the --

1    is it a ratio of the book value to the market

2    price?

3        A    No.  What this model does is, it predicts

4    the price of a private placement transaction.

5        Q    I'm not -- I appreciate that.  I'm asking

6    you about the model.  I'm asking about this line

7    or these -- this set of lines:  Price to Book

8    Dummy I, Price to Book Dummy II.

9             I assume those are separate from log

10   closing price.  Is that correct?  That these two

11   represent the same variable log to book?

12       A    Yes.

13       Q    And is that intended to represent the

14   actual value versus the market cap, for lack of a

15   better expression?  Is that what you said?

16       A    Yes.  Basically, yes.

17       Q    Okay.  So, first of all, what versus

18   market cap?  Is it book value?  Is it --

19       A    It's book value.

20       Q    -- market value?  Is it a valuation

21   number?

22       A    Well, market cap is market value of the

23   whole stock.

24       Q    Right.  In other words, you don't go in

25   and kick the tires and do an actual valuation of

1    all assets and such, do you, for that?

2       A    No.

3       Q    Okay.  And you don't do -- you don't know

4    the actual book value, do you?

5            Well, let me put it this way:  For a

6    publicly traded company like Navidea that

7    publishes financial statements, reviewed on a

8    quarterly basis, and audited on an annual basis,

9    could you determine the book value?

10      A    Yes.

11      Q    Okay.  Did you?

12      A    I do recall looking at it.  I don't

13   remember what the results were.

14      Q    Okay.  Does your -- did you compare the

15   book value to the market cap to determine the

16   actual value?  To determine this variable, I

17   should say.

18      A    No.

19      Q    You just assumed 1?

20      A    Assumed 1, yes.

21      Q    Okay.  And did you take into account that

22   there are a large percentage of the Navidea shares

23   are not registered shares?

24           In other words, the market cap doesn't

25   capture the entire ownership of the company.

1          Did you take that into account?

2                    MR. KAZAN:  Object to the form.

3                    THE WITNESS:  No.

4    BY MR. ZIMMER:

5      Q    But that would be correct.  Right?

6          In a company where there are a lot of

7    nonregistered shares that have been sold, that the

8    market cap wouldn't be a reasonable reflection of

9    the total value of the company.  Right?

10          Because everyone knows that there are

11   these other percentages of the company held by

12   other people that aren't reflected in the market

13   cap.  Correct?

14                    MR. KAZAN:  Object to the form.

15                    THE WITNESS:  The market cap is just

16          the value of the shares traded on the

17          exchange.

18                    MR. ZIMMER:  Right.

19   BY MR. ZIMMER:

20     Q    So if that is less than 100 percent, then

21   that does not relate to the actual total value of

22   the company.  Right?

23                    MR. KAZAN:  Objection to the form.

24                    THE WITNESS:  Correct.

25                    MR. ZIMMER:  Okay.

```
 1   BY MR. ZIMMER:
 2       Q    But you just used the 1 assumption.  You
 3   didn't do anything to determine the percentage of
 4   outstanding stock that is not publicly traded?
 5       A    No, we did not.
 6       Q    Okay.  And you didn't use the publicly
 7   disclosed financial statements to determine the
 8   actual value?
 9       A    Correct.
10       Q    And you didn't, obviously, compare that
11   to even the market cap.  Right?  You just used
12   the 1?
13       A    Correct.  Yes.
14       Q    Okay.  Log Closing Price, what does that
15   mean, the next one?
16       A    The average price of our study was $7.50,
17   so that's our target:  7.50.  So we'd compare our
18   results to the 7.50 number.
19       Q    So the 7.50 represents the average price
20   of the publicly traded shares that were the
21   subject of the private placements that were
22   considered in the MPI study?
23       A    Yes.
24       Q    Okay.  And, again, you have no idea what
25   kind of companies were involved.  Correct?
```

1      A     Correct.

2      Q     **If they had any relation to Navidea's**

3   **financial situation or market situation.  Right?**

4      A     Correct.

5      Q     **Okay.  So why do you use -- how is that**

6   **number used?**

7      A     So, basically, we come down -- if you look

8   at the bottom, it says, "Predicted Price."

9      Q     **Right.**

10     A     We compared the predicted price to the

11   7.50, and the difference is the discount.

12     Q     **But how do you get the predicted price?**

13   **Is that the output of the model?**

14     A     Correct.  Yes, it is.

15     Q     **And is the 7.50 one of the inputs into the**

16   **model?**

17     A     Yes, it is.

18     Q     **So how does the 7.50 contribute to the**

19   **predicted price?**

20     A     It's part of the calculation.

21     Q     **Do you know how that specific line**

22   **contributes to the predicted price?**

23     A     It's all -- basically, it's -- all these

24   factors go into the predicted price.

25     Q     **But do you know how to trace that**

1    through -- what the impact of the predicted

2    price -- I'm sorry, what the log closing price is

3    on the predicted price, or is that just the inner

4    workings of the model?

5        A     It's just the inner workings of the model.

6        Q     And you're not familiar with how that

7    thread traces through the application of the

8    model --

9        A     No.

10       Q     -- to come out to the final number?

11       A     Not specifically.

12       Q     Okay.  Are you generally aware?

13       A     I mean, generally, it's just a

14   calculation.  So you basically sum up all these

15   components to get to your coefficient, which turns

16   into a price.  It's a whole calculation.  It's

17   rather complicated.

18       Q     So the calculation isn't reflected here?

19             These are just the inputs.  Right?

20             Like, if I totaled up this column, I

21   wouldn't come out with anything reflective of the

22   conclusions.  Right?

23             You're just listing --

24       A     Actually, if you total up the log column

25   and the coefficient column, you should come up

```
 1   with 1.4289.
 2      Q    Okay.  Well, "Sumproduct of Coefficients
 3   and Inputs."  Okay.  That makes sense.
 4           Log -- the next line is Log -- well,
 5   actually, under Log Closing Price there is a
 6   second line of 12.
 7      A    That's actually part of Quarters to Sell,
 8   so you can look at it as 12 quarters, 50 quarters,
 9   or 100 quarters.
10      Q    Oh, I see.  So that doesn't -- that's
11   encompassed in Log Quarters to Sell Under the
12   1 Percent Limit Rule?
13      A    Yes.
14      Q    Even though it's a line above that?
15      A    Yes.
16      Q    Okay.  So what does that speak to?  What
17   is that all about?
18      A    So that's the model.  The model can
19   determine the discount based on the quarters to
20   sell.
21           So in this particular case, we use
22   50 quarters because, up at the top of page 10, we
23   came up with 53 quarters to sell.
24      Q    Right.
25      A    So we used -- in this model, we used -- we
```

1    rounded to 50 quarters.

2       Q      Okay.

3       A      And that goes into the calculation.

4       Q      Okay.  But this says, "Log Quarters to

5    Sell Under the 1 Percent Limit Rule."

6              What's the "1 percent limit rule"?

7       A      That is part of Rule 144.  So in the

8    model -- if you look at the model, there's -- it

9    calculates it based on what the impact on the

10   restricted stock studies during the model would

11   be.

12      Q      And what is the 1 percent restriction

13   under Rule 144?

14      A      There's a limit to 1 percent of the

15   trading volume over a period of time.

16      Q      But what's the limit?  What does it limit?

17      A      It limits the amount of shares you can

18   sell.

19      Q      Who can sell?

20      A      That any holder can sell.

21      Q      Well, any holder can only sell 1 percent?

22      A      Under Rule 144.  So if you're subject to

23   144, you're subject to --

24      Q      What do you mean by "subject to Rule 144"?

25      A      Again, under Rule 144, there are certain

1    limitations on selling shares.

2        Q     Okay.  But what limitations lead to a

3    1 percent limit rule?

4        A     There's volume limitations you can sell

5    under 144.

6        Q     But volume limitations on who?

7        A     Anyone who is subject to Rule 144.

8        Q     Well, I understand.  But would Dr. Golberg

9    be subject to 144 such that he could only sell

10   1 percent of his stock?

11       A     I have no opinion on whether he was

12   subject to 144 or not.

13       Q     So if you have no opinion on whether he

14   was subject to it, why would you use the 1 percent

15   limit rule in the model?

16       A     That's the way our model calculates it.

17       Q     And up top, you assume that he could sell

18   15 percent of the daily trading volume.  Right?

19       A     Yes.

20       Q     The 1 percent rule, is that 1 percent per

21   day?

22       A     No.

23       Q     What is it?  1 percent per what?  What

24   does it mean?  What is it 1 percent of?

25       A     There's a formula.  I can't recall the

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 102 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 102

1  exact calculation.  I'm not an expert on 144, but

2  there is a limitation.  I don't recall what it

3  was.

4      Q    Okay.  Did you consult with an expert on

5  144 in this engagement?

6      A    No.

7      Q    Okay.  So you don't know what the

8  1 percent limit rule is?

9      A    I don't know exactly what it is.

10     Q    Okay.  But you used a methodology that

11  applies a 1 percent limit rule.  Right?

12     A    Our model does that, yes.

13     Q    Okay.  But up above, you assume that

14  15 percent of the daily trading volume could have

15  been sold without affecting market price?

16     A    Correct.

17     Q    Do you know how the 15 percent assumption

18  relates to the 1 percent limit rule?

19     A    No.

20     Q    Okay.  So you don't know if the model

21  assumes you could only sell 1 percent per day of

22  the trading volume?

23     A    It's not per day.  I don't know it is.

24     Q    Is it per 15 days?

25     A    Again, I don't recall the exact trading

1    formula.

2        Q    So you really have no idea how the

3    1 percent rule relates to the 15 percent

4    assumption that you used as an input into this?

5        A    No.

6        Q    Okay.  "Registration Status.  Use the Time

7    Period I Dummy variable to reflect the longer

8    holding period due to size of block."

9             So what does that mean?

10       A    Where are you?

11       Q    Well, maybe they are two different things.

12            So Registration Status -- I'm sorry.

13            So the next thing under Log Quarters to

14   Sell Under the 1 Percent Limit Rule, there's a

15   line there for Registration Status.

16       A    Oh, okay.  We use 1 because it was

17   unregistered shares.

18       Q    What other options are there?

19       A    There's either registered shares or

20   unregistered shares.

21       Q    What would the input be if there were

22   unregistered shares?

23       A    If they're unregistered, it's a 1.

24       Q    What about if they're registered?

25       A    I would be a 0.

1      Q     And do you know why that is?

2      A     Why do we have a 0 or 1?

3      Q     Why would you use a 0 for registered and a

4   1 for unregistered?  Do you know why?

5      A     Well, most of the shares we deal with are

6   unregistered.  I understand these shares are

7   unregistered.

8      Q     But do you know why you would use a 1 for

9   unregistered, other than that's what it says on

10   the, you know --

11      A     Well, in our model, there's -- when you

12   have restricted shares, they can be either

13   registered or unregistered.

14      Q     Right.

15      A     So we are looking at shares that are

16   unregistered.

17      Q     I understand that.  But what is the

18   significance of the value 1?

19      A     Because we are valuing unregistered

20   shares.

21      Q     And if they were registered, you would use

22   a 0?

23      A     Correct.

24      Q     I mean, I'm not a math major or an

25   accountant, but I know there's a big difference

 1   when you multiply something by 1 or 0, and those

 2   are actually answers I could give because 1 stays

 3   the same and 0 is 0.

 4       A     Sure.

 5       Q     So how does the variable 1 trace through

 6   the calculations done by the model?

 7       A     What do you mean?  So if it's a 1, it

 8   adds -- it adds that -- whatever those two

 9   variables are to the price.

10       Q     Which two variables?

11       A     So registration, if it's 1, it calculates

12   a field in coefficient, and it's 0, it does not.

13       Q     Okay.

14       A     So, basically, if you had registered

15   shares, it would give you a lower discount.

16       Q     So you think that this is a constant?

17   This variable is a constant?  Registration status

18   is a constant in your model?

19       A     Well, in the model, you can have

20   registered shares or unregistered shares.

21       Q     For unregistered shares, it stays the

22   same?

23       A     Yes.

24       Q     Do you know what that contributes to the

25   calculation?

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 106

1    A    You'd have to add it up.  I don't know.
2    Q    No, no.  I mean, do you know what the
3    reason is for using this data set as part of the
4    overall calculation?
5    A    You mean in the model?
6    Q    Yeah.
7    A    Yes, because there's differences between
8    registered and unregistered shares --
9    Q    Right.
10   A    -- in the discounts.
11   Q    And, again, so unregistered shares,
12   regardless of any of the individual
13   characteristics of the underlying company, the
14   same 1 would be used?
15   A    Yes.
16   Q    And the 1 increases the discount, the
17   reduction, versus market value that you're opining
18   on.  Correct?
19   A    Correct.
20   Q    So you give the same reduction based on
21   this input to every single unregistered share,
22   regardless of who holds it or what company it
23   relates to, what sector the company's in, the
24   company's financial condition, the company's
25   trading history, et cetera?

1    A    Yes.

2    **Q    Okay.  So then Time Period I Dummy, in the**

3    **Comments, it says, "Use the Time Period I dummy**

4    **variable to reflect the longer holding period due**

5    **to size of block."**

6          **What does that refer to?**

7    A    That ties to -- because we used Time

8    Period I above, we used the Time Period I Dummy

9    below.

10   **Q    Okay.  But this says due to "size of**

11   **block."  What does that mean, "size of block"?**

12   A    That refers back to the top of page 10

13   where we calculate the big block and how long it

14   would take to . . .

15   **Q    So "size of block" relates to the absolute**

16   **number of shares, or the number of shares relevant**

17   **to the daily trading volume?**

18   A    The number of both.  Actually, the number

19   of shares -- it's the size of the block and how

20   long it would take to get -- basically, Time

21   Period I Dummy here equates to -- if we look at

22   Log Market Cap Time Period I, it's the same thing.

23          So if you use Time Period I at the top of

24   this -- if you look at this table, if you use Time

25   Period I at the top, you have to use Time Period I

```
 1   down in the dummy section.
 2      Q      Got it.  And then Intercept, that's the
 3   last input, it says, "Assumed to be 1.  (We have
 4   not forced the regression through the origin, but
 5   rather used the intercept as a given)."
 6             What does that mean?
 7      A    That's just where -- if you're doing a
 8   regression, you look at where it intersects the
 9   axis, and that's just basically what this is.
10             So it's about --
11      Q      But it says, "Assumed to be 1."
12      A    Yes.
13      Q      Why do you -- isn't that usually
14   observational in nature, where the intersect is?
15      A    In our model, we assume it's 1.
16      Q      You don't actually observe where the
17   intersect actually is?
18      A    No, we don't.
19      Q      Why not?
20      A    It's the way we run our model.  So we just
21   assume.
22      Q      But do you know why it's done that way?
23      A    No.  I don't know.
24      Q      Did you ask anyone?
25      A    No.
```

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 109 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 109

1    Q    Is it fair to say that, for all of these

2    inputs, you didn't make any inquiry before you

3    used it in this engagement, you know, Why do we do

4    it this way?  Why do we do it that way?  Why do we

5    do it this way?

6          This is the model, and you just simply

7    applied the model?

8    A    I mean, I know why we do most of it.  I

9    know why we picked volatility.  I know why we

10   picked time frame.  Those are the two biggest

11   drivers.

12   Q    And the time frame is driven by the

13   15 percent assumption?

14   A    Correct.

15   Q    It's driven solely by that.  Right?

16          You simply apply that to the daily trading

17   volume.  Right?

18   A    Correct.

19   Q    Okay.  Have you ever asked anyone inside

20   the firm why none of these things are

21   individualized to specific public stocks when you

22   have the actual numbers?

23              MR. KAZAN:  Object to the form.

24              THE WITNESS:  No.

25

```
 1   BY MR. ZIMMER:

 2       Q    Have you ever asked them why they stick

 3   with the 3 percent treasury yield?

 4       A    Because that represents a long-term rate

 5   and we normalize it.

 6       Q    Okay.  Just so I'm clear -- I think I

 7   probably asked this.

 8            The S&P 500 12-month change that was for

 9   Navidea -- that was Navidea specific.  That was an

10   actual observation on the trading history of

11   Navidea, or not?

12       A    No.  That's the actual S&P 500.

13       Q    Oh, I apologize.  That's the index?

14       A    Yes.

15       Q    Okay.  Sorry about that.

16            Okay.  And I just want to summarize a few

17   things.

18            So you're not aware of what types of

19   companies are in the sample size for the MPI

20   study?

21       A    I'm not.

22       Q    Okay.  Are you aware of -- generally, of

23   what the trading volume was of the companies

24   incorporated into the MPI study?

25       A    No.
```

1    Q    And, again, I think I asked this.

2         Are you aware of what specific

3    restrictions existed in the private placements

4    that are the subject of the MPI study?

5    A    For stocks individually?

6    Q    Yes.

7    A    They were subject to whatever the 144 rule

8    was at the time.

9    Q    Do you know if there were any other

10   restrictions on the stock?

11   A    Not that I'm aware of.

12   Q    Do you know whether there were?

13             MR. KAZAN:  Object to the form.

14             THE WITNESS:  I think -- I don't

15        believe there were, actually.

16   BY MR. ZIMMER:

17   Q    You don't believe there were?

18   A    No.

19   Q    What's that based on?

20   A    Because when they do the stocks, they

21   pretty much vet them.  They're looking for stuff

22   that's strictly 144 so that you can put it into

23   the proper buckets.

24   Q    Okay.  So private placements, they're

25   private transactions outside the public market.

1          Right?

2     A     Correct.

3     Q     Are they typically -- well, do you know

4    whether the private placements in your -- strike

5    that.

6          Do you know whether the private placements

7    that were the subject of the MPI study were all

8    arm's length transactions?

9     A     Yes.

10    Q     How do you know that?

11    A     Because we vet the transactions to make

12    sure they are arm's length transactions.

13    Q     Okay.  And those are individual

14    purchasers and individual sellers negotiating the

15    price.

16          Correct?

17    A     Correct.

18    Q     Did you do anything to determine whether

19    the companies involved had issues that might

20    affect the price the company was able to negotiate

21    for the shares?

22    A     I don't know the answer to that.

23    Q     Okay.  Well, you don't know whether it was

24    done, or you don't know whether they existed

25    because it wasn't done?

1         Sorry.  I believe my question was -- and

2    I'll say it again, just in case I didn't say what

3    I meant to say.

4         Do you know whether the specific

5    circumstances of the companies that were the

6    subject of the private placement in the MPI study

7    were considered to determine whether those

8    company-specific issues could have affected the

9    price of the private placement sale?

10   A    I don't know the answer to that.

11   Q    Okay.  You don't know whether that was

12   done or not at the time the study was done?

13   A    I don't know the answer.  No.

14   Q    And have you read the literature around --

15   or whatever there is to describe the creation of

16   the MPI study --

17   A    Yes.

18   Q    -- by your firm?

19   A    Yes.

20   Q    Would that be something that would be

21   mentioned in there?

22   A    Yes, it is.

23   Q    And so it wasn't done, or you don't

24   remember whether it was?

25   A    I don't recall.  I read it a long time

1    ago.  I don't recall.

2        Q    Okay.  You didn't brush up on it for this

3    engagement?

4        A    No.

5        Q    Okay.  Let's see.  Do you know whether the

6    sellers and purchasers were interviewed to

7    determine whether deal-specific issues impacted

8    the price of the private placements that are part

9    of the MPI study?

10       A    I don't believe they were.

11       Q    Okay.  So it's possible that something

12   like the seller needing cash right away, or things

13   like that, could have affected the transaction

14   price.  Correct?

15              MR. KAZAN:  Object to the form.

16              THE WITNESS:  Possibly.  I can't

17          speculate.

18   BY MR. ZIMMER:

19       Q    And if those same conditions didn't occur,

20   would it be an appropriate comparison?

21       A    Again, I can't speculate on that.

22       Q    Okay.  You can't speculate whether

23   specific factors in a transaction that drove the

24   price down would be appropriate to apply to a

25   transaction where that wasn't present?

```
 1    A    Again, I can't -- I don't know the answer
 2  to that.
 3    Q    Okay.  Do you know how many private
 4  placements were in the sample size for the MPI
 5  study?
 6              MR. KAZAN:  Object to the form.
 7        Asked and answered.
 8              THE WITNESS:  You asked me that
 9        earlier.  I said I didn't know the
10        answer.
11  BY MR. ZIMMER:
12    Q    Any order of magnitude?
13    A    There was a couple thousand, but I don't
14  remember the exact number.
15    Q    Okay.  Why wouldn't you compare the
16  trading histories of, you know, like low volume,
17  closely held, publicly traded shares rather than
18  private placements since that's what you seem to
19  want to do, is try to determine the public
20  value -- you know, trading value of a stock?
21              Why would you apply this model versus one
22  that's geared more toward the circumstances you're
23  presented with?
24    A    We've always used this model as our gauge
25  for market data, so I'm not sure if there's other
```

1    models out there.

2        Q    You don't know if there's other models out

3    there?

4        A    No.

5        Q    Did you do any research to see if there

6    were any models that worked up actual thinly

7    traded public shares?

8        A    I know there's models out there that are

9    proprietary.  I know there's another person who

10   does that sort of thing.

11       Q    Okay.  Did your firm consider developing a

12   model for this engagement that would be based on

13   thinly traded public shares versus private

14   placements?

15       A    No.

16       Q    Why not?

17       A    Because we used this model.  This model

18   tends to work fairly well for us.

19       Q    Well, when you say it "works fairly

20   well" --

21       A    We've used it for --

22       Q    -- what does that mean?

23            Like, you've been able to charge money for

24   it for ten years?

25                 MR. KAZAN:  Object to the form.

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 117 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 117

1          MR. ZIMMER:  Let the record reflect
2      that that was said in jest.
3          MR. KAZAN:  Understood, Mr. Zimmer,
4      but can you just repeat the question that
5      you want answered at this point?
6          MR. ZIMMER:  Can read that back for
7      me?
8          THE COURT REPORTER:  Sure.
9          (The last question was read
10         back by the court reporter.)
11  BY MR. ZIMMER:
12     Q    Okay.  So define "works fairly well."
13     A    So I guess I misspoke.  I shouldn't say it
14  "works fairly well."  We've used it a long time.
15  It's a good representation of market data based on
16  lack of liquidity or time to liquidate shares.
17  That's why we use it.
18     Q    But it's not based on public markets?
19     A    It is based on public -- it's based on
20  publicly traded stocks.
21     Q    But it's not based on public trades of
22  stock.  It's based on private placements of
23  publicly traded stock.  Right?
24     A    Correct.  Yes.
25     Q    Okay.  And it's not necessarily based on

1   thinly traded companies.  Right?

2      A    There are some that are thinly traded and

3   some that aren't.

4      Q    Okay.  So do you think that the thinly

5   traded nature of a stock would be relevant?

