Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Tel: (914) 402-5683
GZimmer@GZimmerLegal.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In Re Navidea Biopharmaceuticals Litigation | Case No.: 1:19-cv-01578-VEC |
|---|---|

**MEMORANDUM OF LAW IN SUPPORT OF DR. MICHAEL M. GOLDBERG'S PARTIAL MOTION *IN LIMINE* TO STRIKE CERTAIN OPINIONS OF PURPORTED EXPERT WILLIAM F. MURRAY PROFFERED BY NAVIDEA BIOPHARMACEUTICALS, INC.**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

A. PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 2

I APPLICABLE LEGAL STANDARD ..... 2

II THE METHODOLOGY EMPLOYED BY MURRAY TO DISCOUNT THE VALUE OF NAVIDEA'S SHARES IS NOT RELEVANT OR RELIABLE ..... 4

B. The Underlying Methodology Used By Murray Is Not Relevant To Determining The Price Of Publicly Traded Stocks ..... 5

C. The Discount Methodology Is Not Reliable ..... 9

D. CONCLUSION ..... 17

# TABLE OF AUTHORITIES

**Cases** **Page**

*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002) ..... 3, 17

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ..... 9

*Brooks v. Outboard Marine Corp.*,
234 F.3d 89 (2d Cir. 2000) ..... 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ..... 2

*GE v. Joiner*,
522 U.S. 136 (1997) ..... 3

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ..... 3

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
593 F. Supp. 2d 549 (S.D.N.Y. 2008) ..... 6, 11

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-CV-5810, 2017 U.S. Dist. LEXIS 213074,
2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ..... 6

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ..... 6

*In re Mirena*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ..... 6

*Faulkner v. Arista Records LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014) ..... 7

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017) ..... 7

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ..... 3

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ..... 11

**Statutes**

Fed. R. Evid. 702 ..... 1

Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Dr. Michael M. Goldberg M.D. ("Dr. Goldberg") respectfully submits this memorandum of law in support of his motion (the "Motion") *in limine* to strike certain opinions of purported expert witness William F. Murray ("Murray") proffered by Plaintiff/Counterclaim Defendant Navidea Biopharmaceuticals, Inc. ("Navidea") in this action on the ground that they do not satisfy the requirements of Rule 702 of the Federal Rules of Evidence.

**PRELIMINARY STATEMENT**

The expert witnesses proffered by both Dr. Goldberg and Navidea in this action agree that the proper methodology for initially valuing the shares of Navidea stock that Dr. Goldberg was supposed to receive as consideration for the agreement (the "August 14th Agreement") between Dr. Goldberg, Navidea and Third-Party Defendant Macrophage Therapeutics, Inc. ("Macrophage") is to select the date on which Dr. Goldberg likely would have sold the shares and determine the market value of the shares as of that day. While Murry and Dr. Goldberg's expert, Terry Orr ("Orr") disagree on when Dr. Goldberg likely would have sold the shares, that is a question for the jury.

After determining his initial value (based on his preferred valuation date), however, Murry goes on to argue that a "discount" or "haircut" must be applied to the value because in order to realize it Dr. Goldberg would be required to sell a substantial volume of Navidea shares into the market. Murray admits that he did no research on Navidea's trading or price history to arrive at this conclusion. Rather, he engages in a results-driven effort to "calculate" the value of a discount without ever justifying the concept of a discount. Apparently charged with reducing the amount of Dr. Goldberg's recover as much as possible, Murray pulled an off the shelf discount methodology unrelated to the price or value of publicly traded stock or any of the facts

or circumstances of this case and modified it based on conclusory, untested and decade-old "assumptions" to support his preordained conclusion.

