Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Tel: (914) 402-5683
GZimmer@GZimmerLegal.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Navidea Biopharmaceuticals Litigation | Case No.: 1:19-cv-01578-VEC |

Terry L. Orr, hereby declares under penalty of perjury as follows:

1. I am a Partner with HKA in the Dallas office of the Forensic Accounting and Commercial Damages practice. I am a Certified Public Accountant licensed in the state of Texas with 35 years of experience in the field of public accounting. I am a member of the American Institute of Certified Public Accountants ("AICPA"). I am also a Chartered Global Management Accountant, a Certified Internal Controls Auditor, A Certified Construction Auditor and I am a member of the AICPA's Forensic & Valuation Services Section. I have been retained as an expert by Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Dr. Michael M. Goldberg, M.D. ("Dr. Goldberg") in this action. I make this declaration in opposition to the motion (the "Motion") by Plaintiff/Counterclaim Defendant Navidea Biopharmaceuticals, Inc. ("Navidea") and Third-Party Defendant Macrophage Therapeutics, Inc. ("Macrophage" and, together with Navidea, "Defendants") seeking to disqualify me as an expert witness and/or to exclude testimony by me on certain topics at trial.

2. I understand that Federal Rule of Evidence 702 provides that:

    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

    3.  I was retained to provide specialized knowledge and/or opinions to the finder of fact in this action on four separate issues. First, I was retained to provide specialized knowledge to the finder of fact on the restrictions imposed on transfer of shares of publicly traded companies issued pursuant to Regulation D of the Securities Act of 1933 ("Regulation D") and restrictive legends reflecting these restrictions. Second, I was retained to provide specialized knowledge to the finder of fact regarding the use of contractual provisions addressing the potential for a stock split or other change in the nature of the shares issued by a public company in contracts requiring the delivery of specific numbers of shares at a future date. Third, I was retained to provide my opinion on the appropriate manner by which to value shares of Navidea which it was contemplated would be issued to Dr. Goldberg pursuant to the agreement dated August 14, 2018 (the "August 14th Agreement") between Dr. Goldberg, Navidea and Macrophage. Fourth, I was retained to provide my opinion on the appropriate manner by which to value shares of Macrophage which it was contemplated would be issued to Dr. Goldberg pursuant to the August 14th Agreement. Pursuant to the Court's scheduling orders, I produced a report (the "Orr Report") dated September 30, 2021, summarizing the specialized knowledge and opinions I intend to present on summary judgment and/or at trial in this matter.

4. I have reviewed the Motion and provide the following responses to the arguments made therein:

5. With respect to the restrictions on transfer of publicly traded stock imposed by Regulation D and corresponding restrictive legends, Defendants argue (i) that I am not qualified as an expert in those matters, and (ii) that I intend to provide inadmissible legal opinions to the finder of fact. Both arguments are false.

6. I am fully qualified to provide the finder of fact with specific knowledge regarding Regulation D. As an auditor for 27 years and an audit partner for a majority of those years, I was involved in issuing audit or review reports on financial statements that were included in SEC filings, including Regulation D filings. A responsibility the auditor has when financial statements that the auditor has reviewed or audited accompany an SEC filing, is to verify that the information in the filing is congruent with what is disclosed in the accompanying financial statements. In order to perform these functions, I was required to maintain an understanding of SEC filing requirements and disclosures to ensure what was reported in the SEC filing was congruent with what was reported in the accompanying financial statements that I audited or reviewed. As an auditor I guarded against financial statements that I audited or reviewed accompanying an SEC filing that was false or misleading. Therefore, I studied and took continuing education courses to stay current on SEC guidelines and requirements. As such, I became familiar with Regulation D and the restrictions it placed on securities issued pursuant to it and to update and refresh my knowledge of Regulation D periodically. Additionally, I was a second partner reviewer of financial statements that were included in SEC filings, including Regulation D filings. The second partner's responsibility was to provide an objective review of the congruency of disclosures in the financial

statements and the SEC filing and to provide additional assurance that the information in the SEC filing was not false or misleading.

