UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
             :    19-CV-1578 (VEC)

IN RE: NAVIDEA BIOPHARMACEUTICALS :
LITIGATION          :   OPINION AND ORDER

             :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

  Navidea Biopharmaceuticals, Inc. ("Navidea") sued Dr. Michael Goldberg ("Goldberg")

for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary

duty, and for a declaratory judgment establishing the contractual rights and obligations of the

parties. *See* Am. Compl., Dkt. 15 (hereinafter, "FAC"). Goldberg asserted counterclaims

against Navidea and third-party claims against Macrophage Therapeutics, Inc. ("MT"), a

subsidiary of Navidea (collectively, the "Company"). *See* Answer, Dkt. 31.[1] Now before the

Court are the parties' competing *Daubert* motions to exclude testimony from Goldberg's

proposed damages expert and the Company's proposed rebuttal expert. Navidea's motion is

GRANTED in part; Goldberg's motion is DENIED.

## I.   BACKGROUND

  The Court assumes familiarity with the Court's prior opinions issued over the course of

this more-than-three-year litigation and will summarize only the most pertinent facts. Goldberg

is a former employee of Navidea and MT. FAC ¶ 3. He also served as the CEO of Navidea, the

CEO of Macrophage, and a director of Macrophage. *Id.*

---

[1]   Goldberg moved to dismiss Navidea's breach of fiduciary duty claim and sought attorneys' fees in
connection with litigating that claim. *See* Mot. to Dismiss, Dkt. 32. On December 26, 2019, the Undersigned
granted Goldberg's motion to dismiss the breach of fiduciary duty claim and determined that he was entitled to
attorneys' fees with respect to his defense of that claim. *See* Op. & Order, Dkt. 61.

Navidea and Goldberg entered into a separation agreement on August 14, 2018 (the "August Agreement"), pursuant to which Goldberg resigned from Navidea and MT.  FAC ¶ 12. The August Agreement provided, *inter alia*, that: (1) Navidea would issue Goldberg 23.5 million shares of Navidea under Regulation D of the Securities Act of 1933,[2] 10 millon of which would be subject to an escrow arrangement, *see* Goldberg Opp. at 2, Dkt. 266; Countercl. ¶ 51, Dkt. 31; and (2) MT would issue Goldberg shares of "MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT," Kazan Decl. Ex. 1, Dkt. 253-1; *see also* FAC ¶¶ 16–17.  Approximately eight months later, on April 26, 2019, Navidea effected a 20-for-1 reverse stock split of its shares.[3]  Goldberg Opp. at 22, Dkt. 266.

Goldberg seeks to admit expert testimony on the issue of damages.  To that end, he retained Terry Lee Orr ("Orr") to testify about Regulation D, its operation on restricted securities, the parties' agreement, and the methods for valuing any damages owed to Goldberg. *See id.* at 1.  Navidea and MT seek primarily to exclude Orr's damages opinion; if Orr's damages opinion is not excluded, the Company will offer William F. Murray as a rebuttal expert.  *See* Company Opp. at 1, Dkt. 264.

### A.  Goldberg's Expert Terry L. Orr

Terry L. Orr is a Texas Certified Public Accountant with 35 years of public accounting experience, including 27 years as an auditor.  Declaration of Terry L. Orr ¶¶ 1, 6, Dkt. 267 (hereinafter, "Orr Decl.").  Orr has a Bachelor of Science in Accountancy and Business

---

[2]  "Regulation D provides exemptions from Securities Act registration for securities offerings under three separate rules: Rules 504, 505 and 506." *S.E.C. v. Bronson*, 14 F. Supp. 3d 402, 409 (S.D.N.Y. 2014) (quoting Revision of Rule 504 of Regulation D, the "Seed Capital" Exemption, Securities Act Release No. 33–7644, 64 Fed.Reg. 11,090–01, 11,090 (Mar. 8, 1999)).

[3]  A reverse stock split allows a corporation to reduce the number of outstanding shares by consolidating existing shares into fewer, proportionately more valuable, shares.  Expert Report of Terry L. Orr at 13–14, Dkt. 253-2 (hereinafter, the "Orr Report").

Administration from Brigham Young University.  Orr Report at 1, Dkt. 253-2.  Orr is a member

of the American Institute of Certified Public Accountants ("AICPA"), a Certified Internal

Controls Auditor, and a member of the AICPA's Forensic & Valuation Services Section.  *Id.*

Orr is currently a partner at HKA Inc., a business and litigation consulting firm.  *Id.*

 Orr was retained by Goldberg to "present specialized knowledge regarding the attributes

of shares of stock issued pursuant to Regulation D" and to opine on whether "certain legends

placed on shares of Navidea stock purportedly issued to Dr. Goldberg by Navidea pursuant to the

August 14th Agreement are authorized or required by Regulation D."  Goldberg Opp. at 10, Dkt.

266; *see also* Orr Report at 1, Dkt. 253-2.  Orr is also expected to "provide the jury with

specialized knowledge regarding anti-dilution provisions commonly incorporated into

commercial contracts calling for the delivery of a specific number of shares of stock at a later

date," which Goldberg asserts is "specialized knowledge . . . that is directly relevant" to

Goldberg's and Navidea's claims for relief.  Goldberg Opp. at 3, Dkt. 266; *see also* Orr Report at

13–15, Dkt. 253-2; Orr Decl. ¶¶ 14–15, Dkt. 267.  Orr's assignment also included providing the

appropriate valuation of Navidea and MT shares "that were to be issued" to Goldberg under the

August Agreement.  Goldberg Opp. at 18, Dkt. 266; *see also* Orr Report at 2, Dkt. 253-2; Orr

Decl. ¶ 3, Dkt. 267.

 The Orr Report begins by describing the "[r]estrictions imposed by Regulation D and

Rule 144" on transfers of certain securities.  Orr Report at 4, Dkt. 253-2.  Orr asserts that, absent

an exemption, any offer or sale of a security must be registered with the Securities and Exchange

Commission ("SEC").  *Id.*  One exemption from the registration requirement involves restricted

securities, which "are securities acquired in unregistered, private sales from the issuing company

or from an affiliate of the issuer."  *Id.* at 6.  Under Rules 504 and 506 of Regulation D, Orr

claims, restricted securities may be transferred but not "sold for at least six months or a year without registering them" with the SEC. *Id.* at 4.

