Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Tel: (914) 402-5683
GZimmer@GZimmerLegal.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Navidea Biopharmaceuticals Litigation | Case No.: 1:19-cv-01578-VEC |

**DEFENDANT/COUNTERCLAIM PLAINTIFF/THIRD PARTY PLAINTIFF
DR. MICHAEL M. GOLDBERG MD'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE**

Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Dr. Michael M. Goldberg M.D. ("Dr. Goldberg") respectfully submits this Statement of Material Facts Not in Dispute pursuant to Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts in support of his motion for partial summary judgment (the "Motion") submitted herewith.

## STATEMENT OF MATERIAL FACTS

### I.    NAVIDEA

1.    Plaintiff/Counterclaim Defendant Navidea Biopharmaceuticals, Inc. ("Navidea") is a publicly-traded corporation listed on the New York Stock Exchange ("NYSE"). (*See* Declaration of Gregory Zimmer, Ex. A at ¶ 1 (hereinafter "Zimmer Decl.")).

2.    Since inception, Navidea has focused on developing medical diagnostic products. (Zimmer Decl. Ex. B at 12:11-18.)

### II.    DR. GOLDBERG'S ROLE AT NAVIDEA

3.    Dr. Goldberg was Navidea's Chief Executive Officer ("CEO") between 2016 and August 14, 2018. (Zimmer Decl. Ex. A at ¶ 3; Ex. B at 30:25-31:1; Ex. C at 16:2-11;[1] Ex. D at 2; Ex. E.)

4.    Dr. Goldberg was also a director of Navidea between 2013 and August 14, 2018. (Zimmer Decl., Ex. A at ¶ 3; Ex. B at 32:1-4; Ex. D at 2.)

---

[1] Exhibit C is the Certified Delaware Trial Transcript. (*See* Zimmer Decl. Ex. C at 816.) "It is well-settled that sworn testimony from another trial is admissible on a motion for summary judgment[] ... [because] [t]ranscript testimony serves the same purpose as an affidavit under Fed. R. Civ. P. 56 and is comparable in that each form of testimony is sworn and submitted without cross-examination by the adverse party." *Dillon v. Lake Cumberland Marine, L.L.C.*, No. 01-02, 2006 U.S. Dist. LEXIS 90564, at * (E.D. Ky. Dec. 14, 2006), rev'd in part on other grounds by *Dillon v. Cobra Power Corp.*, 560 F.3d 591 (6th Cir. 2009); *Langston v. Johnson,* F.2d 915, 916 (D.C. Cir. 1973)("[i]t is well settled that a certified transcript of judicial or administrative proceedings may be considered on a motion for summary judgment"); *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 899 F. Supp. 974, 985 (E.D.N.Y. 1994) ("courts have routinely relied on prior trial testimony as proper evidence in deciding summary judgment motions"); *see Shulins v. New England Ins. Co.*, 360 F.2d 781, 785 (2d Cir. 1966) (judicial record); *Fletcher v. Bryan*, 175 F.2d 716, 717 (4th Cir. 1949) (judicial record); *Ramsouer v. Midland Valley R.R.*, 135 F.2d 101, 103, 106 (8th Cir. 1943) (judicial record).

5.      Dr. Goldberg was a major investor in Navidea. (Zimmer Decl. Ex. C at 334:11-18; Ex F. at 79 (identifying Dr. Goldberg as a beneficial owner of shares).)

## III.    THE LICENSED IP

6.      In or about 2015 and at all relevant times thereafter, Navidea had an exclusive license (the "License") from the University of California, San Diego, to use certain patents and other intellectual property (the "Licensed IP") to develop medical diagnostic products. (*See* Zimmer Decl. Ex. G at 2; Ex. H at 302:12-17.)

7.      Diagnostics is the identification of disease or conditions, whereas therapeutics is the treatment of disease or conditions. (Zimmer Decl. Ex. I at 9:19-10:2.)

8.      In or about 2015, Navidea expanded the scope of the License to permit Navidea to use, and sublicense the use of, the Licensed IP to develop therapeutic products. (Zimmer Decl. Ex. H at 303:14-20.)

## IV.    MACROPHAGE

9.      In or about 2015, Navidea obtained the right to use the Licensed IP to develop therapeutic products, and Navidea created its subsidiary, Macrophage, to pursue therapeutic applications of the Licensed IP. (Zimmer Decl. Ex. H at 303:14-20; Ex. C at 331:5-333:21.)

10.     At the time Macrophage was formed, non-party Platinum Montour Life Sciences LLP ("Platinum") and Dr. Goldberg provided Macrophage with $500,000 in initial funding in exchange for certain non-voting preferred shares of Macrophage pursuant to a Stock Purchase Agreement between Macrophage, Platinum, and Dr. Goldberg, dated March 11, 2015 (the "SPA"). (*See* Zimmer Decl. Ex. J; Ex. C at 18:12-19, 71:8-72:17, 332:11-334:2.)

11.     Dr. Goldberg and Platinum later contributed an additional $200,000 in funding to Macrophage. (Zimmer Decl. Ex. C at 349:19-350:7.)

