Jennifer Fiorica Delgado
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 262-6700
jdelgado@lowenstein.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Navidea Biopharmaceuticals Litigation | Case No.: 1:19-cv-01578-VEC |

**MEMORANDUM OF LAW OF DEFENDANT/COUNTERCLAIM AND THIRD-PARTY PLAINTIFF MICHAEL M. GOLDBERG IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF/COUNTERCLAIM-DEFENDANT NAVIDEA BIOPHARMACEUTICALS, INC. AND THIRD-PARTY DEFENDANT MACROPHAGE THERAPEUTICS, INC.**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................ 1

COUNTER-STATEMENT OF FACTS ............................................................................ 3

ARGUMENT ..................................................................................................................... 5

    I.     LEGAL STANDARD ....................................................................................... 5

    II.    NAVIDEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON DR.
        GOLDBERG'S BREACH OF CONTRACT CLAIM ......................................... 6

        A.    The "Closing Date" Has Long Occurred and Navidea Failed to Issue
               Navidea Shares as Required by the August Agreement ............................ 6

        B.    The M1M2 Transaction Cannot Excuse Navidea's Failure to Comply
               with the August Agreement ...................................................................... 10

    III.   MACROPHAGE IS NOT ENTITLED TO SUMMARY JUDGMENT ON
        DR. GOLDBERG'S CLAIM FOR BREACH OF CONTRACT ......................... 13

        A.    Dr. Goldberg Lacked Authority to Issue Super Voting Common
               Stock on Behalf of Macrophage ............................................................... 13

        B.    The M1M2 Transaction Cannot Excuse Macrophage from Complying
               with The August Agreement ..................................................................... 15

        C.    The Court's Daubert Decision Precluding Dr. Goldberg's Expert
               from Opining on the Value of Macrophage Is Not an Impediment to
               Dr. Goldberg Demonstrating Other Forms of Damages at Trial ............... 16

    IV.   NAVIDEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
        BREACH OF CONTRACT CLAIM .................................................................. 18

    V.    NAVIDEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
        CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD
        FAITH AND FAIR DEALING .......................................................................... 21

    VI.   NAVIDEA IS NOT ENTITLED TO A DECLARATORY JUDGMENT ON ITS
        SUMMARY JUDGMENT MOTION ................................................................. 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adchemy, Inc. v. Plateau Data Servs., LLC,*
   No. N15C-03-096, 2017 Del. Super. LEXIS 409 (Del. Super. Ct. Jun. 28, 2017)................25

*Affy Tapple, LLC v. ShopVisible, LLC,*
   No. N18C-07-216, 2019 Del. Super. LEXIS 867 (Del. Super. Ct. Mar. 7, 2019)..................21

*Airborne Health, Inc. v. Squid Soap, LP,*
   984 A.2d 126 (Del. Ch. 2009)............................................................................................22, 24

*Alban v. Kawasaki Kisen Kaisha, Ltd,*
   No. 22-2754, 2023 U.S. App. LEXIS 14101 (3d Cir. June 7, 2023).....................................16

*Brasby v. Morris,*
   No. 05C-10-022, 2007 Del. Super. LEXIS 73 (Del. Super. Ct. Mar. 29, 2007).......................8

*Braxton v. Adirondack Grp.,*
   No. 2001-12-198, 2003 Del. C.P. LEXIS 32 (Del. Aug. 11, 2003 .........................................16

*Carey v. Est. of Myers,*
   No. S11C-10-029, 2015 Del. Super. LEXIS 325 (Del. Super Ct. July 1, 2015) ...................15

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..................................................................................................................5

*Del. Express Shuttle, Inc. v. Sam Waltz & Assocs., LLC,*
   No. CPU4-10-5, 2013 Del. C.P. LEXIS 23 (Del. C.P. July 1, 2013) .....................................21

*Delaney v. Bank of Am. Corp.,*
   766 F.3d 163 (2d Cir. 2014)......................................................................................................5

*DeMarie v. Neff,*
   No. 2077, 2005 Del. Ch. LEXIS 5 (Del. Ch. Jan. 12, 2005) ..................................................12

*Dolan v. Altice USA, Inc.,*
   No. 2018-0651, 2019 Del. Ch. LEXIS 242 (Del. Ch. June 27, 2019) ....................................19

*Dunlap v. State Farm Fire & Cas. Co.,*
   878 A.2d 434 (Del. 2005) ...................................................................................................22, 23

*E.I. Du Pont de Nemours & Co. v. Admiral Ins. Co.,*
   No. 89C-AU-99, 1994 Del. Super. LEXIS 346 (Del. Super. Ct. Aug. 3, 1994).....................20

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
   No. 7471, 2013 Del. Ch. LEXIS 245 (Del. Ch. Sept. 30, 2013)..............................................12

*Est. of Osborn v. Kemp*,
   991 A.2d 1153 (Del. 2010) ........................................................................................7, 8

*First State Constr., Inc. v. Thoro-Good's Concrete Co.*,
   No. 08C-12-041, 2010 Del. Super. LEXIS 174 (Del. Super. Ct. May 3, 2010) ....................18

*Garfield v. Allen*,
   277 A.3d 296 (Del. Ch. 2022)........................................................................................7

*Geler v. Nat'l Westminster Bank USA*,
   770 F. Supp. 210 (S.D.N.Y. 1991)................................................................................22

*Good v. Moyer*,
   No. N12C-03-033, 2012 Del. Super. LEXIS 453 (Del. Super. Ct. Oct. 10, 2012)..................8

*Grimes v. Alteon, Inc.*,
   804 A.2d 256 (Del. 2002) ..........................................................................................14

*Grynberg v. Burke*,
   No. 5198, 1981 Del. Ch. LEXIS 487, at *30-31 (Del. Ch. Aug. 13, 1981)...........................17

*Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*,
   872 A.2d 944 (Del. 2005) ............................................................................................7

*Impact Invs. Colo. II, LLC v. Impact Holding, Inc.*,
   No. 4323, 2012 Del. Ch. LEXIS 215 (Del. Ch. Aug. 31, 2012)...........................................8

*Interim Healthcare, Inc. v. Spherion Corp.*,
   884 A.2d 513 (Del. Super. Ct. 2005) .................................................................................18

*Johnson v. Gov't Empls. Ins. Co.*,
   No. 06-408, 2014 U.S. Dist. LEXIS 81403 (D. Del. June 16, 2014)......................................23

*Kulp v. Mann-Beebe*,
   No. 06C-01-031, 2006 Del. Super. LEXIS 164 (Del. Super. Ct. Mar. 17, 2006)..................25

*Lonergan v. EPE Holdings LLC*,
   5 A.3d 1008 (Del. Ch. 2010)........................................................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................................5

*Medicalgorithmics S.A. v. AMI Monitoring, Inc.*,
   No. 10948, 2016 Del. Ch. LEXIS 128 (Del. Ch. Aug. 18, 2016)............................................12

*Millien v. Popescu*,
No. 8670, 2014 Del. Ch. LEXIS 15 (Del. Ch. Jan. 31, 2014) .................................................17

*In re Mobilactive Media, LLC*,
No. 5725, 2013 Del. Ch. LEXIS 26 (Del. Ch. Jan. 25, 2013) ...................................................9

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) .......................................................................................................22

*In re Numoda Corp. S'holders Litig.*,
No. 9163, 2015 Del. Ch. LEXIS 30 (Del. Ch. Jan. 30, 2015) .................................................17

