Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Tel: (914) 402-5683
GZimmer@GZimmerLegal.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

*In re* Navidea Biopharmaceuticals Litigation             Case No.: 1:19-cv-01578-VEC

**DEFENDANT DR. MICHAEL M. GOLDBERG'S RESPONSE TO PLAINTIFF
NAVIDEA'S ADDITIONAL FACTS IN ITS RULE 56.1 COUNTERSTATEMENT OF
FACTS**

156.    The August Agreement states that MT will issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT. (Kazan Decl. Ex. 10.)

**Defendant's Response:  Admitted.**

157.    By forming M1M2, executing a sub-license under which Macrophage granted its primary asset (the Navidea Sub-License) to M1M2, and causing M1M2 to issue 95 shares of M1M2 common stock to Macrophage and 5 shares of M1M2 super voting stock to himself (collectively, the "Challenged Transactions"), Dr. Goldberg issued himself more than a 5% equity interest in Macrophage. (See Zimmer Decl. Exs. GG, HH, II.)

**Defendant's Response:**  Disputed.  The issuance of 5 shares of M1M2 Super Voting Common Stock did not give Dr. Goldberg any equity interest in Macrophage.  (Zimmer Decl. Ex. JJ; Ex. II Ex. HH; Ex. KK.) Moreover, the August Agreement provided that Dr. Goldberg would receive Super Voting Common Stock giving him a 5% common equity interest and voting control over Macrophage and all of its assets whereas the M1M2 Transaction granted Dr. Goldberg a 5% equity interest and voting control over M1M2, which held only a portion of Macrophage's assets.  *See* ¶ 157 ("Macrophage granted its primary asset (the Navidea Sub-License) to M1M2."); (Zimmer Decl. Ex. JJ; Ex. II Ex. HH; Ex. KK.) It is undisputed that Dr. Goldberg never received the 5% Super Voting Common Stock in Macrophage provided for in the August Agreement. (Navidea's Opposition Brief ("Opp. Br.") at 12.)

158.    Before the Challenged Transactions, (a) Macrophage possessed its intellectual property rights, and (b) Dr. Goldberg (while CEO and a director of Macrophage) only held approximately 0.04% of the outstanding shares of capital stock of Macrophage (and approximately

0.08% on a fully diluted and as-converted basis). (See Zimmer Decl. Exs. J, GG, HH, II; Kazan Resp. Decl. Exs. 2, 15 (MT Trial Transcript Day 3) at 586:8-589:9.)

> **Defendant's Response:**   Disputed to the extent that the August Agreement was executed on August 14, 2018 (*see* ¶ 50, *supra*, and response thereto) and the "Challenged Transaction" took place on February 5, 2019. (Zimmer Decl. Ex. JJ; Ex. II Ex. HH; Ex. KK.) The August Agreement awarded Dr. Goldberg Super Voting Common Stock of Macrophage in a number equal to 5.0% of the outstanding shares of Macrophage (*see* ¶ 156).   The August Agreement provided that Macrophage would redeem all shares of Goldberg's MT Preferred Stock and any warrants or other equity rights held by Goldberg for no additional consideration other than Goldberg's rights in the Transaction.   (*See* ¶ 106, *supra*, and response thereto.)   Admitted to the extent that Macrophage's admitted failure to issue the Super Voting Common Stock resulted in Dr. Goldberg only holding approximately 0.04% of the outstanding shares of capital stock of Macrophage (and approximately 0.08% on a fully diluted and as-converted basis).

