USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/25/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                 :

IN RE: NAVIDEA BIOPHARMACEUTICALS   :
LITIGATION                              :

                                 :
---------------------------------------------------------------X

19-CV-1578 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

       Navidea Biopharmaceuticals, Inc. ("Navidea") sued Michael Goldberg ("Goldberg") for

breach of contract, breach of the implied covenant of good faith and fair dealing, breach of

fiduciary duty, and for a declaratory judgment establishing the contractual rights and obligations

of the parties. *See* Am. Compl., Dkt. 15.[1]  Goldberg asserted counterclaims against Navidea and

third-party claims against Macrophage Therapeutics, Inc. ("Macrophage" or "MT"), a subsidiary

of Navidea (collectively, the "Company"), for breach of contract, wrongful discharge, injunctive

relief, and quantum meruit. *See* Answer, Dkt. 31.[2]  Over the past five years, the parties have

engaged in extensive motion practice in this Court, as well as in the Delaware Court of Chancery

(the "Delaware Action").  The parties have cross-moved for summary judgment. *See* Dkts. 314,

318.  On summary judgment, the Company has a breach of contract claim, a breach of the

implied covenant of good faith and fair dealing claim, and a declaratory judgment claim against

---

[1]       The Company commenced this action against Goldberg on February 20, 2019. *See* Compl., Dkt. 1.  The
operative amended complaint was filed on April 26, 2019. *See* Am. Compl.  Goldberg filed a separate suit against
the Company on March 7, 2019, No. 19-cv-2101, and on May 7, 2019, the Court consolidated the cases. *See* May 7,
2019 Order, Dkt. 26.

[2]       The Company moved to dismiss Goldberg's counterclaims and third-party claims. *See* Mot. to Dismiss,
Dkt. 40.  Goldberg moved to dismiss Navidea's breach of fiduciary duty claim and sought attorneys' fees in
connection with litigating that claim. *See* Mot. to Dismiss, Dkt. 32.  On December 26, 2019, the Undersigned
granted Goldberg's motion to dismiss the breach of fiduciary duty claim and determined that he was entitled to
attorneys' fees with respect to his defense of that claim. *See* Op. & Order, Dkt. 61.  The Undersigned also granted
the Company's motion to dismiss, dismissing Goldberg's wrongful discharge, injunctive relief, and quantum meruit
claims. *See id.*

Goldberg; Goldberg has separate breach of contract claims against Navidea and Macrophage. For the reasons discussed below, the motions and cross-motions are GRANTED in part and DENIED in part.

## I.   BACKGROUND[3]

Navidea is a publicly-traded corporation that focuses on medical diagnostic and imaging products; it is listed on the New York Stock Exchange ("NYSE").  56.1 Stmt. ¶¶ 1–2, Dkt. 327.[4] Navidea's products utilize intellectual property licensed from the University of California, San Diego (the "Licensed IP").  56.1 Stmt. ¶ 2, Dkt. 329.  Goldberg served as Navidea's Chief Executive Officer ("CEO") from September 2016 to August 14, 2018; he was also a member of the Navidea board of directors ("Navidea's Board") from November 13, 2013 until August 14, 2018.  *Id.* ¶ 4.

---

[3]      The facts are gathered from the parties' 56.1 statements, the exhibits attached to the parties' submissions, and the parties' summary judgment briefs.  The facts are construed in the light most favorable to the non-moving party.  *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation omitted).  All facts described herein are undisputed unless otherwise stated.  The Court will refer to the relevant submissions as follows: the Company's memorandum of law in support of its motion for summary judgment, Dkt. 315, as "Company Mem. of Law"; Goldberg's memorandum in opposition to the Company's motion for summary judgment, Dkt. 328, as "Goldberg Opp."; the Company's Reply memorandum, Dkt. 332, as "Company Reply"; Goldberg's memorandum of law in support of his motion for summary judgment, Dkt. 321, as "Goldberg Mem. of Law"; the Company's memorandum of law in opposition to Goldberg's motion for summary judgment, Dkt. 325, as "Company Opp."; Goldberg's Reply Memorandum, Dkt. 334, as "Goldberg Reply"; the Company's Local Civil Rule 56.1 Statement of Undisputed Facts, Dkt. 324, as "56.1 Stmt., Dkt. 324"; Goldberg's Response to the Company's 56.1 Statement of Undisputed Facts, Dkt. 329 as "56.1 Stmt., Dkt. 329"; Goldberg's Local Civil Rule 56.1 Statement of Undisputed Facts, Dkt. 323, as "56.1 Stmt., Dkt. 323"; the Company's Response to Goldberg's 56.1 Statement of Undisputed Facts, Dkt. 327 as "56.1 Stmt., Dkt. 327"; the Company's Additional Statements of Undisputed Facts, Dkt. 333 as "56.1 Stmt., Dkt. 333"; and Goldberg's Response to the Company's Additional Statements of Undisputed Facts, Dkt. 336, as "56.1 Stmt., Dkt. 336."  Citations to the "Kazan Decl." refer to the exhibits attached to the Declarations of Barry Kazan, Dkts. 316 and 326, and citations to the "Zimmer Decl." refer to the exhibits attached to the Declarations of Gregory Zimmer, Dkts. 320, 330, and 335.

[4]      The parties failed to adhere to the Undersigned's Individual Practices Rule 4(H)(ii), in that they did not coordinate their 56.1 statements so that the Court has one, final consolidated 56.1 Statement.  The function of a Rule 56.1 Statement is to require the parties to clarify the elements of the various claims that are and that are not at issue and to clearly identify any facts that are contested.  *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  The parties submitted six 56.1 Statements to the Court and, as such, these 56.1 Statements did not serve their intended purpose and created multiple redundancies and inefficiencies the Court was forced to sort through.

Macrophage is a wholly owned subsidiary of Navidea.  *Id*. ¶ 3.  Goldberg was the CEO of Macrophage until his termination on February 20, 2019.  *Id*. ¶ 5.  When Macrophage was formed in 2015, its board of directors had three seats, and Goldberg held one of them.   56.1 Stmt. ¶¶ 9, 15, Dkt. 327.

On March 11, 2015, in exchange for 100 percent of the common stock of Macrophage, Navidea granted Macrophage an exclusive license to use the Licensed IP for therapeutic purposes.  56.1 Stmt. ¶¶ 14–15, Dkt. 329.  Navidea could terminate the sublicense if Macrophage became insolvent.  *Id*. ¶ 16.