6      A    It could be.

7      Q    You don't know?

8      A    I don't know.

9      Q    Okay.  So you don't know whether including

10  other types in there would skew or somehow render

11  it less representative?

12     A    I don't know the answer to that.

13     Q    Okay.  I may have asked this, and I

14  apologize.

15          Do you know whether the companies in the

16  MPI study were thinly traded -- you said there

17  were some that were thinly traded and some that

18  weren't?

19     A    Yes.

20     Q    Did you even consider using any

21  methodology, other than this one, to address the

22  question of whether the market price should be

23  discounted in an analysis of the value of the

24  shares at issue here?

25     A    The other analysis we looked at was we

1   looked at private placements of large blocks of

2   stock.

3        **Q     How does that vary from what's in the MPI**

4   **study?**

5        A     The MPI study is looking at private

6   placement of restricted stock, whereas I can look

7   at stocks that were traded not through the market

8   but through private networks.

9              So there's basically two trading

10  platforms:  You've got the public market, the

11  New York Stock Exchange, and there's also a

12  network of trades through institutional trades.

13       **Q     Right.**

14       A     So if you look at institutional trades,

15  that's usually where your big blocks trade.

16       **Q     Right.**

17       A     And you can see, from that data, what

18  discounts were for large blocks of stock.

19       **Q     Did you apply that model here?**

20       A     No.

21       **Q     Okay.  So those are two existing models.**

22            **Did you consider that the existing models**

23  **might not be appropriate to use here?**

24       A     No.

25       **Q     You never considered the possibility?**

```
 1    A    No.

 2    Q    Okay.

 3         MR. ZIMMER:  Why don't we take five

 4         minutes.  Let me organize.  I went a

 5         little bit out of order, got ahead of

 6         myself a little bit.

 7         MR. KAZAN:  Sure.

 8         (A recess was held off the record.)

 9         MR. ZIMMER:  Back on the record.

10    BY MR. ZIMMER:

11    Q    In arriving at an output from your -- from

12    the MPI study methodology, is there one variable

13    that has the largest impact on the outcome?

14    A    There's two variables that have the

15    largest impact:  one is volatility, and one is

16    time -- time period.

17    Q    But the time period is based on the

18    15 percent assumption.  Correct?

19    A    Correct.

20    Q    And the volatility is based on the

21    actual -- in this case, the actual volatility of

22    Navidea shares?

23    A    Correct.

24    Q    Okay.  But do you know which of those two

25    has the greatest impact?
```

```
 1     A    No.

 2     Q    Why not?

 3     A    We could calculate it and see.  I don't

 4  recall, off the top of my head.  You'd have to do

 5  the calculation and see which one gives you the

 6  biggest, but . . .

 7     Q    Okay.  But one of the two most important

 8  factors is this longstanding 15 percent

 9  assumption?

10     A    The time frame, yes.

11     Q    To be clear, on page -- you know, the

12  assumption on page -- I believe it was 10 --

13  right? -- of 15 percent of the daily trading

14  volume could be added.  Correct?

15     A    Correct.  Yes.

16     Q    Okay.  It seems like a pretty detailed

17  methodology.

18          Do you know who actually developed it?

19     A    It was developed with a number of the

20  people in our firm.

21     Q    Were you at the firm at the time?

22     A    No.

23     Q    Okay.  Do you know if the people are still

24  at the firm that did it?

25     A    I think most of them are.
```

1    Q    Okay.  And you said, to the best of your

2    knowledge, it hasn't been updated in some time.

3          Has it ever been updated?

4               MR. KAZAN:  Object to the form.

5               THE WITNESS:  The data is updated

6          from time to time.  The methodology stays

7          pretty much the same.

8    BY MR. ZIMMER:

9    Q    The methodology is the same; the inputs

10   are updated.  But, for example, the treasury --

11   some of them -- when you say "updated," you know,

12   they reflect reality.  Right?

13         So, like, the S&P 12-month change, is it

14   always 12 months?  You always use 12 months, you

15   said?

16   A    We've always used 12 months.

17   Q    Even when you're looking at a 53-month

18   period of -- 53-quarter period of selling, you're

19   still going to look at a 12-month period?

20   A    Correct.

21   Q    And although it's probably technically a

22   variable, the risk-free rate has remained the same

23   throughout.  Correct?

24   A    Yes.  Well, since the rates fell to

25   unusually low rates, we've normalized it to

1    3 percent.

2        Q    Do you know what you did before that?

3        A    We used the actual.

4        Q    You used the actual until the rate went

5    down?

6        A    Correct.

7        Q    Okay.  Do you consider the MPI model to be

8    generally accepted?

9        A    Yes.

10       Q    How do you define that?

11       A    We use this in hundreds of valuations each

12   year that go to the IRS, and they've been through

13   it before.

14       Q    Okay.  Has it been used in court before?

15       A    Yes.

16       Q    How many times?

17       A    I don't know.

18       Q    Have you used it in court before?

19       A    Yes.

20       Q    How many times?

21       A    Probably three or four.

22       Q    Okay.  What were the circumstances in

23   those cases?

24       A    One was a -- actually, we can look at my

25   history, and I'll tell you exactly what it was.

1      Q     Yes.  As I said, just to be clear, the

2    last two pages of the addenda are not contained in

3    this exhibit, but your testimony is complete in

4    here.  So we can refer to that, if you want.

5      A     So that was used in Lobsenz versus

6    Lobsenz, which is at the bottom of my trial

7    history.

8      Q     Okay.  And what were the circumstances

9    there?

10     A     That was a family dissolution matter, and

11   the issue was a -- there was an asset we were

12   valuing, and we were determining lack of

13   marketability for that asset.

14     Q     What was the asset?

15     A     It was an interest in a family limited

16   partnership.

17     Q     Publicly traded?

18     A     No.

19     Q     Okay.  What else?

20     A     That's the only one I've used in court.

21     Q     Okay.  Again, that didn't involve publicly

22   traded securities?

23     A     Correct.  I've used it in cases that have

24   settled, but the ones that have gone to trial --

25     Q     Right.  Understood.

```
1              Okay.  Did you say earlier that it had
2     been peer reviewed?
3        A    That's my understanding.
4        Q    Do you know how? when? where?
5        A    No, I do not.
6        Q    What's your understanding based on?
7        A    My understanding is it was published in an
8     article, and I assumed it was peer reviewed.
9        Q    You assumed?
10       A    Yes, sir.
11       Q    Is "publication" equal to "peer review"?
12       A    No.
13       Q    Are you familiar with the publication?
14            It's listed in here.  It's Business
15    Valuation --
16       A    Business Valuation Review:  Spring of
17    2011.  It's on the bottom of page 8.
18       Q    Oh, page 8.  I see the footnote.  Sorry.
19       A    It wasn't my publication.
20       Q    When you say it wasn't your publication,
21    do you mean you weren't involved in having it
22    published, or you weren't the publisher of the
23    periodical?
24       A    Neither.
25       Q    Okay.
```

1      A    I have published in Business Valuation

2    Review, but I was not --

3      Q    Is Business Valuation Review -- what type

4    of a publication is that?  Do you know who

5    publishes it?

6      A    Yeah.  There's an industry group that

7    publishes the Business Valuation Review.  I don't

8    remember the name of them, and they publish a lot

9    of articles.  They published one of my articles.

10     Q    Was your article peer reviewed that was

11   published?

12     A    Yes.

13     Q    What was that on?

14     A    That was on using restricted stock studies

15   to determine lack of marketability.

16     Q    Of what?

17     A    For privately held companies.

18     Q    Okay.  For privately held companies?

19     A    Yes.

20     Q    But you don't know whether this -- do you

21   know whether Business Valuation Review conducts or

22   requires a peer review prior to publication?

23     A    My understanding is they do.

24     Q    Okay.  This says it was published in

25   spring 2011.

```
 1          Is that at or about the time it was
 2   developed, do you believe, or was it developed
 3   earlier than that?
 4     A    My understanding is it was developed a lot
 5   earlier than that.
 6     Q    Okay.  Do you know whether this
 7   publication involved the use of this model to
 8   determine the impact of trading volume of publicly
 9   traded stocks on the public stock price?
10     A    I do not.
11     Q    Okay.  Do you think it's likely that's
12   what it was about?
13               MR. KAZAN:  Object to the form.
14               THE WITNESS:  What?  The publication?
15               MR. ZIMMER:  Yeah.
16               THE WITNESS:  The publication was
17          about a restricted stock study and the
18          methodology they used to do it.
19   BY MR. ZIMMER:
20     Q    You believe -- finish.  I'm sorry.
21     A    That's it.
22     Q    You believe it was about the methodology
23   itself, not applications of the methodology, the
24   different circumstances?
25     A    Not that I recall.  I don't recall -- I
```

Case 1:19-cv-01578-VEC-VF  Document 256-2  Filed 02/04/22  Page 128 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 128

1    read the article a long time ago.  I don't

2    remember.

3         Q    Okay.  Do you know if anyone else at your

4    firm has used this in court to address the impact

5    of trading volume on publicly traded share price?

6         A    In court?  No, I don't.

7         Q    Do you know if it's been peer reviewed for

8    that purpose?

9         A    I don't know.

10        Q    Do you know if it's ever been published

11   for that purpose?

12        A    Not that I'm aware of.

13        Q    Okay.  So even if you were to assume that

14   the methodology had been peer reviewed, is it

15   generally accepted practice to use a methodology

16   designed for one purpose:  to predict outcomes

17   in different situations?

18             MR. KAZAN:  Object to the form.

19             THE WITNESS:  I don't think that's

20        what we were doing here.  We were looking

21        at a discount that's created for a time

22        period that it would take to liquidate a

23        piece of stock.  That's what this model

24        does.

25

 1   BY MR. ZIMMER:

 2      Q    But in your application of it to publicly

 3   traded stock, one of the two key inputs is the

 4   percentage of daily trading volume that could be

 5   sold without affecting share price.

 6           Right?

 7      A    That's an input into the model, yes.

 8      Q    And it's one of two principal inputs that

 9   impact the outcome.  Correct?

10      A    That's correct.

11      Q    And that is not part of the methodology.

12           Right?

13      A    Well, the methodology just takes the -- a

14   group of data over a thousand transactions and

15   summarizes that data such that you can get a

16   result based on your circumstances.

17      Q    But what I'm saying is, this says you

18   believe -- you say that you believe that studies

19   published in Business Valuation Review are peer

20   reviewed.

21           This says that, in 2011, "Regression

22   Analysis and Discounts for Lack of Marketability"

23   was published.

24           Is that the underlying private placement

25   methodology that we've been looking at at the

1   bottom of page 10?

2      A    Yes.

3      Q    Does that incorporate the 15 percent

4   assumption at the top of page 10, or is that

5   what's applied to that assumption?

6      A    We apply the 15 percent to create an input

7   for the model.

8      Q    Right.  Do you believe that what was

9   published in Business Valuation Review included

10   the 15 percent assumption?

11     A    No.

12     Q    Okay.  Is it generally accepted to use a

13   predictive model if the outcome of application of

14   the model incorrectly predicts true events?

15             MR. KAZAN:  Object to the form.

16             THE WITNESS:  I'm not sure what you

17         mean.

18   BY MR. ZIMMER:

19     Q    If you had a model that was used to

20   predict average temperature variant, let's say,

21   per month -- okay? -- and somehow that model would

22   predict that, in the state of Connecticut, it

23   would be warmer in the month of January than in

24   the month of August, would it be generally

25   accepted to use that methodology?

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 131 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 131

1          MR. KAZAN:  Object to the form.

2    BY MR. ZIMMER:

3      Q    If you knew that the outcome was wrong?

4          MR. KAZAN:  Object to the form.

5          THE WITNESS:  If you were using a

6          predictive model as of a point in time, so

7          it's known or knowable as of, in this

8          case, February 14, 2019, so there's no way

9          I would know, at February 14, 2019, what

10          the actual numbers would be going forward.

11    BY MR. ZIMMER:

12      Q    If you apply your model, is there ever a

13    circumstance in which it would predict that sale

14    of large volumes of shares would not cause the

15    market price of the shares to go down?

16      A    Again, that's not what our model does,

17    so . . .

18      Q    Well, you assume -- right? -- the

19    15 percent will -- that more than 15 percent will

20    drive the market price down if more than

21    15 percent of the average daily trading volume is

22    sold on a given day.  Correct?

23      A    That's correct.  Yes.

24      Q    If it turns out that the opposite is true,

25    would that be a valid predictive model?

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 132 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 132

1      A      Again, the 15 percent is a rule of thumb

2   that can be applied to a large population, so it

3   could be possible that it's wrong.  It could be

4   possible that you could sell shares and there's no

5   impact, or you could sell five shares and there is

6   a big impact.

7      **Q      If you knew that it was not effective in**

8   **predicting outcomes, would it be appropriate to**

9   **use it with respect to a specific stock?**

10                    MR. KAZAN:  Object to the form.

11                    THE WITNESS:  Again, you're using a

12              broad market assumption to determine

13              future events.  There's no way you'd know

14              future events at that particular time.

15   BY MR. ZIMMER:

16      **Q      Well, could one use this model -- well,**

17   **could one -- strike that.**

18              **Could one attempt to confirm the accuracy**

19   **of this model with respect to a specific stock by**

20   **applying it to a different date in time?**

21              **You apply to it to two specific dates.**

22              **Correct?**

23      A      Correct.  Yes.

24      **Q      And theoretically -- not theoretically.**

25              **If asked, you could apply it to any date**

1    in time.  Correct?

2        A     True.

3        Q     You'd use the same 15 percent assumption:

4    the assumption that the sale of more than

5    15 percent of the total daily trading volume --

6    the average daily trading volume would affect --

7    cause a downward pressure on the price?

8        A     That's correct.  Yes.

9        Q     So if you observed, say, a dozen instances

10   where trading volume was somewhere in the order of

11   10 to 80 times the average daily trading volume

12   and on each one of those days, the price went up,

13   would that indicate that perhaps your 15 percent

14   assumption would not be appropriate to use on that

15   given stock?

16       A     Well, at a point in time you'd only have

17   historical data first.  So if I'm sitting here at

18   February 14, 2019, I can only look back.  I

19   couldn't look forward.

20       Q     Correct.

21       A     Correct.

22       Q     But you could do an analysis for a

23   specific date earlier in time.  Right?

24       A     Correct.

25       Q     So if you did that for a specific date and

1    it turned out that what was predicted was the

2    opposite of what happened, would that call into

3    question the applicability of this model going

4    forward?

5        A    You mean one instance or consistently over

6    time?

7        Q    Say it was consistent over time.

8        A    Consistent over time, I might look at

9    that, but if it was one instance, it can happen.

10       Q    Okay.  And you used this as a predictive

11   model for dates.  You said you can't look back.

12   Right?

13            You're looking at August -- you're looking

14   at February 14, 2019, and 2020?

15       A    Yes.

16       Q    Is that right?

17       A    Those are my valuation dates, yes.

18       Q    Okay.  So what did you mean when you said,

19   you know, you can't look back?  What was your

20   point there?

21       A    That's not what I said.  I said you can't

22   look forward.

23       Q    You can't look forward.  Okay.

24            But since it's well after February 1 --

25   excuse me, February 14 of 2020, right now, to look

1   at time periods subsequent to that, one would have
2   to look back but not forward.  Right?
3      A    What do you mean?  If we're doing it as of
4   today?  I'm not sure I understand.
5      Q    Well, you used an as-of date.  Right?
6      A    Correct.
7      Q    And I grant you that, if the as-of date
8   were today, one could not look forward with any
9   certainty, but you used an as-of date that was in
10  the past.  Right?
11     A    Correct.
12     Q    So to, quote/unquote, "look forward" from
13  the date you used, one could still use historical
14  data because there's all the time between
15  February 14, 2020, and today that's actually
16  elapsed.  Right?
17          From your vantage point of February 14,
18  2020, it's looking forward.  But you're not trying
19  to predict the future.  You have actual data about
20  subsequent events.  Correct?
21          MR. KAZAN:  Object to the form.
22          THE WITNESS:  I have actual data of
23          what actually happened; however, I'm
24          looking at this at a point in time,
25          February 14, 2019.

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 136 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 136

1              So the question is, What was known or
2         knowable at that date?
3              So if they were going to do a
4         transaction on February 14, 2019, a
5         buyer -- whoever bought that stock could
6         only look back.  He couldn't look forward.
7         They would not know what was going to
8         happen.
9    BY MR. ZIMMER:
10     Q    If your model were consistently wrong
11   about the impact of high-volume trading on the
12   price of Navidea shares, subsequent to
13   February 14, 2020, would that call into question
14   its applicability on that date?
15             MR. KAZAN:  Object to the form.
16             THE WITNESS:  No.  It's only what's
17        known or knowable.
18             So if I would have looked back and
19        saw that it was wrong, possibly, but
20        looking forward, there's no way to know
21        the future.
22             As of February 14, 2019, there's no
23        way to know at that time what was going to
24        happen in the future.
25

1    BY MR. ZIMMER:

2        Q    Did you look at actual trading data for

3    February 14, 2009?

4        A    Yes.

5               MR. KAZAN:  Just a minute.  I think

6            you got the date wrong.

7               MR. ZIMMER:  I'm sorry.

8    BY MR. ZIMMER:

9        Q    Did you look at actual trading data for

10   February 14, 2019, and 2020?

11       A    Yes.

12       Q    Okay.  Did you look to see if there were

13   high-volume trading days bracketing that time

14   period?  Higher-volume trading than on that date?

15       A    We look at -- we look -- we did a lookback

16   from that looking back.  I don't recall any

17   higher-volume days.

18       Q    Did you look for them?

19       A    Yes.

20       Q    Okay.  You don't think there were --

21       A    I don't recall them --

22       Q    -- more than 15 percent?

23       A    I don't recall any drastic movements in

24   the trading volume.

25       Q    But you're talking about 15 percent.

1          Right?

2     A    Yes.

3     Q    Is the threshold.  Right?

4     A    That's what we're saying over an average

5  of time.  That's what you can . . .

6     Q    Okay.  Did you look back to see if there

7  were, in fact, trading days where the volume

8  exceeded 15 percent of the average daily trading

9  volume?

10    A    No.  I don't recall doing that.

11    Q    Okay.  So you didn't bother to look at

12  what the real-world impact of that might have

13  been?

14    A    Again, we didn't do that specific

15  analysis.

16    Q    Okay.  And you didn't look at the known

17  time period the entire time up until the time --

18  the date you did your analysis either.

19          Is that correct?

20    A    What do you mean?  From 2019 back?  Is

21  that what you're asking?

22    Q    Well, the approximate date that you

23  submitted this report was -- what? -- I believe

24  around November 15.  Sometime in November of this

25  year.  Correct?

1     A     Correct.

2     Q     Did you look at the time period prior to,

3    you know, putting this in writing to see if the

4    actual outcomes of high-trading volume days was

5    consistent with what your model would predict?

6     A     Again, at the time we did this analysis,

7    as of February 14, you'd only have historical.

8    You wouldn't have future information.

9     Q     Understood.  And you're assuming, then,

10   that the person who would be willing to buy the

11   shares would have access to it and would use your

12   model to price the stock?

13    A     What I'm saying is, the person who's

14   buying this information as of February 14, 2019,

15   would only have historical data.  He would not

16   have future data.

17    Q     No.  What I'm asking you is, Are you

18   saying that a buyer would use your -- the MPI

19   study to determine the price it was willing to

20   pay?

21    A     Probably not, because it's a proprietary

22   model.

23    Q     Okay.  So would the stars just align and

24   they would somehow automatically pay that same

25   exact price?  Is that how predictive your model

1   is?

2      A    I don't know that it's that exact, but

3   it's an assumption.

4      Q    Okay.  And if someone were to say, "Hey,"

5   you know, "I commissioned MPI to do a study for

6   me, and this is all it's worth," is the potential

7   seller obligated to sell his shares on that date

8   if he doesn't like the price that's offered?

9      A    No.  Not that I'm aware.

10     Q    And if someone holds restricted shares in

11  a publicly traded company and the price is not

12  sufficient to motivate them to sell on any given

13  day, and assuming they don't need the funds or

14  have any other reason to disgorge the stock, is it

15  fair to assume they would sell the stock on that

16  date?

17     A    Again, I can't speculate what an

18  individual seller would do or individual buyers

19  would do.

20     Q    Okay.  Fair enough.  But that's what

21  you're doing here.  You're speculating that he

22  would sell it on the first day.  Correct?

23              MR. KAZAN:  Object to the form.

24              THE WITNESS:  Our assumption is that

25         the sale would happen as soon as it's

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 141 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 141

1               available for sale.

2    BY MR. ZIMMER:

3        Q    But an assumption is a speculation.

4    Right?  It's a fancy-sounding one.  It's

5    expensive.  But an assumption is a speculation.

6         Correct?

7               MR. KAZAN:  Object to the form.

8               THE WITNESS:  It's an assumption.  I

9          don't --

10   BY MR. ZIMMER:

11       Q    How does an assumption differ from a

12   speculation?

13       A    A speculation is saying he would have sold

14   it at a certain block of time when it's the

15   highest price.  I'm saying he sold it on the first

16   available date.  That's the assumption.

17       Q    Do you know anything about Dr. Golberg's

18   financial condition?

19       A    No.

20       Q    Do you know anything about his holdings in

21   Navidea?

22       A    No.

23               MR. KAZAN:  Asked and answered.

24   BY MR. ZIMMER:

25       Q    Do you know anything about the knowledge

1    and research and information he had about Navidea

2    and its potential price changes over time?

3        A    No.

4        Q    Okay.  But you assumed that he would sell

5    it on that date.  How is that more than

6    speculation?

7             You don't even have inputs to speculate.

8    You simply assigned that date.  Correct?

9        A    I assumed that date.  Yes.

10       Q    Okay.  What were the factors that went

11   into your assumption?

12       A    That was the first available sale.

13       Q    Did you take -- did you assume that he

14   needed funds to fund his daily living?

15       A    No.

16       Q    Did you assume he had better, higher uses

17   for the funds as of that specific date?

18       A    No.

19       Q    Did you assume that he was offered an

20   attractive purchase price on that date?

21       A    No.

22       Q    Okay.  You kind of assumed that the price

23   would have been remarkably lower than the market

24   price.  Right?

25             MR. KAZAN:  Object to the form.

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 143 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 143

```
 1                    THE WITNESS:  What do you mean?
 2    BY MR. ZIMMER:
 3        Q    50-plus percent lower than the market
 4    price, if he did a private placement on that day.
 5            Right?
 6        A    It wouldn't be 50.  It was like
 7    40-something.
 8        Q    But you assumed that that would be the
 9    date he would pick to sell?
10                    MR. KAZAN:  Objection to form.
11                    THE WITNESS:  That was my assumption.
12                    MR. ZIMMER:  Okay.
13    BY MR. ZIMMER:
14        Q    Did you come up with that assumption, or
15    did someone ask you to assume that date?
16        A    That was strictly math.  I went to six
17    months and 18 months after the date of the
18    agreement.
19        Q    Well, I understand.  Was that -- was it
20    your -- was it your choice to use that date as the
21    assumed sale date -- or those two dates as the
22    assumed sale date, or did someone instruct you
23    that you should use those as the assumed sale
24    date?
25        A    I don't recall how that came about.  I
```

1   don't know.  I don't remember.