The discount methodology utilized by Murray on pages 7-13 of his report has never been used in court to determine whether or how much the value of publicly traded stock should be discounted based on any volume of trading. The assumptions he employed in the model are not based in any way on the facts of this case, the shares at issue or the true market conditions relevant to an assessment of value of the Navidea shares. For the key assumption in his methodology, Murray used a cookie-cutter assumption regarding the securities market generally, derived from anecdotal inquires performed by unknown persons to unknown persons a decade ago, which has never been tested, questioned or adjusted by Murray or anyone else at his firm, either over time or in response to the actual facts of this case.

Even more important than the faulty nature of Murray's methodology, the results generated by the methodology are demonstrably unreliable in that the methodology necessarily predicts that any sale of Navidea stock in amounts in excess of 15% above the stock's average daily trading volume will necessarily result in a reduction in the price of the stock. However, analysis of Navidea's trading history (which Murray *did not* perform) demonstrates the unreliability of Murray's methodology.

## ARGUMENT

### I. APPLICABLE LEGAL STANDARD

For an expert witness's opinions to be admissible the Court must ensure that expert testimony "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). This "gate-keeping function applies not just to scientific expert testimony . . . but also to testimony based on 'technical' and 'other specialized' knowledge." *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir. 2000)

(quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)) (internal quotation marks omitted). *Daubert* established a list of non-exclusive factors that the Court may consider in determining whether an expert's methodology is reliable. These are: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether there is a high error rate for the expert's technique, and whether there are "standards controlling the technique's operation"; and (4) whether the expert's technique or theory is generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 592-94; accord *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

How the *Daubert* factors apply in a particular case will depend on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150. The Court "should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152.

"In addition to setting forth these criteria for testing an expert's methodology, the Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, expert testimony should be excluded if it is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002).

## II. THE METHODOLOGY EMPLOYED BY MURRAY TO DISCOUNT THE VALUE OF NAVIDEA'S SHARES IS NOT RELEVANT OR RELIABLE

At the outset of the portion of Murray's report explaining his use of the discount methodology he acknowledges that even using the dates be assumes Dr. Goldberg would have sold the Navidea shares Dr. Goldberg would be entitled to no less than $2,998,400 in damages.

He then goes on to criticize Orr's report on the basis that Orr did not take into account a concept he labels "blockage." (*See* Murray Report, a true and correct copy of which is annexed to the Declaration of Gregory Zimmer, Esq. dated February 3, 2022, submitted herewith (hereinafter, the "Zimmer Decl." as Exhibit A, at 7.) Murray explains that "[t]he term 'blockage' is used to describe the fact that *in some instances* a large block of stock cannot be liquidated as quickly as a smaller block without causing a material impact." (*Id.* (emphasis added.)) Thus, Murray's own explanation of his concept of "blockage" recognizes that it does not apply in all instances.[1] However, at deposition he acknowledged that he had done no research or analysis of Navidea, its industry, its stock ownership profile, its trading history or any other factor relating to Navidea, Dr. Goldberg or this case. (*See* Deposition of William F. Murray, Zimmer Decl. Exhibit B at 49:15-50:13.)

After introducing his concept of "blockage" Murray states, without any explanation, that "I consider a private placement to determine the impact of blockage on the Navidea shares." (Zimmer Decl. Ex. A at 7.) However, this lawsuit *does not* involve a private placement. Murray explains that he utilizes the MPI Restricted Stock Study to determine the effect of potential sales of large blocks of Navidea stock on Navidea's stock price. However, Murray admits that he does not know whether any of the companies or stocks included in the MPI Restricted Stock Study

[1] He also states that "If enacted, a sale would *almost certainly* result in significant downward pressure on the price due to the sudden excess supply of Navidea common stock." (*Id.*(emphasis added.))

were comparable to Navidea in terms of industry, company type or trading history, and admits that in performing his analysis he did not review the data underlying the study to determine whether they were relevant or comparable even though he could have done so. (*Id.* at 54:16-56:17.)