7.      Navidea also argues that I intend to provide legal opinions to the finder of fact regarding Regulation D and the shares issued by Navidea to Dr. Goldberg pursuant to the August 14th Agreement. This is false. Although Navidea relies on certain summary descriptions of my testimony on Regulation D topics, I do not seek to, and do not, provide legal opinions regarding either Regulation D or the August 14th Agreement. Rather, I intend to provide the finder of fact with specialized knowledge regarding Regulation D and the attributes of shares issued pursuant to Regulation D, specifically, the restrictions imposed by Regulation D on shares issued pursuant to it and the restrictive legends required by Regulation D. To the extent I provide descriptions of the restrictions on the sale of securities imposed by Regulation D, this is descriptive of the operation of Regulation D. It *is not* a legal opinion regarding the "meaning and interpretation of Regulation D." Nor do I opine on the "the requirements in selling restricted securities," "the definition of a control person or whether Dr. Goldberg qualifies as a control person" or "whether Navidea complied with the requirements of Regulation D." Rather, I provide background information about Regulation D and explain the restrictions on transfer imposed by Regulation D so that the finder of fact will have sufficient knowledge to make factual determinations on those subjects.

8.      Part of the specialized knowledge I intend to provide is the nature of the restrictive legend that one would expect to see placed on shares issued pursuant to Regulation D. As stated in my report "restrictive securities are almost always issued with a 'restrictive' legend. Such a legend indicates that the securities may not be resold in the marketplace unless they are registered with the SEC or are exempt from the registration requirements." The following portion of the Navidea Share legend is typical of a restricted security legend under Regulation D:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL, IF THE ISSUER SO REQUESTS), OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT.

9. I also intend to provide the finder of fact with the specialized knowledge that Regulation D neither authorizes nor requires the placement of other forms of legends on shares issued pursuant to Regulation D. As stated in my report, Regulation D neither authorizes nor requires the placement of other forms of legends on shares issued pursuant to Regulation D, such as the legend related to the Lockup or Escrow Agreements in the August 14th Agreement. As I testified at my deposition Regulation D also does not prohibit the placement of other forms of legends on shares issued pursuant to Regulation D. If questioned on this subject at trial I will provide the same response. However, I understand that Dr. Goldberg intends to argue that the August 14th Agreement did not itself authorize the placement of any specific legends on the stock issued pursuant to it. Therefore, I was asked to educate the finder of fact as to whether or not Regulation D itself authorizes or requires such legends. It does not. Given this context I believe that my testimony is highly relevant to Dr. Goldberg's arguments. It does not constitute legal opinion(s).

10. Navidea argues that I provide "purely legal opinions" in the course of providing this information. I do not. The background and requirements regarding Regulation D that are contained in my report are introductory to the specialized knowledge regarding the restrictions on trading imposed on shares issued pursuant to Regulation D. I do explain that based on what I believe is the undisputed fact that Dr. Goldberg was not an officer or director of Navidea after the

August 14th Agreement was executed, he would not be subject to Rule 144's restrictions on trading by "affiliates" but would only be subject to the generally applicable six (6) month restriction on trading. This discussion of the application of Rule 144's restrictions to the facts and circumstances surrounding Dr. Goldberg's status as a former Chief Executive Officer ("CEO") and director are not legal opinions but are applications of Rule 144's requirements to a stated (and I believe undisputed[1]) set of facts and was necessary to determine the restrictions that would be placed on Dr. Goldberg's transfer of Navidea shares issued pursuant to Regulation D as provided for in the August 14th Agreement. To the extent there is a dispute regarding Dr. Goldberg's status as a non-affiliate of Navidea as a former CEO and director of Navidea, the finder of fact may be required to determine that fact before it can apply the specialized knowledge regarding Regulation D to the facts of this case. To the extent there is a dispute regarding the limitations imposed on non-affiliates by Regulation D the Court may be required to determine that fact before the specialized knowledge regarding Regulation D can be applied to the facts of this case. If so directed at trial by the Court, I would make that clear in my testimony. However, because the August 14th Agreement specifically provides for Dr. Goldberg's resignation as CEO of Navidea on August 14, 2018, it was alleged in Navidea's Complaint that Dr. Goldberg was the CEO of Navidea until August 14, 2018, and because it was undisputed in the deposition testimony in this action that Dr. Goldberg was the former CEO of Navidea, I do not believe that this assumption constitutes an improper "legal opinion" in the context of my testimony.