Orr then summarizes Rule 144, which he describes as an SEC regulation that sets forth "conditions under which restricted, unregistered, and control securities can be sold or resold." *Id.* at 6. Orr claims that restricted securities "almost always" will include a "certificate stamped with a 'restrictive' legend" to inform the recipient that the securities "may not be resold in the marketplace unless they are registered with the SEC or are exempt from the registration requirements." *Id.* at 7. Even if one has met the Rule 144 conditions, "restricted securities cannot be sold to the public until any legends are removed from the certificates." *Id.* at 7. "Only a transfer agent can remove a restrictive legend," which it will not do "unless [it has] obtained the consent of the issuer." *Id.* at 7–8. Shares registered on Form S-8, however, "may be issued without a restrictive legend," *id.* at 13, which is one way that "small issuers" may "register securities offered to employees and consultants under benefit plans under limited circumstances," *id.* at 12.

Because Goldberg resigned from Navidea and MT pursuant to the August Agreement, Orr states that he "does not qualify as a control person," and therefore "[a]ny Navidea shares issued to him would be considered restricted securities and subject to a six-month holding period under Regulation D and Rule 144." *Id.* at 10. Orr asserts that the 13.5 million shares that were supposed to be issued to Goldberg pursuant to the August Agreement were "subject to a six-month holding period" and could not be publicly traded until May 21, 2019.[4] *Id.* at 18. The 5 million shares to be "issued on November 22, 2018 and deposited into the escrow account . . . are also subject to a six-month holding period under Regulation D, as well as to an eighteen-month

---

[4]     This date assumes a 30-day month and is based on an issuance date of November 20, 2018. *See* Orr Report at 8, 18, Dkt. 253-2.

potential holding period under the August 14th Agreement." *Id.* Orr asserts that those 5 million shares could be publicly traded, based on the eighteen-month timeline in the August Agreement, on or after May 15, 2020. *Id.* Finally, Orr, citing the August Agreement, states that an additional 5 million shares were supposed to be issued on January 2, 2019 and deposited into an escrow account, but that those shares have not yet been issued. *Id.* Those shares, had they been issued on January 2, 2019, would also have been "subject to a six-month holding period under Regulation D, as well as to an eighteen-month potential holding period under the August 14th Agreement," meaning that they could not be traded publicly until June 25, 2020. *Id.*

Orr opines that the Navidea shares issued to Goldberg "contained restrictive legends not authorized or required by Regulation D which rendered the shares unsalable unless and until Navidea unilaterally authorized its transfer agent to remove the legends, which Navidea refused to do." *See id.* at 16.[5] Orr also concludes that "the shares that Navidea has issued to date were not issued in accordance with the August 14th Agreement and under Regulation D." *Id.* at 20. Further, Orr opines that the August Agreement "does not contain language common for addressing the potential of a stock split" even though "[i]t would be expected that an issuer contemplating effecting a reverse stock split would include such language in any contract referencing a specific number of shares for clarification purposes." *Id.* at 15. Finally, Orr concludes that "Goldberg did not receive the benefit for which he bargained" because Navidea placed "non-Regulation D legends on issued shares, making them non-tradable until Navidea unilaterally removes the legends," and failed to issue Goldberg the "shares that were to be issued on January 2, 2019," for which Goldberg "has suffered financial harm and damage." *Id.* at 20.

---

[5]      Orr renders this opinion as to both the 722,726 shares issued on Form S-8 as well as the "remaining" shares. *See* Orr Report at 16, Dkt. 253-2.

Orr provides two methodologies for calculating the damages that he asserts Goldberg suffered.  First, Orr calculates damages based on the value of 23.5 million shares before the April 26, 2019 reverse stock split.  *See id.* at 16–17.  Alternatively, assuming the shares were subject to the reverse stock split that occurred on April 26, 2019, Orr asserts that Goldberg's 23.5 million shares would have converted to a total of 1.175 million post-split shares.  *Id.* at 20–21.  Orr considered three potential sale dates to determine the value of the post-split shares: the "Release Date," i.e., the earliest possible date the shares could have been sold based on the holding periods under Regulation D and the August Agreement; the "current date," or September 28, 2021; and the "date of the highest stock price for which the Shares could have been sold," which Orr claimed occurred on August 3, 2020.  *Id.* at 21.  Orr also calculated a range of damages using the closing share price as of each of the three dates provided: (1) the Release Date of each transfer; (2) September 28, 2021; and (3) August 3, 2020, the date that Navidea shares reached their all-time high.  *Id.* at 21–22.  Orr determined the Release Date of Navidea shares "based on the issuance date of each transfer and the holding period," and reached a total damages value of $2,237,750.  *Id.*[6]

Navidea's share price increased between July 20, 2020, and August 7, 2020, which Orr attributed to the release of Navidea's Form 8-K on May 21, 2020.  *Id.* at 23.  In that filing, Navidea announced positive preliminary results for a new imaging process (hereinafter, the "Good News 8-K").  *Id.*  Orr opined that "[a] savvy investor would have expected" the trading volume increase that followed the Good News 8-K to trigger a sustained increase in share price;

---

[6]     Later in his report, Orr opines that Goldberg's damages ought to be calculated based on a "weighted average" of the share price between July 20, 2020, and August 7, 2020, a period in which "shares reached a high of $4.95 and a low of $4.70."  *See* Orr Report at 23–24, Dkt. 253-2; *see also* Goldberg Sept. 20 Letter at 2, Dkt. 289 ("Orr relied on a period of high price and high volume trading in July and August 2020, only one month after the last tranche of the Navidea shares should have become tradeable by Dr. Goldberg.").

"therefore it is reasonable to assume Dr. Goldberg could have taken advantage of this higher share price." *Id.* Using this high share price method, Orr reached a damages value of $5,816,250. *Id.* at 22.

Orr further opined on the damages Goldberg allegedly suffered for failure to receive the "shares of MT Super Voting Common Stock in a number equal to 5% of the outstanding shares of MT" pursuant to the August Agreement. *Id.* at 24. Orr notes that, at some point after the August Agreement, Navidea was in negotiations with "two potential investors regarding a $25 million total investment . . . to be exchanged for an unknown share of MT." *Id.* Because MT was not listed on the NYSE, Orr based his analysis on that potential investment in MT. *Id.* Although that investment never transpired, Orr opines that the "investment offers denote value according to the fair market value principal," *id.* at 25, which is "the value between a willing buyer and a willing seller," *id.* at 24.