2

12.     Navidea was not a party to the SPA. (*See generally* Zimmer Decl. Ex. J.)

13.     The SPA states that it does not create any rights in third parties. (*See* Zimmer Decl. Ex. J § 9.8.)

14.     As CEO, Dr. Goldberg ran Macrophage from its inception until in or around February 2019. (Zimmer Decl. Ex. C at 337:1-3; Ex. H 431:15-16.)

15.     At the time Macrophage was formed, its board of directors contained three seats, and Dr. Goldberg was one of the directors. (*See* Zimmer Decl. Ex. J § 5.6.)

16.     To this day, Dr. Goldberg remains a director of Macrophage. (Ex. I at 347:5.)

17.     Between its formation and August 14, 2018, various scientific research projects were conducted by and/or on behalf of Macrophage in the field of therapeutics. (Zimmer Decl. Ex. I at 12:22-17:20; Ex. C at 17:24-18:3.)

18.     Certain scientific research regarding therapeutics, including research funded by a grant from the National Institutes of Health ("NIH"), was conducted by in-house Navidea scientists for the benefit of Macrophage. (Zimmer Decl. Ex. I at 28:15-2 9:5.)

19.     Certain scientific research regarding therapeutics was conducted by third-party research entities that were compensated for their work. (Zimmer Decl. Ex. I at 26:22-27:7.)

20.     [Intentionally left blank.]

V.     **THE SUBLICENSE**

21.     Effective March 11, 2015, Navidea granted Macrophage an exclusive sublicense (the "Sublicense") to use the Licensed IP in connection with the development of therapeutic methods and applications in exchange for 100% of Macrophage's stock. (*See* Zimmer Decl. Ex. G; Ex. H at 303:18-305:4; Ex. I at 11:14-12:21; Ex. K at 26:17-27:24; Ex. C at 330:7-331:5, 343:14-19.)

22.     The Sublicense required Macrophage to share its research with Navidea but prevented Navidea from using the Licensed IP in the field of therapeutics, with a limited exception for a rheumatoid arthritis drug already under development by Navidea. (*See* Zimmer Decl. Ex. G § 5.1(a).)

23.     The Sublicense permitted Macrophage to sublicense the Licensed IP to further sublicensees. (Zimmer Decl. Ex. G § 2.4(a); Ex. C at 286:7-10, 336:10-24.)

## VI.     FUNDING EFFORTS AT MACROPHAGE

24.     Since its inception, Macrophage sought third-party investors in order to raise working capital to fund its ongoing scientific research. Zimmer Decl. Ex. C at 356:21-358:10.

25.     Dr. Goldberg took the lead on seeking such investments. (Zimmer Decl. Ex. C at 356:21-359:10.)

26.     Macrophage was unable to secure any third-party investments as of August 14, 2018. (Zimmer Decl. Ex. C at 706:1-4.)

27.     Third-party investors who Dr. Goldberg approached with respect to potential investments in Macrophage expressed concerns regarding investing in Macrophage. (Zimmer Decl. Ex. C at 756:24-758:9.; *see also* Ex. B at 36:9-15; Ex. I at 184:10-16.)

28.     Certain potential investors in Macrophage expressed concerns based on Navidea's control of Macrophage. (Zimmer Decl. Ex. L at 99:15-100:17; Ex. C at 757:13-758:9.)

29.     Specifically, the investors were concerned that because of Navidea's control of Macrophage, monies invested in Macrophage for therapeutic research could be diverted by Navidea to fund Navidea's diagnostic work, or even to cover general expenses of Navidea. (Zimmer Decl. Ex. C at 356:21-366:6; 757:13-758:9.)

30.     It also became clear that many investors sought to make investments either in therapeutics or diagnostics, but not both, and potential investors in Macrophage expressed that due to Navidea's control of Macrophage, an investment in Macrophage appeared to be an investment in both therapeutics and diagnostics. (Zimmer Decl. Ex. B at 36:8-15; Ex. C at 356:21-366:6.)

31.     In the summer of 2018, a consulting firm retained by Navidea recommended that Macrophage be separated from Navidea and that Navidea's control of Macrophage be removed in order to increase Macrophage's chances of obtaining third-party investments and thereby maximize the value of Navidea's interest in Macrophage.  (Zimmer Decl. Ex. B at 35:19-36:5; Ex. C at 360:17-362:24; Ex. I at 184:10-16.)

## VII.   NYSE DELISTING THREAT

32.     On or about June 6, 2018**,** Navidea received an early warning letter from NYSE (American) ("NYSE"), the securities exchange on which Navidea's shares trade. (Zimmer Decl. Ex. M.)

33.     The early warning letter informed Navidea that it was at risk of being delisted by NYSE because among other issues, Navidea's common stock price was not suitable for auction market trading due to its low selling price. (Zimmer Decl. Ex. M.)

34.     Another factor cited by NYSE as a reason for a potential delisting of Navidea was that its shareholder equity of more than 4 million as of March 31, 2018, had experienced net losses in three of its four most recent fiscal years, *i.e.*, December 31, 2013-2016. (Zimmer Decl. Ex. M.)

35.     As of August 2018, Dr. Goldberg held debt owed by Navidea in an amount in excess of $2,000,000.  (Zimmer Decl. Ex. N.)

36.     The existence of this debt was one factor affecting the total amount of Navidea's shareholders' equity. (Zimmer Decl. Ex. I at 62:22-65:25, 73:18-74:8.; *see generally* Zimmer Decl. Ex. O.)