*Pivotal Payments Direct Corp. v. Planet Payment, Inc.*,
No. N15C-02-059, 2020 Del. Super. LEXIS 2946 (Del. Super. Ct. Nov. 30, 2020)
("Delaware courts can, however, decide reasonableness on summary judgment in
appropriate cases." (citations and quotations omitted)) ...........................................................8

*Preferred Inv. Servs. v. T&H Bail Bonds, Inc.*,
No. 5886, 2013 Del. Ch. LEXIS 190 (Del. Ch. July 24, 2013) .......................................13, 16

*Rexnord Indus., LLC v. RHI Holdings, Inc.*,
No. 07C-10-057, 2009 Del. Super. LEXIS 47 (Del. Super. Ct. Feb. 13, 2009) .....................25

*Riverbend Cmty., LLC v. Green Stone Eng'g., LLC*,
55 A.3d 330 (Del. 2012) .............................................................................................................7

*Scott v. Harris*,
550 U.S. 372 (2007) ....................................................................................................................5

*Scott v. Vantage Corp.*,
No. 17-448-MPT, 2018 U.S. Dist. LEXIS 192828 (D. Del. Nov. 13, 2018) .........................22

*Serviz, Inc. v. ServiceMaster Co., LLC*,
No. N20C-03-070, 2022 Del. Super. LEXIS 155 (Del. Super. Ct. Apr. 19, 2022) ................20

*Siradas v. Chase Lincoln First Bank, N.A.*,
No. 98-4028, 1999 U.S. Dist. LEXIS 15593 (S.D.N.Y. Sep. 30, 1999)..................................21

*Sonitrol Holding Co. v. Marceau Investissements*,
607 A.2d 1177 (Del. 1992) .........................................................................................................7

*Tackett v. State Farm Fire & Cas. Ins. Co.*,
653 A.2d 254 (Del. 1995) .........................................................................................................20

*Thomas v. Harford Mut. Ins. Co.*,
No. 01C-01-046, 2003 Del. Super. LEXIS 268 (Del. Super. Ct. July 25, 2003)....................20

*Tradex Eur. SPRL v. Conair Corp.*,
No. 06-1760, 2008 U.S. Dist. LEXIS 37185 (S.D.N.Y. May 6, 2008) ...................................18

*TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*,
No. N14C-112, 2015 Del. Super. LEXIS 524 (Del. Super. Ct. Sept. 25, 2015).....................19

*Vienna Metro LLC v. Pulte Home Corp.*,
786 F. Supp. 2d 1076 (E.D. Va. 2011) ....................................................................17

*Walgreen v. Theranos, Inc.*,
No. 16-1040, 2017 U.S. Dist. LEXIS 117428 (D. Del. July 27, 2017) ...........................22, 23

*Wexler v. Hasbro, Inc.*,
No. 20-1100 (VEC), 2022 U.S. Dist. LEXIS 43543 (S.D.N.Y. Mar. 11, 2022) .....................5

*Zurich Am. Life Ins. Co. v. Nagel*,
590 F. Supp. 3d 702 (S.D.N.Y. 2022)....................................................................18

**STATUTES**

8 Del. C. §§ 151, 152, 153, 157, 161, and 166 ...............................................................14

8 Del. C. § 152(b) ...............................................................................................14

**RULES**

Fed. R. Civ. P. 56(a) ............................................................................................5

Michael M. Goldberg M.D. ("Dr. Goldberg") respectfully submits this memorandum of law in opposition to the motion for summary judgment (the "Motion") of Navidea Biopharmaceuticals, Inc. ("Navidea") and Macrophage Therapeutics, Inc. ("Macrophage").

## PRELIMINARY STATEMENT

In their Motion, Navidea and Macrophage misinterpret the plain language of the August 14, 2018 Agreement between the parties (the "August Agreement"), provide inapposite Delaware law, and misstate this case's undisputed facts. Dr. Goldberg's counterclaim against Navidea and his third-party claim against Macrophage not only survive summary judgment scrutiny, but as set forth in Dr. Goldberg's Motion for Summary Judgment, those claims should be resolved in Dr. Goldberg's favor. In making its determination on Dr. Goldberg's claims, the Court need not look further than Navidea's concession that it breached the August Agreement because "the 23.5 million shares of Navidea common stock [(the "Navidea Shares")] were not issued in the form required under the August Agreement," and Macrophage's own admission that it never issued Dr. Goldberg Super Voting Common Stock as required by the August Agreement. (*See* Navidea's and Macrophage's Moving Brief [ECF Dkt No. 315] ("Mov. Br.") at 12, 18.)

Despite its concession of breach, Navidea argues it is excused from issuing the Navidea Shares pursuant to Regulation D of the Securities Act of 1933 ("Reg. D"), because the August Agreement imposed a "condition precedent" (*i.e.*, "Closing Date") that has yet to occur. According to Navidea's flawed reading of the term "Closing Date," it insists Dr. Goldberg was required to execute "Transaction Documents" after the August Agreement's execution as a condition precedent to receiving the Navidea Shares. However, while the Agreement contemplates that Navidea's counsel would provide drafts of proposed "Transaction Documents" to Dr. Goldberg after the August Agreement was executed, the Agreement nevertheless provides that "any subsequent failure to execute the Transaction Documents shall not render the provisions of this

1

Agreement invalid." (Kazan Decl. Ex. 10 at 2.) In other words, contrary to Navidea's position, the purported "condition precedent" is an event the August Agreement expressly provides *never has to happen*.

Navidea and Macrophage also argue that they should be excused from performing their obligations under the August Agreement because Dr. Goldberg breached the Agreement by causing Macrophage to create a subsidiary, M1M2 Therapeutics, Inc. ("M1M2"), transferring certain of Macrophage's assets to M1M2, and issuing certain equity in M1M2 to himself (the "M1M2 Transaction"). Navidea and Macrophage both argue that this purported breach by Dr. Goldberg "excused" both Navidea's failure to issue the Navidea Shares and Macrophage's failure to issue Macrophage Super Voting Common Stock to Dr. Goldberg. However, while Dr. Goldberg was prohibited from issuing equity *in Macrophage* until certain express conditions were met, nowhere in its plain language does the August Agreement place any restrictions on the issuance of equity in a *subsidiary* of Macrophage. The Court should decline Navidea's and Macrophage's invitation to read extra words into a contract that Navidea's own attorney drafted. But, even more fundamentally, Navidea and Macrophage cannot surmount the inescapable fact that far from being a "prior breach" by Dr. Goldberg, the M1M2 Transaction occurred long after Navidea and Macrophage had committed their own breaches by failing to issue the Navidea Shares and the Super Voting Common Stock, respectively. Moreover, Macrophage's misapplication of Delaware law is fatal to its argument that Dr. Goldberg had the authority as the Chief Executive Officer ("CEO") of Macrophage to issue himself Super Voting Common Stock.

As for its breach of contract claim against Dr. Goldberg, Navidea recycles its meritless arguments that Dr. Goldberg failed to enter into Transaction Documents when it is not contractually required, and that the M1M2 Transaction somehow breached the August Agreement

even though it is not contractually prohibited. Additionally, Navidea's claim for breach of the implied covenant of good faith and fair dealing is just a repackaged breach of contract claim that finds no support in Delaware law. For these reasons, the Court should deny the Motion in all respects.