159.   After the Challenged Transactions (and until the Delaware Chancery Court found that the Challenged Transactions were void ab initio), (1) M1M2 possessed the exclusive right to Macrophage's intellectual property, and (2) Dr. Goldberg owned 5% of M1M2 and had voting control of M1M2 (and, effectively, Macrophage) through his ownership of five shares of "M1M2 Super Voting Stock" (i.e., one hundred votes as compared to Macrophage's ninety-five shares of M1M2 Common Stock that had one vote per share). (See Kazan Resp. Decl. Exs. 2 (JX 68 (Unanimous Resolution of M1M2 Shareholders), 15 (MT Trial Transcript Day 3) at 586:8-589:9);.Kazan Decl. Ex. 23; Zimmer Decl. Exs. GG, HH., II)

**Defendant's Response:**  Disputed to the extent that even while the M1M2 transaction was in effect M1M2 did not "possess[] the exclusive right to Macrophage's intellectual property because the M1M2 transaction only transferred a specific license to M1M2 and Macrophage owned other intellectual property in the form of trade secrets and the results of ongoing scientific research being conducted by Macrophage. Further disputed to the extent that the M1M2 transaction did not give Dr. Goldberg "effective[] control of Macrophage."  The M1M2 Transaction gave Dr. Goldberg voting control of M1M2 but had no effect on voting rights with respect to Macrophage.  (Zimmer Decl. Ex. JJ; Ex. II Ex. HH; Ex. KK.) In its Complaint in the Delaware Action dated February 20, 2019 seeking to rescind the M1M2 transaction Macrophage admitted that at that time Dr. Goldberg held only 4 shares of Series A preferred shares of Macrophage and warrants to acquire 120 common shares of Macrophage representing approximately 0.4% of the outstanding capital shares of Macrophage on an as-converted basis and approximately 0.8% of Macrophage on a fully-diluted and as-converted basis. (Zimmer Decl. Ex. OO ¶ 9.)  It is undisputed that Dr. Goldberg has never received the Super Voting Common Stock of Macrophage.  (Opp. Br. at 12.) Dr. Goldberg has never owned any voting stock of Macrophage.  It is also undisputed that as of November 28, 2018 Dr. Goldberg was a minority member of Macrophage's board of directors.  [Dkt. No. 320, Ex. NN at *16-17, *17 n. 63.) Since that time Dr. Goldberg has been removed from Macrophage's board of directors. (*See* Declaration of Dr. Michael M. Goldberg in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Goldberg Decl.").)

160.    Thus, by effecting the Challenged Transactions, Dr. Goldberg controlled substantially all of Macrophage's assets, despite holding exactly the same amount of Macrophage stock, and diluted the interests of Macrophage's other stockholders in the assets of Macrophage. (See Zimmer Decl. Exs. J, GG, HH, II; Kazan Resp. Decl. Exs. 2, 15 (MT Trial Transcript Day 3) at 586:8-589:9.)

> **Defendant's Response:** Disputed. Dr. Goldberg has never had any level of control of Macrophage's assets. The M1M2 Transaction gave Dr. Goldberg voting control of M1M2 but had no effect on the voting rights of stockholders of Macrophage. [Dkt. No. 320, Ex. JJ; Ex. HH; Ex. KK.] In its Complaint in the Delaware Action dated February 20, 2019 seeking to rescind the M1M2 transaction Macrophage confirmed that at that time Dr. Goldberg held only 4 shares of Series A preferred shares of Macrophage and warrants to acquire 120 common shares of Macrophage representing approximately 0.4% of the outstanding capital shares of Macrophage on an as-converted basis and approximately 0.8% of Macrophage on a fully-diluted and as-converted basis. [Dkt. No. 320, Ex. OO ¶ 9.] It is undisputed that Dr. Goldberg has never received the Super Voting Common Stock of Macrophage. (Opp. Br. at 12.) Dr. Goldberg has never owned any voting stock of Macrophage. It is also undisputed that as of November 28, 2018 Dr. Goldberg was a minority member of Macrophage's board of directors. [Dkt. No. 320. Ex. NN at *16-17, *17 n. 63.] Since that time Dr. Goldberg has been removed from Macrophage's board of directors. (*See* Goldberg Decl.)