### A.  The August Agreement

In or around 2018, Macrophage was experiencing difficulty securing third-party investors; potential investors expressed concerns regarding Navidea's control of the company. 56.1 Stmt. ¶¶ 26–28, Dkt. 327.  Then, on June 6, 2018, the NYSE warned Navidea that it was at risk of being delisted because of its low common stock price and because its shareholder equity had experienced net losses in three of its four most recent fiscal years.  *Id*. ¶¶ 32–34.

By August 2018, Navidea's Board agreed that it should relinquish control of Macrophage and that Macrophage should be separated from Navidea to increase the likelihood that Macrophage could obtain third-party investment; Navidea believed that would maximize the value of its ownership of Macrophage.  *Id*. ¶¶ 38–39.  Navidea's Board appointed a Special Committee to negotiate an agreement pursuant to which Goldberg would separate from Navidea to focus on running Macrophage and obtaining third-party investments in that company.  *Id*. ¶ 40.  Although neither Goldberg nor Macrophage was represented by counsel in those negotiations, the Special Committee was represented by Maslon, LLP.  *Id*. ¶¶ 43–44.  Goldberg

negotiated on his and Macrophage's behalf, and Maslon LLP drafted the legal documentation. *Id*. ¶¶ 44–48.

On August 14, 2018, Navidea, Goldberg, and Macrophage executed the agreement that is at the center of this litigation (the "August Agreement"). *Id*. ¶ 51. The parties dispute whether the August Agreement was a preliminary agreement, as the Company contends, or a final agreement, as Goldberg contends. 56.1 Stmt. ¶ 31, Dkt. 329.

The dispute between the parties hinges on the meaning of a handful of terms in the August Agreement. In relevant part, those terms provide:

> Navidea Shares: On the date of the consummation of the Transaction (such date, the "**Closing Date**"), Navidea will issue Goldberg 23.5 million shares of Navidea common stock (the "**Shares**"), 18.5 million currently, and 5 million on January 2nd, 2019. The Shares will be issued under Regulation D of the Securities Act of 1933.

> MT Super Voting Shares: MT will issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT. . . . [E]ach holder of MT Super Voting Common Stock shall have 20 votes for each full share of MT Common Stock into which the shares of MT Super Voting Common Stock would be convertible on the record date for the matter to be voted on. Notwithstanding the foregoing, until such time as MT shall have obtained aggregate gross proceeds of $10 million in one or more financings after the Closing Date, the vote or written consent of Navidea shall be required to issue to Goldberg or any of his affiliates any equity or rights to purchase equity, which vote or consent will not be unreasonably withheld. Navidea will be entitled to appoint one observer to MT's Board of Directors, who will receive all notices of board meetings, written consents and board materials in advance of such meetings.

> Severance: . . . Navidea will pay the costs to continue Goldberg's existing health coverage for a period of 16 months after the Closing Date, by paying the amounts required under COBRA to maintain such coverage.

> Transaction Documents: The Transaction Documents shall contain other terms, conditions, representations and warranties of Navidea, MT and Goldberg customary for transactions of the type set forth in this Agreement. Maslon LLP, counsel to Navidea's Special Committee, shall prepare initial drafts of the Transaction Documents. Upon execution, the terms of such Transaction Documents shall supersede the terms set forth herein, but any subsequent failure to execute the Transaction Documents shall not render the provisions of this Agreement invalid.

Zimmer Decl. Ex. D. at 1–2, Dkt. 320.

### B.  Events Following Execution of the August Agreement

On September 7, 2018, Maslon LLP sent drafts of the Transaction Documents to Goldberg.  56.1 Stmt. ¶ 123, Dkt. 327.  Goldberg provided comments and stated that he believed some provisions were not consistent with the parties' agreement.  *Id*.  ¶ 125.  Maslon LLP and Goldberg continued to discuss the contents of the proposed Transaction Documents between September 7, 2018 and November 16, 2018.  *Id*. ¶ 127.

The August Agreement prohibited Goldberg from issuing himself additional equity in Macrophage without Navidea's express consent until Macrophage had obtained $10 million in one or more financings; Macrophage never obtained $10 million in additional financing.  56.1 Stmt. ¶¶ 48–49, Dkt. 329.  On November 20, 2018, although the Transaction Documents had not been signed, Navidea issued 18.5 million shares of common stock to Goldberg.  The Company asserts that it did so to convince Goldberg to execute the Transaction Documents; Goldberg asserts that the stock was issued so Navidea could increase shareholder equity.  *Id*. ¶ 45, Dkt. 329.

### C.  M1M2 — The Challenged Transactions

On November 29, 2018, Navidea executed a written consent authorized by Macrophage's governing documents that removed every director from the Macrophage Board other than Goldberg and appointed Claudine Bruck and Michael Rice (Navidea directors) to the Macrophage Board.  *Id*. ¶ 53.

Goldberg, acting in his capacity as CEO of Macrophage and as a member of the Macrophage Board, formed non-party M1M2 Therapeutics, Inc. ("M1M2") on February 5, 2019.  56.1 Stmt. ¶ 55, Dkt. 329.  Macrophage then sublicensed its Navidea Sublicense ("Navidea Sublicense") to M1M2 and issued 95 shares of M1M2 common stock to Macrophage and five

shares of M1M2 super voting stock to Goldberg (collectively, the "Challenged Transactions").

*Id*. On February 11, 2019, Goldberg held a special meeting of the Macrophage Board, during

which he informed Bruck and Rice that he had formed M1M2, had transferred the Navidea

Sublicense to M1M2, and had issued M1M2's common stock to Macrophage and its super

voting stock to himself.  *Id*. ¶ 58.

On February 19, 2019, Navidea terminated the Navidea Sublicense because Macrophage

was insolvent, and on February 20, 2019, Macrophage terminated Goldberg as CEO because of

his conduct entering into the Challenged Transactions.  *Id*. ¶¶ 60–62.

### D.  The Delaware Action

On February 20, 2019, Macrophage sued Goldberg in the Delaware Court of Chancery.

*Id*. ¶ 64.  Following a three-day trial in late 2020, the Court of Chancery held that Goldberg had

breached his fiduciary duty of loyalty to Macrophage by entering into the Challenged

Transactions.  Kazan Decl. Ex. 2 (Del. Op.) at 61, Dkt. 316.  The Court of Chancery also held

that Macrophage had failed to prove any damages caused by Goldberg's breach and awarded

only nominal damages in the amount of $1.00.  *Id*. at 53.  The Challenged Transactions were

nullified when Navidea revoked the Navidea Sublicense; the Court of Chancery also declared

that the Challenged Transactions were null and void.  *Id*. at 48.  Although the Court of Chancery

held that Goldberg's conduct regarding the Challenged Transactions violated Delaware law, it

also held his actions were not so "egregious" as to justify awarding Macrophage attorneys' fees.