2       Q    You don't?  Did you discuss it internally

3   at the firm?

4       A    No.  I discussed it with counsel.

5       Q    Okay.  And you don't recall how it came

6   about?

7       A    I don't.

8       Q    Okay.  Has Navidea stock been thinly

9   traded throughout its history in your -- you know,

10  your assessment of thinly traded?

11      A    No.

12      Q    When was it not thinly traded?

13      A    I don't recall the dates, but there was a

14  point when it started trading more actively,

15  subsequent to February 2020.

16      Q    So you looked at the subsequent history as

17  well?

18      A    I did, yes.

19      Q    Okay.  When you talk about timing the

20  market, how is your assumption that these shares

21  would be sold on the very first day they could be

22  sold, regardless of financial condition, other

23  opportunities, you know, available price, you

24  know, the heavy discount -- how is that any

25  different than timing the market that's just

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 145 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 145

1    negative for Dr. Golberg?

2              MR. KAZAN:  Object to the form.

3              THE WITNESS:  What do you mean?

4    BY MR. ZIMMER:

5    Q    Well, aren't you, in essence, assuming --

6    you're assuming that he would sell it on an actual

7    date certain.  Right?

8              Not even a range of dates.  Right?

9    A    Correct.  Yes.

10    Q    How so was that a more valid assumption

11    than any other date that one might assume he would

12    sell the shares?

13    A    Again, I can't speculate when he would

14    sell the shares or not sell the shares.  My

15    assumption was he sold it when it could be sold.

16    Q    But you say you can't speculate on when he

17    would.

18    A    Correct.

19    Q    But you assigned a specific date and went

20    through an entire 12-page -- is it a 12-page

21    report?  I believe it's 12.  I want to give you

22    full credit here.

23    A    Fifteen pages.

24    Q    Oh, 15.

25    A    It doesn't include the exhibits at the

1    end, of course.

2        Q    I'll give you extra credit for that.

3        A    Okay.

4        Q    And it also does include some stuff about

5    Macrophage that we'll get to later.

6             But you produced this whole entire report

7    based on the assumption that he would sell two

8    specific blocks of shares on two specific dates.

9             Right?

10   A    That's correct.

11             MR. KAZAN:  Object to the form.

12             THE WITNESS:  Sorry.

13   BY MR. ZIMMER:

14       Q    And you don't consider that speculating on

15   how he would time the market?

16   A    I think that has nothing to do with timing

17   the market.  It's just a specific date when it

18   could be sold.

19       Q    Well, so is, like, May 10, 2020, or

20   whatever.  And I'm -- just to be fair, I'm not

21   picking -- even if it's coincidental, I'm not

22   suggesting a date that was picked by Mr. Orr or

23   referenced anywhere in this case.

24             Like, how is that any different from any

25   other date in time as far as likelihood that he

1    would sell the shares on that date?

2       A    Again, I can't speculate when he would

3    sell the shares.  I just chose the date when the

4    restriction period was up.

5       Q    Okay.  If someone did some research into

6    Dr. Goldberg's financial condition and, you know,

7    market conditions and known information about

8    Navidea and trading history and financial

9    wherewithal and, you know, available price on

10   specific dates and picked a different date, would

11   that be any more speculative than your assumption

12   that he would sell them on that particular date?

13          Or less, if they had actual real-world

14   inputs to drive their assumption?

15          MR. KAZAN:  Object to the form.

16          THE WITNESS:  Again, I think any time

17          you look at a specific market timing, that

18          could be speculative.  You don't know --

19          sitting here today, you don't know when he

20          would have sold or not sold.

21   BY MR. ZIMMER:

22      Q    Would information based on actual known

23   facts be more speculative an assumption than your

24   assumption, which is based on none of that?

25          MR. KAZAN:  Object to the form.

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 148 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 148

```
 1                    THE WITNESS:  Again, there's no way
 2            to speculate when he would or would not
 3            have sold.
 4    BY MR. ZIMMER:
 5        Q    But you did?
 6        A    I assumed, when the restriction was up, he
 7    would sell.  That was my assumption.
 8        Q    How is that not speculating on when he
 9    would sell?
10            You picked a date in time to value his
11    shares based on an assumption he would sell them
12    on that date.  Right?
13                    MR. KAZAN:  Object.  Asked and
14            answered, and you're bordering on
15            argumentative at this point.
16                    MR. ZIMMER:  I disagree with the
17            argumentative point, and the asked and
18            answered -- this is in the context of an
19            inquiry here, so . . .
20    BY MR. ZIMMER:
21        Q    Is it correct?
22        A    I picked a date that was my assumption.
23        Q    And you don't -- you can differentiate
24    that, in terms of market timing, from anyone else
25    picking any other date?  How?
```

Case 1:19-cv-01578-VEC-VF Document 256-2 Filed 02/04/22 Page 149 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 149

1      A    I can't.  You can pick any date.  You just

2  don't -- no one knows what date.

3      **Q    And you did.  Right?**

4      A    I picked a date when the restrictions

5  lapsed.

6      **Q    What makes your date the right date?**

7      A    I don't know my date's the right date.

8  That's the assumption I made.

9      **Q    Okay.  And how would you know if anyone**

10  **else's date was the right date?**

11      A    You wouldn't.

12      **Q    Okay.  So now if the Navidea shares --**

13  **you have two dates.  Right?**

14          **You have February 2019 -- February 14,**

15  **2019, and February 14, 2020.**

16          **Right?**

17      A    Correct.

18      **Q    Even assuming you couldn't look at time**

19  **frames outside of that -- and I take issue**

20  **with -- as a --**

21          MR. KAZAN:  Greg, I'm just going to

22          stop you.  Ask the question.  You're

23          starting to inject your personal

24          statements, and I'm going to object.

25          At a certain point, I'm going to

Case 1:19-cv-01578-VEC-VF  Document 256-2  Filed 02/04/22  Page 150 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 150

1          instruct him not to answer simply because

2          your question is not going to be clear.

3                    MR. ZIMMER:  Well, if you think my

4          question isn't clear, let me know, because

5          I want to make it clear.

6                    And I grant you that this is a

7          complicated area, and I'm trying to

8          develop clear and meaningful questions for

9          him and get good information.

10                   I'm not trying to trick you.  As I

11         said, the record will reflect what you

12         said.  Nothing I say you said is going to

13         change what you said.  I'm not that kind

14         of a lawyer.

15   BY MR. ZIMMER:

16     Q     So is it your position that you cannot --

17   that if you want to apply your model and you want

18   to determine its predictive value, that you

19   cannot look at a date after February 14, 2020,

20   apply your model, and see whether it was correct

21   or not?

22                   MR. KAZAN:  Object to the form.

23   BY MR. ZIMMER:

24     Q     As one way of determining the predictive

25   value of your model?

1    A    What I'm saying is, as of either of these

2   dates, the February 14, '19, or February 14, '20,

3   you would not have future information.  You would

4   only have historical information.

5    Q    If you are using your 15 percent in your

6   model -- I think maybe refer to it that way.

7         Right?

8         You're using two separate inputs.  You've

9   got all the things listed in the chart on the

10  bottom of page 10.

11        And let me just ask you -- sorry.

12        If we went through the chart on page 11,

13  which is for the later time period, would there

14  be material differences in your answers to those

15  questions about all of those variables?

16        I think there was one with respect to the

17  holding period.

18   A    The only difference is -- well, obviously

19  the volatility changed, but the only difference is

20  the holding period was this model's -- the page

21  on -- page 11 is using the six-month holding

22  period.

23   Q    And why does that one use the six-month

24  holding period?

25   A    Because when we calculated, at the top of

1    page 10, for that second period, we said it would

2    take five quarters to sell.

3        Q    It was a shorter predicted --

4        A    It was shorter.

5        Q    -- time period needed to dribble the

6    shares out to the market, in your view, using the

7    same 15 percent.  Right?

8        A    That's correct.

9        Q    So there were two components to your

10   analysis, basically, and one is the application of

11   the methodology of the MPI study.  Right?

12       A    Yes.

13       Q    And the other one is the 15 percent input.

14       Right?

15       A    Correct.

16       Q    The others are kind of objective things.

17       Right?

18       A    Correct.

19       Q    The only variable that is not,

20   quote/unquote, "objective" is the holding period,

21   and that's based on the 15 percent.  Correct?

22       A    Correct.

23       Q    Okay.  So if one wanted to analyze the

24   predictive value of the combination of the

25   15 percent and the MPI study, couldn't one look at

```
 1   anecdotal dates in various public shares and look

 2   at high-trading volume days, applying the model as

 3   of that date, and then look at the actual impact

 4   on price to determine the predictive value of your

 5   model?  Wouldn't that be fair?

 6                 MR. KAZAN:  Object to the form.

 7                 THE WITNESS:  I'm not sure I

 8          understand that.

 9   BY MR. ZIMMER:

10       Q    So the purpose of, for example, page 10 --

11            Right?

12       A    Mm-hmm.

13       Q    -- was to use your 15 percent of daily

14   trading volume assumption.  Right?

15       A    Correct.  Yes.

16       Q    Input that and some Navidea-specific

17   information into your model.  Correct?

18       A    Correct.

19       Q    And come up with a predicted impact on

20   stock price.  Right?

21       A    Yes.

22       Q    Of a sale of a high volume of shares into

23   the market.  Correct?

24       A    Correct.

25       Q    Okay.  If one wanted to double-check the
```

1    predictive value of the combination of the

2    15 percent and the MPI study methodology, couldn't

3    you go back over time, look at different

4    companies, and go to specific dates where there

5    were exceptionally high trading volumes, apply the

6    15 percent assumption, apply the MPI study

7    methodology, predict what the price impact would

8    have been on that date, and then compare it to the

9    actual?

10            Wouldn't that be one fair way to assess

11   the predictive value of the model?

12                 MR. KAZAN:  Object to the form.

13                 THE WITNESS:  Potentially.

14   BY MR. ZIMMER:

15       Q    Yes or no?  Potentially?  I don't

16   understand what "potentially" means.

17       A    I've never done that analysis, but you

18   could do it, I guess.

19       Q    No, no.  It's not doing the analysis.

20            The question is, Would that be a

21   reasonable way to double-check the predictive

22   value of this model?

23                 MR. KAZAN:  Object to the form.

24                 THE WITNESS:  If you had a big enough

25            population, you could.  Yes.

```
 1   BY MR. ZIMMER:

 2       Q    Okay.  Because the point of this is to

 3   predict, on any given day, what the impact of a

 4   more than 15 percent increase in trading volume

 5   would have on the price of the stock on that date.

 6       Right?

 7               MR. KAZAN:  Object to the form.

 8               THE WITNESS:  Again, there's two

 9          issues:  the 15 percent and the model

10          itself.

11   BY MR. ZIMMER:

12       Q    Well, the purpose of the analysis that you

13   did, by combining the 15 percent assumption with

14   the MPI study methodology, was to predict, for a

15   given day, what the impact of a certain volume of

16   trading would be on the price of the shares on

17   that day.  Correct?

18               MR. KAZAN:  Object to the form.

19               THE WITNESS:  Correct.  Yes.

20   BY MR. ZIMMER:

21       Q    And would your model ever predict that the

22   price of the stock would go up when large blocks

23   of shares were traded?

24       A    I don't know the answer to that.

25       Q    Well, you must know the answer.  Right?
```

```
 1          I mean, you -- is it possible that, even
 2   with one quarter to sell -- you know, you know how
 3   this study -- I mean, there's only two
 4   possibilities:  one, you don't know what you
 5   would get when you put into this model; or two,
 6   this is a discount model that necessarily yields a
 7   discount number.
 8          I mean, it says here, "Predicted Private
 9   Placement Discount."
10   A    Yeah.  It generates a discount.  It
11   predicts a discount.
12   Q    It would always predict a lower price.
13        Right?
14   A    That's correct.  Yes.
15   Q    Okay.  So if there were times where the
16   price is actually higher, that would be contrary
17   to the predictions of your model every time.
18        Right?
19   A    That's correct.  Yes.
20   Q    Okay.  Do you know if anyone has ever done
21   any kind of a secondary or different type of
22   analysis to try to double-check the accuracy of
23   the predictions made by the combination of the
24   15 percent of daily trading volume thresholds and
25   the MPI study methodology?
```

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 157 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 157

1    A    No.

2    Q    You don't know whether they have, or you

3    know they haven't?

4    A    I don't know whether they have.

5    Q    Okay.  Have you ever heard it discussed

6    within the firm?

7    A    No.

8    Q    Okay.  Have you ever considered, before

9    applying it, whether you should do some kind of

10   real-world reality check to see how predictive it

11   actually is?

12   A    No.

13   Q    It's kind of just on the shelf, and when

14   you need to predict a discount, you pull this off

15   the shelf and you use your 15 percent and

16   you -- and that is the way that your firm values

17   the impact of high-volume trading on publicly

18   traded shares.  Right?

19   A    Yes.

20   Q    Okay.  I mean, what's your understanding

21   of how peer review works?

22   A    My understanding of peer review is someone

23   else in the industry reads your analysis.

24   Q    Do they vet it?  Do they try to

25   double-check it?  Do they try to confirm its

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 158 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 158

1   usefulness or no?

2      A    That, I don't know.

3      Q    You don't know.  Okay.

4           Have you ever, on your own initiative,

5   outside an engagement, just applied the

6   combination of the 15 percent of daily trading

7   volume assumption and the methodology on any given

8   day just to see whether it accurately predicted

9   reality?

10     A    No.

11     Q    Do you know if anyone at the firm ever

12  has?

13     A    Not that I'm aware of.

14     Q    Why wouldn't you try to do that before you

15  used it in an opinion like this?

16     A    Because the 15 percent is a basic market

17  guideline that we get from traders.

18     Q    No, no.  We've crossed that bridge.  Okay?

19     A    Yes.

20     Q    Right or wrong, you're using that same

21  number throughout.

22          But you have a combination approach here,

23  which is to incorporate the 15 percent of daily

24  trading volume threshold into the MPI study

25  methodology.  Right?

1     A     Correct.

2     Q     When you want to value the impact of high

3    trading volume on the price of a publicly traded

4    stock.  Right?

5     A     Correct.

6     Q     Did it ever occur to you that that is

7    something that could be done on any given date on

8    any given stock, and you can actually get a

9    reality check or double-check the predictive value

10   if you did that on a day or two just to see what

11   happened anecdotally?

12    A     You'd have to do it over a long period of

13   time.  And, again, you don't know -- if it happens

14   on one day, you don't know that it's going to

15   happen on the next day.

16    Q     But if it -- if you don't know if it's

17   wrong, it's wrong.  Right?

18    A     True.

19    Q     So if you were going to predict something

20   and reality says it's more likely wrong than not

21   in this particular instance, then what's the value

22   of it?

23           MR. KAZAN:  Object to the form.

24   BY MR. ZIMMER:

25    Q     Just to stand on theory?

Case 1:19-cv-01578-VEC-VF  Document 256-2  Filed 02/04/22  Page 160 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 160

1          MR. KAZAN:  Object to the form.

2          THE WITNESS:  Again, you'd have to

3      look at a number of stocks over a period

4      of time to see what the market does.

5  BY MR. ZIMMER:

6    Q    Okay.  But if you used this on a specific

7  date on a specific stock and it was completely

8  wrong, that wouldn't impact your willingness to

9  use it repeatedly?

10          MR. KAZAN:  Object to the form.

11          THE WITNESS:  Again, you'd have to

12      look at it over time.

13  BY MR. ZIMMER:

14    Q    No, no.  What I'm saying is if you did

15  apply it on a single day and the results were

16  off-the-chart opposite of what this would predict,

17  would that raise any question in your mind as to

18  whether you should use it going forward?

19    A    Again, one instance, you don't know

20  the -- you don't know if it's going to happen

21  every time or not.  So, again, it could be off one

22  day.  That's possible.

23    Q    Okay.  And it could easily be off on

24  January -- on February 14, 2019, or February 14,

25  2020?

1      A    It's possible.

2      Q    But you think it would be more accurate

3   than real-world evidence of what the impact of

4   high-volume trading days was upon share price?

5              MR. KAZAN:  Object to the form.

6              THE WITNESS:  Again, it's a

7          predictive model, so you don't know unless

8          you -- you'd have to look historically at

9          the numbers.

10  BY MR. ZIMMER:

11     Q    But could you use it to -- when you say

12  "predictive," you are linking predictive to

13  forward-looking.  But you --

14     A    Correct.

15     Q    -- never used it forward-looking.  You

16  always used it on dates in the past.

17          When you did your report, February 14,

18  2019, was long in the past.  Correct?

19     A    That's correct.

20     Q    And when you did your report, February 14,

21  2020, was long in the past.  Right?

22     A    That's correct.

23     Q    So you could have just as easily looked at

24  the Navidea trading information and applied it to

25  other dates too -- right? -- and seen if this was

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 162 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 162

```
 1   actually predictive of what happened on any number

 2   of those dates -- right? -- to determine whether

 3   it was appropriate to use it to predict the impact

 4   of high-volume trading on Navidea's share price,

 5   couldn't you?

 6                MR. KAZAN:  Object to the form.

 7                THE WITNESS:  The issue is that, as

 8           of February 14, a buyer would not have the

 9           that information, so he wouldn't be able

10           to do that.

11   BY MR. ZIMMER:

12      Q    But if you looked back -- even if you say

13   you want to look back from that date -- if you

14   look back from February 14, 2020, and looked at

15   high volume -- wouldn't it make sense to

16   double-check to say, Okay.  There have been

17   however many high-volume trading -- in your mind,

18   high-volume trading, more than 15 percent --

19   right? -- you know, in the history of the stock

20   that would be known to someone on February 14,

21   2020.

22           I could take my assumption, apply my

23   methodology, and see what would have happened on

24   this date, on this date, on this date, on this

25   date, on this date, just to see if there's
```

Case 1:19-cv-01578-VEC-VF  Document 256-2  Filed 02/04/22  Page 163 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 163

1    something unique -- or not even unique, but

2    something specific to Navidea -- it could be also

3    specific to other companies -- that renders this

4    assumption and model not a reliable predictor of

5    the impact of trading volume on share price.

6          You could do that.  Right?

7                MR. KAZAN:  Object to the form.

8                THE WITNESS:  We could do that, yes.

9    BY MR. ZIMMER:

10   Q    Did you do it?

11   A    No.

12   Q    Okay.  Now, you opined that Mr. Orr did

13   not take into consideration the thinly traded

14   nature of Navidea shares.

15          What's that opinion based on?

16   A    That was on page 13 of my report.  Or it

17   actually starts on page 12.

18   Q    Great.

19   A    Essentially what we're saying is it would

20   take -- he didn't take into account that it would

21   take more than one quarter to sell the shares.  He

22   just assumed he could go down and sell them.

23   Q    But what you really mean is -- you said

24   the 15 percent is not peer reviewed or, you know,

25   Holy Grail.  Right?  Come down from the mountain

1    or anything.

2          He did not -- clearly, he didn't use your

3    assumption as to how long it would take to dispose

4    of the shares without affecting the market.

5          Right?

6    A    That's correct.  Yes.

7    Q    Is that what you're taking issue with, is

8    that he didn't use your assumption?

9    A    I'm saying he didn't do any assumption.

10   He didn't do anything.

11   Q    Well, how do you know that?

12   A    It wasn't in his report.  He just said,

13   "Here's the stock.  Here's the price on that

14   day."

15   Q    Right.

16   A    So he assumed you could sell it all on the

17   same day.

18   Q    Okay.  You say he didn't take into account

19   the thinly traded nature of Navidea stock.

20          Isn't what you're actually saying, In my

21   opinion, the thinly traded nature of Navidea stock

22   would prevent it from all being sold on a single

23   day without impacting price?

24   A    Yes.

25   Q    You're not -- you don't know, literally,

1    that he didn't take it into account.

2            You're saying, if he had used your

3    assumptions, clearly, and your model, it clearly

4    wouldn't have come out with that result.  Correct?

5        A    Correct.

6        Q    And that's basically what your opinion is:

7    You think he should have.  Correct?

8        A    Correct.

9        Q    Okay.  But, again, do you know whether

10   this is the only -- is your proprietary -- I guess

11   it would great if it was.

12           Is your proprietary model combined with

13   this 15 percent assumption the only way that one

14   could attempt to take into account the thinly

15   traded nature of Navidea stock when trying to

16   value shares?

17       A    No.

18       Q    Okay.  And does your analysis assume --

19   well, let me ask you first, are you aware that

20   there were restrictive legends placed on shares

21   issued in Dr. Golberg's name related to a lockup

22   agreement and an escrow agreement?

23       A    Yes.

24       Q    Okay.  And that was in addition to a

25   restrictive legend saying that the shares had not

 1   been publicly registered.  Right?

 2      A    That's my understanding.  Yes.

 3      Q    Okay.  Did your -- did any of the shares

 4   that formed -- excuse me.

 5           Did any of the shares included in private

 6   placements that formed the basis for the MPI study

 7   involve restrictive legends like the ones put on

 8   the shares issued in Dr. Golberg's name relating

 9   to an independent lockup and escrow agreement,

10   rather than just Regulation D?

11      A    I don't know the answer to that.

12      Q    Okay.  Does your assumption that he would

13   sell the shares on those dates assume that those

14   restrictive legends had been removed on those

15   dates?

16      A    Yes.

17      Q    Okay.  And do you disagree that the

18   shares wouldn't be salable with those legends on

19   them?

20              MR. KAZAN:  Object to form.

21              THE WITNESS:  Can you repeat that?

22   BY MR. ZIMMER:

23      Q    Do you disagree with the fact that shares

24   with those two restrictive legends regarding a

25   lockup period and an escrow period made the shares

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 167 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 167

1   nonsalable?

2       A    Correct.  I agree.

3       Q    Do you know whether Dr. Golberg ever asked

4   to have the legends removed?

5       A    I do not.

6       Q    Do you know whether Navidea ever refused

7   to remove the legends?

8       A    I do not.

9       Q    Okay.  Are you still okay?  I'm going to

10  move on.

11      A    How much longer do we have?

12      Q    Much less time.  Yeah.  I predicted 2:00.

13           I will want to take a little time to go

14  over my notes before we wrap up, but certainly we

15  will be done with the Macrophage portion by two

16  o'clock.  It's 1:05 now.