**A. The Underlying Methodology Used By Murray Is Not <u>Relevant To Determining The Price Of Publicly Traded Stocks</u>**

*Daubert* and its progeny make clear that when considering motions to exclude expert testimony the Court must determine whether the nature of the opinions expressed, including the underlying methodology, is relevant to the issues in the present case. *Daubert* 509 U.S. at 589 (court must ensure that expert testimony "is not only relevant, but reliable.") Here, the underlying methodology employed by Murray in his purported analysis of the impact of large volume sales of publicly traded stock shares (the "MPI Restricted Stock Study") actually analyzes the pricing attributes of private placements of restricted stock. Murray does not articulate how an analysis of private placements could predict the results of public stock trades. He states that it was designed to analyze situations where private companies wish to sell their companies in the future but will have to undertake significant work and wait a significant time before being able to sell the company. (Zimmer Decl. Ex. B at 83:18-85:16.) It uses a proprietary study of private placements more than a decade old to evaluate the preset value of a future sale of such a company *because* application of the study *always* predicts a lower number than the actual value of the company. Murray combines this study and methodology relating to the sale of private companies (not even stock in the companies) layered with a study of private placements of restricted stock as one component of his overall methodology. However, the only function this portion of the methodology plays is to provide a discount amount. It is not adjusted for the fact that it is being used to value publicly traded stock, or based on the specific company,

industry sector, investor characteristics or the trading history of the stock at issue. Thus, nothing about the MPI Restricted Stock Study has any relevance to the issue for which Murray employs it – to discount the value of the Navidea stock Dr. Goldberg is entitled to under the terms of the August 14th Agreement based on the fact that it represents a large percentage of Navidea stock. This attempt to apply the results of a study in one context to another wholly different context lacks the rigor required by *Daubert* and its progeny. *See, e.g.*, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 562 (S.D.N.Y. 2008) ("transferring the results from a study of one substance to another has no validity.")

Further, Murray's deposition testimony makes clear that he did not consider any company-specific information regarding Navidea when attempting to predict the effect of what he labels as high-volume trading on its stock price. (*See id.* at 32:8-34:17.) **Murray admits that, over time, trading volume in Navidea's shares increased and that its share price generally went *up* as trading volume increased.** (*Id.* at 37:11-18.) This is confirmed by empirical evidence. (*See* pp. 14-15, *infra*.) Yet Murray admits that his work began with an *assumption* that any time a quantity of stock in excess of 15% of Navidea's average daily trading volume is sold the share price will necessarily go *down*. (*Id.* at 41:5-21. This is exactly the type of result-driven analysis that *Daubert* is intended to preclude. *See, e.g., In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) ("Opinions that assume a conclusion and 'reverse-engineer[] a theory' to fit that conclusion are, similarly, inadmissible."); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810, 2017 U.S. Dist. LEXIS 213074, 2017 WL 6729295, at *8 (S.D.N.Y. Dec. 28, 2017) (excluding expert opinion because it "reveals Plaintiffs' experts to be 'reverse-engineering a theory to fit the desired outcome.'" (citing *In re Mirena*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016); *see also*

*Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) ("[M]ethodology . . . aimed at achieving one result . . . is unreliable, and . . . must be excluded."); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796-800 (3d Cir. 2017) (affirming exclusion of "conclusion-driven" analysis).

In fact, the MPI Restricted Stock Study conducted by his firm (Management Planning, Inc. ("MPI")) that underlies Murray's methodology is one who's use *necessarily* predicts a *reduction* in price every time. Murray testified that he employed the MPI Restricted Stock Study *because* it would predict a reduction in Navidea stock price – he assumed before he began his analysis that the price of Navidea stock would decline if large volumes were sold and used a study that would necessarily yield this result. (*Id.* at 41:5-25.) This assumption ignored the potential impact of stock-specific and company-specific factors that could drive both higher trading volume and stock price. Murray admitted that low trading volume could be the result of a lack of availability of shares for sale, rather than a lack of demand for the shares. (*Id.* at 50:14-51:5.) It also ignores the fact that positive news disclosed into the market may drive both higher stock prices and greater demand for the stock. (*Id.* at 34:12-36:8.) Murray admits that he did not attempt to develop a methodology to analyze *whether* trading large volumes of *Navidea* stock *would* cause its share price to decline. (*Id.* at 42:22-43:8.) He admitted that there are other models used to conduct this type of analysis but that he did not utilize any of those models. (*Id.* at 42:25-43:13.)