11. Additionally, although I provide specialized knowledge regarding whether Regulation D authorizes or requires legends similar to those placed on the Navidea shares issued to Dr. Goldberg pursuant to the August 14th Agreement, I do not opine on whether the inclusion

---

[1] The August 14th Agreement provides that Dr. Goldberg resigned as Navidea's CEO and as a director of Navidea as of the date of the agreement.

of those legends violated Regulation D or breached the terms of the August 14th Agreement.[2] I merely provide the specialized knowledge that such legends are not specifically addressed in Regulation D and therefore are neither authorized nor required by Regulation D.

12.   I also provide specialized knowledge regarding the issuance of shares registered on Form S-8 and how such shares differ from shares issued pursuant to Regulation D because, as I note in my Report, while the August 14th Agreement requires that the Navidea shares issued to Dr. Goldberg be issued pursuant to Regulation D, Navidea issued 722,726 shares to Dr. Goldberg that had been registered on Form S-8. I do not offer any opinion as to whether the issuance of the shares in that form breached the August 14th Agreement.

13.   Finally, I state the undisputed fact that Navidea did not issue the 5,000,000 Navidea shares that the August 14th Agreement provided were to be issued to Dr. Goldberg on January 2, 2019 because, for purposes of one of the valuations I performed, the date, if any, upon which shares were issued pursuant to Regulation D triggers the start of the six month holding period that would be applicable to shares issued to Dr. Goldberg pursuant to Regulation D under the terms of the August 14th Agreement. Defendants acknowledge, even in their memorandum of law in support of their Motion, that these shares were never issued. (*See* Defendant's Memorandum of Law at 5.) This undisputed fact was acknowledged as a necessary factor in my valuation. It was not stated as a factual or legal conclusion. If the trier of fact ultimately determines that notwithstanding Defendant's admissions the shares were actually issued, I reserve the right to amend my opinions accordingly.

---

[2]   I also note certain inconsistencies between the language of the August 14th Agreement and the legends placed on the Navidea shares. I do not provide any opinion regarding whether these inconsistencies constitute breaches of the August 14th Agreement.

14. With respect to the use of contractual provisions addressing the potential for a stock split or other change in the nature of the shares issued by a public company in contracts requiring the delivery of specific numbers of shares at a future date, Defendants argue that I should be precluded from providing this specialized knowledge to the finder of fact because I intend to provide an "inadmissible legal conclusion" that Navidea "intended" to implement a reverse stock split. In fact, as my report makes clear, I intend to provide the finder of fact with specialized knowledge regarding the use of such clauses in contracts because while the August 14th Agreement contemplates the issuance to Dr. Goldberg of a specific number of Navidea shares (23.5 million) at future dates, it does not contain such a clause. I intend to share with the finder of fact the specialized knowledge that, as set forth in my report, parties frequently utilize these types of clauses in contracts to protect themselves from the possibility of a future stock split or other change in the nature of the shares. As set forth in my Report, I intend to further share with the finder of fact the specialized knowledge that negotiation for the inclusion of such a clause would be typical for a company like Navidea which, at the time the August 14th Agreement was executed, was specifically requesting authorization from its shareholders for a reverse stock split of up to 20 shares for one. In fact, as I note in my Report, Navidea's then-President, CFO and COO, Jed Latkin, testified that at the time the August 14th Agreement was executed (by him on behalf of Navidea) there was an urgency at Navidea to obtain shareholder approval for a reverse stock split to address the concerns of the New York Stock Exchange ("NYSE") on which Navidea's shares were publicly traded, which had recently sent Navidea a warning letter that its stock was in danger of being delisted from the NYSE if it did not increase its share price. Mr. Latkin testified that "in my mind, at that time, the reverse split was very, very important." (*See* Latkin Deposition dated September 30 of 2020 at 333:10-12.) In a letter dated September 14, 2018, to the NYSE Navidea