Orr calculated this "fair market value" as follows: Navidea reportedly represented to the NYSE that it would "consolidate MT into their financial statements," which Orr opines meant that Navidea was going to "retain control of MT either through stock ownership or by some other measure." *Id.* at 25. Assuming that Navidea would retain control of MT through stock ownership after the $25 million investment, Orr concluded that Navidea "would have to retain an ownership interest of more than 46.5%, as Dr. Goldberg and Platinum owned 7% of MT." *Id.* Thus, Orr concludes, the $25 million investment offer could not have been for more than a 46% stake of the company, which would make MT "worth approximately $54.348 million"; assuming that total value of MT, Orr opines that a "5% common share interest would be worth approximately $2.717 million." *Id.* Orr performs the same calculation assuming the investors sought 10% of MT, in which case the 5% common stock share interest would be worth $12.5

million.  *Id.*  In either event, "[b]ecause Dr. Goldberg was to be issued super voting common stock per the August 14th Agreement, his shares are of greater value than standard common shares."  *Id.*

In sum, Orr reached the following opinions:

- "The escrow and lockup legend placed on the shares issued by Navidea under the August 14th Agreement are not authorized or required under Regulation D or authorized by the terms of the August 14th Agreement, and therefore the shares bearing those legends are not issued in accordance with Regulation D."

- "Navidea failed to issue shares due to Dr. Goldberg on January 2, 2019, under the terms of the August 14th Agreement."

- When the August Agreement was executed, "Navidea intended to initiate [a] reverse split of stock."

- Goldberg suffered damages "by not getting the Navidea shares issued as anticipated," the amount of which would be determined either by applying Orr's pre-split methodology (i.e., 23.5 million shares multiplied by an adjusted price-per-share using the share price as of the date before judgment is entered), or the post-split methodology, which Orr determined should be determined by using the high share price period between July 20 and August 7, 2020 (i.e., 1,175,000 shares totaling $5,675,250).[7]

- "Goldberg was damaged by Navidea's failure to issue the MT Super Voting Shares."

*Id.* at 23–25.

### B.  William F. Murray

Goldberg seeks to preclude certain portions of the report of the Company's rebuttal expert witness William F. Murray.  Goldberg Mem. at 1, Dkt. 258.  Murray is a Managing Director of the consulting firm Management Planning, Inc. ("MPI").  Kazan Decl., Dkt. 253-4 (hereinafter the "Murray Report").  Murray is a Certified Public Accountant licensed in

---

[7]     Orr's Report does not opine on whether the pre-split or post-split methodology is appropriate.  The Court notes, however, that according to his report, the earliest possible date on which any of the shares purportedly due to Goldberg under the Agreement could have been sold would post-date the April 26, 2019 reverse stock split.  *See* Orr Report at 20–21, Dkt. 253-2.

Connecticut and is accredited in Business Valuation, certified in Financial Forensics by the American Institute of Certified Public Accountants ("AICPA"), and is an Accredited Senior Appraiser by the American Society of Appraisers.  *Id.* at 1.

Navidea and MT retained Murray to rebut "five specific aspects" of the Orr Report: (1) when Goldberg would have sold his shares, (2) Orr's failure to consider "the thinly traded nature of Navidea's stock," (3) the absence of support for the Macrophage damage analysis, (4) when the Navidea shares should have been issued, and (5) Orr's failure "to consider the value of the shares today as an offset to damages."  Company Opp. at 3, Dkt. 264.  Goldberg's motion *in limine* focuses solely on Murray's opinion that Orr should have applied a "blockage" discount to the value of Navidea's shares.  Goldberg Mem. at 4, Dkt. 258.

According to Murray, Orr's damages calculation fails to account for a blockage discount — i.e., a "discount for the lack of marketability," Company Opp. at 1, Dkt. 264 — which Murray asserts is a way "to recognize that in some instances a large block of stock cannot be liquidated as quickly as a smaller block without causing a material impact on the trading price of the stock," Murray Report at 7, Dkt. 253-4.  According to Murray, if 23.5 million Navidea shares were issued to Goldberg on the day the August Agreement was executed, then 13.5 million shares would have been available for sale on February 14, 2019, and 500,000 shares would have been available for sale on February 14, 2020.[8]  Murray opines that because Navidea stock "was very

---

[8]     Murray determined the number of post-split shares based on Goldberg's argument that "all shares should have been issued on August 14, 2018," and concluded that 13.5 million would be eligible for sale on February 14, 2019, and 500,000 on February 14, 2020.  *See* Murray Report at 4, 6, Dkt. 253-4.  Because Murray assumed an issue date of August 14, 2018, he determined that 13.5 million shares would have been freely tradeable prior to the April 26, 2019 reverse stock split.  *Id.* at 6 n.22.  The 500,000 share block reflects the adjusted number of shares after the reverse stock split because those shares, which were subject to an eighteen-month escrow period, would not have been tradeable before the reverse split.  *See id.* at 6 n.23.  By contrast, Orr based his opinion on the actual date the shares were purportedly issued — November 22, 2018 — making all of the shares in Orr's damages calculations subject to the stock split.  *See* Orr Report at 21.

thinly traded" on each of these dates, "[a] blockage discount should be applied since the sale of this amount of stock into the public market on the assumed trading dates would clearly be difficult, if not impractical," and "would almost certainly result in significant downward pressure on the [share] price due to the sudden excess supply of Navidea common stock."  *Id.*

To determine the impact of blockage on the Navidea shares, Murray utilized a "private placement model" based on a proprietary "multiple regression analysis" developed by his firm, MPI, called the "MPI Restricted Stock Study."  Company Opp. at 4, Dkt. 264; Murray Report at 8, Dkt. 253-4.  The MPI Restricted Stock Study, which is "based on private placements[9] of restricted stock," Murray Report at 8, Dkt. 253-4, "was peer-reviewed and published in the Business Valuation Review in 2011," Company Opp. at 5, Dkt. 264.  The "Private Placement Methodology" that Murray employs "has been used in prior court cases and in hundreds of cases before the IRS."  *Id.*

Murray used the "MPI Restricted Stock Study" to "predict a baseline discount that would be observed for a hypothetical private placement involving the subject shares."  Murray Report at 8, Dkt. 253-4.  In other words, it "calculates the discount to be applied when . . . an individual seeks to sell an illiquid block of stock."  Company Opp. at 2, Dkt. 264.  The model assumes a decrease in share price when the trading volume exceeds 15% of the daily average.  Murray Report at 9 n.25, Dkt. 253-4 ("Based on experience, I understand that 10% to 15% of the daily trading volume is considered the maximum level of trading activity to avoid a material negative impact on the trading price of a stock.").  The model accounts for a number of variables,

---

[9]      Murray describes "private placements" as private transactions in which "shares in public corporations are sold . . . subject to trading restrictions."  Murray Report at 7, Dkt. 253-4.  "These private transactions enable one to compare the prices of shares that may not be immediately traded in the public markets (i.e., the restricted shares) with the prices of otherwise identical shares in the same company that may be immediately traded in the established public market."  *Id.*

including the average volatility of the stock, the twelve-month change in the S&P 500, the estimated market capitalization, the holding period,[10] the 30-year Treasury yield, and the average closing price. *See id.* at 8–9.