37.     The total amount of Navidea's shareholders' equity in relation to NYSE listing requirements was one factor that, in August 2018, placed Navidea at risk of being delisted from the NYSE. (Zimmer Decl. Ex. P; Ex. I at 62:8-13.)

## VIII.   THE AUGUST AGREEMENT

### 1.     <u>Negotiation and Execution</u>

38.     By August 2018, the Navidea board of directors agreed that Macrophage should be separated from Navidea and Navidea's control of Macrophage should be removed to increase Macrophage's chances of obtaining third-party investment and thereby maximize the value of Navidea's interest in Macrophage. (Zimmer Decl. Ex. B at 82:10-25; Ex. I at 7:22-8:20, 184:10-16, 341:23-346:2; Ex. K at 48:2-55:13, 56:10-21; Ex. C at 34:24-36:16, 200:2-11, 356:21-366:6, 633:16-634:14, 706:1-707:11, 728:18-729:20.)

39.     In or around August 2018, the Navidea board of directors agreed that Navidea would benefit from third-party investment in Macrophage through its ownership interest in Macrophage. (Zimmer Decl. Ex. K at 52:25-53:15.)

40.     On June 29, 2018, Navidea's board of directors appointed Navidea directors Claudine Bruck and Michael Rice to form a Special Committee, tasked with negotiating an agreement whereby Dr. Goldberg would separate from Navidea as CEO and a director, would be given control of Macrophage, and would continue to run Macrophage and seek third-party investments in Macrophage. (Zimmer Decl. Ex. Q; Ex. B at 40:2-11; 47:7-48:2; 49:13-25, 277:1-8, 278:2-14, 282:10-284:25; Ex. C at 30:8-18, 367:15-368:8, 633:13-634:14.)

41.     One of the purposes of the contemplated agreement with Dr. Goldberg was to eliminate the debt held by Dr. Goldberg from Navidea's books. (Zimmer Decl. Ex. I at 62:4-7.)

42.     One of the purposes of the contemplated agreement with Dr. Goldberg was to turn control of Macrophage over to Dr. Goldberg. (Zimmer Decl. Ex. C at 671:9-12, 674:8-15.)

43.     The Special Committee was represented by counsel, William Mower of Maslon, LLP, in the negotiation of the contemplated agreement with Dr. Goldberg on behalf of Navidea. (Zimmer Decl. Ex. B at 71:13-72:3; 93:2-8; Ex. C at 30:8-18, 424:10-14, 709:15-11, 786:24-788:13.)

44.     Maslon, counsel to the Special Committee, drafted the contemplated agreement with Dr. Goldberg. (Zimmer Decl. Ex. R at 46: 4-7; Ex. C at 216:18-24.)

45.     Dr. Goldberg was not represented by counsel in the negotiation of the agreement. (Zimmer Decl. Ex. R at 34:23-35:9; Ex. K at 223:8-20; 37:18-20; Ex. C at 425:5-7, 482:14-483:3, 709:15-17, 788:19-22.)

46.     Navidea, through the Special Committee and its counsel, was aware that Dr. Goldberg was not represented by counsel and negotiated with him directly. (Zimmer Decl. Ex. C at 424:10-425:11; Ex. I at 227:20-228:2; Ex. B at 145:3-9.)

47.     Dr. Goldberg also negotiated on behalf of Macrophage in connection with the agreement. (Zimmer Decl. Ex. C at 37:21-23, 483:4-6, 635:19-21, 635:16-18, 709:12-14, 788:17-18.)

48.     Macrophage was not represented by counsel in the negotiation of the agreement. (Zimmer Decl. Ex. R at 30:19-24, 33:18-34:22; Ex. K at 223:21-224:13; Ex. C at 38:22-39:9, 424:15-17, 788:14-22.)

49. Navidea, through the Special Committee and its counsel, was aware that Macrophage was not represented by counsel, and Navidea did not believe that it was improper for Dr. Goldberg to negotiate on behalf of Macrophage. (Zimmer Decl. Ex. C at 200:16-202:6; Ex. B at 73:6-8, 79:24-80:11.)

50. On or about August 14, 2018, Navidea received a letter from the NYSE stating that it would be delisted from the exchange if it did not increase the value of its shareholders' equity, and the NYSE directed Navidea to contact the NYSE by August 20, 2018, to notify whether Navidea planned to present a compliance plan. (Zimmer Decl. Ex. P; Ex. B at 214:21-215:9.)

51. On August 14, 2018, Navidea, Dr. Goldberg and Macrophage executed a written agreement (the "August Agreement"). (Zimmer Decl. Ex. D; Ex. C at 41:23-24.)

52. The Navidea Special Committee approved the August Agreement on behalf of Navidea. (Zimmer Decl. Ex. B at 77:22-78:7; Ex. K at 39:2-16, 255:6-11.)

53. The Special Committee authorized and directed Latkin to execute the August Agreement on behalf of Navidea. (Zimmer Decl. Ex. C at 710:4-13.)

54. Latkin executed the August Agreement on behalf of Navidea. (Zimmer Decl. Ex. D; Ex. H at 117:18-23.)

55. Dr. Goldberg executed the August Agreement individually, on his own behalf. (Zimmer Decl. Ex. D; Ex. C at 43:20-24, 709:23-710:1.)