## COUNTER-STATEMENT OF FACTS

Navidea is a publicly-traded corporation listed on the New York Stock Exchange. (*See* Plaintiff's 56.1 Statement ¶ 1 (hereinafter "PSMF")). Since inception, Navidea has focused on developing medical diagnostic products. (Declaration of Gregory Zimmer, Ex. 2 at 12:11-18 (hereinafter "Zimmer Decl.") Dr. Goldberg was Navidea's Chief Executive Officer ("CEO") between 2016 and August 14, 2018. (PSMF ¶ 4.) Dr. Goldberg was also a director of Navidea between 2013 and August 14, 2018. (*Id.*)

In or about 2015 and at all relevant times, Navidea had an exclusive license (the "License") from the University of California, San Diego, to use certain patents and other intellectual property (the "Licensed IP") to develop medical diagnostic products. (PSMF ¶ 2.) In or about 2015, Navidea obtained the right to use the Licensed IP to develop therapeutic products, and Navidea created its subsidiary, Macrophage, to pursue therapeutic applications of the Licensed IP. (Zimmer Decl. Ex. 5 at 303:14-20; Ex. 6 at 331:5-333:21; Ex. 11.) Effective March 11, 2015, Navidea granted Macrophage an exclusive sublicense (the "Sublicense") to use the Licensed IP in connection with the development of therapeutic methods and applications in exchange for 100% of Macrophage's common stock. (PSMF ¶¶ 14-15.)

From its inception, Macrophage sought third-party investors to raise working capital to fund ongoing scientific research. (Zimmer Decl. Ex. 6 at 356:21-358:10.) Dr. Goldberg took the lead on seeking such investments. (*Id.*) Certain potential investors expressed concerns based on

Navidea's control of Macrophage. (*Id.* Ex. 7 at 99:15-100:17; Ex. 6 at 757:13-758:9.) As of August 14, 2018, Macrophage was unable to secure third-party investments. (*Id.* Ex. 6 at 706:1-4.)

On August 14, 2018, Navidea, Dr. Goldberg, and Macrophage executed the August Agreement. (Kazan Decl. Ex. 10.) One purpose of the Agreement was to turn control of Macrophage over to Dr. Goldberg. (Zimmer Decl. Ex. 6 at 671:9-12, 674:8-15.) Indeed, Dr. Goldberg would receive voting control of Macrophage immediately upon the execution of the August Agreement. (Kazan Decl. Ex. 10) Macrophage has never issued any shares of MT Super Voting Common Stock to Dr. Goldberg. (Zimmer Decl. Ex. 5 at 133:22-134:13; Ex. 6 at 93:2-4, 254:20-24, 371:12-372:8.)

The August Agreement also provides that "[o]n the date of the consummation of the Transactions (such date the "**Closing Date**"), Navidea shall issue Goldberg 23.5 million shares of Navidea common stock (the "**Shares**") 18.5 million currently and 5 million on January 2, 2019. The Shares will be issued under Regulation D of the Securities Act of 1933" (Kazan Decl. Ex. 10 at 1 (emphasis in original).) Navidea has not complied with this August Agreement provision. (Zimmer Decl. Ex. 5 at 118:20-119:8, 119:12-19; Ex. 10 at 88:25-89:19, 191:14-193:11; Ex. 6 at 254:3-6.)

On or about February 5, 2019, Macrophage formed a company called M1M2, Inc. as a subsidiary of Macrophage. (PSMF ¶ 55.) At the time of its formation, Macrophage sublicensed to M1M2 all of Macrophage's rights to the Licensed IP to M1M2 in exchange for 100% of M1M2's common stock. (*Id.*) The Sublicense expressly authorized Macrophage to issue further sublicenses of the Licensed Technology to other companies. (Zimmer Decl. Ex. 4 § 2.4(a); Ex. 6 at 286:7-10, 336:10-24.) M1M2 then issued to Dr. Goldberg Super Voting Common Shares of M1M2

comprising 5% of M1M2's common stock. (PSMF ¶ 55.) Macrophage was issued the other 95% of M1M2's common stock. (*Id.*)

After receiving notice of the M1M2 Transaction, Navidea's board of directors instructed its counsel to sue Dr. Goldberg and M1M2 on behalf of Macrophage in the Delaware Court of Chancery (the "Delaware Action") for, among others, breach of fiduciary duty. (Zimmer Decl. Ex. 16 at *2-4.) After a bench trial, the Chancery Court made several post-trial findings; most relevant here is the finding that the M1M2 Transaction did not cause any damages to Macrophage. (*Id.* at *5.) More importantly, the Chancery Court did not address the parties' rights and obligations under the August Agreement.

## ARGUMENT

### I.   LEGAL STANDARD

Summary judgment can only be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wexler v. Hasbro, Inc.*, No. 20-1100 (VEC), 2022 U.S. Dist. LEXIS 43543, at *5 (S.D.N.Y. Mar. 11, 2022). As this Court has observed, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial'." *Wexler*, 2022 U.S. Dist. LEXIS at *5 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). It is well-settled that courts "construe the facts in the light most favorable to the nonmoving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Wexler*, 2022 U.S. Dist. LEXIS at *5 (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014)).

## II.   NAVIDEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON DR. GOLDBERG'S BREACH OF CONTRACT CLAIM

### A.   The "Closing Date" Has Long Occurred and Navidea Failed to Issue Navidea Shares as Required by the August Agreement

Dr. Goldberg's First Cause of Action asserts that Navidea breached the August Agreement when it failed to issue the Navidea Shares pursuant to Regulation D of the Securities Act of 1933 ("Reg. D"). It is undisputed that Navidea did not do so. (*See* Mov. Br. at 18 ("[t]rue, the 23.5 million shares of Navidea common stock were not issued in the form required under the August Agreement"); PSMF ¶ 40.) In an attempt to excuse its failure to perform, Navidea first argues it had no obligation to issue *any* shares in the approximately 5 years since the August Agreement was executed because Dr. Goldberg failed to satisfy a "condition precedent" to the issuance of the shares. The plain language of the Agreement belies Navidea's argument.

Regarding the Navidea Shares, the relevant portion of the Agreement states that "on the date of the consummation of the Transaction (such date, the "Closing Date"), Navidea will issue to Goldberg 23.5 million shares of Navidea common stock (the "Shares"), 18.5 million currently, and 5 million on January 2nd, 2019. The Shares will be issued under Regulation D of the Securities Act of 1933." (Kazan Decl. Ex. 10 at 1.) The Agreement further provides that "[t]he Transaction Documents shall contain other terms, conditions, representations and warranties of Navidea, [Macrophage] and Goldberg customary for transactions of the type set forth in this Agreement . . . . Upon execution, the terms of such Transaction Documents shall supersede the terms set forth herein, *but any subsequent failure to execute the Transaction Documents shall not render the provisions of this Agreement invalid*." (*Id.* at 2 (emphasis added).)

Navidea contends that the term "Closing Date" required Dr. Goldberg to execute Transaction Documents as a condition precedent to his right to receive the Navidea Shares. In so arguing, without referring the Court to any specific language in the Agreement, Navidea defines

"Closing Date" to occur when Dr. Goldberg executes Transaction Documents. However, Navidea misinterprets the term "Closing Date" for two independent reasons.

*First*, adopting Navidea's interpretation would render void an express provision of the Agreement. Under Delaware law, courts are loathe to construe contracts in a way that would create a conflict between the contract's terms and the contract's purpose. *See Riverbend Cmty., LLC v. Green Stone Eng'g., LLC*, 55 A.3d 330, 334-35 (Del. 2012); *Est. of Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."). Rather, all parts of a contract must be read in harmony" to determine its meaning. *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 956 (Del. 2005). That is, one portion of a contract cannot be read to negate a different portion. *Id.* Further, "a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992).