161.    Prior to the Challenged Transactions, the outstanding capital stock of Macrophage on an as-converted basis was held as follows: Navidea—99.90%, Platinum—0.06%, and Dr. Goldberg—0.04%; and the outstanding capital stock on a fully diluted and as-converted basis was

held as follows: Navidea—99.80%, Platinum—0.12%, and Dr. Goldberg—0.08%. (See Zimmer Decl. Exs. J, GG, HH, II; Kazan Resp. Decl. Exs. 2, 15 (MT Trial Transcript Day 3) at 586:8-589:9.)

      **Defendant's Response:  Admitted.**

162.    But following the Challenged Transactions (assuming Macrophage owned 95% of M1M2), the outstanding capital stock on an as-converted basis was held approximately as follows: Navidea—94.905%, Platinum—0.057%, and Dr. Goldberg—5.038%; and the outstanding capital stock on a fully diluted and as-converted basis was held approximately as follows: Navidea—94.80%, Platinum—0.114%, and Dr. Goldberg—5.076%. (See Zimmer Decl. Exs. J, GG, HH, II; Kazan Resp. Decl. Exs. 2, 15 (MT Trial Transcript Day 3) at 586:8-589:9.)

      **Defendant's Response:**  Disputed.  The M1M2 transaction did not issue any equity in Macrophage to any person or entity.  [Dkt. No. 320, Ex. JJ; Ex. HH; Ex. KK.] The capital structure of Macrophage existing prior to the M1M2 transaction was identical to the capital structure of Macrophage after the M1M2 transaction.  (*See* ¶ 161, *supra*; Zimmer Decl. Ex. OO ¶ 9.)   In its Amended Complaint in the Delaware Action dated February 20, 2019 seeking to rescind the M1M2 transaction Macrophage confirmed that at that time Dr. Goldberg held only 4 shares of Series A preferred shares of Macrophage and warrants to acquire 120 common shares of Macrophage representing a approximately 0.8% of Macrophage on a fully-diluted and as-converted basis. (Zimmer Decl. Ex. OO ¶ 9.)

163.    Dr. Goldberg's communications regarding the initial drafts of the Transaction Documents were "extremely aggressive, contentious, and frankly not helpful." (Kazan Resp. Decl. Ex. 9 (Sept. 11, 2020 Bruck Dep. Tr.) at 145:24-146:23.)

> **Defendant's Response:**  Disputed.  The cited material represents Ms. Bruck's personal, subjective reaction to Dr. Goldberg's communications.  Navidea and Macrophage fail to cite to or submit the actual communications, which speak for themselves.

164.    Mr. Rice testified in his deposition that he believed the August Agreement required the Transaction Documents to be executed. (Kazan Resp. Decl. Ex. 10 (Sept. 14, 2020 Rice Dep. Tr.)) at 80:5-85:13.)

> **Defendant's Response:**  Disputed to the extent this statement purports to represent a binding interpretation of the August Agreement, which is the province of the Court or a jury.

165.    In Dr. Goldberg's September 7, 2018 email in response to Bill Mower sending him the draft Transaction Documents, Dr. Goldberg wrote: "[T]here is no agreement for the $750K to be treated as debt so neither David nor I will spend any time reviewing those documents. . . . There also was no agreement to lock up [my] shares for 6 months as I agreed to take unregistered shares so I will de-facto have a six month lock up. . . . Finally the Escrow agreement needs to have a well-crafted (details the specific negotiated steps Navidea must pursue as a requirement for accessing the shares) section on required actions of Navidea before they can claim the shares used as collateral. . . . There should be a provision that if the Platinum claim ever drops below $2.2 million then an immediate pro-rata decrease in the shares held in escrow will result.  (Kazan Decl. Ex. 13 (JX 41).)

> **Defendant's Response:**  Disputed to the extent the foregoing statement purports to describe the contents of the cited communication on the basis that the quoted material represents only a portion of the communication, which speaks for itself; admitted to the extent that the quoted language appears in the cited document.

166.    As of November 5, 2018, counsel for Navidea's special committee still had not received "any red-lined or proposed documents from [Macrophage's] counsel that would permit consummation of the Transaction. . . ." (Kazan Resp. Decl. Ex. 11 (Mower to Goldberg Nov. 5, 2018 Email) at MT-DEL00068371.)