*Id*. at 56–57.  The Court of Chancery did not address whether the Challenged Transactions

violated the August Agreement.  56.1 Stmt. ¶ 140, Dkt. 327.

## II.     DISCUSSION

When parties cross-move for summary judgment, the Court analyzes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Wandering Dago Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted).

Although the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks and citation omitted).

### A.  Navidea's Motion for Summary Judgment on its Claims is Denied; Goldberg's Cross-Motion for Summary Judgment is Granted in Part and Denied in Part

Navidea has three remaining claims against Goldberg: breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment. Company Mem. of Law at 1, Dkt. 315. The Company's motion for summary judgment as to its claim for breach of contract and breach of the implied covenant of good faith and fair dealing claim is DENIED; the Company's motion for summary judgment as to its declaratory judgment claim is DENIED without prejudice. Goldberg's cross-motion for summary judgment on Navidea's claim for breach of contract and breach of the implied covenant is GRANTED; Goldberg's cross-motion

for summary judgment on the Company's declaratory judgment claim is DENIED without prejudice.

### 1. Breach of Contract

To prove breach of contract under Delaware law,[5] the plaintiff must establish "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs." *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.,* No. 2993, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).  The construction of contract language presents a question of law.  *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  The court's "task is to fulfill the parties' shared expectations at the time they contracted." *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks and alterations omitted).  That task starts with the text of the contract.  *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (citation omitted).  When the language of a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract.  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) (citation omitted).  The contract is to be read as a whole, giving effect to each term and provision, so as not to render any part of the contract mere surplusage. *Id.* at 1159.

The Company argues that there is no question of fact that Goldberg breached the contract in three ways: he failed to execute the Transaction Documents; he entered into the Challenged Transactions; and he failed to forward funds provided by Navidea for his health insurance premiums to the insurance carrier.

---

[5]        The parties agree that Delaware law governs the August Agreement.  Zimmer Decl. Ex. D. at 2, Dkt. 320; Company Mem. of Law at 7; Goldberg Mem. of Law at 3.

This litigation centers around a contract that is so poorly drafted that the Court is unable to discern the meaning of several key contractual provisions. Contract law dictates that ambiguities are construed against the drafter – in this case, Navidea. *See Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (citation omitted). Even so, as to several of the terms, the Court needs extrinsic evidence to ascertain their meaning.

Recognizing that the August Agreement is ambiguous in part, the Court will, nevertheless, assume without deciding that Navidea can prove that Goldberg breached the August Agreement. Even with that assumption, however, Navidea is not entitled to summary judgment because an element of a breach of contract claim is resulting damages. The Company has not shown that the putative breaches about which it complains caused it any damage.[6] Thus, even if a jury might conclude that Goldberg breached the contract, it would still have to return a verdict for Goldberg on the breach of contract claim because the Company has not established damages that are directly traceable to any of the putative breaches.

The Company asserts that Goldberg's failure to execute the Transaction Documents caused Navidea to incur significant expenses by way of attorneys' fees and administrative costs in pursuing litigation. Company Opp. at 14. The Company also avers that it suffered reliance damages in the form of the costs and fees it incurred to fund Macrophage. *Id*. at 13. The

---

[6]     The Court is skeptical whether the Company could meet its burden to establish the first two elements of its breach of contract claim. First, as discussed in Part II.B.1., *infra*, the "Transaction Documents" provision is ambiguous, and there are questions of fact whether Goldberg was contractually obligated to execute Transation Documents. Second, although Goldberg engaged in "self-help" by entering into the Challenged Transactions, the August Agreement does not specifically prohibit him from issuing shares of an affiliate or subsidiary of Macrophage – in this case, M1M2 – to himself. The Company contends that the notion that the August Agreement did not prohibit Goldberg from issuing himself shares in a subsidiary of Macrophage elevates form over substance. That may very well be true, but, as previously noted, Navidea drafted the contract and ambiguities are construed against the drafter. *See Bank of N. Y. Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 551 (Del. 2013) (citation omitted). Third, the "Severance" provision provides that "Navidea will pay the costs to continue Goldberg's existing health coverage for a period of 16 months after the Closing Date, by paying the amounts required under COBRA to maintain such coverage." Zimmer Decl. Ex. D at 1–2, Dkt. 320. That provision neither required Navidea to make the payments directly to the insurance carrier nor required Goldberg to forward the payments he was provided to the insurance company.

Company contends that it would not have funded Macrophage had it known that Goldberg would not work in Macrophage's interests to raise needed capital.  56.1 Stmt. ¶ 172, Dkt. 336; Kazan Decl. Ex. 15 at 723, Dkt. 326.  Navidea's CEO testified that the company suffered reputational damage with the "overhang of litigation and disputes that have hindered the ability of the company to move forward and get its business done."  Kazan Decl. Ex. 33 at 249, Dkt. 316.  The Company also argues that the Challenged Transactions resulted in damages including attorneys' fees associated with litigation arising from Goldberg's conduct, the cost of Goldberg using Macrophage's lawyers for his personal use, and lost time on the patent life of the Licensed IP. Company Mem. of Law at 17–18.  Finally, the Company argues that Goldberg's failure to forward COBRA premiums that Navidea had advanced to him (approximately $26,000) to the insurance carrier damaged Navidea because it then had to obtain a special exception to allow it to renew Goldberg's coverage and incurred additional costs as a result.[7]  56.1 Stmt ¶¶ 170–71, Dkt. 336; Kazan Decl. Ex. 20 at 153, Dkt. 316.

Goldberg contends that attorneys' fees associated with litigation cannot constitute damages necessary to establish a breach of contract claim.  Goldberg Opp. at 19–20 (citing *Serviz, Inc. v. ServiceMaster Co., LLC*, No. N20C-03-070, 2022 WL 1164859, at *7 (Del. Sup. Ct. Apr. 19, 2022) (noting that the "Court is always reluctant to treat attorneys' fees as contract damages")).  As for Goldberg's use of Macrophage's lawyers, he argues that the Company cannot show that any such damages flowed from his alleged breach of the contract, especially because he was not represented by counsel when the August Agreement was negotiated.