17      A    Okay.  We can finish up.

18      Q    Okay.  So you state in your report that

19  there were three types of potential valuation

20  analyses that can be done on a company.  Correct?

21      A    Correct.

22      Q    Can you just state what they are?

23      A    There's an asset approach, an income

24  approach, and a market approach.

25      Q    Is the asset also sometimes referred to as

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 168 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 168

1    book value approach?

2       A    No.

3       Q    Is that what you're referring to?

4       A    Not really.  Basically, an asset approach

5    is you take all of the assets at market value less

6    the debt at market value.

7       Q    Market value as opposed to book value?

8       A    Correct.

9       Q    Is book value also a way to value a

10   company?

11      A    No, not particularly.  It depends on the

12   company, but generally, no.

13      Q    Okay.  And why is that?

14      A    Because book value is historical cost,

15   whereas valuation is typically market value.

16      Q    Okay.

17      A    There are exceptions to that.

18      Q    Okay.  But that -- if were it appropriate,

19   I mean, that would just be a fourth.  Right?

20           I'm just trying to understand that we're

21   talking about the same thing as we talk.

22           So when you say an "asset value," you're

23   talking about an independent valuation of the

24   assets, not going off what's recorded in the

25   books.  Correct?

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 169 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 169

1      A      Well, there are cases where the assets of

2   a company reflect market value, such as a bank

3   or --

4      **Q      Meaning they're not -- they're**

5   **advertised --**

6      A      They market to market.

7      **Q      Okay.  And you talk about the market**

8   **approach.  Right?**

9           **You said that the way to conduct a market**

10  **analysis is to look at comparable compensation.**

11          **Is that right?**

12     A      That's one way, yes.

13     **Q      How that would work?**

14     A      Basically, you can go out and either look

15  at other publicly traded companies in the same

16  market or you can go look at transactions in

17  either private or public companies.

18     **Q      And when you say, "publicly traded," is**

19  **that just because the information is available?**

20     A      Yes.

21     **Q      Okay.  And so there's nothing -- and is**

22  **the distinction between publicly traded and not**

23  **publicly traded meaningless in terms of the value**

24  **of the companies?**

25                  MR. KAZAN:  Object to the form.

```
 1                    THE WITNESS:  No, because you can
 2            look at public companies in the same
 3            industry and come up with market multiples
 4            and market indications, or can you look at
 5            transactions.
 6                    So sometimes you'll have private
 7            companies that sold and you can determine
 8            indications of value from those private
 9            companies.
10    BY MR. ZIMMER:
11        Q    How would you get that information?
12        A    We have access to databases that report
13    the sales, so they give us all the metrics we
14    need.
15        Q    Like, what's the basis for the reporting
16    on that?  Do you know?
17        A    What do you mean?
18        Q    Well, you said you have access to
19    databases.  Do you know where they get their
20    information?
21                    Is that, like, they review documents?
22                    How do they get that information that you
23    get from your, you know --
24        A    They have -- there are brokers that report
25    the deals to the database company.
```

1     Q     Okay.  So it's reported.

2     A     There's a couple sources.  One is

3  reported.  The other way is there's public

4  companies that buy private companies, and that's

5  disclosed.  So you could -- there's databases or

6  information sources that give you that

7  information.

8     Q     Okay.  If there were recent transactions

9  in the same company, would those be instructive?

10    A     Yes.

11    Q     Okay.  Are you familiar with the concept

12  of a bona fide offer?

13    A     That's a legal term, but I know that

14  offer --

15    Q     Well, I'm not using it in a legal sense,

16  but, you know, an actual credible offer to

17  purchase.

18          Would you consider that a meaningful input

19  in a market analysis?

20    A     We would look at that, yes.

21    Q     Okay.  It's something you would consider?

22    A     Yes.

23    Q     Okay.  How would you know about that?

24          Is there, like, a resource you would use

25  to look for those types of offers as opposed to

1   closed transactions?

2      A    Well, if there's offers, usually the

3   company discloses that to us.

4      Q    The company would disclose it to you?

5      A    Absolutely.

6      Q    And how do you know whether those

7   disclosures are, you know, reliable? accurate?

8      A    Well, we usually look at the offers that

9   come in.  We use that in certain situations.

10     Q    Okay.  And it would be kind of a judgment

11  as to whether it's reliable?

12     A    Well, it depends.  Like, if there's

13  multiple offers -- sometimes you get a case where

14  there's multiple offers on the table and you

15  figure out, like --

16     Q    What I'm saying is, since it's not a

17  completed transaction, your firm would use some

18  type of, you know, discretion to determine whether

19  the information was credible since it wasn't,

20  like, verifiably completed already.

21         Is that right?

22     A    Well, there's a lot of situations that can

23  happen.  I mean, you can get an offer -- usually

24  you get a letter of intent first, which gives you

25  kind of an indication of the value.  Then they'll

Case 1:19-cv-01578-VEC-VF  Document 256-2  Filed 02/04/22  Page 173 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 173

1    go through a due diligence process, and then they

2    come up with a purchase agreement.

3        Q    Okay.  Did you know that Navidea had told

4    the New York Stock Exchange that it was expecting

5    investments of $10 and 15 million in Macrophage?

6        A    Yes.

7        Q    Okay.  And were you aware that Navidea was

8    under -- I don't mean it in a pejorative way, but

9    under a threat, potentially, of delisting from the

10   New York Stock Exchange based, in part, on

11   shareholder equity requirements?

12       A    I was aware of that, yes.

13       Q    Okay.  Do you know how seriously that was

14   taken as a concern inside of Navidea?

15             MR. KAZAN:  Object to the form.

16             THE WITNESS:  No.

17   BY MR. ZIMMER:

18       Q    Okay.  You didn't look at any board

19   minutes or deposition testimony or anything about

20   how seriously they took that threat and how they

21   perceived it with respect to the company's future?

22       A    No.

23       Q    Okay.  And did you know that it was the

24   CEO, CFO, and COO, same person, of Navidea who

25   made representations to the New York Stock

```
 1    Exchange?

 2              MR. KAZAN:  Object to the form.

 3              THE WITNESS:  No.

 4    BY MR. ZIMMER:

 5        Q    Do you know that they were made in order

 6    to address New York Stock Exchange's concerns

 7    about shareholder equity in the context of trying

 8    to avoid delisting?

 9              MR. KAZAN:  Object to the form.

10              THE WITNESS:  Again, I don't know.

11    BY MR. ZIMMER:

12        Q    You don't know?

13        A    I don't know.

14        Q    Are you aware of the requirements about

15    accurate statements to regulators by officers of

16    public companies?

17              MR. KAZAN:  Object to the form.

18              THE WITNESS:  From a layman's point

19         of view, but not from a legal point view,

20         yes.

21    BY MR. ZIMMER:

22        Q    What's your understanding?

23        A    Well, my understanding is that it's --

24    there's criminal issues with making false

25    statements to the New York Stock Exchange.
```

1    Q    Okay.  I think, in your report, you take

2    issue with Mr. Orr's consideration of those

3    statements.  You go into greater detail about he

4    doesn't talk about what type of interest, what

5    percentage of interest, and things of that nature.

6         Are you finding fault with his considering

7    those statements to the New York Stock Exchange

8    under those circumstances, or are you just saying

9    that a more detailed analysis was required?

10   A    I'm just saying that there is a more

11   detailed analysis required.

12   Q    Okay.  Did you know that, under the

13   August 14 agreement, the intent was to give

14   Dr. Golberg voting control of Macrophage?

15            MR. KAZAN:  Object to the form.

16            THE WITNESS:  Yes.

17            MR. ZIMMER:  Okay.

18   BY MR. ZIMMER:

19   Q    You talked about people wanting -- well,

20   okay.  Let me back up a little bit.

21         The representation to the stock exchange

22   about these offers was made in the context of a

23   representation that Macrophage's financial results

24   would continue to be consolidated with Navidea's

25   financial results and, therefore, an influx of

```
 1    capital into Macrophage would impact Navidea's

 2    shareholder equity.

 3            Were you aware that that was the nature of

 4    the representation?

 5    A    No.

 6            MR. KAZAN:  Object to the form.

 7            THE WITNESS:  Sorry.

 8            MR. ZIMMER:  Okay.  If you would

 9        pause for a second, especially when I ask

10        good questions.

11    BY MR. ZIMMER:

12    Q    Do you know what the requirements are for

13    a public -- requirements or -- do you know what

14    the circumstances are under which a public company

15    may consolidate the financial results of a

16    subsidiary for report purposes?

17    A    Not off the top of my head.

18    Q    You don't.  Okay.

19            Do you know if it has to do with the

20    percentage of ownership?

21    A    That's my understanding.

22    Q    Okay.  So if Navidea's representing that

23    they're going to consolidate the financial results

24    post investment, isn't it reasonable to make an

25    assumption that Navidea would retain the necessary
```

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 177 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 177

1    percentage of ownership to consolidate?

2              MR. KAZAN:  Object to the form.

3              THE WITNESS:  Again, that's an

4         accounting issue.

5    BY MR. ZIMMER:

6    Q     I thought you were an accountant.

7    A     I am an accountant.  But that's public

8    reporting, and those rules have changed since I

9    did public reporting.

10   Q     Okay.  You would not expect, though, the

11   CEO of a public company to make knowingly false

12   statements to the New York Stock Exchange about

13   something like that.  Right?

14   A     Again, I can't speculate.

15   Q     Okay.  But your understanding is there

16   would be criminal penalties if they did?

17   A     That's my understanding, yes.

18   Q     Okay.  Does the existence of criminal

19   penalties from misstatements like that lend some

20   credibility to statements when you're trying

21   to -- you said you have to do a little bit of an

22   analysis to see whether you could use the

23   company-provided information.

24              If they said, "Look, we've made these

25   statements to regulators under penalty of

1    perjury," I mean, would that be a factor you would

2    take into consideration when you were trying to

3    decide whether to use that information as part of

4    your analysis?

5        A    Again, if we had an offer and we had the

6    details, we'd use it.

7        Q    Well, if you had information from the

8    company, it may not have been as concrete, but

9    they said, "Look, we've told our regulators that

10   this was going to happen, under penalty of

11   perjury," would that carry some weight in terms of

12   the credibility of the information?

13       A    As far as it existed, yes.  We would say

14   yes, it existed.

15       Q    No.  As far as whether it was accurate,

16   that it was true, that they weren't making it up.

17       A    Yes.

18       Q    Okay.  So if one was familiar with the

19   ownership percentage that a public company would

20   have to retain in order to consolidate, couldn't

21   one back out the percentage of ownership the

22   company could possibly sell and still be left with

23   the required amount -- percentage to consolidate

24   financial results?

25       A    What do you mean?  In terms of coming up

1   with value?

2      Q    Well, let me just give you -- and, again,

3   this is illustrative.

4           If one needed to have a 51 percent

5   ownership in a company to consolidate and one

6   owned 95 percent of the company, then could one

7   sell 95 percent of the company and continue to

8   consolidate?

9                MR. KAZAN:  Object to the form.

10               THE WITNESS:  I don't understand the

11          question.  Could you repeat the question?

12               MR. ZIMMER:  Yes.

13   BY MR. ZIMMER:

14      Q    If the consolidation rules -- the public

15   reporting rules required a 51 percent ownership --

16      A    That's your assumption.

17      Q    Assumption.

18      A    Okay.

19      Q    -- in order to consolidate financial

20   results of a subsidiary, and the public company

21   owned 95 percent of the subsidiary, could it sell

22   95 percent of the subsidiary and continue to

23   consolidate?

24      A    No.

25      Q    You'd have to subtract the 51 percent they

1    would be required to hold.  Correct?

2      A    Right.

3      Q    Okay.  Now, you also talked about

4    preferred shares.

5      A    Correct.

6      Q    What is the implication of what you're

7    saying there in terms of value?

8      A    Well, in order to -- like, my

9    understanding is we were talking about common

10   shares.  So if someone came in and bought

11   preferred shares, that may not give us an

12   indication of value of the common shares.

13     Q    Okay.  If it required a shareholder vote

14   to issue preferred shares and the August agreement

15   gave Dr. Golberg voting control and there had

16   never been any discussion of issuing additional

17   common shares in connection with those two

18   investments, then that would indicate that they

19   were not going to be preferred shares.

20          Correct?

21             MR. KAZAN:  Object to the form.

22             THE WITNESS:  I don't know.  I can't

23          speculate.

24   BY MR. ZIMMER:

25     Q    You can't speculate if -- if a company's

1  represented that they're in discussions to sell an

2  ownership interest in a company where it owns

3  95 percent of the common interest and no

4  preferred -- okay? -- and it does not have the

5  power, nor has it ever discussed issuing more

6  preferred shares, and yet it's telling a regulator

7  that it's going to be getting these investments

8  and consolidating, that doesn't -- that doesn't

9  speak to whether or not they could have been

10 contemplating selling preferred shares?

11             MR. KAZAN:  Object to the form.

12             THE WITNESS:  Again, I don't know if

13        they had the power or don't have the power

14        to sell preferred shares.

15 BY MR. ZIMMER:

16     Q    Okay.  Assume they don't have the power to

17 issue preferred shares --

18     A    Okay.

19     Q    -- and assume they had never discussed

20 issuing preferred shares with the people who do --

21     A    Okay.

22     Q    -- and assume they have told the regulator

23 that they're expecting two large investments --

24     A    Okay.

25     Q    -- which would be cash in, and the only

1   thing they have to sell is common shares, would

2   that require one to assume they were going to be

3   selling common shares and in an amount low enough

4   to allow them to continue to consolidate?

5              MR. KAZAN:  Object to the form.

6              THE WITNESS:  That's a fair

7         assumption, yes.

8   BY MR. ZIMMER:

9     Q    You opine that Dr. Golberg -- I'm sorry.

10         You opine that Mr. Orr did not deduct the

11  present value of Navidea's shares from his damages

12  analysis.  What does that mean?

13    A    No.  My last point?

14    Q    Yes.

15    A    Oh, I was just saying that if they were

16  to -- if he got the shares today, he didn't

17  consider that.  So if he had tradeable shares

18  today, he didn't take that out of this damages.

19    Q    Well, when you say, "if he had tradable

20  shares," what does that mean?

21    A    It means if they issued him the stock and

22  cleared the legends on the stock.

23    Q    Okay.  But if Mr. Orr were opining on a

24  damages amount that doesn't include a remedy of

25  specific performance of issuing the shares, in

1    that circumstance, there would be no basis to

2    deduct the value of the shares.  Right?

3        A    That's correct.  Yes.

4        Q    You're just looking for money?

5        A    Pardon?

6        Q    You're just looking for the value.  You're

7    not looking to have the shares and have the

8    difference in value?

9        A    Correct.

10       Q    Okay.

11              MR. ZIMMER:  Why don't we take five

12         minutes and let me look through my notes?

13              MR. KAZAN:  Sure.

14              MR. ZIMMER:  We're getting close.

15              (A recess was held off the record.)

16              MR. ZIMMER:  Back on the record.

17   BY MR. ZIMMER:

18       Q    Do you know that Navidea claims that, to

19   this day, the prerequisites to issuing the shares

20   to Dr. Golberg may not have occurred and that

21   they're not even owed to him yet?

22       A    No.  I'm not aware of that.

23       Q    That didn't play any role in your

24   analysis?

25       A    No.

1      MR. ZIMMER:  That's it.

2      MR. KAZAN:  Oh.

3      MR. ZIMMER:  We're done.

4      MR. KAZAN:  I don't have any

5  questions.

6      THE COURT REPORTER:  Attorney Kazan,

7  do you have a preference for the format of

8  your transcript?

9      MR. KAZAN:  PDF is fine.

10     THE COURT REPORTER:  Thank you.

11   (The witness was dismissed, and the

12    deposition was concluded at 1:42 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 185 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 185

1     C E R T I F I C A T E   O F   D E P O N E N T

2

3          I, WILLIAM F. MURRAY, ASA, CPA/ABV, CFF, have

4     read the foregoing transcript of the testimony

5     given, and it is true and accurate, to the best of

6     my knowledge, as originally transcribed and/or

7     noted on the attached Errata Sheet.

8

9                       _____

10                      WILLIAM F. MURRAY, ASA, CPA/ABV, CFF

11

12          Subscribed to and sworn to before me on

13     this _____ day of _____ , 2021.

14

15                      _____

16                              Notary Public

17     My Commission expires:

18     _____

19
       1:19-cv-01578-VEC
20

21     NAVIDEA BIOPHARMACEUTICALS

22     -vs-

23     MICHAEL M. GOLDBERG, M.D.

24     WILLIAM F. MURRAY, ASA  - DECEMBER 6, 2021

25     WJL

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 186 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021          Page 186

```
 1    ERRATA SHEET:  Please note any error(s) and/or
      correction(s) on this sheet.  The rules require a
 2    reason for any change or correction.  It may be
      general, such as "to correct stenographic error"
 3    or "to clarify the record" or "to conform with the
      facts."
 4
      To:  Barry M. Kazan, Esq.
 5
      Re:  Navidea Biopharmaceuticals, Inc. v.
 6         Michael M. Goldberg, M.D.
 7         Deposition of William Murray, ASA, held on
           December 6, 2021
 8
      --------------------------------------------------
 9    Page |   Line  |  Correction | Reason For Change
      --------------------------------------------------
10          |        |
      --------------------------------------------------
11          |        |
      --------------------------------------------------
12          |        |
      --------------------------------------------------
13          |        |
      --------------------------------------------------
14          |        |
      --------------------------------------------------
15          |        |
      --------------------------------------------------
16          |        |
      --------------------------------------------------
17          |        |
      --------------------------------------------------
18          |        |
      --------------------------------------------------
19          |        |
      --------------------------------------------------
20          |        |
      --------------------------------------------------
21          |        |
      --------------------------------------------------
22          |        |
      --------------------------------------------------
23          |        |
      --------------------------------------------------
24          |        |
      --------------------------------------------------
25
```

Case 1:19-cv-01578-VEC-VF  Document 256-2  Filed 02/04/22  Page 187 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021                    Page 187

1   STATE OF CONNECTICUT

2   COUNTY OF TOLLAND

3       I, Wendy J. Leard, a notary public for the

4   State of Connecticut, do hereby certify that the

5   deposition of WILLIAM F. MURRAY, ASA, CPA/ABV,

6   CFF, a witness, was taken before me pursuant to

7   the Federal Rules of Civil Procedure, held at the

8   offices of Halloran & Sage, 225 Asylum Street,

9   Hartford, Connecticut, commencing at 9:44 a.m., on

10  Monday, December 6, 2021.

11      I further certify that the deponent was first

12  sworn by me to tell the truth, the whole truth,

13  and nothing but the truth, and was examined by

14  counsel, and his testimony stenographically

15  reported by me and subsequently transcribed as

16  hereinbefore appears.

17      I further certify that I am not related to

18  the parties hereto or their counsel, and that I am

19  not in any way interested in the event of said

20  cause.

21      Dated at Somers, Connecticut, this 13th day

22  of December, 2021.

23                          -------------------------
                            Wendy J. Leard
24                          Notary Public

25  My Commission Expires May 31, 2022

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021        Index: $10..15

**Exhibits**

**MurrayW A**
 3:9

**$**

**$10**   173:5

**$7.50**   96:16

**0**

**0**   61:15
 88:22
 103:25
 104:2,3,22
 105:1,3,12

**09**   86:24

**1**

**1**   20:8
 77:13
 88:22
 92:11,13
 94:19,20
 96:2,12
 99:12
 100:5,6,
 12,14,21
 101:3,10,
 14,20,23,
 24 102:8,
 11,18,21
 103:3,14,
 16,23
 104:2,4,8,

 18 105:1,
 2,5,7,11
 106:14,16
 108:3,11,
 15 134:24

**1.4289**   99:1

**10**   21:11
 44:19,22
 45:8,10
 46:2,5,9
 49:18
 56:25
 57:1,3,12
 64:12,23
 65:11
 66:12
 68:24 70:5
 74:3 75:22
 77:11
 79:16
 81:11
 85:18,22
 87:22
 99:22
 107:12
 121:12
 130:1,4
 133:11
 146:19
 151:10
 152:1
 153:10

**100**   65:18,
 20,23
 95:20 99:9

**11**   56:25
 57:1

 151:12,21

**115**   65:25
 66:2

**12**   88:3,21
 99:6,8
 122:14,16
 145:21
 163:17

**12-month**
 89:16,21,
 22 90:1,9,
 14 91:6,
 11,13,14
 110:8
 122:13,19

**12-page**
 145:20

**12-year**   89:6

**13**   44:20
 45:18
 86:20
 163:16

**13,500**   44:18

**13,500,000**
 44:21
 46:12
 70:10

**13,500,000-
share**   76:11

**14**   16:20
 17:8,16,21
 18:7 19:3,
 13 20:4,15
 21:10
 22:6,12,

 15,18,23
 25:4,16,23
 28:15,24
 29:13,16
 44:17,24,
 25 45:5,14
 47:13 50:4
 57:5 59:3,
 9,10 70:8,
 9 71:5
 79:6 86:8
 89:20
 131:8,9
 133:18
 134:14,25
 135:15,17,
 25 136:4,
 13,22
 137:3,10
 139:7,14
 149:14,15
 150:19
 151:2
 160:24
 161:17,20
 162:8,14,
 20 175:13

**144**   52:12
 62:12
 100:7,13,
 22,23,24,
 25 101:5,
 7,9,12
 102:1,5
 111:7,22

**14th**   23:5

**15**   65:14

66:6,13
67:6,11,
13,15,16,
21 70:13
71:14,19
73:13
74:20
76:7,10,23
78:25
79:15,24
80:11
81:6,11,14
101:18
102:14,17,
24 103:3
109:13
120:18
121:8,13
130:3,6,10
131:19,21
132:1
133:3,5,13
137:22,25
138:8,24
145:24
151:5
152:7,13,
21,25
153:13
154:2,6
155:4,9,13
156:24
157:15
158:6,16,
23 162:18
163:24
165:13
173:5

**16**  71:4

**18**  21:23
24:9
25:17,22
143:17

**19**  86:11
151:2

**1933**  18:10,
19

**1990**  62:20
63:10

**1997**  63:10

**1:05**  167:16

**1:42**  184:12

---
**2**
---

**2**  77:13

**2.8**  87:2

**20**  151:2

**2008**  63:24,
25

**2009**  86:23
87:12
137:3

**2011**  125:17
126:25
129:21

**2018**  16:21
17:8,16
19:3 20:4
22:9,12,16
23:6

29:13,16
32:3 44:25
50:4 63:19
64:4 69:18

**2019**  16:7
20:8
30:10,24
32:6
44:17,25
50:4 57:5
59:3,9,10
79:6 86:8
131:8,9
133:18
134:14
135:25
136:4,22
137:10
138:20
139:14
149:14,15
160:24
161:18