The MPI Restricted Stock Study analyzed private placements of restricted securities in public companies that were sold during restriction periods that would preclude the purchasers of the stock from selling it for some period of time. He admitted that he does not know whether the companies included in the MPI Restricted Stock Study were analyzed to determine whether

specific circumstances present at the time of the private placements could have affected the price of the private placement sales. (*Id.* at 113:4-13.) He does not believe that individual sellers or purchasers involved in the private placements that were the basis for the MPI Restricted Stock Study were interviewed to determine whether deal-specific or seller- or purchaser-specific issues impacted the price of the private placements or whether factors such as an immediate need for cash by the seller might have affected the transaction prices. (*Id.* at 114:5-17.) He simply employed the only off-the-shelf study available to him at MPI. When asked why he did not attempt to develop a model relating to high volume sales of publicly traded stocks with low trading volumes rather than using a model considering wholly different types of transactions he responded that "[w]e always used this model as our gauge for market data . . ." (*Id.* at 115:21-25.)

The MPI Restricted Stock Study was used even though it is not based on public trades of stock – the types of trades Murray purports to analyze and opine on. It is not necessarily based on thinly traded companies – which Murray states is the principal reason for his application of a discount methodology. He specifically admitted that he *never even considered* the possibility that these differences might render the use of the MPI Restricted Stock Study inappropriate in this case. (*Id.* at 117:18-120:1.)

The MPI Restricted Stock Study did not involve determinations of decline in publicly traded stock prices based on high volume trading. It dealt with non-public private placements of restricted stock and was used simply because it is a formula that necessarily predicts a decline in price or, as Murray put it, it will necessarily "determine the appropriate discount." (*Id.* at 80:8-18.) Not surprisingly, Murray admitted that the MPI Restricted Stock Study is typically used by MPI to value privately traded shares – the type of shares that were the subject of the study. (*Id.*

at 82:2-21; 83:18-84:18.) In other words, this is an apples-to-oranges comparison of private placements of stock as opposed to public trading prices that is used by Murray to quantify the "necessary discount" he assumes would occur any time publicly traded stock in amounts above a threshold of 15% of average daily trading volume occurs. The magnitude of the reduction of price in these public trading transactions is dictated for purposes of Murray's discount methodology by the MPI Restricted Stock Study which studied only private placements of restricted stock that could not be publicly traded. Accordingly, the fundamental component of Murray's discount methodology is not relevant to the public stock trading prices he opines on, and the discount methodology therefore must be precluded under the *Daubert* standard. "[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations omitted) (internal quotation marks omitted).

**B. <u>The Discount Methodology Is Not Reliable</u>**

When asked whether his model applied to any set of circumstances would ever predict that shares in volumes above 15% of average daily trading volume could ever be sold at market price he candidly admitted that his methodology is not intended to determine *whether* a sale of large volumes *would* decrease sales price; rather, his model absolutely assumes, as its fundamental premise, that sales of more than 15% of the average daily trading volume of any stock will necessarily drive the sale price down. (*Id.* at 131:12-23.) He acknowledges that the 15% threshold is a "rule of thumb" that could be wrong with respect to an individual company's stock and that "[i]t could be possible that you could sell shares and there's no impact, or you could sell five shares and there is a big impact." (*Id.* at 131:24-132:6.)