specifically represented that "the Company *intends* to implement such a reverse stock split as necessary to bring the Company under compliance with Section 103(f)(v) of the Company Guide in the event the Company's share price does not appreciate sufficiently by February 14, 2019." (*See* MT-DEL00071235, a true and correct copy of which is annexed hereto as Exhibit A.) I am qualified to provide this specialized information because in my career as an auditor, I dealt several times with stock splits and reverse stock splits. It is my experience in such situations, anti-dilutive language is commonly used to protect the parties' interests and avoid confusion and disputes, especially in contractual situations where a stated number of shares are identified.

15. Despite Navidea's attempt to mischaracterize the nature of the specialized knowledge I intend to provide to the finder of fact regarding stock splits and contractual provisions intended to address them, my intent is only to educate the finder of fact regarding the existence of such contractual clauses and their use. Navidea's undisputed awareness (indeed, its stated "urgency") at the time the August 14th Agreement was executed that it was seeking approval for a reverse stock split is relevant because that awareness would further weigh in favor of Navidea including such a contractual clause in the August 14th Agreement if it wanted to avoid the possibility that implementation of such a reverse stock split would affect its obligations under the contract. To the extent the Orr Report implies that I did intend to offer an opinion as to Navidea's actual intent to effectuate a stock split as of the time the August 14th Agreement was negotiated and executed (as opposed to its awareness that it might do so), I will not do so when presenting my testimony.

16. I am fully qualified to provide the finder of fact with specific knowledge regarding damages related to the valuation of public shares and non-public shares. As stated earlier, I am a

certified public accountant (CPA) and was an auditor for 27 years and an audit partner for a majority of that time.

17. Valuation concepts are used extensively in accounting and auditing when valuing the carrying value of assets, intellectual property, goodwill, trademarks, copyrights, brand recognition, contracts, workforce, investments or when allocating the purchase price of a company (purchase price accounting and valuation). Such assets are reported and carried on financial statements at the lower of cost or market. So as an auditor, I was constantly using valuation concepts.

18. Financial Accounting Standards Board (FASB) provides guidance on how to calculate the market value of assets, FASB 157, Fair Value Measurements, now known as Accounting Standards Topic 820. The accounting literature deals with valuation techniques such as the market approach, income approach and cost approach.

19. To enhance my skills in the area damage valuation calculations I take continuing education (average of 40 hours per year) on topics of accounting but also on the calculation of damages and valuation. I am also a member of the AICPA's Forensic & Valuation Services Section, which provides additional training and guidance on damages and valuation calculations and technics.

20. While at Laventhol & Horwath, I did second partner review of all reports issued by the Dallas office's real estate valuation group. As such I reviewed the technical aspects of every report issued by the group.

21. Additionally, I've been engaged as an expert and given deposition or testified as a valuation and damages expert in a number of cases, most recently Project Boat Holdings, Kenneth Boatman d/b/a Boatman Automotive, Bailey Tool Manufacturing, and Envirodigm.