Using the private placement model, Murray determined that a blockage discount of 44.3% should be placed on the 13.5 million shares that were eligible to be sold on February 14, 2019, and a 19.2% discount on the remaining 500,00 shares that were eligible for sale on February 14, 2020. *Id.* at 10–12. When adjusting for this discount, and based on the earliest point in time that Goldberg could have sold the shares if the restrictions had been lifted, Murray calculates that damages would total $1,873,651. *Id.* at 12.

## II.    LEGAL STANDARD[11]

Federal Rule of Evidence 702 governs expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[10]    The holding period "measures the time necessary to dribble out the subject interest in order to avoid a material impact on the price of the stock." Murray Report at 9, Dkt. 253-4.

[11]    The parties agree that Second Circuit law governs the admissibility of expert opinions and that Delaware substantive law applies to determining the correct measure of damages. *See* Company Mem. at 20 n.7, Dkt. 254; Company Opp. at 3 n.2, Dkt. 264; Goldberg Reply at 3 n.3, Dkt. 274.

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005). The proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact, but the district court serves as the "ultimate gatekeeper" against unreliable expert testimony. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted).

Ultimately, the threshold question is whether the "proffered expert testimony is relevant." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Proffered testimony is not helpful to the jury if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (citation omitted). An expert's opinion will be precluded if it "undertakes to tell the jury what result to reach" and "attempts to substitute the expert's judgment for the jury's." *Id.* (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). "While an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts." *Snyder v. Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (cleaned up).

If the proposed testimony is relevant, the Court must then determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Amorgianos*, 303 F.3d at 265 (internal citation and quotation marks omitted). The Supreme Court has laid down several factors to consider in making this inquiry, including "whether a

theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory or technique enjoys "general acceptance" within the relevant scientific or professional community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993) (internal quotation marks omitted). The Court's ultimate objective is to "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## III.   ORR'S DAMAGES OPINION

Defendant Goldberg offers Orr as an expert to testify about "the attributes of shares of publicly traded companies issued pursuant to Regulation D of the Securities Act . . . , anti-dilution provisions commonly employed in contracts contemplating the delivery of specific numbers of publicly traded shares at a future date, and damages." Goldberg Opp. at 1, Dkt. 266. Specifically, Orr is expected to testify that the Navidea shares in question "did not comply with Regulation D or the August 14th Agreement because they contained restrictive legends that were neither authorized nor required by Regulation D nor permitted by the August 14th Agreement." *Id.* at 13. Goldberg asserts that Regulation D is relevant because Navidea breached the August Agreement by "failing to issue 23.5 million shares of Navidea stock pursuant to Regulation D as required by the August 14th Agreement." *Id.*

The Company argues that the Orr Report "goes well beyond the bounds of admissible expert testimony and does not contain any admissible opinion on damages." Company Mem. at 1, Dkt. 254. The Company also argues that Orr's opinions and testimony should be excluded

because (1) "he is not qualified as an expert to render opinions on federal securities laws or the interpretation of legal agreements;" (2) his opinions on Regulation D, Rule 144, Form S-8, and the August Agreement are "inadmissible legal opinions;" and (3) "Orr's damage analyses use unreliable methodologies, speculation, and faulty assumptions, and are thus of no use or relevance to the judge or jury." *Id.* at 15.

### A.  Orr Is Barely Qualified to Offer an Expert Opinion

The Company argues that Orr should be excluded as an expert witness because he is not qualified as an expert in finance and securities laws. *Id.* at 16–17.  Rather, "Orr's experience with Regulation D is limited to auditing and reviewing the financial statements of public companies." *Id.* at 16.  Because Orr "does not claim to have ever worked for the SEC or have any experience with Regulation D, Rule 144 of Form S-8 from a compliance perspective," the Company argues that he cannot offer any opinion with respect to those SEC regulations or topics. *Id.*

The Court may admit expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The qualification requirement is to be "liberally construed," *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (citing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985)), and an "expert should not be required to satisfy an overly narrow test of his own qualifications," *Valentin v. New York City*, 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997) (quoting *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), *aff'd*, 101 F.3d 682 (2d Cir. 1996)).  Moreover, if an expert has educational and experiential qualifications in a field "closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized

areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).

Orr has experience in "issuing audit or review reports on financial statements that were included in SEC filings, including Regulation D filings." Orr Decl. ¶ 6, Dkt. 267. Although not a securities or compliance expert, as an auditor with experience in forensic accounting, Orr must "maintain an understanding of SEC filing requirements and disclosures" so as to avoid "false or misleading" SEC filings. *Id.* To that end, Orr "studied and took continuing education courses to stay current on SEC guidelines and requirements," through which Orr "became familiar with Regulation D and the restrictions it place[s] on securities issued pursuant to it." *Id.*

Although it is a close call, the Court finds that, based on his experience, training, and education as an accountant and auditor, Orr is sufficiently qualified to testify about the attributes of shares issued pursuant to Regulation D. *See, e.g.*, *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 186 (S.D.N.Y. 2008) (expert's experience auditing records of registered broker-dealers sufficiently qualified him to testify about recordkeeping customs and practices despite lack of trading experience). Orr's admissible testimony is limited to the characteristics typically associated with restricted shares issued under Regulation D, the restrictive legends companies tend to place on restricted shares, the process by which companies typically remove such legends, and one of his preferred methods for calculating damages caused by the Company's alleged breach of contract.