56. Dr. Goldberg also executed the August Agreement on behalf of Macrophage in his capacity as Macrophage's CEO. (Zimmer Decl. Ex. D; Ex. C at 43:20-24, 710:2-3.

57. The August Agreement is a valid, binding agreement. (Zimmer Decl. Ex. A at ¶ 93.)

58. The August Agreement has never been amended. (Zimmer Decl. Ex. R at 235:18-21; Ex. K at 270:8-10.)

59.     The August Agreement contains various terms which are set forth in specific substantive paragraphs, each of which has its own heading. (Zimmer Decl. Ex. D.)

## 2.     **Contract Terms**

### a.     *Navidea Shares*

60.     The first headed paragraph is headed "Navidea Shares" and provides, in whole: "On the date of the consummation of the Transactions (such date the "**Closing Date**"), Navidea shall issue Goldberg 23.5 million shares of Navidea common stock (the "**Shares**") 18.5 million currently and 5 million on January 2, 2019. The Shares will be issued under Regulation D of the Securities Act of 1933" (emphasis in original). (Zimmer Decl. Ex. D at 1.)

61.     This paragraph does not impose any obligations on Dr. Goldberg. (Zimmer Decl. Ex. H at 149:22-150:8; Ex. K at 225:2-229:13.)

62.     The term "Closing Date" is not defined elsewhere in the August Agreement. (*See generally* Zimmer Decl. Ex. D.)

63.     Navidea has not complied with this provision of the August Agreement. (Zimmer Decl. Ex. H at 118:20-119:8, 119:12-19; Ex. K at 88:25-89:19, 191:14-193:11; Ex. C at 254:3-6.)

64.     In November 2018, Navidea purported to issue to Dr. Goldberg 18.5 million shares of Navidea common stock. (Zimmer Decl. Ex. A ¶ 31; Ex. S.)

65.     13.5 million of the shares were purportedly issued to Dr. Goldberg.  (Zimmer Decl. Ex. S.)

66.     5 million of the shares were purportedly issued to Dr. Goldberg but placed into escrow per the terms of the next paragraph of the August Agreement.  (Zimmer Decl. Ex. S; Ex. B at 100:20-101:6.)

67.     The shares were not all issued under Regulation D of the Securities Act of 1933. Zimmer Decl. (Ex. S; Ex. H at 393:15-395:20; Ex. I at 123:24-124:2, 133:3-134:3, 137:20-23, 395:12-396:16.)

68.     Only 17,777,274 of the 18.5 million shares were issued under Regulation D of the Securities Act of 1933. (Zimmer Decl. Ex. S.)

69.     The balance, 722,726, of the shares were not issued pursuant to Regulation D. (Zimmer Decl. Ex. S.)

70.     All shares purportedly issued to Dr. Goldberg pursuant to the August Agreement contained restrictive legends not provided for in the August Agreement. (*Compare* Zimmer Decl. Ex. S *with* Ex. D. *See* Zimmer Decl. Ex. I at 91:25-92:9, 129:19-132:14.)

71.     The purpose of adding the legends to the Navidea shares purportedly issued to Dr. Goldberg was to restrict Dr. Goldberg from trading the shares. (Zimmer Decl. Ex. I at 131:20-132:14.)

72.     Navidea has never issued the 5,000,000 shares of Navidea common stock that were required to be escrowed on January 2, 2019 in any form. (Zimmer Decl. Ex. A at ¶ 32; Ex. I at 137:25-138:6; Ex. K at 93:18-25; Ex. H at 121:6-19.)

### b.     Share Escrow

73.     The second headed paragraph is headed "Share Escrow" and provides, in whole:

> A total of 10 million Shares will be deposited into an escrow account (the "**Escrow Shares**") 5 million immediately and 5 million on January 2nd, 2019. The Escrow Shares will be released from the escrow account after the earlier of (such earlier time, the "**Release Date**") (i) resolution of any currently pending claims related to the Debt (as defined below) in which none of the Debt is required to be paid to any party other than Goldberg, or (ii) 18 months. On the Release Date, all of the then-remaining Escrow Shares will be released to Goldberg if not then subject to any claim by Navidea as outlined herein. If Navidea is ordered by a final, non-appealable judgment, to pay any portion of the Debt (as defined below) to any party

10

other than Goldberg, Navidea may pursue a claim against Goldberg for such amount and may clawback a portion of the Escrow Shares from the escrow account having the equivalent value (at that future time) of the portion of the Debt actually paid by Navidea to the extent Navidea proves that Goldberg was not entitled to that portion of the Debt. The terms of the escrow account will provide that none of the Escrow Shares may be transferred to Navidea without a joint written direction executed by Navidea and Goldberg, or final judgment by a court of competent jurisdiction.

(Zimmer Decl. Ex. D at 1.)

74.    This paragraph does not impose any obligations on Dr. Goldberg. (Zimmer Decl. Ex. K at 229:15-230:15.)

75.    Navidea has not complied with this provision of the August Agreement. (Zimmer Decl. Ex. C at 254:7-9.)

76.    Navidea has never been ordered by any final, non-appealable judgment, to pay any portion of the Debt (as defined in the August Agreement) to any party other than Goldberg. (Zimmer Decl. Ex. H at 122:22-25.)