Here, there is no dispute the parties did not execute Transaction Documents. That fact, however, cannot excuse Navidea from performing its contractual obligations, because the August Agreement is clear that "failure to execute the Transaction Documents shall not render" any of the provisions invalid. (Kazan Decl. Ex. 10.) Stated differently, if "Closing Date" were to be interpreted as the date when the parties executed Transaction Documents, it would contradict the plain language of the August Agreement that all terms of the Agreement be enforceable, even if Transaction Documents are not finalized.

*Second*, based on the language of the August Agreement, "Closing Date" reflects the parties' understanding that it occurred when the Agreement was executed by the parties, *i.e.*, August 14, 2018. In the introductory paragraph of the August Agreement, the term "Transaction"

is defined as "[t]he transactions contemplated by this Agreement," which refers to the series of provisions set forth in the Agreement. (Kazan Decl. Ex. 10 at 1.) The Agreement goes on to state that the "Closing Date" is "[o]n the date of the consummation of the Transaction." (*Id.*) Neither provision refers to Transaction Documents such that the "Closing Date" would be dependent upon the execution of those documents. Moreover, there is also no indication in any other part of the text of the August Agreement that the execution of Transaction Documents holds any significance in determining when the "Closing Date" would occur. On the contrary, the Agreement explicitly states the enforcement of its provisions does not require the execution of Transaction Documents. (*Id.* at 2.) Accordingly, because the parties consummated the Transaction by agreeing to perform various contractual obligations on August 14, 2018, the "Closing Date" is therefore the execution date of the contract.[1] *See Est. of Osborn*, 991 A.2d at 1159-60 (explaining that when a contract is clear, a court should give effect to the contract's plain meaning).

The Court's analysis can stop here, but even if "Closing Date" were an ambiguous term, the undisputed extrinsic evidence demonstrates the parties intended and understood the "Closing Date" to be the August Agreement's execution date. At summary judgment, a court can look beyond the contract's language to ascertain the parties' intent as to the meaning of an ambiguous term. *Impact Invs. Colo. II, LLC v. Impact Holding, Inc.*, No. 4323, 2012 Del. Ch. LEXIS 215, at

---

[1]     Although the August Agreement clearly states that certain obligations are to be fulfilled on or after the Closing Date, it does not provide any specific timeframe or duration for completing those obligations. Indeed, on summary judgment, the Court may impose a reasonable time frame for performance. *Good v. Moyer*, No. N12C-03-033, 2012 Del. Super. LEXIS 453, at *11-12 (Del. Super. Ct. Oct. 10, 2012); *Brasby v. Morris*, No. 05C-10-022, 2007 Del. Super. LEXIS 73, at *9 (Del. Super. Ct. Mar. 29, 2007) (explaining that where contract language does not contain a specific declaration that time is of the essence, the law permits parties a reasonable time in which to perform); *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, No. N15C-02-059, 2020 Del. Super. LEXIS 2946, at *18-19 (Del. Super. Ct. Nov. 30, 2020) ("Delaware courts can, however, decide reasonableness on summary judgment in appropriate cases." (citations and quotations omitted)). While determining what is considered reasonable is typically a fact question, here, there is no dispute that Navidea has not issued the Navidea Shares to Dr. Goldberg in accordance with the August Agreement. Therefore, any reasonable time period that Navidea had to perform has certainly elapsed since the Agreement was executed almost five years ago.

*15 (Del. Ch. Aug. 31, 2012). In so doing, courts may examine extrinsic evidence, such as the parties' performance of the contract. *See In re Mobilactive Media, LLC*, No. 5725, 2013 Del. Ch. LEXIS 26, at *53 (Del. Ch. Jan. 25, 2013) (considering "the parties' performance of the Agreement" to give meaning to the contract). Here, Navidea's consistent conduct makes clear that the "Closing Date" occurred at the time the August Agreement was executed. Indeed, Navidea not only began performance of every one of its obligations, except the issuance of the Navidea Shares*,* immediately upon execution of the August Agreement, but it took the consistent position that obligations that were to continue for specified periods *after* the "Closing Date" ended after those periods following the *execution date* of the August Agreement expired. For example, even though the August Agreement specifies that Navidea agreed to extend a credit line to Macrophage "*for six months after the Closing Date,*" (Kazan Decl. Ex. 10 at 2), contrary to Navidea's own position, Navidea began funding the line of credit immediately upon execution of the August Agreement. (Zimmer Decl. Ex. 5 at 483:19-486:11.) And Navidea's then-CEO, Jed Latkin ("Latkin") testified that Navidea's obligation to extend credit ended on February 19, 2019, exactly six months after the execution date of the Agreement. (*Id.* Ex. 5 at 477:3-11; Ex. 8 at 292:20-24.) Likewise, Navidea paid Dr. Goldberg's health insurance coverage immediately upon execution of the August Agreement and ceased payment sixteen months after the August Agreement was executed, consistent with its contractual responsibility to pay these costs "for a period of 16 months *after the Closing Date.*" (Kazan Decl. Ex. 10 at 1; Zimmer Decl. Ex. 1 at ¶ 22; Ex. 5 at 477:3-11; Ex. 8 at 292:20-24.)

What is more, Navidea issued certain shares of Navidea common stock[2] to Dr. Goldberg in November 2018, when no Transaction Documents had been signed. (Zimmer Decl. Ex. 18) In

---

[2]    It is undisputed the shares of the common stock were not in the form required by the August Agreement. (PSMF ¶ 45.)

fact, Navidea also placed some of the shares in escrow, even though the draft Escrow Agreement, one of the draft Transaction Documents provided by Navidea's counsel, was never executed. (*Id.* Ex. 20.) Again, Navidea provides no explanation for its conduct in light of its position in this litigation that Transaction Documents were required to "trigger" its obligations to perform after the "Closing Date." In short, based on Navidea's own conduct, the Court should reject Navidea's attempt to introduce a definition of the "Closing Date" that finds no support in the language of the contract and is contrary to its actions.

**B.     The M1M2 Transaction Cannot Excuse Navidea's Failure to Comply with the August Agreement**

Next, Navidea argues that the M1M2 Transaction constituted a breach of the August Agreement by Dr. Goldberg. That "breach," according to Navidea, justifies its failure to issue the Navidea Shares to Dr. Goldberg. However, the M1M2 Transaction was not a breach, and more importantly, it cannot serve as an excuse for Navidea's own breach. The provision provides:

> MT will issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT . . . . Notwithstanding the foregoing, until such time as MT shall have obtained aggregate gross proceeds of $ l0 million in one or more financings after the Closing Date, the vote or written consent of Navidea shall be required to issue to Goldberg or any of his affiliates any equity or rights to purchase equity, which vote or consent will not be unreasonably withheld.

(Kazan Decl. Ex. 10 at 1.)

First and foremost, the M1M2 Transaction did not breach the August Agreement. Navidea contends that Dr. Goldberg's issuance of shares in M1M2, then a newly-formed subsidiary of Macrophage, violated the aforementioned provision in the August Agreement that prohibited him from acquiring shares in Macrophage until a specific threshold of outside investment had been secured. However, that provision applies by its own terms only to issuance of Macrophage shares, not shares of a Macrophage subsidiary; the provision neither mentions nor prohibits issuance of equity to Dr. Goldberg in any other companies except Macrophage.