**Defendant's Response:**  Disputed to the extent the statement purports to indicate a lack of negotiation of potential transaction documents by Dr. Goldberg or that such negotiation was not being conducted in good faith; exchange of "red-lined" documents or lack thereof is not indicative of good faith negotiations.  Moreover, the quoted language discusses purported actions by Macrophage's counsel, not Dr. Goldberg.  Dr. Goldberg and Mr. Mower engaged in extensive discussions regarding potential Transaction Documents and the initial draft proposed Transaction Documents provided by Mr. Mower. [Dkt. No. 320, Ex. QQ.] In addition, no later than November 12, 2018 Dr. Goldberg provided red-lined comments to documents provided to him by counsel to the Special Committee on November 9, 2018**.**  [Dkt. No. 320, Ex. S.] Dr. Goldberg provided feedback on those proposed Transaction Documents immediately after they were received by him on November 9. 2018. [*Id.*]

167.    The "Miscellaneous" Paragraph of the August Agreement provides, in part, that the "prevailing party in any [action under the August Agreement] will be entitled to recover its reasonable attorneys' fees and costs." [Dkt. No. 320, Ex. D.]

**Defendant's Response:**  Admitted.  The Court is respectfully referred to the August Agreement for the complete contents of the "Miscellaneous" paragraph of that agreement.

168.     Navidea issued to Dr. Goldberg 18.5 million shares of common stock. (Kazan Resp. Decl. Ex. 12 (Latkin Oct. 26, 2020 Dep. Tr.) at 132:15-133:2.)

**Defendant's Response:**  Disputed to the extent that Paragraph 168 purports to indicate that Navidea partially performed its obligation to issue shares of common stock to Dr. Goldberg pursuant to the August Agreement.  The shares that were purportedly issued to Dr. Goldberg pursuant to the August Agreement were not all issued pursuant to Regulation D of the Securities Act of 1933 as required by the August Agreement and contained restrictive legends not permitted by the August Agreement. (Dkt. No. 320 Ex. S.)

169.     Navidea issued the 18.5 million shares of common stock to Dr. Goldberg in order to convince him to sign the Transaction Documents so that the deal could close. (Kazan Resp. Decl. Ex. 12 (Latkin Oct. 26, 2020 Dep. Tr.) at 133:3-133:23.)

**Defendant's Response:**  Disputed.  Navidea purported to issue 18.5 million shares of common stock to Dr. Goldberg at least in part because the New York Stock Exchange (American), the exchange on which Navidea's stock was listed, would not give Navidea credit for eliminating certain debt owed by Navidea to Dr. Goldberg through the August Agreement, and thereby increasing its Shareholder Equity to partially satisfy a condition to continued listing on the NYSE, until Navidea provided Dr. Goldberg the consideration provided for in the August Agreement.  It is undisputed that Navidea did not issue the 18.5 million shares in the form required by the August Agreement.  (Opp. Br. at 21.)

170.    Dr. Goldberg failed to forward to the insurance carrier the funds that Navidea paid him, under the August Agreement, to cover his health insurance premiums under COBRA. (Kazan Decl. Ex. 20 at 153:6-153:25.)

> **Defendant's Response:  Disputed.**  The August Agreement requires Navidea, not Dr. Goldberg to make payments to continue Dr. Goldberg's COBRA health coverage.  [Dkt. No. 320, Ex. D.]

171.    As a result of Dr. Goldberg's failure to forward Navidea's payment to the insurance carrier, Navidea had to obtain a special exception from the carrier to allow his health insurance to be renewed. (Kazan Decl. Ex. 20 at 153:6-153:25.)