---

[7]      The record is unclear on exactly what happened relative to the approximately $26,000 that Navidea advanced to Goldberg to cover his COBRA payments.  As worded, paragraph 170 of the parties' 56.1 statement suggests that Goldberg failed to forward the entire amount to the insurance carrier, *see* 56.1 Stmt. ¶¶ 170–71, Dkt. 336 ("As a result of Dr. Goldberg's failure to forward Navidea's payment to the insurance carrier . . ."), but the citation it relies on as support for that point, Jed Latkin's deposition, indicates that Goldberg failed to forward *one* month's  premium to the insurance carrier, *see* Kazan Decl. Ex. 20 at 153: 7-9, Dkt. 316 ("[W]e advanced [Goldberg] the full COBRA amount, he actually did not pay the second month in, he didn't pay his COBRA . . .").

Goldberg Opp. at 20 (citing *Del. Exp. Shuttle, Inc. v. Sam Waltz & Assocs. LLC*, No. CPU4-10-000005, 2013 WL 3776523, at *3 (Del. C.P. July 1, 2013)).  With regard to the Company's argument that Navidea "lost time on the patent" of certain intellectual property, Goldberg argues that the Company cannot attribute that loss to Goldberg's alleged breaches, because Goldberg worked at Macrophage until February 20, 2019, when he was removed as CEO, and Navidea terminated its Sublicense on that same day.  Goldberg Opp. at 21 n.8.

The Company has not established any damages resulting from Goldberg's failure to execute the Transaction Documents and has not demonstrated that any of the purported breaches harmed the ability of Macrophage to operate as a separate entity.  The Company put forth no evidence to refute Goldberg's claim that he worked to advance Macrophage's business between the time the August Agreement was signed and the time that Goldberg's employment was terminated.  To the contrary, the record includes emails Goldberg sent between August 2018 and January 2019, working in his capacity as Macrophage CEO to advance its day-to-day business.  Zimmer Decl. Ex. 24, Dkt. 330.   The Company's contentions that it suffered reputational damage and that Goldberg's alleged breaches thwarted its goal of having Macrophage operate as a separate entity capable of garnering outside investment are entirely conclusory.  The Company's complaint that Goldberg used lawyers hired by Macrophage for personal legal advice, Kazan Decl. Ex. 33 at 243–244, Dkt. 316, was previously considered by the Court of Chancery.  That Court held that even if those lawyers did give personal advice to Goldberg that was outside the scope of Macrophage's business, Macrophage was not entitled to recoup its legal fees because it presented no evidence that the firm ever charged Macrophage for legal advice it provided to Goldberg.  Kazan Decl. Ex. 2 (Del. Op.) at 50–51, Dkt. 316.  That lack of evidence has continued into this case.  Similarly, the Company did not proffer any evidence of the cost

incurred in obtaining a "special exception" to renew Goldberg's health insurance coverage after he failed to forward a premium payment to the insurer.  Kazan Decl. Ex. 20 at 153–56, Dkt. 316.

The Company cannot claim as damages its litigation costs and administrative fees. Delaware courts adhere to the American Rule, pursuant to which each party must bear its own attorneys' fees.  That rule can, of course, be modified when "the parties agree by contract to shift the costs and expenses of litigation."  *Nichols v. Chrysler Grp. LLC,* No. 4348, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010) (citation omitted).  A court may also award attorneys' fees in cases where the losing party brought the action in bad faith or where the losing party acted in bad faith to increase the costs of the litigation.  *See also ION Geophysical Corp. v. Fletcher Intern., Ltd.*, No. 5050, 2010 WL 4378400, at *16 (Del. Ch. Nov. 5, 2010) (citation omitted).  In the Delaware Action, despite finding that Goldberg's self-help "was misguided and ultimately unlawful," the Court of Chancery held that his conduct was not so "egregious" as to justify fee-shifting.  Kazan Decl. Ex. 2 (Del. Op.) at 55, 57, Dkt. 316.  This Court finds the issue to be a close one, but ultimately agrees with the Court of Chancery that Navidea has not demonstrated that Goldberg's conduct was so egregious that Navidea's fees can be viewed as contract damages.

Because the Company has not adduced evidence that would allow a reasonable fact finder to conclude that it was damaged by Goldberg's failure to execute the Transaction Documents, orchestration and execution of the Challenged Transactions, or failure to forward payments Navidea provided to his health insurance carrier, it has failed to prove damages, a required element of a breach of contract claim.[8]  Accordingly, the Company's motion for

---

[8]     Although the August Agreement provides that "[t]he prevailing party in any such dispute will be entitled to recover its reasonable attorneys' fees and costs,"  Zimmer Decl. Ex. D. at 2, Dkt. 320, the Company is only entitled to recover fees if it is the prevailing party.  Because it is necessary to prove damages to be the prevailing party on its

summary judgment on its breach of contract claims is denied, and Goldberg's cross motion for summary judgment on Navidea's breach of contract claims is granted.[9]

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

The Company alleges that Goldberg breached the implied covenant of good faith and fair dealing by refusing to execute the Transaction Documents and entering into the Challenged Transactions.  Company Mem. of Law at 19–20.

The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1995) (internal quotation marks omitted)).  "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *Alliance Data Sys. Corp. v. Blackstone Cap. Partners V L.P.,* 963 A.2d 746, 770 (Del. Ch.), *aff'd,* 976 A.2d 170 (Del. 2009).  "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

---

claims for breach of contract, the contractual obligation to pay fees to the prevailing party does not rescue the Company's breach of contract claims.

[9]     Because Goldberg is the prevailing party on that claim, under the August Agreement, he is entitled to recover reasonable attorneys' fees and costs associated with defending against that claim.

To state a claim for breach of the implied covenant, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (citation omitted). Alleging general bad faith is not sufficient to make out a claim; the plaintiff must allege a specific implied contractual obligation and how the defendant's alleged violation of that obligation denied the plaintiff "the fruits of the contract." *See id*. "[T]he covenant is a limited and extraordinary legal remedy. As such, the implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." *Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (cleaned up).