**2020**  25:23
30:11,25
134:14,25
135:15,18
136:13
137:10
144:15
146:19
149:15
150:19
160:25
161:21
162:14,21

**2021**  87:12

**23,514,540**
46:2

**25**  61:21

**25th**  58:6
61:13,24
69:8 74:5,
10 81:23

**27,000**  66:3

**27,156**  65:12

**2:00**  167:12

---
**3**
---

**3**  77:13
86:9,13,25
88:16,20
89:8 90:24
91:4 110:3
123:1

**30-year**
86:2,4

---
**4**
---

**4**  77:13

**4,000**  66:3

**40-something**
143:7

---
**5**
---

**50**  99:8,22
100:1
143:6

**50-plus**

143:3

**500**  89:15,
  19 110:8,
  12

**51**  179:4,
  15,25

**53**  64:24
  65:2 70:5,
  11,13
  76:11 79:9
  86:19
  87:23
  99:23

**53-month**
  122:17

**53-quarter**
  65:7 76:24
  90:6
  122:18

─────────────
        **6**
─────────────

**6**  25:6,12

─────────────
        **7**
─────────────

**7**  30:7
  37:19
  38:10
  44:17
  51:24

**7.50**  96:17,
  18,19
  97:11,15,
  18

**75**  61:21

**75th**  58:6
  61:14,24
  69:8 74:5,
  10

─────────────
        **8**
─────────────

**8**  8:3 43:1
  51:22,24
  125:17,18

**80**  133:11

**82.2**  58:22
  59:4

─────────────
        **9**
─────────────

**9**  63:9
  77:12

**90**  44:3,9,
  12,13

**95**  179:6,7,
  21,22
  181:3

**96**  62:23

─────────────
        **A**
─────────────

**absolute**
  107:15

**Absolutely**
  56:20
  172:5

**accepted**
  123:8

128:15
130:12,25

**access**  39:19
  139:11
  170:12,18

**account**
  21:12,18
  24:5,7,10
  34:19
  47:6,20
  88:18 89:3
  94:21 95:1
  163:20
  164:18
  165:1,14

**accountant**
  8:25
  104:25
  177:6,7

**accounting**
  7:17,21,23
  8:3 10:16,
  25 11:4,11
  12:23 13:8
  177:4

**accuracy**
  132:18
  156:22

**accurate**
  161:2
  172:7
  174:15
  178:15

**accurately**
  158:8

**acknowledge**
  50:25

**across-the-
board**  81:8

**Act**  18:10,
  18

**action**  5:17

**actively**
  31:22 46:5
  144:14

**actual**  23:18
  43:15,25
  46:4 61:6,
  11,23
  69:11
  74:14,21
  77:2 79:4
  82:2 86:16
  89:19
  92:23
  93:14,25
  94:4,16
  95:21 96:8
  109:22
  110:10,12
  116:6
  120:21
  123:3,4
  131:10
  135:19,22
  137:2,9
  139:4
  145:6
  147:13,22
  153:3
  154:9

171:16

add 106:1

added 121:14

addenda 7:4
124:2

addition
28:24 46:9
165:24

additional
63:8 65:23
75:23
180:16

address
118:21
128:4
174:6

adds 105:8

adjust 88:21

adjustment
74:9

advertised
169:5

Advisors
8:12,13

Aetna 9:7,8,
18

affect 21:7
24:23 35:8
36:17 53:4
75:8,25
89:11
112:20
133:6

affected
34:13,21
35:6,17
38:8 113:8
114:13

affecting
75:25
102:15
129:5
164:4

affects
16:22

after-market
9:13

agree 23:4
167:2

agreement
17:6,9,19,
21,22
18:1,3,8,
13 19:13,
17 20:15,
22 21:2,
11,14 25:5
28:15,25
45:6,15
47:13
143:18
165:22
166:9
173:2
175:13
180:14

ahead 120:5

align 139:23

amount 55:10
79:21
100:17
178:23
182:3,24

ample 28:20

analogy 78:5

analyses
167:20

analysis
20:11
24:17
31:21
42:23
47:21
53:17,21
54:4,20
81:3,5
118:23,25
129:22
133:22
138:15,18
139:6
152:10
154:17,19
155:12
156:22
157:23
165:18
169:10
171:19
175:9,11
177:22
178:4
182:12
183:24

analyze
30:19
51:13,15
152:23

analyzing
53:3

Anchin 8:16,
17 12:22,
23

anecdotal
68:1 72:15
153:1

anecdotally
159:11

anecdotical
68:3

announced
45:15

announcements
35:4,16,
22,25 36:4

annual 94:8

answers 5:25
105:2
151:14

antidilution
15:25

anymore 7:23

anything's
73:24

apologies
77:16

apologize

57:20
63:15
83:16
110:13
118:14

**appearances**
7:7

**applicability**
134:3
136:14

**application**
19:6 40:1
82:15 98:7
129:2
130:13
152:10

**applications**
127:23

**applied**
44:11
70:13
91:20
109:7
130:5
132:2
158:5
161:24

**applies**
102:11

**apply** 31:6
43:11
53:20
54:10 61:2
67:7 70:14
79:23
109:16

114:24
115:21
119:19
130:6
131:12
132:21,25
150:17,20
154:5,6
160:15
162:22

**applying**
132:20
153:2
157:9

**approach**
158:22
167:23,24
168:1,4
169:8

**approximate**
138:22

**area** 8:11
11:25
58:14 73:2
150:7

**argue** 71:16

**argumentative**
148:15,17

**arm's** 112:8,
12

**arrive** 65:9
67:25

**arriving**
81:13
120:11

**article**
48:23
125:8
126:10
128:1

**articles**
126:9

**arts** 7:17

**as-of** 135:5,
7,9

**ASA** 5:9

**assess**
154:10

**assessment**
144:10

**asset**
124:11,13,
14 167:23
168:4,22

**asset also**
167:25

**assets** 94:1
168:5,24
169:1

**assigned**
142:8
145:19

**assignment**
42:23

**assisted** 9:5

**Associates**
8:15

**assume** 5:19

22:17 39:2
41:23
64:23
65:2,8,14
67:16
69:12 86:3
89:9
92:10,13
93:9
101:17
102:13
108:15,21
128:13
131:18
140:15
142:13,16,
19 143:15
145:11
165:18
166:13
181:16,19,
22 182:2

**assumed** 6:5,
10 20:2,20
21:22 25:2
27:12 64:4
70:12
94:19,20
108:3,11
125:8,9
142:4,9,22
143:8,21,
22,23
148:6
163:22
164:16

**assumes**

102:21

**assuming**
63:18
139:9
140:13
145:5,6
149:18

**assumption**
22:20
26:10,13,
15,18
27:15,17
41:5,18
76:23
78:25
79:23
80:12
81:6,8
90:7,23
96:2
102:17
103:4
109:13
120:18
121:9,12
130:4,5,10
132:12
133:3,4,14
140:3,24
141:3,5,8,
11,16
142:11
143:11,14
144:20
145:10,15
146:7
147:11,14,

23,24
148:7,11,
22 149:8
153:14
154:6
155:13
158:7
162:22
163:4
164:3,8,9
165:13
166:12
176:25
179:16,17
182:7

**assumptions**
92:1 165:3

**attempt**
42:22
132:18
165:14

**Attorney**
184:6

**attractive**
142:20

**attributes**
90:13

**audit**   8:25
9:1,3,5,6,
8,14

**audited**   94:8

**auditing**
9:16

**auditor**   9:2
10:21

**audits**   9:9
13:25

**August**   16:20
17:8,16,21
18:7 19:3,
13 20:4,15
21:10
22:6,12,
15,18,23
23:6 25:4,
16 28:15,
24 29:13,
16 44:25
45:5,14
47:13 50:4
63:19 64:4
130:24
134:13
175:13
180:14

**auto**   8:5
9:13

**automatically**
139:24

**automotive**
9:11,13

**average**
96:16,19
130:20
131:21
133:6,11
138:4,8

**avoid**   174:8

**award**   16:5

**aware**   17:17,

18 18:3
19:2 20:7,
14,17
21:24
22:1,7,10,
11,13
29:9,12,15
33:18
35:16,21,
23 45:5,
14,17
47:8,13
50:2,7
72:25 74:1
98:12
110:18,22
111:2,11
128:12
140:9
158:13
165:19
173:7,12
174:14
176:3
183:22

**axis**   108:9

_____

**B**

_____

**bachelor**
7:17

**back**   7:13
11:3 12:21
16:13,14
36:22
40:8,11
44:7 56:22

background..Blumshapiro

59:2,7,8,
11 60:5
64:16
74:19 78:8
83:22
86:21
88:15
90:21
107:12
117:6,10
120:9
133:18
134:11,19
135:2
136:6,18
137:16
138:6,20
154:3
162:12,13,
14 175:20
178:21
183:16

**background**
7:16 11:23
15:6,15
17:11 27:1
29:19,21

**bad** 13:11

**bank** 169:2

**bankers**
66:20

**banks** 66:9
68:4

**Base** 92:19

**based** 12:24
13:9 16:10

26:18
31:11,12
36:3 54:3,
13 65:19
66:7
72:14,15,
19 74:10
81:14 83:5
92:18
99:19
100:9
106:20
111:19
116:12
117:15,18,
19,21,22,
25 120:17,
20 125:6
129:16
146:7
147:22,24
148:11
152:21
163:15
173:10

**basic** 158:16

**basically**
14:1
39:18,24
53:22 55:2
58:19
62:18
66:23
86:12,13
92:20
93:16
97:7,23

98:14
105:14
107:20
108:9
119:9
152:10
165:6
168:4
169:14

**basis** 22:19
26:21,22
27:11,17
30:14,23
71:8 94:8
166:6
170:15
183:1

**big** 8:2,3
42:8 44:22
104:25
107:13
119:15
132:6
154:24

**biggest**
44:16
57:14,19
58:8
109:10
121:6

**biopharmaceuti
cal** 55:24
73:2

**Biopharmaceuti
cals** 15:21
17:12

**Biopharmaceuti
cals'** 32:9

**bit** 56:24
67:19
87:15
120:5,6
175:20
177:21

**blend** 78:2

**block** 8:16
12:22,23
25:19
37:24 38:1
39:24
40:18 41:2
44:23
64:24
76:11
79:20
103:8
107:5,11,
13,15,19
141:14

**blockage**
36:20,21
37:20,22,
23 39:11
57:3,4

**blocks** 43:18
44:1,8
49:22,25
119:1,15,
18 146:8
155:22

**Blumshapiro**
8:17 13:7,

8,13,18

**board** 11:9
29:15
68:12,15
70:14
173:18

**bold** 51:22

**bona** 171:12

**book** 92:7,
10,24
93:1,7,8,
11,18,19
94:4,9,15
168:1,7,9,
14

**books** 84:13,
21 168:25

**bordering**
148:14

**bother**
138:11

**bottom** 25:12
57:24,25
69:4,6
74:3 77:11
85:18,22
97:8 124:6
125:17
130:1
151:10

**bought** 9:12
136:5
180:10

**boutique**

12:9 13:22

**bracketing**
137:13

**break** 6:15,
17 56:19
62:13

**bridge**
158:18

**broad** 132:12

**broken** 77:9

**brokers** 84:9
170:24

**brush** 114:2

**buckets**
111:23

**build** 9:22,
25

**building**
9:21

**bulk** 83:23

**business**
7:18 11:19
12:16,25
32:9,11
34:12,20,
21 35:17
59:14,22
83:23
84:24,25
125:14,16
126:1,3,7,
21 129:19
130:9

**business-
related**
12:15

**buy** 49:10
50:18
139:10
171:4

**buyer** 84:10
136:5
139:18
162:8

**buyers**
140:18

**buying**
139:14

——————————
**C**
——————————

**calculate**
39:23 54:1
55:17 65:5
74:19
90:11
92:20
107:13
121:3

**calculated**
70:4,5
151:25

**calculates**
91:9 100:9
101:16
105:11

**calculation**
19:23
78:16,22

92:18
97:20
98:14,16,
18 100:3
102:1
105:25
106:4
121:5

**calculations**
58:20
78:11,13,
19,20
79:16
105:6

**call** 30:22
51:19
68:25 69:4
134:2
136:13

**called** 8:12

**calling** 16:1

**cap** 60:7
62:6 85:21
93:14,18,
22 94:15,
24 95:8,
13,15
96:11
107:22

**capital**
176:1

**capitalism**
47:2

**capture**
94:25

Case 1:19-cv-01578-VEC-VF Document 256-2 Filed 02/04/22 Page 196 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021 Index: carry..column

carry 178:11

case 23:1
  43:3,6,12
  60:21
  61:22
  64:22
  69:10
  77:17
  85:15
  99:21
  113:2
  120:21
  131:8
  146:23
  172:13

cases 14:3,4
  123:23
  124:23
  169:1

cash 114:12
  181:25

caught 13:11

Centerprise
  8:12
  11:20,21,
  25 12:3,4,
  11

CEO 19:2
  29:12
  173:24
  177:11

certainty
  135:9

cetera 69:3
  84:13

106:25

CFO 173:24

chance 73:18

change 10:14
  78:20
  86:20
  89:16,19
  90:1,10,
  14,19 92:5
  110:8
  122:13
  150:13

changed
  59:14,21
  62:13
  73:20
  90:23
  91:25
  151:19
  177:8

characteristic
s 71:12
  74:11
  106:13

charge
  116:23

chart 58:14
  63:14,23
  64:11
  68:24 69:7
  75:21
  77:10
  151:9,12

check 48:22,
  24 157:10

159:9

checked
  78:16

choice 7:19
  143:20

choose 42:4

choosing
  17:3

chose 147:3

circumstance
  131:13
  183:1

circumstances
  113:5
  115:22
  123:22
  124:8
  127:24
  129:16
  175:8
  176:14

City 8:16
  12:24

CLA 8:18

claims 16:19
  183:18

clarify 6:4

clean 84:13

clear 71:19
  75:16
  110:6
  121:11
  124:1

150:2,4,5,
8

cleared
  182:22

Cliftonlarsona
llen 8:19

clock 17:2
  62:18

close 89:1,2
  183:14

closed 172:1

closely
  30:1,4
  49:9
  115:17

closely-held
  62:8

closing
  93:10
  96:14 98:2
  99:5

coefficient
  92:21
  98:15,25
  105:12

Coefficients
  92:15,17
  99:2

coincidental
  146:21

column
  98:20,24,
  25

columns
  92:19

combination
  152:24
  154:1
  156:23
  158:6,22

combined
  165:12

combining
  155:13

comment
  16:11

Comments
  60:8 107:3

commissioned
  140:5

common
  180:9,12,
  17 181:3
  182:1,3

commute
  13:11

commuting
  13:10

companies
  9:22
  31:18,21
  33:15,17
  55:14,24
  56:4,7
  60:14,16,
  19 61:2
  68:18,22

74:9 80:5
83:24
92:11,12
96:25
110:19,23
112:19
113:5
118:1,15
126:17,18
154:4
163:3
169:15,17,
24 170:2,
7,9 171:4
174:16

companies'
  54:17

company  8:4,
  5,12 11:15
  44:22 46:8
  50:21
  54:10,12
  58:1,4,15
  59:22 61:5
  62:1 69:11
  70:18 71:3
  73:6
  74:11,14
  84:4 85:7,
  10,15 92:9
  94:6,25
  95:6,9,11,
  22 106:13,
  22 112:20
  140:11
  167:20
  168:10,12

169:2
170:25
171:9
172:3,4
176:14
177:11
178:8,19,
22 179:5,
6,7,20
181:2

company's
  44:9,13
  70:20
  81:10
  106:23,24
  173:21
  180:25

company-
provided
  177:23

company-
specific
  71:24
  113:8

comparable
  169:10

compare
  54:13,21,
  25 55:5,13
  94:14
  96:10,17
  115:15
  154:8

compared
  97:10

comparison
  114:20

compensation
  169:10

complete
  7:3,5,9
  124:3

completed
  172:17,20

completely
  79:13
  160:7

complicated
  98:17
  150:7

components
  98:15
  152:9

concept
  37:20,22
  171:11

concepts
  73:19

concern
  173:14

concerns
  85:9 174:6

concluded
  184:12

conclusions
  15:10
  98:22

concrete

178:8

**condition**
27:23
28:17
106:24
141:18
144:22
147:6

**conditions**
21:13
114:19
147:7

**conduct**
169:9

**conducted**
43:2

**conducts**
126:21

**confirm**
132:18
157:25

**conformity**
18:18

**Connecticut**
13:9 14:2
130:22

**connection**
56:14 67:1
180:17

**consensus**
66:12

**consideration**
163:13
175:2

178:2

**considerations**
85:12

**considered**
52:2 96:22
113:7
119:25
157:8

**consistent**
134:7,8
139:5

**consistently**
134:5
136:10

**consolidate**
176:15,23
177:1
178:20,23
179:5,8,
19,23
182:4

**consolidated**
175:24

**consolidating**
181:8

**consolidation**
179:14

**constant**
105:16,17,
18

**consult**
102:4

**consultants**
11:17

**contained**
23:13
124:2

**contemplating**
181:10

**contends**
17:4

**context** 61:4
148:18
174:7
175:22

**contexts**
57:10

**continue**
175:24
179:7,22
182:4

**contract**
17:15

**contracts**
16:1

**contrary**
156:16

**contribute**
97:18

**contributes**
97:22
105:24

**control**
175:14
180:15

**controller**
10:24

**controls**
9:17,21
10:1,4,9,
10,12,14

**conversation**
7:12

**conversations**
22:25
68:14

COO  173:24

**Coopers**
8:23,24

**copy**  6:21

**correct**
10:18 15:2
27:10
41:4,12,
20,24,25
45:6,13
51:24
61:8,10
64:2 69:14
70:16,19,
22 71:20,
21 72:1,
10,17
74:7,12,
16,17
76:1,2,12,
13,20
78:8,9
79:1,5,18,
19 80:10,
24 81:2,7,
17 82:14
85:16

Case 1:19-cv-01578-VEC-VF    Document 256-2    Filed 02/04/22    Page 199 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
**William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021** Index: correctly..databases

87:7,13,
18,19
88:8,10
93:10
95:5,13,24
96:9,13,25
97:1,4,14
102:16
104:23
106:18,19
109:14,18
112:2,16,
17 114:14
117:24
120:18,19,
23 121:14,
15 122:20,
23 123:6
124:23
129:9,10
131:22,23
132:22,23
133:1,8,
20,21,24
135:6,11,
20 138:19,
25 139:1
140:22
141:6
142:8
145:9,18
146:10
148:21
149:17
150:20
152:8,15,
18,21,22
153:15,17,

18,23,24
155:17,19
156:14,19
159:1,5
161:14,18,
19,22
164:6
165:4,5,7,
8 167:2,
20,21
168:8,25
180:1,5,20
183:3,9

**correctly**
76:9

**cost**  168:14

**counsel**  6:23
144:4

**couple**  5:22
85:2
115:13
171:2

**court**  7:7
40:9,11
117:8,10
123:14,18
124:20
128:4,6
184:6,10

**cover**  63:25

**CPA/ABV/CFF**
5:9

**create**  91:17
130:6

**created**

128:21

**creation**
113:15

**credibility**
177:20
178:12

**credible**
171:16
172:19

**credit**
145:22
146:2

**criminal**
174:24
177:16,18

**crossed**
158:18

---

**D**

---

**daily**  30:14
31:1
65:10,12,
15,18 69:2
75:7,21
79:12
80:11
101:18
102:14
107:17
109:16
121:13
129:4
131:21
133:5,6,11
138:8

142:14
153:13
156:24
158:6,23

**damage**  11:24
14:3 35:14

**damages**
182:11,18,
24

**Dana**  9:12

**data**  38:23
40:13
41:14
42:9,11,14
43:20,21
53:18,20
54:4,9
61:2
74:14,22
80:17
82:11,24
84:17
91:24
106:3
115:25
117:15
119:17
122:5
129:14,15
133:17
135:14,19,
22 137:2,9
139:15,16

**database**
170:25

**databases**

170:12,19
171:5

date  17:1,6
20:1 21:2,
3,4 22:6
25:13,15,
23 26:19
27:8 47:10
59:8 89:24
132:20,25
133:23,25
135:5,7,9,
13 136:2,
14 137:6,
14 138:18,
22 140:7,
16 141:16
142:5,8,9,
17,20
143:9,15,
17,20,21,
22,24
145:7,11,
19 146:17,
22,25
147:1,3,
10,12
148:10,12,
22,25
149:1,2,4,
6,7,10
150:19
153:3
154:8
155:5
159:7
160:7
162:13,24,

25

date's  149:7

dates  16:23
17:3 25:9,
10,13,14,
18 26:14
132:21
134:11,17
143:21
144:13
145:8
146:8
147:10
149:13
151:2
153:1
154:4
161:16,25
162:2
166:13,15

day  13:11
65:21 66:3
75:24
84:23,24
87:3
101:21
102:21,23
131:22
140:13,22
143:4
144:21
155:3,15,
17 158:8
159:10,14,
15 160:15,
22 164:14,
17,23

183:19

days  67:18
102:24
133:12
137:13,17
138:7
139:4
153:2
161:4

deal  6:12
81:19
104:5

deal-specific
114:7

dealing  84:9

deals  81:21,
25 170:25

debt  168:6

decide  62:3
178:3

decided  43:6

decision
81:15

decrease
71:4

deduct
182:10
183:2

default  60:9

define  30:12
117:12
123:10

definition

30:15,17

delay  84:20

delisting
173:9
174:8

delivered
17:25

delta  54:15

demand  49:6
51:2

depends
168:11
172:12

Deponent
5:10

deposed
5:19,21

deposes  5:10

deposition
5:18
173:19
184:12

depress  40:3

depresses
41:6

derived
68:13

describe
113:15

description
37:21

designed

65:4
128:16

detail  175:3

detailed
57:1,2
121:16
175:9,11

details
178:6

determine
22:25 27:5
31:7
36:19,25
37:1 43:8
53:17,21,
24 54:8
55:10
59:20 67:6
75:20
79:17
80:18
82:16
83:12,19
94:9,15,16
96:3,7
99:19
112:18
113:7
114:7
115:19
126:15
127:8
132:12
139:19
150:18
153:4
162:2