Murray also did no investigation or analysis of Dr. Goldberg's individual characteristics, such as his net worth, his holdings in Navidea stock, his knowledge of securities markets or the market for Navidea shares. (*Id.* at 141:17-142:3.) He also admitted that one of the fundamental premises of his analysis, the dates on which Dr. Goldberg would sell his Navidea stock, was merely assumed by him without any consideration of Dr. Goldberg or his circumstances, Navidea or its circumstances, trading history or any other information about the actual facts of this case or the parties. (*Id.* at 142:4-146:10.)

It is especially damning that Murray's entire analysis is premised on an "assumption" that no more than 15% of the average daily trading volume could be sold by an individual on any day without driving the price of the stock down. Murry testified that the discount he derives through his discount methodology is driven solely by an across-the-board, decade-old anecdotal 15% of daily trading volume threshold that has never been tested, compared to published information or reconsidered since it was first adopted many, many years before Murray joined MPI. (*Id.* at 78:24-81:17.) Murray testified that this is the one of the two most important variables in determining the discount arrived at by the methodology. (*Id.* at 121:7-15.) This is a universal assumption employed by Murray and MPI for every stock in every sector during every time period that may be presented to them. The number is not the result of any published guideline. It is not based on any kind of study performed. "It's just anectodical input from various banks that we talked to" and anecdotal conversations with unidentified "people in the office," "bankers" and other unidentified people. Murray admits that he does not know if anyone who contributed to the number was familiar with Navidea (and in any event it was agreed to at MPI more than a decade ago). It is simply an across-the-board number, developed in a totally ad-hoc and undocumented fashion, which is used in all of MPI's engagements even though Murray

admits that the impact of trading volume on share price *is not* uniform across publicly traded companies. (*Id.* at 64:10-68:23.) "[I]t is well established that an 'insightful, even an inspired, hunch' must be excluded if it 'lacks scientific rigor.'" *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 593 F. Supp. 2d at 562 (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)).

Murry states that based on his use of the 15% threshold it would take 53 quarters, or *more than thirteen years*, for Dr. Goldberg to sell 13.5 million Navidea shares without reducing the stock price on every trading day. He makes this prediction using the 15% threshold despite the fact that he admits that his entire firm simply uses this threshold for *every* publicly traded company even though it is not an engagement-specific or company-specific number, is not an investor-specific number and does not take into account any investor's trading history, ability to hold shares, what trading strategy they might employ, does not consider what, if any, forms of restrictions might be associated with specific shares, and is not based on any methodology. It is simply "based on trading inquires to people in the trading industry" who Murray cannot identify and who's names he does not even believe are recorded anywhere. Murray does not know whether any of the unidentified (and unidentifiable) people who contributed to establishing this threshold have any experience in the biopharmaceutical or research and development spaces (where Navidea operates). Despite earlier asserting that he himself spoke to some of these individuals, Murray ultimately admits that the threshold has been in place for "at least five, maybe ten years" (Murray has been at MPI only since 2019), that he does not know anything about the people who contributed to establishing the threshold and that he never personally spoke to any of them. He also admits that market principles and/or trading concepts may have changed

since the threshold was adopted by MPI but that the threshold has not been reexamined or adjusted in all that time. (*Id.* at 65:1-74:1.)

Murray admits that despite the fact that Navidea is a publicly traded company with a publicly available trading history he never considered analyzing Navidea's trading history to identify an appropriate trading volume threshold to incorporate into his model. He testified that there was no reason why this was not done, and he did not even consider whether it could have been done. (*Id.* at 74:2-76:8.)

Similar to the unjustifiable application of a 15% of average daily trading volume threshold, other variables in Murray's methodology are used that cannot be justified in light of reality. For example, one input into the methodology is what Murray states is "the risk-free rate of a 30-year treasury" bond. (*Id.* at 86:1-4.) Murray admits that this rate fluctuates over time and that the rate has been at historically low numbers since around 2009, but that MPI simply uses an across-the-board value of 3% (higher than even the current rate, which Murray states is about 2.8% and has been lower than that for more than a decade). (*Id.* at 86:5-89:5.) Likewise, regardless of the time MPI calculates it would take to sell a block of stock based on its 15% of average daily trading volume assumption (here 53 quarters or 13.25 years) the model utilizes as an input a single-year change in the S&P 500 index. Murray could not explain why this time period is used. He admitted that the model has never been reassessed or updated. (*Id.* at 89:15-92:5.)