22.     With respect to my opinions concerning the valuation of damages to Dr. Goldberg based on Navidea shares, I offer two forms of opinions. I understand that Dr. Goldberg intends to argue that because the Navidea shares purportedly issued to him to date by Navidea did not comply with the August 14th Agreement he has not received performance under the August 14th Agreement with respect to the Navidea shares. Therefore, Dr. Goldberg intends to argue that in light of the absence of any anti-dilution provision in the August 14th Agreement, in response to Navidea's request for a declaration of the parties' rights under the August 14th Agreement, the Court should declare that he is entitled to the immediate issuance of 23.5 million current shares of Navidea stock as of the date of judgment. It is important to note that Navidea implemented a 20 shares for 1 reverse stock split on April 26, 2019. Therefore, the declaration Dr. Goldberg intends to request would require Navidea to issue to him 23.5 million post-split shares. I was asked by Dr. Goldberg to provide a valuation for those shares if the Court awards him damages representing the value of such shares rather than the issuance of the shares. For reasons stated in my report, I provide a straightforward methodology for valuing the shares. If Dr. Goldberg was entitled to the value of 23.5 million post-split shares of issued and outstanding Navidea stock, it would represent a significant percentage of ownership of Navidea, and because the post-split shares did not exist at the time the August 14th Agreement was executed, my opinion is that the value of these damages should be calculated by determining the percentage of ownership of Navidea represented by those shares multiplied by the total market value of Navidea at the time of judgment. I provide a pragmatic formula for making this calculation, by multiplying the total number of issued and outstanding Navidea shares on the day prior to judgment by the closing per share market price for that day[3] to arrive at a total market value for Navidea and then multiplying that value by the

---

[3]     I believe that the number of shares and the market price per share for the day prior to the judgment should be used because the announcement of a judgment awarding Dr. Goldberg a

percentage that the 23.5 million shares to be issued to Dr. Goldberg represent in relation to the new total number of issued and outstanding shares (*i.e.*, the total on the day prior to the judgment plus the 23.5 million).

23. I understand that Navidea criticizes this methodology because it does not employ any "regression analysis to account for various variables." However, the methodology does not contain any "variables." Both the number of issued and outstanding shares of Navidea on the day before the judgment and the closing price for those shares in the public market on that day are not variables. They are constant numbers that, although they are not known today, will be known on (after the close of trading) the date before a judgment is entered in this case and thereafter. Because Navidea stock is traded on the NYSE public market exchange this information is published and widely available for every trading day.[4] Therefore, Defendants' argument that this methodology is based on a "speculative future stock price" is false. It is based on what will be a concrete, known stock price at the time the calculation is performed. Notably, Defendants do not identify any variables that are inputs into my proposed methodology (because there are none) and do not suggest what, if any form of regression analysis could or should have been employed. Navidea's expert, William F. Murray, does not even address this opinion in his rebuttal expert report. (*See generally* Expert Rebuttal Report of William F. Murray, a true and correct copy of which is annexed hereto as Exhibit B.)

24. Likewise, Defendants' argument that this methodology is based on speculation as to whether Dr. Goldberg would hold or sell the shares is baseless. This methodology differs somewhat from the methodology applied to value pre-split shares because it is based on the stated

---

significant ownership interest in Navidea into the public markets may result in a significant change in the price of Navidea shares before the close of that trading day.

[4] If Navidea is no longer traded on a public exchange at the time of judgment the calculation may be more difficult, but this will be caused by Navidea's conduct.

assumption, and is not to be employed unless and until a judgment may be entered stating that Navidea had not provided Dr. Goldberg with any performance with respect to Navidea shares under the August 14th Agreement and therefore a judgment is entered declaring that Navidea is required to issue him 23.5 million current (*i.e.* post-split) Navidea shares. Under such circumstances Dr. Goldberg would never have received compliant Navidea shares and therefore could neither have held or sold them for any time period. For the same reason, actual share pricing and volume during the time period prior to their issuance would not be an appropriate basis for a valuation opinion.

25. Defendants also criticize this methodology because I do not employ a "blockage discount." However, I do not believe a blockage discount should be applied with respect to this analysis. Dr. Goldberg would own a set percentage of Navidea shares, which, because the shares are publicly traded, has a set market value. Additionally, Navidea's shares have historically sold at higher prices on days on which volume was above average. As set forth in Dr. Goldberg's *Daubert* motion directed to Mr. Murray's "blockage discount" methodology and my declaration submitted in support thereof, Mr. Murray's methodology is flawed in several respects, including that it necessarily predicts a decline in Navidea's share price on any day on which daily trading exceeds by 15% of average daily trading volume, however Navidea's shares frequently traded at higher prices on high volume days than they did on preceding average trading volume days. Finally, Mr. Murray does not address my opinion regarding the valuation of post-split Navidea shares in his report. (*See generally, id.*).