### B. Orr Is Precluded From Testifying About the August Agreement and Compliance *vel non* with Regulation D

The Company argues that, even if Orr is qualified as an expert, he should be precluded from testifying about "(1) the meaning and interpretation of Regulation D, Rule 144 and Form S-8; (2) the propriety of the stock legends; (3) the requirements [for] selling restricted securities;

(4) the definition of a control person and whether Goldberg qualifies as a control person; (5) whether Navidea complied with the requirements of Regulation D, Rule 144 and Form S-8; and (6) whether Navidea complied with or breached the terms of the August Agreement."  Company Mem. at 17–18, Dkt. 254.  The Court agrees.

"Courts in this Circuit have repeatedly held that while an expert 'may opine on an issue of fact within the jury's province,' an expert 'may not give testimony stating ultimate legal conclusions based on those facts.'"  *Ebbert v. Nassau Cnty.*, 2008 WL 4443238, at *3 (E.D.N.Y. Sept. 26, 2008) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). Although Orr is marginally qualified to testify about industry customs and practices, Orr may not opine on compliance with SEC regulations, including whether Goldberg qualified as a "control person" under Rule 144, nor may his testimony invade the province of the jury by wading into the propriety of the restrictive legends placed on Goldberg's Navidea shares or the extent to which Regulation D or the August Agreement authorized or required those legends.  *See Highland Cap. Mgmt., L.P.*, 551 F. Supp. 2d at 186 (expert's "industry customs and practices testimony may include a discussion of regulatory rules and other guidelines, however, he may not opine as to whether such rules and guidelines were violated").

Orr contends that he only intends to offer "specialized knowledge" about the "operation of Regulation D," Orr Decl. ¶ 7, Dkt. 267, an assertion that is belied by his report in which he opines that the restrictive legends placed on the Navidea shares issued to Goldberg "are not authorized or required under Regulation D or authorized by the terms of the August 14th Agreement," and "therefore the shares bearing those legends [were] not issued in accordance with Regulation D," Orr Report at 23, Dkt. 253-2.  To be clear, Orr may opine on "the forms of restrictive legends that one would expect to see" on shares issued pursuant to Regulation D, but

he may not opine on "whether certain legends placed on shares purportedly issued to Dr. Goldberg by Navidea pursuant to the August 14th Agreement were authorized or required by Regulation D." *See* Goldberg Opp. at 12, Dkt. 266.

Nor may Orr offer an interpretation of the August Agreement, testify about whether Navidea breached the Agreement, or testify about clauses that, in his opinion, are typically contained in similar agreements. Although Goldberg insists that Orr's testimony will not include such opinions, *id.* at 14–15, Orr's Report crosses into that territory on multiple occasions, *see, e.g.*, Orr Report at 15, Dkt. 253-2 ("The August 14th Agreement does not contain language common for addressing the potential of a stock split or divide."); *id.* at 10 ("Dr. Goldberg does not qualify as a control person of Navidea. Any shares issued to him would be considered restricted securities and subject to a six-month holding period under Regulation D and Rule 144."); *id.* at 20 ("[T]he August 14th Agreement contains no provision authorizing the placement of any legends on the Navidea shares."); *id.* ("[T]he shares that Navidea has issued to date were not issued in accordance with the August 14th Agreement and under Regulation D of the Securities Act of 1933 . . . .").

To be clear, Orr may not opine on the parties' obligations under the August Agreement, including whether Navidea complied with the Agreement and whether the Agreement prohibited the inclusion of restrictive legends on the Navidea shares; each constitutes an impermissible legal opinion or a factual conclusion that invades the province of the jury. *See Actors Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*, 2012 WL 13070024, at *2 (S.D.N.Y. Sept. 18, 2012) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.") (quoting *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977)).

### C.  Orr's Damages Calculation Is Admissible in Part

The Company argues that Orr's damages opinions with respect to the Navidea shares should be excluded because (1) Orr's pre-split methodology is irrelevant and unreliable, Company Mem. at 19–20, Dkt. 254; and (2) Orr's "savvy investor" methodology is unreliable and counter to Delaware case law, *id.* at 21–22.

#### 1. Orr's Pre-Split Methodology Is Not Admissible

The Company argues that Orr's pre-split methodology is "based on unreliable principles and methods, speculation, and faulty assumptions," and that it lacks relevance because, rather than providing an actual damage value, Orr merely "suggests how damages could be calculated after a trial has concluded."  *Id.* at 19.  More to the point, the Company argues that Orr's pre-split methodology contradicts Orr's own position that none of the Navidea stock would have been tradeable until *after* the reverse split.  *See id.* at 19 n.6; *see also* Orr Report at 17–18, Dkt. 253-2.

The Court agrees that Orr's pre-split methodology is irrelevant.  Goldberg claims that "the absence of any anti-dilution provision" in the August Agreement entitles him to the present value of 23.5 million Navidea shares without any "adjustment of that number based on any stock split."  Goldberg Opp. at 3, Dkt. 266; *see also* Orr Decl. ¶ 22, Dkt. 267.  But Orr concomitantly claims that the August Agreement and Regulation D subjected the 23.5 million shares "to a six-month holding period before they [could] be traded on the public market," meaning that none of the Navidea shares could "be traded until six months after they were issued, or May 21, 2019." Orr Report at 18, Dkt. 253-2.  In other words, Orr posits that the 23.5 million shares were not available for Goldberg to sell until after the April 2019 reverse stock split.  The Court, therefore,

concludes that a valuation of 23.5 million shares has no relevance to determining any amount of damages that Goldberg may be entitled to recover.[12]

### 2. Orr's Calculation of Damages Based on the Earliest Possible Saleable Date Is Admissible

Orr described three alternative methods for determining the damages to which Goldberg might be entitled when factoring in Navidea's reverse stock split.  Orr first determined the absolute number of shares to which Goldberg would be entitled, per tranche, post-split.  *See* Orr Report at 21, Table 1, Dkt. 253-2.  Orr then provided three dates from which to calculate a post-split value of Golberg's alleged damages: (1) the share price as of the earliest possible date that Goldberg could have sold his shares; (2) the highest share price during a period of high-volume trading after Navidea released its Good News 8-K in May 2020; and (3) the share price as of September 28, 2021 (two days before the Orr Report was produced).  *See id.* at 22, Table 3. After characterizing Goldberg as a "savvy investor," Orr opined that "it is reasonable to assume Dr. Goldberg could have taken advantage of this higher share price and sold his shares" during the period after Navidea issued the Good News 8-K, which Orr opines is what "triggered a spike in [trading] volume."  *See id.* at 23.  Thus, using the second methodology described, Orr opined that Goldberg's damages from the Company's failure to issue him shares of Navidea is $5,816,250, which reflects a per-share value of $4.95.  *Id.* at 21.