77.    To date, Navidea has failed and refused to release the Escrow Shares placed into escrow by Navidea to Dr. Goldberg as required by this paragraph of the August Agreement. (Zimmer Decl. Ex. B at 105:12-106:5; Ex. H at 121:21-122:2.)

### c.    *Lock-Up*

78.    The third headed paragraph is headed "Lock-Up" and provides, in whole: "After the award and placement of the Shares with members of Goldberg's family, neither Goldberg nor such family members will transfer any of the Shares for six months after the Closing Date without the prior written consent of Navidea." (Zimmer Decl. Ex. D at 1.)

79.    This paragraph imposes an obligation on Dr. Goldberg (and any family members to whom Navidea shares might be issued pursuant to the August Agreement) on transferring such shares for a limited time period. (Zimmer Decl. Ex. D at 1.)

11

80.     This paragraph does not mention any additional lockup agreement or require Dr. Goldberg or any member of his family to negotiate or execute such an agreement. (Zimmer Decl. Ex. D at 1.)

81.     Neither Dr. Goldberg nor any member of Dr. Goldberg's family has ever transferred any of the Shares. (Zimmer Decl. Ex. B at 213:23-214:1; Ex. H at 152:11-15; Ex. I at 90:21-95:19; Ex. C at 254:10-19.)

### d.     *MT Super Voting Shares*

82.     The fourth headed paragraph is headed "MT Super Voting Shares" and provides, in whole:

> MT will issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT.  Except as otherwise required by law, the holders of MT Super Voting Common Stock shall be entitled to notice of any stockholders meeting and to vote as a single class with holders of the Common Stock upon any matter submitted to the stockholders for a vote.  In that regard, each holder of MT Super Voting Common Stock shall have 20 votes for each full share of MT Common Stock into which the shares of MT Super Voting Common Stock would be convertible on the record date for the matter to be voted on. Notwithstanding the foregoing, until such time as MT shall have obtained aggregate gross proceeds of $10 million in one or more financings after the Closing Date, the vote or written consent of Navidea shall be required to issue to Goldberg or any of his affiliates any equity or rights to purchase equity, which vote or consent shall not be unreasonably withheld.  Navidea will be entitled to appoint one observer to MT's Board of Directors, who will receive all notices of board meetings, written consents and board materials in advance of such meetings.

(Zimmer Decl. Ex. D at 1.)

83.     It was intended that Dr. Goldberg would receive voting control of Macrophage immediately upon the execution of the August Agreement. (Zimmer Decl. Ex. B at 124:3-6; Ex. I at 184:10-185:13; Ex. R at 204:15-23; Ex. C at 35:14-36:10, 658:1-17.)

84.     Dr. Goldberg was not required to take any action pursuant to this provision. (Zimmer Decl. Ex. H at 152:16-21; Ex. K at 231:24-232:16.)

12

85.    The August Agreement does not give Navidea the right to appoint any directors to Macrophage's board of directors. (*See* Zimmer Decl. Ex. D.)

86.    The August Agreement does not impose any requirements on Dr. Goldberg with respect to the management of Macrophage. (*See* Zimmer Decl. Ex. D.)

87.    The August Agreement does not require Dr. Goldberg to seek or obtain additional financing for Macrophage or impose restrictions or mandates on the manner or timeframe within which to perform. (*See* Zimmer Decl. Ex. D.)

88.    The August Agreement does not preclude the future dilution of Navidea's ownership interest in Macrophage in connection with future financings of Macrophage. (*See* Zimmer Decl. Ex. D. at 1.)

89.    Macrophage has never issued any shares of MT Super Voting Common Stock to Dr. Goldberg. (Zimmer Decl. Ex. H at 133:22-134:13; Ex. C at 93:2-4, 254:20-24, 371:12-372:8.)

90.    Navidea's ownership interest in Macrophage has never been diluted by any action of Dr. Goldberg (or otherwise). (Zimmer Decl. Ex. A ¶ 11.)

91.    After the August Agreement was executed, Navidea's lawyers took the position that Navidea, which was the 100% common/voting stockholder of Macrophage, was required to authorize or approve the issuance of the MT Super Voting Common Stock to Dr. Goldberg. (Zimmer Decl. Ex. C at 377:16-381:12, 433:16-434:9; 789:17-19; 789:17-19.)

92.    This issue was not identified until after the August Agreement was executed and was not discussed during the negotiation of the August Agreement. (Zimmer Decl. Ex. C at 789:20-790:8.)

93.     The Special Committee's counsel proposed a mechanism for Navidea to comply with the August Agreement and enable Macrophage to issue the MT Super Voting Stock. (Zimmer Decl. Ex. C at 790:9-792:5.)

94.     Dr. Goldberg agreed to that proposal. (Zimmer Decl. Ex. C at 792:6-793:19.)

95.     Macrophage's lawyers also agreed with the proposal and agreed that it would permit Macrophage to issue the MT Super Voting Common Stock. (Zimmer Decl. Ex. C at 794:1-12.)

96.     The Special Committee's counsel prepared documentation to allow this to occur and received certain approvals from Navidea, but Navidea refused to enact the proposal or otherwise take actions necessary for the issuance of the MT Super Voting Stock. (Zimmer Decl. Ex. C at 795:22-799:1.)