Even if the provision were not clear on that point, Navidea's counsel, who drafted the August Agreement, confirmed this fact in a proposed Stockholders' Agreement provided to Dr. Goldberg after the Agreement was executed. (*See* Zimmer Decl. Ex. 19.) In that document, entitled "Macrophage Therapeutics, Inc. Stockholders' Agreement," Navidea's attorney provided greater detail regarding certain provisions of the August Agreement. Relevant here, that document defines "Corporation" as "Macrophage Therapeutics, Inc.," with no mention of subsidiaries. (*Id.* Ex. 19.) It further defines the "Term" as the period before "the Corporation obtain[s] aggregate gross proceeds of $10,000,000 in one or more financings after the Effective Date." (*Id.*) It then states that "[t]he parties agree that during the Term, neither Dr. Goldberg or the Corporation shall issue, attempt to issue, or enter into any Agreement to issue, [sic] ownership interest *in the Corporation* to Dr. Goldberg or any Affiliate of Dr. Goldberg without the prior written consent of Navidea[.]" (*Id.* (emphasis added).) In turn, the proposed Agreement includes a broad definition of "Affiliate" that covers persons or entities with virtually any connection to Dr. Goldberg, but only restricts the entity whose shares may not be issued to "the Corporation," which is defined solely as Macrophage. (*Id.*) Certainly, if Navidea's counsel intended any of the provisions of the August Agreement to cover related parties of Macrophage, counsel was more than capable of making that distinction either in the August Agreement itself or in the more detailed proposed Stockholders' Agreement. Rather, counsel's deliberate choice not to do so in the August Agreement *and* the subsequently drafted Stockholders' Agreement is a clear indication that Navidea intended the limitation on issuance of stock to only apply to Macrophage's equity, not any of its affiliates or subsidiaries.

Moreover, even assuming, *arguendo*, that the M1M2 Transaction was a breach, it cannot be considered material. "'[F]or a breach of contract to be material, it must 'go to the root' or

'essence' of the agreement between the parties, or be 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, No. 10948, 2016 Del. Ch. LEXIS 128, at *73 (Del. Ch. Aug. 18, 2016) (quoting *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. 7471, 2013 Del. Ch. LEXIS 245, at *40 (Del. Ch. Sept. 30, 2013) (material breach is one that "defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract")); *see also DeMarie v. Neff*, No. 2077, 2005 Del. Ch. LEXIS 5, at *15 (Del. Ch. Jan. 12, 2005) ("[A]lthough a material breach excuses performance of a contract, a nonmaterial– or *de minimis*–breach will not allow the non-breaching party to avoid its obligations under the contract").

Here, the M1M2 Transaction was simply a means for Dr. Goldberg to secure the same level of ownership and control (specifically, 5% Super Voting Common Stock) over a single asset of Macrophage, which was agreed upon by the parties in the August Agreement for the entirety of Macrophage. Put differently, the purpose of the M1M2 Transaction was to partially fulfill the August Agreement's requirement that Dr. Goldberg receive a 5% equity interest and voting control of Macrophage and its assets. (*Compare* (Kazan Decl. Ex. 10 at 1 (granting Dr. Goldberg 5% Super Voting Common Stock in Macrophage)) *with* Zimmer Decl. Ex. 14 (granting Dr. Goldberg 5% Super Voting Common Stock in M1M2).) Thus, the M1M2 Transaction cannot be considered a material breach—to the extent it was a breach at all—to have frustrated or undermined the August Agreement's purpose when the transaction sought to partially implement the agreed-upon control of Macrophage that Dr. Goldberg bargained for.

Finally, Navidea's argument that the M1M2 Transaction excused its outright refusal to properly issue the Navidea Shares defies controlling law. As discussed above, if the Court finds

that the "Closing Date" was the execution date of the August Agreement, *i.e.*, August 14, 2018, the M1M2 Transaction occurred approximately six months *after* the "Closing Date," *i.e.*, February 2019 (*see* PSMF ¶ 7). Thus, based on that definition, even if the transaction breached the August Agreement—it did not—the issuance of the Navidea Shares should have long been fulfilled. Consequently, a subsequent breach by Dr. Goldberg cannot serve as a valid excuse for Navidea to evade its earlier contractual obligations. *See Preferred Inv. Servs. v. T&H Bail Bonds, Inc.,* No. 5886, 2013 Del. Ch. LEXIS 190, at *38 (Del. Ch. July 24, 2013) (explaining the first-breaching party cannot complain if the other party does not perform).

For all these reasons, the Court should reject each and every one of Navidea's arguments for summary judgment on Dr. Goldberg's breach of contract claim against Navidea.

## III. MACROPHAGE IS NOT ENTITLED TO SUMMARY JUDGMENT ON DR. GOLDBERG'S CLAIM FOR BREACH OF CONTRACT

### A. Dr. Goldberg Lacked Authority to Issue Super Voting Common Stock on Behalf of Macrophage

Dr. Goldberg's Second Cause of Action asserts a breach of contract claim against Macrophage, based on Macrophage's admitted failure to issue him Super Voting Common Stock, as required by the August Agreement. Macrophage nonetheless argues Dr. Goldberg cannot demonstrate its breach because the non-issuance was the result of Dr. Goldberg's own inaction, and that inaction disrupted the chain of causation. This argument lacks basis in law.

As set forth, *supra*, the August Agreement clearly provides that "[*Macrophage*] will issue to [Dr.] Goldberg shares of [Macrophage] Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of [Macrophage]." (Kazan Decl. Ex. 10 at 1 (emphasis added).) There is no reference to Dr. Goldberg taking any action to implement that provision of the August Agreement. (*Id.*) Instead, Macrophage attempts to shift blame for its own failure to Dr. Goldberg, arguing that "Dr. Goldberg's failure to act as CEO [to issue himself the shares] can be

characterized as prevention of contractual performance, because his inaction made it impossible for Macrophage to issue the Super Voting Common Stock." (Mov. Br. at 12.) But, under Delaware law, the board of directors—not the CEO—has exclusive authority to issue stock and regulate a corporation's capital structure. *Grimes v. Alteon, Inc.*, 804 A.2d 256, 261 (Del. 2002) (applying 8 Del. C. §§ 151, 152, 153, 157, 161, and 166). Because the authority lies with the board of directors, as the then-CEO, Dr. Goldberg lacked the power to issue the Super Voting Common Stock on behalf of Macrophage.

Rather, the board of directors of Macrophage should have issued the shares. There is no dispute that on November 29, 2018, Dr. Goldberg became a minority member of Macrophage's board, because Navidea appointed two (majority) members of the board, who were also Navidea directors (and the Special Committee members who negotiated and approved the August Agreement).[3] (Zimmer Decl. Ex. 2 at 225:24-226:19, 302:15-305:1; Ex. 8 at 348:18-24; Ex. 10 at 328:16-335:3; Ex. 6 at 63:8-17, 385:17-386:20, 641:18-642:12.) Under controlling Delaware law, a corporation's board of directors can authorize a person or body to issue shares in the corporation, but the board cannot authorize any person or body to issue shares to that same person or body. *See* 8 Del. C. § 152(b) ("A resolution of the board of directors may delegate to a person or body . . . the authority to enter into 1 or more transactions to issue stock . . . . No such resolution shall permit a person or body to issue stock to such person or body."). Hence, by November 29, 2018, to the extent Macrophage intended to meet its August Agreement obligation to issue Super Voting Common stock to Dr. Goldberg, only its board members could have voted to do so; no unilateral

---

[3]    Macrophage makes the inaccurate statement that "[b]etween August 14, 2018 and February 20, 2019, Dr. Goldberg was the CEO of Macrophage and had effective control over its Board of Directors." (Mov. Br. at 12.) But Navidea installed two new directors, along with Dr. Goldberg, on the board on November 29, 2018. (*See* Zimmer Decl. Ex. 13.) The two Navidea-appointed directors, acting as a majority of the Macrophage board, terminated Dr. Goldberg as CEO on February 20, 2019. (*See id.* Ex. 17.) Accordingly, contrary to Navidea's position, between November 29, 2018, and February 20, 2019, Dr. Goldberg did not have "effective control" over Macrophage's board of directors.