> **Defendant's Response:**  Disputed.  The August Agreement requires Navidea, not Dr. Goldberg, to make payments to continue Dr. Goldberg's COBRA health coverage. [Dkt. No. 320, Ex. D.] Therefore any impact resulting from any non-payment of COBRA payments was a result of Navidea's failure to do so.  *Id.*

172.    Navidea would not have funded Macrophage had Navidea known that Dr. Goldberg was not going to work for Macrophage's interests to try to build the company. (See Kazan Resp. Decl. Ex. 15 (MT Trial Transcript Day 3) at 723:13-723:17 ("From the very beginning of this, the idea was to fund Macrophage Therapeutics with capital. With that capital, Dr. Goldberg was to build a company. And that never happened."); Kazan Resp. Decl. Ex. 18 (JX 128).)

> **Defendant's Response:**  Disputed.  The cited language does not support the statement asserted in Paragraph 172.  Navidea's funding of Macrophage following the execution of the August Agreement was required by the August Agreement, which requires Navidea to provide Macrophage with a line of credit of up to $750,000 for the six-month period after the Closing Date.  [Dkt. No. 320, Ex. D.] The August Agreement

does not require Dr. Goldberg to take any action with respect to Macrophage's business. (see generally *id.*) Moreover, Dr. Goldberg worked to develop therapeutics products at Macrophage between the execution of the August Agreement and his removal from Macrophage's CEO position by Navidea on February 20, 2019. (Dr. Goldberg's Response to Navidea's 56.1 Statement, ¶ 61.) The elimination of Navidea's control of Macrophage, which Navidea, its paid consultants, its Special Committee, Macrophage and Dr. Goldberg all agreed was necessary to try to attract third-party investors, never occurred. (*Id.* ¶ 150 and response thereto.) Thus, Dr. Goldberg could not effectively seek investment in Macrophage. Finally, the only witness for Navidea and Macrophage who worked at Macrophage during the time between the execution of the August Agreement and Dr. Goldberg's removal as Macrophage's CEO, Joel Kaufman, testified that Macrophage did not have sufficient funding to build the management team that Jed Latkin claimed Dr. Goldberg was expected to put in place. [Dkt. No. 323]

173.    Navidea commenced this action seeking, inter alia, a declaratory judgment regarding "the parties' respective obligations under the August Agreement in light of (1) [Dr.] Goldberg's issuance of equity to himself; (2) [Dr.] Goldberg's failure to enter into the Transaction Documents; [and (3)] [Dr.] Goldberg's insistence that his personal interests be satisfied before causing Macrophage to comply with its obligations under the August Agreement." (Zimmer Decl. Ex. A (First Am. Compl.) ¶ 115.)

> **Defendant's Response**: Disputed to the extent the quoted language in Paragraph 173 purports to accurately represent the claims asserted by Navidea in this action. In fact, Navidea asserted a claim that Dr. Goldberg breached his fiduciary duty unrelated to the August Agreement or any conduct at Macrophage seeking $50 million in damages

(Zimmer Decl. Ex. OO.) which was dismissed at the pleadings stage by the Court (Dkt. No. 61.); however, admitted that the quoted text appears in Navidea's First Amended Complaint.

174.    Navidea would not have commenced the instant lawsuit if it were not for Dr. Goldberg's actions. (See Kazan Resp. Decl. Ex. 9 (Sept. 11, 2020 Dr. Claudine Bruck Dep. Tr.) at 101:11-101:14 (". . . the situation became really contentions between Michael Goldberg and Navidea, and lawsuit ensured"), 152:25-153:2 (". . . what is also very serious is that there's a reason for which Navidea entered into a lawsuit in New York"); Kazan Resp. Decl. Ex. 17 (Sept. 29, 2020 Dr. Claudine Bruck Dep. Tr.) at 365:22-365:25 ("The consideration was that in this new frame, again, Michael Goldberg was free to do self-dealing and evade all the rules that had been put in place."), 377:10-377:21 (". . . the whole thing was . . . extremely bad for the company, both for Macrophage and Navidea . . . it was felt that it was the doing of Michael Goldberg"), 383:23-384:2 (". . . the research would have continued within Navidea and at one point, Macrophage would have been reactivated and it would have been given the license again . . .").)