Goldberg breached the covenant, according to the Company, by failing to execute the Transaction Documents and by attempting, in bad faith, to renegotiate the agreed-upon terms of the August Agreement. Company Opp. at 16. Further, the Company argues that Goldberg's orchestration of the Challenged Transaction "frustrate[d] the fruits of the bargain that Navidea reasonably expected." Company Mem. of Law at 20. Although the Company concedes that the August Agreement does not expressly bar Goldberg from creating a separate entity, it argues that Goldberg's machinations to obtain an interest in Macrophage through M1M2 is the type of contractual gap that an implied covenant claim is intended to fill. Company Opp. at 17. Finally, the Company argues that it expected Goldberg to work to advance Macrophage's interests and, although that was not specifically spelled out in the August Agreement, this duty was implied and arose from the relationship that the Agreement formed. *See id*. at 18.

Goldberg argues that the Court should dismiss this claim because it is duplicative of the Company's contractual claim.[10]  Goldberg Mem. of Law at 20 n.8 (citing *Affy Tapple, LLC v. ShopVisible, LLC*, No. N18C-07-216, 2019 WL 1324500, at *4 (Del. Super. Ct. Mar. 7, 2019) (explaining that "there cannot be a separate implied covenant claim involving the same conduct as the breach of contract claim")).  Moreover, he argues, the Company cannot simultaneously argue that his failure to execute the Transaction Documents and his entering into the Challenged Transactions breached an express provision of the August Agreement and an implied obligation. *See id*. at 21.  Finally, Goldberg argues that this claim must fail for the same reason that the Company's breach of contract claim fails – the Company has not adduced evidence of damages. Goldberg Mem. of Law at 21.

As a starting matter, the Court has already held that the Company has not established its breach of contract claims against Goldberg, *supra*, and, accordingly, the Company's implied covenant claim is not duplicative.  *See Whitestone REIT Operating P'ship, L.P. v. Pillarstone Cap. REIT*, No. 2022-0607, 2024 WL 274227, at *6 (Del. Ch. Jan. 25, 2024) (finding plaintiff's breach of the implied covenant of good faith and fair dealing claim was not duplicative when it was brought in the alternative to its breach of contract claim).

Although the Company claims that Goldberg "acted arbitrarily and unreasonably in refusing to execute the Transaction Documents," it has not adduced facts showing that

---

[10]    The Company concedes that it cannot prevail on both its breach of contract and breach of the implied covenant claim.  It notes, however, that some Delaware courts have held that the implied covenant claim can be pled in the alternative.  Company Opp. at 16–17 (*citing Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, No. 7668, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) (denying motion to dismiss an implied covenant claim pled in alternative where plaintiff alleged defendant's misconduct affected matters so fundamental to contract that plaintiff's reasonable expectations were frustrated); *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. 7471, 2013 WL 5621678, at *33–35 (Del. Ch. Sept. 30, 2013) (finding party breached express provision in contract but also concluding, in alternative, that gap existed in parties' contract and if they had foreseen the conduct that constituted the breach, they would have agreed to proscribe it)).

Goldberg's attempts to negotiate the terms of the draft Transaction Documents sent to him was a breach of the implied covenant of good faith and fair dealing. *See* Company Mem. of Law at 20. The Court has already noted its hesitation whether the Company could prove that Goldberg breached the August Agreement by failing to execute the Transaction Documents, as the poorly drafted contract does not explicitly obligate Goldberg to execute them. *See supra* n.6. The August Agreement addresses the conduct at issue, but because it is ambiguous, the parties dispute their respective obligations.

The Company's assertion that Goldberg's attempt to negotiate the terms of the Transaction Documents was in bad faith is entirely conclusory. Bill Mower, of Maslon LLP who drafted the August Agreement, testified that the August Agreement was intended to be "a binding agreement with an understanding that we had some cleanup to do later." Zimmer Decl. Ex. R at 48–49, Dkt. 320. After receiving the proposed drafts of Transaction Documents, Goldberg provided comments and noted which documents he contended were inconsistent with the parties' agreement; he offered to continue discussions and asked Maslon LLP to provide certain documents and information to Macrophage's counsel. 56.1 Stmt. ¶¶ 125–26, Dkt. 327. It can hardly be said that Goldberg's attempt to clarify inconsistencies was done in bad faith. Because the implied covenant is "an extraordinary legal remedy," and the August Agreement is not "truly silent" concerning the execution of Transaction Documents, given the undisputed facts surrounding Golberg's actions, his failure to execute the Transaction Documents did not constitute a breach of the implied covenant of good faith and fair dealing. *See Oxbow Carbon & Minerals Holdings, Inc.*, 202 A.3d at 507 (Del. 2019).

Goldberg's conduct in orchestrating and entering into the Challenged Transactions, on the other hand, is a different matter. The Court of Chancery held that Goldberg breached his

fiduciary duty of loyalty to Macrophage; instead of pursuing his claims against Navidea in court, he "exploited the parties' inability to come to terms on definitive agreements implementing the August Agreement by surreptitiously removing Navidea from the process and taking the Navidea Sub-License for his own." Kazan Decl. Ex. 2 (Del. Op.) at 40, Dkt. 316. "The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes." *Steiner v. Meyerson*, No. 13139, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995).

Although breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing are not the same, the elements of each claim are exceedingly similar and at times overlapping. An implied covenant claim requires a party to a contract to "refrain from arbitrary or unreasonable conduct that has the effect of preventing a counterparty from receiving the fruits of the bargain." *See Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023). The fiduciary duty of loyalty requires the fiduciary – in this case, Goldberg – to act in good faith to "not advantage himself at the expense of [Macrophage]." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005) (citation omitted). The Court of Chancery held that, by entering into the Challenged Transactions, Goldberg "failed to follow a fair process and ultimately failed to deliver a fair price in breach of his duty of loyalty." Kazan Decl. Ex. 2 (Del. Op.) at 40, Dkt. 316. In essence, Goldberg deprived Navidea "the fruits of the bargain." As the Court of Chancery held, Goldberg "failed to prove that he engaged in a transaction that duplicated what the parties would have agreed to had they ever been able to finalize contracts implementing the August Agreement."[11] *Id*. at 43; *Dunlap*, 878 A.2d at 442.

---

[11]     Goldberg is collaterally estopped from relitigating whether he engaged in the Challenged Transactions or the Court of Chancery's fairness holding. *See M.G. Bancorp. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999) ("Collateral estoppel prohibits a party from relitigating a factual issue that was adjudicated previously.").