170:7
172:18

determined
79:8
91:11,15

determines
54:15

determining
53:4
124:12
150:24

develop
42:23 53:9
150:8

developed
10:2 48:1
121:18,19
127:2,4

developing
116:11

development
33:6 35:5
36:1,5
56:4 73:6

differ  9:15
141:11

difference
97:11
104:25
151:18,19
183:8

differences
106:7
151:14

differentiate
148:23

diligence
173:1

direct  5:13
42:14

director
14:1

disagree
148:16
166:17,23

disagreement
25:3

disbelieve
67:10

disclose
172:4

disclosed
45:19
46:22
47:14 96:7
171:5

discloses
172:3

disclosures
50:9 172:7

discount
39:9 41:15
44:11
53:24
54:15
57:3,4
58:9 80:18
83:3,5

89:13
97:11
99:19
105:15
106:16
128:21
144:24
156:6,7,9,
10,11
157:14

discounted
118:23

discounts
83:8
106:10
119:18
129:22

discretion
172:18

discuss
37:19
144:2

discussed
144:4
157:5
181:5,19

discussing
51:24

discussion
180:16

discussions
81:14
181:1

disgorge
140:14

Case 1:19-cv-01578-VEC-VF Document 256-2 Filed 02/04/22 Page 202 of 236

NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021 Index: dismissed..entries

dismissed
  184:11

dispose
  164:3

disputes
  14:4,5

dissolution
  124:10

distinction
  169:22

divest  39:24

divorce  14:3

documents
  170:21

double-check
  48:19
  78:14,15
  153:25
  154:21
  156:22
  157:25
  159:9
  162:16

downward
  133:7

downwardly
  75:25

dozen  133:9

drastic
  137:23

dribble
  39:16,18,
  22 40:19

41:2 55:11
64:19
70:6,9
152:5

dribbled
  64:18,25

drive  131:20
  147:14

driven
  109:12,15

driver  58:9
  78:24
  79:12

drivers
  57:13
  109:11

drives  79:21
  87:5

drove  114:23

due  103:8
  107:4,10
  173:1

duly  5:10

dummy  92:7,8
  93:8 103:7
  107:2,3,8,
  21 108:1

—————————
        E
—————————

earlier
  115:9
  125:1
  127:3,5
  133:23

easier  69:5

easily  46:8
  160:23
  161:23

Echlin  9:10,
  11 10:7,8
  11:8

education
  14:9,14
  15:6,11

educational
  7:16 29:18

effect  37:15
  39:13 42:5
  85:11

effective
  132:7

effectively
  65:25

effectuating
  84:10

efficiently
  47:4

elapsed
  135:16

eliminate
  31:20

else's
  149:10

embodied
  23:20

empirical
  80:20

employment
  29:21

encompassed
  99:11

end  40:23
  78:8 79:9
  146:1

ended  10:21,
  25 11:1,8,
  11,13

engaged
  14:20

engagement
  67:2 68:9
  76:4 102:5
  109:3
  114:3
  116:12
  158:5

engagement-
specific
  71:20

engagements
  68:16
  70:15

entered
  17:15,18

entire  54:8
  94:25
  138:17
  145:20
  146:6

entries
  85:22

environment
  10:15

equal  125:11

equates
  107:21

equity
  173:11
  174:7
  176:2

escrow
  21:12,25
  25:21 26:4
  165:22
  166:9,25

essence
  145:5

essentially
  53:14 58:9
  163:19

estate  14:6

estimate
  64:15
  76:7,16
  81:24

evaluation
  79:2

events
  130:14
  132:13,14
  135:20

evidence
  38:25
  40:14
  41:14 42:7

83:3 84:1
161:3

exact  21:4
  23:22 30:8
  32:17,18
  102:1,25
  115:14
  139:25
  140:2

EXAMINATION
  5:13

exceeded
  138:8

Excel  78:6

exceptionally
  154:5

exceptions
  168:17

exchange
  38:7 95:17
  119:11
  173:4,10
  174:1,25
  175:7,21
  177:12

Exchange's
  174:6

exclusively
  83:12

excuse
  134:25
  166:4

exhibit  6:20
  7:9 124:3

exhibits
  145:25

existed
  111:3
  112:24
  178:13,14

existence
  36:14
  177:18

existing
  119:21,22

expect
  177:10

expecting
  173:4
  181:23

expensive
  141:5

experience
  66:22
  73:2,4

expert  12:18
  13:3 14:20
  80:2
  102:1,4

expired  26:9

explain
  35:10
  38:14
  53:13 57:7
  58:12 60:7
  64:10
  69:16
  81:18,21

90:18

explained
  51:1

explanation
  57:22

expression
  93:15

extent  23:17
  36:20
  55:17
  80:20

external  9:6

extra  146:2

extremely
  86:18

―――――――――
         F
―――――――――

fact  16:19
  17:4 21:8
  23:1 27:19
  39:9 46:1
  47:8
  48:19,22
  52:23 68:8
  138:7
  166:23

factor  178:1

factors
  57:19
  97:24
  114:23
  121:8
  142:10

facts  147:23

fails  16:18

fair  27:15
  109:1
  140:15,20
  146:20
  153:5
  154:10
  182:6

Fairfield
  13:10

fairly
  116:18,19
  117:12,14

false  174:24
  177:11

familiar
  6:14 18:21
  29:23 32:8
  33:5 68:5
  75:5 76:5
  78:10 98:6
  125:13
  171:11
  178:18

familiarize
  75:6 76:5

family
  124:10,15

fancy-sounding
  141:4

fault  175:6

February
  25:23

30:10,24,
  25 44:17,
  24 57:5
  59:3,8,10
  70:8,9
  79:6 86:8,
  11 89:20
  131:8,9
  133:18
  134:14,24,
  25 135:15,
  17,25
  136:4,13,
  22 137:3,
  10 139:7,
  14 144:15
  149:14,15
  150:19
  151:2
  160:24
  161:17,20
  162:8,14,
  20

fed  87:21
  88:6

Federal
  87:4,6

Fee  85:17

feel  16:22

fell  122:24

fide  171:12

field  105:12

Fifteen
  145:23

figure  64:17

84:20
  172:15

filed  47:14

final  98:10

finally
  87:21

finance
  11:11

financial
  9:16 10:3,
  12,13
  11:1,4
  27:23
  28:17
  29:24 94:7
  96:7 97:3
  106:24
  141:18
  144:22
  147:6,8
  175:23,25
  176:15,23
  178:24
  179:19

find  30:8
  38:17
  44:11
  57:12

finding
  84:10
  175:6

fine  6:16
  184:9

finish
  127:20

167:17

firm  8:3
  12:9,14,
  15,24
  13:8,23
  38:24
  47:23
  51:12 66:7
  72:16
  75:19
  81:16
  109:20
  113:18
  116:11
  121:20,21,
  24 128:4
  144:3
  157:6,16
  158:11
  172:17

firms  12:7
  33:6

five-year
  59:4,6

fixed  78:19

fluctuate
  86:5

focused
  10:16

footnote
  125:18

forced  108:4

form  15:13
  16:8 18:11
  19:4,15

20:9,25
21:15 23:7
24:1 33:24
34:23
41:10 42:1
45:21
46:15,24
49:11
50:19 51:3
71:6,22
72:18
73:21
74:23 87:8
88:11
90:25
95:2,14,23
109:23
111:13
114:15
115:6
116:25
122:4
127:13
128:18
130:15
131:1,4
132:10
135:21
136:15
140:23
141:7
142:25
143:10
145:2
146:11
147:15,25
150:22
153:6

154:12,23
155:7,18
159:23
160:1,10
161:5
162:6
163:7
166:20
169:25
173:15
174:2,9,17
175:15
176:6
177:2
179:9
180:21
181:11
182:5

**formal**
30:15,16

**format**   184:7

**formed**
166:4,6

**forming**
36:12

**formula**   31:7
78:5
101:25
103:1

**forward**
86:18
131:10
133:19
134:4,22,
23 135:2,
8,12,18

136:6,20
160:18

**forward-
looking**
161:13,15

**found**   60:2
66:12,25

**fourth**
168:19

**frame**   80:16
109:10,12
121:10

**frames**   18:4
63:12
149:19

**Free**   85:23

**full**   145:22

**fund**   142:14

**funding**
33:13

**funds**   27:25
140:13
142:14,17

**future**
132:13,14
135:19
136:21,24
139:8,16
151:3
173:21

——————————

——————————

**G**

——————————

**gauge**   115:24

**gave**   44:14
180:15

**geared**
115:22

**general**   53:7
60:18
66:12
67:20,22
71:13
81:12

**generally**
19:17
37:17
67:2,3,15
98:12,13
110:22
123:8
128:15
130:12,24
168:12

**generate**
32:23,24
33:2,8,23

**generated**
82:24

**generates**
156:10

**generic**
30:17
32:10

**Gerber**   8:10
10:19,20
11:10,22

**give**   5:24
7:15 37:21

Index: glitch..high-volume

56:25 57:2
75:6
105:2,15
106:20
145:21
146:2
170:13
171:6
175:13
179:2
180:11

glitch  78:18

Golberg
15:22
16:5,19,25
17:12,25
18:5,8,17
22:2,8,12
27:4 28:13
32:2,5
101:8
145:1
167:3
175:14
180:15
182:9
183:20

Golberg's
19:1 23:13
24:20
26:24
27:2,23
29:18
45:4,7,19
46:12 77:3
79:5
141:17

165:21
166:8

Goldberg
5:17 14:20
17:4 20:1

Goldberg's
147:6

good  5:15
42:9
117:15
150:9
176:10

graduate
7:18

Grail  163:25

grant  135:7
150:6

great  163:18
165:11

greater
175:3

greatest
120:25

Greg  5:16
149:21

ground  5:22

group  12:25
13:13
126:6
129:14

guess  38:6
117:13
154:18

165:10

guidance
38:12

guideline
58:1,3,15,
18 67:21,
22 158:17

guy  12:10,
18

————————
————————
              H
————————

haircut
41:16

half  45:18

happen  38:16
134:9
136:8,24
140:25
159:15
160:20
172:23
178:10

happened
26:8 134:2
135:23
159:11
162:1,23

happy  6:4,9
57:22

Hartford
8:11

head  32:25
33:21 52:3
55:25 56:5

121:4
176:17

header  70:7
92:16

hear  6:7
57:22 87:3

heard  6:10
157:5

heavy  144:24

held  7:12
21:23 24:9
25:20,21,
24 26:1,3,
7 28:4
49:9,16
56:21
83:24
95:11
115:17
120:8
126:17,18
183:15

hey  62:3
140:4

high  32:10
35:12 59:5
153:22
154:5
159:2
162:15

high-trading
139:4
153:2

high-volume
42:6

136:11
137:13
157:17
161:4
162:4,17,
18

**higher**
43:23,24
44:1,2,5
62:4
89:11,14
142:16
156:16

**higher-volume**
137:14,17

**highest**
141:15

**historical**
55:9,12
59:21
86:13
88:20 89:7
133:17
135:13
139:7,15
151:4
168:14

**historically**
37:3 86:22
87:17 88:3
161:8

**histories**
115:16

**history** 7:24
12:6

14:10,15
15:12
26:24
29:10
31:12,14
34:13,21
35:6
36:14,19
37:10 38:6
54:21,22
55:2,5,7,
9,10 67:5,
6,8,9 68:6
70:21 77:7
89:4,6
106:25
110:10
123:25
124:7
144:9,16
147:8
162:19

**hold** 6:19
83:10
180:1

**holder**
100:20,21

**holding** 24:8
62:10,13,
15 64:12,
14,15 72:3
90:3 103:8
107:4
151:17,20,
21,24
152:20

**holdings**
141:20

**holds** 106:22
140:10

**Holy** 163:25

**hundreds**
31:16
123:11

—————————

**I**

—————————

**idea** 49:21
96:24
103:2

**identify**
46:9

**II** 63:5
77:15,21
92:8 93:8

**III** 63:3
77:15,21

**illustrative**
179:3

**immediately**
28:2

**impact** 24:17
36:4 38:19
40:15 41:9
43:16
64:19
65:16,19,
24 66:4
67:17,19
68:20 71:1
80:22 81:1

82:16
83:13,20
84:17,20
98:1 100:9
120:13,15,
25 127:8
128:4
129:9
132:5,6
136:11
138:12
153:3,19
154:7
155:3,15
157:17
159:2
160:8
161:3
162:3
163:5
176:1

**impacted**
35:22
114:7

**impacting**
38:3
83:15,20
164:23

**implemented**
16:6

**implication**
23:24
180:6

**important**
29:7 34:7
121:7

in-house
68:11

include
145:25
146:4
182:24

included
23:17
32:15
54:17  56:2
130:9
166:5

including
118:9

income
167:23

incorporate
19:21
130:3
158:23

incorporated
19:23  47:4
55:23
110:24

incorrectly
130:14

increase
155:4

increased
37:13

increases
106:16

independent
79:14

166:9
168:23

index   110:13

indication
172:25
180:12

indications
170:4,8

individual
71:12
106:12
112:13,14
140:18

individualized
72:7,9,11
109:21

individually
111:5

industry
31:19
66:24
70:17
72:20
126:6
157:23
170:3

influx
175:25

inform   41:8

information
38:18  40:2
41:8  42:15
46:13,22
47:3  52:4

55:13
77:20
79:13  83:7
88:4
139:8,14
142:1
147:7,22
150:9
151:3,4
153:17
161:24
162:9
169:19
170:11,20,
22  171:6,7
172:19
177:23
178:3,7,12

infrastructure
10:11

initial
25:19

initiative
158:4

inject
149:23

input  68:1,3
75:20
81:3,5
103:4,21
106:21
108:3
129:7
130:6
152:13
153:16

171:18

inputs   78:7
97:15
98:19  99:3
109:2
122:9
129:3,8
142:7
147:14
151:8

inquire
28:13  29:3

inquiries
72:15,19

inquiry
109:2
148:19

inside   72:16
87:20
109:19
173:14

instance
134:5,9
159:21
160:19

instances
133:9

institutional
119:12,14

instruct
38:15
143:22
150:1

instruction

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 209 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021      Index: instructive..Kazan

58:17

**instructive**
171:9

**insurance**
8:4 9:22

**intend** 7:1

**intended**
75:22
92:23,25
93:13

**intent**
172:24
175:13

**intercept**
108:2,5

**interest**
87:22
124:15
175:4,5
181:2,3

**internal**
9:4,8,17,
21 10:1,3,
8 81:15

**internally**
91:20
144:2

**intersect**
108:14,17

**intersects**
108:8

**interview**
27:4

**interviewed**
114:6

**investigate**
36:13

**investigation**
11:14

**investment**
176:24

**investments**
173:5
180:18
181:7,23

**investor-
specific**
72:2

**investors**
50:2

**involve**
42:16
124:21
166:7

**involved**
13:17 52:6
54:22
55:14 56:7
60:24 61:4
78:11
96:25
112:19
125:21
127:7

**involves**
80:4

**involving**
52:23

**IRS** 48:10
123:12

**issuance**
16:1 19:14
45:17

**issue** 15:8
16:17
18:23 19:7
36:22 79:4
118:24
124:11
149:19
162:7
164:7
175:2
177:4
180:14
181:17

**issued** 15:22
16:20
17:1,5,8
18:5,9,17,
25 19:12
20:8,16,
20,21,24
21:8 22:3,
8,11,15,
18,22
23:5,13
24:11,20
25:3 63:18
64:4 69:17
77:2 79:5
165:21
166:8
182:21

**issues** 13:4
31:25 32:1
112:19
113:8
114:7
155:9
174:24

**issuing**
180:16
181:5,20
182:25
183:19

**IV** 63:3,23,
25 79:3

---
**J**
---

**January** 20:8
50:4
130:23
160:24

**jest** 117:2

**job** 11:4

**judgment**
30:22
31:9,10,11
172:10

**justify**
70:23

---
**K**
---

**Kazan** 6:22
7:10 15:13
16:8 18:11
19:4,15

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021  Index: keeping..legal

20:9,25
21:15 23:7
24:1 33:24
34:23
41:10 42:1
45:21
46:15,24
49:11
50:19 51:3
71:6,22
72:18
73:21
74:23 87:8
88:11
90:25
95:2,14,23
109:23
111:13
114:15
115:6
116:25
117:3
120:7
122:4
127:13
128:18
130:15
131:1,4
132:10
135:21
136:15
137:5
140:23
141:7,23
142:25
143:10
145:2
146:11

147:15,25
148:13
149:21
150:22
153:6
154:12,23
155:7,18
159:23
160:1,10
161:5
162:6
163:7
166:20
169:25
173:15
174:2,9,17
175:15
176:6
177:2
179:9
180:21
181:11
182:5
183:13
184:2,4,6,
9

**keeping**  87:7

**key**  129:3

**kick**  93:25

**kind**  8:22
11:18,23
14:17
22:24 31:6
32:16
43:5,14
46:8 54:20
67:25

96:25
142:22
150:13
152:16
156:21
157:9,13
172:10,25

**knew**  28:10
34:4 45:16
131:3
132:7

**knowable**
131:7
136:2,17

**knowingly**
177:11

**knowledge**
73:14
87:20 91:3
122:2
141:25

———————

L

———————

**labeled**
25:13

**lack**  38:13
43:8 51:2
78:5 93:14
117:16
124:12
126:15
129:22

**lapsed**  149:5

**large**  37:24
38:1,7

39:12,15
40:3,18
41:2,6
43:18,25
44:8 48:7
49:22,25
50:3 94:22
119:1,18
131:14
132:2
155:22
181:23

**large-volume**
82:16

**largest**
69:21
120:13,15

**law**  7:18

**lawyer**
150:14

**layman's**
18:22 57:7
174:18

**lead**  101:2

**leads**  76:14,
24

**learn**  83:17

**led**  67:13
77:3,7

**left**  8:17
12:11 19:1
178:22

**legal**  18:22
19:7

171:13,15
174:19

legend
165:25

legends
15:20
23:14,16,
19,20,24
24:11,13,
16,19
165:20
166:7,14,
18,24
167:4,7
182:22

lend 177:19

length
112:8,12

letter
172:24

level 32:10

likelihood
146:25

limit 99:12
100:5,6,
14,16
101:3,15
102:8,11,
18 103:14

limitation
102:2

limitations
101:1,2,4,
6

limited
124:15

limits
100:17

lines 18:14
93:7

linking
161:12

liquidate
57:18 79:9
117:16
128:22

liquidity
32:1 38:13
40:17
117:16

list 72:24

listed 25:13
125:14
151:9

listing
61:13
98:23

literally
164:25

literature
113:14

litigation
11:24
12:17,25
13:1,13,23
14:2,7

litigation-
related

12:14

living
142:14

Lobsenz
124:5,6

lock 31:25

locked 70:1
80:21

lockup 39:1,
3,25 69:21
80:17
165:21
166:9,25

log 58:1,3,
14,17,18,
19 62:6
85:17,21,
23 86:1
92:18,20,
21 93:9,11
96:14
98:2,24
99:4,5,11
100:4
103:13
107:22

logarithm
58:19,20

long 56:9,
11 58:10
64:18
73:13
76:17
79:17 83:1
87:24

88:14
107:13,20
113:25
117:14
128:1
159:12
161:18,21
164:3

long-term
86:14
88:13
110:4

longer 62:19
70:1 103:7
107:4
167:11

longest
76:19

longstanding
121:8

lookback
137:15

looked 9:20
20:2 31:1
34:14
36:9,19
37:5 43:17
55:9 56:9
81:10
118:25
119:1
136:18
144:16
161:23
162:12,14

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 212 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021   Index: lot..market already

**lot**  11:9,
  10,11
  14:12
  30:13 33:8
  42:7 43:19
  60:13 95:6
  126:8
  127:4
  172:22

**low**  31:2,3
  49:5,6
  50:15,21
  51:1
  86:10,12,
  18,22,24
  87:7,17
  88:3,24
  115:16
  122:25
  182:3

**lower**  37:25
  60:3 62:3
  86:25
  88:19
  89:11,13
  105:15
  142:23
  143:3
  156:12

**Lybrand**
  8:23,24

___

**M**

___

**M&a**  11:22

**Macrophage**
  17:13,15

  146:5
  167:15
  173:5
  175:14
  176:1

**Macrophage's**
  175:23

**made**  7:19
  41:5 42:4
  50:2
  62:24,25
  81:15
  149:8
  156:23
  166:25
  173:25
  174:5
  175:22
  177:24

**magnitude**
  115:12

**main**  16:15

**major**  104:24

**make**  7:2
  9:13 10:10
  67:10 74:9
  78:17
  84:12
  89:13
  109:2
  112:11
  150:5
  162:15
  176:24
  177:11

**makes**  35:25
  89:21 99:3
  149:6

**making**
  174:24
  178:16

**Management**
  8:15,20
  12:8
  13:21,22
  14:13

**managing**
  14:1

**manufacture**
  32:19

**manufacturer**
  8:5

**market**  36:1,
  20 37:25
  38:25
  39:17
  40:14
  41:7,14
  42:7 45:5,
  9,25 46:4,
  21 47:7
  60:7,17,19
  62:2,3,4,6
  65:24
  66:11
  67:20,21,
  22 69:20
  73:18
  74:22
  83:3,5,7,
  20,25 84:1

  85:5,11,21
  90:15
  92:24
  93:1,14,
  18,20,22
  94:15,24
  95:8,12,15
  96:11 97:3
  102:15
  106:17
  107:22
  111:25
  115:25
  117:15
  118:22
  119:7,10
  131:15,20
  132:12
  142:23
  143:3
  144:20,25
  146:15,17
  147:7,17
  148:24
  152:6
  153:23
  158:16
  160:4
  164:4
  167:24
  168:5,6,7,
  15 169:2,
  6,7,9,16
  170:3,4
  171:19

**market already**
  46:14

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 213 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021   marketability..model

marketability
 43:8
 124:13
 126:15
 129:22

markets
 29:24 47:3
 117:18

Markham  8:14

material
 151:14

math  78:15
 104:24
 143:16

matter  57:14
 124:10

matters
 13:17 14:6

maximum
 75:23

Meaning
 169:4

meaningful
 150:8
 171:18

meaningless
 169:23

means  30:13
 154:16
 182:21

meant  113:3

median
 53:23,25

54:2,5,7,
 14 58:6
 59:4
 61:19,20,
 22 62:5
 74:5,16

medical
 32:16,22

medium  88:7

meeting
 88:10

member  29:16

memory  8:7
 32:12

mentioned
 113:21

merged  8:13,
 18

methodology
 15:9 16:10
 42:25
 53:1,8
 72:15
 91:25
 102:10
 118:21
 120:12
 121:17
 122:6,9
 127:18,22,
 23 128:14,
 15 129:11,
 13,25
 130:25
 152:11

154:2,7
 155:14
 156:25
 158:7,25
 162:23

metrics
 170:13

Michael  5:17

million
 21:11
 44:19,20,
 22 45:8,
 10,18 46:5
 49:18
 173:5

million-plus
 46:9

mind  160:17
 162:17

minimum  90:3

minute  83:10
 137:5

minutes
 120:4
 173:19
 183:12

mishear  6:8

misheard  6:8

missing  7:1

misspoke
 117:13

misstatements
 177:19

Mm-hmm
 153:12

model  42:4,
 5,10 43:5,
 7 47:25
 48:2
 54:10,13,
 14 65:3,6
 77:18
 79:23 80:3
 81:21
 83:11,18,
 25 84:17
 89:12,23,
 24 90:12
 91:9,16,
 17,19
 93:3,6
 97:13,16
 98:4,5,8
 99:18,25
 100:8,10
 101:15,16
 102:12,20
 104:11
 105:6,18,
 19 106:5
 108:15,20
 109:6,7
 115:21,24
 116:12,17
 119:19
 123:7
 127:7
 128:23
 129:7
 130:7,13,
 14,19,21