Yet another "variable" in the model that Murray used is the ratio of the subject company's book value to its market cap. However, rather than conduct any actual research or investigation is the ratio of the book value of the company whose stock is being analyzed versus its market cap, Murray testified that MPI consistently employs a ratio of 1. Although he initially

stated that "we assume it's 1 for most companies, *especially nonoperating companies*," and Navidea *is* an operating company, he utilized an assumed ratio of 1 for Navidea without ever considering Navidea's actual book value, even though that could have been determined through review of Navidea's publicly disclosed financial statements – a review Murray did not conduct. He also admitted that while the "market cap" of a company includes only the stock price multiplied by the number of publicly traded shares, Murray was aware that Navidea had issued millions of shares to Dr. Goldberg and that other non-publicly traded shares had been issued and publicly disclosed by Navidea. Murray did not take any or this information into consideration when arriving at the ratio of Navidea's book value to its market cap for purposes of deriving the appropriate ratio to use as an input into his analysis. He simply used a ratio of 1. (*Id.* at 92:15-96:13.)

Another variable input into the formula is "Log Quarters to Sell Under the 1% Limit Rule." (*See* Zimmer Decl. Ex. A at 10 – 14th "Variable" listed in left column of table at bottom of page). Murray explains that this references a limit on a "1 percent" trading imposed by securities "Rule 144." (*See* Zimmer Decl. Ex. B at 100:4-11.) Yet Murray admits that he does not know whether Dr. Goldberg was subject to Rule 144 or the 1 percent trading limit, or even know what the 1 percent trading limit is or how it works. The model also assigns a variable of "1" or "0" to a particular calculation based on whether the shares under consideration are registered or unregistered. Registered shares receive a "0" and unregistered shares receive a "1" for this variable. There is no consideration regarding the nature of the shares of their potential or known future registration status. (*Id.* at 103:11-107:1.)

Murray acknowledges that his report states that his discount methodology is premised on the assumption (discussed above) that Dr. Goldberg could only sell up to 15% of the average

daily trading volume per day without causing a price decline in Navidea stock, and acknowledges that the 1 percent trading limit might impose different requirements, but admits that he does not know or understand whether the formula underlying the MPI Restricted Stock Study assumes that Dr. Goldberg could sell only 1% above daily trading volume, 15% above daily trading volume, or some other percentage. (*Id.* at 100:12-103:5.)

Murray admitted that he is not familiar with how the MPI Restricted Stock Study model calculates a predicted price reduction and does not know how the model works. (*Id.* 97:18-98:17.) He acknowledged that he has never asked anyone why the 15% threshold or the other variables are never individualized to specific public stocks when they have the actual numbers for the stock at issue. (*Id.* at 109:19-24.)

Although Murray initially claimed that the MPI Restricted Stock Study had been "peer reviewed" he admitted that while it had been "published" he did not know whether it had actually been peer reviewed. Murray agreed to determine whether it had been peer reviewed and to inform Dr. Goldberg through counsel, but he never did so. (*Id.* at 47:23-49:4.) He was clear that the use of the MPI Restricted Stock Study in conjunction with the assumed 15% trading threshold to analyze public stock price discounts has never been peer reviewed. (*Id.* at 129:17-130:11.)