26. With respect to my opinion concerning the value of damages suffered by Dr. Goldberg based on a pre-split analysis of the 23.5 million Navidea shares I believe that my opinion that Dr. Goldberg would likely have sold his shares during a high-price, high-volume period of

several weeks shortly after all of his shares would have become tradeable is based on realistic assumptions. Dr. Goldberg has years of experience as a successful stock trader, including Navidea stock. The time period of high volume and high stock prices followed a positive announcement by Navidea concerning its product, and Dr. Goldberg was aware that such positive announcements generally resulted in higher stock prices for Navidea shares. I also do not believe that any type of "blockage discount" or other adjustment for the volume of shares was required with respect to my pre-split stock value analysis. This is especially true during the interim time period from which I took my valuation stock prices. I selected this time frame in part because Dr. Goldberg could have sold all of his stock during this high-volume trading period without having a significant effect on the overall trading volume of Navidea shares. Significantly, although I strongly disagree with the "blockage discount" concept and methodology proposed by Defendants' expert, Mr. Murray, for the reasons set forth in Dr. Goldberg's *Daubert* motion concerning Mr. Murray and my declaration submitted in support of that motion, even if it were applied Dr. Goldberg's sale of the entire 23.5 million shares during the time frame that I base my opinion on would not result in any downward adjustment because Dr. Goldberg could easily have sold all of his shares during that period without triggering the 15% threshold by which average daily trading volume would have to increase to justify the application of Mr. Murray's improper "blockage discount" adjustments. I am informed that Delaware law generally permits a plaintiff to select an appropriate timeframe in which to value shares and then use the highest interim price during that period. I believe that my analysis is more conservative than this. First, I understand that Delaware law permits this even where the restrictions on trading are temporary and relatively short-lived. In this case the restrictions on trading have never been lifted and Dr. Goldberg has been unable to trade any of the shares since they were purportedly issued to him in November 2018. In addition, I did not select a single high-

price day to use in my analysis. I selected a sustained period of high price and high volume that extended over a period of weeks and used a weighted average to derive a share price. I also identified the time period using facts specific to this case such as Dr. Goldberg' experience in trading stocks, his lack of need for funds and the high volumes of stock traded during the relevant time frame. In total I believe that my valuation approach is more conservative than the highest interim price methodology that I understand Delaware law authorizes in situations where the defendant renders shares untradeable.

27. With respect to calculating the valuation of Macrophage, I attempted to use the market valuation methodology. Navidea represented to the NYSE the existence of two potential investors contemplating a $25 million total investment in Macrophage (one $10 million investment and one $15 million investment). (*See* MT-DEL00007125, a true and correct copy of which is annexed hereto as Exhibit A.) However, despite these representation to the NYSE, Navidea was not able to provide any further details regarding the potential investments or the ownership percentage or range of ownership of Macrophage the investors might receive for those investments. I was informed and believe that it was reasonable for me to rely upon these representations to the NYSE because submission of false statements made in writing to the NYSE by companies trading on the NYSE and its officers and employees may be subject to significant penalties. It was my understanding that despite not being able to provide details regarding the potential investment, Navidea would continue to consolidate Macrophage into its financial statements after the investment was completed. Therefore, I attempted to provide the finder of fact with a valuation range that would allow Navidea to continue to consolidate Macrophage into its financial statements. I believe these inferences are well founded based on the limited facts concerning these offers made available to Dr. Goldberg during discovery. Had I known the

ownership percentage of MT the investor might receive for their investments, I could have provided a more accurate valuation of MT, based upon the market valuation approach.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge and investigation or, where noted, on information and belief.

March 18, 2022


/s/ *Terry L. Orr*
Terry L. Orr