The ultimate question in assessing the admissibility of what the Company has dubbed the "savvy investor" methodology rests on whether it is relevant.  To be relevant, Orr's damages opinion must comport with Delaware law for the computation of damages in cases where, as

---

[12]     The Court also notes that Orr cannot testify that Navidea had plans to split its stock at the time the Company entered into the August Agreement.  *See* Company Mem. at 19 n.6, Dkt. 254.  That is fundamentally a fact question; to the extent it bears on the issues to be decided at all, Goldberg would have to prove it at trial using one or more fact witnesses.

here, a party alleges a failure to issue (or an improper restriction from trading) shares of stock to which the party is purportedly entitled. The Company argues that Orr's high share price methodology contravenes Delaware case law holding that the issuer of improperly restricted securities "should not bear the risk of all subsequent share price increases because it is impossible to know whether and when the stockholders actually would have sold their shares during the restricted period." Company Reply at 7, Dkt. 272 (quoting *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2001)).[13]

The *Duncan* court was called upon to "determine the appropriate default measure of damages under Delaware law for an issuer's breach of a merger agreement that results in a temporary restriction on certain stockholders' ability to sell their shares." *Duncan*, 775 A.2d at 1021. The defendant corporation in *Duncan* failed to register certain of its shares, thereby restricting certain shareholders from selling their shares to the public. *See id.* After the corporation lifted the restrictions, some shareholders decided to hold their shares, while others opted to sell. *Id.* To calculate damages for the lost opportunity to sell during the restricted period, the Delaware Supreme Court determined that the appropriate measure of damages was "the difference between (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares, and (2) the average

---

[13]     On August 29, 2022, the Court ordered supplemental briefing "on the proper measure of damages if [Goldberg] proves that the Company breached the August 14 Agreement." Order, Dkt. 284. In his brief in response, *see* Dkt. 285, Goldberg cited to virtually no law and merely echoed the same arguments he had made in previous briefing. Apparently when reviewing the Company's submission, Dkt. 288, Goldberg realized that he had missed the point of the Court's August 29 Order and filed a supplemental letter dated September 20, 2022 (the "Goldberg September 20 Letter") in which he belatedly addressed Delaware law, Dkt. 289.

market price of the shares during a reasonable period after the restrictions were lifted," which reflects the residual value of the shares after the breach was cured.  *Id.* at 1020.[14]

*Duncan*'s two-part test was concerned with preventing a "double recovery" for shareholders who, after the restrictions were lifted, could either hold or sell the shares as each saw fit.  *See id.* at 1024.  By netting the average market price after the restrictions were removed against the highest intermediate price at the beginning of the wrongfully-imposed restricted period, the Court provided "certainty by immediately locking in the amount of damages after the breach and assign[ed] the risk of all fluctuations in the share price after reinstatement to stockholders who elect[ed] to retain the shares."  *Id.* at 1029.

Here, because Goldberg has yet to receive any unrestricted shares, the second part of the *Duncan* formula is $0,[15] leaving only the first part as the measure of his damages: that is, the "highest intermediate price of the shares during a reasonable time at the beginning of the restricted period."  *See id.* at 1020.  Although Orr did not use the *Duncan* terminology, in effect he chose August 3, 2020 as the "highest intermediate price" when he opined that Goldberg's damages are the share price "at the high" for Goldberg's entire holding of restricted Navidea stock.  *See* Orr Report at 21–22, Dkt. 253-2.  If that approach could be squared with Delaware

---

[14]     Goldberg appears to acknowledge that *Duncan* is controlling authority.  *See* Goldberg September 20 Letter at 1–2, Dkt. 289 ("[The Company] admits that the proper measure of damages is the 'highest intermediate price of the shares during a reasonable time at the beginning of the restricted period,' and that 'reasonable time' in this context is the 'time in which [the plaintiff] could have disposed of its shares without depressing the market had it been able to do so.'").

[15]     This assumes, of course, that the shares remain restricted and therefore untradeable at the time of trial.  If they are unrestricted and delivered to Goldberg, he concedes that any damages would have to be offset by the then-current value of the shares, *see* Goldberg September 20 Letter at 1–2, although Orr provided no mechanism for determining the current value of a block of 1.175 million shares of a thinly traded company like Navidea.

law, his opinion would be relevant.  Unfortunately for Goldberg, it cannot, and therefore, it is
not.[16]

As the *Duncan* Court explained, the "highest intermediate price" during the wrongful
restriction period "is adapted from the rule used to determine damages in conversion cases
because, by preventing the stockholders from trading their shares, the issuer's breach at least in
some sense is a temporary 'conversion' of the shares."  775 A.2d at 1023 n.9.  The "highest
intermediate" price is, therefore, the highest price during "a reasonable period" after the shares
were wrongfully restricted.[17]  The Court went on to explain that "[t]he 'reasonable time' in this
context is the 'time in which [the plaintiff] could have disposed of the shares without depressing
the market had it been able to do so."  *Id.* (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F.
Supp. 597, 609 (S.D.N.Y. 1977)).

In supplemental briefing, Goldberg argued that Orr's opinion works perfectly within the
*Duncan* framework.  He explains:

> Orr relied on a period of high price and *high volume* trading in July and August
> 2020, only one month after the last tranche of the Navidea shares should have
> become tradeable by Dr. Goldberg.  This was considered a reasonable time to
> value the shares because Orr has noted that Dr. Goldberg could easily have sold

---

[16]     The Company argues that, even if relevant, the so-called "savvy investor" methodology should be excluded
as unreliable because it (1) has not been tested, (2) has not been subject to peer review or publication, and (3) is not
generally accepted.  Company Mem. at 19–20, 21, Dkt. 254.  More specifically, the Company argues that Orr "fails
to use any regression model to account for various variables," and "fails to apply a 'blockage discount' or even
explain why such a discount should not be used."  *Id.* at 20.  Because the Court finds that Orr's "savvy investor"
opinion is not relevant, the Company's reliability arguments are moot.  That said, the Court would have had serious
reservations about admitting Orr's opinion that because Goldberg is "savvy," a conclusion he reached entirely out of
thin air, he would have perfectly timed the market.  *See* Orr Report at 23, Dkt. 253-2.  If savviness translated to
perfect market timing, the "experts" on Wall Street (most of whom would surely qualify as "savvy") would never
make ill-timed trades.  That, obviously, is not the case.