### e.     Severance

97.     The fifth headed paragraph is headed "Severance" and provides, in whole: "Navidea will pay to Goldberg an aggregate of $979,000, which amount includes all unpaid vacation days, as severance after the Closing Date (the "Severance"), payable in equal installments over the next 24 months on Navidea's regular pay dates (less any required withholding). Navidea will pay the costs to continue Goldberg's existing health coverage for a period of 16 months safter the Closing Date, by paying the amounts required under COBRA to maintain such coverage." (Zimmer Decl. Ex. D at 1.)

98.     This paragraph does not impose any obligations on Dr. Goldberg. (Zimmer Decl. Ex. D; Ex. B at 128:11-24; *see* Ex. H at 155:12-157:9.)

99.     Navidea commenced paying the Severance to Goldberg immediately after execution of the August Agreement. (Zimmer Decl. Ex. A at ¶ 24.)

100.    Navidea commenced paying amounts required to maintain Dr. Goldberg's health insurance coverage immediately after the execution of the August Agreement. (Zimmer Decl. Ex. A at ¶ 23.)

### f.    Credit Line

101.    The sixth headed paragraph is headed "Credit Line" and provides, in whole:  "For six months after the Closing Date, Navidea will provide a line of credit to MT for the salary and benefits of Joel Kaufman (starting November 1), the expense of Nai Fang Wang, the expense of Jeffrey Arnold and MedChem (shared 50% to be reevaluated after the first two months), the remaining payment due and owing to the Salzman Group, the payment to Smart Assays, and other working capital items not to exceed $750,000 in the aggregate."  (Zimmer Decl. Ex. D at 2.)

102.    This paragraph does not impose any obligations on Dr. Goldberg. (Zimmer Decl. Ex. D at 2.; Ex. B at 134:5-14; Ex. H at 157:10-158:8.)

103.    Navidea commenced funding the items described in the Credit Line paragraph immediately after execution of the August Agreement. (Zimmer Decl. Ex. H 483:19-486:11.)

104.    Navidea ceased funding pursuant to the Credit Line paragraph in the August Agreement on February 14, 2019. (Zimmer Decl. Ex. A at ¶ 22; Ex. H at 477:3-11; Ex. I at 292:20-24.)

105.    Navidea never funded the full $750,000 contemplated by this provision of the August Agreement. (Zimmer Decl. Ex. C at 255:4-11.)

### g.    MT Preferred Stock

106.    The seventh headed paragraph is headed "MT Preferred Stock" and provides, in whole: "MT will redeem all shares of Goldberg's MT Preferred Stock and any warrants or other

equity rights held by Goldberg for no additional consideration other than Goldberg's rights in the Transaction." (Zimmer Decl. Ex. D at 1.)

107.    This paragraph required that Dr. Goldberg exchange his existing preferred shares of Macrophage, as well as any other equity rights in Macrophage held by Dr. Goldberg, in exchange for receipt of the consideration provided to him under the August Agreement. (Zimmer Decl. Ex. D; Ex. I at 88:24-90:20.)

108.    Goldberg has never been asked to redeem his preferred shares of Macrophage and has never resisted or refused to consummate the redemption of his MT Preferred Shares. (Zimmer Decl. Ex. B at 214:12-14; Ex. C at 255:12-18.)

### h.    Termination of Debt

109.    The eighth headed paragraph is headed "Termination of Debt" and provides, in whole: "Goldberg waives his rights to collect any debt (including, without limitation, interest) owed by Navidea to Goldberg." (Zimmer Decl. Ex. D at 2.)

110.    Goldberg waived his right to all debt owed to him by Navidea (other than obligations under the August Agreement) as of August 14, 2018. (Zimmer Decl. Ex. A at ¶ 20; Ex. B at 214:18-215:14; Ex. H at 159:11-160:3; Ex. I at 83:21-87:2, 99:23-103:8; Ex. C at 25519-257:19.)

### i.    Waiver of Goldberg Rights

111.    The ninth headed paragraph is headed "Waiver of Goldberg Rights" and provides, in whole:

> Goldberg releases, to the maximum extent permitted by law, each of Navidea and MT from any and all claims that currently exist or arise prior to the Closing Date, whether known or unknown, contingent or fixed, including but not limited to claims for any compensation, vacation pay, severance, bonus, options, warrants, (excluding the existing right to an option to purchase 5,000,000 phantom shares of Navidea common stock

16

currently held by Goldberg) or the Debt.  The release excludes any claims
for breaches of the Transaction Documents by Navidea and MT.

(Zimmer Decl. Ex. D at 2.)

112.   Dr. Goldberg never asserted any claim against Navidea until Navidea and
Macrophage had sued him. (Zimmer Decl. Ex. H at 160:7-161:12.)

113.   Dr. Goldberg released all claims as defined in the August Agreement. (Zimmer
Decl. Ex. A at ¶ 21; Ex. I at 87:3-88:20.)

### j.   *Resignation*

114.   The tenth headed paragraph is headed "Resignation" and provides, in whole:
"Goldberg hereby resigns as an officer and director of Navidea and any other subsidiary of Navidea
other than MT on the date of execution of this Agreement. Navidea will make its final salary
payment on August 15, 2018 and will begin severance payments on August 30, 2018."  (Zimmer
Decl. Ex. D at 2.)