decision of Dr. Goldberg either in his role as a director or CEO could have met this obligation. For these reasons, Dr. Goldberg's purported "inaction" did not prevent or disrupt Macrophage from performing its contractual obligation.[4]

**B.    The M1M2 Transaction Cannot Excuse Macrophage from Complying with The August Agreement**

Piggybacking on Navidea's prior arguments, Macrophage also argues the M1M2 Transaction was a breach of the August Agreement that excused its performance. (Mov. Br. at 14.) For the reasons set forth in Section II B, *supra*, it was not. A significant distinction, however, is worth noting. Unlike Navidea's obligation to issue its shares to Dr. Goldberg, the August Agreement does not condition Macrophage's obligation to issue the Super Voting Common Stock on the occurrence of the "Closing Date." Therefore, Macrophage cannot rely on Navidea's argument based on that term. Without the disputed term in effect, the August Agreement was clear that Macrophage's performance was due upon the Agreement's execution. The M1M2 Transaction, which occurred almost six months after the August Agreement was executed and months after Navidea took over the Macrophage board of directors, cannot serve as a valid excuse for Macrophage's initial failure to issue the Super Voting Common Stock. Delaware law is settled on this point: "[t]he party *first* guilty of a material breach cannot complain if the other party subsequently refuses to perform." *Preferred Inv. Servs.*, 2013 Del. Ch. LEXIS 190 at *38 (emphasis added); *Braxton v. Adirondack Grp.*, No. 2001-12-198, 2003 Del. C.P. LEXIS 32, at *9 (Del. Aug. 11, 2003); *Carey v. Est. of Myers*, No. S11C-10-029, 2015 Del. Super. LEXIS 325, at *67 (Del. Super Ct. July 1, 2015). Accordingly, the Court must reject Macrophage's argument that the M1M2 Transaction relieved it of its contractual obligations.

---

[4]    Macrophage further argues that Dr. Goldberg's failure to issue himself the Super Voting Common Stock constitutes a failure to mitigate damages. (Mov. Br. at 13-14.) For the same reasons already set forth in detailed, *supra*, Dr. Goldberg, as the then-CEO, lacked the authority to issue stocks on behalf of Macrophage.

**C.     The Court's *Daubert* Decision Precluding Dr. Goldberg's Expert from Opining on the Value of Macrophage Is Not an Impediment to Dr. Goldberg Demonstrating Damages at Trial**

Lastly, Macrophage argues that Dr. Goldberg cannot establish damages because the Court precluded his proffered expert witness from testifying about the value of Macrophage. (Mov. Br. at 15-16.) Macrophage's argument is specious. First, there is no dispute that on this motion, Dr. Goldberg has established that Macrophage injured Dr. Goldberg by failing to issue Super Voting Common Stock as required by the August Agreement. While the Court has barred Dr. Goldberg's expert from opining on the value of those shares, contrary to Macrophage's argument, the Court has not precluded Dr. Goldberg from seeking specific performance, *i.e.*, compelling Macrophage to perform in accordance with the Agreement by issuing Dr. Goldberg the appropriate shares. *See Alban v. Kawasaki Kisen Kaisha, Ltd*, No. 22-2754, 2023 U.S. App. LEXIS 14101, at *6-7 (3d Cir. June 7, 2023) ("Specific performance is an equitable remedy, in the alternative to damages, that 'will be granted in the discretion of the court against a party who has committed or is threatening to commit a breach of [a contractual] duty.'" (quoting Restatement (Second) of Contracts § 357)).

In its brief, Macrophage maintains this Court "has already ruled that monetary damages are the only appropriate remedy for Dr. Goldberg's breach claim." (Mov. Br. at 15.) To support its contention, Macrophage cites to this Court's decisions on Navidea's Motion to Dismiss [ECF Doc. No. 61], and its decision on Dr. Goldberg's Motion for Leave to Amend the Counterclaims and Third-Party Claims [ECF Doc. No. 108]. These decisions solely concerned Dr. Goldberg's standing to seek an injunction to (1) remove Rice and Bruck from Macrophage's board of directions; (2) invalidate all actions taken by the Macrophage Board of Directors on or after November 29, 2018; and reinstate the Sub-License to Macrophage. (*See* ECF Doc No. 61 at 16; ECF Doc. No. 108 at 2.) The Court did not strike any of Dr. Goldberg's Third-Party claims that

-16-

sought injunctive relief as part of his breach of contract claim, *i.e.*, specific performance. *See* ECF Doc. No. 31 at 43 ("Awarding Dr. Goldberg the declaratory and injunctive relief sought herein" and "Awarding Dr. Goldberg such other further relief that this Court deems just and proper.").

While specific performance may not always be an appropriate remedy in a breach of contract action involving the issuance of stock, "[i]t is established law that one who contracts for the purchase of shares of stock in a corporation in such amount as to give majority control is entitled to specific performance of the contract because of the inadequacy of the remedy at law for damages." *Grynberg v. Burke*, No. 5198, 1981 Del. Ch. LEXIS 487, at *30-31 (Del. Ch. Aug. 13, 1981); *see Millien v. Popescu*, No. 8670, 2014 Del. Ch. LEXIS 15, at *57 (Del. Ch. Jan. 31, 2014) (finding specific performance to be an appropriate remedy to issue an additional share of voting stock in a breach of contract action); *see also In re Numoda Corp. S'holders Litig.*, No. 9163, 2015 Del. Ch. LEXIS 30, at *46 (Del. Ch. Jan. 30, 2015) (finding that specific performance is an equitable remedy available for a breach of contract claim involving stock). Here, the purpose of issuing Dr. Goldberg the Super Voting Common Stock was to give him control of Macrophage. (*See* PSMF ¶ 24 ("Dr. Goldberg would . . . control voting rights with respect to Macrophage.)). As such, specific performance is a valid equitable remedy for a breach of contract claim in this context, and even without monetary damages, summary judgment is not appropriate. *See, e.g., Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1079 (E.D. Va. 2011) (denying summary judgment on a breach of contract claim since "specific performance is appropriate because Plaintiff does not have an adequate remedy at law").

In addition to an equitable remedy, nominal damages may be awarded on Dr. Goldberg's breach of contract claim, which also precludes summary judgment. *See Garfield v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) ("[A] court can vindicate a breach of contract that does not give rise to

monetary damages through an award of nominal damages"); *see, e.g.*, *Tradex Eur. SPRL v. Conair Corp.*, No. 06-1760, 2008 U.S. Dist. LEXIS 37185, at *18 (S.D.N.Y. May 6, 2008) (denying summary judgment regarding breach of contract claim because defendant "fail[ed] to address whether [p]laintiffs may . . . recover nominal damages" even though they failed to produce evidence of any direct or consequential damages); *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 718 (S.D.N.Y. 2022) (denying motion for summary judgment and letting breach of contract claim go to jury because nominal damages might be available at trial where plaintiffs requested injunctive relief).

Because none of Macrophage's arguments have merit, the Court should deny summary judgement on Dr. Goldberg's breach of contract claim against Macrophage.

## IV.   NAVIDEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM

In support of its argument that it is entitled to summary judgment on its breach of contract claim, Navidea argues that Dr. Goldberg breached the August Agreement by (1) failing to execute Transaction Documents, and (2) causing Macrophage to enter into the M1M2 transaction. These arguments are without merit, and the Motion must be denied on this claim.