> **Defendant's Response:**  Disputed.  The quoted material does not discuss this action or state that it would not be commenced but for any actions of Dr. Goldberg.  In addition, to the extent Paragraph 174 purports to suggest that this action would not be commenced if it were not for Dr. Goldberg's actions with respect to the August Agreement, Navidea asserted a claim that Dr. Goldberg breached his fiduciary duty unrelated to the August Agreement or any conduct at Macrophage seeking $50 million in damages. (Zimmer Decl. Ex. OO.) which was dismissed at the pleadings stage by the Court. [Dkt. No. 61.]

175.    In order to issue the MT Super Voting Common Stock, Dr. Goldberg proposed a change to the August Agreement whereby he would not redeem his shares in Macrophage. (Kazan Resp. Decl. Ex. 7 ("What do you think about the board of MT voting to pay my current ongoing salary in preferred shares . . . combined with my previous 5.6 shares I will have 8.6 shares and platinum will still have 8.4 shares. We can then change the restrictions and get on with the rest of our agenda. . . . I will then also 'give up' all economic interest in the preferred shares existing and new, as I committed to as part of the Navidea deal, except for the right to vote or prevent platinum from voting to change the terms of the Preferred. In any event, let's please get back to Bill Mower ASAP and move all of this along either with their help or on our own. Time is valuable and I need to get things moving.") (emphasis added); Kazan Resp. Decl. Ex. 15 (MT Day 3 Trial) at 797:1- 797:19) ("…the negotiations did not – were not consummated in an agreement subsequent…") and ("I can't say [Dr. Goldberg was willing to do his part to overcome the preferred share impediment to the issuance of Macrophage shares] for certain.").

> **Defendant's Response:**  Disputed to the extent that the quotation from the transcript of the Delaware Action purports to indicate that the witness, Mr. Mower, did not believe Dr. Goldberg was willing to work to allow the Super Voting Common Stock to be issued; the entirety of his testimony makes clear that Dr. Goldberg negotiated Mr. Mower regarding ways to allow the Super Voting Common Stock to be issued and that when Mr. Mower arrived at what he believed was a means to do so Navidea did not approve it.  (Zimmer Decl. Ex. C at 796:2-797:23.)  Admitted to the extent that Dr. Goldberg proposed ways to issue the Super Voting Common Stock and that the quoted text was included in correspondence from Dr. Goldberg but disputed to the extent that

the quoted text purports to set forth Dr. Goldberg's entire communication, which speaks for itself.

176.    Dr. Goldberg could have compelled MT to consummate the issuance of the Super Voting Stock. (*See* Kazan Resp. Decl. Ex. 7 ("What do you think about the board of MT voting to pay my current ongoing salary in preferred shares . . . combined with my previous 5.6 shares I will have 8.6 shares and platinum will still have 8.4 shares. We can then change the restrictions and get on with the rest of our agenda. . . . I will then also 'give up' all economic interest in the preferred shares existing and new, as I committed to as part of the Navidea deal, except for the right to vote or prevent platinum from voting to change the terms of the Preferred. In any event, let's please get back to Bill Mower ASAP and move all of this along either with their help or on our own. Time is valuable and I need to get things moving.") (emphasis added); Kazan Resp. Decl. Ex. 15 (MT Day 3 Trial) at 797:1-797:19) ("…the negotiations did not – were not consummated in an agreement subsequent…") and ("I can't say [Dr. Goldberg was willing to do his part to overcome the preferred share impediment to the issuance of Macrophage shares] for certain.").