As noted previously in note 6, *supra*, the August Agreement does not expressly prohibit Goldberg from creating a separate entity owned by himself, transferring Macrophage's only real asset to that entity, and thereby increasing his equity in Macrophage indirectly.  "[P]arties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."  *Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, No. 2020-0255, 2022 WL 906521, at *22 (Del. Ch. March 29, 2022) (citation omitted).  An implied covenant claim works to "imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."  *Id*. (citation omitted).  The absence of contractual language barring the type of self-dealing transaction orchestrated by Goldberg is exactly the type of gap that an implied covenant claim is intended to cover.  The Court of Chancery noted that Goldberg's "attempt to remedy the wrong he perceived when Navidea failed to engage with him to effectuate the August Agreement was misguided and ultimately unlawful," and is an example "of why contractual self-help rarely can be effected within the bounds of our law."  Kazan Decl. Ex. 2 (Del. Op.) at 55, Dkt. 316.

The Company also asserts that Goldberg breached the implied covenant of good faith and fair dealing by failing to advance Macrophage's interests.  After Goldberg formed M1M2 but before the Court of Chancery found its creation to be void ab initio, the parties dispute the extent to which M1M2 possessed the exclusive right to Macrophage's intellectual property.  The Company argues that Goldberg owned five percent of M1M2, had voting control of that entity and "effectively, Macrophage" through his ownership of five shares of M1M2 Super Voting Stock; Goldberg denies that the Challenged Transactions gave him effective control of Macrophage because the voting control of M1M2 had no effect on voting rights relative to Macrophage, and M1M2 owned only a license, not the exclusive right to Macrophage's

intellectual property.  56.1 Stmt. ¶ 159, Dkt. 336.   Goldberg's argument that Macrophage owned

intellectual property other than the Navidea Sublicense is disingenuous.  The Court of Chancery

found that the Challenged Transactions resulted in the transfer of substantially all of

Macrophage's assets, as the Navidea Sublicense was Macrophage's "primary asset."  Kazan

Decl. Ex. 2 (Del. Op.) at 32, Dkt. 316.  This Court concurs.[12]  There is no evidence in the record

that Macrophage owned any intellectual property beyond what it licensed to M1M2.

Although the Court agrees with the Company that there is no question of fact that

Goldberg breached the implied covenant of good faith and fair dealing by entering into the

Challenged Transactions, the Company's claim, and therefore its motion for summary judgment,

founders for the same reason that its breach of contract claim failed – the Company has not

demonstrated any damage from that breach.  *See* Part II.A.1*., supra*.

The Company's motion for summary judgment on the breach of the implied covenant of

good faith and fair dealing is, therefore, denied, and Goldberg's cross motion for summary

judgment on that claim is granted.[13]

### 3. Declaratory Judgment Claim

The Declaratory Judgment Act provides that "any court of the United States . . . may

declare the rights and other legal relations of any interested party seeking such a declaration,

whether or not further relief is or could be sought" in "a case of actual controversy."  28 U.S.C. §

2201(a).  "[A] declaratory judgment action is a creature of statute, and therefore is neither fish

---

[12]     Goldberg is collaterally estopped from relitigating the extent to which Macrophage possessed assets other than the Navidea Sublicense.  *See* n.11, *supra*.

[13]     As the prevailing party on this claim, Goldberg is entitled to recover reasonable attorneys' fees and costs associated with defending against this claim.

nor fowl, neither legal nor equitable." *Diematic Mfg. Corp. v. Packaging Indus., Inc.*, 516 F.2d 975, 978 (2d Cir. 1975) (internal quotation marks and citation omitted).

An "actual controversy" exists if there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No. 22-cv-2943, 2023 WL 3868585, at *14 (S.D.N.Y. June 7, 2023) (citation omitted). The controversy between the parties must "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Jenkins v. United States*, 386 F.3d 415, 418 (2d Cir. 2004) (citation omitted). "Even where an actual controversy has been established, a court must still decide whether it will exercise its discretion to entertain a request for declaratory judgment." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010). Courts retain "broad discretion" to decline jurisdiction under the Declaratory Judgment Act and look to the following factors in guiding their decision whether to do so:

> (1) whether the [declaratory] judgment [sought] will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether [such] a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023) (internal quotation marks and citation omitted).

The Company seeks a declaratory judgment that it is entitled to terminate the August

Agreement and that any outstanding performance on its part is excused due to Goldberg's breach. Alternatively, even if the Court finds that the Company is not entitled to terminate the August Agreement, the Company seeks a declaratory judgment articulating the rights and obligations of the parties moving forward.

Goldberg primarily argues that the Company's declaratory judgment claim cannot survive because the Declaratory Judgment Act does not create substantive rights. Goldberg Mem. of Law at 22 (citing *Hoechst Celanese v. Nat'l Union Ins.Co. of Pittsburgh, Pa.*, 623 A.2d 1133, 1136 (Del. Sup. Ct. 1992)). Because a declaratory judgment claim is a dependent claim, Goldberg contends that because the Court should deny the Company's motion for summary judgment on its underlying substantive claims, the corresponding declaratory judgment claim should also be denied. Goldberg Mem. of Law at 22 (citing *Renco Grp., Inc.*, 2015 WL 394011, at *6 n.70 ("The motion to dismiss Plaintiff's declaratory judgment claims is resolved, here and throughout the balance of this opinion, with the Court's conclusions on the underlying substantive claims.")). Alternatively, Goldberg argues that if the Court denies both parties' summary judgment motions, the Court should reserve ruling on the Company's declaratory judgment claim. *See* Goldberg Opp. at 25 (*citing Kulp v. Mann-Beebe*, No. 06C-01-031, 2006 WL 1149146, *3 (Del. Super. Ct. Mar. 21, 2006) (finding declaratory judgment not appropriate for resolution on summary judgment when factual developments could have an impact on the outcome of the case)).

In this case, the declaratory judgment claim is not duplicative of the Company's breach of contract claim; the Company sought to recover damages allegedly caused by Goldberg's breaches of the August Agreement while the claim for declaratory relief is to prevent future harm that it would experience if it were required to perform its outstanding contractual obligations.

The Company's declaratory judgment claim is, however, not ripe for adjudication given the Court's finding that genuine issues of material fact exist regarding whether either party breached the August Agreement, *see* Part II.A.1., *supra*, and Part II.B.1., *infra*. *See Adchemy, Inc. v. Plateau Data Servs., LLC*, No. N15C-03-096, 2017 WL 3412159, at *6 (Del. Super. Ct. June 28, 2017) (denying declaratory relief where there exists a genuine issue of material fact).

Both parties' motions for summary judgment on the Company's declaratory judgment claim are denied without prejudice. The parties will be afforded the opportunity to re-brief their respective motions after trial.