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 214 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021   Index: model's..Navidea

131:6,12,
16,25
132:16,19
134:3,11
136:10
139:5,12,
22,25
150:17,20,
25 151:6
153:2,5,17
154:11,22
155:9,21
156:5,6,17
161:7
163:4
165:3,12

**model's**
151:20

**models** 43:9,
11 47:24
51:12
116:1,2,6,
8 119:21,
22

**money** 28:21
39:19
116:23
183:4

**monitors**
30:1,4

**month**
130:21,23,
24

**months** 19:13
20:3 21:23
24:9

25:15,17,
20,22 45:1
69:24
122:14,16
143:17

**morning** 5:15

**motivate**
140:12

**mountain**
163:25

**mouth** 75:15

**move** 167:10

**movements**
137:23

**MPI** 43:1
47:24
51:20,21
52:1 53:9
55:23
56:3,12
60:25
66:15
76:21
77:18
79:12,21,
23 80:3,6,
12,14,15,
19 81:4,
21,25
82:12,15
83:18,22
90:23
96:22
110:19,24
111:4

112:7
113:6,16
114:9
115:4
118:16
119:3,5
120:12
123:7
139:18
140:5
152:11,25
154:2,6
155:14
156:25
158:24
166:6

**multiple**
172:13,14

**multiples**
170:3

**multiply**
105:1

**multivariant**
53:17

**Murray** 5:9,
15

_____

**N**
_____

**NA** 61:15

**nature**
32:17,18
34:20
108:14
118:5
163:14

164:19,21
165:15
175:5
176:3

**Navidea**
15:21,22
16:6
17:12,13
19:2,3
26:24 27:2
28:5,8,14,
23 29:10,
13,16
30:2,5,9
32:3,6,8
33:16,20,
22 35:5,25
36:10
45:15,20
46:7 47:15
49:16,25
50:3 54:16
55:18
58:24
60:9,21
61:11 67:7
69:10 70:6
74:13,15,
16,22 75:5
76:5,6,12
94:6,22
110:9,11
120:22
136:12
141:21
142:1
144:8
147:8

149:12
161:24
163:2,14
164:19,21
165:15
167:6
173:3,7,
14,24
176:25
183:18

**Navidea's**
34:12,20
35:12,17
36:4,14
50:8 54:21
55:12
59:13
60:11 67:4
68:6 77:6
97:2 162:4
175:24
176:1,22
182:11

**Navidea-
specific**
153:16

**necessarily**
40:3 49:6
117:25
156:6

**needed**
142:14
152:5
179:4

**needing**
114:12

**negative**
145:1

**negotiate**
112:20

**negotiating**
112:14

**network**
119:12

**networks**
119:8

**news** 87:3
88:5

**nonoperating**
92:11

**nonpublic**
82:18

**nonpublicly**
60:25
61:2,5
74:8
82:17,19
83:8,13,15

**nonregistered**
49:24 95:7

**nonsalable**
167:1

**normalize**
86:9,12,15
110:5

**normalized**
91:4
122:25

**notes** 167:14

183:12

**notice** 37:9,
11,15

**November**
22:8,16
23:13
138:24

**number** 12:5
31:4 38:23
45:2,3,10,
11 53:14
64:21
65:4,5,8,9
66:8,19,
21,24
67:2,3,16,
17 68:11,
12,13
70:14,24
71:9,20,24
73:13,25
74:19
75:22
76:10
82:10
93:21
96:18 97:6
98:10
107:16,18
115:14
121:19
156:7
158:21
160:3
162:1

**numbers** 16:2
18:5 73:9

78:7
109:22
131:10
161:9

**numeral**
77:14,15

---

**O**

---

**object** 15:13
16:8 18:11
19:4,15
20:9,25
21:15 23:7
24:1 33:24
34:23
41:10 42:1
45:21
46:15,24
49:11
50:19 51:3
71:6,22
72:18
73:21
74:23 87:8
88:11
90:25
95:2,14
109:23
111:13
114:15
115:6
116:25
122:4
127:13
128:18
130:15
131:1,4

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 216 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021   Index: Objection..order

132:10
135:21
136:15
140:23
141:7
142:25
145:2
146:11
147:15,25
148:13
149:24
150:22
153:6
154:12,23
155:7,18
159:23
160:1,10
161:5
162:6
163:7
166:20
169:25
173:15
174:2,9,17
175:15
176:6
177:2
179:9
180:21
181:11
182:5
**Objection**
95:23
143:10
**objective**
152:16,20
**obligated**

140:7
**observation**
43:14
110:10
**observational**
108:14
**observe**
108:16
**observed**
133:9
**occasion**
12:5
**occur**  54:3,
13 114:19
159:6
**occurred**
83:8 89:25
90:14
183:20
**off-the-chart**
160:16
**off-the-shelf**
43:5
**offer**  15:7
49:9
171:12,14,
16 172:23
178:5
**offered**
140:8
142:19
**offering**
14:17
15:5,19,24

16:4,9
17:7,24
18:16
**offers**
171:25
172:2,8,
13,14
175:22
**office**  14:2
66:18,20,
22
**officers**
174:15
**one-year**
62:24 63:3
**onward**  64:1
**operational**
9:9 10:23
11:10
85:13
**operationally**
11:7
**opine**  14:10,
15 182:9,
10
**opined**
163:12
**opining**
15:11
106:17
182:23
**opinion**
14:18
15:5,14,

19,24
16:4,10,
15,22,24
17:7,24
18:16 19:7
20:18
21:7,19,23
23:8
24:13,23
26:9
34:16,18
36:3,17
75:7
101:11,13
158:15
163:15
164:21
165:6
**opinions**
15:7 19:22
24:15 34:7
36:13
**opportunities**
144:23
**opposed**
50:17 51:2
168:7
171:25
**opposite**
131:24
134:2
160:16
**options**
103:18
**order**  36:25
115:12

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021

120:5
133:10
174:5
178:20
179:19
180:8

organize
120:4

origin 108:4

Orr 14:19
16:18
23:17
35:13 37:6
146:22
163:12
182:10,23

Orr's 15:6
16:10
175:2

outcome
89:12
120:13
129:9
130:13
131:3

outcomes
57:10
128:16
132:8
139:4

output 97:13
120:11

outstanding
31:5
44:10,18,

21 45:3,4
49:18 96:4

owed 183:21

owned 28:14,
23 29:4
49:22
179:6,21

owners 49:8

ownership
27:2 94:25
176:20
177:1
178:19,21
179:5,15
181:2

owning 29:2

owns 181:2

―――――――――

P

―――――――――

p.m. 184:12

pages 7:1,2,
4 51:24
124:2
145:23

Pardon 183:5

part 9:4,18
35:13
52:16
55:15 56:3
80:12
84:9,11
89:3,6
97:20 99:7
100:7

106:3
114:8
129:11
173:10
178:3

parties'
17:9

partner
13:14

partnership
124:16

parts 8:5
9:14

past 135:10
161:16,18,
21

patterns
36:9

pause 176:9

pay 139:20,
24

PDF 184:9

peer 48:3,
5,11,15,
16,20
125:2,8,11
126:10,22
128:7,14
129:19
157:21,22
163:24

pejorative
173:8

penalties
177:16,19

penalty
177:25
178:10

pending 6:17

people 50:16
66:9,14,
18,19,21,
24 72:16,
20 73:1,8
75:4,19
95:12
121:20,23
175:19
181:20

perceived
173:21

percent
44:3,9,12,
13 58:22
59:4 61:15
65:14,18,
20,23,25
66:2,6,13
67:6,11,
13,15,16,
21 70:13
71:4,5,14,
19 73:13
74:20
76:7,10,23
78:25
79:15,24
80:11
81:6,11,14

86:9,13,25
87:2
88:16,22
89:8 90:24
91:4 95:20
99:12
100:5,6,
12,14,21
101:3,10,
14,18,20,
23,24
102:8,11,
14,17,18,
21 103:3,
14 109:13
110:3
120:18
121:8,13
123:1
130:3,6,10
131:19,21
132:1
133:3,5,13
137:22,25
138:8
143:3
151:5
152:7,13,
21,25
153:13
154:2,6
155:4,9,13
156:24
157:15
158:6,16,
23 162:18
163:24
165:13

179:4,6,7,
15,21,22,
25 181:3

percentage
75:8,21
83:21
85:10
89:11
94:22 96:3
129:4
175:5
176:20
177:1
178:19,21,
23

percentages
95:11

percentile
58:6
61:14,21,
25 69:8,9
74:5,6,10
81:23

perform
82:11

performance
182:25

period   24:8
26:2,5,11
35:11,13
37:4,7
50:10 58:8
59:1,6,14
60:7 62:7,
10,13,14,
15,17

63:2,3,5,
16,20,23,
25 64:8,
10,12,13,
14,15
69:15,17,
20,22
73:20
76:15,18,
24 77:4,7,
13,20,21
78:1,3,25
79:3,4,10
80:17
83:2,14
84:2,3,15,
18,19,25
85:21
89:21,22
90:2,3
91:6,13,14
100:15
103:7,8
107:2,3,4,
8,21,22,
23,25
120:16,17
122:18,19
128:22
137:14
138:17
139:2
147:4
151:13,17,
20,22,24
152:1,5,20
159:12
160:3

166:25

periodical
125:23

periods   37:6
59:24
62:14
63:25
77:10,12,
14,19
135:1

perjury
178:1,11

person   72:3,
7,9 116:9
139:10,13
173:24

personal
149:23

perspective
87:17

pick   25:18
44:13
143:9
149:1

picked
109:9,10
146:22
147:10
148:10,22
149:4

picking
146:21
148:25

picks   16:23

piece   128:23

pieces   58:8

piggyback
  62:15,21
  63:4,7

placement
  38:11,15
  39:5  40:2,
  13,21
  41:8,13
  42:5,10
  53:3  80:3
  93:4
  113:6,9
  119:6
  129:24
  143:4
  156:9

placements
  38:21,22
  42:8,16,18
  48:7  52:2,
  7,16,20,22
  55:15,22
  56:2,8
  57:9  60:24
  80:8  82:12
  96:21
  111:3,24
  112:4,6
  114:8
  115:4,18
  116:14
  117:22
  119:1
  166:6

Planning
  8:20
  13:21,22
  14:13

platforms
  119:10

play   183:23

point   10:17,
  24  11:1,15
  13:12
  18:22  20:5
  35:9,10,
  12,19
  36:23,24
  37:1  41:18
  62:23
  65:15  70:6
  75:18  82:9
  88:23  90:1
  117:5
  131:6
  133:16
  134:20
  135:17,24
  144:14
  148:15,17
  149:25
  155:2
  174:18,19
  182:13

points   54:4

poll   66:18

population
  132:2
  154:25

portion   7:9
  167:15

position
  19:1
  150:16

positive
  35:25
  48:20

possession
  45:4

possibilities
  156:4

possibility
  119:25

possibly   7:6
  27:9  60:12
  75:18
  114:16
  136:19
  178:22

post   176:24

post-2008
  80:25

Postgraduate
  8:1,2

potential
  62:10
  140:6
  142:2
  167:19

potentially
  46:3  83:4
  154:13,15,
  16  173:9

power   181:5,
  13,16

practical
  85:12

practice
  14:13
  128:15

pre-1990
  62:9,14
  63:10,17,
  20  64:7
  69:16
  76:22
  80:22

pre-2009
  88:2

precipitously
  88:7

predict   42:5
  49:2  54:11
  57:9
  128:16
  130:20,22
  131:13
  135:19
  139:5
  154:7
  155:3,14,
  21  156:12
  157:14
  159:19
  160:16
  162:3

predicted
  53:22
  97:8,10,

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 220 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021    Index: predicting..prior

12,19,22,
24 98:1,3
134:1
152:3
153:19
156:8
158:8
167:12

**predicting**
132:8

**predictions**
156:17,23

**predictive**
130:13
131:6,25
134:10
139:25
150:18,24
152:24
153:4
154:1,11,
21 157:10
159:9
161:7,12
162:1

**predictor**
163:4

**predicts**
93:3
130:14
156:11

**preference**
184:7

**preferred**
180:4,11,
14,19

181:4,6,
10,14,17,
20

**premarked**
6:20

**premise**
40:1,12

**premises**
47:2

**preparing**
84:21

**prerequisites**
183:19

**present**
114:25
182:11

**presented**
115:23

**press** 47:14

**pressure**
133:7

**pretty** 6:13
56:25 57:2
78:19
111:21
121:16
122:7

**prevent**
164:22

**previous**
59:15

**price** 34:10,
13,21

35:6,8,9,
18,23 36:7
37:12,14,
16,17
38:3,8,16,
19 39:13
40:4 41:7,
19,24
42:12,15,
17 43:16
46:21 49:2
53:4,23,25
54:2,5,7,
9,11,12,14
57:13
60:17
64:20
65:16,19,
24 66:4
67:5,9,17,
19 68:21
71:1 75:8,
25 80:22
83:15
85:11
89:24 92:7
93:2,4,7,
8,10
96:14,16,
19 97:8,
10,12,19,
22,24
98:2,3,16
99:5
102:15
105:9
112:15,20
113:9

114:8,14,
24 118:22
127:9
128:5
129:5
131:15,20
133:7,12
136:12
139:12,19,
25 140:8,
11 141:15
142:2,20,
22,24
143:4
144:23
147:9
153:4,20
154:7
155:5,16,
22 156:12,
16 159:3
161:4
162:4
163:5
164:13,23

**priced** 46:13
47:7

**prices** 30:5

**pricing** 47:4
55:13

**principal**
129:8

**principles**
73:19

**prior** 7:6
70:20

126:22
139:2

**private**
38:11,14,
21,22 39:5
40:2,13,20
41:8,13
42:4,10,
16,18 48:7
52:2,6,16,
20,22 53:3
55:15,22
56:2,7
57:8
60:14,16,
24 62:1
80:3,8
82:12 84:4
85:15 93:4
96:21
111:3,24,
25 112:4,6
113:6,9
114:8
115:3,18
116:13
117:22
119:1,5,8
129:24
143:4
156:8
166:5
169:17
170:6,8
171:4

**privately**
80:5 82:6

83:24
126:17,18

**problem**
43:18

**process**
31:15 53:2
66:17 84:6
173:1

**produced**
146:6

**programs**
35:5 36:1,
5

**prohibiting**
19:12

**prohibits**
18:24

**project**
11:14

**projects**
9:20
10:21,22,
23

**proper**
111:23

**proposition**
23:4

**proprietary**
47:25 48:2
116:9
139:21
165:10,12

**provide**
20:18

38:12

**provided**
14:22 18:4
20:14

**provision**
19:11
62:16,22,
24,25
63:2,3,4,
5,7

**provisions**
15:25

**proxy** 48:7
61:9

**public** 11:15
12:2,19
13:8,15,18
31:17,18
36:4 38:18
42:12,14,
19,21
43:15 47:3
49:2 50:5,
9 53:4
80:4 84:17
85:5
109:21
111:25
115:19
116:7,13
117:18,19,
21 119:10
127:9
153:1
169:17
170:2

171:3
174:16
176:13,14
177:7,9,11
178:19
179:14,20

**publication**
125:11,13,
19,20
126:4,22
127:7,14,
16

**publicly**
13:4 14:11
16:2 31:13
38:11,16
42:6,11,17
45:15,19
46:22
47:14,17
48:8
52:19,23
53:25
55:13 61:1
68:21
69:10
71:3,9,11
74:13
80:6,9
81:9,22
82:1,3,5,
12,22,24,
25 94:6
96:4,6,20
115:17
117:20,23
124:17,21

127:8
128:5
129:2
140:11
157:17
159:3
166:1
169:15,18,
22,23

publish
126:8

published
48:23
67:22
125:7,22
126:1,9,
11,24
128:10
129:19,23
130:9

publisher
125:22

publishes
94:7
126:5,7

pull   157:14

purchase
142:20
171:17
173:2

purchasers
112:14
114:6

purchases
50:3

purportedly
15:22

purpose
48:5,12,14
74:22
83:18
128:8,11,
16 153:10
155:12

purposes
38:23 43:2
66:9 76:3
176:16

pursuant
18:9 19:12

put   25:22
40:15
58:19
65:5,22
66:11
75:15 78:7
94:5
111:22
156:5
166:7

putting
139:3

—————

Q
—————

qualifies
14:15 15:7

qualify
14:10

quantify
41:15,23

quantities
39:12

quantity
39:15 40:3
41:6,15

quarter
156:2
163:21

quarterly
88:9 94:8

quarters
64:24 65:2
70:5,11,13
76:11 79:9
86:19
87:23
99:7,8,9,
11,19,22,
23 100:1,4
103:13
152:2

question
6:5,7,10,
17 22:4
23:3 28:16
40:10,25
49:13
50:14
63:22
113:1
117:4,9
118:22
134:3
136:1,13
149:22
150:2,4

154:20
160:17
179:11

questions
5:24 6:3
16:15
28:11
150:8
151:15
176:10
184:5

quote   16:18

quote/unquote
135:12
152:20

—————

R
—————

raise   88:7
160:17

ran   13:12

range   89:2
145:8

rate   85:17,
24 86:2,3,
5,14,16,
17,20,22
87:7 88:2,
13,19,20
89:13
90:9,22
91:12
110:4
122:22
123:4

**rates** 86:10,
12 87:17,
22 88:7
89:7
122:24,25

**ratio** 93:1

**read** 40:7,
10 47:16
113:14,25
117:6,9
128:1

**reads** 157:23

**ready** 84:12

**real-world**
138:12
147:13
157:10
161:3

**reality**
122:12
157:10
158:9
159:9,20

**realize**
40:16

**reason** 5:23
45:25
74:18
106:3
140:14

**reasonable**
95:8
154:21
176:24

**rebuttal**
14:23,25
15:19,24
16:4

**recall** 12:4,
6,21 18:13
19:5,18
20:10
21:1,4,16
22:21
23:15,20,
23 28:6,9,
10,16,20,
22 29:1,5
32:18,20,
23,25
33:21,25
34:15
35:7,11
45:22
47:18
48:18
50:13
56:10
91:22,23
94:12
101:25
102:2,25
113:25
114:1
121:4
127:25
137:16,21,
23 138:10
143:25
144:5,13

**receive** 18:9

**recent** 89:6
171:8

**recently**
62:25

**recess** 56:21
120:8
183:15

**record** 7:3,
10,12,13
56:21,22
117:1
120:8,9
150:11
183:15,16

**recorded**
168:24

**reduction**
38:12
41:19,24
106:17,20

**reevaluated**
91:19

**refer** 14:18
17:13,14,
20 18:12
42:25
64:12 92:8
107:6
124:4
151:6

**referenced**
146:23

**referred**
51:21
63:14

167:25

**referring**
51:20
57:23
168:3

**refers** 64:11
107:12

**reflect** 39:9
92:23,25
103:7
107:4
117:1
122:12
150:11
169:2

**reflected**
63:9 95:12
98:18

**reflection**
95:8

**reflective**
98:21

**refresh** 8:6
32:12

**refused**
167:6

**regard** 62:9

**regime** 80:22

**registered**
45:8,9,11
46:10
52:19
94:23
103:19,24

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 224 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
**William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021** .representations

104:3,13,
21 105:14,
20 106:8
166:1

**registration**
103:6,12,
15 105:11,
17

**regression**
53:17,21
54:3
108:4,8
129:21

**Regulation**
18:10,18,
21,24 19:6
166:10

**regulator**
181:6,22

**regulators**
174:15
177:25
178:9

**relate**   95:21

**related**   14:7
16:12
42:11 72:6
165:21

**relates**
37:12
39:11
102:18
103:3
106:23
107:15

**relating**
28:15,24
166:8

**relation**
97:2

**relative**
31:3,4
52:18 54:5

**release**
47:15

**released**
21:13,25

**relevant**
34:16
42:15 50:9
64:11
69:17
76:23
107:16
118:5

**reliable**
163:4
172:7,11

**remained**
122:22

**remarkably**
142:23

**remedy**
182:24

**remember**
12:1 21:2
23:23 29:1
34:3 45:16
47:19

94:13
113:24
115:14
126:8
128:2
144:1

**remove**   167:7

**removed**
24:21
166:14
167:4

**render**
118:10

**renders**
163:3

**repeat**   6:9
40:5 117:4
166:21
179:11

**repeatedly**
160:9

**replacement**
54:2

**report**   7:5,6
14:21,22,
23,24,25
15:7,18
16:17,23
20:18
23:18 25:7
30:7
32:13,15
34:5,8,9
44:17
51:22

56:15 57:2
59:8
138:23
145:21
146:6
161:17,20
163:16
164:12
167:18
170:12,24
175:1
176:16