In addition to the above, which amply demonstrates that the discount methodology is result-driven, not relevant to the valuation of publicly traded securities, is not adjusted for actual circumstances relating to the company, market conditions, or the individual stockholder, utilizes arbitrary and unjustified inputs from unknown sources, analysis of actual market events relating to trading in Navidea stock demonstrate empirically that Murray's discount methodology, which he acknowledges necessarily predicts a decline in Navidea's stock price where average daily

trading volume is exceeded by more than 15%, is demonstrably inaccurate and unreliable in its predictions.

Murray admitted that in performing his work he never reviewed or considered the actual market volume during the time for which his model purports to predict outcomes. He did not look back to determine whether there were trading days on which trading volume exceeded the 15% threshold and he did not look at what the real-world impact of high trading volume in Navidea stock had on its stock price. (*Id.* at 137:12-138:15.) He acknowledged that one could look at dates where there were exceptionally high trading volumes to test the accuracy of his methodology and acknowledged that for any day on which the trading volume exceeded the average daily trading volume by 15% or more his model would predict that stock prices would decline. (*Id.* at 155:2-156:19.) He acknowledged that despite the ease with which this analysis could be done, he was not aware of it ever having been done at his firm, he had never heard it discussed at his firm, and he never considered testing the validity or predictive accuracy of the methodology before utilizing it in this case. (*Id.* at 156:20-157:12.) He acknowledged that he never attempted to do such an analysis to determine whether the methodology is reliable and that if such testing showed that the methodology's predictions were wrong, then the model would not be reliable. (*Id.* at 158:4-159:18; 162:12-163:11.)

Performance of such an analysis conclusively demonstrates that Murray's discount methodology is inherently unreliable. An analysis of Navidea's actual trading history during the time period between February 14, 2019 (the first date Murray opines Dr. Goldberg could have sold any of the Navidea shares into the market) and November 15, 2021 (the date of Murray's expert report) demonstrates empirically that whereas Murray's discount methodology *necessarily* and by design predicts that Navidea's stock price would decline on *any* day on which its trading

volume exceeded its average daily trading volume by 15% or more, there are many instances on which Navidea's trading volume exceeded that threshold yet its stock price increased. (*See* Declaration of Terry L. Orr dated February 4, 2022, submitted herewith, hereinafter, the "Orr Decl." at ¶ 2, Ex. 1.)

Likewise, as Orr Decl. Ex. 1 demonstrates that the predictions yielded by Murray's discount methodology are demonstrably inaccurate and unreliable. Murray opines that sales in excess of 15% over the average daily trading volume for Navidea's shares on both February 14, 2019, and February 14, 2020, would cause Navidea's stock price to decline. The trading volume for Navidea shares on February 14, 2019, did not reach the average daily trading volume level, and no conclusion can be drawn on that date. However, the trading volume in Navidea stock on February 14, 2020, exceeded the average daily trading volume by more than two-and-a-half times, yet its closing price increased from $0.98 on the prior trading day to $1.18 on February 14, 2020.

Finally, as Orr Decl. Ex. 2 demonstrates, there were several trading days during the relevant period where the trading volume in Navidea was so high that Dr. Goldberg's could have sold blocks of Navidia stock of between 24% and 100% into the market without even approaching the 15% above average daily trading volume threshold. On such days Murray's discount analysis would have been completely irrelevant (and unreliable) because complete sales of all of the Navidea shares on any one of these days would not have triggered Murray's threshold for applying his discount methodology. (*See* Orr Decl. ¶ 7, Ex. 2.)

* * *

"When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of

that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. Murray's discount methodology has never been admitted in any court to predict a decline in value of publicly traded stock based on trading volume. (*Id.* at 123:14-124:24.) It should not be admitted here.

**CONCLUSION**

For the foregoing reasons, the Court should grant Dr. Goldberg's Motion and should grant Dr. Goldberg such other and further relief as the Court deems just and proper.

Dated: Westchester, New York
February 4, 2022

Respectfully submitted,

/s/ Gregory Zimmer

Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Phone: 914.402.5683
Fax: 914.402.5683
Email: GZimmer@GZimmerLegal.com