[17]     Choosing the highest price during the "reasonable time" after restrictions are wrongfully imposed
obviously benefits the plaintiff through a calculation that assumes the wronged party would have perfectly timed the
market to get the highest price shortly after the restrictions should have been removed.  That is reasonable,
according to Delaware courts, because in cases of mathematical uncertainty, "the extent of damages are generally
resolved against the breaching party."  *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015); *see
also Haft v. Dart Grp. Corp.*, 877 F. Supp. 896, 902 (D. Del. 1995) (citing *Am. Gen. Corp. v. Continental Airlines
Corp.*, 622 A.2d 1, 8 (Del. Chancery Ct. 1992)).

> all of his stock during this period without any impact from Navidea's historical
> low trading volumes.

Goldberg September 20 Letter at 2, Dkt. 289 (emphasis in original).

The Court disagrees. According to Orr, the August 2018 Agreement provided for three tranches of shares that should have been freely tradeable as of May 21, 2019, May 15, 2020, and June 25, 2020, respectively. Orr Report at 18, Dkt. 253-2. Accepting Goldberg's position that selling a large volume of shares would not have depressed the market price because, paradoxically, the price of Navidea rose when volume rose, Goldberg Mem. at 6, Dkt. 258, the "reasonable period" during which Goldberg could have sold his shares without depressing the market would have been one day — in other words, as soon as the shares should have been tradeable. *See Madison Fund, Inc.*, 427 F. Supp. at 609–10. Beyond the *ipse dixit* in Goldberg's September 20 Letter, there is no basis for Orr's assumption that a "reasonable period" for each tranche of shares would extend from the date on which each tranche "should have become tradeable" to August 3, 2020. *See* Goldberg September 20 Letter at 2, Dkt. 289. Given that Goldberg would not have held any shares when the market peaked on August 3, 2020, Orr's damages opinion based on the the value of 1.175 million shares as of August 3, 2020, is irrelevant and thus inadmissible.[18]

---

[18]     An argument could have been made, the Court presumes, that a "reasonable period" for the last tranche, which, according to Orr, should have been tradeable on June 25, 2020, would have extended to August 3, 2020. But that would have required acknowledging that such a large block of stock simply could not have been sold in a day without depressing the share price. Having staked out a contrary position, Goldberg has been hoist with his own (or Orr's) petard.

     For the same reason, Orr's alternative measure of damages based on the market price of Navidea shares on September 28, 2021, is also not relevant and inadmissible. Accepting Orr's premise that Goldberg could have sold massive blocks of shares on the day they became tradeable, under the *Duncan* analysis the share price months after the restriction was purportedly wrongfully imposed is entirely irrelevant when calculating damages.

Having found inadmissible Orr's high share price methodology and the option of valuing all of the shares as of September 28, 2021, all that remains of the Orr Report vis-à-vis the Navidea shares is his calculation using the share price as of the earliest possible date that each tranche of shares would have been saleable (and his position that there is no need to consider a blockage discount). *See* Orr Report at 21, Dkt. 253-2. That aspect of his damages opinion comports with *Duncan* and is, therefore, admissible.[19]

### D. Orr's Opinion Regarding Damages Caused by the Company's Purported Breach with Respect to the Macrophage Shares Is Inadmissible

The Company also challenges Orr's opinion on Goldberg's damages from the Company's alleged breach of contract associated with the issuance of MT shares. The Company argues his opinion is irrelevant and speculative. The Court agrees.

When determining damages relative to the MT shares, Orr "attempted to use the market valuation methodology." Orr Decl. ¶ 27, Dkt. 267. According to his Report, Orr's analysis begins with Navidea's representations to the NYSE regarding "two *potential* investors" who were "negotiating with" Navidea to invest collectively $25 million in exchange "for an *unknown* share of MT." Orr Report at 24, Dkt. 253-2 (emphases added). Orr speculates that this potential transaction must have been a share purchase for less than 100% of the company because Navidea referred to the prospective transaction as an investment, not a sale. *Id.* at 25. Further, because Navidea represented to the SEC that it "would continue to consolidate MT into their financial statements," Orr opined that Navidea must have planned to retain control "either through stock

---

[19]    Although persuasive, Murray's rebuttal opinion that any damages calculation must include a blockage discount constitutes a variable that "will affect [Orr's] analysis' probativeness, not its admissibility." *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020); *see also, e.g.*, *Emerson Radio Corp. v. Stelling*, 52 F. App'x 173, 180 (3d Cir. 2002) (noting that a blockage discount "might apply [when] the sale in question involved an 'exceptionally large block' of shares," but that "even under such 'exceptional' cases, the observed market value might be a more appropriate benchmark, in part because the vagaries of the market to which investors subject themselves include such factors"); *Scully v. US WATS, Inc.*, 238 F.3d 497, 515 (3d Cir. 2001) (affirming lower court's decision not to apply blockage discount because it "would have undervalued [plaintiff's] loss").

ownership or some other measure." *Id.* Orr then assumes that Navidea's retention of control would have been through a majority ownership of MT's shares, leading to his premise that the potential investors would have received a 46% interest in MT (because Goldberg and Platinum collectively owned 7%). *See id.* Finally, Orr, assuming the potential investors would have received a 46% equity share for $25 million, concluded that a "standard 5% common share interest would be worth approximately $2.717 million." *Id.* Goldberg, however, was to receive super voting shares; Orr opines that such shares "are of greater value than standard common shares," but he does not quantify how much more valuable. *Id.*

Even if the inputs to Orr's methodology were ascertainable, Orr does not propose a single calculation that would aid a jury in determining Goldberg's damages. Rather, each step in Orr's purported opinion rests on one flimsy assumption after another, which is then summarized by a single, non-specific conclusion: "Goldberg was damaged by Navidea's failure to issue the MT Super Voting Shares." *Id.* Orr's opinion on damages caused by Navidea's purported failure to issue MT shares — assuming it can be classified as an opinion at all — is almost entirely speculative and, therefore, not admissible.

Goldberg argues that Orr was unable to ascertain the share of MT the prospective investors were negotiating to acquire because limited information regarding the offers was produced during discovery. Goldberg Opp. at 24, Dkt. 266. Accordingly, Goldberg claims that Orr's opinion on MT damages is admissible because "damages may be awarded based on a reasonable estimate" if "the amount of damages cannot be proven with certainty due to the fault of the defendant." *Id.* But, as the parties recall, this Court granted multiple extensions to the fact discovery deadline in this case, and ultimately referred the parties to Magistrate Judge Freeman to resolve any remaining discovery disputes. *See, e.g.*, Dkts. 106, 115, 126. The parties

collectively acknowledged, in writing, that they had successfully completed all fact discovery by June 15, 2021. *See* Dkt. 208. Goldberg's current contention that he received insufficient discovery from Navidea and MT is incredible; it is also improperly and untimely raised.