115.   Dr. Goldberg resigned as Navidea's Chief Executive Officer on August 14, 2018.
(Zimmer Decl. Ex. A at ¶ 19; Ex. B 30:25-31:1; Ex. C At 16:2-11; Ex. D at 2; Ex. E.)

116.   Dr. Goldberg resigned as a director of Navidea on August 14, 2018. (Zimmer Decl.
Ex. A at ¶ 3; Ex. B 32:1-4; Ex. D at 2; Ex. T.)

### k.   *Transaction Documents*

117.   The eleventh headed paragraph is headed "Transaction Documents" and provides,
in whole: "The Transaction Documents shall contain other terms, conditions, representations and
warranties of Navidea, MT and Goldberg customary for transactions of the type set forth in this
Agreement. Maslon LLP, counsel to Navidea's Special Committee, shall prepare initial drafts of
the Transaction Documents. Upon execution, the terms of such Transaction Documents shall

supersede the terms set forth herein, but any subsequent failure to execute the Transaction Documents shall not render the provisions of this Agreement invalid." (Zimmer Decl. Ex. D at 2.)

118. This paragraph does not impose any obligations on Dr. Goldberg. (Zimmer Decl. Ex. D at 2; Ex. H at 162:2-163:16.)

119. This paragraph does not impose any obligation on any party to negotiate the terms of proposed Transaction Documents. (Zimmer Decl. Ex. D.)

120. This paragraph does not require that any party accept proposed terms in Transaction Documents that are inconsistent with the terms of the August Agreement. (Zimmer Decl. Ex. D; Ex. B 145:24-146:19.)

121. This paragraph does not impose any obligation on any party to execute Transaction Documents. (Zimmer Decl. Ex. K at 244:12-249:25, 246:13-264:8; 269:19-25.)

122. Under this provision, if Transaction Documents were not signed, all parties would still receive the consideration they were promised in the August Agreement. (Zimmer Decl. Ex. B at 127:25-128:10; Ex. R at 48:24-49:19.)

123. Maslon LLP did not provide proposed initial drafts of Transaction Documents to Dr. Goldberg until September 7, 2018. (Zimmer Decl. Ex. T; Ex. U; Ex. C at 426:7-15.)

124. Upon receiving the drafts, Dr. Goldberg immediately reviewed them. (Zimmer Decl. Ex. V.)

125. Upon receiving the drafts, Dr. Goldberg provided comments on certain documents, and stated that he believed that certain other documents were inconsistent with the parties' agreement or unnecessary. (Zimmer Decl. Ex. V.)

126.    Dr. Goldberg offered to continue discussions and requested that Malson LLP provide certain background documents and information to Macrophage's counsel. (Zimmer Decl. Ex. V.)

127.    Dr. Goldberg continued to discuss the contents of potential Transaction Documents with Maslon, LLP between September 7, 2018 and November 16, 2018. (Zimmer Decl. Ex. W, Ex. X, Ex. Y, Ex. Z, Ex. AA, Ex. BB, Ex. CC, Ex. DD, Ex. EE; Ex. B at 170:22-172:23; Ex. R at 248:7-361:3, Ex. R Exs. 3-25; Ex. C at 422:19-423:7, 428:4-433:15.)

128.    On November 16, 2018, Maslon, LLP informed Dr. Goldberg that it had been instructed by Navidea not to discuss implementation of the August Agreement further with him, but rather would only have further discussions with counsel retained by Dr. Goldberg. (Zimmer Decl. Ex. FF; Ex. B at 172:24-173:3; 202:13-24; Ex. R at 356:7-357:12, Ex. GG.)

129.    [Intentionally left blank.]

*          *          *

130.    With respect to every aspect of the August Agreement other than the redemption of Dr. Goldberg's Macrophage Preferred Shares it is undisputed that he did every act he was required to do by the August Agreement and that he did not do any act prohibited by the August Agreement. (Zimmer Decl. Ex. H at 164:6-166:8.)

## IX.    THE M1M2 TRANSACTION and THE DELAWARE ACTION

131.    On or about February 5, 2019, Macrophage formed a company called M1M2, Inc. as a subsidiary of Macrophage. (Zimmer Decl. Ex. GG.)

132.    At the time of its formation, Macrophage sublicensed to M1M2 "all of Macrophage's rights under the March Sub-License Agreement [between Navidea and Macrophage], including the right to enforce any or all of the Licensed Patents, subject to any and

all limitations on MT's enforcement rights, including but not limited to those set forth in Article 6 of the March Sub-License Agreement [between Navidea and Macrophage]. Furthermore, M1M2 must comply with all applicable terms and conditions (and, if applicable, the Sponsor's Rights) under the March Sub-license Agreement [between Navidea and Macrophage]" in exchange for 100% of M1M2's common stock. (Zimmer Decl. Ex. HH.)

133.    The Sublicense expressly authorized Macrophage to issue further sublicenses of the Licensed Technology to other companies. (Zimmer Decl. Ex. G § 2.4(a); Ex. C at 286:7-10, 336:10-24.)

134.    M1M2 then issued to Dr. Goldberg Super Voting Common Shares of M1M2 comprising 5% of M1M2's common stock. (Zimmer Decl. Ex. II; Ex. JJ.)