In Delaware, to establish a breach of contract claim, the plaintiff bears the burden to prove by a preponderance of the evidence that: (1) a contractual obligation existed; (2) there was a breach of that obligation; and (3) damages resulted from the breach. *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005); *First State Constr., Inc. v. Thoro-Good's Concrete Co.*, No. 08C-12-041, 2010 Del. Super. LEXIS 174, at *7-8 (Del. Super. Ct. May 3, 2010). Here, Navidea's claim fails on the first element—that Dr. Goldberg had a contractual

duty to execute additional Transaction Documents.[5]  As noted, *supra*, the Agreement does not require anyone, let alone Dr. Goldberg, to sign Transaction Documents. (*See* Kazan Decl. Ex. 10 at 2.) Rather, the Agreement explicitly provides that "any subsequent failure to execute the Transaction Documents shall not render the provisions of this Agreement invalid." (*Id.*) In other words, contrary to Navidea's position, the parties are not required to do so. Navidea's witnesses admitted to this fact at their depositions. (Zimmer Decl. Ex. 2 at 145:24-146:19; Ex. 10 at 244:12-249:25, 246:13-264:8; 269:19-25.) Navidea cannot ask this Court to rewrite a contract to include additional provisions for which it did not bargain. *See Dolan v. Altice USA, Inc.*, No. 2018-0651, 2019 Del. Ch. LEXIS 242, at *25 n.100 (Del. Ch. June 27, 2019) ("The Court is not the forum to rewrite the contract or to add provisions that, in hindsight, a party wishes it had included." (quoting *TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, No. N14C-112, 2015 Del. Super. LEXIS 524, at *32 (Del. Super. Ct. Sept. 25, 2015)).

Navidea further contends Dr. Goldberg breached the August Agreement by causing the M1M2 Transaction. Navidea's argument that the M1M2 Transaction caused it damages is contrary to both the facts and the law.[6] For the reasons set forth above, the M1M2 Transaction was not a breach of the August Agreement. In addition, Navidea cannot establish that it was damaged by the M1M2 Transaction. First, Navidea argues it suffered damages in the form of "the costs and attorneys' fees incurred in pursuing and defending against claims arising from Dr. Goldberg's breach." (Mov. Br. at 17-18.) However, under controlling Delaware law, costs and attorneys' fees associated with litigation *are not* damages sufficient to establish a breach of contract claim. *See*

---

[5]        For a more fulsome analysis of this claim, Dr. Goldberg refers the Court to his affirmative Motion for Summary Judgment. (*See* ECF Dkt. 319 at 8-12.)

[6]        It bears noting that the Chancery Court in the Delaware Action found that in connection with Macrophage's breach of fiduciary duty claim against Dr. Goldberg, Macrophage could not show that it suffered any quantifiable damages as a result of the M1M2 Transaction. (Zimmer Decl. Ex. 16 at *47-53.)

*Serviz, Inc. v. ServiceMaster Co., LLC*, No. N20C-03-070, 2022 Del. Super. LEXIS 155, at *21

(Del. Super. Ct. Apr. 19, 2022) (explaining courts should "always [be] reluctant to treat attorney's

fees as contract damages," and that a party cannot "adequately plead contract damages with a mere

claim for attorney's fees or costs stemming from another party's bad faith"); *E.I. Du Pont de

Nemours & Co. v. Admiral Ins. Co.*, No. 89C-AU-99, 1994 Del. Super. LEXIS 346, at *17-18 (Del.

Super. Ct. Aug. 3, 1994) (rejecting plaintiff's argument that the court should view attorney's fees

as compensatory damages because they were caused by the defendant's bad faith conduct).

Second, Navidea maintains that another form of damages suffered by Navidea is "the cost

to Navidea of Dr. Goldberg using Macrophage's lawyers for his personal use." (Mov. Br. at 18.)

This argument fails for a fundamental reason: Navidea has not explained how, let alone presented

any evidence to show, these purported legal fees and costs arose naturally from its breach of

contract claim against Dr. Goldberg. *See Thomas v. Harford Mut. Ins. Co.*, No. 01C-01-046, 2003

Del. Super. LEXIS 268, *7 (Del. Super. Ct. July 25, 2003) ("Recovery for breach of contract is

limited to 'those damages that arise naturally from the breach or that were reasonably foreseeable

at the time the contract was made." (quoting *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d

254, 265 (Del. 1995)); *Del. Express Shuttle, Inc. v. Sam Waltz & Assocs., LLC*, No. CPU4-10-5,

2013 Del. C.P. LEXIS 23, at *8 (Del. C.P. July 1, 2013) (finding that to satisfy the element of

damages in a breach of contract claim, the plaintiff must show that the alleged "damages flowed

from defendant's violation of the contract"). By merely stating Navidea suffered damages in the

form of reimbursement of legal fees and costs, Navidea fails to link those expenses to Dr.

Goldberg's alleged breach of the August Agreement, particularly since neither Macrophage nor

Dr. Goldberg was represented by counsel during the parties' negotiations of the Agreement.[7]

---

[7]     The Chancery Court in the Delaware Action also found that Macrophage failed to establish that its lawyer
charged any fees in connection with the M1M2 Transaction. (*See* Kazan Decl., Ex. 2 at *51.)

Finally, grasping at straws, Navidea argues it is entitled to damages representing "lost time on the patent life of" the Licensed IP for use in developing therapeutics. (Mov. Br. at 18.) Again, as discussed above, it is Navidea's burden to establish the basis for these purported damages and how they relate to the alleged breach of the August Agreement by Dr. Goldberg. Besides its say-so, Navidea has not carried that burden on this Motion. Even if Navidea lost time on the patent life of certain intellectual property, Navidea fails to explain how that "lost time" can be attributed to Dr. Goldberg's alleged breaches of the Agreement (*i.e.*, by failing to enter into Transaction Documents and by causing the M1M2 Transaction).[8]

## V.   NAVIDEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Navidea's claim for breach of the implied covenant of good faith and fair dealing relies on the same conduct as its breach of contract claim: Dr. Goldberg allegedly breached the duty of good faith and fair dealing incorporated by law into the August Agreement by failing to execute Transaction Documents and causing Macrophage to enter the M1M2 transaction. (Mov. Br. at 18-19.) The good faith claim is therefore duplicative of Navidea's contract claim and should be dismissed on that basis alone. *See Affy Tapple, LLC v. ShopVisible, LLC*, No. N18C-07-216, 2019 Del. Super. LEXIS 867, at *10 (Del. Super. Ct. Mar. 7, 2019) (explaining "there cannot be a separate implied covenant claim involving the same conduct as the breach of contract claim"); *see also Siradas v. Chase Lincoln First Bank, N.A.*, No. 98-4028, 1999 U.S. Dist. LEXIS 15593, at *19 (S.D.N.Y. Sep. 30, 1999) (citation omitted) ("A party may maintain a claim for breach of the duty of fair dealing only if it is based on allegations different than those underlying the

---

[8]   As a factual matter, the undisputed evidence shows Dr. Goldberg worked continuously on the development of therapeutics at Macrophage until at least February 20, 2019, when he was removed as Macrophage CEO by Macrophage's Navidea-appointed majority directors. (Zimmer Decl. Ex. 24.) On that same date, Navidea terminated the licensing Agreement that allowed Macrophage to use the Licensed IP. (Zimmer Decl. Ex. 17.) Therefore, as of that date no one acting on behalf of Macrophage—including Dr. Goldberg—could utilize the Licensed IP.

accompanying breach of contract claim."); *Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991).