> **Defendant's Response:**  Disputed.  Dr. Goldberg, as Macrophage's CEO, could not change Macrophage's capital structure to create the Super Voting Common Stock or issue any equity.  *See Grimes v. Alteon, Inc.*, 804 A.2d 256, 261 (Del. 2002) (applying 8 Del. C. §§ 151, 152, 153, 157, 161 and 166).  Further disputed to the extent Paragraph 176 purports to suggest that Dr. Goldberg had the power to issue the Super Voting Common Stock without Navidea's participation.  The text from Dr. Goldberg quoted in Paragraph 176 represents a question asked by Dr. Goldberg to Macrophage's attorneys regarding a potential means to address issues relating to approvals needed from a majority of Macrophage's preferred stock holders; the quoted text does not contain any

response from Macrophage's counsel indicating that his suggestion would be effective or that Dr. Goldberg could implement it unilaterally and, in fact, Dr. Goldberg asks Macrophage's attorneys to work with Navidea's counsel, Mr. Mower, to determine whether his proposal could, or should be implemented.  (*See* Kazan Resp. Decl. Ex. 7.) Dr. Goldberg was a minority preferred stockholder of Macrophage.  (Zimmer Decl. Ex. OO ¶ 9.)  Further disputed to the extent the quotation from the transcript of the Delaware Action purports to indicate that the witness, Mr. Mower, did not believe Dr. Goldberg was willing to work to allow the Super Voting Common Stock to be issued; in fact, the entirety of his testimony makes clear that Dr. Goldberg negotiated Mr. Mower regarding ways to allow the Super Voting Common Stock to be issued and that when Mr. Mower arrived at what he believed was a means to do so Navidea did not approve it.  (Zimmer Decl. Ex. C at 796:2-797:23.)  Further disputed to the extent Paragraph 176 relies on testimony in the Delaware Action; the quoted portion of the transcript of the Delaware Action represents the opinion of the witness.  *Id.*  Admitted to the extent that Dr. Goldberg proposed ways to issue the Super Voting Common Stock as required by the August Agreement and that the quoted text was included in correspondence from Dr. Goldberg, but disputed to the extent that the quoted text purports to set forth Dr. Goldberg's entire communication, which speaks for itself.

177.   Dr. Goldberg's actions in connection with the August Agreement and the Challenged Transactions caused Navidea to suffer losses. (See Kazan Resp. Decl. Ex. 4; Kazan Decl. Ex. 20 at 153:6-153:25; Kazan Decl. Ex. 33 at 210:8-220:14, 243:23-244:8, 249:3-205:15)).)

**Defendant's Response:**  Disputed.  The statement in Paragraph 177 is not a factual statement; it is a legal conclusion.  Causation is a legal question that can only be

determined by the Court.  The cited authority does not support the contention contained in Paragraph 177.  The Delaware Action did not find that Dr. Goldberg caused any damages.  [*See* Dkt. No. 320, Ex. NN at *51.] In his deposition Mr. Latkin could not explain how the August Agreement required Dr. Goldberg to take any action with respect to COBRA payments, any action by Dr. Goldberg that breached the COBRA provision of the August Agreement or any damages any conduct by Dr. Goldberg caused. (Kazan Decl. Ex. 20 at 156:6-157:9.) The Delaware Action held that under Delaware law (which applies to the claims in this action) the cost of litigation is not an element of damages.  [*See* Dkt. No. 320, Ex. NN at *46-49.] Mr. Latkin also could not identify any damages caused by Dr. Goldberg's alleged use of Macrophage's counsel for his own use.  (Kazan Decl. Ex. 33 at 210:8-220:14.) The Delaware Acton held that there is no evidence of any amount attributable to Dr. Goldberg's alleged use of Macrophage's attorneys for his own personal use. [*See* Dkt. No. 320, Ex. NN at *43-45.] Moreover, at his deposition, Mr. Latkin was unable to identify any damages caused by Dr. Goldberg.  (Zimmer Decl. Ex. H2 at 248:4-12.)  And Dr. Goldberg diligently worked to develop therapeutic products at Macrophage using the intellectual property licensed to Macrophage by Navidea.  [*See* Dkt. No. 330, Ex. 24.]

Dated: Westchester, New York
       July 20, 2023

Respectfully submitted,
/s/ Gregory Zimmer
Gregory Zimmer, Esq.
142 New Chalet Drive
Mohegan Lake, NY 10547
Phone: 914.402.5683

*Attorneys for Defendant/Counterclaim Plaintiff/*
*Third-Party Plaintiff Michael M. Goldberg, M.D.*