### B. Goldberg's Motion for Summary Judgment On His Breach of Contract Claims is Denied; the Company's Cross-Motion is Denied in Part and Granted in Part

Goldberg has two counterclaims remaining, both for breach of the August Agreement: a claim against Navidea for its failure to issue him 23.5 million shares of Navidea common stock issued pursuant to Regulation D; and a claim against Macrophage for its failure to issue him Macrophage Super Voting Common Stock. Answer at 35-37. For the following reasons, Goldberg's motion is DENIED, and the Company's cross-motion for summary judgment is DENIED in part and GRANTED in part.

#### 1. Breach of Contract Claim Against Navidea

The August Agreement provides: "[o]n the date of the consummation of the Transactions (such date the "**Closing Date**"), Navidea will issue to Goldberg 23.5 million shares of Navidea common stock (the "**Shares**"), 18.5 million currently, and 5 million on January 2nd, 2019. The Shares will be issued under Regulation D of the Securities Act of 1933." Zimmer Decl. Ex. D. at 1, Dkt. 320. There is no dispute that in November 2018, Navidea issued Goldberg 18.5 million shares of Navidea common stock; 13.5 million shares were delivered to Goldberg and five million shares were placed into escrow. 56.1 Stmt. ¶¶ 64–66, Dkt. 327.

Approximately 17.7 million of the shares were issued under Regulation D; the balance were not. *Id*. ¶¶ 68–69.   Navidea never issued the five million shares that, pursuant to the August Agreement, were supposed to be issued to Goldberg on January 2, 2019.  *Id*. ¶ 72.

Goldberg asserts that he is entitled to summary judgment on his breach of contract claim because it is undisputed that Navidea did not issue him the contractually-agreed upon shares. The Company argues that it is entitled to summary judgment on Goldberg's breach of contract claim because: (i) Navidea's obligation to issue the Navidea shares was never triggered because the "consummation of the Transaction" never occurred; and (ii) Goldberg breached the August Agreement by entering into the Challenged Transactions.  Company Mem. of Law at 7–11.  His breach, Navidea argues, excused it from its obligations under the August Agreement, including its obligation to issue Navidea common shares to Goldberg.  *Id*. at 11.

According to the Company, "consummation of the Transaction" is a condition precedent[14] to Navidea's obligation to issue Goldberg the Navidea shares.  *Id*. at 8.  Although Draft Transaction Documents were sent to Goldberg on September 7, 2018, Transaction Documents were never executed so the Closing Date never occurred.  56.1 Stmt. ¶ 123, Dkt. 327. Because the Closing Date never occurred, the Company argues, Navidea was not required to issue the shares.  Company Mem. of Law at 9 (citing *Oyola v. 21st Century Centennial Ins. Co.*, No. N19C-02-200, 2020 WL 4344553, at *4 (Del. Super. July 28, 2020) (granting insurer summary judgment where insured did not satisfy condition precedent)).

The Company also argues that Goldberg's material breach of the August Agreement excused Navidea from any obligation under the Agreement.  *Id*. at 10.  Specifically, Navidea

---

[14]     A condition precedent is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.*, No. Civ. A. 2248, 2003 WL 21254847, at *5 n.30 (Del. Ch. May 21, 2003) (citing *Black's Law Dictionary* 289 (7th ed. 1999)).

argues that the August Agreement prohibited Goldberg from issuing Macrophage equity to himself without Navidea's consent until Macrophage had received at least $10 million in additional financing following the Closing Date.  Zimmer Decl. Ex. D. at 1, Dkt. 320.  Goldberg allegedly violated that provision when he engaged in the Challenged Transactions, which he did without Navidea's written consent and before Macrophage had obtained the required financing. 56.1 Stmt. ¶ 55, Dkt. 329.

The Court must evaluate both the "Navidea Shares" and "Transaction Documents" clauses to determine whether, as a matter of law, there was a condition precedent to Navidea's obligation to issue shares to Goldberg.  The "Navidea Shares" clause defines the "date of the consummation of the Transaction" as the "Closing Date," but it is unclear from the text whether the parties intended for the occurrence of the Closing Date to be a condition precedent to Navidea's obligation to issue the shares.  Although both parties have reasonable arguments about what the contract means, the Court is left with an ambiguous contract.

As to the obligation to issue shares, on the one hand, as written, the obligation to issue the shares seems tied to the "Closing Date," and the "Closing Date" clearly refers to the date on which the Transaction Documents are executed.  The Transaction Documents, in turn, are not particularly well defined, but it is clear from the plain language that they are something other than the "August Agreement."[15]   On the other hand, the August Agreement expressly provides that "any subsequent failure to execute the Transaction Documents shall not render the provisions of [the August] Agreement invalid."  Zimmer Decl. Ex. D. at 2, Dkt. 320.  Moreover, Navidea issued Goldberg 18.5 million shares in November, even though the Closing Date had

---

[15]     Specifically, Transaction Documents are defined as documents that "contain other terms, conditions, [and] representations . . . customary for tranactions of the type set forth in [the August] Agreement." Zimmer Decl. Ex. D. at 2, Dkt. 320.

not occurred, suggesting that it did not understand the occurrence of the Closing Date to be a condition precedent.  Finally, the August Agreement set a date certain on which the second tranche of shares would be issued to Goldberg, significantly undercutting Navidea's argument that occurrence of the Closing Date was a condition precedent for its obligation to issue any shares.

There is similar ambiguity with respect to Goldberg's obligation *vel non* to execute Transaction Documents.  The provision states that Maslon LLP, counsel to Navidea's Special Committee, "will prepare the initial drafts of the Transaction Documents" and that "[u]pon execution, the terms of such Transaction Documents shall supersede the terms set" in the August Agreement.  Zimmer Decl. Ex. D. at 2, Dkt. 320.  The Company concedes that the August Agreement "may not be perfectly drafted" but insists that the only reasonable interpretation of the provision is that Goldberg was required to execute the Transaction Documents.  Company Opp. at 8.  But that is not the only reasonable interpretation of that provision.  It is entirely possible that the provision contemplated the very negotiations in which the parties engaged, and that, upon reaching agreement on the additional terms, both parties would execute the Transaction Documents.  The parties never reached an agreement, so it is entirely possible that the parties intended, in that eventuality, for the August Agreement to control their respective rights and duties. [16]

In short, as to both Navidea's obligation to issue shares to Goldberg and Goldberg's obligation to execute Transaction Documents, the Agreement is ambiguous, and the intent of the parties is a question of fact.  Accordingly, Goldberg's motion for summary judgment and the

---

[16]     As noted *supra*, the August Agreement itself provides that "any subsequent failure to execute the Transaction Documents shall not render the provisions of [the August] Agreement invalid," further suggesting that the parties did not view the execution of the Transaction Documents as a contractual obligation.