**reported**
171:1,3

**reporter**
40:9,11
117:8,10
184:6,10

**reporting**
11:2,12
170:15
177:8,9
179:15

**represent**
5:16
25:10,14
75:23
85:19
93:11,13

**representation**
117:15
175:21,23
176:4

**representation
s**   173:25

representative
  118:11

represented
  181:1

representing
  176:22

represents
  96:19
  110:4

require
  182:2

required
  28:1
  175:9,11
  178:23
  179:15
  180:1,13

requirements
  173:11
  174:14
  176:12,13

requires
  126:22

research
  22:24
  26:23 27:1
  33:5,13,
  14,16 46:8
  49:16
  51:9,11
  56:3 73:5
  116:5
  142:1
  147:5

researched

  35:24

Reserve
  87:4,6

resource
  171:24

resources
  28:20

respect
  36:15
  132:9,19
  151:16
  173:21

response
  28:18

rest   63:24

restricted
  25:25 26:5
  38:22 39:4
  42:20 43:1
  47:24 50:6
  51:21 52:6
  53:15,16
  62:9,17
  89:25
  100:10
  104:12
  119:6
  126:14
  127:17
  140:10

restriction
  39:21
  62:17,19,
  20 79:10
  84:2

  100:12
  147:4
  148:6

restrictions
  23:24
  24:12
  38:18
  39:7,10
  40:15,21,
  23 52:9,
  11,13
  72:12
  76:19 77:2
  79:11
  111:3,10
  149:4

restrictive
  23:14
  165:20,25
  166:7,14,
  24

result   43:22
  59:22 65:6
  129:16
  165:4

resulting
  38:13

results   78:2
  94:13
  96:18
  160:15
  175:23,25
  176:15,23
  178:24
  179:20

retain

  176:25
  178:20

retire
  87:21,25

revenue
  32:23,24
  33:3,9,23

reverse   16:6

revert   86:21
  88:15

reverts   89:9

review   23:16
  26:23
  38:14
  50:8,12
  54:18
  125:11,16
  126:2,3,7,
  21,22
  129:19
  130:9
  157:21,22
  170:21

reviewed
  14:21
  17:22
  48:3,5,11,
  15,16,21
  94:7
  125:2,8
  126:10
  128:7,14
  129:20
  163:24

revisit

56:14

rid  58:11

risk  85:17,
23 86:1

risk-free
86:2 90:22
122:22

role  183:23

Roman  77:14,
15

rounded
100:1

row  25:13

rule  52:12
62:12
71:13
81:12
99:12
100:5,6,7,
13,22,24,
25 101:3,
7,15,20
102:8,11,
18 103:3,
14 111:7
132:1

rules  5:22
6:13 177:8
179:14,15

run  25:4
108:20

running  17:2

## S

S&p  89:15,
19 90:9,15
91:5
110:8,12
122:13

salable
166:18

sale  18:25
19:12
23:25
25:13,25
26:11,12,
17,20
49:10
65:20
83:21
84:10,22
85:9 113:9
131:13
133:4
140:25
141:1
142:12
143:21,22,
23 153:22

sales  38:7
42:6
170:13

sample  51:19
52:1
110:19
115:4

scenarios
38:15

Scientific
8:10
10:19,20

SEC  11:14

secondary
156:21

section  60:8
108:1

sector
106:23

securities
12:2,19
13:15,18
14:11
18:10,18,
25 47:3
62:8
124:22

security
10:13

segregate
77:19

select  76:15

selected
35:13

sell  22:2
27:13 28:1
32:21
33:13
34:10
50:16 63:7
64:24
76:11
79:17

83:2,14,19
84:3,5,6,
16,23,24
85:4,5,6,9
99:7,11,
20,23
100:5,18,
19,20,21
101:4,9,17
102:21
103:14
132:4,5
140:7,12,
15,22
142:4
143:9
145:6,12,
14 146:7
147:1,3,12
148:7,9,11
152:2
156:2
163:21,22
164:16
166:13
178:22
179:7,21
181:1,14
182:1

seller
114:12
140:7,18

sellers
112:14
114:6

selling  38:4
39:12 40:2

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 227 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021     Index: sells..short

101:1
122:18
181:10
182:3

**sells**  33:20

**Senior**  9:2

**sense**  99:3
162:15
171:15

**separate**
93:9 151:8

**separately**
78:1

**set**  21:13
82:11 93:7
106:3

**settled**
124:24

**shaded**  58:14

**share**  30:5
34:21
39:13
40:17 48:8
52:15
68:20 81:9
106:21
128:5
129:5
161:4
162:4
163:5

**shareholder**
14:4,5
173:11

174:7
176:2
180:13

**shares**  15:20
16:2,6,11,
20,25
17:5,8
18:1,5,8,
17 19:12
20:2,3,7,
14,19
21:11,22
22:2,7,8,
11,14,17,
22 23:12
24:9,11,20
25:3,19,21
26:24
27:2,6
28:1,5,8,
14,23
29:2,4,10
30:13 31:4
37:24
38:2,4,8,
12,16
39:2,4,8,
21,24 40:3
42:6,12,
15,19,20,
21 43:15
44:10,16,
18,19,21
45:2,7,9,
12,18
46:2,5,7,
10,12
47:9,17

49:3,16,
22,25
50:3,5,6
52:6,10,
18,19,23
53:5
54:17,22
55:14
60:25 61:1
63:18 64:3
65:20,23
66:4
69:17,21
70:1,3,6,
10 72:3,4
75:23 77:2
79:4,9,11,
20 80:21
81:22
82:1,6,7,
13,17,18,
20,23
83:9,14,15
94:22,23
95:7,16
96:20
100:17
101:1
103:17,19,
20,22
104:5,6,
12,15,20
105:15,20,
21 106:8,
11 107:16,
19 112:21
115:17
116:7,13

117:16
118:24
120:22
131:14,15
132:4,5
136:12
139:11
140:7,10
144:20
145:12,14
146:8
147:1,3
148:11
149:12
152:6
153:1,22
155:16,23
157:18
163:14,21
164:4
165:16,20,
25 166:3,
5,8,13,18,
23,25
180:4,10,
11,12,14,
17,19
181:6,10,
14,17,20
182:1,3,
11,16,17,
20,25
183:2,7,19

**shelf**
157:13,15

**short**  87:9,
11 88:7,12

shorter
  152:3,4

shorthand
  51:20

significance
  104:18

similar  11:7
  62:8

simply  91:20
  109:6,16
  142:8
  150:1

single  71:2
  81:9
  106:21
  160:15
  164:22

sir  125:10

sitting
  133:17
  147:19

situation
  97:3

situations
  128:17
  172:9,22

six-month
  24:8 62:25
  63:2
  151:21,23

size  51:19
  52:1 103:8
  107:5,10,
  11,15,19

110:19
115:4

skew  118:10

skip  56:24

slightly
  86:24

sold  22:14
  26:14,16
  28:7 32:2,
  5 34:19
  39:3,4,6,8
  41:6 42:19
  49:25
  62:16
  65:20
  75:24 95:7
  102:15
  129:5
  131:22
  141:13,15
  144:21,22
  145:15
  146:18
  147:20
  148:3
  164:22
  170:7

sole  78:24

solely
  109:15

sort  40:14
  78:4
  116:10

sounds  11:6

sources  68:2

171:2,6

speak  14:24
  99:16
  181:9

speaking
  67:15

special  9:19
  10:21,22

specific
  12:7 16:1
  24:11,12
  25:9
  35:19,21
  42:25
  53:20
  54:8,10
  97:21
  109:21
  110:9
  111:2
  113:4
  114:23
  132:9,19,
  21 133:23,
  25 138:14
  142:17
  145:19
  146:8,17
  147:10,17
  154:4
  160:6,7
  163:2,3
  182:25

specifically
  24:2 68:9
  98:11

speculate
  27:20
  46:16
  50:21 51:5
  114:17,21,
  22 140:17
  142:7
  145:13,16
  147:2
  148:2
  177:14
  180:23,25

speculating
  140:21
  146:14
  148:8

speculation
  141:3,5,
  12,13
  142:6

speculative
  147:11,18,
  23

split  16:7

spoke  75:14,
  19

spot  30:8

spring
  125:16
  126:25

staff  8:24

stand  159:25

stars  139:23

start  37:19

62:18

**start-up**
10:25

**started** 7:25
8:2 9:12
11:24
144:14

**starting**
20:5 41:18
149:23

**starts**
163:17

**startup** 73:5

**state** 30:9
130:22
167:18,22

**statement**
30:23
71:17

**statements**
94:7 96:7
149:24
174:15,25
175:3,7
177:12,20,
25

**states** 5:11

**statistical**
92:17

**status**
103:6,12,
15 105:17

**stays** 105:2,
21 122:6

**step** 90:21

**steps** 53:2

**stick** 110:2

**stock** 13:4
16:7
23:19,25
24:12,14,
21 30:2,9,
19,24
31:13,24
32:3,6
34:10,11,
13,19
35:6,12,
17,25 36:7
37:12,14,
15,17,24
38:3,7,19,
22 39:1,
12,16,18
40:4,17,
19,22
41:2,6,16
42:12,17
43:1,16
44:1,8,14,
23 47:24
49:5,6,9
50:15,16
51:21
53:6,15,
16,20
55:11,18
58:10,11,
24 59:5
60:10,11,
17,21

61:23
62:16,17
63:7
64:18,20,
24 67:5,9
71:1,10,11
75:8,19,25
81:1 82:3
83:1 84:3,
5 85:4
89:24,25
92:10
93:23 96:4
100:10
101:10
111:10
115:20
117:22,23
118:5
119:2,6,
11,18
126:14
127:9,17
128:23
129:3
132:9,19
133:15
136:5
139:12
140:14,15
144:8
153:20
155:5,22
159:4,8
160:7
162:19
164:13,19,
21 165:15

173:4,10,
25 174:6,
25 175:7,
21 177:12
182:21,22

**stocks** 55:21
56:1 80:7,
9 109:21
111:5,20
117:20
119:7
127:9
160:3

**stop** 149:22

**strictly**
10:16 14:7
34:9 81:5,
14 111:22
143:16

**strike** 24:18
28:12
55:20
63:21 64:8
68:18
71:16
77:16
83:6,10,17
90:19
112:4
132:17

**studies** 66:8
100:10
126:14
129:18

**study** 43:1,
2,22 47:24

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 230 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021    Index: stuff..technology

51:20,21
52:2 53:7,
8,9,19,23
54:8,23
55:16,23
56:3,10
60:25
67:25
76:21 77:9
79:12,21
80:4,6,12,
14,15,19
81:4,25
82:4,12,15
83:22
84:14
96:16,22
110:20,24
111:4
112:7
113:6,12,
16 114:9
115:5
118:16
119:4,5
120:12
127:17
139:19
140:5
152:11,25
154:2,6
155:14
156:3,25
158:24
166:6
**stuff** 11:10,
11 111:21
146:4

**subject** 39:3
52:11
55:22
96:21
100:22,23,
24 101:7,
9,12,14
111:4,7
112:7
113:6
**submitted**
138:23
**subsequent**
135:1,20
136:12
144:15,16
**subsequently**
8:13
**subsidiary**
10:25
176:16
179:20,21,
22
**subtract**
179:25
**sufficiency**
15:11
**sufficient**
140:12
**suggested**
37:6,7
**suggesting**
146:22
**sum** 98:14

**summarize**
110:16
**summarizes**
129:15
**summary** 7:15
**Sumproduct**
99:2
**supply** 51:2
**support**
11:25
12:17 13:1
**supposed**
20:8,21,23
**sworn** 5:10
**system** 10:9
78:18
**systems**
9:18,21,23
10:1

———————————

**T**

———————————

**table** 25:11
57:4,11,
12,21,23,
25 63:10
69:3,6
74:3 77:12
85:18,22
107:24
172:14
**tables** 57:1,
2 78:17
**takes** 24:7

39:17
40:20
129:13
**taking** 5:18
164:7
**talk** 38:6
57:20 66:9
73:11
144:19
168:21
169:7
175:4
**talked**
66:19,20,
21,23 68:4
175:19
180:3
**talking**
14:25
35:19
44:18,20,
24 57:21
59:7 63:17
69:1
137:25
168:21,23
180:9
**talks** 77:12
**target** 96:17
**team** 9:5,20
11:14,16
**technically**
122:21
**technology**
32:17,22

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021    Index: telling..time

telling
  181:6

tells  80:20
  84:1

temperature
  130:20

ten  44:7
  73:16,17
  74:21
  75:18
  81:10
  87:13
  116:24

ten-minute
  56:19

tend  9:22

term  30:17
  87:9,11
  88:8,13,14
  171:13

terms  15:3
  49:18 57:7
  148:24
  169:23
  178:11,25
  180:7

Terry  14:19

testifying
  13:2

testimony
  124:3
  173:19

theoretically
  47:5

132:24

theory
  159:25

Therapeutics
  17:14

thing  31:17
  39:20
  64:17 69:1
  74:19
  89:15
  103:13
  107:22
  116:10
  168:21
  182:1

things  11:9
  15:10
  31:20
  38:20 48:9
  57:14,17
  85:13
  88:15
  103:11
  109:20
  110:17
  114:12
  151:9
  152:16
  175:5

thinly
  30:10,12,
  19,24
  31:7,22,24
  36:22,23
  116:6,13
  118:1,2,4,

16,17
  144:8,10,
  12 163:13
  164:19,21
  165:14

thought
  22:21
  32:15
  39:11
  177:6

thousand
  115:13
  129:14

thousands
  31:17

thread  98:7

threat
  173:9,20

three-party
  17:15

three-year
  90:3

threshold
  30:18,21
  71:1 138:3
  158:24

thresholds
  156:24

thumb  132:1

ties  107:7

time  6:2,15
  9:25 17:2
  18:4 19:1
  26:2,8,9

31:23
  32:14
  34:2,4,14,
  22 35:11,
  17,20,21
  36:10,14
  37:1,4,13,
  16 38:1,5
  39:17,18,
  22,24
  40:16,20
  41:3,5
  43:7 50:9
  55:10 56:9
  57:13,18
  58:7,25
  59:1,14,25
  60:7 62:6,
  7,12,14
  63:2,3,4,
  8,12,16,
  20,23,24,
  25 64:7,
  10,13,14,
  15,25
  65:15
  69:15,17,
  19,20,22
  70:7,15
  73:20
  75:18
  76:15,17,
  18,24
  77:3,7,10,
  12,13,14,
  19,20,21,
  25 78:3,24
  79:3,22,23

80:16
83:2,14
84:15,18,
19,25
85:6,8,21
86:5,11,
17,20
87:24
90:2,13
91:21
100:15
103:6
107:2,3,7,
8,20,22,
23,24,25
109:10,12
111:8
113:12,25
117:14,16
120:16,17
121:10,21
122:2,6
127:1
128:1,21
131:6
132:14,20
133:1,16,
23 134:6,
7,8 135:1,
14,24
136:23
137:13
138:5,17
139:2,6
141:14
142:2
146:15,25
147:16

148:10
149:18
151:13
152:5
154:3
156:17
159:13
160:4,12,
21 167:12,
13

times   5:20
12:6
46:23,25
123:16,20
133:11
156:15

timing
144:19,25
146:16
147:17
148:24

tires   93:25

today   5:18,
24 14:19
39:22
85:4,5,6
86:25
135:4,8,15
147:19
182:16,18

told   173:3
178:9
181:22

top   32:25
33:21 52:3
55:25 56:5

57:16,22
58:3,4,13
64:23
65:11
69:2,4
70:5 75:21
79:16
99:22
101:17
107:12,23,
25 121:4
130:4
151:25
176:17

total   45:2
95:9,21
98:24
133:5

totaled
98:20

trace   97:25
105:5

traces   98:7

tradable
182:19

trade   20:3
27:16
31:21
37:1,6,7,8
39:21
41:17
46:4,7
55:2 58:11
65:14,18
67:18
69:22

75:21
80:11
119:15

tradeable
182:17

traded   13:4
14:11 16:2
27:9,19
30:10,12,
13,19,24
31:7,13,
22,24
36:22,23
38:11,16
42:6,11,17
44:14
46:3,5
48:8 52:24
53:25
55:13
60:25
61:1,2,5
68:21
69:11
71:3,5,9,
11 74:8,14
80:5,6,9
81:9,22
82:1,3,5,
6,13,17,
20,23,25
83:8,13,15
94:6 95:16
96:4,20
115:17
116:7,13
117:20,23

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021   Index: traders..type

118:1,2,5,
16,17
119:7
124:17,22
127:9
128:5
129:3
140:11
144:9,10,
12 155:23
157:18
159:3
163:13
164:19,21
165:15
169:15,18,
22,23

traders
68:14
75:12,13,
14,20 76:3
158:17

traders'
81:15

trades 37:25
82:17,18
117:21
119:12,14

trading
26:24
29:10 31:1
36:9,15,19
37:2,3,9,
11,15,18
38:18
39:10
40:15

43:15,17,
25 44:6,10
45:9 47:9
48:8 49:5
50:15,17,
22 54:21
55:5,6,7,
9,10 61:7
65:10,12,
15,18
66:1,2,10
67:5,8
68:6,20
69:2 70:20
72:4,20
73:5,19
75:7 77:7
79:12
83:13
100:15
101:18
102:14,22,
25 106:25
107:17
109:16
110:10,23
115:16,20
119:9
121:13
127:8
128:5
129:4
131:21
133:5,6,
10,11
136:11
137:2,9,
13,14,24

138:7,8
144:14
147:8
153:14
154:5
155:4,16
156:24
157:17
158:6,24
159:3
161:4,24
162:4,17,
18 163:5

transact
54:2

transaction
44:10,11
54:3,12
89:25
90:14 93:4
114:13,23,
25 136:4
172:17

transactions
44:7 53:15
62:9 82:25
111:25
112:8,11,
12 129:14
169:16
170:5
171:8
172:1

transcript
184:8

transitioned

11:3

Travelers
9:2,4

treasury
86:3,4
110:3
122:10

trends 36:13
37:9,11
53:18,20

trial 124:6,
24

trick 150:10

triggered
17:2

true 39:14
42:18
130:14
131:24
133:2
159:18
178:16

truing 84:21

trust 14:6

turn 92:20

turned 134:1

turns 6:25
98:15
131:24

two-year
62:15,19
63:4

type 10:6

Case 1:19-cv-01578-VEC-VF Document 256-2 Filed 02/04/22 Page 234 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021 Index: types..variables

72:12
126:3
156:21
172:18
175:4

types 52:5,9
56:6
110:18
118:10
167:19
171:25

typically
33:8 39:8
60:5,18,25
61:20 62:4
82:5,6,16,
19 87:5
92:14
112:3
168:15

—————

U

U.S. 86:3

UHY 8:13

ultimately
11:13

underlying
91:24
106:13
129:24

understand
5:24 6:3,
18 15:3,4,
8 22:4,5
23:2 24:15

27:14 40:5
44:4 46:1,
6 47:16
49:13
51:23
53:11 57:6
64:8 70:25
76:9 77:18
78:21
81:20
91:10
101:8
104:6,17
135:4
143:19
153:8
154:16
168:20
179:10

understanding
24:22 26:3
32:11 33:4
39:5 45:7
74:7 75:17
125:3,6,7
126:23
127:4
157:20,22
166:2
174:22,23
176:21
177:15,17
180:9

understood
6:5 87:6
117:3
124:25

139:9

uniform
68:21

unique 163:1

unregistered
103:17,20,
22,23
104:4,6,7,
9,13,16,19
105:20,21
106:8,11,
21

unusually
122:25

update 73:25
91:21

updated
91:22,23
122:2,3,5,
10,11

upfront
84:12

usefulness
158:1

user 58:17

—————

V

valid 131:25
145:10

valuation
12:2,9,16,
25 13:1,
13,23
14:3,4,5

16:5 24:6,
7 31:15
93:20,25
125:15,16
126:1,3,7,
21 129:19
130:9
134:17
167:19
168:15,23

valuations
31:16
123:11

values
157:16

valuing
16:11
82:5,6
83:23 85:4
104:19
124:12

vantage
135:17

variable
93:11
94:16
103:7
105:5,17
107:4
120:12
122:22
152:19

variables
81:19
85:23
105:9,10

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 235 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021   Index: variant..working

120:14
151:15

**variant**
130:20

**vary** 119:3

**verbiage**
23:22

**verifiably**
172:20

**versus** 62:2
67:5 92:3,
10 93:14,
17 106:17
115:21
116:13
124:5

**vet** 111:21
112:11
157:24

**view** 16:24
66:10
152:6
174:19

**volatile**
58:10

**volatility**
55:2,17
57:15,17,
18 58:1,4,
15,17,24
59:4,5,21,
23 60:9,
11,20,22,
23 61:7
69:12

74:4,16
81:20,25
82:3,10
109:9
120:15,20,
21 151:19

**volume**
36:10,15
37:12,13,
15,18,24,
25 43:15
44:16 48:7
49:5
50:15,22
51:1 52:18
65:10,12,
15,18
66:1,2
67:5 68:20
69:2 75:23
79:13
80:12
83:13
85:10
100:15
101:4,6,18
102:14,22
107:17
109:17
110:23
115:16
121:14
127:8
128:5
129:4
131:21
133:5,6,
10,11

137:24
138:7,9
139:4
153:2,14,
22 155:4,
15 156:24
158:7,24
159:3
162:15
163:5

**volumes** 31:1
37:3 38:7
43:17
131:14
154:5

**vote** 180:13

**voting**
175:14
180:15

———————

**W**

———————

**wait** 40:22
83:10

**wanted** 9:25
152:23
153:25

**wanting**
175:19

**warmer**
130:23

**weight**
178:11

**wherewithal**
147:9

**widely** 49:16

**Willamette**
8:15 12:8,
9,11

**WILLIAM** 5:9

**willingness**
160:8

**word** 71:17

**words** 48:6
52:9 72:3
75:15
81:24
93:24
94:24

**work** 7:24
8:16,22
9:3 10:6,
22 11:22
12:2,19
13:15
14:4,5,10,
14 15:12
53:1 60:13
66:14
84:12
116:18
169:13

**worked**
11:15,16,
21 12:10,
17,24
13:2,9,19
116:6

**working**
11:13

Case 1:19-cv-01578-VEC-VF   Document 256-2   Filed 02/04/22   Page 236 of 236

**NAVIDEA BIOPHARMACEUTICALS, INC. vs MICHAEL M. GOLDBERG, M.D.**
William F. Murray, CPA/ABV/CFF, ASA on 12/06/2021 Index: workings..Zimmer

workings
  98:4,5

works  53:11
  77:23
  116:19
  117:12,14
  157:21

worth  140:6

wrap  167:14

writing
  139:3

wrong  131:3
  132:3
  136:10,19
  137:6
  158:20
  159:17,20
  160:8

wrote  34:5

─────────────

        Y
─────────────

year  8:19
  9:19 25:16
  59:23
  60:2,3,4
  92:2,4
  123:12
  138:25

years  9:13
  44:7 56:13
  59:2,11,
  15,24 60:5
  62:21 63:6
  68:14
  73:15,16,

17 74:21
  75:19
  81:10 85:3
  86:20
  87:13
  88:3,21
  116:24

yield  43:21
  110:3

yields  156:6

York  8:16
  12:24
  13:9,10
  38:7
  119:11
  173:4,10,
  25 174:6,
  25 175:7
  177:12

─────────────

        Z
─────────────

Zimmer  5:14,
  16 6:21,
  23,24
  7:13,14
  15:16
  16:13,16
  18:15
  19:9,10,
  19,20
  20:12,13
  21:5,6,17
  23:10,11
  24:3,4
  34:1 35:1
  40:7,24

41:11 42:3
  45:24
  46:18 47:1
  49:14
  50:23,24
  51:6
  56:20,22,
  23 71:7,23
  72:21
  73:23 75:1
  87:10
  88:17 91:2
  95:4,18,
  19,25 96:1
  110:1
  111:16
  114:18
  115:11
  117:1,3,6,
  11 120:3,
  9,10 122:8
  127:15,19
  129:1
  130:18
  131:2,11
  132:15
  136:9
  137:1,7,8
  141:2,10,
  24 143:2,
  12,13
  145:4
  146:13
  147:21
  148:4,16,
  20 150:3,
  15,23
  153:9

154:14
  155:1,11,
  20 159:24
  160:5,13
  161:10
  162:11
  163:9
  166:22
  170:10
  173:17
  174:4,11,
  21 175:17,
  18 176:8,
  11 177:5
  179:12,13
  180:24
  181:15
  182:8
  183:11,14,
  16,17
  184:1,3