In short, Orr's opinion on Goldberg's damages caused by the Company's failure to issue him MT shares is not admissible.

## IV. MURRAY'S REBUTTAL

Murray, a Managing Director employed by the consulting firm MPI, was retained by the Company "to provide an analysis of and rebuttal to" the Orr Report. Murray Report at 1, Dkt. 253-4. Murray is expected to rebut Orr's damages opinion because Orr failed "to consider or apply a discount for the lack of marketability ("DLOM") on Goldberg's block of Navidea stock." Company Opp. at 1, Dkt. 264.[20] Murray utilized a multivariable regression analysis based on a peer-reviewed study conducted by his firm to determine what discount rate should be applied to Orr's damages calculation, but does not purport to offer his own affirmative damages opinion. *See id.*

Goldberg argues that Murray's methodology for discounting damages from the restrictions on the sale of Navidea shares is not relevant or reliable because Murray improperly: (1) used a private placement model to apply a discount to the value of Navidea's publicly traded shares; (2) assumed that trading volume of more than 15% of the average daily trading volume would result in a decrease in the stock price; and (3) failed separately to consider Navidea's stock trading history. Goldberg Mem. at 2, 5–9, Dkt. 258. Because each of Goldberg's

---

[20]    Murray's opinions criticizing the portions of Orr's opinions and report that the Court has deemed inadmissible, *see infra*, are inadmissible because they are no longer relevant. *See Fin. Guaranty Ins. Co. v. Putnam Adv. Co.*, 2020 WL 4251229, *9 (S.D.N.Y. Feb. 19, 2020).

arguments goes to weight and not admissibility, the Court denies his motion to exclude Murray's rebuttal testimony.

First, Goldberg asserts that the MPI study, which was based in part on the value of publicly traded shares in companies offered for sale in private transactions, is irrelevant to determining an appropriate discount to Navidea's share price. *Id.* at 4–5. But the MPI study is specifically designed to "determin[e] discounts for lack of marketability for . . . illiquid blocks of publicly traded stock." Kazan Decl. Ex. 3 at 1, Dkt. 265-3 (hereinafter the "MPI Study"). The crux of Murray's opinion is that Goldberg's Navidea shares were illiquid; because Navidea was "thinly traded," Goldberg would not have been able to sell all of his shares for the same amount as the closing share price on any of the "assumed trading dates" provided in Orr's Report. Murray Report at 7, Dkt 253-4. Thus, the MPI Study and Murray's use of private placement data, which offers a comparison of restricted share prices "with the prices of otherwise identical shares in the same company that may be immediately traded in the established public market," *see id.*, is patently relevant.

Goldberg also challenges Murray's assumption that stock prices tend to decline when the stock's trading volume exceeds 15% of its daily average. Goldberg Mem. at 6–7, Dkt. 258; Orr. Decl. ¶¶ 2–3, Dkt. 257. Goldberg points to Navidea's trading volume over time which reflects that "share price generally went *up* as trading volume increased." Goldberg Mem. at 6, Dkt. 258 (emphasis in original). While that may be true, Murray's theory that higher-than-normal trading volume depresses share price was not derived out of thin air; Murray testified that he consulted "bankers, traders, people in the industry, and his colleagues" to arrive at a "general consensus" that a range of 10 to 15% is the "general market guideline" for estimating DLOM. *See* Company Opp. at 7, Dkt. 264. Goldberg's rebuke that Murray did not consider Navidea's actual stock-

trading history, which purportedly suggests that high-volume trading days had a positive impact on price, is fair ground for cross-examination.

Likewise, Murray's failure to consider the trends and trading history specific to Navidea cannot serve as a basis for exclusion when an expert is permitted to rely on "facts or data in forming an opinion" if "experts in the particular field would reasonably rely on those kinds of facts or data." *See Henkel v. Wagner*, 2016 WL 1271062, at *10 (S.D.N.Y. Mar. 29, 2016). Nor was Murray required to "attempt to develop a model relating to high volume sales of publicly traded stocks," Goldberg Mem. at 8, Dkt. 258, or any other specific methodology; as a rebuttal witness, Murray need only offer a competing analysis to rebut that of Orr. *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015).

As is the case with the Company's disputes with the Orr Report, Goldberg is free to cross-examine Murray on the above and any other remaining deficiencies that Goldberg finds in Murray's analysis and the MPI Study. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) ("[C]ontentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))).[21] In sum, Murray's rebuttal opinion challenging the admissible portions of Orr's damages opinion is admissible.

---

[21] The Company argues that Goldberg may not use the Company's rebuttal expert Murray as a "backup plan." *See* Company Opp. at 13, Dkt. 264. To the extent Goldberg seeks to call Murray as an affirmative expert witness on damages, *see* Goldberg Reply at 10 n.6, Dkt. 274, that request is moot, as Orr's opinion on damages is partially admissible and so, too, is Murray's rebuttal opinion. For the avoidance of doubt, and to the extent Goldberg is so inclined, the Court agrees with the Company that Goldberg may not call Murray in his affirmative case if he did not timely disclose him in his initial expert disclosures. *See TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 179–80 (N.D.N.Y. 2002); *see also Mason v. Am. Fam. Mut. Ins. Co.*, 2020 WL 5982883, at *3 (D. Colo. Oct. 8, 2020) ("Individuals designated only as rebuttal experts may present limited testimony, may not testify as part of a party's case-in-chief, and cannot testify unless and until the testimony they were designated to rebut is given at trial." (citation omitted)).

## V.       CONCLUSION

The Company's motion to exclude Terry Orr as an expert witness is GRANTED in part.

Goldberg's motion to exclude the Company's rebuttal expert William Murray is DENIED.  In

light of this Opinion and Order, the parties must meet and confer and submit a joint letter

proposing next steps by no later than **Friday, November 18, 2022**.

The Clerk of Court is respectfully directed to close the open motions at docket entries

252 and 255.


**SO ORDERED.**

**Date:  November 9, 2022**                                   _____
**New York, NY**                                                  **VALERIE CAPRONI**
                                                                        **United States District Judge**