135.    Navidea was issued the other 95% of M1M2's common stock. (Zimmer Decl. Ex. KK.)

136.    Upon forming M1M2, Dr. Goldberg informed Navidea, through Bruck and Rice, of the transaction and gave them an accurate description of the transaction. (Zimmer Decl. Ex. LL; Ex. I at 198:19-201:25.)

137.    After a presentation from Navidea's lawyers, Navidea's Board approved the filing of an action in Delaware Chancery Court by Macrophage for breaches of fiduciary duty against Dr. Goldberg and M1M2 (the "Delaware Action"). (Zimmer Decl. Ex. MM.)

138.    The minutes record from such meeting in which Navidea took such action describe the board's approval of the Delaware Action, as well as the instant suit, under a heading referring to discussions of the August Agreement. (Zimmer Decl. Ex. MM.)

139.    [Intentionally left blank.]

140.    The Delaware Action did not address, or make any findings with respect to, whether the M1M2 transaction violated the August Agreement. (Zimmer Decl. Ex. NN. at *41.)

141.    The Chancery Court determined that Macrophage failed to proffer sufficient proof of a specific injury based on the M1M2 transaction, and based on the lack evidence, the court awarded only nominal damages in the amount of $1.00. (Zimmer Decl. Ex. NN. at *46.)

## X.    CLAIM THAT DR. GOLDBERG MISAPPROPRIATED INTELLECTUAL PROPERTY

142.    Navidea alleges that Dr. Goldberg executed a Proprietary Information Agreement annexed to the Amended Complaint in this action as Exhibit B [Dkt. No. 15-2] in connection with his employment by Navidea as CEO. (Zimmer Decl. Ex. A at ¶ 55.)

143.    The Proprietary Information Agreement sets forth Dr. Goldberg's obligations with respect to intellectual property created by him "during the period of [his] employment by Navidea" in Section 2(b), "Inventions."  (*See* Zimmer Decl. Ex. A at Ex. B.)

144.    The Proprietary Information Agreement covers only intellectual property created by Dr. Goldberg "during the period of [his] employment by Navidea."  (Zimmer Decl. Ex. A at Ex. B at § 2(b).)

145.    The Proprietary Information Agreement does not place any restrictions on Dr. Goldberg creating, using, selling, or otherwise disposing of intellectual property of any kind invented by him after the termination of his employment by Navidea (which ended August 14, 2018). (*See generally*, Zimmer Decl. Ex. A at Ex. B.)

146.    Dr. Goldberg does not claim to own any intellectual property necessary to the success of Macrophage or Navidea. (Zimmer Decl. Ex. C at 392:8-10, 583:7-12, 614:10-615:14.)

147.    The Delaware Trial Court ruled that there is no evidence that Dr. Goldberg owns or converted any intellectual property necessary to the success of Macrophage or Navidea. (Zimmer Decl. Ex. C at 259:22-271:20; Ex. NN at *51.)

148.    A letter in which Dr. Goldberg's attorney identified him as "the owner of certain intellectual property necessary for Macrophage go succeed . . ." was not reviewed or approved by Dr. Goldberg before it was sent. (Zimmer Decl. Ex. C at 390:18-392:17.)

149.    [Intentionally left blank.]

## XI.    CLAIMS REGARDING DR. GOLDBERG'S POST-EXECUTION CONDUCT AS MACROPHAGE CEO

150.    The elimination of Navidea's control of Macrophage, which Navidea, its paid consultants, its Special Committee, Macrophage and Dr. Goldberg all agreed was necessary to try to attract third-party investors, never occurred. (Zimmer Decl. Ex. C at 201:12-207:14, 208:13-209:10.)

151.    On November 29, 2018, Navidea purported to take control of Macrophage's board of directors by removing all existing members of the board other than Dr. Goldberg and purporting to appoint Bruck and Rice as Macrophage directors. (Zimmer Decl. Ex. B at 225:24-226:19, 302:15-305:1; Ex. I at 348:18-24; Ex. K at 328:16-335:3; Ex. C at 63:8-17, 385:17-386:20, 641:18-642:12.)

152.    Nothing contemplated by the Special Committee or embodied in the August Agreement that was intended to make Macrophage more attractive to investors happened between August 2018 and February 2019. (Zimmer Decl. Ex. I at 348:25-349:7.)

153.    Macrophage was not in a position to raise funds or obtain investments as of February 2019. (Zimmer Decl. Ex. I at 350:7-351:14; Ex. C at 382:15-385-15.)

154.    No one was ever able to market Macrophage as a company that was not subject to Navidea's control because Navidea never gave up control of Macrophage as required by the August Agreement. (Zimmer Decl. Ex. I at 352:4-10; Ex. C at 662:15-663:22, 777:5-779:6.)

155.    Even if Navidea had provided the entire $750,000 it would not have been sufficient funding to allow Dr. Goldberg to hire a management team for Macrophage until additional funding was secured. (Zimmer Decl. Ex. C at 774:3-777:3.)

Dated: Westchester, New York
       June 1, 2023

Respectfully submitted,

/s/ Gregory Zimmer
Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Phone: 914.402.5683
Fax: 914.402.5683
Email: GZimmer@GZimmerLegal.com

*Attorneys for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Michael M. Goldberg, M.D.*