Even if the claim is not duplicative, Navidea cannot rely on its argument related to the Transaction Documents as the duty of good faith and fair dealing does not impose obligations inconsistent with the terms of a written contract. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). Indeed, as addressed above, the August Agreement specifically states that no party is required to execute Transaction Documents. In that regard, the duty of good faith and fair dealing cannot impose an obligation to do an act where the contract at issue specifically states that no such obligation exists. *See id.* ("[T]he implied obligation must be consistent with the terms of the Agreement as a whole."); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain").

Similarly, as demonstrated above, neither the text of the August Agreement nor the intent of the parties restricted the issuance of shares of a subsidiary of Macrophage to Dr. Goldberg. *See Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010) ("The implied covenant will not infer language that contradicts a clear exercise of an express contractual right."). Navidea's arguments on the M1M2 Transaction therefore also fails because that transaction did not frustrate the purpose of the August Agreement. Under Delaware law, "the term 'good faith' contemplates 'faithfulness to the scope, purpose, and terms of the parties' contract.'" *Scott v. Vantage Corp.*, No. 17-448-MPT, 2018 U.S. Dist. LEXIS 192828, at *16 (D. Del. Nov. 13, 2018) (quoting *Walgreen v. Theranos, Inc.*, No. 16-1040, 2017 U.S. Dist. LEXIS 117428, at *12 (D. Del. July 27, 2017)).

> When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled. If a gap exists, the court must determine whether the implied covenant should be used to supply a term to fill the gap. Delaware courts will only imply

contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. Thus, parties are liable . . .when their conduct frustrates the overarching purpose of the contract.

*Scott*, 2018 U.S. Dist. LEXIS, at \*16-17 (internal quotations and citations omitted). However, "while there exists an occasional need to imply contract terms that 'ensure the parties' reasonable expectations are fulfilled,' quasi-reformation 'should be a rare and fact intensive exercise, governed solely by issues of compelling fairness." *Johnson v. Gov't Empls. Ins. Co.*, No. 06-408, 2014 U.S. Dist. LEXIS 81403, at \*10 (D. Del. June 16, 2014) (quoting *Dunlap*, 878 A.2d at 442). To sustain an implied covenant claim, the plaintiff must establish a "specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Walgreen*, 2017 U.S. Dist. LEXIS 117428, at \*12-13.

Navidea correctly states in its brief that one of the paramount goals of the August Agreement was to separate Macrophage from Navidea such that the company would be more attractive to investors. (Mov. Br. at 19.) The mechanism agreed by the parties and adopted in the August Agreement was the issuance to Dr. Goldberg of 5% Super Voting Common Stock in Macrophage that would give Dr. Goldberg a 5% Super Voting (*i.e.*, controlling) interest in Macrophage and *all of its assets*. (Kazan Decl. Ex. 10 at 1.) Accusing Dr. Goldberg of frustrating that purpose, Navidea insists Dr. Goldberg engaged in the M1M2 Transaction to deprive Navidea of the benefit of its bargain under the Agreement. That bargain, Navidea claims, was its expectation that Dr. Goldberg would not work to the detriment of Macrophage. (Mov. Br. at 20.) Nothing can be further from the truth. Navidea cannot escape the fact that after the execution of the Agreement, it prevented Dr. Goldberg from taking control of Macrophage, thereby obstructing him from advancing the company's business. For several months following the Agreement's execution, Dr. Goldberg not only fulfilled all his contractual obligations but also made efforts to cooperate with

Navidea to accomplish the Agreement's intended purpose. From the undisputed facts presented in this case, Dr. Goldberg's goal in the M1M2 Transaction was to advance the business interests of Macrophage by partially implementing the ownership and governance structure required by the August Agreement when Macrophage failed to perform its obligations under the August Agreement after months of negotiations. (Zimmer Decl. Ex. 5 at 133:22-134:13; Ex. 6 at 93:2-4, 254:20-24, 371:12-372:8.) Despite Navidea's stance, the M1M2 Transaction simply granted Dr. Goldberg the identical interest in a portion of M1M2's assets that was agreed upon in the August Agreement for all of Macrophage and its assets. Although the Chancery Court found that Dr. Goldberg breached his fiduciary duty to Macrophage due to the manner in which the M1M2 Transaction was implemented, it *did not* consider whether the M1M2 transaction breached the August Agreement, or even whether it was inconsistent with the terms of the August Agreement. In fact, while it did not consider the August Agreement in any respect, it did acknowledge that Dr. Goldberg undertook the M1M2 Transaction to implement its provisions regarding the Super Voting Common Stock. (Zimmer Decl. Ex. 16 at *17-19.) As such, Navidea is wrong on the facts.

Navidea is also wrong on the law. "The implied covenant is not a substitute for fiduciary duty analysis." *Lonergan v. EPE Holdings LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010). *Compare Airborne Health,* 984 A.2d at 146 ("The [implied covenant] doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result") *with Lonergan*, 5 A.3d at 1018 ("Fiduciary duty review empowers courts to determine how a governance scheme should operate under particularized factual circumstances."). Accordingly, the Chancery Court's finding with regard to Dr. Goldberg 's fiduciary duty has no bearing on Navidea's implied covenant claim; rather, each claim has separate standards and

burdens of proof. Because Navidea has failed to meet its burden, the Court should deny summary judgment on Navidea's implied covenant of good faith and fair dealing claim.[9]

## VI.   NAVIDEA IS NOT ENTITLED TO A DECLARATORY JUDGMENT ON ITS SUMMARY JUDGMENT MOTION

Dr. Goldberg's Motion for Summary Judgment (ECF Dkt. 319) seeks the dismissal of Navidea's breach of contract claim and breach of implied covenant of good faith and fair dealing claim on the basis that Navidea cannot sustain those claims as a matter of law. (*See id.* at 8-22). However, should the Court determine both parties' summary judgment motions should be denied on these claims, the Court should reserve ruling on Navidea's declaratory judgment claim. *See Rexnord Indus., LLC v. RHI Holdings, Inc.*, No. 07C-10-057, 2009 Del. Super. LEXIS 47, at *31 (Del. Super. Ct. Feb. 13, 2009) (finding it "imprudent to grant declaratory relief when the issue will be more fully developed during the upcoming trial"); *Adchemy, Inc. v. Plateau Data Servs., LLC*, No. N15C-03-096, 2017 Del. Super. LEXIS 409, at *17 (Del. Super. Ct. Jun. 28, 2017) (denying motion for summary judgment for declaratory relief in light of genuine issue of material fact); *Kulp v. Mann-Beebe*, No. 06C-01-031, 2006 Del. Super. LEXIS 164, *8 (Del. Super. Ct. Mar. 17, 2006) (finding declaratory judgment not appropriate for resolution on summary judgment when factual developments could impact case's outcome.

## CONCLUSION

For the foregoing reasons, the Court should deny Navidea's and Macrophage's Motion in its entirety and should grant Dr. Goldberg such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 29, 2023

---

[9]     Summary judgment should also be denied as to the implied covenant claim because, as discussed fully above, Navidea cannot show that the M1M2 Transaction caused it any damages. (*See, supra,* Section IV.)

Respectfully submitted,

_/s/ Jennifer Fiorica Delgado_
Jennifer Fiorica Delgado, Esq.
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
(646) 414-6962
jdelgado@lowenstein.com


Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Phone: 914.402.5683
Fax: 914.402.5683
Email: gzimmer@gzimmerlegal.com

_Attorneys for Defendant/Counterclaim Plaintiff_
_/Third-Party Plaintiff Michael M. Goldberg, M.D._