Company's cross-motion for summary judgment as to Goldberg's claim that Navidea breached the August Agreement when it failed to issue him 23.5 million shares of Navidea common stock, are denied.  That issue must be tried.

### 2.  Breach of Contract Claim Against Macrophage

Goldberg also claims that Macrophage breached the August Agreement because it failed to issue Macrophage Super Voting Common Stock to him as required.  *See* Answer at 36–37. The August Agreement provides: "MT will issue to Goldberg shares of MT Super Voting Common Stock in a number equal to 5.0% of the outstanding shares of MT."  Zimmer Decl. Ex. D. at 1, Dkt. 320.  It is undisputed that Macrophage never issued any shares of Super Voting Common Stock to Goldberg.  56.1 Stmt. ¶ 89, Dkt. 327.

Goldberg contends that he is entitled to summary judgment on this breach of contract claim because Macrophage never issued the super voting common stock to him, and there were no conditions precedent to its obligation to do so.  Goldberg Opp. at 13.  Macrophage argues, among other things, that, as a matter of law, Goldberg cannot maintain a breach of contract claim because he himself breached the contract.  Company Mem. of Law at 14.  Specifically, Macrophage argues that Goldberg engaged in a material breach by entering into the Challenged Transactions, and that breach relieves Macrophage of its obligation to issue Goldberg the super voting common stock.  *See id*. at 14.[17]

It is black letter contract law that "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."  *IFM Therapeutics, Inc. v. Lycera Corp.*, No. 17-608, 2018 WL 4223192, at *4 (D. Del. Aug. 31,

---

[17]   Macrophage contends that Goldberg cannot establish that he suffered any damages from the alleged breach, as the Court previously excluded his expert testimony on damages.  Company Opp. at 23–24.  Goldberg argues that the Court's prior *Daubert* opinion does not preclude him from seeking specific performance as a remedy.  Goldberg Opp. at 16–18.  Because Goldberg breached the contract, the Court need not wade into that issue.

2018) (citation omitted).  Moreover, "[a] party is excused from performance under a contract if the other party is in material breach thereof." *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (citation omitted). *See also Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, No. 12201, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017) (citation omitted).  "A 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, No. 10948, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016) (citation omitted).  "The question whether the breach is of sufficient importance to justify nonperformance by the non-breaching party is one of degree." *Id*. (citation omitted).

Delaware courts look to Section 241 of the *Restatement (Second) of Contracts* to determine whether a breach is material.  The Restatement points to these considerations: "the extent to which the injured party will be deprived of the benefit which [it] reasonably expected"; "the extent to which the injured party can be adequately compensated for the part of that benefit of which [it] will be deprived"; "the extent to which the party failing to perform or to offer to perform will suffer forfeiture"; "the likelihood that the party failing to perform or to offer to perform will cure [its] failure, taking account of all the circumstances including any reasonable assurances"; and "the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing." RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981); *2009 Caiola Family Trust v. PWA, LLC*, No. 8028, 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015).

Although Navidea cannot prevail on its breach of the implied covenant of good faith and fair dealing claim on account of its failure to prove damages, there is no question of fact that

Goldberg breached the implied covenant by engaging in the Challenged Transactions.  *See* Part

II.A.2., *supra*.  A claim for breach of the implied covenant is a claim for breach of contract with

the "only difference [being] the source of the provision."  *Cygnus Opportunity Fund, LLC*, 302

A.3d at 457.  Accordingly, Goldberg cannot maintain an action against Macrophage for breach

of contract, when he was the party who breached first.[18]  As a result, Goldberg's motion for

summary judgment against Macrophage is denied, and the Company's cross-motion on that

claim is granted.[19]

## CONCLUSION

Navidea's motion for summary judgment on its breach of contract claim and its breach of

the implied covenant of good faith and fair dealing claim is DENIED, and Goldberg's cross-

motion on those claims is GRANTED.  Goldberg's motion for summary judgment on his breach

of contract claim against Navidea and Navidea's cross-motion on that claim are DENIED.

Goldberg's motion for summary judgment on his breach of contract claim against Macrophage is

DENIED, and Macrophage's cross-motion on that claim is GRANTED.  Both parties' respective

motions on the Company's declaratory judgment claim are DENIED without prejudice.

In light of the denial of summary judgment to both parties on Goldberg's breach of

contract claim against Navidea, the next step is a trial on that claim.  Trial will begin on July 8,

---

[18]     Goldberg argues that the Challenged Transactions cannot excuse Macrophage's performance because,
unlike the Navidea Shares provision, the MT Super Voting Shares clause does not condition Macrophage's
contractual performance on the occurrence of the "Closing Date."  Goldberg Opp. at 15.  As such, Goldberg
contends that Macrophage's performance was due when the August Agreement was executed and not at a
contemplated future date, and that the Challenged Transactions which occurred six months after the execution
cannot serve as a valid excuse for non-performance.  The Court is not persuaded by Goldberg's argument.  *See
Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, No. 5886, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013)
("The party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to
perform.").  The August Agreement does not establish a date by which Macrophage was obligated to issue the
shares, and Goldberg has provided the Court with no evidence that that the parties intended for Macrophage to do so
immediately.

[19]     Because the Company is the prevailing party on this aspect of Goldberg's breach of contract claim, it is
entitled to reasonable attorney's fees and costs incurred in defendant against this claim.

2024.  Motions *in limine* are due May 17, 2024; oppositions are due May 31, 2024.  The parties'

joint pretrial order, requests to charge, and proposed *voir dire* questions are due June 10, 2024.

The final pretrial conference will take place on July 2, 2024 at 2:30 P.M. in Courtroom 443 of

the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007.

      If, at any time, the parties want a settlement conference with Magistrate Judge Figueredo,

who is their newly-assigned Magistrate Judge, they may submit a joint letter requesting a

referral.  The Court will not delay trial for a settlement conference, however, so if this is a

desirable option, the parties should act quickly.

      The Clerk of Court is respectfully directed to close the open motions at docket entries

314 and 318.


**SO ORDERED.**

Date:  **March 25, 2024**　　　　　　　               **VALERIE CAPRONI**
      **New York, NY**　　　　　　　　　       **United States District Judge**